# EXHIBIT A

Issued to: _____

Control No.: _____


NOT AUTHORIZED FOR DISTRIBUTION BY OR TO
ANY PERSON WITHIN THE UNITED STATES
CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM


_____


# SOUNDVIEW ELITE LTD.


(a Cayman Islands exempted Company)


NONVOTING PARTICIPATING
**CLASS D** (ISIN KYG828111032)   AND
**CLASS E** (ISIN KYG828111115)   SHARES


June 1, 2005

*This document is strictly confidential and is supplied only for the personal use of the recipient. It should not under any circumstances be copied or distributed to any person other than the recipient's professional advisors with whom the recipient may consult in connection with evaluating a possible investment in the shares described herein.*

THE SECURITIES DESCRIBED IN THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM HAVE NOT BEEN REGISTERED OR QUALIFIED FOR OFFER OR SALE TO THE PUBLIC UNDER THE SECURITIES LAWS OF ANY COUNTRY OR JURISDICTION. THEY HAVE NOT BEEN FILED WITH OR APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY OF ANY COUNTRY OR JURISDICTION NOR HAS ANY REGULATORY AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE FUND IS A REGULATED MUTUAL FUND FOR THE PURPOSES OF THE MUTUAL FUNDS LAW (2003 REVISION) OF THE CAYMAN ISLANDS. THE FUND IS REGISTERED WITH THE CAYMAN ISLANDS MONETARY AUTHORITY PURSUANT TO SECTION 4(3) OF THAT LAW AND THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM HAS BEEN FILED WITH THE CAYMAN ISLANDS MONETARY AUTHORITY. SUCH REGISTRATION DOES NOT IMPLY THAT THE CAYMAN ISLANDS MONETARY AUTHORITY OR ANY OTHER REGULATORY AUTHORITY IN THE CAYMAN ISLANDS HAS APPROVED THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM OR THE OFFERING OF THE SHARES HEREUNDER.

FOR A SUMMARY OF THE CONTINUING REGULATORY OBLIGATIONS OF THE FUND AND A DESCRIPTION OF THE REGULATORY POWERS OF THE CAYMAN ISLANDS MONETARY AUTHORITY SEE THE "GENERAL INFORMATION") SECTION OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM.

The Directors of Soundview Elite Ltd. (the "Fund") accept responsibility for the accuracy of the information contained in this document as of the date of publication of this Confidential Private Placement Memorandum (the "Memorandum"). To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

This Memorandum has been prepared in connection with the private offering and sale of Shares (as defined herein) of SOUNDVIEW ELITE LTD., a Cayman Islands exempted company (the "Fund"), to a limited number of persons and may not be reproduced. The Fund advises each prospective investor to read this Memorandum in its entirety, and to consult the prospective investor's investment, tax, accounting and legal advisors with respect to an investment in the Fund. Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice.

In this Memorandum, unless stated otherwise, all references to "dollars," "$" and "cents" are to the lawful currency of the United States, and all references to "euros" and "€" are to the single European currency endorsed by the European Union.

The Fund's nonvoting, participating Class D shares, par value U.S.$0.01 per share (the "Class D Shares"), and nonvoting, participating Class E shares, par value €0.01 per share (the "Class E Shares" and, collectively with the Class D Shares, the "Shares") available for purchase by prospective investors are offered on the basis of the information and representations contained in this Memorandum.

PROSPECTIVE INVESTORS SHOULD NOT CONSIDER ANY FURTHER INFORMATION GIVEN OR REPRESENTATIONS MADE BY ANY PERSON AS HAVING BEEN AUTHORIZED BY THE FUND AND SHOULD NOT RELY UPON SUCH INFORMATION OR REPRESENTATIONS.

The Fund's portfolio is subject to normal market fluctuations as well as the risk inherent in the investment instruments described below under "Investment Strategy and Policy" and "Risk Factors" and there can be no assurance that appreciation of the assets of the Fund will occur or that losses will not be realized. Consequently, the value of Shares of the Fund may be subject to volatile movements and may fall as well as rise. Investment in Shares should be considered speculative and therefore, investment in shares should be considered as suitable only for sophisticated investors.

PURSUANT TO SECTION 25(3) OF THE COMPANIES LAW (2004 REVISION) OF THE CAYMAN ISLANDS, EVERY INVESTOR SHALL BE BOUND BY THE PROVISIONS OF THE ARTICLES OF ASSOCIATION OF THE FUND AS IF SUCH INVESTOR HAD SUBSCRIBED HIS NAME AND AFFIXED HIS SEAL THERETO AND AS IF THERE WERE CONTAINED IN THE ARTICLES ON THE PART OF THE INVESTOR A COVENANT TO OBSERVE THE PROVISIONS OF THE ARTICLES.

## RISK WARNINGS

INVESTMENT IN THE FUND IS SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS WHICH SHOULD BE CAREFULLY CONSIDERED. THERE IS NO ASSURANCE THAT THE INVESTMENT APPROACH OF THE FUND WILL BE SUCCESSFUL OR THAT IT WILL ACHIEVE ITS INVESTMENT OBJECTIVES. ACCORDINGLY THE VALUE OF SHARES IN THE FUND MAY GO DOWN AS WELL AS UP AND INVESTORS MAY NOT REALIZE THE AMOUNT INITIALLY INVESTED. FURTHER, PAST PERFORMANCE IS NOT NECESSARILY A GUIDE FOR FUTURE PERFORMANCE

## IMPORTANT

IF YOU ARE IN ANY DOUBT ABOUT THE CONTENTS OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, YOU SHOULD CONSULT YOUR STOCKBROKER, COUNSEL AND ATTORNEY, ACCOUNTANT OR OTHER FINANCIAL ADVISER.

### Restrictions on the Circulation and Distribution of this Memorandum

The circulation and distribution of this Memorandum in certain countries is restricted by law. In particular, this Memorandum may not be circulated or distributed in the United States. For purposes of this Memorandum, the term "U.S." or "United States" means and includes the United

States of America, its territories and possessions, any State of the United States, and the District of Columbia. Persons into whose possession this Memorandum may come are required to inform themselves of and to observe any such restrictions of any relevant country or other jurisdiction.

This Information Memorandum is intended solely for the person to whom it has been delivered by the Fund for the purpose of evaluating a possible investment by the recipient in the shares described herein, and it has not to be reproduced or distributed to any other persons (other than professional advisers of the prospective investor receiving this document from the fund).

Prospective investors should not construe the contents of this Information Memorandum as legal, tax or financial advice. Each prospective investor should consult his own professional advisers as to (a) legal requirements within the country of residence for the purchase, holding or disposal of shares, (b) any foreign exchange restrictions that may be relevant to him and the income and other tax consequences that may be relevant to the purchase, holding or disposal of Shares of the Fund.

THIS MEMORANDUM SUPERCEDES ALL PRIOR INFORMATION WITH RESPECT TO THE SHARES OFFERED HEREBY. NO PERSON HAS BEEN AUTHORISED TO MAKE REPRESENTATIONS CONCERNING THE COMPANY THAT ARE INCONSISTENT WITH THOSE CONTAINED IN THIS MEMORANDUM. PROSPECTIVE INVESTORS SHOULD NOT RELY ON ANY INFORMATION NOT CONTAINED IN THIS MEMORANDUM OR THE EXHIBITS HERETO. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE OF THIS MEMORANDUM.

THE FUND IS A REGULATED MUTUAL FUND FOR THE PURPOSES OF THE MUTUAL FUNDS LAW (2003 REVISION) OF THE CAYMAN ISLANDS. THE FUND IS REGISTERED WITH THE CAYMAN ISLANDS MONETARY AUTHORITY PURSUANT TO SECTION 4(3) OF THAT LAW AND THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM HAS BEEN FILED WITH THE CAYMAN ISLANDS MONETARY AUTHORITY. SUCH REGISTRATION DOES NOT IMPLY THAT THE CAYMAN ISLANDS MONETARY AUTHORITY OR ANY OTHER REGULATORY AUTHORITY IN THE CAYMAN ISLANDS HAS APPROVED THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM OR THE OFFERING OF THE SHARES HEREUNDER.

FOR A SUMMARY OF THE CONTINUING REGULATORY OBLIGATIONS OF THE FUND AND A DESCRIPTION OF THE REGULATORY POWERS OF THE CAYMAN ISLANDS MONETARY AUTHORITY SEE THE "GENERAL INFORMATION") SECTION OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM.

**Restrictions on the Offer, Sale and Transfer of the Shares**

The Shares have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "U.S. Securities Act"), or under the securities laws of any State of the United States, and the Fund is not registered as an investment company under the U.S. Investment Company Act of 1940, as amended (the "U.S. Investment Company Act"). Accordingly, Shares may not be directly or indirectly offered, sold or transferred in the United States or to or for the benefit of any U.S. Person (as hereinafter defined). Any reoffer or resale of any Shares in the United States or to one or more U.S. Persons may constitute a violation of U.S. law. Shares also may not be offered or sold to members of the public resident in the Cayman Islands (which does not include an exempted or ordinary non-resident company in the Cayman Islands).. No application presently has been made for the Shares to be listed on any stock exchange and it is not anticipated that any such application will be made.

This Memorandum does not constitute an offer to or a solicitation of any person in any jurisdiction in which such offer or solicitation is not authorized or to any person to whom it is unlawful to make such offer or solicitation. It is the responsibility of each prospective investor to

verify that the purchase of Shares by it is in compliance with all relevant laws of its jurisdiction of residence and any other jurisdiction relevant to it.

The Shares do not represent interests in, or obligations of, the Investment Manager or any affiliate thereof. The Shares are not insured or guaranteed by any governmental agency nor has any governmental agency passed upon or verified the accuracy of the information contained in this Memorandum.

## Requests for Additional Information

Additional copies of this Memorandum and of the Exhibits attached hereto may be obtained by contacting the Fund's Subadministrator, Citco Fund Services (Europe) B.V., Telestone 8 – Teleport - Naritaweg 165 -- P.O. Box 7241 -1007 JE- Amsterdam, The Netherlands --- Telephone (+31-20) 57.22.100, Facsimile (+31-20) 57.22.610. Representatives of the Fund are available to answer questions concerning the terms and conditions of the offering of Shares and to furnish any additional information necessary to enable an offeree to evaluate the merits and risks of a purchase of Shares to the extent that they possess or can acquire the information without unreasonable effort or expense.

# TABLE OF CONTENTS

PAGE

DIRECTORY ............................................................................................................... 1

INTRODUCTION ...................................................................................................... 3

THE OFFERING ........................................................................................................ 5

INVESTMENT STRATEGY ..................................................................................... 7

CALL OPTIONS ........................................................................................................ 10

MANAGEMENT AND ADMINISTRATION ......................................................... 13

FEES AND EXPENSES ............................................................................................. 16

RISK FACTORS ........................................................................................................ 18

CONFLICTS OF INTEREST.................................................................................... 24

TAXATION ................................................................................................................. 25

SUBSCRIPTIONS...................................................................................................... 28

REDEMPTIONS AND TRANSFERS OF SHARES............................................... 30

GENERAL INFORMATION.................................................................................... 32

EXHIBIT A – SUBSCRIPTION AGREEMENT
EXHIBIT B – FORM OF REQUEST FOR REDEMPTION

**SOUNDVIEW ELITE LTD.**

**DIRECTORY**

Registered Office:

**SOUNDVIEW ELITE LTD.**
c/o **CITCO FUND SERVICES (CAYMAN ISLANDS) LTD.**
Windward I, 2nd Floor,
Regatta Office Park, West Bay Road
P.O. Box 31106SMB
Grand Cayman, Cayman Islands

Investment Manager:

**SOUNDVIEW CAPITAL MANAGEMENT LTD.**
One Montague Place
1st Floor, East Bay Street
P.O. Box N-4906
Nassau, Bahamas

Administrator:

**CITCO FUND SERVICES (CAYMAN ISLANDS) LTD.**
Windward I, 2nd Floor,
Regatta Office Park, West Bay Road
P.O. Box 31106SMB
Grand Cayman, Cayman Islands

Sub Administrator:

**CITCO FUND SERVICES (EUROPE) B.V.**
Teleport 8 -- Telestone
Naritaweg 165
PO Box 7241
1007 JE -Amsterdam, The Netherlands

Middle-Office Service Provider:

**RICHCOURT CAPITAL MANAGEMENT INC.**
Citco Building -- Wickhams Cay
P.O. Box 662 -- Road Town, Tortola
British Virgin Islands

Directors:

**CFS COMPANY LTD.**
Windward I, 2nd Floor,
Regatta Office Park, West Bay
Road
P.O. Box 31106SMB
Grand Cayman, Cayman
Islands

**CFS CORPORATION LTD.**
Windward I, 2nd Floor,
Regatta Office Park, West Bay
Road
P.O. Box 31106SMB
Grand Cayman, Cayman
Islands

Bank:

**CITCO BANKING CORPORATION N.V.**
Schottegatweg Oost 44
Willemstad, Curaçao
Netherlands Antilles

Custodian:                  **CITCO GLOBAL CUSTODY (NA) N.V.**
Schottegatweg Oost 44
Willemstad, Curaçao
Netherlands Antilles

Auditors:                 **KPMG Financial Services**
Burg. Rijnderslaan 10-20
1185 MC Amstelveen
The Netherlands

**KPMG (Cayman)**
P.O. BOX 493GT
Century Yard, Cricket Square
George Town
Grand Cayman
Cayman Islands

# INTRODUCTION

Soundview Elite Ltd. (the "Fund") was initially incorporated as an international business company in the Commonwealth of The Bahamas in October 2003 and was transferred by way of continuation to the Cayman Islands in June 2005. Accordingly, the Fund is now an exempted company registered in the Cayman Islands under the provisions of the Companies Law (2004 Revision) (the "Law"). The Fund commenced investment activities pursuant to its investment strategy on November 01, 2003. The Fund is registered with the Cayman Islands Monetary Authority pursuant to section 4 (3) of the Mutual Funds Law (2003 Revision) of the Cayman Islands (the "Mutual Funds Law").

The Fund's registered office is at Windward I, 2nd Floor, Regatta Office Park, West Bay Road, P.O. Box 31106 SMB, Grand Cayman, Cayman Islands.

CFS Company Ltd & CFS Corporation Ltd are the directors of the Fund (the "Directors").

The Fund's investment manager is Soundview Capital Management Ltd., an international business company incorporated in the Commonwealth of The Bahamas in 1999 and governed by the International Business Companies Act, 2000 (the "IBC Act") (the "Investment Manager").

The Fund operates subject to its Memorandum of Association and Articles of Association (collectively, the "Articles of Association") and the laws of the Cayman Islands. See "GENERAL INFORMATION." Certain actual and potential conflicts of interest exist in the structure and operations of the Fund. See "CONFLICTS OF INTEREST."

## Investment Objective and Dividend Policy

The Fund's investment objective is to give investors access to the hedge fund industry by investing in a group of money managers. In an attempt to provide superior risk-adjusted performance, the Investment Manager will allocate the Fund's assets among a group of money managers selected by the Investment Manager (the "Money Managers") that, taken together, results in the Fund's assets being traded pursuant to a wide variety of the trading strategies available in the hedge fund industry from time to time.

Shareholders may also benefit from an allocation of assets to a money manager who at the time the shareholders enter the fund is not accepting additional assets. The Investment Manager will attempt to allocate the Fund's assets to those money managers that the Investment Manager believes have displayed superior performance in delivering risk adjusted returns. Many of the managers who may be retained by the Fund may employ leverage as a part of their overall investment strategy, as well as engage in the short sale of securities.

Types of strategies that Money Managers may utilize include, without limitation, the following types of strategies: global macroeconomic strategies; convertible arbitrage; risk arbitrage; fixed-income arbitrage; index arbitrage; intra-capitalization arbitrage; statistical arbitrage; volatility arbitrage; systematic trading; pairs trading; options trading; long/short equity; long-only equity; global fixed-income; managed futures; and distressed securities investing. Money Managers may employ other types of strategies as well. The Fund generally will participate in the performance of each Money Manager's flagship investment vehicle (each a "Trading Vehicle").

The Investment Manager currently does not invest the Fund's assets directly in Trading Vehicles. Instead, the Fund's investment objective currently is being pursued through one or more derivative transactions structured as European-style call options ("Call Options") with a European bank that has a market capitalization in excess of $48 billion and whose senior unsecured long-term debt is rated AA, Aa2 and AA by Fitch Ratings, Moody's and Standard & Poor's, respectively (the "Call Issuer"). Call Options are illiquid investments that simulate leveraged investments in shares of Trading Vehicles selected by the Investment Manager from time to time (the "Reference Shares"). In the future, Call Options may be linked to the performance of affiliates of the Fund if agreed with the Call Issuer, and the Investment Manager, in its sole discretion, may determine to invest the Fund's

assets in derivative transactions with counterparties other than the Call Issuer or, either on a leveraged or unleveraged basis, directly in Trading Vehicles. See "INVESTMENT STRATEGY" and "CALL OPTIONS."

It is expected that Call Options and interests in Trading Vehicles generally will be denominated in dollars.

Investment in the Fund should be considered speculative and involves certain risks, including the fact that there can be no assurance that the Fund will achieve its investment objective or that any of them will not experience losses from its investment activities. See "RISK FACTORS."

The Fund is not precluded from paying dividends on the Shares, but it is anticipated that it will reinvest earnings rather than pay dividends to shareholders.

## Classes of Shares

The Fund may issue Shares in separate classes with each such class bearing such designations, powers, preferences, rights, qualifications, limitations and restrictions as the Directors, in their sole discretion, shall determine upon the issuance of such class. Pursuant to this Memorandum, the Fund is offering two separate classes of Shares for purchase by eligible investors – Class D (dollar) and Class E (euro) (referred to collectively herein as the "Classes"). The Investment Manager will seek to hedge the dollar currency risk (i.e., the risk of fluctuations in the exchange rate between the euro and the dollar) for Class E Shares. Subscription amounts for Class D Shares must be paid in dollars. Subscription amounts for Shares of Class E must be paid in euros. Eligible investors may purchase Shares of one or both Classes.

Each Class will participate in the profits and losses resulting both from the Fund's investments in Call Options and from any other investments that the Fund may make in the future.

# THE OFFERING

The Fund is offering up to 2,499,900 Class D Shares and up to 2,500,000 Class E Shares by this Memorandum for purchase by eligible investors. The Fund reserves the right to increase the number of Shares of each Class offered.

Shares of each Class will be offered as of the first Business Day of each calendar month at the then current Net Asset Value per Share (as hereinafter defined) of such Class. See "SUBSCRIPTIONS" for information regarding how to subscribe for Shares. The minimum subscription for Class D Shares is $50,000 in Shares, and the minimum subscription for Class E Shares is €50,000 in Shares. The allotment of Shares upon a subscription ordinarily will be based on estimated values provided by the Fund's Subadministrator and will be subject to possible subsequent adjustment after the Fund has reported its official value. See "GENERAL INFORMATION - Net Asset Value."

Shares will be subject to the payment of a load fee to the Investment Manager in a minimum amount of 1% of the total subscription up to 5%. Such load fee will be deducted from the subscription proceeds and paid to the Investment Manager by the Fund. In the sole discretion of the Investment Manager, such load fees may be waived.

The Fund may use the services of placement agents it selects ("Placement Agents") in offering Shares. Affiliates of the Directors and the Investment Manager may act as Placement Agents from time to time. Shares purchased through Placement Agents may be subject to the payment of either an up-front placement fee charged as a percentage of the purchase price of the Shares or a redemption fee charged as a percentage of the Net Asset Value of the Shares upon redemption. Placement Agents also may receive a portion of the management fees and incentive fees paid to the Investment Manager by the Fund.

## No Offer, Sale or Transfer of Shares to U.S. Persons

The Shares may not be directly or indirectly offered, sold or transferred in the United States or to or for the benefit of any U.S. Person. "U.S. Person" means: (a) any natural person resident in the United States, including any U.S. resident who is temporarily outside the United States; (b) any corporation, partnership, limited liability company or other entity organized or incorporated under the laws of the United States; (c) any estate of which any executor or administrator is a U.S. Person; (d) any trust of which any trustee is a U.S. Person; (e) any agency or branch of a foreign entity located in the United States; (f) any nondiscretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. Person; (g) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident, in the United States; and (h) any corporation, partnership, limited liability company or other entity if (1) organized or incorporated under the laws of any non-U.S. jurisdiction and (2) formed by a U.S. Person principally for the purpose of investing in securities not registered under the U.S. Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) promulgated under the U.S. Securities Act) which are not natural persons, estates or trusts.

The following persons do not constitute "U.S. Persons" for purposes of this Memorandum: (a) any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. Person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident, in the United States; (b) any estate of which any professional fiduciary acting as executor or administrator is a U.S. Person if (1) an executor or administrator of the estate which is not a U.S. Person has sole or shared investment discretion with respect to the assets of the estate and (2) the estate is governed by non-U.S. law; (c) any trust of which any professional fiduciary acting as trustee is a U.S. Person shall not be deemed a U.S. Person if a trustee who is not a U.S. Person has sole or shared investment discretion with respect to the trust assets, and no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. Person; (d) an employee benefit plan established and administered in accordance with the laws of a country other than the United States and customary

practices and documentation of such country; (e) any agency or branch of a U.S. Person located outside the United States if (1) the agency or branch operates for valid business reasons and (2) the agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located; and (f) the International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations, and their agencies, affiliates and pension plans, and any other similar international organizations, their agencies, affiliates and pension plans.

**Investor Suitability**

The Shares are suitable for purchase only by sophisticated high net-worth investors for which an investment in the Fund would not constitute a complete investment program, which fully understand, are willing to assume and have the financial resources necessary to withstand the risks involved in the Fund's speculative investment strategy, and which are able to bear the potential loss of their entire investment. Prospective investors should maintain investment holdings with risk characteristics different than the Fund's portfolio. Each prospective investor is urged to consult with its own professional advisors to determine the suitability of an investment in the Fund and the relationship of such an investment to the prospective investor's overall investment program and financial and tax position.

# INVESTMENT STRATEGY

## The Investment Manager

Soundview Capital Management Ltd., a Bahamian limited liability company, has been retained as the Fund's investment manager (the "Investment Manager") pursuant to the Investment Management Agreement (as hereinafter defined), which renews automatically on an annual basis unless terminated by either party upon written notice to the other party at least 90 days prior to the end of the then current term.

The Investment Manager is an indirect subsidiary of Richcourt Inc., a British Virgin Islands Company. The investment manager owns all the voting shares of the Fund. See "CONFLICTS OF INTEREST." The Investment Manager's principal office is at One Montague Place, 1st Floor, East Bay Street, P.O. Box N-4906, Nassau, Bahamas. The Investment Management Agreement provides that the Investment Manager may delegate its functions, powers, discretions, privileges and duties as it deems appropriate.

Biographical information regarding the Directors of the Investment Manager are:

**Ermanno Unternährer,** *President of the Investment Committee* of Richcourt Fund Advisors and an Executive Director of The CITCO Group Limited. He is also Director of the Financial Services Division of Citco. Mr. Unternährer joined Citco in 1991 as Managing Director of Citco Financial Services in Lausanne, and launched the first Richcourt Fund of Funds in 1992. He then moved to the U.S. to establish the first broker-dealer of Citco (Citco Securities), and in 1996, Citco Fund Advisors (now renamed into Richcourt Fund Advisors), the Investment Advisor of the Richcourt Funds. Mr. Unternährer started his career at First Boston Corp. in Geneva in 1986, before joining Lehman Brothers in Lugano in 1990. He graduated from the University of Lausanne (H.E.C.) in Economics in 1982 and obtained a Master Degree in Economics from the University of Lausanne in 1984.

**Enrico Laddaga,** *Director of Soundview Capital Management and of the Richcourt Funds;* Enrico devotes a significant portion of his time to the business development of the family of funds offered by the Richcourt Group. From August 2002 to August 2004 he was a Director of Richcourt Capital Management Inc. Prior to that, Mr. Laddaga has been a Client Relationship Manager for certain subsidiaries of The Citco Group since October 1999, when he joined The Citco Group. From 1996 to 1998, Mr. Laddaga worked as an associate in the Private Banking and the International Financial Planning divisions of J.P. Morgan in New York. From 1994 to 1996, Mr. Laddaga was with the Euroclear Operations Center of J.P. Morgan in Brussels, employed as a Professional in the Management Information Planning and Analysis Division. Mr. Laddaga received a Master Degree in Finance from the University of Turin in Italy in 1999. He also received a Bachelor of Science degree from the European Business School in Brussels in 1994.

**Yves Bloch,** *Financial Officer of Richcourt Group*, joint venture related to Citco's hedge funds business between Hamilton Lane LLC and Citco Group Ltd. since December 2004. Prior to that, he has been Financial Officer of the Financial Division of the Citco Group, since April 2000. Between May 1997 and April 2000, Mr. Bloch set up Citco Finance S.A. in Geneva, Switzerland, a company providing wealth management services to High Net Worth Individuals; at the same time, he was Financial Officer of the Financial Services division of the Citco Group, composed of several companies acting in various sectors (brokerage, portfolio management and advisory). Between April 1995 and April 1997 he worked as Internal and Mutual Fund Accountant at Citco Fund Services (CI) Ltd. in the Cayman Islands. Mr. Bloch joined Citco in April 1991 as Accountant of Citco (Suisse) S.A., in Lausanne, Switzerland, a company active in the Trust business.

## Investment Strategy

As noted earlier, the investment objective of the Fund is to achieve capital appreciation by investing a substantial portion of its assets among a diversified group of Money Managers selected by

the Investment Manager that, taken together, results in the Fund's assets being traded pursuant to a wide variety of the trading strategies available in the hedge fund industry from time to time. The Investment Manager currently does not invest the Fund's assets directly in the Money Managers' respective Trading Vehicles. Instead, the Fund's investment objective currently is being pursued through Call Options, which are illiquid investments that simulate leveraged investments in Reference Shares.

There can be no assurance that the investment objective of the Fund will be achieved. The Fund is not precluded from paying dividends on the Shares, but it is anticipated that it will reinvest earnings rather than pay dividends to shareholders.

Examples of types of strategies that Money Managers may utilize include, without limitation, the following:

- global macroeconomic strategies
- convertible arbitrage
- risk arbitrage
- fixed-income arbitrage
- index arbitrage
- intra-capitalization arbitrage
- statistical arbitrage
- volatility arbitrage
- systematic trading
- pairs trading
- options trading
- long/short equity
- long-only equity
- global fixed-income
- managed futures
- distressed securities investing

The Investment Manager continuously screens the money management industry in an attempt to select promising up and coming money managers. Each Money Manager selected will have, in the opinion of the Investment Manager, a unique approach to trading. Generally, in allocating the Fund's assets among Money Managers from time to time, the Investment Manager will attempt to obtain the highest expected return for the amount of risk deemed appropriate by the Investment Manager at the time of allocation. Shareholders may also benefit from an allocation of assets to a money manager who at the time the shareholders enters the fund is not accepting additional assets

The past performance of a Money Manager is not necessarily indicative of the Money Manager's future results.

In seeking to achieve the Fund's investment objective, the Investment Manager will attempt to maintain the Fund's investments among Money Managers with a view toward maximizing the risk/reward potential of the Fund's portfolio. The Money Managers selected may be changed by the Investment Manager at any time in its sole discretion, and additional Money Managers may be selected as the Investment Manager deems appropriate.

The Investment Manager currently does not invest the Fund's assets directly in Trading Vehicles. Instead, the Fund's investment objective currently is being pursued through one or more Call Options. Call Options are illiquid investments that simulate leveraged investments in Reference

Shares.  In the future, Call Options may be linked to the performance of affiliates of the Fund if agreed with the Call Issuer, and the Investment Manager, in its sole discretion, may determine to invest the Fund's assets in derivative transactions with counterparties other than the Call Issuer or, either on a leveraged or unleveraged basis, directly in Trading Vehicles. See "CALL OPTIONS."

**Leveraged Investments**

The Investment Manager has complete discretion to invest and reinvest the assets of the Fund, to cause the Fund to borrow money to leverage such investments and reinvestments and to cause the Fund to enter into Call Options and other derivative transactions.  Call Options provide the Fund with a form of leverage that is an alternative to borrowing to finance investment activities.  In the future, the Fund also may leverage any direct investments that it may make in Trading Vehicles, and may obtain bridge financing on a secured or unsecured basis from time to time, e.g., to invest amounts equal to sums that the Fund expects to receive with respect to pending redemption payments due from Trading Vehicles.  Money Managers may utilize leveraging techniques in trading securities.

**Hedging**

It is expected that Call Options and interests in Trading Vehicles generally will be denominated in dollars.

The Investment Manager will seek to hedge the dollar currency risk (i.e., the risk of fluctuations in the exchange rate between the euro and the dollar) for Class E Shares.

# CALL OPTIONS

The Fund's investment strategy currently is implemented through Call Options, which simulate leveraged investments in the Reference Shares. Effective as of May 31, 2005 (the "Effective Date"), the Fund entered into a Call Option with the Call Issuer. Such Call Option (the "2005 Call Option") is scheduled to terminate on May 31, 2008 (the "Scheduled Expiration Date"). The Fund may agree to amend the 2005 Call Option in the future, and may enter into other Call Options from time to time, on terms similar to or different from the terms of the 2005 Call Option. The terms of the 2005 Call Option as of the date of this Memorandum are described below.

## Principal Terms of the 2005 Call Option

The Fund entered into a Confirmation for a Resetable Strike Equity Option Transaction linked to a Basket dated as of the Effective Date (the "Confirmation"), which, among other things, incorporates by reference the terms and provisions of the 1992 ISDA Master Agreement (Multicurrency-Cross Border). The Confirmation sets forth the initial terms of the 2005 Call Option. The following summary of principal terms is qualified in its entirety by the provisions of the Confirmation, a copy of which may be inspected free of charge, upon reasonable notice, during normal business hours on any weekday (public holidays excepted) at the registered office of the Fund.

The Fund effectively purchased the 2005 Call Option by payment in kind of interests in Trading Vehicles (the "Premium") as of the Effective Date. The Call Issuer will be obligated to pay to the Fund the Settlement Amount, if greater than zero, following the Scheduled Expiration Date, subject to certain early termination provisions described hereinafter. The "Settlement Amount" will mean the greater of (a) the excess, if any, of (x) the Basket Value (as defined below) applicable at the time of settlement over (y) the Strike Price (as defined below) as of the Scheduled Expiration Date, and (b) zero.

