1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6  SOUNDVIEW ELITE LTD.,                   Case No. 13-13098-reg

7               Debtor.

8  - - - - - - - - - - - - - - - - - - - - -x

9  In the Matter of:

10  SOUNDVIEW PREMIUM, LTD.,                Case No. 13-13099-reg

11               Debtor.

12  - - - - - - - - - - - - - - - - - - - - -x

13  In the Matter of:

14  SOUNDVIEW STAR LTD.,                    Case No. 13-13101-reg

15               Debtor.

16  - - - - - - - - - - - - - - - - - - - - -x

17  In the Matter of:

18  ELITE DESIGNATED,                       Case No. 13-13102-reg

19               Debtor.

20  - - - - - - - - - - - - - - - - - - - - -x

21  In the Matter of:

22  PREMIUM DESIGNATED,                     Case No. 13-13103-reg

23               Debtor.

24  - - - - - - - - - - - - - - - - - - - - -x

25

2

```
 1  - - - - - - - - - - - - - - - - - - - -x
 2  In the Matter of:
 3  STAR DESIGNATED,                      Case No. 13-13104-reg
 4            Debtor.
 5  - - - - - - - - - - - - - - - - - - - -x
 6
 7
 8            United States Bankruptcy Court
 9            One Bowling Green
10            New York, New York
11
12            October 16, 2013
13            10:03 AM
14
15
16
17
18
19
20
21  B E F O R E:
22  HON. ROBERT E. GERBER
23  U.S. BANKRUPTCY JUDGE
24
25
```

1

2  Status conferences

3

4  In re Soundview Elite Ltd.:

5  Doc #28 Response to Motion for an Order Pursuant to 11 U.S.C.

6  105(a) and 331 Establishing Procedures for Monthly Compensation

7  and Reimbursement of Expenses of Professionals and Authorizing

8  and Directing Wilmington Trust's Disbursement of Funds in

9  Accordance with Same (related document(s)9)

10

11  Doc #17 Motion to Extend Deadline to File Schedules or Provide

12  Required Information

13

14  Doc #9 Motion to Approve Motion for an Order Pursuant to

15  11 U.S.C. 105(a) and 331 Establishing Procedures for Monthly

16  Compensation and Reimbursement of Expenses of Professionals and

17  Authorizing and Directing Wilmington Trust's Disbursement of

18  Funds in Accordance with Same

19

20  In re Soundview Elite Ltd.; In re Soundview Premium, Ltd.; In

21  re Soundview Star Ltd.; In re Elite Designated; In re Premium

22  Designated; and In re Star Designated:

23  Hearing on Objection to Motion for Joint Administration

24

25

Doc #12 Motion for Sanctions for Violation of Automatic Stay
Motion for an Order Imposing Sanctions Against Citco Global
Custody (N.A.) N.V., Deborah Hicks Midanek, The Solon Group,
Inc., Optima Absolute Return Fund, Ltd., Richcourt Allweather
Fund, Inc., America Alternative Investments, Ltd. for Contempt
of the Automatic Stay in Connection with their Continued
Prosecution of Foreign Liquidation Proceedings Following Entry
and Clear Notice of the Automatic Stay Herein

Doc #14 Motion to Extend Deadline to File Schedules or Provide
Required Information

Doc #10 Motion to Approve Motion for an Order Pursuant to
11 U.S.C. 105(a) and 331 Establishing Procedures for Monthly
Compensation and Reimbursement of Expenses of Professionals and
Authorizing and Directing Wilmington Trust's Disbursement of
Funds in Accordance with Same

Transcribed by:  David Rutt
eScribers, LLC
700 West 192nd Street, Suite #607
New York, NY 10040
(973)406-2250
operations@escribers.net

1

2  A P P E A R A N C E S :

3  PORZIO BROMBERG & NEWMAN P.C.

4        Proposed Counsel to Debtors

5        100 Southgate Parkway

6        Morristown, NJ 07962

7

8  BY:   WARREN J. MARTIN, JR., ESQ.

9        MARK J. POLITAN, ESQ.

10

11  UNITED STATES DEPARTMENT OF JUSTICE

12        Office of the United States Trustee

13        201 Varick Street

14        Suite 1006

15        New York, NY 10014

16

17  BY:   LINDA A. RIFFKIN, AUST

18

19  KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

20        Attorneys for Pasig Ltd.

21        1633 Broadway

22        New York, NY 10019

23

24  BY:   JEFFREY R. GLEIT, ESQ.

25

```
 1   LUSKIN, STERN & EISLER LLP
 2          Attorneys for Richard J. Davis, Chapter 11 Trustee of
 3           Fletcher International Ltd.
 4          Eleven Times Square
 5          New York, NY 10036
 6
 7   BY:   MICHAEL LUSKIN, ESQ.
 8
 9   MORRISON & FOERSTER LLP
10          Attorneys for Peterson Anderson and Matthew Wright, as
11           Joint Official Liquidators of Soundview Elite Ltd.,
12           Soundview Premium Ltd. and Soundview Star Ltd.
13          1290 Avenue of the Americas
14          New York, NY 10104
15
16   BY:   WILLIAM M. HILDBOLD, ESQ.
17          JOHN A. PINTARELLI, ESQ.
18
19   PAUL, WEISS, RIFKIN, WHARTON & GARRISON LLP
20          Attorneys for Citco Global Custody
21          1285 Avenue of the Americas
22          New York, NY 10019
23
24   BY:   KELLEY A. CORNISH, ESQ.
25          ANDREW GORDON, ESQ.
```

```
 1

 2   RICHARDS, LAYTON & FINGER, P.A.

 3         Attorneys for Wilmington Trust Company

 4         920 North King Street

 5         Wilmington, DE 19801

 6

 7   BY:   MICHAEL J. MERCHANT, ESQ. (TELEPHONICALLY)

 8         CHAD M. SHANDLER, ESQ. (TELEPHONICALLY)

 9

10

11   OSTAD PLLC

12         Attorneys for Optima Absolute Return Fund Ltd.; Richcourt

13          Allweather Fund Inc.; and America Alternative

14          Investments Ltd.

15         185 Great Neck Road

16         Suite 330

17         Great Neck, NY 11021

18

19   BY:   KAREN OSTAD, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25
```

1                      P R O C E E D I N G S

2              THE COURT:  Anybody here in anything other than

3    Soundview Elite?

4              Okay, come on up on that one, please.

5              Some of you I know; some of you I don't.  I'd like to

6    get some appearances, and then I have some preliminary

7    comments.

8              MR. MARTIN:  Thank you, Your Honor.  Warren J. Martin,

9    Jr. and Mark Politan, proposed counsel to the Chapter 11

10   debtors.

11             THE COURT:  Okay.

12             MR. PINTARELLI:  Your Honor, John Pintarelli, Morrison

13   & Foerster, for the joint official liquidators --

14             THE COURT:  All right.

15             MR. PINTARELLI:  -- Peter Anderson and --

16             THE COURT:  Thank you, Mr. --

17             MR. PINTARELLI:  -- Matthew Wright.

18             THE COURT:  -- Jarelli (sic).

19             MR. GLEIT:  Hi, Your Honor.  Jeff Gleit with Kasowitz,

20   on behalf of Pasig Limited.

21             THE COURT:  Okay.

22             MR. HILDBOLD:  Billy Hild --

23             MS. OSTAD:  Good morning, Your Honor.  Karen --

24             THE COURT:  Just a minute, please.  I'll take phone

25   appearances after I have the human beings in the courtroom.

1           MS. CORNISH:  Good morning, Your Honor.  Kelley
2   Cornish from Paul, Weiss, Rifkind, Wharton & Garrison, on
3   behalf of Citco Global Custody.

4           THE COURT:  Okay, thank you, Ms. Cornish.

5           MS. CORNISH:  You're welcome.

6           MS. RIFFKIN:  Good morning, Your Honor.  Linda Riffkin
7   from the Office of the United States Trustee.

8           THE COURT:  Okay.

9           MR. HILDBOLD:  Billy Hildbold, Your Honor, Morrison --

10          THE COURT:  I'm so --

11          MR. HILDBOLD:  -- & Foerster --

12          THE COURT:  Mr. Hildbold.

13          MR. HILDBOLD:  Yes.

14          THE COURT:  Right.

15          Okay.

16          MR. LUSKIN:  Your Honor, Michael Luskin, Luskin, Stern
17   & Eisler.  I'm here for Richard J. Davis, who's the Chapter 11
18   trustee of Fletcher International Limited, which I believe has
19   been identified on the docket as a related case.  For the
20   record, it's 12-12796, and it is pending before Your Honor.

21          THE COURT:  Okay, thank you.

22          Folks, this is just a status conference but, although
23   I signed and approved the stip, I wanted to have the status
24   conference anyway because I had concerns as to the extent to
25   which this case might be getting off on the wrong foot.

SOUNDVIEW ELITE LTD., et al.                    10

1       I've been in this job for about thirteen years and
2   change, at this place, and I was a lawyer for thirty years
3   before that.  Was the first time that I ever had an objection
4   to joint administration.  It wasn't the first time that I'd
5   seen a demand for the production of documents on Monday, served
6   on a Friday afternoon, but it was one of the first.  And when I
7   see matters of that character, it causes me to wonder what has
8   been going on.  And I saw what were, at least seemingly,
9   instances of failures to pick up the phone and for people to
10  communicate with each other and to focus on areas that might be
11  legitimate needs and concerns by parties on the one hand, and
12  to avoid skirmishing on stuff that was inexplicable to me on
13  the other.  It also raised concerns, at least initially, as to
14  how it could be that a bunch of cases could be filed as related
15  cases and then no notice would be given to the party who was
16  captain of the ship in the related case.

17      Now, the stip seems to be indicative of progress in
18  the case, in teeing up matters that are deserving of litigation
19  and pruning those that might not be, such as whether weekend
20  discovery demands are reasonable or not, especially when those
21  weekend demands are, at least seemingly, on a motion for joint
22  administration.  And I did not yet have a return date on a
23  motion for sanctions, which might more appropriately have been
24  characterized as one for determining the more fundamental
25  issues of authorization for filing, interference with this case

1    on the one hand, or the cases that led to the appointment of

2    the liquidators on the other.  And I saw what I feared was

3    insufficient attention to the needs and concerns of the

4    underlying stakeholders in this case, who, at least seemingly,

5    would be, like a lot of cases that are on my watch, creditors

6    who'd like to get paid back.

7            So I want each of you, not in an ad hominem way to

8    tell but, nevertheless, to tell me what is going on.  You can

9    share with me your perspectives of this.  As you saw from one

10   of my endorsed orders -- or maybe I only had one -- when I have

11   captain-of-the-ship issues, that raises a red flag in my mind

12   as to the extent to which I need to have a fiduciary in whom I

13   have confidence as the captain of the ship, which could, under

14   certain circumstances, result in none of you guys retaining

15   control over this case and me putting this case into the hands

16   of a fiduciary, like I did the original Fletcher case, the one

17   to which this case was said to be related.

18           But I certainly want to hear what you have to say.

19           I also want to get your thoughts, Mr. Luskin.  This

20   case, in some respects, walks and talks and quacks a lot like

21   the original one, where I had a lot of jousting before the

22   trustee was appointed, which cost people a lot of money and I'm

23   not sure what it accomplished.