"Basket Value" means an amount equal to the aggregate net asset value of the Reference Shares, as calculated by an affiliate of the Call Issuer (the "Calculation Agent") from time to time. The Investment Manager manages the simulated portfolio of Reference Shares by selecting Money Managers, monitoring their trading activities, allocating and reallocating assets among them, terminating Money Managers and selecting additional or replacement Money Managers from time to time, subject to the Call Issuer's consent to changes in the composition of the portfolio.

The initial "Strike Price" is a number reflecting the amount of simulated leverage represented by the Call Option on the Effective Date. The Strike Price will accrete and compound on a daily basis at a rate equal to the overnight deposit rate for Eurodollars plus a spread of 1.35% per annum (such sum, the "Accretion Rate"). In addition, all fees, costs and expenses which a beneficial owner of the Reference Shares would have paid, incurred or otherwise borne in connection with the Reference Shares will (without duplication) be added to the Strike Price, other than such fees, costs and expenses that would have reduced the Basket Value.

Subject to certain conditions and restrictions and provided that the minimum Strike Price will be $25,000,000 and the maximum Strike Price will be $60,000,000 (the "Maximum Strike Price"), the Fund may make certain adjustments during the term of the 2005 Call Option, e.g., by (a) increasing the number of Reference Shares by making a payment to the Call Issuer or by making an upward adjustment to the Strike Price, (b) decreasing the number of Reference Shares in exchange for a payment from the Call Issuer or by making a downward adjustment to the Strike Price or (c) increasing the Strike Price by requiring that the Call Issuer pay the Fund an amount equal to such increase.

With certain exceptions, the Settlement Amount, if greater than zero, generally will be payable on approximately the same schedule as a hypothetical investor holding Reference Shares would receive redemption proceeds from the relevant Trading Vehicles if they had properly tendered notice of redemption effective as of the Scheduled Expiration Date. The Call Issuer's obligation to pay the Settlement Amount is unsecured. As of the date of this Memorandum, the senior unsecured long-term debt of the Call Issuer is rated AA, Aa2 and AA by Fitch Ratings, Moody's and Standard &

Poor's, respectively. The Call Issuer may transfer the 2005 Call Option to any branch of the Call Issuer or to any direct or indirect subsidiary of the Call Issuer whose obligations under the 2005 Call Option will be guaranteed by the Call Issuer so long as the Fund in its reasonable opinion will not be adversely affected by such transfer.

The ratio of the Strike Price to the Basket Value (the "Strike Ratio") will not be permitted to exceed an applicable maximum from time to time (the "Maximum Strike Ratio"). The Maximum Strike Ratio will mean the lesser of (a) 50%, subject to reduction by the Calculation Agent in its sole discretion if the "Volatility" of the Reference Shares (generally defined as the annualized standard deviation of the monthly returns of the portfolio of Trading Vehicles in which the Fund invests from time to time) exceeds 15%, and (b) the ratio of (x) the "Eligible Basket Value" (defined as the value of the Reference Shares from time to time, as determined by the Calculation Agent, as reduced by any haircuts to the value thereof which may be applicable under the terms of the Confirmation), to (y) the Basket Value. In determining the Eligible Basket Value, the Calculation Agent will exclude the pro rata interests of the Reference Shares in all Trading Vehicles that do not qualify as "Eligible Basket Components" under various criteria set forth in the Confirmation.

In addition, both the Call Issuer and, subject to certain conditions, the Fund have an option to elect physical settlement. In the case of such an election by the Call Issuer, the Call Issuer would deliver Reference Shares having an aggregate net asset value equal to the Settlement Amount (less any previous payments toward the Settlement Amount). In the case of such an election by the Fund, the Fund would pay to the Call Issuer an amount equal to the Strike Price as of the Expiration Date in exchange for all of the Reference Shares. The Fund's assets generally are substantially invested in Call Options and accordingly it is expected that the Fund would not have sufficient working capital to make such a payment and would have to obtain financing in connection therewith.

Under certain circumstances, the 2005 Call Option may be terminated by the Fund or by the Call Issuer, and the Settlement Amount, if greater than zero, will be paid prior to the Scheduled Expiration Date, subject, in certain cases, to the payment by the terminating party of a fee (an "Early Termination Fee") equal to the Maximum Strike Price multiplied by 0.50% multiplied by the fractional number of years remaining to the Scheduled Expiration Date.

In the case of a Termination Event, Additional Termination Event or Knock-Out Event (as those terms are defined in the 2005 Confirmation), the Call Issuer may terminate the 2005 Call Option prior to the Scheduled Expiration Date without payment of an Early Termination Fee. In the event of such an early termination, the Call Issuer would be required to pay the Settlement Amount, if greater than zero, to the Fund following such termination. A "Knock-out Event" will occur upon notice from the Call Issuer to the Fund if the Strike Price Ratio at any time exceeds the Maximum Strike Price Ratio unless the Fund effects an adjustment to the 2005 Call Option that reduces the Strike Price Ratio to 97% or less of the Maximum Strike Price Ratio within two business days.

## Disclaimer by the Call Issuer

The Call Issuer is not participating in the offering of Shares and accordingly is not responsible for this Memorandum. The 2005 Call Option is, and any future Call Option will be, purchased by the Fund rather than by its shareholders, and accordingly no holder of Shares will have any direct claim or right against the Call Issuer under or in respect of any Call Option. The Call Issuer will negotiate each Call Option as principal for and on its own behalf. The Call Issuer will not act as fiduciary or in any other capacity for or on behalf of the Fund. The Call Issuer has not provided, and will not provide, the Fund with any tax, financial or investment advice regarding a Call Option or otherwise. The Call Issuer may provide to the Fund or the Investment Manager certain information with respect to the Fund's portfolio, but such information is not intended as, and cannot be relied upon by the Fund as, investment advice.

## Additional Derivative Transactions

The Fund may enter into further amendments to the 2005 Call Option or into other Call Options from time to time, on terms similar to or different from the terms of the 2005 Call Option. In addition, the Investment Manager, in its sole discretion, may determine to invest the Fund's assets in

derivative transactions with counterparties other than the Call Issuer or, either on a leveraged or unleveraged basis, directly in Trading Vehicles.

# MANAGEMENT AND ADMINISTRATION

**Directors**

The Directors of the Fund are CFS Company Ltd. and CFS Corporation Ltd.

**CFS Company Ltd** – a Cayman Islands Exempt Company incorporated under the laws of the Cayman Islands.

**CFS Corporation Ltd** - a Cayman Islands Exempt Company incorporated under the laws of the Cayman Islands.

The Directors are elected by the holder of the Voting Shares (as hereinafter defined) to serve for indefinite terms. They are responsible for managing the business and affairs of the Fund, including supervision of the activities of the Administrator, Subadministrator and Middle-Office Service Provider and the maintenance of corporate records. The Directors establish and maintain the Fund's bank, custodial and other accounts and may exercise the power of the Fund under its Articles of Association to borrow and lend money. The Directors are affiliates of the Administrator, the Subadministrator, the Bank (as hereinafter defined) and the Custodian (as hereinafter defined). They are also affiliated with The Citco Group which is a minority shareholder of the Investment Manager and the Middle Office Service Provider –See "CONFLICTS OF INTEREST."

**Administrator**

Citco Fund Services (Cayman Islands) Ltd. serves as the Fund's administrator (the "Administrator") subject to the terms and conditions of the Administrative Services Agreement (as hereinafter defined), which may be terminated by either party upon at least 90 days prior written notice to the other party.

The Administrator has its principal offices at Windward I, 2nd Floor, Regatta Office Park, West Bay Road, P.O. Box 31106 SMB, Grand Cayman, Cayman Islands ,telephone +1 (345) 949-3977, facsimile +1 (345) 949-3877. The Administrator has responsibility for the day-to-day administrative operations of the Fund, which include, among other things, the following activities:

- communicating with the Fund's shareholders;

- acting as the registrar and transfer agent with respect to Shares;

- processing subscriptions for Shares and redemptions of Shares;

- preparing and maintaining the Fund's financial and accounting records and statements;

- determining the Net Asset Value of the Fund (as hereinafter defined), the Net Asset Value of each Class (as hereinafter defined) and the Net Asset Value per Share of each Class (as hereinafter defined);

- preparing financial statements and periodic reports to shareholders; and

- disbursing payments of fees and expenses.

The Administrator provides accounting, corporate and shareholder services to investment funds. The Administrator is a subsidiary of The Citco Group. From time to time, the Administrator may delegate all or a portion of its responsibilities to affiliates.

**Subadministrator**

Citco Fund Services (Europe) B.V., a corporation organized under the laws of The Netherlands (the "Subadministrator"), provides administrative services to the Fund pursuant to an

agreement between the Administrator and the Subadministrator. Accordingly, certain of the services described in this Memorandum as being performed by the Administrator will be performed by the Subadministrator. The compensation for the Subadministrator's services is paid by the Administrator.

The Subadministrator has its principal offices at Telestone 8 – Teleport – Naritaweg 165 – PO Box 7241, 1007 JE Amsterdam – The Netherlands -- telephone (+31-20) 57.22.100, facsimile (+31-20) 57.22.610.

**Middle-Office Service Provider**

Richcourt Capital Management Inc., a British Virgin Islands company is the Middle-Office Service Provider and provides services to the Fund pursuant to the Middle-Office Services Agreement (as hereinafter defined), which may be terminated by either party upon 90 days written notice to the other party. Its duties include the following activities:

- serving as the liaison among the Custodian, the Administrator and the Subadministrator;

- verifying the Subadministrator's Net Asset Value calculations and other proper implementation of the Subadministrator's back-office functions;

- determining figures for available cash and outstanding borrowings and available credit (if applicable); and

- verifying the proper implementation of instructions given to the custodian banks with respect to investments, borrowing and currency hedge instructions.

**Bank**

Citco Banking Corporation N.V., a Netherlands Antilles corporation that is an indirect subsidiary of The Citco Group Ltd., will act as the principal bank of the Fund (the "Bank") for purposes of receiving subscription funds, disbursing redemption payments, processing cash transactions not directly related to the Fund's portfolio and hedging the dollar currency risk for Class E shares. The Fund may borrow money from the Bank to purchase additional shares of the Trading Vehicles and thereby leverage its investments in the same Trading Vehicles.

**Custodian**

Citco Global Custody (N.A.) N.V., a Netherlands Antilles corporation that is an indirect subsidiary of The Citco Group Ltd., will act as the Fund's custodian (the "Custodian"). The Custodian will hold the Fund's shares of the Fund's portfolio. Its duties will include processing purchases and redemptions of shares of the Trading Vehicles.

**The Citco Group**

The Citco Group, which has its origin in the fiduciary corporate services business of the law firm of Mr. A.A.G. Smeets, was established as an autonomous organization in 1966. The law firm had been providing trust services since 1948 and mutual fund administration since 1955. The Citco Group's majority shareholder is the Sandoz Family Foundation of Switzerland. The Smeets Family Trust retains a significant minority ownership interest in The Citco Group.

Subsidiaries of The Citco Group Ltd. offer a wide range of financial and fiduciary services consisting of corporate/fiduciary, fund administration and fund advisory services as well as custody and banking services. The International Fund Services division is one of the leading international fund administrators with over 1,400 funds under administration representing net assets of approximately $220 billion as of December 31, 2004, and has offices in Amsterdam, Dublin, New York, San Francisco, Toronto, Curaçao, the British Virgin Islands, the Cayman Islands, the Bahamas,

Bermuda and Sydney. The Citco Group Ltd. and its subsidiaries employ approximately 1,500 people worldwide.

**Auditor**

The Fund has retained KPMG as the Fund's independent auditor. The auditor's address is KPMG Financial Services, Burg. Rijnderslaan 10-20, 1185 MC Amstelveen, The Netherlands.

The Fund has also retained KPMG (Cayman) of PO BOX 493GT, Century Yard, Cricket Squqre, George Town, Grand Cayman, Cayman Islands. KPMG (Cayman) has been retained as the Cayman Islands-based independent auditor of the Fund and will (i) sign off on the Fund's audited financial statements in accordance with the local audit sign-off policy of the Cayman Islands Monetary Authority and (ii) file the Fund's audited financial statements with the Cayman Islands Monetary Authority.

# FEES AND EXPENSES

## The Investment Manager's Fees

Pursuant to the terms of the Investment Management Agreement (as hereinafter defined), the Fund will pay the Investment Manager a calendar monthly management fee, payable in advance, in an amount equal to 1/12 of 1.00% of the gross assets invested of the Fund as of the first Business Day of each calendar month (approximately 1.00% annually). For purposes of calculating each such management fee, the Gross Assets shall be determined before deductions of any fees such as management fees, but the calculation of Gross Assets shall exclude all expenses and commissions accrued in previous and current valuation periods, which have not been paid out yet; management fees accrued in the previous valuation periods, which have not been paid out yet; any amounts received by the Portfolio, or the Fund in advance and attributable to the specific Portfolio; and redemption proceeds payable by the Portfolio.

"Business Day" means any day on which the New York Stock Exchange and banks in New York City are open for business. If for any reason the Fund is dissolved or the Investment Management Agreement is terminated as of any date other than the last day of a calendar month, the Investment Manager shall rebate to the Fund a portion of the management fee paid to the Investment Manager in respect of such month based on the ratio of the remaining number of days in the calendar month to the total number of days in the calendar month.

Management fees will be allocated solely to the Classes to which they relate.

The Investment Manager or its affiliates also may receive a portion of the management fees and incentive fees paid by certain Trading Vehicles to Money Managers.

The Fund may use the services of Placement Agents in offering Shares. Affiliates of the Directors and the Investment Manager may act as Placement Agents from time to time. Shares purchased through Placement Agents may be subject to the payment of either an up-front placement fee charged as a percentage of the purchase price of the Shares or a redemption fee charged as a percentage of the Net Asset Value of the Shares upon redemption. Placement Agents also may receive a portion of the management fees and incentive fees paid to the Investment Manager by the Fund.

## Derivative Transaction Costs

The Strike Price of the 2005 Call Option will accrete and compound on a daily basis at the Accretion Rate as described in "CALL OPTIONS – Principal Terms of the 2005 Call Option."

All fees, costs and expenses which a beneficial owner of the Reference Shares would have paid, incurred or otherwise borne in connection with the Reference Shares will (without duplication) be added to the Strike Price, other than such fees, costs and expenses that would have reduced the Basket Value.

In order for the 2005 Call Option to be profitable to the Fund, the performance of the Reference Shares will have to outpace both the increases in the Strike Price described above and the fees and expenses of the Fund. The fees and expenses of the Trading Vehicles will reduce the Basket Value from time to time because they impact the performance of the Reference Shares.

In the event that the 2005 Call Option is terminated by the Fund prior to the Scheduled Expiration Date, the Fund may be obligated to pay an Early Termination Fee to the Call Issuer as described in "CALL OPTIONS – Principal Terms of the 2005 Call Option," depending on the circumstances of the termination.

## The Administrator's Fees

Pursuant to the Administrative Services Agreement the Fund will pay the Administrator remuneration for services rendered as invoiced to the Fund at the Administrator's standard rates for

such services and approved by the Directors. Disbursements are charged separately. Fees are payable monthly, based on average monthly net assets.

### The Middle-Office Service Provider's Fees

Pursuant to the Middle-Office Services Agreement, the Fund will pay the Middle-Office Service Provider a monthly service fee, payable in advance as of the first Business Day of each calendar month. For purposes of calculating each such service fee, the Net Asset Value of the Fund is determined before reduction for the Middle-Office Service Provider's service fee or extraordinary expenses accrued or payable as of the date on which the service fee is payable and after giving effect to any subscriptions made and any redemptions and distributions paid or payable as of such date.

### The Custodian's Fees

The Fund will pay the Custodian remuneration for services rendered as invoiced to the Fund at the Custodian's standard rates for such services. The Custodian also will be entitled to reimbursement of the fees of all agents, subcustodians and any other third parties appointed by the Custodian and all other reasonable costs, transaction charges, expenses and disbursements incurred by the Custodian.

### Currency Hedging Expenses

Expenses incurred in implementing currency hedges for Class E will be allocated solely to Class E.

### Other Expenses and Fees Chargeable to the Fund

The Fund is responsible for all other expenses incurred by the Fund in the ordinary course of its business, including, without limitation, legal, accounting and auditing fees and expenses, organizational expenses, continuing offering expenses, banking charges, governmental charges and duties, expenses associated with compliance with applicable laws and regulations, costs of printing and distributing offering documents, reports and notices to shareholders and other operating expenses. The Fund also will be responsible for any extraordinary expenses that it may incur. The Investment Manager, the Administrator, the subadministrator and the Middle-Office Service Provider will be responsible for providing all office personnel, office space and office facilities required for the performance of their services.

### Placement Agent's Fees

Shares purchased through Placement Agents, if any, may be subject to the payment of either an up-front placement fee upon the purchase of Shares or a redemption fee upon redemption. Any such redemption fee will be deducted from the subscription or redemption proceeds, as applicable, and paid to the relevant Placement Agent by the Fund. Placement Agents also may receive a portion of the management fees and incentive fees paid to the Investment Manager by the Fund.

# RISK FACTORS

Prospective investors should consider, among others, the following risk factors before subscribing.

## General

The transactions in which the Money Managers generally will engage involve trading risks and other risks. Growing competition in the markets as well as the development of sophisticated technology that is able to discover trading opportunities more rapidly may limit each Money Manager's ability to take advantage of opportunities in rapidly changing markets.

Shareholders in the Fund should understand that all investments involve risk and that there can be no guarantee against loss resulting from an investment in the Fund. No assurance can be given that the Investment Manager's or the Money Managers' respective investment and trading objectives and strategies will be successful or attained or that shareholders will realize net profits on their respective investments. As with any investment, the value of an investment in the Fund may decrease as well as increase, depending on a variety of factors which may affect the values of the Fund's portfolio of assets, including general economic conditions, market factors, and currency exchange rates. Each shareholder may lose some or all of its investment in Shares.

Because of the nature of the Fund's investment activities, the results of the Fund's operations may fluctuate from month to month and from period to period. Accordingly, investors should understand that the results of a particular period will not necessarily be indicative of results in future periods. Additionally, investment decisions made by the Investment Manager will not always be profitable or prove to have been correct. It should be noted that the Fund will not be liable to the shareholders for special, indirect, or consequential damage or for lost profits or loss of business. Investment in this Fund carries certain risks, including but not limited to, the risks referred to below. This list does not purport to be exhaustive and potential shareholders should review this Memorandum carefully and in its entirety and should consult their professional advisers before making an application for Shares.

## Leverage

The Fund may borrow money to fund investments in the Trading Vehicles. Borrowing money to purchase a stock may provide the opportunity for greater capital appreciation but at the same time will increase the risk of loss with respect to the stock. Although the use of leverage increases returns to the Fund if it earns a greater return on the incremental positions purchased with the borrowed funds than it pays for such funds, the use of leverage decreases returns to the Fund if it fails to earn as much on such incremental positions as it pays for such funds. In addition, the level of interest rates generally, and the rates at which the Fund can borrow in particular, will ultimately affect the operating results of the Fund.

## Uncovered Risks

Money Managers may employ various "risk-reduction" techniques designed to minimize the risk of loss in portfolio positions, and the Investment Manager will seek to hedge the dollar currency risk for Class E Shares by entering into forward contract or swap transactions in the interbank market. A substantial risk remains, nonetheless, that such techniques will not always be possible to implement and when possible will not always be effective in limiting losses.

Hedging against a decline in the value of a portfolio position does not eliminate fluctuations in the values of portfolio positions or prevent losses if the values of such positions decline, but certain Money Managers may establish other positions designed to gain from those same developments, thus moderating the decline in the portfolio positions' value. Such hedge transactions also limit the opportunity for gain if the value of the portfolio position should increase. Similarly, during periods in which the value of the dollar increases relative to the value of the euro, implementing a hedge against

the dollar currency risk for Class E Shares will result in poorer performance than would have been experienced if no currency hedge had been implemented.

The success of any hedging transactions entered into by a Money Manager will be dependent upon the Money Manager's ability to correctly predict market fluctuations and movements. While a Money Manager may enter into such transactions to seek to reduce risks, unanticipated market movements and fluctuations may result in a poorer overall performance for the Fund than if the Money Manager had not engaged in any such hedging transactions. In addition, the degree of correlation between price movements of the instruments used in a hedging strategy and price movements in the portfolio position being hedged may vary.

**Contingent Liabilities**

The Fund may find it necessary from time to time to establish reserves for unamortized, undetermined or contingent liabilities and withhold a portion of a redeeming shareholder's redemption proceeds in respect thereof.

**Charges to the Fund**

With the exception of the Investment Manager's incentive fees, the fees and expenses described under "FEES AND EXPENSES" must be paid regardless of whether the Fund realizes profits. Prospective investors should review such descriptions carefully and should note that the Trading Vehicles also incur fees and expenses which must be paid regardless of whether the Trading Vehicles realize profits, as described in the their Memorandum. Prospective investors also should note that the calculations of the Investment Manager's incentive fees and of the Trading Vehicles performance fees are based in part upon unrealized profits (as well as unrealized losses) and that such unrealized profits might never be realized by the Fund or by the Trading Vehicles.

In addition, the Strike Price will increase on an ongoing basis as described under "CALL OPTIONS – Principal Terms of the 2005 Call Option." In order for the 2005 Call Option to be profitable to the Fund, the performance of the Reference Shares will have to outpace both such increases in the Strike Price and the fees and expenses of the Fund.

**Credit Risks**

A substantial portion, if not substantially all, of the Fund's assets may be invested in Call Options from time to time. Consequently, the Fund is not a direct investor in Trading Vehicles and is subject to the risk of default by the Call Issuer. There can be no guarantee that the Call Issuer's credit will not be downgraded in the future, and the Fund has no right to terminate the 2005 Call Option without payment of an Early Termination Fee in the event of a downgrade. Moreover, the Call Issuer's obligations to the Fund under the 2005 Call Option is not secured by any of the Call Issuer's assets, and thus the Fund would merely be an unsecured creditor in a bankruptcy or similar insolvency proceeding. If the Fund enters into derivative transactions with counterparties other than the Call Issuer, the Fund will be subject to the risk of default by such other counterparties.

From time to time, the Fund may make bridge loans to affiliated investment funds to assist them in funding redemptions. While the Director believes that such loans are low-risk, the Fund is subject to the risk of default by such affiliated borrowers.

**Conflicting Interests of the Call Issuer**

The Call Issuer and the Fund have conflicting interests in respect of Call Options. For example, if the Call Issuer at any time has secured recovery of the Strike Price under the 2005 Call Option (i.e., if the Settlement Amount at such time would be greater than zero), it may have an incentive to terminate the 2005 Call Option prior to the Scheduled Expiration Date if the Strike Price Ratio is volatile or the Basket Value is declining. However, the Call Issuer must pay an Early Termination Fee to the Fund if it wishes to terminate early other than in the case of a Termination Event, Additional Termination Event or Knock-Out Event.

## Valuation

The method by which the Fund allocates net profit and net loss involves, among other things, the valuation of the Call Options which in turn is based on the valuation of the Reference Shares. Pursuant to the terms of the 2005 Call Option, all amounts that factor into the valuation of the 2005 Call Option are determined and calculated by the Calculation Agent, an affiliate of the Call Issuer whose determinations and calculations generally are required under the terms of the 2005 Call Option to be made in good faith in a commercially reasonable manner and will be binding absent manifest error. In valuing interests in Trading Vehicles, the Fund and the Calculation Agent will be dependent upon financial information provided by the Money Managers or the Trading Vehicles.

## Limited Ability to Liquidate an Investment in the Fund

A shareholder will not be able to liquidate its investment in the Fund immediately after deciding to do so. Subject to certain conditions and restrictions, Shares may be redeemed only after an initial lock-up period of one and as of any quarterly Redemption Date (as hereinafter defined) upon giving the Subadministrator at least 45 days prior written notice, unless such notice is waived by the Director. See "REDEMPTIONS AND TRANSFERS OF SHARES".

The Fund may limit, defer or suspend redemptions under certain circumstances. See "GENERAL INFORMATION - Suspension of Determination of Net Asset Value and of Redemptions." Further, the ability of the shareholders to redeem Shares will be subject to the Fund's ability to make withdrawals from the Trading Vehicles, which may be restricted as described in their Memorandums.

No secondary public market for the sale of Shares exists, and none is likely to develop. In addition, there are restrictions on the transfer and assignment of Shares. For example, Shares may not be transferred without the prior approval of the Director.

## Effects of Substantial Redemptions

Substantial redemptions of Shares within a limited period of time could require the liquidation of positions more rapidly than would otherwise be desirable, which could adversely affect the value of both the Shares being redeemed and the remaining outstanding Shares. In addition, regardless of the period of time during which redemptions occur, the resulting reduction in the Fund's assets could make it more difficult for the Fund to generate profits or recover losses. These same risks apply with respect to the redemption of interests in the Trading Vehicles.

## Shareholders Will Not Participate in Management

The Shares are nonvoting and as such will not entitle any of the holders thereof to participate in the management of the Fund.

## Involuntary Liquidation of Shareholder's Shares

Shares may be liquidated by the Fund through forced redemption where the Directors determine, in their sole judgment, that such compulsory redemption would best serve the interests of the Fund or the Directors determine that the Shares have been acquired in violation of the laws of any country, the rules or regulations of any governmental agency, regulatory or self-regulatory organization or the provisions of the Fund's organizational documents.

## Multiple Classes

In the event the Fund incurs losses attributable to any particular Class of Shares of the Fund which exceed the Net Asset Value of such Class, then the assets of the other Classes of Shares would be used to offset such losses. Given the Fund's investment strategy of diversifying the investment of its assets among various Trading Vehicles which are entities organized with limited liability and utilize various trading strategies, the Fund's investment strategy as implemented by Call Options, and the fact that all classes of participating Shares of the Fund utilize the same investment strategy except

that the currency risk is hedged for Class E Shares, the Fund believes that such risk to either Class of Shares of the incursion of losses from other Classes of Shares of the Fund is minimal.

## Conflicts of Interest

Certain actual and potential conflicts of interest exist in the structure and operation of the Fund. See "CONFLICTS OF INTEREST."

## Lack of Regulation

The Fund is not registered as an investment company under the U.S. Investment Company Act. Therefore, investors in the Fund will not be afforded the protective measures provided by the U.S. Investment Company Act and the regulations promulgated thereunder (which, among other things, require registered investment companies to have a majority of disinterested directors and which regulate the relationship between an investment company and its investment adviser). In addition, the Investment Manager is not registered as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended (the "U.S. Advisers Act"), and the Fund will not be afforded the protective measures provided by such Act and the regulations promulgated thereunder with respect to the relationship between a registered investment adviser and its client. In addition, Call Options are unregulated financial instruments.

## Litigation

The Fund might be named as a defendant in a lawsuit or regulatory action stemming from the conduct of its business and the activities of third parties with which it has business relationships. In the event such litigation were to occur, the Fund would bear the costs of defending against it and be at further risk if the case were to be lost.

## Possible Indemnification Obligations

The Fund, under certain circumstances, directly or indirectly may be obligated to indemnify, among others, one or more of the following persons: the Call Issuer, the Directors, the Investment Manager, the Administrator, the Middle-Office Service Provider and the Placement Agents and their respective principals and affiliates.

## Changes in Investment Strategies

The investment strategy of the Fund generally may be altered without prior approval by shareholders. Any such change of strategy could result in the exposure of the Fund's capital to additional risks which might be substantial.

## Illiquidity of the Call Options and the Fund's Investment in the Trading Vehicles

The Fund's ability to adjust the 2005 Call Option by reducing the number of Reference Shares in exchange for cash payments by the Call Issuer to the Fund is subject to the consent of the Call Issuer. If the Fund seeks to make such a reduction in order to fund redemption payments to shareholders and the Call Issuer does not consent, the Fund's only practical recourse may be to terminate the 2005 Call Option. Depending upon the circumstances, the Fund may be obligated to pay an Early Termination Fee.

Call Options are not standardized financial instruments. No secondary public market for the sale of the Call Options exists, and none is likely to develop. In addition, the 2005 Call Option may not be assigned or transferred by the Fund without the prior written consent of the Call Issuer.

The Fund's ability to withdraw capital from the Trading Vehicles is restricted as described in their Memorandum, and consequently the Fund does not have the ability to react quickly to changing investment circumstances.

## Portfolio Concentration

Under the terms of the 2005 Call Option the Investment Manager is permitted to allocate up to 100% of the Reference Shares to investments in Trading Vehicles that are diversified funds or funds or multi-strategy funds, as determined by the Call Issuer. Initially, and from time to time, the portfolio of Reference Shares may be substantially concentrated in one Trading Vehicle or a small number of Trading Vehicles that the Call Issuer determines falls into one of these two categories. At any time that the portfolio is concentrated in this manner, certain of the risks outlined in this Memorandum may be amplified.

## Lack of Control Over Invested Assets

The Fund does not have custody or control over its assets that are invested in the Trading Vehicles. The Fund is subject to the risk that the Money Managers of the Trading Vehicles (or any other person with access to such assets) could divert or abscond with such assets, fail to follow the disclosed investment strategy, provide false reports of operations or engage in other misconduct. Each Trading Vehicle operates on a private, unregistered basis and is not subject to regulatory audit by any governmental or self-regulatory authorities.

## Lack of Operating History of Money Managers

The Money Managers may have a limited performance history in operating their own management company (although such Money Managers typically will have significant prior experience in the securities industry). Therefore, such investments may involve greater risks than investment with more established Money Managers.

## Special Situations

The Money Managers may invest in companies involved in (or the target of) acquisition attempts or tender offers or companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions. In an investment opportunity involving any such type of business enterprise, there exists the risk that the transaction in which such business enterprise is involved either will be unsuccessful, take considerable time or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Money Manager of the security or other financial instrument in respect of which such distribution is received. Similarly, if an anticipated transaction does not in fact occur, the Money Manager may be required to sell its investment at a loss. Because there is a substantial uncertainty concerning the outcome of transactions involving financially troubled companies in which the Money Managers may invest, there is a potential risk of loss of the Money Manager's entire investment in such companies.

## Turnover

The portfolio turnover rates of the Trading Vehicles may be significantly higher than that of many other investment funds. Typically, high portfolio turnover may result in correspondingly high transaction costs. The exact amount of brokerage and related transaction costs which will be incurred by the Trading Vehicles is impossible for the Fund to estimate and will depend upon a number of factors including the nature and frequency of the market opportunities presented, the size of the transactions and the transaction rates in effect from time to time.

## Institutional Risks

Institutions, such as brokerage firms and banks, will have custody of the assets of the Fund and of the Trading Vehicles. Such firms may encounter financial difficulties which impair the operating capabilities or the capital position of the Fund or a Trading Vehicle. The Fund intends to limit transactions to well-capitalized and established banks and brokerage firms in an effort to mitigate such risks.