24           So that's what I want to hear from you guys on.

25           Mr. Martin, you have the debtors; I'll hear from you

1  first.

2          Oh, one other thing.  Before you guys sit down -- you

3  don't have to address it upfront; right now I got, I think,

4  nine cases on my watch, or something like that.  I mean, that's

5  exactly why we have joint-administration motions:  so papers

6  don't have to be filed nine times.  Is it that big a deal to

7  have joint administration with a reservation of rights so that

8  you -- we don't have to have my courtroom deputy docket things

9  nine separate times and you don't have to give me nine separate

10  sets of papers?  I want each of you, when it's time to be

11  heard, address that.

12          Morrison Foerster, I think it was, objected to joint

13  admin.  As I said, it's the first time I've ever seen an

14  objection to joint administration.  Tell me whether that's

15  really necessary.

16          By the way, I did cut somebody off when I was taking

17  appearances of the people in the courtroom.  Was that you,

18  Ms. Ostad, on the phone?

19          MS. OSTAD:  Yes.  Thank you, Judge.  I'm appearing

20  this morning on behalf of three of the redemption creditors

21  that have filed for liquidation proceedings in the Cayman

22  Islands; those are:  Optima Absolute Return Fund Limited;

23  Richcourt Allweather Fund Inc.; and America Alternative

24  Investments Limited.

25          THE COURT:  Okay.  I'll give you a chance to be heard

1 | when it's your turn.

2 |      Do I also have somebody from Richards Layton on behalf

3 | of Wilmington Trust?

4 |      MR. MERCHANT:  Yes.  Good morning, Your Honor.  It's

5 | Michael Merchant, here from Richards Layton, on behalf of

6 | Wilmington Trust.

7 |      THE COURT:  Okay.  Good enough.

8 |      All right, back to you, please, Mr. Martin.

9 |      MR. MARTIN:  Thank you very much, Your Honor.  I'm

10 | going to -- unless the Court wants to hear more from me at this

11 | time, I'm going to limit my initial comments to the specific

12 | questions that the Court raised, given that this is in nature

13 | of a status conference, and reserve some time, if I may, after

14 | we hear from the others, because I think the scope and

15 | direction of what's raised there may dictate how deep we want

16 | to get into things.  But I'm certainly prepared to make this as

17 | large or as small as the Court would seek to have it.

18 |      In the order that you raised them, on the

19 | communications issues, I would -- although it didn't seem like

20 | a thankable event at the time, I would thank you for the

21 | endorsed order which you entered on, I believe, Monday the

22 | 7th -- or Monday the 6th, if that was the 6th.  And it really

23 | motivated the parties, over the next twenty-four hours, to work

24 | very diligently together, not only the two parties that signed

25 | it, but three other parties who I believe are now all present

SOUNDVIEW ELITE LTD., et al.                    14

1  in court but were not signatories to the stip and have not

2  appeared yet but all worked together to agree to those terms.

3          I think we're communicating -- we're communicating

4  regularly with the trustee for Fletcher International.  We've

5  been communicating with the U.S. Trustee regularly since the

6  beginning, and certainly with the Fletcher International

7  trustee, from Your Honor's initial order directing them to be

8  served.

9          In terms of -- and I don't raise this by way of

10  excuse; just by way of illustration:  In terms of the

11  relationship between these six debtors and the Fletcher

12  International case, there is an exhibit, Exhibit C to the

13  first-day affidavit, which is a chart that my office created

14  from a much, sort of, larger set of charts.  The chart

15  actually -- looking at it makes things -- makes entities look

16  closer, in terms of their affiliation and relationship, than

17  they really are, because the purpose of the chart was to

18  reflect that these six debtors are in fact, under the

19  Bankruptcy Code, an affiliate of Fletcher International.  But

20  if you were to look at it more precisely and more accurately,

21  you would look at -- and I'll use some shorthand -- these six

22  debtors as three brother/sisters and three children, each of

23  the three brothers and sisters having one child each.  You

24  would look at Fletcher International as a -- and folks can

25  disagree with my gross characterization here -- but as a second

1  cousin twice removed.

2          These particular funds were created by Citco in the

3  early 2000s, and --

4          THE COURT:  Created by what?

5          MR. MARTIN:  By C-I-T-C-O, who I think -- who is

6  present in court today.

7          THE COURT:  Is that an acronym or is that a name?

8          MR. MARTIN:  That's a name, I believe.

9          MS. CORNISH:  It's a name, Your Honor.

10         MR. MARTIN:  Ms. Cornish --

11         They were created by Citco and purchased by the

12  Fletcher organization.  And when I say "purchased", I mean the

13  rights to manage these funds, the rights to control these

14  funds, were purchased by the Fletcher organization in 2008.

15  Citco remained a shareholder in the funds, remained a manager

16  of the funds, following that purchase.  Shortly following that

17  purchase -- historical fact -- in 2008, Bernard Madoff was

18  arrested, the economy was affected in a certain way, funds

19  became challenged.  And Citco ultimately resigned as manager of

20  Fletcher organization, now owning these funds, and made a

21  redemption demand to get the money back that it had

22  investment -- invested in those funds.

23         The funds repaid roughly fifty percent of the amount

24  demanded, were not able at that time to comply with the

25  redemption demand.  That's what led to Citco going into the

1    Cayman courts, seeking a windup proceeding and these debtors'

2    decisions that the best way to proceed for a windup, with full

3    and open proceeding, all creditors noticed and participating,

4    even given the possibility, if not likelihood, of a Chapter 11

5    trustee that -- we felt that the best place to do that was here

6    where all the assets are, where all the books and records are.

7            So Fletcher International, sort of having been a

8    longtime Fletcher organization member, is a little bit

9    different from these funds that were purchased, created,

10   funded, invested by others having nothing to do with Fletcher,

11   and then purchased by the Fletcher --

12           THE COURT:  I understand what you told me about their

13   historic origins.  To what extent are the debtors I have on my

14   watch in the Soundview cases, managed by Fletcher Asset

15   Management?

16           MR. MARTIN:  They are managed by Fletcher Asset

17   Management.  Mr. Buddy Fletcher is in court today with me; and

18   Mr. Floyd Saunders, who's the corporate secretary for these

19   debtors.

20           I'll jump ahead to Your Honor's third question, which

21   was, concern for the underlying stakeholders.  Our cash, as I'm

22   sure Your Honor has seen from the pleadings, is currently one

23   hundred percent -- let me not say one hundred percent, because

24   there's some cash with Citco, and I'll assume that the cash

25   with Citco is protected also.  But ninety-some-odd percent of

1   our cash -- some of approximately nineteen to twenty million

2   dollars is in Wilmington Trust -- was subject to an

3   interpleader action pre-petition.  We have a proposed

4   stipulation that we're circulating with Wilmington Trust, that

5   we've discussed with the U.S. Trustee, pursuant to which

6   Wilmington Trust would no longer be the stakeholder; it would

7   be moved to a Section 345 approved depository.  And we are

8   proposing -- the debtors -- that absolutely no cash go anywhere

9   without order of this court.

10          Joint administration.  Let me move to joint

11   administration.  I agree with Your Honor.  I think the

12   stipula -- the order that Your Honor entered, which essentially

13   said we can deem it to be the Court's motion, a motion to

14   dismiss, motion to convert, motion to appoint a trustee.  We

15   now have a procedural mechanism for those matters.  And so I

16   would suggest that, now that that's calendared and agreed to by

17   the parties, we can have a full and fair discussion, litigation

18   if necessary, that joint administration -- we really -- one

19   nice thing we could accomplish today at this status conference

20   would be for folks to consent to an order of joint

21   administration.  It's an inconvenience to not have the cases

22   jointly administered; and cost, frankly.

23          I suspect -- but I'll leave it to the -- Mr. Hildbold

24   and the folks who objected to joint administration; I suspect

25   that it was an effort to not make a full appearance, given that

1    the objectors were foreign, ostensibly, appointed liquidators.

2    We take issue with that.  And there was a motion for sanctions,

3    pending, which Your Honor reads properly as sort of an

4    application to enforce the stay.  And I suspected, when I saw

5    that objection, that there was an effort to not make a full

6    appearance by filing a motion to dismiss and, instead, kind of

7    put a toe in the water by calling it something else:  an

8    objection to joint administration.

9         I think, now that Your Honor's signed the order, that

10   subterfuge -- you know, without intending any ill will with

11   that word -- but that sort of cloaking of an objection -- of a

12   motion to dismiss and of joint administration is just not

13   necessary, and we should be able to go ahead and jointly

14   administer these cases.

15        THE COURT:  You would understand if I came at it with

16   the perspective that I don't want to accuse parties of having

17   stepped on a crack and that I would normally look at things by

18   just giving everybody reservations of rights as to everything

19   and then sort out the mess?

20        MR. MARTIN:  That's certainly acceptable.  And we

21   did --

22        THE COURT:  And if your opponents fully appear in this

23   case, you wouldn't be taking the position that somehow they

24   gave up any substantive rights?

25        MR. MARTIN:  By their -- solely by virtue of their

1    appearance, no.

2              THE COURT:  All right --

3              MR. MARTIN:  No.

4              THE COURT:  -- continue, please.

5              MR. MARTIN:  And I think, at least to the issues Your

6    Honor outlined -- communication, joint administration, concern

7    for the underlying stakeholders -- the captain of the ship --

8    and maybe more about this later on my reserved time -- we can't

9    deny, nor do we hope -- nor do we intend to deny, that there is

10   a substantial history of information; it can be characterized

11   in different ways:  propaganda, allegations surrounding this

12   management.  We believe that we can deal with each of those

13   issues.  We intend to do everything that we are supposed to do

14   as Chapter 11 debtors.  I invited and requested Ms. Riffkin to

15   come today, and we appreciate it, despite the shutdown and the

16   restrictions on her office.  And Ms. Riffkin -- she'll speak

17   for herself, but -- may seek to appoint a trustee.

18              We're prepared and -- to show by our actions each and

19   every day, starting with protecting all the assets of this

20   estate, preparing our schedules and statements.  We've retained

21   EisnerAmper.  Mr. Bernard Katz is here from EisnerAmper; he's

22   been through the debtors' -- CohnReznick.  Ever since they

23   changed their names and put two names together -- I apologize.

24   CohnReznick.  Both firms now two names now smooshed together.

25              He's been in the debtors' books and records; he's been

1  in regular communication with the third-party fund

2  administrator, Pinnacle, who's based in North Carolina.  We're

3  putting things together.

4           Whatever Your Honor decides on December 17th, we're

5  going to have this estate in tiptop shape, from our point of

6  view, that we can continue to manage and dig ourselves out of

7  this horrible hole that the Fletcher name is in right now.  Or

8  if we can't do that and we don't succeed in doing that and Your

9  Honor determines there's either a dismissal or a third-party

10 fiduciary, we will have everything in order and everything up

11 to speed in order to transition.