The foregoing list of risk factors does not purport to be a complete explanation of all risks involved in this offering. Prospective investors should read this entire Memorandum and consult with

independent, qualified sources of investment and tax advice before determining whether to invest in Shares.

**Leverage and Interest Rates**

Call Options are financial instruments that, by simulating leveraged investments in the Trading Vehicles, provide the Fund with a form of leverage that is an alternative to borrowing to finance investment activities. In the event the Fund makes direct investments in Trading Vehicles in the future, the Fund also may obtain bridge financing on a secured or unsecured basis from time to time, e.g., to invest amounts equal to sums that the Fund expects to receive with respect to pending redemption payments due from Trading Vehicles. Money Managers may use leverage in their trading activities.

Borrowing money to purchase an instrument may provide the opportunity for greater capital appreciation but at the same time will increase the risk of loss with respect to the instrument. The higher the level of leverage that is utilized by the Fund through the 2005 Call Option, the higher the volatility of the Strike Price Ratio will be, and increased volatility will enhance the risk of occurrence of a Knock-Out Event.

Although the use of leverage by an investor increases returns to the investor if it earns a return on the incremental positions purchased with the borrowed funds that exceeds its borrowing costs, the use of leverage decreases returns to the investor if its borrowing costs exceed the return on such incremental positions. The amount of borrowings outstanding at any time by Money Managers in respect of assets that they manage may be large in relation to such assets. In addition, the level of interest rates generally, and the rates at which the Strike Price of any Call Option accretes and compounds and at which the Money Managers can borrow in particular, will ultimately affect the operating results of the Fund.

# CONFLICTS OF INTEREST

Prospective investors should consider the following actual and potential conflicts of interest relating to the Fund.

The Directors are affiliates of the Administrator, the Subadministrator, the Bank and the Custodian. They are also affiliates to The Citco Group which is a minority shareholder of the Investment Manager and the Middle Office Service Provider. Therefore, the Directors may have a conflict of interest with respect to their duties to manage the Fund in the best interests of its shareholders and their interest in appointing and retaining their affiliates, the Administrator, the Bank and the Custodian, to act as administrator, banker and custodian, respectively, of the Fund. There is an absence of arm's-length negotiation with respect to the terms of the compensation payable to such parties pursuant to their respective agreements with the Fund. The Investment Manager owns all of the Fund's Voting Shares and therefore controls both the election and removal of directors of the Fund and the votes on amendments to the Articles of Association, provided that no amendment may vary the rights attached to the Shares of any Class without the consent of the holders of at least 75% of the issued and outstanding Shares of such Class.

In view of the Fund's objective to seek capital appreciation, the Directors do not intend to declare and pay any dividends to shareholders. To the extent that increases in the Net Asset Value of the Fund are retained by the Fund rather than distributed, the Net Asset Value of the Fund will be greater, thereby increasing the amounts of the management fees and incentive fees payable to the Investment Manager, the administrative fees payable to the Administrator and the service fees payable to the Middle-Office Service Provider.

The Directors, the Investment Manager, the Administrator, the Subadministrator, the Middle-Office Service Provider and their respective principals will not devote their time exclusively to the management or administration (as applicable) of the Fund, and each will devote time to the pursuit of other businesses, including other investment funds and accounts. Each of such persons will have conflicts of interest in allocating their business time, services and functions among the various entities for which such person provides services.

The performance fee arrangement between the Trading Vehicles and their investment managers may create an incentive for to make investments that are more speculative or subject to a greater risk of loss than would be the case if no such performance fee arrangement existed.

Placement Agents may have a conflict of interest in advising investors whether to purchase or redeem Shares because Placement Agents may receive up-front placement fees and/or redemption fees with respect to Shares sold by them and the Investment Manager may pay portions of its management fees and incentive fees to Placement Agents. In addition, Placement Agents may include one or more affiliates of the Investment Manager, the Administrator and the Middle-Office Service Provider, each of which receives compensation based on the Net Asset Value of the Fund.

The Fund and the Investment Manager are represented by single legal counsel in connection with this offering of Shares. No independent counsel has been retained to represent investors in the Fund.

# TAXATION

## Importance of Obtaining Professional Tax Advice

The following summary of the principal tax and exchange control considerations applicable to the Fund and its shareholders does not constitute legal or tax advice. Prospective investors should consult their own professional advisors on the income and other tax consequences of acquiring, holding or disposing of Shares arising in the jurisdiction in which they are resident or domiciled for tax purposes. While this summary is considered to be a correct interpretation of existing laws in force as of the date of this Memorandum, no assurance can be given that courts or fiscal authorities responsible for the administration of such laws will agree with such interpretations or that changes in such laws will not occur.

## Cayman Islands Taxation

This summary of the Cayman Islands tax consequences applicable to the Fund and its shareholders is based upon advice received from Ogier & Boxalls. Such advice is based upon factual representations made by the Fund and the Investment Manager concerning the proposed conduct of the activities to be carried out by the Fund and the Investment Manager. The conclusions summarized herein could be adversely affected if any of the material factual representations on which they are based should prove to be inaccurate. While this summary is considered to be a correct interpretation of existing laws in force on the date of this Confidential Private Placement Memorandum, no assurance can be given that courts or authorities responsible for the administration of such laws will agree with the interpretations or that changes in such laws (possibly with retrospective effect) will not occur.

### The Fund

The Fund is not subject to any income, withholding or capital gains taxes in the Cayman Islands. The Fund has applied for and can expect to receive an undertaking from the Governor-in-Council of the Cayman Islands pursuant to the Tax Concessions Law (1999 Revision) of the Cayman Islands that no law which is enacted in the Cayman Islands after the date of the undertaking imposing any tax to be levied on profits, income, gains or appreciations will apply to the Fund or its operations; and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable on or in respect of the Shares, debentures or other obligations of the Fund or by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision). No capital or stamp duties are levied in the Cayman Islands on the issue, transfer or redemption of Shares.

### Shareholders of the Fund

Holders of Shares who are not otherwise subject to Cayman Islands taxes by reason of their citizenship, residence, domicile or other particular circumstances should not become subject to any such taxes by reason of the ownership, transfer or redemption of the Shares.

Shareholders will not be subject to any income, withholding or capital gains taxes in the Cayman Islands, with respect to the Shares owned by them and dividends received on such Shares, nor will they be subject to any estate or inheritance taxes in the Cayman Islands

## U.S. Federal Taxation

The Fund intends to conduct its affairs in a manner such that it should not be deemed to be "engaged in a trade or business within the United States" and, to the extent possible, income and gain realized by it will not be subject to U.S. federal taxation. Whether the Fund is "engaged in a trade or business within the United States" is a question of fact the answer to which will depend principally

upon the activities that the Fund (or any non-corporate Trading Vehicle in which the Fund may invest) conducts within the United States. Pursuant to a "safe harbor" set forth in the U.S. Internal Revenue Code of 1986, as amended, the Fund will not be deemed to be "engaged in a trade or business within the United States" for U.S. federal income tax purposes solely as a result of the Fund's investing or trading in stocks or securities for its own account. If any of the Fund's activities were deemed to constitute being "engaged in a trade or business within the United States" (e.g., through the ownership of an interest in a U.S. business partnership), the Fund would be subject to U.S. federal income taxation at graduated rates, plus a flat 30% branch profits tax (unless reduced by an applicable income tax treaty), with respect to the Fund's income which is "effectively connected" with such trade or business. To the extent that the Fund receives dividends and certain types of interest on portfolio securities of U.S. issuers, and such dividends or interest are not effectively connected with the conduct by the Fund of a U.S. trade or business, such dividends or interest will be subject to a 30% U.S. federal withholding tax, unless reduced by an applicable income tax treaty. No treaty is currently in effect that would reduce this withholding rate.

The Fund's policies do not permit the transfer of Shares to U.S. Persons. Accordingly, tax consequences to U.S. Shareholders (as hereinafter defined), including individuals who are citizens of the United States but not residents of the United States, are not discussed herein. As used herein, the term "U.S. Shareholder" means a shareholder who, for U.S. federal income tax purposes is (a) a citizen or resident of the United States, (b) a corporation, partnership, limited liability company or other entity created or organized in or under the laws of the United States or any political subdivision thereof, (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source or (d) a trust (i) of which one or more U.S. persons have the authority to control all substantial decisions and over the administration of which a court within the United States is able to exercise primary supervision, or (ii) which, if the trust was in existence on August 20, 1996, was treated as a U.S. person (as defined for U.S. tax purposes) as of that date, and has in effect an election to continue to be so treated.

The term "Non-U.S. Shareholder" means a shareholder that is not a U.S. Shareholder. Subject to the discussion of "backup" withholding below, a Non-U.S. Shareholder that is not considered to be "engaged in a trade or business within the United States" or otherwise subject to U.S. taxation should not be subject to U.S. federal income, branch profits or withholding taxes on any gain realized on a disposition of its Shares outside the United States or on Fund distributions or dividends. If the Fund were considered to be "engaged in a trade or business within the United States," however, some or all of the gross amount of the dividends of the Fund paid to Non-U.S. Shareholders might be subject to a 30% U.S. federal withholding tax, unless reduced by an applicable income tax treaty. No treaty is currently in effect that would reduce this withholding rate.

Special rules may apply in the case of shareholders that are former citizens of the United States or that are considered, for U.S. tax purposes, to be personal holding companies, foreign personal holding companies, controlled foreign corporations, passive foreign investment companies or corporations that accumulate earnings and avoid U.S. federal income tax, and in some situations special rules also may apply to shareholders of the foregoing. Moreover, this summary does not address the U.S. federal income tax consequences of an investment in the Fund to a beneficial owner of a Share which is or becomes, for U.S. federal income tax purposes, a citizen or resident of the United States, a U.S. corporation, or a holder otherwise subject to U.S. federal income tax on a net income basis in respect of a Share, or to an individual who spends more than 182 days in the United States. Such shareholders are urged to consult their U.S. tax advisors concerning the U.S. tax treatment of an investment in the Fund in light of their particular circumstances.

A 30% U.S. "backup" withholding tax (which tax rate is scheduled for periodic reduction) and information reporting may apply to any dividends on, and gross proceeds from the sale or redemption of, Shares held in the U.S. by a custodian or nominee unless the shareholder properly certifies that it is a Non-U.S. Shareholder for U.S. federal income tax purposes or otherwise establishes an exemption from backup withholding.

No assurance can be given that forthcoming legislation, administrative changes or court decisions will not significantly modify the tax consequences discussed in this summary. A change in

the tax law may or may not be applied retroactively to transactions entered into or completed prior to the adoption of any such change. This summary is of a general nature only and is not intended to be, nor should it be construed to be, legal or tax advice to any particular investor. The Fund has not obtained any private letter ruling from the U.S. Internal Revenue Service concerning the tax consequences set forth herein. Accordingly, prospective purchasers of the Shares should consult their own tax advisors with respect to the tax treatment of the acquisition, ownership and disposition of Shares in light of their particular circumstances.

# SUBSCRIPTIONS

Persons wishing to subscribe for Class D Shares must complete the Subscription Agreement attached hereto as Exhibit A and pay the subscription amount in dollars. Persons wishing to subscribe for Class E Shares must complete the Subscription Agreement attached hereto as Exhibit B and pay the subscription amount in euros. Each Subscription Agreement includes, among other provisions, a representation and warranty that the subscriber is not a U.S. Person. Completed Subscription Agreements must be mailed or delivered to the Subadministrator. The minimum subscription for Class D Shares is $50,000 in Shares, and the minimum subscription for Class E Shares is €50,000 in Shares. The allotment of Shares upon a subscription ordinarily will be based on estimated values provided by the Fund's subadministrator which, in turn, may rely on estimated values provided by the Trading Vehicles which will be subject to possible subsequent adjustment after the official values of the Trading Vehicles have been reported. See "GENERAL INFORMATION – Net Asset Value."

Shares will be subject to the payment of a load fee to the Investment Manager in a minimum amount of 1% of the total subscription up to 5%. Such load fee will be deducted from the subscription proceeds and paid to the Investment Manager by the Fund. In the sole discretion of the Investment Manager, such load fees may be waived.

Unless an alternative form of payment is permitted by the Director, subscription monies must be paid by wire transfer in the relevant currency and remitted net of bank charges pursuant to the payment instructions set forth in the relevant Subscription Agreement. Failure to remit the full amount due will be treated as a withdrawal of a prospective investor's subscription.

A subscription for Shares will not be processed and the Shares will not be allotted until the Subadministrator receives an executed Subscription Agreement and notification that the prospective investor's funds have been cleared in the full amount of the subscription. For a subscription to be credited as of a particular monthly subscription date, (a) the Subscription Agreement must be received no later than the close of business in Amsterdam, The Nederlands at least ten days prior to the subscription date and (b) cleared funds must be received in the Fund's subscription account no later than the close of business (local time) at least four days prior to the subscription date.

The Fund reserves the right to reject any subscription or to accept only part of a subscription for any reason. If a subscription is not accepted or is accepted only in part, the amount paid on the subscription or the balance thereof will be returned at the risk of the prospective investor. Fractions of Shares may be issued.

Share certificates will not be issued. Share ownership is reflected in book entries recorded by the Subadministrator.

## Anti-Money Laundering

In order to comply with applicable laws aimed at the prevention of money laundering and terrorist financing, each prospective investor that is an individual will be required to represent in the Subscription Agreement that, among other things, he is not, nor is any person or entity controlling, controlled by or under common control with the prospective investor, a "Prohibited Person" as defined in the Subscription Agreement (generally, a person involved in money laundering or terrorist activities, including those persons or entities that are included on any relevant lists maintained by the U.S. Treasury Department's Office of Foreign Assets Control, any senior foreign political figures, their immediate family members and close associates, and any foreign shell bank). Further, each prospective investor which is an entity will be required to represent in the Subscription Agreement that, among other things, (i) it has carried out thorough due diligence to establish the identities of its beneficial owners, (ii) it reasonably believes that no beneficial owner is a "Prohibited Person", (iii) it holds the evidence of such identities and status and will maintain such information for at least five years from the date of its complete redemption from the Fund, and (iv) it will make available such information and any additional information that the Fund may require upon request.

The Fund and the Administrator or the Subadministrator on its behalf reserves the right to request such information as is necessary to verify the identity of a prospective investor, including any transferee of Shares. In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the Fund or the Administrator or Subadministrator may refuse to accept the subscription and the subscription funds related thereto or may refuse to process a redemption request until proper information has been provided.

The Fund, in the absolute discretion of the Directors, or the Administrator or Subadministrator on its behalf, also reserves the right to refuse to make any redemption payment or distribution to a shareholder if any of the Directors of the Fund or the Administrator or Subadministrator suspects or is advised that the payment of any redemption or distribution moneys to such shareholder might result in a breach or violation of any applicable laws or regulations (including, without limitation, any anti-money laundering or anti-terrorism laws and regulations) by the Fund or any other person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund, its Directors or the Administrator or Subadministrator with any such laws or regulations in any relevant jurisdiction. In such circumstances, and until otherwise instructed by the relevant authority, the Fund or the Administrator or Subadministrator on its behalf may deposit such redemption proceeds in a separate bank account. If the Fund is given permission to pay out such redemption proceeds to the relevant Shareholder, such Shareholder's only right against the Fund shall be the right to receive the moneys so deposited (without interest).

If, as a result of any information or other matter which comes to his attention, any person resident in the Cayman Islands (including the Administrator) knows or suspects that a payment to the Fund (by way of subscription or otherwise) is the proceeds of criminal conduct, such person is required to report such information or other matter pursuant to the Proceeds of Criminal Conduct Law (2004 Revision) of the Cayman Islands, and such report shall not be treated as a breach of any restriction upon the disclosure of information imposed by law or otherwise.

In addition, the Subadministrator may request further information and documents before processing the application. This may result in shares/units being issued on a dealing day subsequent to the dealing day on which an applicant initially wished to have shares/units issued to him.

The Subadministrator reserves the right to request such information as is necessary to verify the identity of an applicant. To ensure compliance with statutory and other requirements relating to the prevention of money laundering, the Subadministrator may require verification of identity from any applicant who submits a completed subscription agreement. Pending the provision of evidence satisfactory to the Subadministrator as to identity, the evidence of title in respect of Shares may be retained at the absolute discretion of the Subadministrator. If within a reasonable period of time following a request for verification of identity, the Subadministrator has not received evidence satisfactory to it as set forth above, it may, in its absolute discretion, refuse to allot the Shares applied for, in which event application moneys will be returned without interest to the account from which such moneys were originally debited.

# REDEMPTIONS AND TRANSFERS OF SHARES

Shareholders generally may redeem all or some of their Shares of either Class after a one year lock-up period on any quarterly Redemption Date at the then current Net Asset Value per Share of such Class by sending a written request for redemption to the Subadministrator. A form of request for redemption is attached hereto as Exhibit B. Shares also may be redeemed at such other times on such terms and conditions as the Directors, acting in their sole discretion, may decide. Requests for redemption are irrevocable upon receipt thereof by the Subadministrator. No redemption which applies to less than all of a shareholder's Shares can result in the shareholder owning Shares with an aggregate Net Asset Value of less than $50,000 in the case of Class D Shares, or less than €50,000 in the case of Class E Shares, unless such condition is waived by the Directors. If the number of Shares to be redeemed is not specified, a redemption notice will be presumed to apply to all of the Shares held by the shareholder.

In the sole discretion of the Investment Manager, Shares may be subject to the payment of a redemption fee to the Investment Manager in an amount up to 0.50% of the Net Asset Value of the Shares upon redemption. Any such redemption fee will be deducted from the redemption proceeds and paid to the Investment Manager by the Fund.

Payment of not less than 90% of the estimated value of the Shares requested to be redeemed will be made within 40 days following the Redemption Date for the Class of Shares which are being redeemed, unless redemptions are limited, deferred or suspended.

The right to redeem is contingent upon the Fund having sufficient assets to discharge its liabilities on the Redemption Date.

Prospective investors should be aware that the relevant redemption price ordinarily will be based on unaudited accounts. After the Fund has determined the Net Asset Value of the Class of Shares which are being redeemed as of the Redemption Date (which in the Fund's discretion may be after the Auditors have completed their examination of the Fund's financial statements), the Fund will pay the shareholder the balance, if any, of the amount to which the shareholder is entitled, or such shareholder will be obligated to pay the Fund the excess, if any, of the amount previously paid over the amount to which the shareholder is entitled. Redemption payments will be made in dollars (in the case of Class D Shares) or euros (in the case of Class E Shares), and will be remitted to the redeeming shareholder by wire transfer to an account, as specified in the written request for redemption.

While the Fund has the right to make payment on such redemption in securities owned by it rather than in dollars or euros, as the case may be, it does not intend to do so as a matter of general policy. If Shares are held in certificate form, the redemption will not be processed until the certificates have been tendered to the Subadministrator, and no interest will accrue on the redemption proceeds pending the payment date. See "GENERAL INFORMATION - Net Asset Value."

## Forty-Five Days Notice Required

Redemption requests must be received by the Subadministrator at least 45 days prior to a Redemption Date in order to be acted on as of that Redemption Date, and redemption requests received by the Subadministrator less than 45 days prior to a Redemption Date will be deemed deferred until the next Redemption Date, unless the 45-day notice requirement is waived by the Director. The Fund is not liable for any loss arising from late payment of redemption proceeds.

## Limitation on Redemptions

The maximum Net Asset Value of Shares that may be redeemed on any Redemption Date is 20% of the Net Asset Value of the Fund, unless such limitation is waived by the Directors in their sole discretion. In the event that timely requests for redemption as of any particular Redemption Date are received by the Subadministrator with respect to Shares having an aggregate Net Asset Value of more than 20% of the Net Asset Value of the Fund, the Subadministrator shall limit the redemption of Shares to 20% of the Net Asset Value of the Fund. Each redeeming shareholder's redemption request

shall be decreased pro rata based on the ratio of the Net Asset Value of the Shares requested to be redeemed by such shareholder to the aggregate Net Asset Value of all Shares requested to be redeemed on such Redemption Date. The remainder of each such shareholder's redemption request will be deferred until the next Redemption Date, when redemptions will be subject to the same limitation.

## Deferral and Suspension of Redemptions

In accordance with the Fund's Articles of Association, the Directors may limit, defer or suspend redemptions under certain circumstances. In addition, the Directors may redeem Shares compulsorily in certain circumstances. See "GENERAL INFORMATION."

## Transfer of Shares

Subject to the approval of the Directors and to certain restrictions and requirements set forth herein, in the Subscription Agreement and in the Fund's Articles of Association, Shares are transferable. The instrument of transfer must be in writing and in such form as the Directors approve, and must be served upon the Subadministrator.

The Directors will decline to register any transfer which in their opinion may result in Shares being held by a U.S. Person or by any person in violation of the laws of any country or governmental authority or which in its opinion may subject the Fund or its shareholders to adverse tax consequences under the laws of any country.

# GENERAL INFORMATION

## Definitions

"Redemption Date" means the last Business Day of each calendar quarter.

"Business Day" means any day on which the Federal Reserve Bank of New York and banks in the Bahamas are open for business.

## Net Asset Value

The Net Asset Value of the Fund, the Net Asset Value of each Class and the Net Asset Value per Share of each Class will be determined by the Subadministrator at the close of business on the last Business Day of each calendar month. The "Net Asset Value of the Fund" shall mean the total assets of the Fund, including all cash, cash equivalents and other securities (each valued at fair market value), less the total liabilities of the Fund determined in accordance with international accounting standards, consistently applied under the accrual method of accounting, except as otherwise may be set forth below:

- the Fund's investments in Call Options will be valued as reported by the Calculation Agent, and initially may be based on an estimated value reported by the Calculation Agent;

- any direct investment in a Trading Vehicle shall be valued as reported by such Trading Vehicle or any person that the Subadministrator reasonably believes to be such Trading Vehicle's authorized representative, and initially may be based on an estimated value reported by the Trading Vehicle or such a person;

- all other securities and assets of the Fund shall be valued at fair market value as determined in good faith by the Subadministrator in accordance with the Articles of Association;

- fees and expenses shall be accrued at least monthly;

- any value other than in dollars shall be converted into dollars at the rate (whether official or otherwise) which the Subadministrator shall in good faith deem appropriate having regard to any premium or discount which it considers may be relevant and to costs of exchange; and

- for any Class for which Net Asset Value is quoted in euros, amounts in dollars or other currencies shall be converted into euros at the rate (whether official or otherwise) which the Subadministrator shall in good faith deem appropriate having regard to any premium or discount which it considers may be relevant and to costs of exchange.

The "Net Asset Value of each Class" means the portion of the Net Asset Value of the Fund allocable to each particular Class. The Net Asset Value of Class D Shares will be expressed in dollars, and the Net Asset Value of Class E Shares will be expressed in euros.

The "Net Asset Value per Share" of a Class means the amount determined by dividing the Net Asset Value of such Class by the number of outstanding Shares of such Class. The Net Asset Value per Share of Class D Shares will be expressed in dollars, and the Net Asset Value per Share of Class E Shares will be expressed in euros.

## Calculation of Subscription and Redemption Prices

The price of each Share of a Class subscribed for on the first Business Day of a calendar month shall be the Net Asset Value per Share of such Class as of the close of business on the

immediately preceding Business Day rounded up to the nearest whole cent. The redemption price for each Share of a Class shall be the Net Asset Value per Share of such Class as of the close of business on the relevant Redemption Date rounded down to the nearest whole cent.

It is anticipated that a substantial portion of the Fund's assets at times when the Net Asset Value of each Class is being determined generally will be invested in the Trading Vehicles, each of which will be reporting an estimated value that is subject to subsequent adjustment by the applicable Trading Vehicle. As a consequence, the Subadministrator will recalculate (and may restate) the Net Asset Value of each Class after the applicable Trading Vehicle has reported an official value. If the difference between the recalculated Net Asset Value of any Class and the originally calculated Net Asset Value of such Class (i.e., the Net Asset Value based on the Trading Vehicles' estimated value) equals more than 1% of the originally calculated Net Asset Value of such Class, then Net Asset Value will be restated and subscriptions will be recalculated accordingly, resulting in a greater or lesser number of Shares, as the case may be, being allotted to each new subscriber.

## Temporary Suspension of Determination of Net Asset Value and of Redemptions

The Directors may suspend the determination of the Net Asset Value per Share and the redemption of Shares for the whole or any part of a period during which the determination of the net asset value of the Trading Vehicles has been suspended (as described in the Trading Vehicles Memorandum) or when for any other reason the prices or values of the Fund's investments cannot be promptly and reasonably ascertained.

Whenever the Directors declare a suspension of the determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Subadministrator shall give notice of such declaration to all shareholders then requesting redemption. During any period when the determination of the Net Asset Value per Share is suspended, no Shares may be issued or redeemed.

## Compulsory Redemption

The Fund reserves the right to require the redemption of Shares acquired or held by any shareholder at any time for any reason upon notice to the shareholder.

## Fiscal Year

Each fiscal year of the Fund commences on January 1 and ends on December 31, exception done for the year 2003, which was audited together with the year 2004.

## Reports and Net Asset Value Quotations

An annual report and annual audited statements of account of the Fund will be sent to shareholders within 120 days of the end of each fiscal year or as soon thereafter as practicable. Upon request by a shareholder, following the end of any calendar month, the Subadministrator will provide the shareholder with information regarding the number and Net Asset Value of the Shares owned by the shareholder as of the end of the month. Estimated Net Asset Value per Share quotations as of the close of any calendar month may be obtained any time during the next calendar month by contacting the Subadministrator.

## Cayman Mutual Funds Law

The Fund is a regulated mutual fund for the purposes of the Mutual Funds Law (2003 Revision) of the Cayman Islands. The Fund is registered with the Cayman Islands Monetary Authority pursuant to section 4(3) of that law and this Confidential Private Placement Memorandum has been filed with the Cayman Islands Monetary Authority. Such registration does not imply that the Cayman Islands Monetary Authority or any other regulatory authority in the Cayman Islands has approved this Confidential Private Placement Memorandum or the offering of the shares hereunder.

The continuing Cayman Islands regulatory obligations of the Fund are to (i) file with the Cayman Islands Monetary Authority prescribed details of any changes to this Confidential Private Placement

Memorandum; (ii) file annually with the Cayman Islands Monetary Authority accounts audited by an approved auditor; and (iii) pay a prescribed annual fee (currently CI $2,000 (US $2,440)).

As a regulated mutual fund, the Fund is subject of the supervision of the Cayman Islands Monetary Authority and the Cayman Islands Monetary Authority has wide powers under the Mutual Funds Law in that regard. The powers of the Cayman Islands Monetary Authority include the power to require the substitution of a director and, at the expense of the Fund, to appoint a person to advise the Fund on the proper course of its affairs; and, at the expense of the Fund, to appoint a person to assume control of the affairs of the Fund including, but not limited to, having the ability to terminate the business of the Fund. There are other remedies available to the Cayman Islands Monetary Authority including the ability to apply to the courts of the Cayman Islands for approval of other actions.

## Corporate Structure

The Fund has an authorized share capital of U.S.$25,000.00 and €25,000.00 divided as follows: (i) 100 voting, non-participating Class B shares, par value U.S.$0.01 per share (the "Voting Shares") all of which are held by the Investment Manager, (ii) 2,499,900 non-voting, participating Class D, par value U.S.$0.01 per share, and (iii) 2,500,000 non-voting participating Class E Shares, par value Euro 0.01 per share. The Class D Shares and Class E Shares are collectively referred to throughout this Memorandum as the "Shares."

The principal rights attaching to the Voting Shares and the Shares are as follows:

## Voting Shares

The Voting Shares have voting rights, are not redeemable except upon liquidation of the Fund, and do not participate in any appreciation or depreciation of the Net Asset Value of the Fund. Upon a winding up of the Fund, the Voting Shares rank before the Shares for the return of the capital paid in thereon.

## Special Rights Attaching to Voting Shares

The holders of the Voting Shares have the exclusive right to vote (to the exclusion of the holders of the Shares) and are entitled to one vote per Voting Share with respect to any of the following matters:

- the appointment or removal of the Director;
- the winding up of the Fund; and
- any amendment to the Fund's Articles of Association affecting, among other matters, the foregoing matters.

## Shares

No profits will be payable on the Shares as dividends unless the Directors so declare or the holders of the Voting Shares so declare in a general meeting of shareholders. Upon a winding up of the Fund, the Shares are subordinate to the Voting Shares on the return of paid-in capital. The Shares are then entitled to the remaining surplus assets of the Fund.

The Shares are nonvoting. However, under the Articles of Association, even though the Shares are nonvoting, the rights attached to any Class may be varied only if at least 75% of the issued and outstanding Shares of such Class and at least 75% of the issued and outstanding shares of any other classes which may be affected by such variation are in favor of such amendment.

## Winding Up or Liquidation of the Fund

The Fund may be liquidated or wound up at any time at the discretion of the holders of a majority of the Voting Shares at a general meeting of the shareholders. Upon liquidation, first the Fund's creditors will be paid out of the assets of the Fund, next to the holders of the Voting Shares

will be paid their paid-in capital, and the balance of paid-in capital for the Shares and the surplus assets of the Fund then will be paid to holders of the Shares.

**Indemnities**

The Articles of Association contain provisions exempting the directors and officers of the Fund, inter alia, from liability in connection with or relating to the execution or discharge of his or her duties, and entitling them to indemnification in certain circumstances provided that they have acted honestly and in good faith.

The Investment Management Agreement contains provisions exempting the Investment Manager from liability and entitling it and its affiliates to indemnification in certain circumstances unless due to its own gross negligence, willful misconduct or reckless disregard of its duties.

The Administrative Services Agreement contains provisions exempting the Administrator from liability and entitling it and its affiliates to indemnification in certain circumstances unless due to its own gross negligence, willful misconduct or reckless disregard of its duties.

The Middle-Office Services Agreement contains provisions exempting the Middle-Office Service Provider from liability and entitling it and its affiliates to indemnification in certain circumstances unless due to its own gross negligence, willful misconduct or reckless disregard of its duties.

The Fund also has agreed to indemnify each of the Bank and the Custodian in certain circumstances unless due to its own gross negligence or willful misconduct.

Material Contracts

The following contracts have been or will be entered into by the Fund and are or will be material:

- an Investment Management Agreement by and between the Fund and the Investment Manager (the "Investment Management Agreement");

- an Administrative Services Agreement by and between the Fund and the Administrator (the "Administrative Services Agreement");

- a Services Agreement by and among the Funds and the Middle-Office Service Provider (the "Middle-Office Services Agreement"); and

- contracts relating to Call Options.