12          THE COURT:  All right.  Thank you, Mr. Martin.

13          MR. MARTIN:  Thank you.

14          THE COURT:  Can I hear from Morrison Foerster next?

15          Oh, I'm sorry, did I misunderstand your firm?

16          MR. PINTARELLI:  No, that's -- Your Honor, John

17 Pintarelli of Morrison & Foerster, appearing on behalf of Peter

18 Anderson and Matthew Wright, who have been appointed by the

19 Grand Court of the Cayman Islands, as joint official

20 liquidators of Soundview Elite, Soundview Premium, and

21 Soundview Star.

22          Your Honor, I confess that it is a little bit unusual

23 to file an objection -- or actually completely unusual to file

24 an objection to a joint-administration motion, but it was filed

25 on presentment with the Court.  And the issue is one of

SOUNDVIEW ELITE LTD., et al.                          21

1    corporate governance.  With the JOLs' appointment, under Cayman
2    law, as a matter of Cayman law, we believe that no party can
3    take action on behalf of these entities without the consent of
4    the JOLs.  And so what we were worried about is that, if we did
5    not throw the stake -- put our stake in the ground initially
6    with the joint-administration motion, that there was somehow a
7    belief that we consented to the debtors operating or the
8    officers and directors continuing to operate these debtors-in-
9    possession.

10        Your Honor, we agreed with counsel for the debtors, to
11   a sixty-day schedule to brief the issues.  But really before
12   anything goes forward in this case, any additional expenses
13   such as having to reply to motions for retention, we believe
14   that there are two gating issues:  What is the proper venue for
15   this case:  Should it be in New York or should it be in the
16   Cayman Islands?  And who is to operate these cases?  It's a
17   control issue.

18        We believe strongly that the creditors have spoken;
19   they filed winding-up proceedings in the Cayman Islands in
20   August.  And at the last minute, the debtors, the officers and
21   directors filed cases here in New York in an attempt to
22   frustrate the order of the Cayman court to wind up these
23   companies.

24        Your Honor, the reason why the Cayman court proceeded
25   in -- on Septem -- on Oc -- I'm sorry -- on September 24th, was

1    because, during the hearing, that is when counsel to the

2    debtors -- Cayman counsel to the debtors raised with the court

3    that the Chapter 11 cases were filed.  They were never properly

4    entered into evidence, and so the court decided that the

5    Chapter 11 proceedings were not properly before them.  And the

6    court decided to move forward with the hearing on winding-up

7    and, at the end of that hearing, they ordered the companies be

8    wound up and they appointed the JOLs.

9          So --

10         THE COURT:  What did you mean when you said they were

11   not properly admitted into evidence?  That there was no effort

12   to try or that the order -- or the evidence of the filing here

13   was deemed inadmissible?  Or some other possibility?

14         MR. PINTARELLI:  Your Honor, counsel for the -- Cayman

15   counsel for the debtors had an e-mail that they referred to,

16   that had a -- there was an affidavit prepared by the Porzio

17   firm, stating that the Chapter 11 cases were filed thirty

18   minutes earlier.  Cayman counsel had no idea that the Chapter

19   11 cases were going to be filed; they -- it is our

20   understanding that they were not consulted.  They were sent an

21   e-mail right before, on the minute before the hearing started,

22   to advise them that Chapter 11 cases were filed in New York.

23         Now, the hearing in the Cayman Islands was actually

24   delayed by an hour and a half.  The hearing would have been

25   well underway had it not been delayed.  And based on an e-mail

1    where Stuarts was reading the e-mail to the court, the court

2    said it's not properly entered, there's -- there're procedures

3    to be followed to have notice of a Chapter 11 filing entered

4    into the Cayman court so it's properly before the court for

5    decision.  The court decided it was not properly before them.

6    The court conferred and had conversations back and forth with

7    Stuarts.  And the court decided --

8              THE COURT:  With whom?

9              MR. PINTARELLI:  -- to move forward.  I'm sorry?

10             THE COURT:  Conversations back and forth with whom?

11             MR. PINTARELLI:  Well, with -- well, he said -- my

12   understanding -- I was not at the Cayman hearing.  My

13   understanding is that the court was asking had they entered

14   this information, had they followed procedures to get this

15   information into evidence and before the court.  It was --

16             MR. HILDBOLD:  Sorry, Judge; that is Cayman counsel --

17             MR. PINTARELLI:  Yeah.  Yeah.

18             MR. HILDBOLD:  -- to the debtors.

19             MR. PINTARELLI:  Cayman counsel to the debtors.

20   They're Cayman corporate counsel.

21             THE COURT:  The name, which I asked about, was Stuart?

22             MR. PINTARELLI:  Stuarts.  They'll --

23             THE COURT:  And he's the Cayman counsel --

24             MR. PINTARELLI:  It's a --

25             THE COURT:  -- for the debtors?

1           MR. PINTARELLI:  It's a law firm in Cayman.  They were

2     Cayman --

3           THE COURT:  It's the name of --

4           MR. PINTARELLI:  -- corporate --

5           THE COURT:  -- a law firm that acted for the Fletcher

6     interests in the Caymans?

7           MR. PINTARELLI:  They were acting as Cayman corporate

8     counsel for the -- Soundview Elite, Soundview Premium, and

9     Soundview Star, the debtors.

10          THE COURT:  All right.  Continue, please.

11          MR. PINTARELLI:  So they first heard about the filing

12    thirty minutes after the filings here, and they presented

13    evidence -- or tried to enter evidence into the court in the

14    Cayman Islands, via an e-mail.  The court decided it was not

15    properly before them.  The debtors had plenty of time to

16    respond and they did provi -- I guess they did -- they did

17    stand up and argue against the court -- the companies being

18    wound up in the Cayman Islands.  There was sufficient evidence

19    in the Cayman (sic) to wind the companies up.  CIMA, who is the

20    regulator, filed an affidavit in support of the companies being

21    wound up, and they -- in their affidavit, they also supported

22    the appointment of the JOLs to be wound up -- I'm sorry; the

23    appointment of the JOLs over the Cayman funds to be wound up.

24          And, Your Honor, the JOLs are court-appointed

25    fiduciaries for these companies.  And we say, what's in the

1   best interests of creditors here?  Well, the creditors filed

2   the winding-up proceedings in the Cayman Islands.  These are

3   all offshore entities.  There's a specific reason why they

4   invested in offshore entities:  They did not want to be

5   subjected to U.S. jurisdiction; they didn't want to be subject

6   to U.S. taxation for their investments.  And in a last-ditch

7   effort, we believe, the Fletcher entities filed here.  We don't

8   believe it was in the best interests of Debtors.  We also think

9   there're misrepresentations, like, all of the assets are not in

10  the U.S.  If you look at the Fletcher declaration, nineteen

11  million in cash; yes, we can see that's in the U.S.  But all

12  the other investments are offshore investments, and they're not

13  held in custody in the U.S.; they're held in custody accounts

14  offshore.  So we don't believe that there're U.S. assets -- or

15  the majority of the assets are in the U.S.

16          And there are other inconsistencies.  I think it's

17  important that, in the Fletcher declaration, they didn't

18  include the CIMA affidavit in support that gives a laundry list

19  of the grievances that CIMA had with the debtors and their

20  management, or lack thereof.

21          Regulatory fees have not been paid for years.  Audited

22  financials have not been filed for years.  And CIMA said in its

23  affidavit, if the creditors did not file the winding-up

24  petition, they would have done so themselves.

25          THE COURT:  All right, Mr. Jarelli, I'm not going to

1  put a sock in your mouth, but you're shifting from the case-

2  management issues --

3             MR. PINTARELLI:  Right.

4             THE COURT:  -- and the get-your-arms-around-the-

5  terrain questions that I had, into what I imagine is going to

6  be in your trial brief on your motion --

7             MR. PINTARELLI:  Yeah.

8             THE COURT:  -- to dismiss, or what I assume would be a

9  motion to dismiss, from the tenor of your remarks.  You got a

10  full reservation of rights on that but, if you keep talking,

11  then Mr. Martin, or somebody else, is going to want equal

12  time --

13             MR. PINTARELLI:  Right.

14             THE COURT:  -- and I'm going to be --

15             MR. PINTARELLI:  Understood.

16             THE COURT:  -- here all day.

17             MR. PINTARELLI:  I'll cut my comments short.  And we

18  have -- with a full reservation of rights, we will agree to a

19  joint-administration motion order being entered.

20             THE COURT:  Okay.

21             MR. PINTARELLI:  It was not our intent to cause extra

22  costs or cause a burden on the Court, but we felt that we

23  needed to throw -- put a stake in the ground as to the

24  corporate-governance issues that are raised by these cases.

25             THE COURT:  All right.

1          MR. PINTARELLI:  The other issue, Your Honor:  We

2    don't believe -- right now there are two retention motions on

3    that are returnable on November 6th.  We don't think -- we

4    would object to those on the same -- for the same reasons that

5    we raised in our joint-admin motion.  We think that they should

6    not be heard until after December 17th.

7          THE COURT:  Well, you know, a corporation needs to be

8    retained -- represented by counsel to appear in a federal

9    court, at least in New York.  I assume you're not taking the

10   position that I can't listen to Mr. Martin?

11         MR. PINTARELLI:  No.  No.

12         THE COURT:  You just don't want him paid?

13         MR. PINTARELLI:  Well, we don't think -- we think that

14   the only party that can agree to retain counsel or, for that

15   matter, enforce the automatic stay, are the JOLs; they're

16   the -- they are the managers of the limited debtors.  And

17   therefore, there's an issue.  We have two -- you have two heads

18   right now trying -- seeking to govern one body.

19         THE COURT:  There is a national Rule of Bankruptcy

20   Procedure that limits the extent to which a court can deal with

21   certain motions before a certain time in the case, specifics of

22   which, frankly, I've forgotten; I'm sure Ms. Riffkin knows.

23   But the way we've dealt with this historically is that, from

24   day one in 11s, not just before me but before every judge in

25   the Southern District of New York, we've authorized proposed

1   counsel to appear and to do its job; and since you can't get

2   paid under 331 for something like ninety days anyway, we just

3   let the lawyers do their jobs and we nunc pro tunc any order of

4   retention back to the retention date.  I assume you would have

5   no problem with that if it's later determined that they're

6   entitled to hire their counsel?

7        MR. PINTARELLI:  We don't have an issue with that,

8   Your Honor.

9        THE COURT:  All right, then what's the -- what are you

10  objecting to?

11       MR. PINTARELLI:  Well, no, I'm just suggesting that

12  the matters currently scheduled for November 6th should be

13  adjourned because we're being -- look, we stipulated to a

14  scheduling order, which included discovery, and that is right

15  in the midst -- the return date on November 6 is right in the

16  midst of that discovery.

17       THE COURT:  Suppose I were to enter an order saying in

18  substance -- an order at the time that the national Rule allows

19  me to enter such an order -- although we do this on emergency

20  basis on day 1 anyway -- that Mr. Martin and his firm are fully

21  authorized to appear and be heard and to represent their

22  client, and the issue of their compensation will be left for

23  another day, based on their status to act as Debtors' counsel,

24  and all the usual stuff we consider on fee apps, like whether

25  they've earned the money and they haven't milked the case.