Copies of the foregoing contracts, as well as copies of the Fund's Articles of Association, may be inspected free of charge during normal business hours on any weekday (public holidays excepted) at the registered office of the Fund. This Memorandum is not intended to provide a complete description of any such document and is qualified in its entirety by the terms and provisions thereof.

# EXHIBIT B

**Exhibit A**

**SOUNDVIEW ELITE LTD.**

(A A Cayman Islands exempted company)

**SUBSCRIPTION AGREEMENT**

Soundview Elite Ltd.
Citco Fund Services (Europe) B.V.
Attention – Investor Relations Group
Telestone 8 – Teleport
Naritaweg 165 -P.O. Box 7241
1007 JE Amsterdam The Netherlands
Tel. +31 20 572 2100
Fax +31 20 572 2610

Ladies and Gentlemen:

This Subscription Agreement relates to the nonvoting, participating Class D or Class E shares, par value U.S.$0.01 or €0.01 respectively per share (the "Shares"), of Soundview Elite Ltd., (the "Fund"), a company initially incorporated as an international business company in the Commonwealth of The Bahamas which transferred by way of continuation to the Cayman Islands in June 2005 and is now an exempted company registered in the Cayman Islands. The Shares are being offered by the Fund pursuant to its Confidential Private Placement Memorandum dated June 1, 2005 (the "Memorandum"). The undersigned or, if executed by a nominee, the beneficial owner of the Shares (in either case, the beneficial owner of the Shares referred to herein as the "Subscriber") hereby subscribes for the amount set forth in line e. of Section 6 below.

The Subscriber hereby acknowledges receipt of the Memorandum. Capitalized terms used herein, and not otherwise defined herein, shall have the meanings assigned to such terms in the Memorandum.

1.  Understandings and Acknowledgments. The Subscriber understands and acknowledges as follows:

    a. This subscription may be accepted or rejected, in whole or in part, by the Fund. The Fund reserves the right to close the subscription books at any time without notice. If the Subscriber's subscription for Shares is rejected, any funds paid by the Subscriber and received by the Fund will be returned to the Subscriber as soon as practicable at the Subscriber's risk. In the case of rejection in part, the funds paid with respect to the rejected part will be so returned.

    b. This subscription, and each agreement made by the Subscriber hereunder, is and shall be irrevocable; provided that the Subscriber shall have no obligations hereunder if the offering described in the Memorandum is for any reason canceled or withdrawn or if this subscription is for any reason rejected (but, if this subscription is rejected in part, only with respect to the portion so rejected). This Subscription Agreement shall be binding upon the Subscriber's administrators, successors and assigns and, if the Subscriber is an individual, this Subscription Agreement also shall survive the death or disability of the Subscriber and shall be binding upon the Subscriber's heirs, executors, administrators, successors and assigns.

c. The Shares offered have not been registered under the U.S. Securities Act, and the Fund has not been registered under the U.S. Investment Company Act.

d. The Shares are not being offered and may not be sold directly or indirectly in the United States or to U.S. Persons.

e. There is no secondary public market for the Shares, and no assurance has been given to the Subscriber that such a market will develop. It may be difficult or even impossible for the Subscriber to sell its Shares. Shares may be hypothecated, pledged, sold or transferred by the Subscriber only in accordance with the Fund's Articles of Association and with the approval of the Director.

f. The Fund intends to retain its earnings and does not anticipate declaring or paying cash distributions (including dividends) on the Shares.

g. The Subscriber's right to redeem Shares may be restricted for the reasons and in the manner set forth in the Memorandum. In addition, the Fund may limit, defer or suspend redemptions from time to time as the Directors may determine in their sole discretion.

h. The Fund has the right to have the Subscriber's Shares involuntarily redeemed at any time for any reason and in the manner set forth in the Memorandum.

i. The discussion of tax consequences arising from investment in Shares set forth in the Memorandum is general in nature, and the tax consequences to the Subscriber of its investment in Shares depend upon the Subscriber's circumstances. The Subscriber did not receive any advice from the Fund or the Investment Manager with respect to the tax consequences of an investment in the Shares.

j. An investment in Shares is speculative and involves significant risks including, but not limited to, those specified in the section of the Memorandum entitled "RISK FACTORS." The Investment Manager and its respective principals and affiliates may effect transactions for their own accounts or other clients' accounts which may be in conflict with the best interests of the Fund. Further, the Fund is subject to other material conflicts of interest, including those described in the section of the Memorandum entitled "CONFLICTS OF INTEREST."

k. The Subscriber understands and acknowledges that while the Investment Manager acts as the investment manager of the Fund, it does not act as an investment manager or advisor to the Subscriber.

2. Representations and Warranties. The Subscriber hereby represents and warrants to the Fund as follows:

a. The Subscriber is a suitable investor for the Shares as described in the Memorandum.

b. The Subscriber is acquiring the Shares for investment purposes solely for its own account and not for the account of others or with a view to distribution. If the Subscriber is a corporation, trust, partnership or other non-natural person, it was not formed for the purpose of investing in the Shares.

c. The Subscriber: (1) is not a U.S. Person (as such term is defined in the Memorandum) and is not acquiring Shares for the account, on behalf or for the benefit of any U.S. Person; (2) certifies that none of the funds used by the Subscriber to effect the purchase of the Shares have been obtained from U.S. Persons; (3) will not transfer any of its Shares or any interest therein in violation of the restrictions on transfer set forth in the Memorandum;

(4) did not acquire, and will not transfer, any of its Shares within the United States; (5) will notify the Fund immediately if the Subscriber should at any time become a U.S. Person; (6) was not solicited to purchase, and did not place any order to purchase, Shares while present in the United States; and (7) has lawfully subscribed for Shares with lawfully obtained monies.

d. The Subscriber has carefully read and understands the Memorandum and acknowledges that the Fund has made available to the Subscriber all other documents that the Subscriber has requested relating to its investment in the Shares. In evaluating the suitability of an investment in the Shares, the Subscriber has not relied on any representations, warranties or other information (whether oral or written) other than as set forth in the Memorandum.

e. The Subscriber has informed itself as to the securities laws and other legal requirements within the countries and other jurisdictions that are relevant to the Subscriber. The Subscriber is responsible for complying with all such requirements and has complied therewith, including, without limitation, by obtaining any and all requisite approvals and consents.

f. The Subscriber has been duly authorized, if required, to execute and deliver and comply with the terms of this Subscription Agreement and such execution, delivery and compliance does not conflict with or constitute a default under any instrument governing the Subscriber, any law, regulation or order, or any agreement or instrument to which the Subscriber is a party or by which the Subscriber is bound.

3.    The Subscriber understands and agrees that the Fund prohibits the investment of funds by any persons or entities that are acting, directly or indirectly, (i) in contravention of any U.S. or international laws and regulations, including anti-money laundering regulations or conventions, (ii) on behalf of terrorists or terrorist organizations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Treasury Department's Office of Foreign Assets Control[1] ("OFAC"), as such list may be amended from time to time, (iii) for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure[2], unless the Fund, after being specifically notified by the Subscriber in writing that it is such a person, conducts further due diligence, and determines that such investment shall be permitted, or (iv) for a foreign shell bank[3] (such persons or entities in (i) – (iv) are collectively referred to as "Prohibited Persons").

4.    Indemnification. The Subscriber agrees to indemnify and hold harmless the Fund, the Director, the Investment Manager, the Placement Agent(s), if any, the Administrator, the Subadministrator, the Middle-Office Service Provider, their respective officers, directors and affiliates and anyone acting on their behalf from and against all damages, liabilities, losses, costs and expenses (including, without limitation, attorneys' fees) which they may incur by

---

[1] The OFAC list may be found on the web at http://www.treas.gov/ofac.

[2] Senior foreign political figure means a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major political party, or a senior executive of a foreign government-owned corporation. In addition, a senior foreign political figure includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure. The immediate family of a senior foreign political figure typically includes the political figure's parents, siblings, spouse, children and in-laws. A close associate of a senior foreign political figure is a person who is widely and publicly known internationally to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial financial transactions on behalf of the senior foreign political figure.

[3] Foreign shell bank means a foreign bank without a physical presence in any country, but does not include a regulated affiliate. A post office box or electronic address would not be considered a physical presence. A regulated affiliate means a foreign shall bank that: (1) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the Unites States or a foreign country, as applicable; and (2) is subject to supervision by a banking authority in the country regulating such affiliated depository institution, credit union, or foreign bank.

reason of the Subscriber's failure to fulfill any of the terms or conditions of this Subscription Agreement or arising out of or relating to any breach of any representation or warranty made by the Subscriber herein.

5.    Miscellaneous.

a. All representations, warranties and agreements made by the Subscriber herein shall survive the date on which the Subscriber receives Shares and remain operative and in full force and effect, and shall continue after any redemption of Shares.

b. If any provision of this Subscription Agreement is held to be void or unenforceable under the laws of any jurisdiction governing its construction or enforcement, this Subscription Agreement shall not be invalidated thereby, but shall be construed to be in force with the same effect as though such provisions were omitted.

c. Within five Business Days after receipt of a written request from the Fund, the Administrator or the Subadministrator, the Subscriber agrees to (1) furnish additional information with regard to the Subscriber's suitability as a prospective investor (e.g., as may be reasonably necessary to enable the Fund to ascertain whether the Subscriber is a U.S. Person) and (2) execute and deliver such documents or furnish such additional information as may be reasonably necessary to comply with any and all laws and ordinances to which the Fund is subject.

d. This Subscription Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and may be amended only by a writing executed by the Subscriber and the Fund.

e. This Subscription Agreement shall be governed by and construed in accordance with the laws of the Cayman Islands.

6.    Subscriber Information.  The following information regarding the Subscriber is correct:

a. Print Name of Subscriber:  _____

b. Address of Subscriber:  _____

_____

c. Telephone Number:  _____

   Facsimile Number:  _____

d. Date of Execution:  _____

e. Amount of Subscription:*  _____

*minimum $50,000 or €50,000

f. Amount of Load fees : (Minimum of 1% up to 5%)_____

g.Name, Address and Telephone
  Number of Remitting Bank:    _____

                                _____

                                _____

                                _____

7.      Redemption Fee. The Subscriber hereby acknowledges and agrees that upon the redemption of any of the Shares, a redemption fee payable to the applicable Placement Agent shall be deducted from the redemption proceeds in the amount of ____% of the Net Asset Value of such Shares. (If no amount has been inserted in the previous sentence, no redemption fee will be charged.)

8.      Payment Instructions. Unless an alternative form of payment is permitted by the Directors, subscription monies must be paid by wire transfer and should be remitted net of bank charges:

        Class D, in US dollars to:

        Chase Manhattan Bank, 1 Chase Manhattan Plaza, New York 10081, United States of America (ABA No.: 021-000021) (SWIFT Address: "CHAS US 33"), for credit to Citco Banking Corporation N.V., account no. 001-1-627502, for further credit to Soundview Elite Ltd., account no. 0012-209 453-200.

        Class E, in euros to:

        De Nederlandsche Bank, Westeinde 1, 1000 AB Amsterdam, account no.: 60.01.76.360, SWIFT Address: FLOR NL 2A, for the account of Citco Bank Nederland, for further credit to Citco Banking Corporation N.V., account no. 63.59.34.361, for further credit to Soundview Elite Ltd., account no. 0012-209 453-201

Failure to remit the full amount due will be treated as a withdrawal of the prospective investor's subscription.

For a subscription to be credited as of a particular monthly subscription date, (a) the Subscription Agreement must be received no later than the close of business in Amsterdam, The Netherlands at least ten days prior to the subscription date and (b) cleared funds must be received in the Fund's subscription account no later than the close of business (local time) at least four days prior to the subscription date.

      IN WITNESS WHEREOF, the Subscriber has executed this Subscription Agreement as of the date set forth above.

Entity Shareholder                    Individual Shareholder

_____        _____
Name of Entity                       Name of Individual Shareholder

By:_____
Authorized officer, partner,
trustee or custodian

_____
Signature of Individual Shareholder


_____
Name & Title of Authorized Signatory

_____
Nationality of Individual Shareholder


_____
Form of Organization of Entity


_____
Jurisdiction of Organization of Entity


Accepted and Agreed to:

SOUNDVIEW ELITE LTD.


By: _____

Its: _____

**Exhibit B**

**REQUEST FOR REDEMPTION**

Soundview Elite Ltd.
Citco Fund Services (Europe) B.V.
Attention – Investor Relations Group
Telestone 8 – Teleport
Naritaweg 165 -P.O. Box 7241
1007 JE Amsterdam The Netherlands
Tel. +31 20 572 2100
Fax +31 20 572 2610

Ladies and Gentlemen:

      The undersigned hereby requests redemption as described in, and subject to all of the terms and conditions of, the Memorandum of Association and the Articles of Association of Soundview Elite Ltd (the "Fund") and the Confidential Private Placement Memorandum of the Fund dated June 1, 2005 including all the exhibits thereto, as the same may be amended or supplemented from time to time (the "Memorandum"), of participating, nonvoting shares of the Fund as follows:

| Specify the Class: | Specify the applicable amount: |
|---|---|
| Class D | $_____; or Number of Shares: _____ |
| Class E | €_____; or Number of Shares: _____ |

      It is understood that Shares shall be redeemed at the Net Asset Value per Share of the applicable Class. Except as otherwise provided in the Memorandum, redemptions shall be effective after a one-year lock-up as of the close of business on the last Business Day of any calendar quarter provided that the shareholder has given at least 45 days prior written notice to the Fund's Subadministrator. Redemption amounts for Class D Shares will be paid in dollars. Redemption amounts for Class E Shares will be paid in euros. Capitalized terms used in this Request for Redemption shall have the same meanings as are ascribed thereto in the Memorandum.

      The undersigned hereby represents and warrants that the undersigned is the true, lawful and beneficial owner of the Shares (or fractions thereof) to which this Request for Redemption relates, with full power and authority to request redemption of such Shares. Such Shares are not subject to any pledge or otherwise encumbered in any fashion.

SIGNATURE(S) MUST BE IDENTICAL TO NAME(S) IN WHICH THE SHARES ARE REGISTERED

| Entity Shareholder | Individual Shareholder |
|---|---|
| _____ | _____ |
| Name of Entity | Name of Individual Shareholder |
| By:_____ | _____ |
| Authorized officer, trustee or custodian | Signature of Individual Shareholder |
| _____ | _____ |
| Date | Name & Title of Authorized Signatory |

**PLEASE ATTACH WIRE TRANSFER INSTRUCTIONS OR MAILING ADDRESS, AS APPLICABLE**

# EXHIBIT C



Fletcher Asset Management, Inc.

*General Partner*

The Fletcher Fund, L.P.

*General Partner*

50%

50%

RPGP, Limited

100%

Richcourt Acquisition Inc. (BVI)

85%

Richcourt Holding Inc. (BVI)

100%

Soundview Capital Management Ltd.

*100% Voting Control of Each*

Fletcher Income Arbitrage Fund, LP

100%

Equity Income Corporation

100%

Multi Manager Investors, L.L.C.

93%

Fletcher International, Inc.

7%

100%

**Debtors**
- Soundview Elite, Ltd
- Soundview Premium, Ltd
- Soundview Star, Ltd
- Elite Designated
- Premium Designated
- Star Designated

**Fletcher International, Ltd**

2547031

# EXHIBIT D



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

CAUSE NO: 107 of 2013

**IN THE MATTER OF THE COMPANIES LAW (2012 REVISION)**

**AND IN THE MATTER OF ELITE DESIGNATED**

**("the Company")**

## AFFIDAVIT OF DEBORAH HICKS MIDANEK

I, Deborah Hicks Midanek, of 81 South Church Street, Grenada, MS 389.., being duly sworn make oath and say as follows: -

1.      I am the Chief Executive Officer of Solon Group Inc. ("Solon"). I am authorized by Solon to make this affidavit on its behalf.

2.      Solon is the sole director of certain of the funds known as the *Richcourt Funds*. The Richcourt Funds are:-

   2.1.   Richcourt Allweather Fund Inc.,

   2.2.   America Alternative Investments Inc.;

   2.3.   Optima Absolute Return Fund Ltd.;

   2.4.   Richcourt Euro Strategies Inc.;

   2.5.   Richcourt Composite Inc.;

   And from March 26 to June 19, 2013 also served, together with Alphonse Fletcher, Jr., as director of the following funds: -

   2.6.   Soundview Star Ltd.;

   2.7.   Soundview Elite Ltd.;

   2.8.   Soundview Premium Ltd.;

   2.9.   Soundview Composite Ltd.;

   2.10.  Star Designated;

   2.11.  Elite Designated;

   2.12.  Premium Designated;

2.13.   Pitagora Fund Ltd.;

2.14.   New Wave Fund SPC;

2.15.   Richcourt Top Stars 1 Fund Ltd.

3.   Solon is a director of Optima Absolute Return Fund Ltd., the Petitioner in this matter.  I am therefore authorized to swear this affidavit on its behalf.

4.   The statements in the Petition now produced and shown to me marked Exhibit "DHM 1" are made from my own knowledge or from information supplied to me in my capacity as Solon's representative in which case they are true to the best of my knowledge, information and belief.  I have been concerned in the matters giving rise to the Petition and have the requisite knowledge of the matters referred to in the Petition by virtue of my position within Solon, a director of the Petitioner and my ongoing involvement in this matter.

5.   I make this affidavit in order to verify the winding up petition presented by the Petitioner in respect of Elite Designated.

6.   Optima Absolute Return Fund Ltd. holds shares in Elite Designated as set out in the Petition.  Optima Absolute Return Fund Ltd. presents this Petition on the ground that it is just and equitable that Elite Designated be wound up for the reasons set out in the Petition which I believe to be true.

Sworn this 24 day of July 2013                )
at  Grenada, MS  , USA )
before me:                                                )
                                                               )
                                                                          Deborah Hicks Midanek

Notary Public

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 48384
PATRICIA ANN WOODS
Commission Expires
Jan. 31, 2014
MONTGOMERY COUNTY

This affidavit was filed by Giglioli & Company whose address for service is 4F Kirk House, PO Box 2505, George Town, Grand Cayman  KY1-1104, CAYMAN ISLANDS

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO:**     of 2013

**IN THE MATTER OF THE COMPANIES LAW (2012 REVISION)**

**AND IN THE MATTER OF ELITE DESIGNATED**

**("the Company")**

This is Exhibit " DHM 1 "
Referred to in the affidavit of
DEBORAH HICKS MIDANEK
Sworn to before:

*Patricia Ann Woods*
NOTARY PUBLIC

Subscribed and sworn to before me in my
presence, this 24 day of July
2013, a Notary Public in and for the
County of *Montg* State of *MISSISSIPPI*
*Patricia Ann Woods*
(Signature)          Notary Public
My Commission Expires Jan 31, 20 14

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 48384
PATRICIA ANN WOODS
Commission Expires
Jan. 31, 2014
MONTGOMERY COUNTY

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO:**     **of 2013**

**IN THE MATTER OF THE COMPANIES LAW (2012 REVISION)**

**AND IN THE MATTER OF ELITE DESIGNATED**

**("the Company")**

---

**WINDING UP PETITION**

---

**To the Grand Court**

The humble petition of Optima Absolute Return Fund Ltd. whose registered office is Intertrust Corporate Services (BVI) Limited 171 Main Street, PO Box 4041, Road Town, Tortola, British Virgin Islands VG1110, shows that:

1.    The Petitioner seeks orders winding up the Company on the grounds that it is just and equitable to do so because (a) it has been rendered insolvent by investments in insolvent companies related to their common directors and the persons who control their investment managers and (b) there has been a justifiable loss of confidence in the common management.

2.    The Petitioner and the Company are companies that are part of the funds known as the *Richcourt Funds*. The Richcourt Funds are:-

    (1)    Richcourt Allweather Fund Inc.,

    (2)    America Alternative Investments Inc.;

    (3)    Optima Absolute Return Fund Ltd.;

    (4)    Richcourt Composite Inc.; ("the Petitioning Companies") and

    (5)    Soundview Elite Ltd.;

    (6)    Richcourt Euro Strategies Inc.;

(7)     New Wave Fund SPC;

(8)     Premium Designated;

(9)     Elite Designated;

(10)    Star Designated;

(11)    Soundview Star Ltd.;

(12)    Soundview Premium Ltd.;

(13)    Soundview Composite Ltd.;

(14)    Pitagora Fund Ltd.;

(15)    Richcourt Top Stars 1 Fund Ltd.

**Soundview Elite Ltd. (SEL)**

3.      Soundview Elite Ltd. ("SEL") was initially incorporated as an international business company in the Commonwealth of the Bahamas in October 2003 and its registered office and place of incorporation was transferred by way of continuation to the Cayman Islands in June 2005.

4.      Accordingly, SEL is now an exempted company registered in the Cayman Islands under Part XII of the Companies Law. SEL's corporate number is 151268. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

5.      SEL has been at all material times carrying on the business of an open-ended Investment Company. According to its Offering Memorandum "The Company's investment objective is to give investors access to the hedge fund industry and achieve capital appreciation by investing a substantial portion of its assets among a group of money managers selected by the Investment Manager (the "Money Managers")."

6.      SEL commenced investment activities on November 1st, 2003 and has at all material times since it is believed about 2005 been registered with the Cayman

Islands Monetary Authority pursuant to the Mutual Funds Law (now 2009 Revision) of the Cayman Islands (the "Mutual Funds Law").

**New Wave Fund SPC**

7.  New Wave Fund SPC ("NWF") was incorporated in the Cayman Islands as an exempted company on 17th September, 2007 with limited liability as a segregated portfolio company.

8.  According to its Offering Memorandum dated February, 2008, "The primary investment objective of the Company is to achieve capital appreciation while attempting to limit investment risk."

9.  NWF's number is 195409. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

10. NWF commenced investment activities pursuant to its investment strategy in about 2007. It has only one segregated portfolio, Aliter Segregated Portfolio, in respect of which NWF has issued four share classes named "A" to "D".

11. The Fund is registered with the Cayman Islands Monetary Authority pursuant to the Mutual Funds Law.

**The Designated Entities**

<u>Premium Designated</u>

12. Premium Designated ("PD") was incorporated in the Cayman Islands on 19th March, 2009 as an exempted company registered in the Cayman Islands under the Companies Law. PD's corporate number is 224267. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

13. PD was established in order to restructure the then existing redemption debts of Soundview Premium, Ltd. ("Premium") an open ended mutual fund registered with the Cayman Islands Monetary Authority.

14. According to Article 38 of its Articles of Association, "the purpose of the Company is to act as a closed-end investment fund housing the illiquid assets of [Premium]. In return for the transfer of assets to the Company, the Company shall issue shares to [Premium]."

15. Shareholders who had redeemed their investment in Premium were paid in part in kind with shares in PD.

16. PD received certain assets from Premium as described above in exchange for the issue of shares to Premium which were used to pay its redeeming shareholders in or about March 2009.

17. PD has been at all material times carrying on the business of a closed end private investment fund, formed to hold the illiquid assets of Premium as described above. It is believed that PD has at all material times since 2010 been registered with the Cayman Islands Monetary Authority pursuant to the Mutual Funds Law.

18. In July 2012, PD was struck from the Register of Companies in the Cayman Islands for non-payment of fees, and has only very recently been restored to the Register in June 2013.

The Company

19. The Company was incorporated in the Cayman Islands on 19th March, 2009 and is now an exempted company under the Companies Law. The Company's corporate number is 224275. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

20.    The Company was established in order to restructure certain of the then existing redemption debts of SEL.

21.    According to Article 38 of its Articles of Association, "the purpose of the Company is to act as a closed-end investment fund housing the illiquid assets of [SEL]. In return for the transfer of assets to the Company, the Company shall issue shares to [SEL]. Shares shall be freely transferrable by [SEL]."

22.    The Petitioner believes that shareholders who had redeemed their investment in SEL were paid in part in kind with shares in the Company.

23.    The Company received assets from SEL as described above in exchange for the issue of shares to SEL which were used to pay its redeeming shareholders it is believed in or about March 2009.

24.    The Company has been at all material times carrying on the business of a closed end private investment fund, formed to hold the illiquid assets of SEL as described above.

25.    It is believed that the Company has at all material times since 2010 been registered with the Cayman Islands Monetary Authority pursuant to Mutual Funds Law.

26.    In July 2012, the Company was struck from the Register of Companies in the Cayman Islands for non-payment of fees, and has only very recently been restored to the Register in June 2013.

Star Designated

27.    Star Designated ("SD") was incorporated in the Cayman Islands on 19th March, 2009 as an exempted company under the Companies Law. SD's corporate number

is 224271. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

28. SD was established in order to restructure the then existing redemption debts of Soundview Star, Ltd. ("Star") an open ended mutual fund registered with the Cayman Islands Monetary Authority.

29. According to Article 38 of its Articles of Association, "the purpose of the Company is to act as a closed-end investment fund housing the illiquid assets of, [Star]. In return for the transfer of assets to the Company, the Company shall issue shares to [Star]. Shares shall be freely transferrable by [Star]."

30. Shareholders who had redeemed their investment in Star were paid in part in kind with shares in SD.

31. SD received assets from Star as described above in exchange for the issue of shares to Star which would be used to pay its redeeming shareholders it is believed in or about March, 2009.

32. SD has been at all material times carrying on the business of a closed end private investment fund, formed to hold the illiquid assets of Star as described above. It is believed that SD has at all material times since 2010 been registered with the Cayman Islands Monetary Authority pursuant to the Mutual Funds Law.

33. In July 2012, SD was struck from the Register of Companies in the Cayman Islands for non-payment of fees, and has only very recently been restored to the Register in June 2013.

**The Companies' Management**

34. The current directors of SEL, NWF, Premium, Star and the Designated Entities are George Ladner and Alphonse Fletcher, Jr. ("Mr. Fletcher").

35.     NWF's investment manager is New Wave Asset Management Ltd. ("NWAM"), incorporated in the Cayman Islands.

36.     SEL's investment manager, Soundview Capital Management Ltd. ("SCM"), is an international business company incorporated in the Commonwealth of the Bahamas in 1999.

37.     Mr. Fletcher controls both SCM and NWAM.

        (1)     Mr. Fletcher is also the principal and sole owner of the shares in Fletcher Asset Management Inc. ("FAM"), which appears to have carried out investment management services as agent for SCM and NWAM.

        (2)     The shares in the SCM and NWAM are held by Richcourt Holding, Inc. In 2008 Richcourt Holding, Inc. was acquired by companies owned or controlled by Mr. Fletcher or FAM.

38.     SEL, NWF, Star, Premium and the Designated Entities have had common directors each of whom has had a close association over many years with Mr. Fletcher and/or FAM:

        (1)     one Denis Keily ("Mr.Keily") who has for many years been an associate of Mr. Fletcher, has served as FAM's Deputy Chief Executive Officer and an adviser to FAM including FIA Leveraged Fund Ltd) ("FIAL");

        (2)     one Stewart Turner ("Mr. Turner") who has been associated as employee of or independent contractor to FAM since approximately 1998 and served as a director of a number of other entities managed by FAM or associated with Mr. Fletcher including FIAL;

(3)    one Floyd Saunders ("Mr. Saunders") who is also an employee of FAM, serves as Corporate Secretary for and a director of a number of other entities managed by FAM or associated with Mr. Fletcher.

**The Shares**

39.    The Articles of Association of SEL and NWF provided that each company could issue could issue non-voting, participating shares, which could be redeemed by investors at the Net Asset Value calculated for a redemption date and on the terms set out in the Offering Memorandum.

40.    According to the SEL's Offering Memorandum all shares were redeemable on the last day of the calendar quarter by giving 30 days' notice.

41.    Richcourt Allweather Fund Inc. ("RAF") is the holder of 1,503.4 Class "D" Shares issued by SEL, shown the Share Register of SEL to represent approximately 7.19% of the value of the Fund's Class D Shares.

42.    America Alternative Investments Ltd. ("AAI") is the holder of the following shares:

(1)    1013.79 Class "D" Shares issued by SEL, shown in the Share Register of SEL to represent approximately 4.85% of the value of the Fund's Class "D" Shares.

(2)    27,400 Class "A", "C" and "D" shares issued by the NWF according to the values last published by the Company in December 2010.

(i)    valued at a total of US$2,335,250 (25,000 Class "A" Shares), US$107,556 (1,200 Class "C" Shares) and EUR99,736 (Class "D" Shares).

(ii) representing together with the shares in NWF held by SEL 100% of NWF's issued share capital.

43. In respect of the "Designated Entities" AAI was in 2009 a redemption creditor of SEL, Premium and Star and received payment in kind as a result of which it holds shares as follows:

(1) Shares representing 305.74 shares valued at US$277,241 of PD's USD Class shares

(2) Shares representing 199.59 shares valued at US$199,621.93 of SD's USD Class shares (10.8%)

(3) Shares representing 447.67 shares valued at US$456,865.14 of the Company's USD Class shares (12.6%)

44. The Petitioner was in 2009 a redemption creditor of SEL, Premium and Star and received payment in kind as a result of which it holds shares in the "Designated Entities" as follows:

(1) Shares representing 290.89 shares valued at US$263,776.14 of PD's USD Class shares

(2) Shares representing 190.50 shares valued at US$190,530.48 of SD's USD Class shares (10.4%)

(3) Shares representing 426.90 shares valued at US$435,668.53 of the Company's USD Class shares (12.03%)

45. Richcourt Composite Inc. ("Richcourt Composite") was in 2009 a redemption creditor of SEL, Premium and Star and received payment in kind as a result of which it holds shares in the "Designated Entities" as follows:

(1) Shares representing 436.59 shares valued at US$395,895.45 of PD's USD Class shares

(2) Shares representing 291.56 shares valued at US$291,606 of SD's USD Class shares (15.91%)

46. All shares in the companies (other than the Designated Entities) were redeemable according to their Offering Memoranda on the last day of the month or calendar quarter by giving 30 days' notice.

**Failure by SEL to pay RAF's Redemption Proceeds**

47. RAF sought to redeem its SEL shareholdings on 30 September 2011 (at which date the redemption value of its shareholding in SEL was recorded as US$1,769,206.21). RAF was entitled to be paid its redemption proceeds on about 31 October 2011.

48. SEL has failed to pay the redemption monies due to RAF or any part thereof and at the date hereof the same remains unpaid.

**SEL's Insolvency and Inability to Pay Redemptions**

49. It is believed that the total number of outstanding redemptions in respect of the Class "D", Class "E", and Class "F" shares of SEL amounted in 2011 to US$15,180,870 with a further US$5,595,584 in 2012 and a further US$1,050,825 in 2013. The company has failed to pay the same.

50. As at April 2013, SEL's balance sheet showed assets of about US$18.3m against liabilities owing to the redemption creditors and others exceeding US$20m.