 1  Would you have a problem with that?

 2          MR. PINTARELLI:  One moment, Your Honor.

 3          Well, look, as long as --

 4          THE COURT:  You understand --

 5          MR. PINTARELLI:  Look, I understand --

 6          THE COURT:  -- that I'm not going to allow a fight in

 7  my court with one party having a hand tied behind --

 8          MR. PINTARELLI:  No, no.

 9          THE COURT:  -- its back?

10          MR. PINTARELLI:  I understand that they can -- you

11  know, that they are proposed counsel for the debtors, and it

12  will be left for another day.  I think the issue that we have

13  is -- for example, it was raised earlier today -- that there's

14  a stipulation being discussed with the U.S. Trustee, about the

15  cash held at Wilmington Trust.  I mean --

16          THE COURT:  What does that have to do with the issue

17  that I asked about?

18          MR. PINTARELLI:  I think that the -- right now the

19  cash is firmly secure with Wilmington Trust; they could speak

20  for themselves.  I know that they want a -- they want a deposit

21  in the court and they want to be -- they want to be done with

22  this.  But we have raised issues of jurisdiction and we have

23  raised issues of whether these cases should be dismissed.

24          And right now the court in Delaware is fully versed in

25  this interpleader action, and we don't necessarily believe that

1   those funds should be deposited into the court here while

2   there's a pending motion of whether these cases should be

3   dismissed, or it's undecided as to whether they should be

4   dismissed.

5           THE COURT:  Are you shifting to another thing that

6   troubles you:  Wilmington Trust's request -- or a request of

7   Wilmington Trust?  Are you beyond the --

8           MR. PINTARELLI:  I --

9           THE COURT:  -- issue of counsel retention at this

10  point?

11          MR. PINTARELLI:  No, no, I'm just -- we're trying to

12  preserve the status quo right now, until these -- until the

13  issues can be heard in December.  We don't -- we're not saying

14  that the debtors' counsel cannot act on behalf of the debtors.

15  We're just saying that we have a briefing schedule, that we're

16  going to address all of these issues in that briefing schedule,

17  and to hear the retention motion before then is just going to

18  accelerate part of that brief.

19          THE COURT:  All right.  Anything else?

20          MR. PINTARELLI:  No, that's it.

21          THE COURT:  Okay, who wants to be heard next?

22          MR. GLEIT:  I'll speak, Your Honor.  Again, it's --

23          THE COURT:  Mr. Gleit.

24          MR. GLEIT:  -- Jeff Gleit, Kasowitz Benson, on behalf

25  of Pasig, who's a redeeming invest --

1            THE COURT:  Pause, please, Mr. Gleit.

2            MR. GLEIT:  Sure.

3            THE COURT:  Obviously, I know you and your firm.

4    Refresh my recollection or educate me on who your client is in

5    the scheme of things.

6            MR. GLEIT:  Pasig was an investor in the debtor

7    entities, and they're a redeeming investor and a stakeholder in

8    the case.  On the petition, they're listed as a creditor.

9            THE COURT:  Um-hum.

10           MR. GLEIT:  And -- I guess I'm glad here today,

11   because Your Honor was -- mentioned that you would want to hear

12   what stakeholders would like to happen in the case.  And as

13   we've been hearing, there's cash in the U.S., you know, a

14   certain amount.  And excluding any causes of action that the

15   debtor's estate may have, that's it as far as the assets go.

16   And as -- Pasig sitting back --

17           THE COURT:  Pause, please, Mr. Gleit.

18           MR. GLEIT:  Sure.

19           THE COURT:  Is that something as to which you believe

20   there's consensus among all the different points of view, or is

21   that your client's position --

22           MR. GLEIT:  I'd say client's pos --

23           THE COURT:  -- what the assets --

24           MR. GLEIT:  -- client's position.

25           THE COURT:  -- of this estate -- I'm sorry?

1          MR. GLEIT:  Client's position.  And the reason I'll

2     say that is, we reached out to Mr. Porzio's (sic) firm on

3     Monday to discuss the case; we haven't heard back.  And after

4     this hearing, I think we're going to try to meet with the

5     Cayman liquidators to discuss the Cayman proceeding in the case

6     in general.  But we're in, ourselves -- we have certain

7     information, but we're trying to get a little bit more

8     information --

9          THE COURT:  All right --

10         MR. GLEIT:  -- we can't get from the pleadings.

11         THE COURT:  But it's your client's position that the

12    asset mix of this case -- or these cases, is the cash in the

13    U.S., most of which is held by Wilmington Trust, and various

14    causes of action?

15         MR. GLEIT:  Correct, Your Honor.

16         THE COURT:  All right, continue, please.

17         MR. GLEIT:  And I've been listening today that there's

18    going to be a fight over control over the debtor, and that's

19    really our concern is we don't want to see that cash to be

20    wasted on a fight, which is probably going to be inevitable.

21    But the point of us being here today is actually -- and Your

22    Honor mentioned at the beginning -- we do support the

23    appointment of an independent fiduciary in this case, because

24    there are concerns about the dissipation of the cash.  And

25    unless the parties can reach some agreement, the stakeholders

1   are just going to be heard and it'll end up being the

2   professionals that do well in this case.

3           THE COURT:  Slice and dice that, please, Mr. Gleit.  I

4   can see why you might want to take the position that in the

5   long term the case needs a fiduciary.  But I've seen Wilmington

6   Trust in an awful lot of cases on my watch.  I mean, they're an

7   indenture trustee in practically every major 11 I've got.

8   They're the most trustworthy guys in the world.  They're good

9   for the money.  And they're not going to do anything,

10  especially if they've already filed an interpleader action,

11  with that cash, are they?

12          MR. GLEIT:  No, Your Honor, I'm not concerned at all

13  about Wilmington Trust.  I'm concerned about just the accrual

14  of fees, litigating a fight and then -- as Your Honor said,

15  debtors are generally entitled to counsel; that counsel

16  generally gets paid.  There's Cayman liquidators that are going

17  to want to get paid.  And ultimately some --

18          THE COURT:  I got to pay a trustee and his counsel or

19  her counsel, as well, I would think.

20          MR. GLEIT:  Yes, Your Honor, you definitely do.  And,

21  look, one of the issues, in our mind, actually, is whether the

22  case is better in the U.S. or the Caymans.  I know that on the

23  phone there's three creditors, or stakeholders, who are

24  supporting the Cayman liquidator; I want to talk to them after,

25  which I will be doing.  One issue that I have is, there's cash

1  in the U.S., does it necessarily need to go to the Caymans to

2  then come back and to pay Pasig, or is it more efficient for

3  the cash to remain here to be distributed over the -- with the

4  oversight of this Court.

5          THE COURT:  Your main concern is just not having the

6  cash running in an ever-decreasing circle and eventually

7  getting dissipated?

8          MR. GLEIT:  Exactly, Your Honor.  I mean --

9          THE COURT:  Okay.

10         MR. GLEIT:  -- and I've been in cases -- not exactly

11 like this, but I've been in similar cases where it's just --

12 the asset keeps dissipating; it gets smaller and smaller, and

13 ultimately my clients are going to be even more frustrated.

14         THE COURT:  Um-hum.

15         MR. GLEIT:  And that's what we'd like to avoid here,

16 to the best --

17         THE COURT:  Okay.

18         MR. GLEIT:  -- of our ability.

19         The only other thing, Your Honor, before -- is, I know

20 there's a stipulation with discovery deadlines and depositions;

21 and even though we're not a party to it, we may want to

22 participate as part of the process, and I wanted to make sure

23 that we will be able to do that if we so choose.  And we

24 would --

25         THE COURT:  Well, I would assume that if you have 1109

1   rights, nobody would object.  Are you asking me to ask them

2   whether they care?

3            MR. GLEIT:  You know what, I'm asking them --

4            THE COURT:  I think Mr. --

5            MR. GLEIT:  -- I'm asking them on the record --

6            THE COURT:  -- Martin kind of raised his arms --

7            MR. GLEIT:  -- whether they care.

8            THE COURT:  -- in a kind of "I don't care" style.

9            Did I read you right, Mr. Martin?

10           MR. MARTIN:  You did, Your Honor.

11           MR. GLEIT:  And that works --

12           THE COURT:  All right.

13           MR. GLEIT:  -- perfectly for me, Your Honor.  Thank

14   you.

15           THE COURT:  Well, wait a second; you're not -- he's

16   not the only one.

17           Mr. Jarelli, you cool with that as well?

18           MR. PINTARELLI:  Yeah, we're fine.

19           THE COURT:  Okay.  Anybody opposed to the other

20   stakeholders, in the underlying funds, being heard as part --

21   or -- and participating in the discovery process?

22           No objection.

23           I'm going to simply so-order it.

24           MR. GLEIT:  All right.

25           THE COURT:  Go ahead.

SOUNDVIEW ELITE LTD., et al.                    36

1          MR. GLEIT:  Thank you, Your Honor.

2          THE COURT:  Anything else, Mr. Gleit?

3          MR. GLEIT:  That's it.

4          THE COURT:  Okay, Ms. Cornish, would you like to be

5    heard?

6          MS. CORNISH:  Yes.  Good morning, Your Honor.  Kelley

7    Cornish --

8          THE COURT:  Good morning.

9          MS. CORNISH:  -- from Paul Weiss.  And I'm here with

10   my partner Andrew Gordon --

11         MR. GORDON:  Good morning.

12         MS. CORNISH:  -- as well.  We're here on behalf of

13   Citco Global Custody (N.A.) N.V., Your Honor; and that's

14   C-I-T-C-O.  That entity, Your Honor, is incorporated in the

15   Netherlands Antilles.  And I know that Your Honor covered this

16   already, but I just want to make sure, for the record, we do

17   reserve personal-jurisdiction issues as well as service-of-

18   process issues, because we do believe that the motion that

19   names this entity as a party wasn't properly served on the

20   Citco entity and also that this Court does not have personal

21   jurisdiction, but -- and I know you covered --

22         THE COURT:  Slice and dice the manner of service from

23   whether you're going to be subject to orders of this Court,

24   particularly in-rem orders.  What do you care about and what do

25   you not care about?

1          MS. CORNISH:  What do we care -- well, as a technical

2   matter, it really steps back from the personal-jurisdiction

3   issue.  We do not believe that this Court has personal

4   jurisdiction over this entity, in that it has no contacts

5   whatsoever with the U.S.  And our papers that we -- we will

6   appear, as we have today, in court, to respond to the sanction

7   motion, and we'll lay that out with proper declarations and the

8   like.  But as a result of that, we believe that service of

9   process, if it were to be effected properly, would have to be

10  done by letters rogatory or some similar procedure.

11          THE COURT:  That's what I meant --

12          MS. CORNISH:  Having said all that, Your Honor --

13          THE COURT:  -- by "do you care".

14          MS. CORNISH:  Yeah.  I --

15          THE COURT:  I mean, if you say that there's no way by

16  which you could be subject to in-personam jurisdiction in the

17  United States, that's one thing.  If you're saying -- and I'm

18  thinking of something similar to what Mr. Gleit was saying,

19  that he doesn't want to turn everything into a nuclear war that

20  just eats up creditors' money, you know, in the bankruptcy

21  courts, as a general matter, you can serve by first-class mail;

22  and the purpose of that is so that we don't dissipate

23  creditors' money on meaningless exercises when actual notice is

24  given.  It's obvious that your client has actual notice

25  already.