51. However, the true asset value of SEL is likely to be less than US$9 million for the following reasons. Although SEL had cash of about US$5.5 million, its other investments were wholly illiquid:

(1)     It held shares in Class "A" and "B" shares in NWF Aliter Segregated
        Portfolio valued as at 31 March 2011 at $4.26 million (representing 60%
        of NWF's issued shares).

        (i)     SEL redeemed all of their shares in NWF in 2011 and was entitled
                to be paid on 30 September 2011

        (ii)    NWF has not reported a NAV since 31 March 2011

        (iii)   NWF's assets consist entirely of shares in FIAL which is in
                insolvent supervised liquidation in the Cayman Islands.

(2)     SEL also held shares in Soundview Composite Ltd ("Soundview
        Composite") Class "H"

        (i)     SEL placed a full redemption in Soundview Composite on 30
                September 2011 but the same has not been paid;

        (ii)    Soundview Composite has not reported a NAV since 31 March
                2011.

        (iii)   Soundview Composite's assets consist entirely of its holding of
                shares in FIAL which is in insolvent or supervised liquidation.

(3)     SEL assets now also include US$4m invested in some form in Fletcher
        International Ltd. (Bermuda) purchased from Fletcher International Inc
        (incorporated in Delaware, US) which is in insolvency proceedings.

52.     Accordingly SEL is unable to meet its liabilities and has no reasonable prospect of
        being able to do so.  The company is therefore unable to pay its debts and it is just
        and equitable that the company be wound up.

**NWF's Insolvency**

53.     As stated above, SEL redeemed its investment in NWF on 30 September 2011. As a result US$4.26m has been due and owing to SEL since at least 31 December 2011 but NWF has failed to pay the same.

54.     Apart from ca. US$129,000 cash NWF's sole asset is its investment in FIAL of US$5.358 million. FIAL is in insolvent or supervised liquidation.

55.     Accordingly NWF is unable to meet its liabilities and has no reasonable prospect of being able to do so.

**Loss of Sub-Stratum of SEL, NWF and the Designated Entities**

56.     Neither SEL nor any of the Designated Entities has reported net asset values for any date later than 31 December 2010 and NWF has not done so since 31 March 2011 (prior to which each of them had done so regularly) and neither SEL nor NWF have given investors any or any proper explanation of the time and manner in which redemption might be paid.

57.     Further, in contravention of Section 8 of the Mutual Funds Law (2009 Revision) no audited accounts have been prepared for the 4 years since 2008 by or on behalf of SEL, NWF sent to its investors or otherwise filed or, in the case of the Designated Entities for the three years since 2009 and again no explanation has been provided.

58.     In January 2013 SCM, was struck off the register of companies in the Bahamas for non-payment of fees. Each of the Designated Entities were struck off the register of Companies for non-payment of fees in 2012 and not restored to the Register until about June 2013.

59. Redemptions have not been paid in full or in part for SCL or NWF since March 2011. Despite the fact that the Designated Entities have substantial amounts of cash none of them has attempted to pay shareholders:

   (1) PD has cash of about US$2.994 million as at 11 June 2013 but has not made any payments to AAI, the Petitioner or Richcourt Composite or any other redemption creditor

   (2) The Company has cash of about US$4.019 million as at 11 June 2013 but has not made any payments to AAI or the Petitioner or any other redemption creditor

   (3) SD has cash of about US$4.195 million as at 11 June 2013 but has not made any payments to AAI, The Petitioner or Richcourt Composite or any other redemption creditor

60. Neither SEL nor NWF has attempted to carry on the business of making investments in accordance with their respective Offering Memoranda.

61. The Designated Entities have not passed on the benefit of realization of assets in accordance with their respective Articles of Association but have instead been accumulating cash and making payments of fees to investment managers including FAM.

62. Further the sub-stratum of SEL and NWF have failed and it is just and equitable that they be wound up.

**Justifiable Loss of Confidence**

63. The Petitioner repeats the allegations above. The failure to provide Net Asset Value calculations or accounts or to give explanations of the failure to pay redemptions and, in the case of the Designated Entities, the failure to pass on the proceeds of

realisations amounted to breaches of fiduciary duty on the part of the directors and investment managers.

64.    Despite its failure to pay redemptions SEL's directors and its investment manager have allowed SEL to continue to make payments from the company's accounts which payments appear to have been made for the direct or indirect benefit of FAM and/or Mr Fletcher.

(1)    In December 2012 SEL's directors and investment manager caused SEL to buy from an entity Fletcher International Inc. ("FII") 100% of the shares of another entity Fletcher International Ltd ("FIL") for $4 million.

    (i)    FII was controlled and managed by Mr. Fletcher and FAM and/or affiliates Mr. Fletcher or FAM owns.

    (ii)    FIL, controlled and or managed by Mr. Fletcher and FAM, filed for chapter 11 protection from creditors US Bankruptcy Court in the Southern District of New York on June 29, 2012.

    (iii)    On or about September 5, 2012, Richard J. Davis was appointed by the Bankruptcy Court to assume control of the FIL estate.

    (iv)    FIL was at the time of purchase, therefore, and is currently under the control of Mr. Davis as chapter 11 trustee. Its value is not known but it is highly likely to be insolvent.

    (v)    In about March 2013 FII made a payment of US$2.2m to FIL's Chapter 11 Trustee to restore the like amount which FIL had made in 2012 to FIAL at the direction of Mr. Fletcher and/or FAM.

(2)    Approximately $112,000 in investment management fees were paid in February 2013, and others such fees may have been paid since SEL ceased being able to report its NAV to shareholders.

(3)     FII's directors included Mr. Ladner and FIL's directors included Mr.
        Turner and both were managed by FAM and/or Mr Fletcher.

65.     NWF and the Designated Entities each acquired investments in FIAL or FII in
        circumstances which are not known to the Petitioner but it is believed that such
        investments may have been made after statutory demands for payment were made
        by the petitioners of FIAL in about late 2011.

66.     By virtue of the fact that SEL and Soundview Composite have common
        management the Soundview Composite directors' interest in not enforcing SEL's
        redemption rights conflicted with their duty to SEL to do so.

67.     Despite its failure to pay redemptions the directors and SCM have allowed the
        Designated Entities to continue to pay investment management fees and make other
        payments which payments appear to have been made for the direct or indirect
        benefit of FAM and/or Mr. Fletcher.

        (1)     PD paid approximately $85,125.60 in investment management fees in
                February 2013, and other such fees may have been paid since PD ceased
                being able to report its NAV to shareholders.

        (2)     SD paid approximately $66,477.60 in investment management fees in
                February 2013, and other such fees may have been paid since SD ceased
                being able to report its NAV to shareholders.

        (3)     The Company paid approximately $108,410.40 in investment management
                fees in February2013, and other such fees may have been paid since the
                Company ceased being able to report its NAV to shareholders.

68.   In the circumstances it is just and equitable to wind up SEL, NWF and the Designated Entities.

69.   The Petitioner wishes to appoint Kenneth Krys and Margot MacInnis as joint official liquidators.

70.   Your Petitioners therefore humbly pray that:-

(1)   The Company be wound up in accordance with the Companies Law.

(2)   Kenneth Krys and Margot MacInnis both of PO Box 10663, Grand Cayman KY1-1008 (to hold their offices jointly and severally) be appointed as joint official liquidators of the Company.

(3)   The Joint Official Liquidators are authorized jointly and severally to exercise any of the powers listed in Part II of Schedule 3 of the Companies Law (2012 Revision) without the further sanction or intervention of the Court.

(4)   The Joint Official Liquidators be authorized to do any act or things considered by them to be necessary or desirable in connection with the liquidation of the Company and the winding up of their affairs.

(5)   The Joint Official Liquidators do file with the Clerk of Court a report in writing of the position of and progress made with the winding up of the Company with the realization of the assets thereof and to any other matters connected to the winding up of the Company as the Court may direct.

(6)   The Joint Official Liquidators be at liberty to appoint counsel, attorneys, professional advisors, whether in the Cayman Islands or elsewhere as they may consider necessary to advise and assist them in the performance of their duties and on such terms as they may think fit and remunerate them out of the assets of the Company.

(7)     The Joint Official Liquidators and their staff be remunerated out of the assets of the Company at their usual customary rates.

(8)     The Joint Official Liquidators be at liberty to apply generally.

(9)     The costs of the Petition and the Petitioner be paid out of the assets of the Company.

(10)    The Joint Official Liquidators cause a copy of this petition to be delivered to the Registrar of Companies and the Cayman Islands Monetary Authority.

(11)    Such further or other relief be granted as this Court deems appropriate.

Dated the 26th day of July 2013.

_____

Giglioli & Company

**Note:**  This petition is intended to be served on the Registrar of Companies, the Cayman Islands Monetary Authority, and the registered office of the Company.

FILED by Giglioli & Company whose address for service is 4th Floor Kirk House, PO Box 2505, Grand Cayman KY1-1104, Cayman Islands.

# NOTICE OF HEARING

TAKE NOTICE THAT the hearing of this petition will take place at the Law Courts, George Town, Grand Cayman on                                    at 10:00 am.

Any correspondence or communication with the Court relating to the hearing of this petition should be addressed to the Registrar of the Financial Services Division of the Grand Court at PO Box 494, Grand Cayman KY1-1106, and telephone 345 949 4296.

# EXHIBIT E

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: 106 of 2013

IN THE MATTER OF THE COMPANIES LAW (2012 REVISION)

AND IN THE MATTER OF PREMIUM DESIGNATED

("the Company")

WINDING UP PETITION

To the Grand Court

The humble petition of Optima Absolute Return Fund Ltd. whose registered office is Intertrust Corporate Services (BVI) Limited 171 Main Street, PO Box 4041, Road Town, Tortola, British Virgin Islands VG1110, shows that:

1.  The Petitioner seeks orders winding up the Company on the grounds that it is just and equitable to do so because (a) it has been rendered insolvent by investments in insolvent companies related to their common directors and the persons who control their investment managers and (b) there has been a justifiable loss of confidence in the common management.

2.  The Petitioner and the Company are companies that are part of the funds known as the *Richcourt Funds*. The Richcourt Funds are:-

    (1)  Richcourt Allweather Fund Inc.,

    (2)  America Alternative Investments Inc.;

    (3)  Optima Absolute Return Fund Ltd.;

    (4)  Richcourt Composite Inc.; ("the Petitioning Companies") and

    (5)  Soundview Elite Ltd.;

    (6)  Richcourt Euro Strategies Inc.;

1

(7)     New Wave Fund SPC;

(8)     Premium Designated;

(9)     Elite Designated;

(10)    Star Designated;

(11)    Soundview Star Ltd.;

(12)    Soundview Premium Ltd.;

(13)    Soundview Composite Ltd.;

(14)    Pitagora Fund Ltd.;

(15)    Richcourt Top Stars 1 Fund Ltd.

**Soundview Elite Ltd. (SEL)**

3.      Soundview Elite Ltd. ("SEL") was initially incorporated as an international business
        company in the Commonwealth of the Bahamas in October 2003 and its registered
        office and place of incorporation was transferred by way of continuation to the
        Cayman Islands in June 2005.

4.      Accordingly, SEL is now an exempted company registered in the Cayman Islands
        under Part XII of the Companies Law.  SEL's corporate number is 151268.  Its
        registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20
        Genesis Close, George Town, Grand Cayman.

5.      SEL has been at all material times carrying on the business of an open-ended
        Investment Company. According to its Offering Memorandum "The Company's
        investment objective is to give investors access to the hedge fund industry and
        achieve capital appreciation by investing a substantial portion of its assets among a
        group of money managers selected by the Investment Manager (the "Money
        Managers")."

6.      SEL commenced investment activities on November 1st, 2003 and has at all
        material times since it is believed about 2005 been registered with the Cayman

Islands Monetary Authority pursuant to the Mutual Funds Law (now 2009 Revision) of the Cayman Islands (the "Mutual Funds Law").

**New Wave Fund SPC**

7.    New Wave Fund SPC ("NWF") was incorporated in the Cayman Islands as an exempted company on 17th September, 2007 with limited liability as a segregated portfolio company.

8.    According to its Offering Memorandum dated February, 2008, "The primary investment objective of the Company is to achieve capital appreciation while attempting to limit investment risk:"

9.    NWF's number is 195409. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

10.   NWF commenced investment activities pursuant to its investment strategy in about 2007. It has only one segregated portfolio, Aliter Segregated Portfolio, in respect of which NWF has issued four share classes named "A" to "D".

11.   The Fund is registered with the Cayman Islands Monetary Authority pursuant to the Mutual Funds Law.

**The Designated Entities**

<u>The Company</u>

12.   The Company was incorporated in the Cayman Islands on 19th March, 2009 as an exempted company registered in the Cayman Islands under the Companies Law. The Company's corporate number is 224267. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

13. The Company was established in order to restructure the then existing redemption debts of Soundview Premium, Ltd. ("Premium") an open ended mutual fund registered with the Cayman Islands Monetary Authority.

14. According to Article 38 of its Articles of Association, "the purpose of the Company is to act as a closed-end investment fund housing the illiquid assets of [Premium]. In return for the transfer of assets to the Company, the Company shall issue shares to [Premium]."

15. Shareholders who had redeemed their investment in Premium were paid in part in kind with shares in the Company.

16. The Company received certain assets from Premium as described above in exchange for the issue of shares to Premium which were used to pay its redeeming shareholders in or about March 2009.

17. The Company has been at all material times carrying on the business of a closed end private investment fund, formed to hold the illiquid assets of Premium as described above. It is believed that the Company has at all material times since 2010 been registered with the Cayman Islands Monetary Authority pursuant to the Mutual Funds Law.

18. In July 2012, the Company was struck from the Register of Companies in the Cayman Islands for non-payment of fees, and has only very recently been restored to the Register in June 2013.

Elite Designated

19. Elite Designated ("ED") was incorporated in the Cayman Islands on 19th March, 2009 and is now an exempted company under the Companies Law. ED's corporate

number is 224275. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

20.   ED was established in order to restructure certain of the then existing redemption debts of SEL.

21.   According to Article 38 of its Articles of Association, "the purpose of the Company is to act as a closed-end investment fund housing the illiquid assets of [SEL]. In return for the transfer of assets to the Company, the Company shall issue shares to [SEL]. Shares shall be freely transferrable by [SEL]."

22.   The Petitioner believes that shareholders who had redeemed their investment in SEL were paid in part in kind with shares in ED.

23.   ED received assets from SEL as described above in exchange for the issue of shares to SEL which were used to pay its redeeming shareholders it is believed in or about March 2009.

24.   ED has been at all material times carrying on the business of a closed end private investment fund, formed to hold the illiquid assets of SEL as described above.

25.   It is believed that ED has at all material times since 2010 been registered with the Cayman Islands Monetary Authority pursuant to Mutual Funds Law.

26.   In July 2012, ED was struck from the Register of Companies in the Cayman Islands for non-payment of fees, and has only very recently been restored to the Register in June 2013.

Star Designated

27.   Star Designated ("SD") was incorporated in the Cayman Islands on 19th March, 2009 as an exempted company under the Companies Law. SD's corporate number

5

is 224271. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

28.     SD was established in order to restructure the then existing redemption debts of Soundview Star, Ltd. ("Star") an open ended mutual fund registered with the Cayman Islands Monetary Authority.

29.     According to Article 38 of its Articles of Association, "the purpose of the Company is to act as a closed-end investment fund housing the illiquid assets of, [Star]. In return for the transfer of assets to the Company, the Company shall issue shares to [Star]. Shares shall be freely transferrable by [Star]."

30.     Shareholders who had redeemed their investment in Star were paid in part in kind with shares in SD.

31.     SD received assets from Star as described above in exchange for the issue of shares to Star which would be used to pay its redeeming shareholders it is believed in or about March, 2009.

32.     SD has been at all material times carrying on the business of a closed end private investment fund, formed to hold the illiquid assets of Star as described above. It is believed that SD has at all material times since 2010 been registered with the Cayman Islands Monetary Authority pursuant to the Mutual Funds Law.

33.     In July 2012, SD was struck from the Register of Companies in the Cayman Islands for non-payment of fees, and has only very recently been restored to the Register in June 2013.

**The Companies' Management**

34.     The current directors of SEL, NWF, Premium, Star and the Designated Entities are George Ladner and Alphonse Fletcher, Jr. ("Mr. Fletcher").

6

35. NWF's investment manager is New Wave Asset Management Ltd. ("NWAM"), incorporated in the Cayman Islands.

36. SEL's investment manager, Soundview Capital Management Ltd. ("SCM"), is an international business company incorporated in the Commonwealth of the Bahamas in 1999.

37. Mr. Fletcher controls both SCM and NWAM.

   (1)   Mr. Fletcher is also the principal and sole owner of the shares in Fletcher Asset Management Inc. ("FAM"), which appears to have carried out investment management services as agent for SCM and NWAM.

   (2)   The shares in the SCM and NWAM are held by Richcourt Holding, Inc. In 2008 Richcourt Holding, Inc. was acquired by companies owned or controlled by Mr. Fletcher or FAM.

38. SEL, NWF, Star, the Company and the Designated Entities have had common directors each of whom has had a close association over many years with Mr. Fletcher and/or FAM:

   (1)   one Denis Keily ("Mr.Keily") who has for many years been an associate of Mr. Fletcher, has served as FAM's Deputy Chief Executive Officer and an adviser to FAM including FIA Leveraged Fund Ltd) ("FIAL");

   (2)   one Stewart Turner ("Mr. Turner") who has been associated as employee of or independent contractor to FAM since approximately 1998 and served as a director of a number of other entities managed by FAM or associated with Mr. Fletcher including FIAL;

(3)     one Floyd Saunders ("Mr. Saunders") who is also an employee of FAM, serves as Corporate Secretary for and a director of a number of other entities managed by FAM or associated with Mr. Fletcher.

**The Shares**

39.     The Articles of Association of SEL and NWF provided that each company could issue could issue non-voting, participating shares, which could be redeemed by investors at the Net Asset Value calculated for a redemption date and on the terms set out in the Offering Memorandum.

40.     According to SEL's Offering Memorandum all shares were redeemable on the last day of the calendar quarter by giving 30 days' notice.

41.     Richcourt Allweather Fund Inc. ("RAF") is the holder of 1,503.4 Class "D" Shares issued by SEL, shown the Share Register of SEL to represent approximately 7.19% of the value of the Fund's Class D Shares.

42.     America Alternative Investments Ltd. ("AAI") is the holder of the following shares:

(1)     1013.79 Class "D" Shares issued by SEL, shown in the Share Register of SEL to represent approximately 4.85% of the value of the Fund's Class "D" Shares.

(2)     27,400 Class "A", "C" and "D" shares issued by the NWF according to the values last published by the Company in December 2010.

(i)     valued at a total of US$2,335,250 (25,000 Class "A" Shares), US$107,556 (1,200 Class "C" Shares) and EUR99,736 (Class "D" Shares).

(ii)     representing together with the shares in NWF held by SEL 100% of NWF's issued share capital.

43.     In respect of the "Designated Entities" AAI was in 2009 a redemption creditor of SEL, Premium and Star and received payment in kind as a result of which it holds shares as follows:

(1)     Shares representing 305.74 shares valued at US$277,241 of the Company's USD Class shares

(2)     Shares representing 199.59 shares valued at US$199,621.93 of SD's USD Class shares (10.8%)

(3)     Shares representing 447.67 shares valued at US$456,865.14 of ED's USD Class shares (12.6%)

44.     The Petitioner was in 2009 a redemption creditor of SEL, Premium and Star and received payment in kind as a result of which it holds shares in the "Designated Entities" as follows:

(1)     Shares representing 290.89 shares valued at US$263,776.14 of the Company's USD Class shares

(2)     Shares representing 190.50 shares valued at US$190,530.48 of SD's USD Class shares (10.4%)

(3)     Shares representing 426.90 shares valued at US$435,668.53 of ED's USD Class shares (12.03%)

45.     Richcourt Composite Inc. ("Richcourt Composite") was in 2009 a redemption creditor of SEL, Premium and Star and received payment in kind as a result of which it holds shares in the "Designated Entities" as follows:

(1)     Shares representing 436.59 shares valued at US$395,895.45 of the Company's USD Class shares

(2)     Shares representing 291.56 shares valued at US$291,606 of SD's USD Class shares (15.91%)

46.     All shares in the companies (other than the Designated Entities) were redeemable according to their Offering Memoranda on the last day of the month or calendar quarter by giving 30 days' notice.

**Failure by SEL to pay RAF's Redemption Proceeds**

47.     RAF sought to redeem its SEL shareholdings on 30 September 2011 (at which date the redemption value of its shareholding in SEL was recorded as US$1,769,206.21). RAF was entitled to be paid its redemption proceeds on about 31 October 2011.

48.     SEL has failed to pay the redemption monies due to RAF or any part thereof and at the date hereof the same remains unpaid.

**SEL's Insolvency and Inability to Pay Redemptions**

49.     It is believed that the total number of outstanding redemptions in respect of the Class "D", Class "E", and Class "F" shares of SEL amounted in 2011 to US$15,180,870 with a further US$5,595,584 in 2012 and a further US$1,050,825 in 2013. The company has failed to pay the same.

50.     As at April 2013, SEL's balance sheet showed assets of about US$18.3m against liabilities owing to the redemption creditors and others exceeding US$20m.

51.     However, the true asset value of SEL is likely to be less than US$9 million for the following reasons. Although SEL had cash of about US$5.5 million, its other investments were wholly illiquid:

(1)     It held shares in Class "A" and "B" shares in NWF Aliter Segregated Portfolio valued as at 31 March 2011 at $4.26 million (representing 60% of NWF's issued shares).

    (i)     SEL redeemed all of their shares in NWF in 2011 and was entitled to be paid on 30 September 2011

    (ii)    NWF has not reported a NAV since 31 March 2011

    (iii)   NWF's assets consist entirely of shares in FIAL which is in insolvent supervised liquidation in the Cayman Islands.

(2)     SEL also held shares in Soundview Composite Ltd ("Soundview Composite") Class "H"

    (i)     SEL placed a full redemption in Soundview Composite on 30 September 2011 but the same has not been paid;

    (ii)    Soundview Composite has not reported a NAV since 31 March 2011.

    (iii)   Soundview Composite's assets consist entirely of its holding of shares in FIAL which is in insolvent or supervised liquidation.

(3)     SEL assets now also include US$4m invested in some form in Fletcher International Ltd. (Bermuda) purchased from Fletcher International Inc (incorporated in Delaware, US) which is in insolvency proceedings.

52.     Accordingly SEL is unable to meet its liabilities and has no reasonable prospect of being able to do so. The company is therefore unable to pay its debts and it is just and equitable that the company be wound up.

**NWF's Insolvency**

53.    As stated above, SEL redeemed its investment in NWF on 30 September 2011. As a result US$4.26m has been due and owing to SEL since at least 31 December 2011 but NWF has failed to pay the same.

54.    Apart from ca. US$129,000 cash NWF's sole asset is its investment in FIAL of US$5.358 million. FIAL is in insolvent or supervised liquidation.

55.    Accordingly NWF is unable to meet its liabilities and has no reasonable prospect of being able to do so.

**Loss of Sub-Stratum of SEL, NWF and the Designated Entities**

56.    Neither SEL nor any of the Designated Entities has reported net asset values for any date later than 31 December 2010 and NWF has not done so since 31 March 2011 (prior to which each of them had done so regularly) and neither SEL nor NWF have given investors any or any proper explanation of the time and manner in which redemption might be paid.

57.    Further, in contravention of Section 8 of the Mutual Funds Law (2009 Revision) no audited accounts have been prepared for the 4 years since 2008 by or on behalf of SEL, NWF sent to its investors or otherwise filed or, in the case of the Designated Entities for the three years since 2009 and again no explanation has been provided.

58.    In January 2013 SCM, was struck off the register of companies in the Bahamas for non-payment of fees. Each of the Designated Entities were struck off the register of Companies for non-payment of fees in 2012 and not restored to the Register until about June 2013.

59.     Redemptions have not been paid in full or in part for SCL or NWF since March
        2011. Despite the fact that the Designated Entities have substantial amounts of cash
        none of them has attempted to pay shareholders:

        (1)     the Company has cash of about US$2.994 million as at 11 June 2013 but
                has not made any payments to AAI, the Petitioner or Richcourt Composite
                or any other redemption creditor

        (2)     ED has cash of about US$4.019 million as at 11 June 2013 but has not
                made any payments to AAI or the Petitioner or any other redemption
                creditor

        (3)     SD has cash of about US$4.195 million as at 11 June 2013 but has not
                made any payments to AAI, the Petitioner or Richcourt Composite or any
                other redemption creditor

60.     Neither SEL nor NWF has attempted to carry on the business of making investments
        in accordance with their respective Offering Memoranda.

61.     The Designated Entities have not passed on the benefit of realization of assets in
        accordance with their respective Articles of Association but have instead been
        accumulating cash and making payments of fees to investment managers including
        FAM.

62.     Further the sub-stratum of SEL and NWF have failed and it is just and equitable that
        they be wound up.

**Justifiable Loss of Confidence**

63.     The Petitioner repeats the allegations above. The failure to provide Net Asset Value
        calculations or accounts or to give explanations of the failure to pay redemptions
        and, in the case of the Designated Entities, the failure to pass on the proceeds of

realisations amounted to breaches of fiduciary duty on the part of the directors and investment managers.

64.     Despite its failure to pay redemptions SEL's directors and its investment manager have allowed SEL to continue to make payments from the company's accounts which payments appear to have been made for the direct or indirect benefit of FAM and/or Mr Fletcher.

    (1)     In December 2012 SEL's directors and investment manager caused SEL to buy from an entity Fletcher International Inc. ("FII") 100% of the shares of another entity Fletcher International Ltd ("FIL") for $4 million.

        (i)     FII was controlled and managed by Mr. Fletcher and FAM and/or affiliates Mr. Fletcher or FAM owns.

        (ii)     FIL, controlled and or managed by Mr. Fletcher and FAM, filed for chapter 11 protection from creditors US Bankruptcy Court in the Southern District of New York on June 29, 2012.

        (iii)     On or about September 5, 2012, Richard J. Davis was appointed by the Bankruptcy Court to assume control of the FIL estate.

        (iv)     FIL was at the time of purchase, therefore, and is currently under the control of Mr. Davis as chapter 11 trustee. Its value is not known but it is highly likely to be insolvent.

        (v)     In about March 2013 FII made a payment of US$2.2m to FIL's Chapter 11 Trustee to restore the like amount which FIL had made in 2012 to FIAL at the direction of Mr. Fletcher and/or FAM.

    (2)     Approximately $112,000 in investment management fees were paid in February 2013, and others such fees may have been paid since SEL ceased being able to report its NAV to shareholders.

14

(3)    FII's directors included Mr. Ladner and FIL's directors included Mr. Turner and both were managed by FAM and/or Mr Fletcher.

65.    NWF and the Designated Entities each acquired investments in FIAL or FII in circumstances which are not known to the Petitioner but it is believed that such investments may have been made after statutory demands for payment were made by the petitioners of FIAL in about late 2011.

66.    By virtue of the fact that SEL and Soundview Composite have common management the Soundview Composite directors' interest in not enforcing SEL's redemption rights conflicted with their duty to SEL to do so.

67.    Despite its failure to pay redemptions the directors and SCM have allowed the Designated Entities to continue to pay investment management fees and make other payments which payments appear to have been made for the direct or indirect benefit of FAM and/or Mr. Fletcher.

(1)    The Company paid approximately $85,125.60 in investment management fees in February 2013, and other such fees may have been paid since the Company ceased being able to report its NAV to shareholders.

(2)    SD paid approximately $66,477.60 in investment management fees in February 2013, and other such fees may have been paid since SD ceased being able to report its NAV to shareholders.

(3)    ED paid approximately $108,410.40 in investment management fees in February2013, and other such fees may have been paid since ED ceased being able to report its NAV to shareholders.

68.     In the circumstances it is just and equitable to wind up SEL, NWF and the Designated Entities.

69.     The Petitioner wishes to appoint Kenneth Krys and Margot MacInnis as joint official liquidators.

70.     Your Petitioners therefore humbly pray that:-

(1)     The Company be wound up in accordance with the Companies Law.

(2)     Kenneth Krys and Margot MacInnis both of PO Box 10663, Grand Cayman KY1-1008 (to hold their offices jointly and severally) be appointed as joint official liquidators of the Company.

(3)     The Joint Official Liquidators are authorized jointly and severally to exercise any of the powers listed in Part II of Schedule 3 of the Companies Law (2012 Revision) without the further sanction or intervention of the Court.

(4)     The Joint Official Liquidators be authorized to do any act or things considered by them to be necessary or desirable in connection with the liquidation of the Company and the winding up of their affairs.

(5)     The Joint Official Liquidators do file with the Clerk of Court a report in writing of the position of and progress made with the winding up of the Company with the realization of the assets thereof and to any other matters connected to the winding up of the Company as the Court may direct.

(6)     The Joint Official Liquidators be at liberty to appoint counsel, attorneys, professional advisors, whether in the Cayman Islands or elsewhere as they may consider necessary to advise and assist them in the performance of their duties and on such terms as they may think fit and remunerate them out of the assets of the Company.

(7)     The Joint Official Liquidators and their staff be remunerated out of the assets of the Company at their usual customary rates.

(8)     The Joint Official Liquidators be at liberty to apply generally.

(9)     The costs of the Petition and the Petitioner be paid out of the assets of the Company.

(10)    The Joint Official Liquidators cause a copy of this petition to be delivered to the Registrar of Companies and the Cayman Islands Monetary Authority.

(11)    Such further or other relief be granted as this Court deems appropriate.

Dated the 26th day of July 2013.

Giglioli & Company

**Note:**  This petition is intended to be served on the Registrar of Companies, the Cayman Islands Monetary Authority, and the registered office of the Company.

FILED by Giglioli & Company whose address for service is 4th Floor Kirk House, PO Box 2505, Grand Cayman KY1-1104, Cayman Islands.

## NOTICE OF HEARING

TAKE NOTICE THAT the hearing of this petition will take place at the Law Courts, George Town, Grand Cayman on *24th September* at 10:00 am.

Any correspondence or communication with the Court relating to the hearing of this petition should be addressed to the Registrar of the Financial Services Division of the Grand Court at PO Box 494, Grand Cayman KY1-1106, and telephone 345 949 4296.