1          So what I want to know is, if you got a reservation of

2     rights on whether you're cap -- your client's capable of being

3     subject to in-personam jurisdiction in the U.S., does it really

4     matter that somebody's going to serve you by letters rogatory

5     or the -- whichever convention, the Hague Convention or

6     whatever we got?

7          MS. CORNISH:  Your Honor, I'm just not prepared

8     today -- I understand Your Honor, and I don't want to cause

9     undue skirmishes and undue expense.  But I -- at this -- for

10    today's purposes, I'm just not in a position where I can waive

11    that in court.

12         THE COURT:  Go on.

13         MS. CORNISH:  Okay.  Your Honor, there were a

14    number -- the other point I wanted to make, just in terms of

15    background, is that the entity -- the Citco Global Custody

16    (N.A.) entity -- is the entity that filed winding-up petitions

17    against various Soundview entities in the Cayman Islands -- I

18    believe it was on August 20th -- and it did so in its capacity

19    as a custodian for various holders of interests, include Pasig,

20    who just addressed the Court -- whose counsel just addressed

21    the Court.

22         There were various factual -- purported factual

23    statements made about the creation of the Soundview funds and

24    Citco's role in that and related issues, and I just note that

25    we reserve rights to respond to those or deal with those

1   accurately as the matter goes forward, if necessary.

2          Similarly, the account of the hearings down in the

3   Caymans -- I think there may have been some not exactly

4   accurate records of the chronology that took place there.  One

5   thing, for example, that's very clear is that the petitions,

6   the actual petitions, were filed in August, some thirty-five

7   days before the Chap -- before the winding-up hearing was

8   occurring down in the Caymans and the cases were filed here.

9   So there was a full -- over a month, thirty-five days, that

10  passed where there was no appearance whatsoever by the debtors,

11  down in the Cayman Islands, and that -- and as we understand

12  it, the first notice of the filing of these cases came during

13  the hearing down in the Caymans.

14          And in fact, again, as we understand it -- I was not

15  there -- the court, after hearing from Stuarts, determined to

16  go forward on its own.  And, also would point out that even if

17  other parties had not complied with the court's direction,

18  there was a regulatory authority there -- CIMA -- who supported

19  going forward on that petition, and I believe that that would

20  be exempted from the automatic stay in any event.  But again,

21  the time will come when we'll all -- I think, through

22  appropriate affidavits and the like, will address those issues.

23          We don't have too much to say about the skirmishing

24  that took place, I think, that prompted your orders -- Your

25  Honor's order.  But we did partici -- we didn't participate in

1    any of that.  We did participate in discussions with counsel

2    for the joint liquidators and the debtors.  And I think all of

3    us very cooperatively, over a period of twenty-four hours, came

4    to an agreement on a schedule.

5           And I'm happy to answer any questions Your Honor has,

6    but that's all I have today.

7           THE COURT:  That's fine for now.

8           MS. CORNISH:  Okay.  Thank you, Your Honor.

9           THE COURT:  Okay.  Is there anybody else who is a

10   stakeholder, who'd like to be heard, either in a shareholder

11   hat or a redeeming-shareholder hat or a classic creditor hat,

12   or any hybrid or combination?

13          If not, I want to hear --

14          MS. OSTAD:  Yes.

15          THE COURT:  -- from --

16          Oh.  Ms. Ostad, you're in the --

17          MS. OSTAD:  Yes.

18          THE COURT:  -- same boat?  Or your client's in the

19   same boat?

20          MS. OSTAD:  Yes, Your Honor.  We represent redemption

21   creditors who were petitioners as well, similar to Citco, but

22   also my clients' petition with respect to the other three

23   debtors, for which the official liquidators have not been

24   appointed to date.  And I would like to basically support many

25   of the comments that Ms. Cornish has made.  We also have

1  different -- but we also have personal-jurisdiction and service

2  issues with respect to my clients, who are BVI entities.

3        And importantly, although I'm not appearing for them

4  today, I will be appearing with respect to the sanctions today,

5  for an individual who is an officer of the entity, who's a

6  director of the clients I'm appearing for today.  That's

7  complicated, Your Honor.  But they were named personally and as

8  an entity in the sanctions motion, we believe, improperly and

9  inappropriately.  And we will address the sanctions motion

10  separately.

11        But the facts that I have from our Cayman Islands

12  counsel support the facts that have been stated, that are that

13  counsel to the debtors, at the September 24th hearing in the

14  Cayman Islands, did attempt to introduce evidence of these

15  Chapter 11 cases; and the Court ruled, as a matter of evidence,

16  that the information was not properly before the court, did not

17  admit that information as evidence, and asked the parties to

18  proceed with their petition.

19        And I will just note for the record that, on that

20  basis, I have asked counsel for the debtors to consider

21  withdrawing their motion for sanctions against not only

22  entities but individuals who are in the courtroom.  And I was

23  pleased to hear today that Debtor's motion is primarily to

24  discuss whether the automatic stay applies as opposed to

25  whether something else happened at those hearings.

1          THE COURT:  All right, well --

2          MS. OSTAD:  Um --

3          THE COURT:  Pause, please, Ms. Ostad.  This ain't the

4   English Parliament, so you can't have a back-and-forth with

5   your opponents, especially in front of me.  What you can do is

6   pick up the phone with your opponent and -- if you haven't

7   already, which I would have thought, after my endorsed order,

8   you would have done and had that dialogue.

9          You know, when you have a controversy of this sort,

10  you can put any name on the pleading you want.  When things are

11  gray, as they are here -- or at least they are, subject to you

12  putting in your evidentiary presentations -- the chances of any

13  judge imposing sanctions when you have a jurisdictional dispute

14  like this is about the same as me playing for the Patriots:

15  That ain't going to happen, unless somebody brings facts to my

16  knowledge that certainly don't appear in the record before.

17         What you have is an underlying jurisdictional dispute,

18  a timing dispute, and a dispute as to corporate governance and

19  filing authority.  When people kept calling it a motion for

20  sanctions, I was scratching my head.  Somebody's going to have

21  to explain to me why it's not just getting my arms around the

22  underlying issues.  With that said, do it back-channel, not in

23  front of me; have your discussion.  I assume I'm going to have

24  to decide which -- who is captain of this ship.  I'm going to

25  have to decide which filing or filings is or were more

1  appropriate.  But let's not take time to deal with that now.

2          MS. OSTAD:  Thank you, Your Honor.  I had two more

3  brief comments to make.

4          THE COURT:  Yeah, before you do that --

5          MS. OSTAD:  Uh --

6          THE COURT:  Before you do that, please, Ms. Ostad.

7          Ms. Jimenez, you've been sitting through all of this?

8  Has your lawyer now appeared?

9          UNIDENTIFIED SPEAKER:  No.

10          THE COURT:  All right, come on up, please.

11      (Unrelated Jimenez matter heard from 10:56 a.m. until

12  10:59 a.m.)

13          THE COURT:  All right, Ms. Ostad, continue, please.

14          MS. OSTAD:  Your Honor, I just wanted to make clear

15  for the record -- and I don't believe it's in dispute but I

16  wanted to state it because we have counsel for Wilmington Trust

17  on the line, as well -- that although the debtors have made a

18  motion with respect to six of the accounts that are held at

19  Wilmington Trust, there are other monies at Wilmington Trust

20  that are not monies of these debtors, are monies of other

21  Fletcher-managed estates and other entities that I believe the

22  debtors' motion does not relate to.  And I would hope that any

23  ruling on the 17th -- I just wanted to reserve our right as to

24  the other monies.

25          And that was -- with that, Your Honor, that was all I

1   had to say today.

2              THE COURT:  Okay.  Thank you.

3              This is good a time as any to hear from Mr. Merchant.

4              Do you want to be heard, sir?

5              MR. SHANDLER:  Your Honor, this is Chad Shandler from

6   Richards, Layton & Finger.  Mr. Merchant had an 11 o'clock

7   hearing with Judge Walrath in Delaware, and so he can't --

8              THE COURT:  Yeah, I know who she is.

9              MR. SHANDLER:  And so I am present on behalf of

10  Wilmington Trust.  I am not admitted pro hac; just in interest

11  of --

12             THE COURT:  You are now.

13             MR. SHANDLER:  Thank you.  Thank you, Your Honor.

14             I'm not sure there's much for me to say on behalf of

15  Wilmington Trust, other than the fact that our interest in this

16  matter is to rid ourselves of the funds that are being held by

17  the bank.  There has been a motion for interpleader; it's been

18  granted by the Delaware Superior Court.  And before the

19  bankruptcy was filed, the parties were in the process of

20  negotiating an implementing order.  Competing orders were

21  submitted to the judge.  And upon entry of that order, the

22  funds would have been deposited into the court, for all of the

23  entities, including the six entities that filed for bankruptcy.

24             We intend to still deposit the funds into the Superior

25  Court, with respect to the nonbankrupt entities.  Those that

1  had filed petitions -- we've been negotiating a stipulation

2  with counsel for the debtors, that would, subject to court

3  approval, have the funds deposited into a third-party account

4  to be administered by the court and that no funds would be

5  disbursed from that -- from those six accounts, unless it was

6  approved by the court.

7       And so that's where Wilmington Trust stands at this

8  point.

9       THE COURT:  What's the cheapest way to skin this cat?

10  I mean, I understand why --

11       MR. SHANDLER:  From Wilmington Trust --

12       THE COURT:  -- you're not making claim to it yourself,

13  and you want to avoid criticism and you want to be relieved of

14  liability for the money you're holding.  What's the cheapest

15  way to accomplish that?

16       MR. SHANDLER:  From the bank's perspective, it would

17  just -- it would be for us to deposit the funds into a court-

18  controlled account, and then we would have no administrative

19  responsibility from that point forward, with respect to the

20  funds.

21       THE COURT:  "The court" being the Delaware Superior

22  Court or "the court" being the U.S. Bankruptcy Court for the

23  Southern District of New York, pending further order?  Or some

24  other court?

25       MR. SHANDLER:  From our perspective, it would be the

SOUNDVIEW ELITE LTD., et al.                    46

 1   Delaware court, since the court has already entered an order

 2   allowing us to do -- or is about to enter an order allowing us

 3   to do that.

 4            THE COURT:  Um-hum.  Has any party objected to that so

 5   far?

 6            MR. SHANDLER:  The interpleader action was contested

 7   and we had a hearing, at which point the court allowed us to --

 8   or granted the order.  And that -- from this -- at this stage,

 9   we're waiting for the court to enter an implementing order.

10   There are some differences with respect to the parties'

11   position on that order, but the underlying relief which granted

12   the interpleader will not be changed as a result of the entry

13   of that -- of our motion.

14            So at this point we're just waiting for the Delaware

15   Superior Court to give us direction as to the deposit of those

16   funds.

17            THE COURT:  So if nobody asks me to do anything, or if

18   I don't do anything, the money will wind up safe and sound in

19   the Delaware Superior Court?

20            MR. SHANDLER:  I think it's the debtors' position that

21   the funds with respect to those six accounts should be

22   deposited into an account that's subject to your control.