18

# EXHIBIT F

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: 108 of 2013

IN THE MATTER OF THE COMPANIES LAW (2012 REVISION)

AND IN THE MATTER OF STAR DESIGNATED

("the Company")



WINDING UP PETITION

To the Grand Court

The humble petition of America Alternative Investments Ltd. whose registered office is Intertrust Corporate Services (BVI) Limited 171 Main Street, PO Box 4041, Road Town, Tortola, British Virgin Islands VG1110, shows that:

1.     The Petitioner seeks orders winding up the Company on the grounds that it is just and equitable to do so because (a) it has been rendered insolvent by investments in insolvent companies related to their common directors and the persons who control their investment managers and (b) there has been a justifiable loss of confidence in the common management.

2.     The Petitioner and the Company are companies that are part of the funds known as the *Richcourt Funds*. The Richcourt Funds are:-

     (1)     Richcourt Allweather Fund Inc.,

     (2)     America Alternative Investments Inc.;

     (3)     Optima Absolute Return Fund Ltd.;

     (4)     Richcourt Composite Inc.; ("the Petitioning Companies") and

     (5)     Soundview Elite Ltd.;

     (6)     Richcourt Euro Strategies Inc.;

1

(7)    New Wave Fund SPC;

(8)    Premium Designated;

(9)    Elite Designated;

(10)   Star Designated;

(11)   Soundview Star Ltd.;

(12)   Soundview Premium Ltd.;

(13)   Soundview Composite Ltd.;

(14)   Pitagora Fund Ltd.;

(15)   Richcourt Top Stars 1 Fund Ltd.

**Soundview Elite Ltd. (SEL)**

3.    Soundview Elite Ltd. ("SEL") was initially incorporated as an international business company in the Commonwealth of the Bahamas in October 2003 and its registered office and place of incorporation was transferred by way of continuation to the Cayman Islands in June 2005.

4.    Accordingly, SEL is now an exempted company registered in the Cayman Islands under Part XII of the Companies Law. SEL's corporate number is 151268. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

5.    SEL has been at all material times carrying on the business of an open-ended Investment Company. According to its Offering Memorandum "The Company's investment objective is to give investors access to the hedge fund industry and achieve capital appreciation by investing a substantial portion of its assets among a group of money managers selected by the Investment Manager (the "Money Managers")."

6.    SEL commenced investment activities on November 1st, 2003 and has at all material times since it is believed about 2005 been registered with the Cayman

Islands Monetary Authority pursuant to the Mutual Funds Law (now 2009 Revision) of the Cayman Islands (the "Mutual Funds Law").

**New Wave Fund SPC**

7.   New Wave Fund SPC ("NWF") was incorporated in the Cayman Islands as an exempted company on 17th September, 2007 with limited liability as a segregated portfolio company.

8.   According to its Offering Memorandum dated February, 2008, "The primary investment objective of the Company is to achieve capital appreciation while attempting to limit investment risk."

9.   NWF's number is 195409. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

10.   NWF commenced investment activities pursuant to its investment strategy in about 2007. It has only one segregated portfolio, Aliter Segregated Portfolio, in respect of which NWF has issued four share classes named "A" to "D".

11.   The Fund is registered with the Cayman Islands Monetary Authority pursuant to the Mutual Funds Law.

**The Designated Entities**

<u>Premium Designated</u>

12.   Premium Designated ("PD") was incorporated in the Cayman Islands on 19th March, 2009 as an exempted company registered in the Cayman Islands under the Companies Law. PD's corporate number is 224267. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

13.    PD was established in order to restructure the then existing redemption debts of Soundview Premium, Ltd. ("Premium") an open ended mutual fund registered with the Cayman Islands Monetary Authority.

14.    According to Article 38 of its Articles of Association, "the purpose of the Company is to act as a closed-end investment fund housing the illiquid assets of [Premium]. In return for the transfer of assets to the Company, the Company shall issue shares to [Premium]."

15.    Shareholders who had redeemed their investment in Premium were paid in part in kind with shares in PD.

16.    PD received certain assets from Premium as described above in exchange for the issue of shares to Premium which were used to pay its redeeming shareholders in or about March 2009.

17.    PD has been at all material times carrying on the business of a closed end private investment fund, formed to hold the illiquid assets of Premium as described above. It is believed that PD has at all material times since 2010 been registered with the Cayman Islands Monetary Authority pursuant to the Mutual Funds Law.

18.    In July 2012, PD was struck from the Register of Companies in the Cayman Islands for non-payment of fees, and has only very recently been restored to the Register in June 2013.

Elite Designated

19.    Elite Designated ("ED") was incorporated in the Cayman Islands on 19th March, 2009 and is now an exempted company under the Companies Law. ED's corporate number is 224275. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

4

20. ED was established in order to restructure certain of the then existing redemption debts of SEL.

21. According to Article 38 of its Articles of Association, "the purpose of the Company is to act as a closed-end investment fund housing the illiquid assets of [SEL]. In return for the transfer of assets to the Company, the Company shall issue shares to [SEL]. Shares shall be freely transferrable by [SEL]."

22. The Petitioner believes that shareholders who had redeemed their investment in SEL were paid in part in kind with shares in ED.

23. ED received assets from SEL as described above in exchange for the issue of shares to SEL which were used to pay its redeeming shareholders it is believed in or about March 2009.

24. ED has been at all material times carrying on the business of a closed end private investment fund, formed to hold the illiquid assets of SEL as described above.

25. It is believed that ED has at all material times since 2010 been registered with the Cayman Islands Monetary Authority pursuant to Mutual Funds Law.

26. In July 2012, ED was struck from the Register of Companies in the Cayman Islands for non-payment of fees, and has only very recently been restored to the Register in June 2013.

The Company

27. The Company was incorporated in the Cayman Islands on 19th March, 2009 as an exempted company under the Companies Law. The Company's corporate number is 224271. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

28.     The Company was established in order to restructure the then existing redemption debts of Soundview Star, Ltd. ("Star") an open ended mutual fund registered with the Cayman Islands Monetary Authority.

29.     According to Article 38 of its Articles of Association, "the purpose of the Company is to act as a closed-end investment fund housing the illiquid assets of, [Star]. In return for the transfer of assets to the Company, the Company shall issue shares to [Star]. Shares shall be freely transferrable by [Star]."

30.     Shareholders who had redeemed their investment in Star were paid in part in kind with shares in the Company.

31.     The Company received assets from Star as described above in exchange for the issue of shares to Star which would be used to pay its redeeming shareholders it is believed in or about March, 2009.

32.     The Company has been at all material times carrying on the business of a closed end private investment fund, formed to hold the illiquid assets of Star as described above. It is believed that the Company has at all material times since 2010 been registered with the Cayman Islands Monetary Authority pursuant to the Mutual Funds Law.

33.     In July 2012, the Company was struck from the Register of Companies in the Cayman Islands for non-payment of fees, and has only very recently been restored to the Register in June 2013.

**The Companies' Management**

34.     The current directors of SEL, NWF, Premium, Star and the Designated Entities are George Ladner and Alphonse Fletcher, Jr. ("Mr. Fletcher").

35. NWF's investment manager is New Wave Asset Management Ltd. ("NWAM"), incorporated in the Cayman Islands.

36. SEL's investment manager, Soundview Capital Management Ltd. ("SCM"), is an international business company incorporated in the Commonwealth of the Bahamas in 1999.

37. Mr. Fletcher controls both SCM and NWAM.

    (1) Mr. Fletcher is also the principal and sole owner of the shares in Fletcher Asset Management Inc. ("FAM"), which appears to have carried out investment management services as agent for SCM and NWAM.

    (2) The shares in the SCM and NWAM are held by Richcourt Holding, Inc. In 2008 Richcourt Holding, Inc. was acquired by companies owned or controlled by Mr. Fletcher or FAM.

38. SEL, NWF, Star, Premium and the Designated Entities have had common directors each of whom has had a close association over many years with Mr. Fletcher and/or FAM:

    (1) one Denis Keily ("Mr.Keily") who has for many years been an associate of Mr. Fletcher, has served as FAM's Deputy Chief Executive Officer and an adviser to FAM including FIA Leveraged Fund Ltd) ("FIAL");

    (2) one Stewart Turner ("Mr. Turner") who has been associated as employee of or independent contractor to FAM since approximately 1998 and served as a director of a number of other entities managed by FAM or associated with Mr. Fletcher including FIAL;

(3)     one Floyd Saunders ("Mr. Saunders") who is also an employee of FAM, serves as Corporate Secretary for and a director of a number of other entities managed by FAM or associated with Mr. Fletcher.

**The Shares**

39.     The Articles of Association of SEL and NWF provided that each company could issue could issue non-voting, participating shares, which could be redeemed by investors at the Net Asset Value calculated for a redemption date and on the terms set out in the Offering Memorandum.

40.     According to SEL's Offering Memorandum all shares were redeemable on the last day of the calendar quarter by giving 30 days' notice.

41.     Richcourt Allweather Fund Inc. ("RAF") is the holder of 1,503.4 Class "D" Shares issued by SEL, shown the Share Register of SEL to represent approximately 7.19% of the value of the Fund's Class D Shares.

42.     The Petitioner is the holder of the following shares:

(1)     1013.79 Class "D" Shares issued by SEL, shown in the Share Register of SEL to represent approximately 4.85% of the value of the Fund's Class "D" Shares.

(2)     27,400 Class "A", "C" and "D" shares issued by the NWF according to the values last published by the Company in December 2010.

(i)     valued at a total of US$2,335,250 (25,000 Class "A" Shares), US$107,556 (1,200 Class "C" Shares) and EUR99,736 (Class "D" Shares).

(ii)     representing together with the shares in NWF held by SEL 100% of NWF's issued share capital.

43.    In respect of the "Designated Entities" the Petitioner was in 2009 a redemption creditor of SEL, Premium and Star and received payment in kind as a result of which it holds shares as follows:

(1)     Shares representing 305.74 shares valued at US$277,241 of PD's USD Class shares

(2)     Shares representing 199.59 shares valued at US$199,621.93 of the Petitioner's USD Class shares (10.8%)

(3)     Shares representing 447.67 shares valued at US$456,865.14 of ED's USD Class shares (12.6%)

44.    Optima Absolute Return Fund Inc. ("Optima") was in 2009 a redemption creditor of SEL, Premium and Star and received payment in kind as a result of which it holds shares in the "Designated Entities" as follows:

(1)     Shares representing 290.89 shares valued at US$263,776.14 of PD's USD Class shares

(2)     Shares representing 190.50 shares valued at US$190,530.48 of the Company's USD Class shares (10.4%)

(3)     Shares representing 426.90 shares valued at US$435,668.53 of ED's USD Class shares (12.03%)

45.    Richcourt Composite Inc. ("Richcourt Composite") was in 2009 a redemption creditor of SEL, Premium and Star and received payment in kind as a result of which it holds shares in the "Designated Entities" as follows:

9

(1)     Shares representing 436.59 shares valued at US$395,895.45 of PD's USD
        Class shares

(2)     Shares representing 291.56 shares valued at US$291,606 of the Company's
        USD Class shares (15.91%)

46.     All shares in the companies (other than the Designated Entities) were redeemable
        according to their Offering Memoranda on the last day of the month or calendar
        quarter by giving 30 days' notice.

**Failure by SEL to pay RAF's Redemption Proceeds**

47.     RAF sought to redeem its SEL shareholdings on 30 September 2011 (at which date
        the redemption value of its shareholding in SEL was recorded as US$1,769,206.21).
        RAF was entitled to be paid its redemption proceeds on about 31 October 2011.

48.     SEL has failed to pay the redemption monies due to RAF or any part thereof and at
        the date hereof the same remains unpaid.

**SEL's Insolvency and Inability to Pay Redemptions**

49.     It is believed that the total number of outstanding redemptions in respect of the Class
        "D", Class "E", and Class "F" shares of SEL amounted in 2011 to US$15,180,870
        with a further US$5,595,584 in 2012 and a further US$1,050,825 in 2013. The
        company has failed to pay the same.

50.     As at April 2013, SEL's balance sheet showed assets of about US$18.3m against
        liabilities owing to the redemption creditors and others exceeding US$20m.

51.     However, the true asset value of SEL is likely to be less than US$9 million for the
        following reasons. Although SEL had cash of about US$5.5 million, its other
        investments were wholly illiquid:

(1)     It held shares in Class "A" and "B" shares in NWF Aliter Segregated
        Portfolio valued as at 31 March 2011 at $4.26 million (representing 60%
        of New Wave's issued shares).

        (i)     SEL redeemed all of their shares in New Wave in 2011 and was
                entitled to be paid on 30 September 2011

        (ii)    New Wave has not reported a NAV since 31 March 2011

        (iii)   New Wave's assets consist entirely of shares in FIAL which is in
                insolvent supervised liquidation in the Cayman Islands.

(2)     SEL also held shares in Soundview Composite Ltd ("Soundview
        Composite") Class "H"

        (i)     SEL placed a full redemption in Soundview Composite on 30
                September 2011 but the same has not been paid;

        (ii)    Soundview Composite has not reported a NAV since 31 March
                2011.

        (iii)   Soundview Composite's assets consist entirely of its holding of
                shares in FIAL which is in insolvent or supervised liquidation.

(3)     SEL assets now also include US$4m invested in some form in Fletcher
        International Ltd. (Bermuda) purchased from Fletcher International Inc
        (incorporated in Delaware, US) which is in insolvency proceedings.

52.     Accordingly SEL is unable to meet its liabilities and has no reasonable prospect of
        being able to do so. The company is therefore unable to pay its debts and it is just
        and equitable that the company be wound up.

**New Wave's Insolvency**

53.     As stated above, SEL redeemed its investment in NWF on 30 September 2011. As a result US$4.26m has been due and owing to SEL since at least 31 December 2011 but NWF has failed to pay the same.

54.     Apart from ca. US$129,000 cash NWF's sole asset is its investment in FIAL of US$5.358 million. FIAL is in insolvent or supervised liquidation.

55.     Accordingly NWF is unable to meet its liabilities and has no reasonable prospect of being able to do so.

**Loss of Sub-Stratum of SEL, NWF and the Designated Entities**

56.     Neither SEL nor any of the Designated Entities has reported net asset values for any date later than 31 December 2010 and NWF has not done so since 31 March 2011 (prior to which each of them had done so regularly) and neither SEL nor NWF have given investors any or any proper explanation of the time and manner in which redemption might be paid.

57.     Further, in contravention of Section 8 of the Mutual Funds Law (2009 Revision) no audited accounts have been prepared for the 4 years since 2008 by or on behalf of SEL, NWF sent to its investors or otherwise filed or, in the case of the Designated Entities for the three years since 2009 and again no explanation has been provided.

58.     In January 2013 SCM, was struck off the register of companies in the Bahamas for non-payment of fees. Each of the Designated Entities were struck off the register of Companies for non-payment of fees in 2012 and not restored to the Register until about June 2013.

59.     Redemptions have not been paid in full or in part for SCL or NWF since March 2011. Despite the fact that the Designated Entities have substantial amounts of cash none of them has attempted to pay shareholders:

(1)     PD has cash of about US$2.994 million as at 11 June 2013 but has not made any payments to the Petitioner, Optima or Richcourt Composite or any other redemption creditor

(2)     ED has cash of about US$4.019 million as at 11 June 2013 but has not made any payments to the Petitioner or Optima or any other redemption creditor

(3)     The Company has cash of about US$4.195 million as at 11 June 2013 but has not made any payments to the Petitioner, Optima or Richcourt Composite or any other redemption creditor

60.     Neither SEL nor NWF has attempted to carry on the business of making investments in accordance with their respective Offering Memoranda.

61.     The Designated Entities have not passed on the benefit of realization of assets in accordance with their respective Articles of Association but have instead been accumulating cash and making payments of fees to investment managers including FAM.

62.     Further the sub-stratum of SEL and NWF have failed and it is just and equitable that they be wound up.

**Justifiable Loss of Confidence**

63.     The Petitioner repeats the allegations above. The failure to provide Net Asset Value calculations or accounts or to give explanations of the failure to pay redemptions and, in the case of the Designated Entities, the failure to pass on the proceeds of

realisations amounted to breaches of fiduciary duty on the part of the directors and investment managers.

64.     Despite its failure to pay redemptions SEL's directors and its investment manager have allowed SEL to continue to make payments from the company's accounts which payments appear to have been made for the direct or indirect benefit of FAM and/or Mr Fletcher.

(1)     In December 2012 SEL's directors and investment manager caused SEL to buy from an entity Fletcher International Inc. ("FII") 100% of the shares of another entity Fletcher International Ltd ("FIL") for $4 million.

(i)     FII was controlled and managed by Mr. Fletcher and FAM and/or affiliates Mr. Fletcher or FAM owns.

(ii)    FIL, controlled and or managed by Mr. Fletcher and FAM, filed for chapter 11 protection from creditors US Bankruptcy Court in the Southern District of New York on June 29, 2012.

(iii)   On or about September 5, 2012, Richard J. Davis was appointed by the Bankruptcy Court to assume control of the FIL estate.

(iv)    FIL was at the time of purchase, therefore, and is currently under the control of Mr. Davis as chapter 11 trustee. Its value is not known but it is highly likely to be insolvent.

(v)     In about March 2013 FII made a payment of US$2.2m to FIL's Chapter 11 Trustee to restore the like amount which FIL had made in 2012 to FIAL at the direction of Mr. Fletcher and/or FAM.

(2)     Approximately $112,000 in investment management fees were paid in February 2013, and others such fees may have been paid since SEL ceased being able to report its NAV to shareholders.

(3)     FII's directors included Mr. Ladner and FIL's directors included Mr. Turner and both were managed by FAM and/or Mr Fletcher.

65.     NWF and the Designated Entities each acquired investments in FIAL or FII in circumstances which are not known to the Petitioner but it is believed that such investments may have been made after statutory demands for payment were made by the petitioners of FIAL in about late 2011.

66.     By virtue of the fact that SEL and Soundview Composite have common management the Soundview Composite directors' interest in not enforcing SEL's redemption rights conflicted with their duty to SEL to do so.

67.     Despite its failure to pay redemptions the directors and SCM have allowed the Designated Entities to continue to pay investment management fees and make other payments which payments appear to have been made for the direct or indirect benefit of FAM and/or Mr. Fletcher.

(1)     PD paid approximately $85,125.60 in investment management fees in February 2013, and other such fees may have been paid since PD ceased being able to report its NAV to shareholders.

(2)     The Company paid approximately $66,477.60 in investment management fees in February 2013, and other such fees may have been paid since the Company ceased being able to report its NAV to shareholders.

(3)     ED paid approximately $108,410.40 in investment management fees in February 2013, and other such fees may have been paid since ED ceased being able to report its NAV to shareholders.

68.    In the circumstances it is just and equitable to wind up SEL, NWF and the Designated Entities.

69.    The Petitioner wishes to appoint Kenneth Krys and Margot MacInnis as joint official liquidators.

70.    Your Petitioners therefore humbly pray that:-

(1)    The Company be wound up in accordance with the Companies Law.

(2)    Kenneth Krys and Margot MacInnis both of PO Box 10663, Grand Cayman KY1-1008 (to hold their offices jointly and severally) be appointed as joint official liquidators of the Company.

(3)    The Joint Official Liquidators are authorized jointly and severally to exercise any of the powers listed in Part II of Schedule 3 of the Companies Law (2012 Revision) without the further sanction or intervention of the Court.

(4)    The Joint Official Liquidators be authorized to do any act or things considered by them to be necessary or desirable in connection with the liquidation of the Company and the winding up of their affairs.

(5)    The Joint Official Liquidators do file with the Clerk of Court a report in writing of the position of and progress made with the winding up of the Company with the realization of the assets thereof and to any other matters connected to the winding up of the Company as the Court may direct.

(6)    The Joint Official Liquidators be at liberty to appoint counsel, attorneys, professional advisors, whether in the Cayman Islands or elsewhere as they may consider necessary to advise and assist them in the performance of their duties and on such terms as they may think fit and remunerate them out of the assets of the Company.

(7)     The Joint Official Liquidators and their staff be remunerated out of the assets of the Company at their usual customary rates.

(8)     The Joint Official Liquidators be at liberty to apply generally.

(9)     The costs of the Petition and the Petitioner be paid out of the assets of the Company.

(10)    The Joint Official Liquidators cause a copy of this petition to be delivered to the Registrar of Companies and the Cayman Islands Monetary Authority.

(11)    Such further or other relief be granted as this Court deems appropriate.

Dated the 26th day of July 2013.

Giglioli & Company

**Note:**  This petition is intended to be served on the Registrar of Companies, the Cayman Islands Monetary Authority, and the registered office of the Company.

FILED by Giglioli & Company whose address for service is 4th Floor Kirk House, PO Box 2505, Grand Cayman KY1-1104, Cayman Islands.

# NOTICE OF HEARING

TAKE NOTICE THAT the hearing of this petition will take place at the Law Courts, George Town, Grand Cayman on *24th September* at 10:00 am.

Any correspondence or communication with the Court relating to the hearing of this petition should be addressed to the Registrar of the Financial Services Division of the Grand Court at PO Box 494, Grand Cayman KY1-1106, and telephone 345 949 4296.

# EXHIBIT G

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: 9 / of 2013

IN THE MATTER OF THE COMPANIES LAW (2012 REVISION)

AND IN THE MATTER OF SOUNDVIEW ELITE LTD.



WINDING UP PETITION

**To the Grand Court**

The humble petition of Richcourt Allweather Fund Inc. whose registered office is Intertrust
Corporate Services (BVI) Limited 171 Main Street, PO Box 4041, Road Town, Tortola,
British Virgin Islands VG1110, shows that:

1.   The Petitioner seeks orders winding up the Company on the grounds that it is just
     and equitable to do so because (a) it has been rendered insolvent by investments in
     insolvent companies related to their common directors and the persons who control
     their investment managers and (b) there has been a justifiable loss of confidence in
     the common management.

2.   The Petitioner and the Company are companies that are part of the funds known as
     the *Richcourt Funds*. The Richcourt Funds are:-

     (1)   Richcourt Allweather Fund Inc.,

     (2)   America Alternative Investments Inc.;

     (3)   Optima Absolute Return Fund Ltd.;

     (4)   Richcourt Composite Inc.; ("the Petitioning Companies") and

     (5)   Soundview Elite Ltd.;

     (6)   Richcourt Euro Strategies Inc.;

1

(7)    New Wave Fund SPC;

(8)    Premium Designated;

(9)    Elite Designated;

(10)   Star Designated;

(11)   Soundview Star Ltd.;

(12)   Soundview Premium Ltd.;

(13)   Soundview Composite Ltd.;

(14)   Pitagora Fund Ltd.;

(15)   Richcourt Top Stars 1 Fund Ltd.

**The Company**

3.    The Company was initially incorporated as an international business company in the Commonwealth of the Bahamas in October 2003 and its registered office and place of incorporation was transferred by way of continuation to the Cayman Islands in June 2005.

4.    Accordingly, the Company is now an exempted company registered in the Cayman Islands under Part XII of the Companies Law. The Company's corporate number is 151268. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

5.    The Company has been at all material times carrying on the business of an open-ended Investment Company. According to its Offering Memorandum "The Company's investment objective is to give investors access to the hedge fund industry and achieve capital appreciation by investing a substantial portion of its assets among a group of money managers selected by the Investment Manager (the "Money Managers")."

6.    The Company commenced investment activities on November 1st, 2003 and has at all material times since it is believed about 2005 been registered with the Cayman

2

Islands Monetary Authority pursuant to the Mutual Funds Law (now 2009 Revision) of the Cayman Islands (the "Mutual Funds Law").

**New Wave Fund SPC**

7.  New Wave Fund SPC ("NWF") was incorporated in the Cayman Islands as an exempted company on 17th September, 2007 with limited liability as a segregated portfolio company.

8.  According to its Offering Memorandum dated February, 2008, "The primary investment objective of the Company is to achieve capital appreciation while attempting to limit investment risk."

9.  NWF's number is 195409. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

10. NWF commenced investment activities pursuant to its investment strategy in about 2007. It has only one segregated portfolio, Aliter Segregated Portfolio, in respect of which NWF has issued four share classes named "A" to "D".

11. The Fund is registered with the Cayman Islands Monetary Authority pursuant to the Mutual Funds Law.

**The Designated Entities**

<u>Premium Designated</u>

12. Premium Designated ("PD") was incorporated in the Cayman Islands on 19th March, 2009 as an exempted company registered in the Cayman Islands under the Companies Law. PD's corporate number is 224267. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

13. PD was established in order to restructure the then existing redemption debts of Soundview Premium, Ltd. ("Premium") an open ended mutual fund registered with the Cayman Islands Monetary Authority.

14. According to Article 38 of its Articles of Association, "the purpose of the Company is to act as a closed-end investment fund housing the illiquid assets of [Premium]. In return for the transfer of assets to the Company, the Company shall issue shares to [Premium]."

15. Shareholders who had redeemed their investment in Premium were paid in part in kind with shares in PD.

16. PD received certain assets from Premium as described above in exchange for the issue of shares to Premium which were used to pay its redeeming shareholders in or about March 2009.

17. PD has been at all material times carrying on the business of a closed end private investment fund, formed to hold the illiquid assets of Premium as described above. It is believed that PD has at all material times since 2010 been registered with the Cayman Islands Monetary Authority pursuant to the Mutual Funds Law.

18. In July 2012, PD was struck from the Register of Companies in the Cayman Islands for non-payment of fees, and has only very recently been restored to the Register in June 2013.

Elite Designated

19. Elite Designated ("ED") was incorporated in the Cayman Islands on 19th March, 2009 and is now an exempted company under the Companies Law. ED's corporate number is 224275. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

4

20.     ED was established in order to restructure certain of the then existing redemption debts of the Company.

21.     According to Article 38 of its Articles of Association, "the purpose of the Company is to act as a closed-end investment fund housing the illiquid assets of [the Company]. In return for the transfer of assets to the Company, the Company shall issue shares to [the Company]. Shares shall be freely transferrable by [the Company]."

22.     The Petitioner believes that shareholders who had redeemed their investment in the Company were paid in part in kind with shares in ED.

23.     ED received assets from the Company as described above in exchange for the issue of shares to the Company which were used to pay its redeeming shareholders it is believed in or about March 2009.

24.     ED has been at all material times carrying on the business of a closed end private investment fund, formed to hold the illiquid assets of the Company as described above.

25.     It is believed that ED has at all material times since 2010 been registered with the Cayman Islands Monetary Authority pursuant to Mutual Funds Law.

26.     In July 2012, ED was struck from the Register of Companies in the Cayman Islands for non-payment of fees, and has only very recently been restored to the Register in June 2013.

Star Designated

27.     Star Designated ("SD") was incorporated in the Cayman Islands on 19th March, 2009 as an exempted company under the Companies Law. SD's corporate number

5

is 224271. Its registered office is DMS Corporate Services Ltd. of PO Box 1344, DMS House, 20 Genesis Close, George Town, Grand Cayman.

28.     SD was established in order to restructure the then existing redemption debts of Soundview Star, Ltd. ("Star") an open ended mutual fund registered with the Cayman Islands Monetary Authority.

29.     According to Article 38 of its Articles of Association, "the purpose of the Company is to act as a closed-end investment fund housing the illiquid assets of, [Star]. In return for the transfer of assets to the Company, the Company shall issue shares to [Star]. Shares shall be freely transferrable by [Star]."

30.     Shareholders who had redeemed their investment in Star were paid in part in kind with shares in SD.

31.     SD received assets from Star as described above in exchange for the issue of shares to Star which would be used to pay its redeeming shareholders it is believed in or about March, 2009.

32.     SD has been at all material times carrying on the business of a closed end private investment fund, formed to hold the illiquid assets of Star as described above. It is believed that SD has at all material times since 2010 been registered with the Cayman Islands Monetary Authority pursuant to the Mutual Funds Law.

33.     In July 2012, SD was struck from the Register of Companies in the Cayman Islands for non-payment of fees, and has only very recently been restored to the Register in June 2013.

**The Companies' Management**

34.     The current directors of the Company, NWF, Premium, Star and the Designated Entities are George Ladner and Alphonse Fletcher, Jr. ("Mr. Fletcher").

6

35.     NWF's investment manager is New Wave Asset Management Ltd. ("NWAM"), incorporated in the Cayman Islands.

36.     The Company's investment manager, Soundview Capital Management Ltd. ("SCM"), is an international business company incorporated in the Commonwealth of the Bahamas in 1999.

37.     Mr. Fletcher controls both SCM and NWAM.

    (1)     Mr. Fletcher is also the principal and sole owner of the shares in Fletcher Asset Management Inc. ("FAM"), which appears to have carried out investment management services as agent for SCM and NWAM.

    (2)     The shares in the SCM and NWAM are held by Richcourt Holding, Inc. In 2008 Richcourt Holding, Inc. was acquired by companies owned or controlled by Mr. Fletcher or FAM.

38.     The Company, NWF, Star, Premium and the Designated Entities have had common directors each of whom has had a close association over many years with Mr. Fletcher and/or FAM:

    (1)     one Denis Keily ("Mr.Keily") who has for many years been an associate of Mr. Fletcher, has served as FAM's Deputy Chief Executive Officer and an adviser to FAM including FIA Leveraged Fund Ltd) ("FIAL");

    (2)     one Stewart Turner ("Mr. Turner") who has been associated as employee of or independent contractor to FAM since approximately 1998 and served as a director of a number of other entities managed by FAM or associated with Mr. Fletcher including FIAL;

(3)     one Floyd Saunders ("Mr. Saunders") who is also an employee of FAM, serves as Corporate Secretary for and a director of a number of other entities managed by FAM or associated with Mr. Fletcher.

### The Shares

39.   The Articles of Association of the Company and NWF provided that each company could issue could issue non-voting, participating shares, which could be redeemed by investors at the Net Asset Value calculated for a redemption date and on the terms set out in the Offering Memorandum.

40.   According to the Company's Offering Memorandum all shares were redeemable on the last day of the calendar quarter by giving 30 days' notice.

41.   The Petitioner is the holder of 1,503.4 Class "D" Shares issued by the Company, shown the Share Register of the Company to represent approximately 7.19% of the value of the Fund's Class "D" Shares.

42.   America Alternative Investments Ltd. ("AAI") is the holder of the following shares:

(1)     1013.79 Class "D" Shares issued by the Company, shown in the Share Register of the Company to represent approximately 4.85% of the value of the Fund's Class "D" Shares.

(2)     27,400 Class "A", "C" and "D" shares issued by the NWF according to the values last published by the Company in December 2010.

(i)     valued at a total of US$2,335,250 (25,000 Class "A" Shares), US$107,556 (1,200 Class "C" Shares) and EUR99,736 (Class "D" Shares).

(ii)     representing together with the shares in NWF held by the Company 100% of NWF's issued share capital.