23   Wilmington Trust doesn't take a position on that.  As long as

24   the funds are out of the bank's control, we don't much care

25   whether the funds are subject to the control of the Delaware

1  Superior Court or the bankruptcy court, as long as there's a
2  court order blessing that decision.
3          THE COURT:  Okay.  All right, thank you.
4          MR. MARTIN:  Your Honor, on that very limited issue,
5  may I be heard?
6          THE COURT:  Yes.
7          MR. MARTIN:  It's really administrative.  My
8  understanding -- and Mr. Shandler could correct me if I'm
9  wrong, because the counsel who is handling the Wilmington
10 matter for the debtors is not here today.  But there was some
11 issue -- we have six separate debtors and six separate funds
12 that are tracked, and there were literally some ministerial
13 efforts where the Delaware Chancery judge said our --
14         THE COURT:  Wait.  You said "Chancery".  He said
15 "Superior".
16         MR. MARTIN:  I'm sorry.
17         THE COURT:  Which one is it?
18         MR. SHANDLER:  It's Superior Court, Your Honor.
19         THE COURT:  Okay.
20         MR. MARTIN:  The Superior Court judge had diffic --
21 pointed out a difficulty in the court's administrative system,
22 with the court actually holding money and being able to track
23 it separately on a debtor-by-debtor basis.  In other words, the
24 court would have commingled the six funds.  So we were simply
25 concerned, as a ministerial basis, that we should sit with the

SOUNDVIEW ELITE LTD., et al.                    48

1  U.S. Trustee, we should pick a depository institution that the

2  U.S. Trustee agrees to, since Wilmington Trust doesn't want to

3  manage the funds anymore.  And as I mentioned before, the

4  debtors' insistence, because of the swirl and the noise

5  surrounding this case, and the posture that we're in, is the

6  debtor doesn't want any funds to be distributed, from this

7  account, to lawyers or anybody else, without further order of

8  this Court.

9          So Mr. -- that's our view at this point.  If the

10  Delaware funds could manage the monies as easily as a Section

11  345 depository -- and I honestly don't know how the Delaware

12  Superior Court holds funds -- then we would have no objection

13  to it.  But I would suggest that -- now that we're in

14  bankruptcy, and technically the interpleader action is stayed,

15  that the sensible thing would be to sit with the U.S. Trustee

16  and move it into a proper 345 account.

17          THE COURT:  Um-hum.

18          MR. SHANDLER:  Your Honor, this is Chad Shandler.

19  I -- we're not taking a position as to whether or not the

20  Delaware action is stayed or not.  I'm not sure if any other

21  party to this -- on this call agree with that or not.

22          With respect to the Delaware Superior Court, they

23  notified the parties that they were not capable of maintaining

24  the accounts, for the fifteen entities, in separate accounts.

25  Their proposal was to have all of the funds deposited into a

1  single account, and then the simple accounting mechanisms would

2  account for the amount of money that were entitled to each

3  entity.  It was merely an administrative issue that was pointed

4  out by the Superior Court.  I understand that certain parties

5  have objected to that but, again, from our perspective, it

6  doesn't change the fact that the interpleader motion has been

7  granted and the Court is capable of accepting funds, although

8  not separate accounts.

9          THE COURT:  Um-hum.  Mr. Chandler (sic), I normally

10  think of your client as a trust company.  Is it also a bank?

11  Does it have accounts?

12          MR. SHANDLER:  It also functions as a bank, Your

13  Honor, that is correct.

14          THE COURT:  Is it 345-qualified?

15          MR. SHANDLER:  I'm sorry?

16          THE COURT:  Is it qualified as a depository under 345?

17          MR. MARTIN:  He's not a bankruptcy lawyer.  The

18  bankruptcy lawyer's in front of --

19          MR. SHANDLER:  Yes, Your Honor, I'm not --

20          MR. MARTIN:  -- Walrath.

21          MR. SHANDLER:  -- a bankruptcy lawyer, so I can't --

22          THE COURT:  All right.  I understand.  All right.

23  Here's what I want to do on this.  I have no doubts whatever

24  that the money's safe as long as it's in Wilmington Trust.  I

25  have no doubt that the money's going to be safe as long as it's

1    custodia legis in the Delaware Superior Court.  I do care about

2    maintaining records.  It may be that the records don't matter,

3    that it's no longer necessary to keep them isolated if you know

4    what the share of it was when it went in.

5           But, Ms. Riffkin, I know you got no resources.  I know

6    you're one of only, what, two people in the whole U.S. Trustee

7    office who's working or allowed to work.  I'll invite you to

8    weigh in, but mainly I want to know is -- if, with a little

9    time, you can give me a recommendation for the best way to deal

10   with this and to keep the cost low.  Frankly, I don't want to

11   pay account-administration fees if I can avoid it.

12          MS. RIFFKIN:  Your Honor, we'll be happy to look at

13   it.  Our interest is making sure that 345 is complied with.

14   And this is all coming new to me, unfortunately.  Today I'm

15   hearing some of these things for the first time.  But my office

16   will definitely be happy to work for the debtors and hopefully

17   come up with a resolution that's -- that would be amenable to

18   most the major parties in this case.

19          THE COURT:  What I would like to see, folks, after

20   you've had enough time to think about it and after --

21   Mr. Chandler, you can bring Mr. Merchant or one of your

22   bankruptcy colleagues in.  I have known the Richards Layton

23   bankruptcy department for twenty-five years.  See if you can

24   come up with a consent order that nobody objects to, that would

25   deal with this issue.

1          Mr. Hildbold, do you have something to add?

2          MR. HILDBOLD:  Yes, Your Honor.

3          THE COURT:  Ms. Riffkin, did I cut you off?  I assume

4   you may want to be heard on other things, but right now I'm

5   just concerned about the --

6          MS. RIFFKIN:  Thank you, Your Honor.

7          THE COURT:  -- Wilmington Trust issue.

8          MS. RIFFKIN:  Yes.

9          MR. HILDBOLD:  Your Honor, this is kind of the

10  overarching issue that goes into this 345 issue.  Again, it's a

11  matter of corporate governance.  The debtors -- and, look, we

12  certainly want to protect the money; we don't want to waste any

13  money.  The debtors making decisions on behalf of the companies

14  is a violation of Cayman law.  They haven't consulted the JOLs.

15         So we are not disagreeing with the result, but it's an

16  issue of how we get to that result.  If -- you know, in

17  Ms. Riffkin's statement, she said that she'll work with the

18  debtors to get to the solution.  The issue, for us, is a matter

19  of Cayman law, the power of --

20         THE COURT:  Mr. Hildbold --

21         MR. HILDBOLD:  Yes, sir.

22         THE COURT:  -- forgive me.  And I'm really trying to

23  keep my patience in this case.  You're really starting to sound

24  like Mr. Jarelli and you're failing satisfactorily to address

25  the needs and concerns that I, as a federal judge, have with a

SOUNDVIEW ELITE LTD., et al.                    52

1  case on my watch, as to which, until and unless the case is

2  dismissed, I have responsibilities.

3          MR. HILDBOLD:  I totally agree, Your Honor.

4          THE COURT:  Now, you've got reservations of rights on

5  everything.  When I said "a consent order", I did not envision

6  a consent order just between Ms. Riffkin and Ms. (sic) Martin.

7  I envisioned a consent order that had the no-object of every

8  party in this case.  But until and unless I know where this

9  case -- or these cases belong, you will forgive me if I want to

10 take reasonable steps to protect nineteen or twenty million --

11         MR. HILDBOLD:  Oh --

12         THE COURT:  -- dollars in a case on my watch.

13         MR. HILDBOLD:  -- we totally agree, Your Honor.

14 It's --

15         THE COURT:  Then what are you saying to me now, sir?

16         MR. HILDBOLD:  That the consultation of the JOLs

17 should occur.  That's what I'm saying.  We do not --

18         THE COURT:  I don't --

19         MR. HILDBOLD:  -- disagree --

20         THE COURT:  -- know of anybody who objected to that.

21 If you want the JOLs to be a party to this dialogue, the answer

22 is "of course".

23         MR. HILDBOLD:  Great.  That's all I wanted to make

24 sure, Your Honor.

25         THE COURT:  Thank you.

1          MR. HILDBOLD:  Okay.

2          THE COURT:  Thank you.

3          Do I have any other Wilmington Trust issues?

4          All right.  Mr. Luskin, can you tell me the extent to

5    which your client has a dog in this fight and may have a dog in

6    this fight later on?

7          MR. LUSKIN:  Yes, I can, Your Honor.  Michael Luskin,

8    Luskin, Stern & Eisler, for the Chapter 11 trustee in Fletcher

9    International Limited; that's the Bermuda Company that we refer

10   to as FILB.

11         The debtors here are some, but not all, of the

12   Richcourt funds -- that's how they're referred to -- that were

13   acquired or whose management was acquired by Fletcher back in

14   2008.  Several of them, including the debtors, have filed

15   proofs of claim in the FILB case, arising out of their status

16   as investors or redeeming investors.  Those claims are

17   disputed, and I would put the dispute into two categories; one

18   is just the accounting issue, how much did they put in, how

19   much did they take out.  I can't imagine there's going to be a

20   dispute about that.  Our financial advisor will sit down with

21   their financial advisor and resolve that pretty quickly.  The

22   other issue is not unique to Richcourt but is -- and frankly,

23   not unique to this or the FILB case; it's common to all of

24   these failed-fund cases, and that is, to what extent are

25   investors who've redeemed protected from clawback claims or are

1  they still subject to clawback claims.  And those may also be

2  an issue with respect to these Richcourt funds.

3          I believe that the extent of the Richcourt -- these

4  debtors' investment in the Fletcher funds that are part of the

5  FILB case came to about ten million dollars or so, after April

6  of 2010; it's an important date for us, which I'll get into.

7  I'm not sure of that number.  I mean, they had more --- more

8  money came in before and went out before.  But I think that the

9  net claim now is in the ten million dollar range.  And as I

10 say, they filed proofs of claim in the case.

11         The funds, both FILB -- my debtor -- and the various

12 Richcourt funds that are here before Your Honor -- the

13 Soundview and delegated funds -- are managed by FAM -- by

14 Fletcher Asset Management -- or its affiliates.  I mean, it's

15 the same people running all of the assets.  They're obviously

16 no longer running the FILB master feeder structure.

17         Perhaps I should just take a step back.  I think Your

18 Honor will recall all of this.  FILB is the master Bermuda

19 fund.  There are feeder funds leveraged, and arbitrage, which

20 are subject to Cayman Islands liquidation proceedings; they're

21 in administration under joint official liquidators.  I know the

22 Yankees aren't in it, and Yogi's not here, but for Your Honor

23 it must be deja vu all over again:  It's pretty similar to what

24 happened two summers ago when this case -- when the FILB case

25 filed and before the trustee was appointed.

1          And on that, I know Your Honor doesn't want to hear

2    anything on the merits, but I will tell you this:  There are

3    two gating issues that, in my view, must be dealt with as

4    expeditiously as possible, and that is -- those issues are the

5    venue issue, which you've certainly heard about:  Does the case

6    belong in the Cayman Islands or does it belong here?  There are

7    reasons for and against each.  I'm pretty certain that Your

8    Honor has the discretion to go either way, that you could

9    probably -- I'm certain you could justify a decision to keep

10   the case here, either as filed under 11 or as a Chapter 15

11   ancillary proceeding.

12          THE COURT:  Well, if there're avoidance actions, there

13   are limits on my ability to help creditors, if it's a 15 as

14   contrasted to an 11, aren't there?