43.     In respect of the "Designated Entities" AAI was in 2009 a redemption creditor of the Company, Premium and Star and received payment in kind as a result of which it holds shares as follows:

(1)     Shares representing 305.74 shares valued at US$277,241 of PD's USD Class shares

(2)     Shares representing 199.59 shares valued at US$199,621.93 of SD's USD Class shares (10.8%)

(3)     Shares representing 447.67 shares valued at US$456,865.14 of ED's USD Class shares (12.6%)

44.     Optima Absolute Return Fund Inc. ("Optima") was in 2009 a redemption creditor of the Company, Premium and Star and received payment in kind as a result of which it holds shares in the "Designated Entities" as follows:

(1)     Shares representing 290.89 shares valued at US$263,776.14 of PD's USD Class shares

(2)     Shares representing 190.50 shares valued at US$190,530.48 of SD's USD Class shares (10.4%)

(3)     Shares representing 426.90 shares valued at US$435,668.53 of ED's USD Class shares (12.03%)

45.     Richcourt Composite Inc. ("Richcourt Composite") was in 2009 a redemption creditor of the Company, Premium and Star and received payment in kind as a result of which it holds shares in the "Designated Entities" as follows:

(1)     Shares representing 436.59 shares valued at US$395,895.45 of PD's USD Class shares

(2)     Shares representing 291.56 shares valued at US$291,606 of SD's USD Class shares (15.91%)

46.     All shares in the companies (other than the Designated Entities) were redeemable according to their Offering Memoranda on the last day of the month or calendar quarter by giving 30 days' notice.

### Failure by the Company to pay the Petitioner's Redemption Proceeds

47.     The Petitioner sought to redeem its shareholdings in the Company on 30 September 2011 (at which date the redemption value of its shareholding in the Company was recorded as US$1,769,206.21). The Petitioner was entitled to be paid its redemption proceeds on about 31 October 2011.

48.     The Company has failed to pay the redemption monies due to the Petitioner or any part thereof and at the date hereof the same remains unpaid.

### The Company's Insolvency and Inability to Pay Redemptions

49.     It is believed that the total number of outstanding redemptions in respect of the Class "D", Class "E", and Class "F" shares of the Company amounted in 2011 to US$15,180,870 with a further US$5,595,584 in 2012 and a further US$1,050,825 in 2013. The Company has failed to pay the same.

50.     As at April 2013, the Company's balance sheet showed assets of about US$18.3m against liabilities owing to the redemption creditors and others exceeding US$20m.

51.    However, the true asset value of the Company is likely to be less than US$9 million for the following reasons. Although it had cash of about US$5.5 million, its other investments were wholly illiquid:

(1)    It held shares in Class "A" and "B" shares in NWF Aliter Segregated Portfolio valued as at 31 March 2011 at $4.26 million (representing 60% of NWF's issued shares).

   (i)    the Company redeemed all of their shares in NWF in 2011 and was entitled to be paid on 30 September 2011

   (ii)    NWF has not reported a NAV since 31 March 2011

   (iii)    NWF's assets consist entirely of shares in FIAL which is in insolvent supervised liquidation in the Cayman Islands.

(2)    the Company also held shares in Soundview Composite Ltd ("Soundview Composite") Class "H"

   (i)    the Company placed a full redemption in Soundview Composite on 30 September 2011 but the same has not been paid;

   (ii)    Soundview Composite has not reported a NAV since 31 March 2011.

   (iii)    Soundview Composite's assets consist entirely of its holding of shares in FIAL which is in insolvent or supervised liquidation.

(3)    the Company assets now also include US$4m invested in some form in Fletcher International Ltd. (Bermuda) purchased from Fletcher International Inc (incorporated in Delaware, US) which is in insolvency proceedings.

52. Accordingly the Company is unable to meet its liabilities and has no reasonable prospect of being able to do so. The Company is therefore unable to pay its debts and it is just and equitable that the Company be wound up.

**NWF's Insolvency**

53. As stated above, the Company redeemed its investment in NWF on 30 September 2011. As a result US$4.26m has been due and owing to the Company since at least 31 December 2011 but NWF has failed to pay the same.

54. Apart from ca. US$129,000 cash NWF's sole asset is its investment in FIAL of US$5.358 million. FIAL is in insolvent or supervised liquidation.

55. Accordingly NWF is unable to meet its liabilities and has no reasonable prospect of being able to do so.

**Loss of Sub-Stratum of the Company, NWF and the Designated Entities**

56. Neither the Company nor any of the Designated Entities has reported net asset values for any date later than 31 December 2010 and NWF has not done so since 31 March 2011 (prior to which each of them had done so regularly) and neither the Company nor NWF have given investors any or any proper explanation of the time and manner in which redemption might be paid.

57. Further, in contravention of Section 8 of the Mutual Funds Law (2009 Revision) no audited accounts have been prepared for the 4 years since 2008 by or on behalf of the Company, NWF sent to its investors or otherwise filed or, in the case of the Designated Entities for the three years since 2009 and again no explanation has been provided.

58. In January 2013 SCM, was struck off the register of companies in the Bahamas for non-payment of fees. Each of the Designated Entities were struck off the register of

Companies for non-payment of fees in 2012 and not restored to the Register until about June 2013.

59.     Redemptions have not been paid in full or in part for SCL or NWF since March 2011. Despite the fact that the Designated Entities have substantial amounts of cash none of them has attempted to pay shareholders:

(1)     PD has cash of about US$2.994 million as at 11 June 2013 but has not made any payments to AAI, Optima or Richcourt Composite or any other redemption creditor

(2)     ED has cash of about US$4.019 million as at 11 June 2013 but has not made any payments to AAI or Optima or any other redemption creditor

(3)     SD has cash of about US$4.195 million as at 11 June 2013 but has not made any payments to AAI, Optima or Richcourt Composite or any other redemption creditor

60.     Neither the Company nor NWF has attempted to carry on the business of making investments in accordance with their respective Offering Memoranda.

61.     The Designated Entities have not passed on the benefit of realization of assets in accordance with their respective Articles of Association but have instead been accumulating cash and making payments of fees to investment managers including FAM.

62.     Further the sub-stratum of the Company and NWF have failed and it is just and equitable that they be wound up.

**Justifiable Loss of Confidence**

63.     The Petitioner repeats the allegations above. The failure to provide Net Asset Value calculations or accounts or to give explanations of the failure to pay redemptions and, in the case of the Designated Entities, the failure to pass on the proceeds of realisations amounted to breaches of fiduciary duty on the part of the directors and investment managers.

64.     Despite its failure to pay redemptions the Company's directors and its investment manager have allowed the Company to continue to make payments from the Company's accounts which payments appear to have been made for the direct or indirect benefit of FAM and/or Mr Fletcher.

(1)     In December 2012 the Company's directors and investment manager caused the Company to buy from an entity Fletcher International Inc. ("FII") 100% of the shares of another entity Fletcher International Ltd ("FIL") for $4 million.

(i)     FII was controlled and managed by Mr. Fletcher and FAM and/or affiliates Mr. Fletcher or FAM owns.

(ii)     FIL, controlled and or managed by Mr. Fletcher and FAM, filed for chapter 11 protection from creditors US Bankruptcy Court in the Southern District of New York on June 29, 2012.

(iii)     On or about September 5, 2012, Richard J. Davis was appointed by the Bankruptcy Court to assume control of the FIL estate.

(iv)     FIL was at the time of purchase, therefore, and is currently under the control of Mr. Davis as chapter 11 trustee. Its value is not known but it is highly likely to be insolvent.

(v)     In about March 2013 FII made a payment of US$2.2m to FIL's Chapter 11 Trustee to restore the like amount which FIL had made in 2012 to FIAL at the direction of Mr. Fletcher and/or FAM.

(2)     Approximately $112,000 in investment management fees were paid in February 2013, and others such fees may have been paid since the Company ceased being able to report its NAV to shareholders.

(3)     FII's directors included Mr. Ladner and FIL's directors included Mr. Turner and both were managed by FAM and/or Mr Fletcher.

65.    NWF and the Designated Entities each acquired investments in FIAL or FII in circumstances which are not known to the Petitioner but it is believed that such investments may have been made after statutory demands for payment were made by the petitioners of FIAL in about late 2011.

66.    By virtue of the fact that the Company and Soundview Composite have common management the Soundview Composite directors' interest in not enforcing the Company's redemption rights conflicted with their duty to the Company to do so.

67.    Despite its failure to pay redemptions the directors and SCM have allowed the Designated Entities to continue to pay investment management fees and make other payments which payments appear to have been made for the direct or indirect benefit of FAM and/or Mr. Fletcher.

(1)     PD paid approximately $85,125.60 in investment management fees in February 2013, and other such fees may have been paid since PD ceased being able to report its NAV to shareholders.

(2)     SD paid approximately $66,477.60 in investment management fees in February 2013, and other such fees may have been paid since SD ceased being able to report its NAV to shareholders.

(3)     ED paid approximately $108,410.40 in investment management fees in February 2013, and other such fees may have been paid since ED ceased being able to report its NAV to shareholders.

68.     In the circumstances it is just and equitable to wind up the Company, NWF and the Designated Entities.

69.     The Petitioner wishes to appoint Kenneth Krys and Margot MacInnis as joint official liquidators.

70.     Your Petitioners therefore humbly pray that:-

(1)     The Company be wound up in accordance with the Companies Law.

(2)     Kenneth Krys and Margot MacInnis both of PO Box 10663, Grand Cayman KY1-1008 (to hold their offices jointly and severally) be appointed as joint official liquidators of the Company.

(3)     The Joint Official Liquidators are authorized jointly and severally to exercise any of the powers listed in Part II of Schedule 3 of the Companies Law (2012 Revision) without the further sanction or intervention of the Court.

(4)     The Joint Official Liquidators be authorized to do any act or things considered by them to be necessary or desirable in connection with the liquidation of the Company and the winding up of their affairs.

(5)     The Joint Official Liquidators do file with the Clerk of Court a report in writing of the position of and progress made with the winding up of the

Company with the realization of the assets thereof and to any other matters connected to the winding up of the Company as the Court may direct.

(6)     The Joint Official Liquidators be at liberty to appoint counsel, attorneys, professional advisors, whether in the Cayman Islands or elsewhere as they may consider necessary to advise and assist them in the performance of their duties and on such terms as they may think fit and remunerate them out of the assets of the Company.

(7)     The Joint Official Liquidators and their staff be remunerated out of the assets of the Company at their usual customary rates.

(8)     The Joint Official Liquidators be at liberty to apply generally.

(9)     The costs of the Petition and the Petitioner be paid out of the assets of the Company.

(10)    The Joint Official Liquidators cause a copy of this petition to be delivered to the Registrar of Companies and the Cayman Islands Monetary Authority.

(11)    Such further or other relief be granted as this Court deems appropriate.

Dated the 26th day of July 2013.



Giglioli & Company

**Note:** This petition is intended to be served on the Registrar of Companies, the Cayman Islands Monetary Authority, and the registered office of the Company.

FILED by Giglioli & Company whose address for service is 4th Floor Kirk House, PO Box 2505, Grand Cayman KY1-1104, Cayman Islands.

17

# NOTICE OF HEARING

TAKE NOTICE THAT the hearing of this petition will take place at the Law Courts, George Town, Grand Cayman on *24th September* at 10:00 am.

Any correspondence or communication with the Court relating to the hearing of this petition should be addressed to the Registrar of the Financial Services Division of the Grand Court at PO Box 494, Grand Cayman KY1-1106, and telephone 345 949 4296.

# EXHIBIT H

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION
FSD NO. [ 1/1 ] 2013 (AJJ)

IN THE MATTEROF THE COMPANIES LAW (2012 REVISION)

AND IN THE MATTER OF SOUNDVIEW PREMIUM LIMITED




**WINDING UP PETITION**

**To: The Grand Court of the Cayman Islands**

The humble Petition of Citco Global Custody (N.A.) N.V. of De Ruyterkade 62, P.O. Box 707, Curaçao, Netherlands Antilles

Shows as follows:

1.  Soundview Premium Limited ("the Company") was incorporated in the Cayman Islands on 21 November 2005 under the provisions of the Companies Law (2003 Revision). The Company is an exempted company under the provisions of the Companies Law (2012 Revision) ("the Law") and a mutual fund registered with the Cayman Islands Monetary Authority pursuant to section 4(3) of the Mutual Funds Law (2012 Revision).

2.  The registered office of the Company is at Stuarts Corporate Services Ltd., 4th Floor Cayman Financial Services Centre, 36A Dr. Roy's Drive, PO Box 2510, Grand Cayman KY1-1104, Cayman Islands.

1

3. The share capital of the Company (as defined in its Memorandum and Articles of Association) is US$17,500, €14,750, £12,500, Japanese Yen 300,000 and CHF 13,500, which capital is divided into:

(1) 100 voting, non-participating class B Management Shares with a par value of US$ 0.01 per share,

(2) 1,249,900 Class D Participating Shares with a par value of US$ 0.01 per share,

(3) 500,000 Class D-NI Participating Shares with a par value of US$ 0.01 per share,

(4) 1,100,000 Class E Participating Shares of €0.01 per share,

(5) 375,000 Class E-NI Participating Shares with a par value of €0.01 per share,

(6) 1,200,000 Class P Participating Shares of £0.01 per share,

(7) 30,000,000 Class Y Participating Shares with a par value of Japanese Yen 0.01 per share and

(8) 1,350,000 Class F Participating Shares of CHF 0.01 per share,

with power for the Company, subject to the provisions of the Law and the Articles of Association ("the Articles"), to increase the said capital and to redeem any of its shares.

4. The objects for which the Company is established are unrestricted.

5. The investment manager of the Company is and at all material times has been Soundview Capital Management Limited of One Montague Place, 1st Floor, East Bay Street, P.O. Box N-4906, Nassau, Bahamas ("the Investment Manager").

6.      On or about 14 June 2007, the Company offered for subscription shares of each of the foregoing classes, subject to the provisions of the Articles and generally on the terms described in a Confidential Private Placement Memorandum ("the June 2007 PPM") of that date.

7.      On or about 2 July 2007, your Petitioner subscribed for 5,091.27 such Class D-NI shares and paid a subscription price of US$6,410,310.97 to the Company for them.

8.      On or about 12 June 2008, a consortium led by Fletcher Asset Management Incorporated ("FAM"), a New York corporation, acquired 85% majority control of the group of companies then known as the Richcourt Group, which included the Investment Manager and, through its ownership of the management shares, the Company, as well as certain other companies operating in the mutual funds industry. Such acquisition was made through the vehicle of a British Virgin Islands company, Richcourt Acquisition Incorporated, an affiliate of FAM. The acquisition was subject to a put option under which the remaining 15% of the Richcourt Group ownership would also be acquired by the FAM-led consortium. The said option has been exercised but to date the consortium has failed to complete the further acquisition as required.

9.      On 26 May 2010, your Petitioner submitted to the Company a Redemption Request in respect of the whole of its holding of 5,091.27 Class D-NI Participating Shares in the Company. Such redemption request was effective in relation to the next following Redemption Day (as defined in the Articles and the July 2007 PPM), which was the 30th September 2010 quarter day.

10.     Article 29 of the Articles provides in material part as follows:

10.1     Subject to the Articles and the Law, a holder of Participating Shares in the Company may request redemption of such shares (subject to a minimum number not here relevant) as of any Redemption Day.

10.2     The Redemption Request must be lodged at least 45 days before the Redemption Day on which redemption is requested.

10.3     Once received a Redemption Request may only be withdrawn with the consent of the Company's Directors.

10.4     Per Article 29(j), if Redemption Requests of an amount equal to or greater than 20% of the Net Asset Value ("NAV") of the Company, or of any Master Fund in which it has invested, are received in respect of any given Redemption Day, the Directors of the Company have a discretion whether to determine to reduce each such Redemption Request *pro rata* so that the Redemption Requests so received and relating to the Redemption Day in question amount to no more than 20% of the NAV of the Company or any such Master Fund.

10.5     Article 29(j) further provides that, in the event that the Directors exercise such discretion, *"The partial Amounts of the Redemption Request which remain unsatisfied shall be carried forward to the next Redemption Day and satisfied in priority to*

any Redemption Requests received in relation to such Redemption Day until the prior Redemption Requests shall have been satisfied in full" (Article 1(c) provides that the word "shall" is to be construed as imperative).

11. Article 31 of the Articles provides in material part as follows:

11.1 Payment of the Redemption Price of Participating Shares "shall be made in such manner as the Directors of the Company may from time to time determine in respect of each Class, as set out in the Offering Memorandum."

11.2 The July 2007 PPM provides (in the section thereof headed "Redemptions and Transfers of Shares") that payment of not less than 90% of the estimated value of Participating Shares the subject of redemption will be made by the Company within 40 days following the Redemption Day.

11.3 On the true construction of these provisions, the Company was obliged to make payment of the balance of the Redemption Price within a reasonable time of the initial 90% payment and such reasonable time is not later than one month after the initial payment or the next following quarter day, whichever is the earliest to occur.

12. Article 25(b)(ii) of the Articles provides that "Participating Shares to be redeemed pursuant to Articles 29 and 31 shall be deemed to remain in issue until and including the close of business on the Redemption Day on which

*they are to be redeemed, and from that time until paid the Redemption Price*
*shall be deemed to be a liability of the Company."*

13.     In the premises, once your Petitioner's Redemption Request had
expired and close of business on the Redemption Day (30 September
2010) had passed, your Petitioner was a creditor or contingent or
prospective creditor of the Company for the amount of the
Redemption Price payable in respect of the Participating Shares the
subject of the Redemption Request. Alternatively, and having regard
to the terms of Article 29(j) providing for the carrying forward of
unsatisfied Redemption Requests, the latest date on which your
Petitioner became a creditor or potential or contingent creditor of the
Company for the amount of the Redemption Price payable in respect
of Participating Shares for which no payment was made in the
circumstances referred to in paragraphs 17, 21 and 23 hereof was either
31 March 2011 or 30 June 2011.

14.     Neither as at 30 September 2010 nor any later stage relevant for present
purposes had the Directors declared and duly notified to your
Petitioner in accordance with the Articles, in particular Articles 26 to
28, any suspension by the Company of the calculation of NAV per
Participating Share. The last such NAV notified to your Petitioner was
as at 28 February 2011 in the amount of $1,012.48.

15.     By a letter dated 8 November 2010 and purporting to be written on
behalf of the Company over the signature of two directors, Mr Stuart
Turner and Mr Denis Kiely ("the First Gating Letter"), it was stated
that the Company was in receipt of Redemption Requests *"as of*
*September 30, 2010 in an amount that exceeded 20% of the Net Asset Value*

*of the Fund on that date. Pursuant to the Fund's Confidential Private*
*Placement Memorandum, the maximum Net Asset Value of shares that may*
*be redeemed on any Redemption Date is 20% of the Net Asset Value of the*
*Fund on such Redemption Date, unless such limitation is waived by the*
*Directors in their sole discretion . . . the Directors do not consider it*
*appropriate to waive this limitation . . ."*

16. The said letter did not refer to the provisions of Article 29(j) of the Articles referred to in paragraph 10.4 above and demonstrates that the Directors did not exercise, either validly or at all, the discretion conferred on them by it, but proceeded on the false basis that there was an automatic limitation on redemptions that they were only authorised to waive.

17. As respects the 30 September 2010 quarter date, your Petitioner was paid the net sum of US$1,518,494.12 in respect of the redemption price of approximately 1,592.55 of its Participating Shares in the Company. Even if the First Gating Letter was effective to impose the gate referred to in it (which is not admitted), payment of the Redemption Price in respect all of your Petitioner's Participating Shares that were the subject of the 26 May 2010 Redemption Request was by virtue of Article 29(j) automatically carried forward to the next following Redemption Day, 31 December 2010.

18. Subsequent to that date, by an unsigned letter dated 28 February 2011 over the typewritten name of the Investment Manager ("the Second Gating Letter"), it was stated that "*the Fund had outstanding redemption requests as of September 30, 2010 and as of December 31, 2010 in an amount that each exceeded 10% of the Net Asset Value of the Fund on each respective*

date. Pursuant to the Fund's Confidential Private Placement Memorandum, the maximum Net Asset Value of shares that may be redeemed on any Redemption Date is 10% of the Net Asset Value of the Fund on such Redemption Date, unless such limitation is waived by the Directors in their sole discretion . . . the Directors do not consider it appropriate to waive this limitation . . ." The letter went on to state that "The gate will remain in place until further notice, which will be communicated through a letter by the Directors."

19.    The said letter did not refer to the provisions of Article 29(j) of the Articles referred to in paragraph 10.4 above and did not refer to the threshold of 20% of relevant NAV provided for by it, the threshold of 10% referred to in the letter being that set out in the section of the July 2007 PPM headed "Limitation on Redemptions." The July PPM mis-described the threshold set out in the Articles and was of no effect to override or qualify the terms of Article 29(j). The letter demonstrates that even if (which is not admitted), it records a decision in fact taken by the Directors, they did not exercise, either validly or at all, the discretion conferred on them by that Article, but proceeded on the false basis that there was a limitation on redemptions that they were only authorised to waive and that the threshold at which that limitation was engaged was 10% of relevant NAV instead of 20%.

20.    Further, under the provisions of Article 29(j), such discretion falls to be exercised in respect of each Redemption Day and accordingly a gate on redemptions cannot be declared in advance or for an indefinite period as the letter purported to do; the Company had no power under Article 29(j) to take such a course.

21. As respects the 31 December 2010 quarter date, your Petitioner was paid the net sum of US$465,720.85 in respect of the Redemption Price of approximately 572.41 of its Participating Shares in the Company. However the said sum represented approximately 80% of the Redemption Price payable in respect of such shares, leaving a sum of US$123,442.33 due as the balance. No explanation was given by the Company for the payment of that proportion as opposed to the 90% payable pursuant to the provisions referred to in paragraph 11 hereof.

22. Even if the gate declared by the Second Gating letter as respects the December 2010 quarter day was effective (which is not admitted), payment of the balance of your Petitioner's Participating Shares that were the subject of the 26 May 2010 Redemption Request was by virtue of Article 29(j) automatically carried forward to the next following Redemption Day, 31 March 2011.

23. As respects that quarter date, your Petitioner was paid the net sum of US$481,434.97 in respect of the Redemption Price of approximately 500.81 of its Participating Shares in the Company. The said sum represented approximately 80% of the Redemption Price payable in respect of such shares, leaving a sum of US$120,358.74 due as the balance. No explanation was given by the Company for the payment of that proportion as opposed to the 90% payable pursuant to the provisions referred to in paragraph 11 hereof.

24. Since such payment, the Company has failed to pay your Petitioner any further sums in respect of the Participating Shares the subject of 26 May 2010 Redemption Request. The Company's failure to make payment extends to (a) the whole of the sums payable in respect of

those Participating Shares which had not been the subject of the payments referred to in paragraphs 17, 21 and 23 hereof and (b) the balances referred to in paragraphs 21 and 23 hereof.

25.     By a letter dated 7 November 2012 and sent by your Petitioner to the Company, your Petitioner made and required by 28 November 2012 answers to certain inquiries, including the following:

    25.1     Your Petitioner pointed out that it had only been provided with estimated statements of the Company's NAV since the quarter ended 30 September 2010 and no information on the Company's NAV since 30 June 2011, and asked for an explanation of why no final statements of NAV had been provided since 30 September 2010 and a statement of the Company's current NAV.

    25.2     Your Petitioner referred to the Second Gating Letter and pointed out that under the Articles, the Company is not entitled to impose a gate for a "blanket" or indefinite period. Your Petitioner asked the Company to clarify whether gating restrictions were still in place and if so, on what basis.

    25.3     Your Petitioner stated that no redemption payments had been made to it since that referred to in paragraph 23 hereof and asked for an explanation of the Company's delay in making the remaining redemption payments.

    25.4     Your Petitioner further asked for (a) details of the Company's current administrator, (b) a copy of the

Company's most recent audited accounts, together with copies of the Company's audited accounts for the financial years ending in 2009, 2010 and 2011, (c) details of the current directors of the Company, with a certified copy of the Register of Directors of the Company and (d) confirmation that the Company is in good standing with the Registrar of Companies and the Cayman Islands Monetary Authority.

26.     The said letter stated that your Petitioner is a creditor of the Company in respect of sums payable in redemption of Participating Shares and demanded that the Company pay to it the unpaid redemption sums due to it.

27.     Your Petitioner has received no acknowledgement of or response to the said letter from the Company.

28.     Your Petitioner believes that the Company was without a fund administrator since December 2011 and without a fund custodian since January 2012 and no purported notice of appointments of a new fund administrator and new fund custodian was given by the Company to your Petitioner until the letter referred to in paragraph 29 below. Between March 2012 and June 2012, inquiries were made by employees of the Citco group of companies as to whether certain redemption payments due to your Petitioner would be made and what was the current status of the Company's fund administration arrangements. The responses to those inquiries were made by employees of the FAM group by email messages dated 5 April, 11 April, 15 May and 18 June 2012, respectively, and were that "*Payments outstanding on all funds cannot be made until a new admin is official*", "*A*

*new admin is required to process all outstanding payments. A new admin appointment has still not been made"*, *"The Richcourt/Soundview funds are all in the same situation in regards to their status on appointing the new administrator. Their status has not changed"* and *"We are awaiting the appointment of an administrator. Your request will be addressed at that time."*

29.   In or about mid-January 2013, your Petitioner received a letter dated 1 January 2013 purporting to be sent by the Company. The letter purports to give notice that (a) a company called Pinnacle Fund Administration LLC with offices in Charlotte, North Carolina assumed administration duties with respect to the Company as from 1 January 2013 and *"will calculate NAVs for all capital activity going back to January 1, 2011,"* and (b) that a new custodian agreement had been executed with Wilmington Trust Company (for which no address was given) on 6 November 2012. No indication was given in the said letter whether any redemption payments due from the Company to your Petitioner will be made and if so when. No indication was given as to when NAVs would be calculated.

30.   On 29 January 2013, your Petitioner wrote to Pinnacle Fund Administration LLC making certain inquiries, including whether calculations of final NAV for the period since the quarter ended 30 September 2010 are or will be available and when the outstanding redemption payments due to the Petitioner will be made. On the same date Pinnacle Fund Administration LLC responded by an email message confirming that your Petitioner's letter had been passed to the Investment Manager for response and stating that *"any response would be forthcoming from the Investment Manager, not ourselves, as this is solely*

*an issue for the Investment Manager.*" Your Petitioner has received no information from the Investment Manager or the Company in response to such inquiries.

31.     Your Petitioner believes that no audited annual accounts have been prepared and/or filed by the Company with the Cayman Islands Monetary Authority since 2008 in breach of the requirements of sections 8(1) - (3) of the Mutual Funds Law (2012 revision).

32.     According to the Company's Register of Directors and Officers filed as at 3rd July 2013, the directors of the Company were Alphonse Fletcher Jr (appointed 4th September 2012) and "George Lander" (appointed 12th June 2013, although the name given appears to be a misprint for George Ladner, who is also a director of the related companies Soundview Elite Ltd and Soundview Star Ltd). It therefore appears that all former directors of the Company have resigned, Mr Ladner having been appointed on the same date that a former corporate director, Solon Group Inc., a business development and restructuring specialist, resigned. Both Mr Fletcher and Mr Ladner are associated with FAM.

33.     In the premises, the Company is unable to pay its debts and ought to be compulsorily wound up by the Court.

34.     Further or alternatively, in view of:

34.1     the Company's default in its regulatory obligations to prepare and file audited accounts since 2008;

34.2 the absence of any interim or final NAV calculations since the times referred to in paragraph 25.1 hereof;

34.3 the fact that the Company did not have either a fund administrator or fund custodian for the periods referred to in paragraph 28 hereof;

34.4 the absence of any confirmation from the Company or the Investment Manager of when final NAV calculations will be available and outstanding redemption payments will be made; and

34.5 the resignation of all previous directors and their replacement by the two individuals named in paragraph 32 hereof,

it is also just and equitable that the Company be wound up pursuant to section 92(e) of the Law so that an Official Liquidator or Official Liquidators may investigate the Company's affairs and take control of its assets.

**YOUR PETITIONER THEREFORE PRAYS THAT**:

1. The Company may be wound up by the Court under the provisions of the Companies Law (2012 Revision).

2. Matthew Wright and Peter Anderson of RHSW (Cayman) Limited, PO Box 897, Windward 1, Regatta Office Park, Grand Cayman KY1-1103, Cayman Islands be appointed as Joint Official Liquidators of the Company with power to act jointly and severally.

3. The Official Liquidators shall not be required to give security for their appointment.

4. In addition to the powers prescribed in Part II of the Third Schedule to the Companies Law, the Official Liquidators may also without further sanction or intervention from this Court:

   (a) exercise the powers set out in Part I of the Third Schedule to the Companies Law; and

   (b) take any such action as may be necessary or desirable to obtain the recognition of their appointment in any other relevant jurisdictions and to make applications to the courts of such jurisdictions for that purpose,

   and for the avoidance of doubt the powers bestowed on the Official Liquidators may be exercised by them within and outside the Cayman Islands

5. The costs of the petitioner of and incidental to the Petition be paid forthwith from the assets of the Company, to be taxed on the indemnity basis if not agreed.

6. Such other orders and/or directions may be made as the Court thinks fit.

Dated this 20 August 2013

_Smeed Law (Cayne)._

Attorneys-at-Law for the Petitioner

**NOTE: It is intended to serve this Petition on (a) Soundview Premium Limited and (b) the Cayman Islands Monetary Authority.**

## INDORSEMENT

This Petition having been presented to the Court on _20 August_ 2013 will be heard at the Law Courts, George Town, Grand Cayman on _24 September_ 2013 at _10 : 00_ a.m./~p.m.~ or as soon thereafter as the Petition can be heard.

This petition was filed by Smeets Law (Cayman), Attorneys-at-Law for the Petitioner, whose address for service is Suite 2206, Cassia Court, 72 Market Street, Camana Bay, PO Box 32302, Grand Cayman KT1-1209, Cayman Islands.

# EXHIBIT I

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION                    FSD NO. [ 112 ] 2013 (AJ)

IN THE MATTEROF THE COMPANIES LAW (2012 REVISION)

AND IN THE MATTER OF SOUNDVIEW STAR LIMITED



**WINDING UP PETITION**

**To: The Grand Court of the Cayman Islands**

The humble Petition of Citco Global Custody (N.A.) N.V. of De Ruyterkade 62,
P.O. Box 707, Curaçao, Netherlands Antilles

Shows as follows:

1.  Soundview Star Limited ("the Company") was initially incorporated
    as an international business company in the Commonwealth of the
    Bahamas in May 2002 and was transferred by way of continuation to
    the Cayman Islands in June 2005. Accordingly the Company is now an
    exempted company registered in the Cayman Islands under the
    provisions of the Companies Law (2012 Revision) ("the Law"). The
    Company is a mutual fund registered with the Cayman Islands
    Monetary Authority pursuant to section 4(3) of the Mutual Funds Law
    (2012 Revision).