15          MR. LUSKIN:  If -- yes, except those actions may

16   actually be in the hands of the Cayman funds, who may be able

17   to bring them; or the JOLs down there can bring them.  I don't

18   know, Your Honor.  I'm saying that these are not such simple

19   issues.

20          And I know you're on a pretty tight schedule, setting

21   this up for hearing on December 17th.  I'm going to jump to one

22   of my conclusions, which is this:  I would urge the Court to

23   clear the decks for these two issues.  I think everything else,

24   frankly, either ought to be resolved by stipulation or just

25   tabled, and that includes retaining professionals; it includes

 1   sanctions.  Obviously, joint administration would have to be

 2   done.  But if they can't solve it by stipulation, the agenda's

 3   pretty full with just these two issues:  the venue issue and

 4   the fiduciary issue.

 5        On the fiduciary issue, I -- this is what I'm going to

 6   say about that:  First, the Chapter 11 trustee in FILB has gone

 7   on the public record at least twice in the FILB proceedings,

 8   with motions or adversary complaints that make it very clear

 9   why, in our view, the Fletcher affiliates cannot serve as

10   independent fiduciaries in any case, anywhere, for any reason,

11   at any time.  The first of those was a -- what turned out to be

12   a settlement motion on what we refer to as the April 22, 2012

13   transactions.  We've been prepared to file an adversary

14   complaint against the various Fletcher entities, including

15   FAM -- Fletcher Asset Management -- and Mr. Fletcher.  We

16   successfully negotiated a transaction under which the transfers

17   were done; we brought it to court.  All this was disclosed in

18   the papers.  And the court approved that settlement earlier

19   this year and, since then, all of those transactions have been

20   undone.

21        The second transaction -- and I'm, again, only

22   referring to transactions or claims as to which we've made

23   public filings -- was an adversary filed last week or two weeks

24   ago; it's an avoidance action against a law firm.  About a

25   million dollars of FILB's money -- again, my debtor's money --

1    was used for Mr. Fletcher's personal legal expenses involving

2    his ongoing fight with the Dakota.  And again, that complaint

3    is on file.

4           The final point -- and I won't go into detail on it --

5    is that the trustee is at the end -- or nearly at the end of

6    his investigation, and plans to file a combined report and

7    disclosure statement in connection with the liquidating plan

8    shortly; I mean, with a matter -- within a matter of weeks.

9    And we've been speaking with all of the key constituents,

10    including Mr. Fletcher and including others here in the room,

11    the Citco attorneys, accounting firms, law firms, employees,

12    former employees and so on.  And the report will certainly make

13    it clear why we -- that is, Mr. Davis the trustee, and his

14    advisors -- believe that there are good -- in some cases very,

15    very good -- claims against a whole host of insiders, and some

16    noninsiders, arising out of breaches of contract, breaches of

17    fiduciary duty, other tort-type claims.  And that will all be

18    laid out in the report.

19           I made reference to "deja vu all over again" because

20    what I see here is two months of litigation, of expedited

21    discovery, and what, again, at least seems to me -- and I don't

22    expect agreement of those on either side of me -- is going to

23    end up with a fiduciary in the case, just as it did a year and

24    a half ago -- or a year and a month ago.

25           So I think, again, that, to the extent the Court

1   hasn't already cleared the decks for these two issues, these

2   are the issues that should be teed up.  I would suggest that,

3   if possible, this might be a case where a pre-trial order filed

4   with the Court well in advance -- a week or two in advance, at

5   least -- of the December 17th hearing, might make sense.  If

6   there were any way to accelerate the consideration of these two

7   issues -- fiduciary and venue -- I would urge the Court to

8   consider it.  I recognize that December 17th is literally a

9   blink away and that may not be possible, but perhaps it is if

10   all of the other underbrush is cleared away.

11          THE COURT:  Pause, please, Mr. Luskin.

12          MR. LUSKIN:  Yes.

13          THE COURT:  If I were to regard the sanctions prong of

14   the automatic-stay issue as something that I would deal with

15   only in a phase 2, if ever anyhow --

16          MR. LUSKIN:  Correct.  Yes.

17          THE COURT:  -- what else would I have to hold in

18   abeyance besides -- I assume what you referred to as "the

19   venue" is kind of a catchall to describe who had corporate

20   authority to file what --

21          MR. LUSKIN:  Yes.

22          THE COURT:  -- and which, if it matters, was filed

23   first, and anything else that would affect whether I deferred

24   it to Caymans or hold some kind of a case on my watch.  I'm not

25   sure if I can hold a 15 --

SOUNDVIEW ELITE LTD., et al.                    59

1          MR. LUSKIN:  I don't think you --

2          THE COURT:  -- I can run a 15 without a 15 petition.

3    But the alternative is simply keeping it 11 or some case --

4          MR. LUSKIN:  Yeah.

5          THE COURT:  -- under either 11 or -- although I have

6    more difficulty seeing why it would be appropriate -- 7 here.

7          MR. LUSKIN:  I think, Your Honor, you would have

8    discretion to keep this as an 11 and put it on a, whatever,

9    slow but coordinated track if Cayman were the center of main

10   interest and that's where the proceedings were, going ahead.  I

11   think there needs to be something here to deal with assets here

12   in the U.S., among them the monies at Wilmington.

13          No, my only suggestion -- or to go back to your point,

14   Your Honor, that the joint-administration motion is really not

15   a joint-administration motion, we've -- none of us has ever

16   seen a contested joint-administration motion.  It's really a

17   corporate-control issue.  And when I -- I mentioned the two

18   issues -- venue and fiduciary; that encompasses who's in

19   control.  If Your Honor decides that the case belongs in

20   Cayman, they're already fiduciaries -- court-appointed

21   fiduciaries there, and nothing further need be done, at least

22   if the U.S. case is stayed or if Your Honor enters an order

23   that requires the JOLs to come here to the U.S. and state their

24   position to -- before taking action.

25          THE COURT:  So the practical decision tree that I

SOUNDVIEW ELITE LTD., et al.                    60

1  would have in December would be to 1112 the case, dismiss it

2  for -- because no case should have been filed here, for lack of

3  authority; or to consider it as it's going now, as an ordinary

4  11 with a debtor remaining in possession; or to continue it as

5  an 11 here but to appoint an 11 trustee; unless I'm missing

6  something.

7        MR. LUSKIN:  Sounded pretty thorough to me, Your

8  Honor.

9        THE COURT:  I'll hear you in a second, Mr. Hildbold.

10  I'm talking to Mr. Luskin now.

11        Okay.

12        MS. OSTAD:  Your Honor?

13        THE COURT:  Yeah, I'll hear you in a second, too,

14  Ms. Ostad, but I just --

15        MS. OSTAD:  Okay.

16        THE COURT:  -- want to understand what I need to

17  case-manage between now and December.

18        MR. LUSKIN:  It seems, Your Honor, that the one point

19  that needs to be case-managed is the money.  If the money is

20  sitting frozen and there are no expenses that would actually

21  have to be disbursed between now and the end of the year, that

22  issue really goes away too; it can be tabled until after the

23  December 17th hearing.

24        I haven't seen a budget.  I don't know that I've seen

25  all of the filings in the case.  I haven't seen anything that

SOUNDVIEW ELITE LTD., et al.                          61

1  says that there's anything that has to be paid for today.  On

2  that, I would -- if there is a modest budget, I suppose we

3  would have heard about it or we will hear about it and it'll be

4  dealt with by stipulation.

5         But apart from the money, I think the only two real

6  issues are venue and fiduciary.

7         THE COURT:  All right.

8         MR. LUSKIN:  And as your decision tree made clear,

9  fiduciary may fall away, depending on the outcome of venue and

10 jurisdiction.

11        THE COURT:  Okay.

12        MR. LUSKIN:  Thank you, Your Honor.

13        THE COURT:  Thank you.

14        Ms. Riffkin, your opport -- oh, wait.

15        Ms. (sic) Hildbold, did you want to comment on

16 something Mr. Luskin said?

17        MR. HILDBOLD:  Yes, Your Honor.  There was a fourth

18 alternative, I guess -- maybe I'll call it a 3(a) -- is, you

19 said, recognizing -- keeping the Chapter 11 and keeping the

20 debtors-in-possession, you could also recognize the JOLs as the

21 management of the company, keep the Chapter 11 in place.  I'm

22 not sure if that was encompassed in your answer.  But you

23 would --

24        THE COURT:  You're saying, if I were to determine,

25 in -- as one of the gating issues that Mr. Luskin articulated,

 1   that the captain of the ship -- of the 11 ships should be the

 2   various liquidators, then they can step in just like the CEO

 3   and board of directors of a U.S. company does?

 4              MR. HILDBOLD:  Correct.

 5              THE COURT:  I'm with you.  Okay.

 6              MR. HILDBOLD:  Okay.  Thank you.

 7              THE COURT:  Ms. Riffkin?

 8              MS. RIFFKIN:  Thank you, Your Honor.  Your Honor, I

 9   want to point out the thing that Your Honor began this hearing

10   with was that you had concerns about who should be the captain

11   of this ship.  I have reviewed all the documents since

12   yesterday, or at least in a limited way, and I have serious

13   concerns about who is the captain of this ship.  My office

14   intends to file a motion for the appointment of a Chapter 11

15   trustee; in my experience, such a motion would be better heard

16   on an expeditious basis.  I understand that we have a schedule,

17   and it's set by Your Honor's order, for the middle of December.

18   But if there was any way that we could be heard on a -- my

19   office is willing to devote the resources, despite this

20   furlough, to prepare a motion on shortened time.  And if that

21   would be possible, I would request that we be given a date

22   prior to December.

23              THE COURT:  The problem I have with that,

24   Ms. Riffkin -- and certainly I would want you to weigh in on

25   your views as to the ultimate relief when I have to decide

1    it -- is that, as Mr. Luskin articulated it, I think he's right

2    in the respect that he said that where the case is presents a

3    gating issue even before dealing with the appointment of a

4    fiduciary.

5          If there is a case in the U.S., I would certainly

6    understand where you're coming from.  But if the case was never

7    properly filed in the U.S. in the first place and I have to

8    1112 it or abstain under 305 in favor of the Caymans, then

9    reasonable people might say I ain't got no business appointing

10   a trustee here in the States.  I would prefer to deal with it

11   in the combination so I don't stretch out the time, but I don't

12   think I can assume a fact to be decided -- that the case

13   belongs here -- and appoint an 11 trustee, until I know that I

14   got a case here.  Now, I can deal with those in a bunch.

15         I also have procedural due-process concerns.  I don't

16   want any more episodes where documents have to be produced over

17   a weekend.  And I understand, from all the people who are here,

18   that these are important issues to people.  I don't see how I

19   could fast-track it consistent with due process, even putting

20   aside the fact that I'm no longer allowed to hold hearings

21   after 5 o'clock, we're rationing paper, you're running an

22   office on two people, and you're going to have only modestly

23   greater resources once the government shutdown stops, but

24   you're still under sequestration.