2. The registered office of the Company is at Stuarts Corporate Services Ltd., 4th Floor Cayman Financial Services Centre, 36A Dr. Roy's Drive, PO Box 2510, Grand Cayman KY1-1104, Cayman Islands.

3. The share capital of the Company (as defined in its Memorandum and Articles of Association) is US$17,500, €17,500 and CHF 15,000 divided into 100 voting, non-participating class B Management Shares with a par value of US$ 0.01 per share, 1,749,900 Class D Participating Shares with a par value of US$ 0.01 per share, 1,750,000 Class E Participating Shares of €0.01 per share and 1,500,000 Class F Participating Shares of CHF 0.01 per share, with power for the Company, subject to the provisions of the Law and the Articles of Association ("the Articles"), to increase the said capital and to redeem any of its shares.

4. The objects for which the Company is established are unrestricted.

5. The investment manager of the Company is and at all material times has been Soundview Capital Management Limited of One Montague Place, 1st Floor, East Bay Street, P.O. Box N-4906, Nassau, Bahamas ("the Investment Manager").

6. On or about 1 June 2005, the Company offered for subscription up to the provisions of the Articles and generally on the terms described in a Confidential Private Placement Memorandum ("the June 2005 PPM") of that date.

7. On or about 1 September 2005, your Petitioner subscribed for 3,797.41 such Class D shares and paid a subscription price of US$4,000,000 to the Company for them.

8.     On or about 14 June 2007, the Company offered for subscription Class D shares, Class E Shares and Class F Shares, subject to the provisions of the Articles and generally on the terms described in a Confidential Private Placement Memorandum ("the July 2007 PPM") of that date. The Minimum subscription for Class D shares that was solicited by the Company on this occasion was US$ 50,000.

9.     On or about 2 July 2007, your Petitioner subscribed for 842.79 such Class D shares and paid a subscription price of US$ 1,196,664.68 to the Company for them.

10.    On or about 12 June 2008, a consortium led by Fletcher Asset Management Incorporated ("FAM"), a New York corporation, acquired 85% majority control of the group of companies then known as the Richcourt Group, which included the Investment Manager and, through its ownership of the management shares, the Company, as well as certain other companies operating in the mutual funds industry. Such acquisition was made through the vehicle of a British Virgin Islands company, Richcourt Acquisition Incorporated, an affiliate of FAM. The acquisition was subject to a put option under which the remaining 15% of the Richcourt Group ownership would also be acquired by the FAM-led consortium. The said option has been exercised but to date the consortium has failed to complete the acquisition as required.

11.    On 26 May 2010, your Petitioner submitted to the Company a Redemption Request in respect of the whole of its holding of 4,640.2 Class D Participating Shares in the Company. Such Redemption

Request was effective in relation to the next following Redemption Day (as defined in the Articles and the June 2005 PPM and the July 2007 PPM), which was the quarter day 30 September 2010.

12.    Article 29 of the Articles provides in material part as follows:

12.1    Subject to the Articles and the Law, a holder of Participating Shares in the Company may request redemption of such shares (subject to a minimum number not here relevant) as of any Redemption Day.

12.2    The Redemption Request must be lodged at least 45 days before the Redemption Day on which redemption is requested.

12.3    Once received a Redemption Request may only be withdrawn with the consent of the Company's Directors.

12.4    Per Article 29(j), if Redemption Requests of an amount equal to or greater than 10% of the Net Asset Value ("NAV") of the Company, or of any Master Fund in which it has invested, are received in respect of any given Redemption Day, the Directors of the Company have a discretion whether to determine to reduce each such Redemption Request *pro rata* so that the Redemption Requests so received and relating to the Redemption Day in question amount to no more than 10% of the NAV of the Company or any such Master Fund.

12.5    Article 29(j) further provides that, in the event that the Directors exercise such discretion, *"The partial Amounts of the Redemption Request which remain unsatisfied shall be carried forward to the next Redemption Day and satisfied in priority to any Redemption Requests received in relation to such Redemption Day until the prior Redemption Requests shall have been satisfied in full"* (Article 1(c) provides that the word *"shall"* is to be construed as imperative).

13.    Article 31 of the Articles provides in material part as follows:

13.1    Payment of the Redemption Price of Participating Shares *"shall be made in such manner as the Directors of the Company may from time to time determine in respect of each Class, as set out in the Offering Memorandum."*

13.2    Both the June 2005 PPM and the July 2007 PPM provide (in the sections thereof headed *"Redemptions and Transfers of Shares"*) that payment of not less than 90% of the estimated value of Participating Shares the subject of redemption will be made by the Company within 40 days following the Redemption Day.

13.3    On the true construction of these provisions, the Company was obliged to make payment of the balance of the Redemption Price within a reasonable time of the initial 90% payment and such reasonable time is not later than one month after the initial payment or the next following quarter day, whichever is the earliest to occur.

14. Article 25(b)(ii) of the Articles provides that *"Participating Shares to be redeemed pursuant to Articles 29 and 31 shall be deemed to remain in issue until and including the close of business on the Redemption Day on which they are to be redeemed, and from that time until paid the Redemption Price shall be deemed to be a liability of the Company."*

15. In the premises, once your Petitioner's Redemption Request had expired and close of business on the Redemption Day (30th September 2010) had passed, your Petitioner was a creditor or potential or contingent creditor of the Company for the amount of the Redemption Price payable in respect of the Participating Shares the subject of the Redemption Request. Alternatively, and having regard to the terms of Article 29(j) providing for the carrying forward of unsatisfied Redemption Requests, the latest date on which your Petitioner became a creditor or potential or contingent creditor of the Company for the amount of the Redemption Price payable in respect of Participating Shares for which no payment was made in the circumstances referred to in paragraphs 19, 23 and 25 hereof was either 31 March 2011 or 30 June 2011.

16. Neither as at 30 September 2010 nor at any later stage relevant for present purposes had the Directors declared and duly notified to your Petitioner in accordance with the Articles, in particular Articles 26 to 28, any suspension by the Company of the calculation of NAV per Participating Share. The last such NAV notified to your Petitioner was as at 28 February 2011 in the amount of $1,284.74.

17. By a letter dated 8 November 2010 and purporting to be written on behalf of the Company over the signature of two directors, Mr Stuart Turner and Mr Denis Kiely ("the First Gating Letter"), it was stated that the Company was in receipt of Redemption Requests *"as of September 30, 2010 in an amount that exceeded 10% of the Net Asset Value of the Fund on that date. Pursuant to the Fund's Confidential Private Placement Memorandum, the maximum Net Asset Value of shares that may be redeemed on any Redemption Date is 10% of the Net Asset Value of the Fund on such Redemption Date, unless such limitation is waived by the Directors in their sole discretion . . . the Directors do not consider it appropriate to waive this limitation . . ."*

18. The said letter did not refer to the provisions of Article 29(j) of the Articles referred to in paragraph 12.4 above and demonstrates that the Directors did not exercise, either validly or at all, the discretion conferred on them by it, but proceeded on the false basis that there was a limitation on redemptions that they were only authorised to waive.

19. As respects the 30 September 2010 quarter date, your Petitioner was paid the net sum of US$774,023.90 in respect of the redemption price of approximately 647.77 of its Participating Shares in the Company. Even if the First Gating Letter was effective to impose the gate referred to in it (which is not admitted), payment of the Redemption Price in respect of the balance of your Petitioner's Participating Shares that were the subject of the 26 May 2010 Redemption Request was by virtue of Article 29(j) automatically carried forward to the next following Redemption Day, 31 December 2010.

20. Subsequent to that date, by an unsigned letter dated 28 February 2011 over the typewritten name of the Investment Manager ("the Second Gating Letter"), it was stated that "*the Fund had outstanding redemption requests as of September 30, 2010 and as of December 31, 2010 in an amount that each exceeded 10% of the Net Asset Value of the Fund on each respective date. Pursuant to the Fund's Confidential Private Placement Memorandum, the maximum Net Asset Value of shares that may be redeemed on any Redemption Date is 10% of the Net Asset Value of the Fund on such Redemption Date, unless such limitation is waived by the Directors in their sole discretion . . . the Directors do not consider it appropriate to waive this limitation . . .*" The letter went on to state that "*The gate will remain in place until further notice, which will be communicated through a letter by the Directors.*"

21. The said letter did not refer to the provisions of Article 29(j) of the Articles referred to in paragraph 12.4 above and demonstrates that even if (which is not admitted), it records a decision in fact taken by the Directors, they did not exercise, either validly or at all, the discretion conferred on them by that Article, but proceeded on the false basis that there was a limitation on redemptions that they were only authorised to waive.

22. Further, under the provisions of Article 29(j), such discretion falls to be exercised in respect of each Redemption Day and accordingly a gate on redemptions cannot be declared in advance or for an indefinite period as the letter purported to do; the Company had no power under Article 29(j) to take such a course.

23.    As respects the 31 December 2010 quarter date, your Petitioner was
       paid the net sum of US$534,391.66 in respect of the Redemption Price
       of approximately 528.99 of its Participating Shares in the Company.
       However the said sum represented approximately 80% of the
       Redemption Price payable in respect of such shares, leaving a sum of
       US$132,587.53 due as the balance. No explanation was given by the
       Company for the payment of that proportion as opposed to the 90%
       payable pursuant to the provisions referred to in paragraph 13 hereof.

24.    Even if the gate declared by the Second Gating Letter as respects the
       December 2010 quarter date was effective (which is not admitted),
       payment for the balance of your Petitioner's Participating Shares that
       were the subject of the 26 May 2010 Redemption Request was by virtue
       of Article 29(j) automatically carried forward to the next following
       Redemption Day, 31 March 2011.

25.    As respects that quarter date, your Petitioner was paid the net sum of
       US$1,689,032.57 in respect of the Redemption Price of approximately
       1,651.62 of its Participating Shares in the Company. The said sum
       represented approximately 80% of the Redemption Price payable in
       respect of such shares, leaving a sum of US$422,258.14 due as the
       balance. No explanation was given by the Company for the payment
       of that proportion as opposed to the 90% payable pursuant to the
       provisions referred to in paragraph 13 hereof.

26.    Since such payment, the Company has failed to pay your Petitioner
       any further sums in respect of the Participating Shares the subject of 26
       May 2010 Redemption Request. The Company's failure to make
       payment extends to (a) the whole of the sums payable in respect of

those Participating Shares which had not been the subject of the payments referred to in paragraphs 19, 23 and 25 hereof and (b) the balances referred to in paragraphs 23 and 25 hereof.

27. By a letter dated 7 November 2012 and sent by your Petitioner to the Company, your Petitioner made and required by 28 November 2012 answers to certain inquiries, including the following:

27.1 Your Petitioner pointed out that it had only been provided with estimated statements of the Company's NAV since the quarter ended 30 September 2010 and no information on the Company's NAV since 30 June 2011, and asked for an explanation of why no final statements of NAV had been provided since 30 September 2010 and a statement of the Company's current NAV.

27.2 Your Petitioner referred to the Second Gating Letter and pointed out that under the Articles, the Company is not entitled to impose a gate for a "blanket" or indefinite period. Your Petitioner asked the Company to clarify whether gating restrictions were still in place and if so, on what basis.

27.3 Your Petitioner stated that no redemption payments had been made to it since that referred in paragraph 25 hereof and asked for an explanation of the Company's delay in making the remaining redemption payments.

27.4 Your Petitioner further asked for (a) details of the Company's current administrator, (b) a copy of the

Company's most recent audited accounts, together with copies of the Company's audited accounts for the financial years ending in 2009, 2010 and 2011, (c) details of the current directors of the Company, with a certified copy of the Register of Directors of the Company and (d) confirmation that the Company is in good standing with the Registrar of Companies and the Cayman Islands Monetary Authority.

28.     The said letter stated that your Petitioner is a creditor of the Company in respect of sums payable in redemption of its Participating Shares and demanded that the Company pay to it the unpaid redemption sums due to it.

29.     Your Petitioner has received no acknowledgement of or response to the said letter from the Company.

30.     Your Petitioner believes that the Company was without a fund administrator after December 2011 and without a fund custodian since January 2012 and no purported notice of appointments of a new fund administrator and new fund custodian was given by the Company to your Petitioner until the letter referred to in paragraph 31 below. Between March 2012 and June 2012, inquiries were made by employees of the Citco group of companies as to whether certain redemption payments due to your Petitioner would be made and what was the current status of the Company's fund administration arrangements. The responses to those inquiries were made by employees of the FAM group by email messages dated 5 April, 11 April, 15 May and 18 June 2012, respectively, and were that "*Payments outstanding on all funds cannot be made until a new admin is official*", "*A*

*new admin is required to process all outstanding payments. A new admin appointment has still not been made*", "*The Richcourt/Soundview funds are all in the same situation in regards to their status on appointing the new administrator. Their status has not changed*" and "*We are awaiting the appointment of an administrator. Your request will be addressed at that time.*"

31. In or about early January 2013, your Petitioner received a letter dated 1 January 2013 purporting to be sent by the Company. The letter purports to give notice that (a) a company called Pinnacle Fund Administration LLC with offices in Charlotte, North Carolina assumed administration duties with respect to the Company as from 1 January 2013 and "*will calculate NAVs for all capital activity going back to January 1, 2011,*" and (b) that a new custodian agreement had been executed with Wilmington Trust Company (for which no address was given) on 6 November 2012. No indication was given in the said letter whether any redemption payments due from the Company to your Petitioner will be made and if so when. No indication was given as to when NAVs would be calculated.

32. On 29 January 2013, your Petitioner wrote to Pinnacle Fund Administration LLC making certain inquiries, including whether calculations of final NAV for the period since the quarter ended 30 September 2010 are or will be available and when the outstanding redemption payments due to the Petitioner will be made. On the same date Pinnacle Fund Administration LLC responded by an email message confirming that your Petitioner's letter had been passed to the Investment Manager for response and stating that "*any response would be forthcoming from the Investment Manager, not ourselves, as this is solely*

*an issue for the Investment Manager*. Your Petitioner has received no information from the Investment Manager or the Company in response to such inquiries.

33.   Your Petitioner believes that no audited annual accounts have been prepared and/or filed by the Company with the Cayman Islands Monetary Authority since 2008 in breach of the requirements of sections 8(1) - (3) of the Mutual Funds Law (2012 revision).

34.   According to the Company's Register of Directors and Officers filed as at 3rd July 2013, the directors of the Company were Alphonse Fletcher Jr (appointed 4th September 2012) and George Ladner (appointed 12th June 2013). It therefore appears that all former directors of the Company have resigned, Mr Ladner having been appointed on the same date that a former corporate director, Solon Group Inc., a business development and restructuring specialist, resigned. Both Mr Fletcher and Mr Ladner are associated with FAM.

35.   In the premises, the Company is unable to pay its debts and ought to be compulsorily wound up.

36.   Further or alternatively, in view of:

      36.1   the Company's default in its regulatory obligations to prepare and file audited accounts since 2008;

      36.2   the absence of any interim or final NAV calculations since the times referred to in paragraph 27.1 hereof;

36.3    the fact that the Company did not have either a fund administrator or fund custodian for the periods referred to in paragraph 30 hereof;

36.4    the absence of any confirmation from the Company or the Investment Manager of when final NAV calculations will be available and outstanding redemption payments will be made; and

36.5    the resignation of all previous directors and their replacement by the two individuals named in paragraph 34 hereof,

it is also just and equitable that the Company be wound up pursuant to section 92(e) of the Law so that an Official Liquidator or Official Liquidators may investigate the Company's affairs and take control of its assets.

**YOUR PETITIONER THEREFORE PRAYS THAT**:

1.    The Company may be wound up by the Court under the provisions of the Companies Law (2012 Revision).

2.    Matthew Wright and Peter Anderson of RHSW (Cayman) Limited, PO Box 897, Windward 1, Regatta Office Park, Grand Cayman KY1-1103, Cayman Islands be appointed as Joint Official Liquidators of the Company with power to act jointly and severally.

3.    The Official Liquidators shall not be required to give security for their appointment.

4.   In addition to the powers prescribed in Part II of the Third Schedule to the Companies Law, the Official Liquidators may also without further sanction or intervention from this Court:

(a) exercise the powers set out in Part I of the Third Schedule to the Companies Law; and

(b) take any such action as may be necessary or desirable to obtain the recognition of their appointment in any other relevant jurisdictions and to make applications to the courts of such jurisdictions for that purpose,

and for the avoidance of doubt the powers bestowed on the Official Liquidators may be exercised by them within and outside the Cayman Islands

5.   The costs of the petitioner of and incidental to the Petition be paid forthwith from the assets of the Company, to be taxed on the indemnity basis if not agreed.

6.   Such other orders and/or directions may be made as the Court thinks fit.

Dated this 20 August 2013

*Jmets dana (Cayma)*

Attorneys-at-Law for the Petitioner

**NOTE: It is intended to serve this Petition on (a) Soundview Star Limited and (b) the Cayman Islands Monetary Authority.**

## INDORSEMENT

This Petition having been presented to the Court on *20 August* 2013
will be heard at the Law Courts, George Town, Grand Cayman on
*24 September* . 2013 at *10:00* a.m./~~p.m.~~ or as soon thereafter
as the Petition can be heard.

This petition was filed by Smeets Law (Cayman), Attorneys-at-Law for the
Petitioner, whose address for service is Suite 2206, Cassia Court, 72 Market
Street, Camana Bay, PO Box 32302, Grand Cayman KT1-1209, Cayman Islands.

# EXHIBIT J

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| WILMINGTON TRUST, NATIONAL ASSOCIATION, | ) ) ) ) |
| Plaintiff, | ) C.A. NO. _____ [CCLD] |
| | ) |
| v. | ) ) |
| SOUNDVIEW ELITE LTD., PREMIUM DESIGNATED, SOUNDVIEW STAR LTD., PITAGORA FUND LTD., AMERICA ALTERNATIVE INVESTMENTS, INC., ELITE DESIGNATED, RICHCOURT EURO STRATEGIES INC., STAR DESIGNATED, RICHCOURT COMPOSITE INC., SOUNDVIEW PREMIUM LTD., RICHCOURT ALLWEATHER B INC., SOUNDVIEW COMPOSITE LTD., RICHCOURT ALLWEATHER FUND INC., NEW WAVE FUND SPC, OPTIMA ABSOLUTE RETURN FUND LTD., and LEVERAGED HAWK, INC. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## INTERPLEADER COMPLAINT

Plaintiff Wilmington Trust, National Association ("Wilmington Trust") files this interpleader Complaint pursuant to Superior Court Rule of Civil Procedure 22, and alleges in support of its Complaint as follows:

## INTRODUCTION

1.     This action arises over competing claims for funds held by Wilmington Trust on behalf of Defendants Soundview Elite Ltd., Premium Designated, Soundview Star Ltd., Pitagora

Fund Ltd., America Alternative Investments, Inc., Elite Designated, Richcourt Euro Strategies Inc., Star Designated, Richcourt Composite Inc., Soundview Premium Ltd., Richcourt Allweather B Inc., Soundview Composite Ltd., Richcourt Allweather Fund Inc., New Wave Fund SPC, and Optima Absolute Return Fund Ltd. (collectively the "Richcourt Entities" and individually a "Richcourt Entity"). Although the Richcourt Entities demand an immediate distribution of funds to each individual Richcourt Entity from the accounts owned by the Richcourt Entities, another Defendant, Leveraged Hawk, Inc. ("Leveraged Hawk"), has also claimed a right to the funds. Specifically, a representative of Leveraged Hawk, claiming to act on behalf of the Richcourt Entities, has demanded an immediate distribution of approximately $5,000,000, which is contrary to the instructions provided by the Richcourt Entities. Faced with these competing instructions, Wilmington Trust seeks to deposit all funds held on behalf of the Richcourt Entities with the Superior Court for distribution to the Richcourt Entities and/or Leveraged Hawk in a manner deemed appropriate by the Court.

## THE PARTIES

2.      Wilmington Trust is a national banking association with its main office at 1100 North Market Street, Wilmington, Delaware 19890.

3.      Upon information and belief, Defendant Soundview Elite Ltd. is a company organized and existing under the laws of the Cayman Islands located at dms Corporate Services Ltd., dms House, 20 Genesis Close, Grand Cayman KY1-1108.

4.      Upon information and belief, Defendant Premium Designated is a company organized and existing under the laws of the Cayman Islands located at dms Corporate Services Ltd., dms House, 20 Genesis Close, Grand Cayman KY1-1108.

2

5.     Upon information and belief, Defendant Soundview Star Ltd. is a company organized and existing under the laws of the Cayman Islands located at dms Corporate Services Ltd., dms House, 20 Genesis Close, Grand Cayman KY1-1108.

6.     Upon information and belief, Defendant Pitagora Fund Ltd. is a company organized and existing under the laws of the Cayman Islands located at dms Corporate Services Ltd., dms House, 20 Genesis Close, Grand Cayman KY1-1108.

7.     Upon information and belief, Defendant American Alternative Investments, Inc. is a company organized and existing under the laws of the British Virgin Islands located at Walkers Corporate Services (BV) Limited, Walkers Chambers, 171 Main Street, Road Town, Tortola.

8.     Upon information and belief, Defendant Elite Designated is a company organized and existing under the laws of the Cayman Islands located at dms Corporate Services Ltd., dms House, 20 Genesis Close, Grand Cayman KY1-1108.

9.     Upon information and belief, Defendant Richcourt Euro Strategies Inc. is a company organized and existing under the laws of the British Virgin Islands located at Walkers Corporate Services (BV) Limited, Walkers Chambers, 171 Main Street, Road Town, Tortola.

10.     Upon information and belief, Defendant Star Designated is a company organized and existing under the laws of the Cayman Islands located at dms Corporate Services Ltd., dms House, 20 Genesis Close, Grand Cayman KY1-1108.

11.     Upon information and belief, Defendant Richcourt Composite Inc. is a company organized and existing under the laws of the British Virgin Islands located at Walkers Corporate Services (BV) Limited, Walkers Chambers, 171 Main Street, Road Town, Tortola.

3

12.     Upon information and belief, Defendant Soundview Premium Ltd. is a company organized and existing under the laws of the Cayman Islands located at dms Corporate Services Ltd., dms House, 20 Genesis Close, Grand Cayman KY1-1108.

13.     Upon information and belief, Defendant Richcourt Allweather B Inc. is a company organized and existing under the laws of the British Virgin Islands located at Walkers Corporate Services (BV) Limited, Walkers Chambers, 171 Main Street, Road Town, Tortola.

14.     Upon information and belief, Defendant Soundview Composite Ltd. is a company organized and existing under the laws of the Cayman Islands located at dms Corporate Services Ltd., dms House, 20 Genesis Close, Grand Cayman KY1-1108.

15.     Upon information and belief, Defendant Richcourt Allweather Fund Inc. is a company organized and existing under the laws of the British Virgin Islands located at Walkers Corporate Services (BV) Limited, Walkers Chambers, 171 Main Street, Road Town, Tortola.

16.     Upon information and belief, Defendant New Wave Fund SPC is a company organized and existing under the laws of the Cayman Islands located at dms Corporate Services Ltd., dms House, 20 Genesis Close, Grand Cayman KY1-1108.

17.     Upon information and belief, Defendant Optima Absolute Return Fund Ltd. is a company organized and existing under the laws of the British Virgin Islands located at Walkers Corporate Services (BV) Limited, Walkers Chambers, 171 Main Street, Road Town, Tortola.

18.     Upon information and belief, Defendant Leveraged Hawk, Inc. is a Delaware corporation whose registered agent is Registered Agent Solutions, Inc., 1679 S. DuPont Highway, Suite 100, Dover, Delaware 19901.

4

## JURISDICTION AND VENUE

19. This Court has *in rem* jurisdiction over this action because the property at issue is located in Delaware.

20. Alternatively, this Court has personal jurisdiction over the Richcourt Entities because they have taken actions in Delaware giving rise to this action. Among other things, the Richcourt Entities and/or their agents transacted business in Delaware by creating accounts in Delaware. Further, each Richcourt Entity signed a custody agreement with Wilmington Trust to adminster the custody accounts in Delaware, and each custody agreement contains a forum selection clause providing for exclusive jurisdiction in the state of administration. This Court also has personal jurisdiction over Leveraged Hawk because Leveraged Hawk is a Delaware corporation.

21. This case qualifies for assignment to the Superior Court Complex Commercial Litigation Division because the amount in controversy exceeds One Million Dollars ($1,000,000).

## STATEMENT OF FACTS

22. During November 2012 to January 2013, each Richcourt Entity entered into a substantially similar custody agreement with Wilmington Trust. Pursuant to the terms of the custody agreements, Wilmington Trust agreed to create and maintain a custody account for each Richcourt Entity and agreed to buy, sell, accept, and transfer account assets in accordance with instructions from certain authorized representatives designated under the custody agreements. Upon executing the custody agreement, each Richcourt Entity deposited funds with Wilmington Trust into a separate account.

5

23.     The custody agreements provide, among other things, that the Richcourt Entities shall "release and indemnify [Wilmington Trust] for, any loss, cost, or other damage (including attorneys' fees) that may result from . . . acting to protect assets pending their distribution or other disposition, from delaying acting on any instructions that are conflicting, incomplete or otherwise not in good order, until [Wilmington Trust] is satisfied that all issues are resolved, [and] from taking, or abstaining from taking, any action based on legal advice from your or our lawyers."

24.     Each individual custody agreement was executed by Gerti Muho, a director of each individual Richcourt Entity at the time of execution.  Pursuant to the custody agreements, Mr. Muho was an authorized representative and could authorize the transfer of funds to and from the individual accounts.

25.     On or about May 1, 2013, a representative purportedly acting on behalf of the Richcourt Entities informed Wilmington Trust that the bank should not accept any further instructions from Mr. Muho concerning the funds held on behalf of the Richcourt Entities. Specifically, the representative told Wilmington Trust that Mr. Muho was no longer an authorized representative of the Richcourt Entities and could not authorize transfers to or from any of the accounts created by the Richcourt Entities.

26.     On or about May 7, 2013, Wilmington Trust received instructions from Mr. Muho that were completely contrary to those received a few days earlier from the Richcourt Entities. In an email, Mr. Muho requested that the sum of $5,000,000 be transferred from accounts owned by the Richcourt Entities to Leveraged Hawk.  In the email, Mr. Muho stated that he was authorized to act on behalf of the Richcourt Entities and provided various documents to support his assertion.

6

27.     Faced with conflicting instructions from the Richcourt Entities and Mr. Muho, Wilmington Trust placed a temporary hold on the funds in the various accounts because it was unclear whether Mr. Muho was still authorized to act on behalf of the Richcourt Entities.

28.     During the ensuing weeks, Mr. Muho continued to bombard Wilmington Trust with phone calls and written correspondence claiming that Leveraged Hawk was entitled to the funds held in the accounts. During this same period of time, the United States Securities and Exchange Commission contacted Wilmington Trust about the accounts and issued a subpoena to Wilmington Trust in connection with its investigation of certain of the Richcourt Entities.

29.     On or about June 10, 2013, Wilmington Trust received a letter from counsel for the Richcourt Entities demanding an immediate distribution of funds. The letter set forth the Richcourt Entities' position that Mr. Muho was no longer an authorized representative and had been removed as a director of all Richcourt Entities in early April 2013. The letter also enclosed legal opinions with the certified register of directors for certain Richcourt Entities and sought to provide assurance that Mr. Muho was no longer a director of any Richcourt Entity. The June 10 letter claimed that the Richcourt entities would incur "financial distress" if they did not have access to funds held in the accounts in order to pay unidentified creditors.

30.     In response to the June 10 letter, Wilmington Trust sent a letter to counsel for the Richcourt Entities requesting additional information about the amounts allegedly owed to creditors of the Richcourt Entities. The letter also sought to address any concern of "financial distress" and offered "to consider the possibility of releasing some of the funds [held] under the Agreements with the eleven funds specifically covered by the [] legal opinions." Wilmington Trust has been contacted by a representative of the Richcourt Entities about a list of creditors, but Wilmington Trust has not released any funds to date.

7

31.     Mr. Muho, on behalf of Leveraged Hawk, continues to claim that Leveraged Hawk is entitled to the funds. Accordingly, there is a legitimate dispute regarding the proper distribution of funds held by Wilmington Trust on behalf of the Richcourt Entities. The Richcourt Entities request an immediate distribution to each individual Richcourt Entity, while Mr. Muho, on behalf of Leveraged Hawk, requests an immediate distribution to Leveraged Hawk. In light of these conflicting instructions, Wilmington Trust has filed this interpleader action so that the Court can determine the proper recipient of the funds.

## COUNT I
### (Interpleader of Funds)

32.     Wilmington Trust repeats and realleges the allegations of paragraphs 1 through 31 of this Complaint as if fully set forth herein.

33.     Wilmington Trust holds funds on behalf of the Richcourt Entities.

34.     There is a present dispute between the Richcourt Entities and Leveraged Hawk as to how and to whom certain funds should be distributed. Both claim ownership of the funds, and both seek a contrary distribution.

35.     These conflicting demands regarding the ownership of the funds puts Wilmington Trust in doubt as to which Defendants are entitled to the funds, and the apportionment of such funds among Defendants.

36.     Accordingly, Wilmington Trust seeks to have the entirety of the funds held on behalf of the Richcourt Entities deposited into an account belonging to the Superior Court of the State of Delaware in and for New Castle County for distribution to the Richcourt Entities and/or Leveraged Hawk in a manner deemed appropriate by the Court.

8

## PRAYER FOR RELIEF

**WHEREFORE,** Wilmington Trust respectfully requests that:

A.     The Court permit Wilmington Trust to deposit with the Prothonotary the funds currently held in the accounts maintained by Wilmington Trust for the Richcourt Entities;

B.     The Court relieve and discharge Wilmington Trust from any liability with respect to any claims, now or hereafter made, based on Wilmington Trust's decision to deposit the funds in this Court rather than distribute such funds to the Richcourt Entities and/or Leveraged Hawk;

C.     The Court determine which, if any, of the Defendants are entitled to the funds deposited with the Court;

D.     The Court award Wilmington Trust from the deposited funds its reasonable costs and attorneys' fees incurred in this action; and

E.     The Court award Wilmington Trust any further relief that it deems just and proper.

*/s/ Chad M. Shandler*
Chad M. Shandler (#3796)
Travis S. Hunter (#5350)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700

*Attorneys for Wilmington Trust, National Association*

Dated:  June 17, 2013

RLF1 8755727v.3