25         So my tentative -- and I'll -- I'm not going to put a

SOUNDVIEW ELITE LTD., et al.                    64

1    sock in your mouth -- is -- my tentative is to invite you to
2    become part of the briefing process and to tee up your motion
3    but simultaneously with the remainder.  I mean, if you want to
4    be heard and further protest, I'm not going to accuse you --
5    you know, put you in contempt.  But that's the way I see it.
6              MS. RIFFKIN:  I understand, Your Honor.
7              THE COURT:  Okay.
8              MS. RIFFKIN:  It's just my view that sometimes, if
9    Your Honor were to find that there would be a Chapter 11
10   trustee, perhaps the Chapter 11 trustee would be amenable to
11   working more cooperatively with the parties.  But I
12   understand --
13             THE COURT:  Well --
14             MS. RIFFKIN:  -- Your Honor.
15             THE COURT:  -- if you think you can arrange a
16   consensus by being kind of like a quasi-mediator amongst the
17   various parties here and somehow give me peace in the valley, I
18   say go with God.  I would love to -- I don't know, given the
19   fact that I have parties who argued over whether I can have
20   joint administration, how realistic that is.  But bless you.
21   Try.
22             MS. RIFFKIN:  All right, Your Honor.
23             THE COURT:  Okay.
24             MS. RIFFKIN:  We'll try.  Thank you, Your Honor.
25             THE COURT:  Thank you.

1          MS. RIFFKIN:  Oh, Your Honor, that Rule was 6003.

2          THE COURT:  Oh, the Rule that impairs my ability to

3    take action before fifteen days, or whatever it is --

4          MS. RIFFKIN:  Twenty --

5          THE COURT:  -- in a case?

6          MS. RIFFKIN:  Twenty-one --

7          THE COURT:  What?

8          MS. RIFFKIN:  Twenty-one days, Your Honor.

9          THE COURT:  Twenty-one days, okay.  All right.

10         Okay.  All right, folks, here's what I want you to do.

11   Am I correct that everybody who wanted a chance to be heard has

12   had a chance to be heard?  I don't think I need reply, because

13   the reply is going to be with -- disputing things that I'm not

14   making findings on anyway.

15         MR. MARTIN:  What I'd like to do, Judge, is not that

16   but just limit the reply to scheduling.

17         THE COURT:  Okay.  Come on up, please.

18         MR. MARTIN:  There's only one point of Mr. Luskin's

19   that I'll disagree with, which is that all these folks are so

20   far apart that they might not find a way to get together and

21   put something together that works; and let's hope we can do

22   that.

23         In terms of scheduling, Your Honor, right now,

24   pursuant to the scheduling order that you entered, we have

25   December 17th for the dismissal conversion -- we'll call it the

1  gating issue -- and the commander-in-chief issue:  who's in

2  charge and where's the case.  We also have the sanctions

3  motion; and to be perfectly frank about that -- and I'll

4  confess to taking a page out of the Morrison & Foerster

5  playbook -- you had an objection to joint administration, which

6  was essentially a motion to dismiss, and you had an adversary

7  complaint for declaration that the automatic stay applies,

8  essentially in the -- cloaked in the clothing of a contempt

9  motion.  So those things we have set right now for December

10  17th, and it sounds like Your Honor's considering whether part

11  of that should go forward or part of it shouldn't.

12         The -- I think it's a critical issue that they all be

13  heard together.  There was a lot of testimony put on the record

14  about what happened in the Cayman Islands, from the attorneys

15  who were up here.  There are no transcripts of Cayman Islands

16  proceedings; the proceedings are closed to the public.  There's

17  no public access to courts, like we have here.

18         I have a twenty-page memorandum from Cayman Islands

19  counsel, about what happened that afternoon.  For these

20  purposes, suffice it to say, it differs from the

21  representations that were put on the record here.  What is

22  completely undisputed by anybody is that these Chapter 11

23  bankruptcies preceded, in time, the appointment of the

24  liquidators in the Caymans.  That is a fact that no one has

25  disputed.  Affidavits were faxed down; proof of the bankruptcy

1  filings presented to the court.  Whether the court accepted

2  them or not --

3          THE COURT:  Forgive me, Mr. Martin.  Are you giving me

4  a preview of your trial brief on --

5          MR. MARTIN:  No, Your Honor.

6          THE COURT:  -- December 17th?

7          MR. MARTIN:  And I'm sorry; I'm falling into the same

8  trap, and sometimes we get ahead of ourselves.

9          Retention:  That's what I wanted to talk about in

10  terms of scheduling.  Right now my retention and our financial

11  advisor's retention, which were shared with the U.S. Trustee in

12  advance, are noticed for November 6th before Your Honor.  And

13  there was banter about what makes sense in Your Honor's effort

14  to come up with a creative solution.  All fee awards are

15  interim until final.

16          I would propose, rather than -- and Your Honor used

17  the term -- you're not going to have a litigant, before you,

18  forced to litigate with one arm tied behind its back.  I need

19  to prepare schedules and statements.  I need to file a motion

20  to assume a contract with Pinnacle, which is our third-party

21  fund administrator in North Carolina, to get some of the

22  records released that Mr. Katz needs for that.  We need to do

23  an initial debtor interview.  There's things that we have to do

24  between now and December 17th, and I want to move forward with

25  all of those.  And I'd like to know, within the appropriate

1   time under the Rules, that I am in fact retained, and that goes

2   for the other professionals as well.  And if in fact it turns

3   out that that was improvident, it can certainly be addressed in

4   connection with fee applications and at fee app time.  And

5   again, until it's a final fee app, we're all subject to --

6        THE COURT:  You understand that you and your firm

7   couldn't get paid under 331 until the earliest that 331 allows

8   you to get paid, anyhow.  So you're simply talking about

9   knowing that you're not at risk?  Here's what I --

10        MR. MARTIN:  In terms of retention.

11        THE COURT:  Here's what I'd like you to do.  I'll give

12   people a chance to object today, but what I am of a mind to do

13   is what I've done on the first day of every 11 in thirteen

14   years -- GM, Adelphia, down to the deli cases -- that says that

15   you are now authorized to represent your client, to speak on

16   behalf of your client and to perform services on behalf of your

17   client, with a follow-up hearing on November 6th, in which I'll

18   hear from Ms. Riffkin or one of her people -- assuming she has

19   any people -- on whether you're disinterested, in which case I

20   need to do a stop, look and listen.

21        And the matter of your pay will be dealt with later.

22   If I ultimately determine that the case was appropriately

23   filed -- maybe otherwise, with a reservation of rights on

24   that -- your retention will be nunc pro tunc back to the filing

25   date.  Will that skin the cat?

1              MR. MARTIN:  Yes, Your Honor.  Thank you.

2              THE COURT:  All right.  Does anybody want to be heard

3    in opposition to that approach?

4              Hearing none, that's the way we're going to do it.

5              If you want to put in an interim order to keep your

6    partners happy, you can.  Otherwise, I'm going to so-order the

7    record.

8              MR. MARTIN:  That's fine, Your Honor.  And I can wait

9    till November 6th for the --

10             THE COURT:  Okay.  Ms. Riffkin, I don't know if you're

11   going to have the resources to look at his disinterestedness

12   affidavit and the stuff you normally do.  Can you have somebody

13   take a look at that between now and the 6th of November?

14             MS. RIFFKIN:  Yes, Your Honor.

15             THE COURT:  Okay.  Thank you.

16             All right.  Here's what I want you all to do:  I want

17   you to slice off the portion of the sanctions motion that asks

18   me to put people in contempt and to find that anybody did

19   anything bad, and to continue it sine die.  I want you to deal

20   with the remainder of the issues that are subject to the stip

21   that you guys entered into and that I had so-ordered before,

22   except that I am so-ordering joint administration today.  You

23   only need to file in one case.  If there are distinctions that

24   you need to make, distinctions, you know, between debtors, just

25   say so in your papers, which will minimize the burden on you

1    all and on the Court.

2         You're to caucus amongst yourselves to see whether the

3    discovery that you need is any different than what you thought

4    you needed before you went in today, and to accomplish what you

5    need to do.  I think Mr. Luskin is right that on a case of this

6    complexity, if I'm going to have an evidentiary hearing, as I

7    sense you're going to ask me to do, I need to have a pre-trial

8    order, which I have the right to ask for in a contested manner

9    (sic), all of these things being contested matters.

10        And that's the way we're going to do it, folks.  Not

11   by way of reargument, are there any things I failed to address?

12        Hearing --

13        MS. OSTAD:  Your Honor, this is Karen Ostad speaking.

14        THE COURT:  Yes, Ms. Ostad.

15        MS. OSTAD:  Is your order, Your Honor, that the

16   parties, if they have objections to disinterestedness or to

17   retention or whatever, as putting perhaps, as a payment matter,

18   the cart before the horse -- that they need not file additional

19   objections but, by virtue of appearing at this hearing, their

20   objections are reserved to eliminate lots of paper filings with

21   the Court?  Or should we file objections to those motions?

22        THE COURT:  I have trouble envisioning anything that

23   you would say, other than disinterestedness, that would tell me

24   that I can't hear what Mr. Martin has to say.  Are you saying

25   something the same as that, or different than that?

1        MS. OSTAD:  No, no.  Your Honor, I'm saying there's a

2   disinterestedness issue, and of course an authority issue, with

3   respect to the debtors.  But --

4        THE COURT:  That the --

5        MS. OSTAD:  -- that was --

6        THE COURT:  -- Porzio firm -- you're disputing whether

7   the Porzio firm is disinterested?

8        MS. OSTAD:  There is something in their adversary

9   proceeding that raises a concern, Your Honor --

10       THE COURT:  Okay.  Here's what --

11       MS. OSTAD:  -- the fact --

12       THE COURT:  Here's what --

13       MS. OSTAD:  -- that a retainer --

14       THE COURT:  -- the way I'm going to deal with that,

15   because I want to keep --

16       MS. OSTAD:  Okay.

17       THE COURT:  -- my eye on the ball:  Mr. Martin you're

18   authorized to act.  If it turns out that I sustain Ms. Ostad's

19   objection, you're going to be at risk of not getting paid.

20       MR. MARTIN:  Understood, Your Honor.

21       THE COURT:  Okay.  Anything else, anybody?

22       We're adjourned.

23       UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

24       MS. OSTAD:  Thank you.

25       (Whereupon these proceedings were concluded at 11:42 AM)

```
 1
 2                                  I N D E X
 3
 4                                   RULINGS
 5                                                  Page        Line
 6    The other stakeholders in the underlying      35          23
 7    funds will be entitled to participate in the
 8    discovery process.
 9    Chad Sandler, Esq. is admitted pro hac vice.   44          12
10    Mr. Martin is authorized to represent, and to  69           6
11    speak and perform services on behalf of the
12    debtors, with a follow-up hearing on
13    November 6th.
14    The sanctions motions are adjourned.           69          19
15    Motions for joint administration, granted.     69          22
16    The parties will caucus as to discovery        70           2
17    issues.
18    If the Court sustains Ms. Olstad's             71          18
19    objection, Mr. Martin will be at risk of
20    not getting paid for his services to the
21    debtors.
22
23
24
25
```

1

2                    C E R T I F I C A T I O N

3

4    I, David Rutt, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9    _____

10   DAVID RUTT

11   AAERT Certified Electronic Transcriber CET**D 635

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  October 22, 2013

18

19

20

21

22

23

24

25