1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 13-13098-reg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   SOUNDVIEW ELITE LTD., et al.

9

10              Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              November 6, 2013

19              10:04 AM

20

21

22

23   B E F O R E:

24   HON. ROBERT E. GERBER

25   U.S. BANKRUPTCY JUDGE

1

2   Doc # 43 Motion of Debtors Pursuant to Section 365 of the

3   Bankruptcy Code, Bankruptcy Rule 6006 and Local Bankruptcy Rule

4   6006-1(a) for an Order Authorizing the Assumption of

5   Administration Agreements, as Modified, Between the Debtors and

6   Pinnacle Fund Administration LLC

7

8   Doc# 29 Authorizing the Retention and Employment of Porzio,

9   Bromberg & Newman, P.C. as Counsel to the Debtors Nunc Pro Tunc

10  to the Petition Date

11

12  Doc# 31 Motion Authorizing the Retention and Employment of

13  CohnReznick LLP as Financial Advisor to the Debtors Nunc Pro

14  Tunc to the Petition Date

15

16  Doc# 41 Motion Authorizing the Retention and Employment of

17  Patterson Belknap Webb & Tyler LLP as Special Counsel to the

18  Debtors, Nunc Pro Tunc to the Petition Date

19

20  Transcribed by:  Sharona Shapiro

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

```
 1
 2   A P P E A R A N C E S :
 3   PORZIO BROMBERG & NEWMAN P.C.
 4        Attorneys for Debtors
 5        100 Southgate Parkway
 6        Morristown, NJ 07962
 7
 8   BY:   WARREN J. MARTIN, JR., ESQ.
 9         RACHEL A. SEGALL, ESQ.
10
11   PATTERSON BELKNAP WEBB & TYLER LLP
12        Proposed counsel to Debtors
13        133 Avenue of the America
14        New York, NY  10036
15
16   BY:   PETER C. HARVEY, ESQ.
17
18
19   UNITED STATES DEPARTMENT OF JUSTICE
20        Office of the United States Trustee
21        33 Whitehall Street
22        21st Floor
23        New York, NY 10004
24
25   BY:   GREG M. ZIPES, ESQ.
```

**4**

1

2   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

3          Attorneys for Pasig Ltd.

4          1633 Broadway

5          New York, NY 10019

6

7   BY:   ANDREW K. GLENN, ESQ.

8

9

10   MORRISON & FOERSTER LLP

11          Joint Official Liquidators

12          1290 Avenue of the Americas

13          New York, NY 10104

14

15   BY:   WILLIAM M. HILDBOLD, ESQ.

16

17

18   MORRISON & FOERSTER LLP

19          Attorneys Cayman Joint Official Liquidators

20          425 Market Street

21          San Francisco, CA 94105

22

23   BY:   LARRY ENGEL, ESQ.

24

25

1

2  OSTAD PLLC

3          Attorneys for Optima Absolute Return Fund Ltd.; Richcourt

4          Allweather Fund Inc.; and America Alternative

5          Investments Ltd.

6          185 Great Neck Road

7          Suite 330

8          Great Neck, NY 11021

9

10  BY:   KAREN OSTAD, ESQ.

11

12

13  ALSO PRESENT TELEPHONICALLY:

14          Brian Smith, Pinnacle Fund Administration

15

16

17

18

19

20

21

22

23

24

25

SOUNDVIEW ELITE LTD., et al.                                6

1              P R O C E E D I N G S
2          THE COURT:  Okay, Soundview.  Folks want to come up on
3    that one, please?  I know some of you, but I don't know
4    everybody.  I want to get appearances, and then I have some
5    preliminary comments.
6          First, Mr. Martin, I know you, of course, and I
7    know --
8          MR. MARTIN:  Thank you, Your Honor.  I do have my
9    colleague, Rachel Segall; attorneys for the debtor, Porzio,
10   Bromberg & Newman.  It's S-E-G-A-L-L; the reporter has --
11         MR. GLENN:  Good morning, Your Honor.  Andrew Glenn,
12   Kasowitz, Benson, Torres & Friedman, on behalf of Pasig Ltd.
13         THE COURT:  Okay.
14         MR. ENGEL:  Good morning, Your Honor.  Larry Engel
15   from Morrison & Foerster for the Cayman joint liquidators.
16         THE COURT:  Okay.
17         MR. HILDBOLD:  Good morning, Your Honor.  Billy
18   Hildbold on behalf of the joint official liquidators.
19         THE COURT:  Okay.
20         MS. OSTAD:  Good morning, Your Honor. Karen Ostad of
21   Ostad PLLC, on behalf of Optima as well as America Investment
22   and Richcourt Allweather Funds.
23         THE COURT:  Okay.  Mr. Zipes, are you appearing on
24   this one?
25         MR. ZIPES:  Yes, Your Honor.

1          THE COURT:  Okay.  All right.  Folks, I've got a

2   tentative, California style, after reading all the papers, many

3   of which rehash issues that are appropriate for December 17th

4   but aren't relevant, in my thinking, today.  There is one

5   unanswered question which could affect my tentatives, but

6   somehow, with lawyers of this quality, I think that if it were

7   a factor, I would have seen it in the papers.

8          My tentative, folks, is to grant the Porzio

9   application, and to deny, without prejudice, or at the option

10  of the movant to continue the motions vis-a-vis CohnReznick and

11  Patterson Belknap, and to do likewise with respect to the

12  Pinnacle application.

13         On these, a matter that could inform the exercise of

14  my discretion, if it were true, would be if there is some

15  demonstrable urgency in deciding the matters that I think that

16  should be denied without prejudice.  In particular, I would

17  need to know what is the need for any of the CohnReznick or

18  Patterson Belknap entities to be retained between now and

19  December 17th, especially if, as I understand, the interpleader

20  action is frozen for the time being.  I have similar questions

21  with respect to Pinnacle.  I understand that Pinnacle, at some

22  point, either would or might be providing useful services.  But

23  I need to know whether, and to what extent, there is an urgency

24  in Pinnacle serving before December 17th or the decision that

25  would follow any proceedings that take place on the 17th.

1          It seemed to me that the assumption of that contract

2     has more than minimal economic consequences, but I can't tell

3     whether the Pinnacle services are worth the cost or not.

4     That's not to say, of course, that they're not, but I'm not

5     sure if there's an urgency.

6          Also, if Pinnacle is holding any information with

7     respect to the debtor, I saw no briefing or argument as to the

8     extent to which we could skin the cat by 542(e).  And Pinnacle,

9     under such circumstances, might have whatever rights it has to

10    get paid its pre-petition debt, but they would be separate from

11    its duty to comply with any information that might hold with

12    respect to the debtor and that's necessary for the

13    administration of the estate.

14         Of course, if people want Pinnacle's services, going

15    forward, which is something I hardly rule out, nobody would

16    expect Pinnacle to do that for free.  But it seems to me that

17    would be better clarified after we know what's going to happen

18    on the 17th.

19         So anybody want to be heard in opposition to my

20    tentatives?  Mr. Martin?

21         Oh, let me say what I think is obvious, and I think I

22    said it at the last hearing.  I'm expressing no views now, just

23    as I didn't then, vis-a-vis who should win on the 17th.  But I

24    don't think it's appropriate to make the estate prosecute the

25    defense of the filing, or the matters related to it, without a

1  lawyer, or with one hand tied behind its back.  And at least

2  until the 17th, implicit in my ruling is that Mr. Martin

3  continues -- Mr. Martin and his firm.

4       Go ahead, Mr. Martin.

5       MR. MARTIN:  Thank you, Your Honor.  Let me address

6  Pinnacle first, and then Patterson Belknap and CohnReznick.

7  Just as a housekeeping matter, Mr. Brian Smith of Pinnacle,

8  who's based in Raleigh, North Carolina, wanted to be here but

9  was not able to get here.  And I understand they were trying to

10  make arrangements for him to dial in.

11       THE COURT:  I have a dial-in log that shows you as

12  appearing by phone, which is obviously no longer the case.

13       MR. SMITH:  Warren, this is Brian Smith.  I actually

14  am on the line.

15       THE COURT:  Oh, okay.

16       MR. MARTIN:  Okay.

17       THE COURT:  All right.  Very well, Mr. Smith.

18       MR. MARTIN:  Your Honor, with respect to Pinnacle --

19  and it's good that we're doing this one first so we can let Mr.

20  Smith go when we're done, because he's been very busy.

21       Let me say that 542(e) is -- or 542, rather, is not

22  required here.  Pinnacle has been nothing but professional.

23  They -- after the petition, we began discussions with them, we

24  asked them for help, we filed the motion.  Mr. Smith has shared

25  with us 5,500 pages of documents which represent the HSBC file,

 1  who was the fund administrator before Mr. Smith.

 2          With respect to the necessity and essential nature of

 3  the application, I would say the following, Your Honor.  I

 4  don't think any of the other parties here would dispute, in the

 5  hedge fund industry, the critical nature of a third party fund

 6  administrator.  It is, in effect, the back office for the

 7  financial and accounting records of the fund.  And because of

 8  the Wilmington Trust interpleader, which Your Honor is well

 9  aware of, the back office was frozen.

10          We have been in regular daily communications with Mr.

11  Morrissey, Ms. Riffkin.  The CohnReznick firm -- and we'll get

12  to CohnReznick separately -- has been doing yeomen's work in

13  putting together schedules and statements.  And a 341, although

14  I don't think I saw the notice, it was tentatively scheduled

15  for November 15th.  We had committed to the U.S. Trustee to get

16  our schedules done by November 15th.  They can't get done

17  without Pinnacle.

18          With respect to Mr. Smith's professionalism, I would

19  add the following.  Mr. Smith cleared his calendar; he had some

20  forty or fifty items, cleared them for this case, and has been

21  working eight hour days, and he's on the line.  But I know the

22  effort that he's been putting in.

23          So if you look at the objection, that was filed, to

24  assumption of this contract, and you think about the business

25  judgment test, the objection doesn't dispute pricing of

1  Pinnacle.  It doesn't dispute that it's not in the debtors'

2  business judgment, other than the concept that the obligations

3  that this debtor has, as a debtor-in-possession, ought to be

4  put on hold until we decide who's captaining the ship.

5       But I sense, and Your Honor hinted to it a bit in your

6  opening comments, that a lot of what we're seeing here is

7  litigation, or litigation-driven.  And I sense a concern, on

8  the part of my adversaries, that if they let this debtor do

9  what it's supposed to do, under the Bankruptcy Code, it'll be

10  used against them on December 17th.

11      We don't want credit.  December 17th, we will make our

12  case or we won't, and Your Honor will rule on the appropriate

13  disposition of this case.  We don't need credit for doing what

14  we're supposed to do, but to delay a project that anybody

15  needs -- and Mr. Smith can tell us, if necessary; I believe if

16  this case did go back to the Caymans, for example, Mr. Smith

17  would be retained on the same terms and out of the same funds,

18  and he would proceed forward.  So why not do it now?

19      THE COURT:  I take your points, Mr. Martin, but I have

20  residual questions.  One is that -- perhaps I read the papers

21  too hastily; I did sense an uncertainty vis-a-vis the economic

22  terms.  But more importantly, I was led to believe, either in

23  earlier proceedings in this case, or in the most recent round

24  of papers, that the debtor is not -- or actually debtors are

25  not actively running funds at this point.  And therefore, it

1  was unclear to me as to the extent to which some of the

2  services that you articulated would be as necessary as if you

3  had an actively running fund.  Can you help me on those things?

4        MR. MARTIN:  My understanding, Your Honor, and

5  unfortunately I'm just an attorney, not a witness, but my

6  understanding is that in order -- to the extent your question

7  goes exclusively to timing --

8        THE COURT:  Which it does, because I've got nothing

9  against Pinnacle, and so far as the record reflects, everything

10  you said about Mr. Smith and his diligence and his not holding

11  up anybody is entirely true.

12        MR. MARTIN:  To the extent that your question goes to

13  timing, unfortunately, because of the situation in which these

14  debtors found themselves with the Wilmington situation, which

15  is now resolved, there was an extensive period of time where

16  what should have gotten done didn't get done.  And now we're

17  debtors under the Bankruptcy Code, and I have requirements of

18  the U.S. Trustee's Office that I cannot complete without

19  Pinnacle.  So I either need to get a pass on those, or we need

20  to bring Pinnacle in.

21        THE COURT:  But I still have more authority than the

22  U.S. Trustee's Office, don't I?

23        MR. MARTIN:  I'm sorry, Your Honor?

24        THE COURT:  I still have more authority than the U.S.

25  Trustee's Office.  I can give you a pass on schedules and

1    statements, if I think it's otherwise in the interest of the

2    estate.  Not a pass, but a --

3            MR. MARTIN:  Deferral?

4            THE COURT:  -- deferral.  I mean --

5            MR. MARTIN:  It --

6            THE COURT:  -- certainly I would hear from the U.S.

7    Trustee's --

8            MR. MARTIN:  You know, you --

9            THE COURT:  -- from Mr. Zipes or whomever --

10           MR. MARTIN:  You --

11           THE COURT:  -- as to whether there are immediate

12   needs.  I would also want to hear from the parties as to

13   whether they think they need extra information.  They sure have

14   been able to file a lot of paper without the benefit of what

15   would appear in the schedules and statements.

16           MR. MARTIN:  Your Honor spoke about hamstringing in

17   terms of the selection of counsel.  I would posit that not

18   giving us financial advisors -- not retaining financial

19   advisors at this time, not allowing assumption of the Pinnacle

20   contract, accomplishes that same hamstringing, because now you

21   have counsel without easy access to financial information.  We

22   want to be transparent.  I talked about that at the status

23   conference on October 16th.

24           We chose the U.S. of A. bankruptcy court for openness,

25   for avoidance actions, for transparency to tell our story, and

1   we will tell our story on December 17th.  There are parts of

2   our story that will be difficult to tell, and will remain

3   untold, if we can't have access to Pinnacle, who again, I would

4   toss the question or ask Your Honor to toss the question to the

5   other parties: Do these funds not need a Pinnacle?  Whether --

6   if we -- if the debtor was removed today from management, and

7   we put in Caymans liquidators, would the Caymans liquidators

8   not need Pinnacle, and would they find these terms

9   unreasonable?  We want to mind the store, and if we lose on

10  December 17th, we want to present the best debtor and

11  transition the best debtor that we can on that day.

12          I don't think I have anything else to say on Pinnacle.

13  And with Your Honor's permission, then, I would turn to

14  Patterson Belknap.

15          THE COURT:  Sure.

16          MR. MARTIN:  Your Honor, there's two matters that

17  Patterson Belknap are handling besides the Wilmington Trust

18  matter.  The Wilmington Trust matter, you're absolutely

19  correct, is concluded.  And we attached two complaints as

20  exhibits to Mr. Harvey's certification.  Mr. Harvey is present

21  in court.

22          One is the complaint against Gerti Muho, who is a

23  former director/officer of the debtor, who is alleged -- it's a

24  pretty strong allegation -- to have removed two million

25  dollars, unauthorized, from the debtors' bank account.  Last

1   week, in that action, Mr. Harvey obtained a preliminary

2   injunction and froze over 400,000 dollars at Citibank for the

3   benefit of this estate.  He is in the process of finding more

4   money, HSBC and elsewhere, and we hope and expect that he'll

5   find the entire two million dollars.  To not give Mr. Harvey

6   the benefit of 372(e) retention, under these circumstances,

7   with him actively pursuing litigation for our behalf, I think

8   is not appropriate.

9         The other action is an action against Deborah Midanek,

10   also a former director of the debtors, for breach of a

11   confidentiality agreement and for damages.  That action is

12   proceeding at pace, in the United States District Court for the

13   District of New Jersey.  And the Muho action is Southern

14   District of New York.

15         And the prosecution of that action is related to all

16   the other -- without getting into them, it is related to the

17   matters Your Honor will be considering on December 17th.  And I

18   will rely on Mr. Harvey's help and guidance in keeping me up to

19   speed and doing what he needs to do in that action.  So again,

20   under those circumstances, with those two offensive litigation

21   actions that he's pursuing on behalf of these debtors, we would

22   ask that he have the comfort, at least, of knowing he can be

23   retained, recognizing that fees are for another day.

24         THE COURT:  You understand why I'm not crazy about

25   having somebody working for the benefit of the estate and not

SOUNDVIEW ELITE LTD., et al.                          16

1   having some comfort that his firm would get paid for it.

2          MR. MARTIN:  Yes, Your Honor, I appreciate that.

3          THE COURT:  Let me confirm my understanding on what

4   you just said.  From what I heard, on the first of the two

5   non-Wilmington Trust matters that you were talking about, your

6   opponents, the guys at the other table, would have a shared

7   interest in success in that litigation, if the guy did, as

8   alleged, rip off the estate for two million bucks.

9          MR. MARTIN:  Absolutely.

10          THE COURT:  But on the second one, it sounded to me

11   like you were trying to use Patterson Belknap to act contrary

12   to your opponents, and it would be less likely that they would

13   endorse that aspect.  Of course I'm going to hear their

14   perspective, but I want to hear yours.

15          MR. MARTIN:  I think that's accurate.  The action,

16   just to put it in perspective, the first of those two actions

17   was filed post-petition.  And as I mentioned, the injunction

18   against the Citibank funds was obtained by Mr. Harvey last

19   week.  The second action we spoke about, which involves one of

20   the opponents, was filed by Mr. Harvey in either the spring or

21   summer.  So it predated these petitions, and frankly, pre-dated

22   my knowledge of these debtors.  So it hasn't been trumped up,

23   post-petition, to help in the litigation.  It's a matter that

24   existed and was proceeding apace, and we would like to continue

25   Mr. Harvey's work on that matter.  I believe there are motions

1    to dismiss, scheduled for November 18th, that Mr. Harvey has to

2    argue in Camden.  And there's work to be done.

3              THE COURT:  I understood from what you said, rightly

4    or wrongly, that he got a pre-judgment attachment.  If you

5    know -- and I'll let you ask Mr. Harvey if you don't -- are

6    there other potential gains to the estate that might be

7    advanced if I were to allow him to continue to act before the

8    17th of December?

9              MR. MARTIN:  Do you want to -- may Mr. Harvey address

10   the Court?

11             THE COURT:  Yes, and he can do it directly.

12             Welcome, Mr. Harvey?

13             MR. HARVEY:  Thank you, Judge.  Thank you for your

14   time.  The action against Muho actually arose from the

15   Wilmington Trust action.  Mr. Muho went to Wilmington Trust

16   after he left the debtors, and he tried to withdraw -- transfer

17   five million dollars.  He had created a new entity after he

18   left the debtors, called Leveraged Hawk, Inc.  He went to

19   Wilmington Trust, and he tried to persuade them to transfer

20   five million dollars to Leveraged Hawk.  The bank refused, and

21   brought an interpleader action, claiming that they were unclear

22   as to who had the rights to access the funds.  We intervened

23   and showed the Court, we thought, that Mr. Muho --

24             THE COURT:  The interpleader court?

25             MR. HARVEY:  The interpleader court in Wilmington,

SOUNDVIEW ELITE LTD., et al.                    18

1   Delaware, Superior Court, that Mr. Muho had no such authority.

2   In fact, prior to the hearing, Mr. Muho participated in a

3   telephone conference with the judge, and when he was asked who

4   was representing the corporate entity, Leveraged Hawk, he said

5   I will.  The judge said, well, you're not admitted --

6           THE COURT:  Forgive me for interrupting you --

7           MR. HARVEY:  Yes.

8           THE COURT:  -- Mr. Harvey, I still have a very full

9   courtroom.

10           MR. HARVEY:  Sure.

11           THE COURT:  I'm not so concerned about the merits of

12   the underlying controversy with this guy, especially since he's

13   not here in the courtroom, as far as I know, and I may have to

14   adjudicate it, in the first instance, although I'm not sure if

15   I'd have Constitutional power to issue a final order if it

16   proceeded here.

17           But what I need to know is a narrow question, the same

18   one that I asked Mr. Martin.  Is there stuff that you've got to

19   do immediately to protect the interests of the estate?  Because

20   if you were successful in putting a freeze at Wilmington Trust,

21   then it doesn't -- it sounds like that fire's been put out.  I

22   want to know if there are existing fires that need to be put

23   out, or things that you might do, between now and the 17th,

24   that would cause me to want you to continue --

25           MR. HARVEY:  Yes.

1        THE COURT:  -- to act between now and the 17th of

2   December.

3        MR. HARVEY:  Let me focus my attention on that

4   question, Judge.

5        THE COURT:  Please.

6        MR. HARVEY:  The answer's yes.  U.S. District Court

7   Judge Analisa Torres has entered, not only a TRO, but now a

8   preliminary injunction --

9        THE COURT:  Analisa Torres is here in the Southern

10  District.

11       MR. HARVEY:  That's correct.  She has entered not only

12  a TRO but a preliminary injunction against Mr. Muho.  We have

13  frozen his assets, in excess of 400,000 dollars at Citibank.

14  She has also granted us an order for expedited discovery.  We

15  know that Mr. Muho has more money.  We do not believe, in the

16  span of sixty days, he burned through over two million dollars.

17       We know some things.  We know, for example, he went to

18  Atlantic City, and went to the Borgata casino and spent money

19  there.  We know he also bought a luxury vehicle.  But we also

20  believe that money has been transferred out of Citibank to

21  other accounts.

22       We have a process pending with Citibank to discover

23  what transfers were made out of his accounts to other accounts.

24  We also have served him with discovery, as authorized by Judge

25  Torres.  And we intend to take his deposition later this month.

1    We believe that these discovery tools will help us identify
2    other funds that will come back to the debtor, at some point,
3    that Mr. Muho has taken from HSBC.
4         Essentially, when he failed to get money in
5    Wilmington, he went to HSBC in Monaco, and using what we
6    believe to be fraudulent documents, obtained the two million
7    dollars.  And so we have frozen what we have found in Citibank,
8    because the money was routed through Citibank here in New York.
9    We've frozen what is left.  We are trying to find the other
10   assets.  And Judge Torres has given us expedited discovery to
11   find exactly that, where are the other assets, where are the
12   other monies.
13        And so the problem that we have is that unless we
14   press him, and unless we act expeditiously, he's going to burn
15   through the money.  And the clock is essentially running on us.
16   And so that's why we're trying to act as quickly as we can.
17   We've been trying to serve him.  He's been alluding service of
18   our deposition notice.  And we're trying to get him in on a
19   deposition, and we are using process to obtain other
20   information.
21        THE COURT:  If he's a party, why -- how can he evade
22   service?
23        MR. HARVEY:  Well --
24        THE COURT:  Once you get jurisdiction over a person at
25   the outset of the litigation, you don't need to keep serving

1    him with subpoenas.

2            MR. HARVEY:  That's correct, but Judge Torres has

3    asked us to give him specific notice of the discovery tools and

4    specific notice of the deposition date.  And in order to

5    schedule the deposition, we have to make sure he knows about

6    it, so we don't set up, prepare to take the deposition, he

7    doesn't show up and then claim to Judge Torres later he didn't

8    know about it.

9            So essentially, the clock is running.  We are acting

10   as quickly as we can.  And we are trying to find this money

11   before he continues to spend it.  And we have a very limited

12   window, because he has shown a desire to spend as much of it as

13   he can, on himself, mostly, and perhaps to even start a new

14   business.  And so for that reason we are seeking it.

15           And with respect to the New Jersey action involving

16   Ms. Midanek, she has a contract with the debtors that prohibits

17   her from engaging in conduct that's detrimental to the funds.

18   What we are trying to explore is what monies she took out of

19   the debtors, what payment she has made to herself, what payment

20   she has made to Solon Group.

21           There are cross motions pending.  She has a motion to

22   dismiss.  We have a motion for expedited discovery so that we

23   can get in and take her deposition and obtain documents from

24   her relating to the monies that she has taken out of the debtor

25   and has expended on other matters.

1        And so everything we're trying to do, Judge,

2   everything we're trying to do, is to bring money back into the

3   debtors, not for any other purpose.  So our Muho action is to

4   find funds to bring them back, and our Midanek action is also

5   to find out from her how she spent the funds of the debtor, and

6   try to recover those funds by order of the Court.  And we just

7   have a very limited window.

8        THE COURT:  Okay, thank you.

9        MR. HARVEY:  Thank you.

10        THE COURT:  Mr. Martin, anything further before I give

11   your opponents a chance to be heard?

12        MR. MARTIN:  Yes, Your Honor, just -- I don't want my

13   lack of speaking on it to be deemed acquiescence.  The third

14   item I wanted to speak on was CohnReznick.  And frankly, for

15   all the reasons that I expressed with respect to Pinnacle, it's

16   critical that we have financial advisors who are assured,

17   again, subject to the fee application process -- are assured

18   that, should they do their job and do it well, and Your Honor

19   ultimately finds that it was appropriate, the steps that have

20   been taken, that they have some assurance that they will be

21   paid at that time.  And Mr. Bernie Katz of CohnReznick is in

22   court, if the Court has any questions.

23        THE COURT:  Okay.  Mr. Glenn, do you want to be heard

24   first?

25        MR. GLENN:  Thank you, Your Honor.  I'm not going to

1    address the issues of the Porzio retention.  We're going to

2    rest on our papers.  I think the liquidators have some items to

3    add with respect to that.

4         Concerning Pinnacle, we were able to speak with Mr.

5    Smith, and I would indicate that he was helpful; he was

6    cooperative with us.  And our first inclination, when we heard

7    about the Pinnacle retention, was, you know, can't we use 542;

8    why is this necessary?  And what we learned was that it's

9    probably unhelpful, if not useless, to us, because the problem

10   with this debtor is that it essentially does not have many, if

11   not all, of the accounting records that a fund would typically

12   have, since around the 2009 or 2010 time frame.  So what

13   Pinnacle proposes to do, as we understand it, is to roll the

14   company forward, from 2009 to 2013, as if this bankruptcy had

15   never occurred.

16        Now, the problem with that is that it's obviously

17   expensive, it's not going to happen between now and the

18   hearing, and in our view, it sort of begs the question about

19   the fundamental leadership and direction of this company.  Yes,

20   some accounting work will need to be done, at some point in

21   time.  But someone's going to --

22        THE COURT:  Pause, please, Mr. Glenn.

23        MR. GLENN:  Yes.

24        THE COURT:  By whom?

25        MR. GLENN:  Well, that's the question.  That's the

1  question; under whose direction?  To cite one example --

2        THE COURT:  Well, under whose direction is not the

3  same question as by whom.  On one side, you have the guy or

4  woman who's giving the orders, and on the other hand, you have

5  the company that's taking the orders.

6        MR. GLENN:  Correct.  Correct.

7        THE COURT:  And I well understand your problems and

8  the JOLs problems with who's giving the orders, but I'm trying

9  to get my arms on who's going to take the orders, and whether

10  orders should be taken between now and the 17th.

11        MR. GLENN:  Well, two responses to that, Your Honor.

12  Most, or a significant portion, of the accounting that needs to

13  be done is questions regarding inter-fund and intra-fund

14  transfers within the Fletcher family of funds, both that are

15  debtors before Your Honor in this case, the cases under Mr.

16  Davis' auspices, the BVI companies that Ms. Midanek is running.

17  And it could very well be the case that the cost of doing this

18  process outweighs the benefit of it.  We could explore subcon

19  (ph.).  We could disregard all these intercompany claims.  The

20  creditors and redeeming investors, such as my client, could get

21  together and come up with a global resolution in this case

22  without undertaking that process.

23        And it's important to understand that the amount that

24  they want to charge for this is based on a variety of

25  assumptions that very well may not prove to be true, that there

1    are accounting records that would allow them to reconstruct and

2    roll forward the company's books and records, calculating the

3    net asset value of each fund, on a quarterly basis, from the

4    time Pinnacle was supposed to start working until today.   So

5    there's no guarantee that 240,000 dollars is going to be the

6    extent of the work that needs to occur.

7           I don't want to prejudice their litigation position by

8    my objection to this, and their position with the U.S. Trustee,

9    so consistent with Your Honor's indication, we would support an

10   extension to file schedules, and we would not use the fact that

11   they didn't file their schedules, within a certain amount of

12   time, against them on the 17th.

13          But what I think the critical issue here is, Your

14   Honor, the fact that the company doesn't have these books and

15   records since 2009 and 2010, is what it is.   That was the case

16   as of the petition date.   And whether they could rectify that

17   between now and December 17th, begs the question of why these

18   books and records didn't exist for years before these debtors

19   filed Chapter 11 petitions.   So --

20          THE COURT:   Pause, please, Mr. Glenn.   You talked

21   about issues vis-a-vis intercompany obligations and

22   intercompany transfers, or potential intercompany transfers.   I

23   had another case on my watch for a couple of years, Adelphia.

24   Your firm was actively involved; I'm not sure if you personally

25   were --

1            MR. GLENN:  I was.

2            THE COURT:  -- as involved as some of the others.  One

3    thing we learned in Adelphia was that doing the schedules and

4    statements required not just getting one's arms around the

5    obligations to the outside world, but getting one's arms on the

6    intercompany obligations.  Do you have a view, one way or the

7    other, as to whether any accurate schedules and statements

8    could be done, until there was more either forensic analysis,

9    or otherwise, vis-a-vis the intercompany obligations?

10           MR. GLENN:  Do I have a view as to whether an --

11           THE COURT:  Or am I going to have a situation, as I

12   did in Adelphia, where it was almost two years before schedules

13   and statements filed because of the inability to get

14   intercompany obligations fixed with satisfactory certainty.

15           MR. GLENN:  I don't think this debtor is anywhere near

16   as complicated as Adelphia, based on very preliminary

17   indications and my informal conversation with Mr. Smith, who

18   was helpful about this.  But there's no definitive end in sight

19   for this process, and I don't have any confidence that it can

20   be done before December 17th.  To my mind, this company is

21   divided into buckets.  It's a fund-to-funds investment vehicle.

22   So the third-party investments, if they exist, as has been

23   described to us, are in reputable, major, international hedge

24   funds.  We certainly can get accounting statements from those

25   funds, because they're provided to all their investors,

1   including the debtors and other people.  The cash is sitting in
2   Wilmington Trust; we hope it stays in Wilmington Trust, despite
3   some of the issues that have been described to us.  So the only
4   real issue here is what do we do with these inter-fund claims.
5   And I think that, as a matter of confidence in the process and
6   in the integrity of the process, that can't be done without
7   second guessing, without the possibility of significant regret
8   about the cost and the direction, in our view, without a true
9   independent fiduciary to run it.  Otherwise, if an independent
10  fiduciary is appointed by this Court, if the case moves to the
11  Cayman Islands, under the auspices of the liquidators, they're
12  going to have to revisit what has been done.

13          So in my estimation, if they're doing this for us, so
14  that we can get a snapshot of what this company is about, in
15  the next quarter or so, we don't want the money spent.  Okay.
16  We're going to freeze the record, as of the petition date.
17  We're not going to use the fact that they didn't do this post-
18  petition as some nefarious issue that independently warrants a
19  trustee or dismissal of the case in favor of the Caymans.

20          But given the cloud over these cases, and in my view,
21  the almost certainty, if the Court does appoint a third party
22  or the JOLs are running this case, that it's going to be second
23  guessed, there's going to be a do-over, why waste that money?
24  Let's do this right.

25          The Court scheduled this hearing for December 17th,

SOUNDVIEW ELITE LTD., et al.                                    28

1   based on a variety of issues: the government shutdown, as I

2   understand it.  And the case is being drawn out.  We shouldn't

3   use this stub period to sort of fill in that space, like gas

4   occupying a room, just because we have it.  Let's sort out

5   who's going to run this case and agree with that person, be it

6   Mr. Fletcher, be it a trustee, be it the JOLs, about the right

7   way to do this once and to do it once correctly.

8           With respect to Patterson Belknap, I'm going to divide

9   this into two pieces.  One is the Wilmington Trust and Midanek

10  actions, and the other is the Muho actions.

11          With respect to Midanek and Wilmington Trust,

12  Wilmington Trust, those funds are now frozen.  That case, as we

13  understand it, is on a suspense calendar.  Nothing is going to

14  happen in that case for the foreseeable future.  Whether Ms.

15  Midanek should remain in place begs the question, almost, about

16  the outcome of the trustee motion.  That case, as we understand

17  it, in New Jersey, is yet another struggle about who's supposed

18  to be running the funds, what authority Ms. Midanek had versus

19  Mr. Fletcher.  That's going to be sorted out between now and

20  we're on December 17th.  Again, if an independent fiduciary is

21  running this debtor, that person should have the right to

22  review the Midanek action and decide whether to move forward.

23  But it seems to us that it begs the question of who's going to

24  be running this fund and whether there really is a true dispute

25  over Ms. Midanek's stewardship of the funds she's running and

1    the Soundview funds before the Court.

2            THE COURT:  I'm confused then, Mr. Glenn; I'm not sure

3    which way that cuts.  I thought there were allegations that Ms.

4    Midanek was ripping off the estate, just like Muho was.  If I

5    misunderstood that, you or the others can help me.  But if it

6    is a matter of stuff that you or your allies might have the

7    same gripes against her that the existing management has, that

8    Mr. Harvey's quarterbacking, I'm not sure whether I should fire

9    Mr. -- not fire -- Mr. Harvey, I mean no disrespect.  I wonder

10   if I should put Mr. Harvey's Patterson Belknap firm on hold

11   while things clarify, or whether it advances the joint interest

12   to allow him to continue between now and the 17th.

13           MR. GLENN:  I fundamentally disagree with the

14   assertion that Ms. Midanek has ripped off these debtors.  If

15   that were the case, we'd see a motion for an order of

16   attachment like we saw in the Muho action, and I'll get to that

17   in a moment because I have very different concerns about that,

18   and based on what I've heard, I'm ready to revisit our position

19   with respect to that.  But there's no proof that we've seen

20   that Ms. Midanek took any money out of this company that she

21   wasn't entitled to.

22           The allegations that I've seen or that she might have

23   overcharged fees or that people disagreed with business

24   decisions she made but she's from a reputable firm in the

25   United States, she worked on many, many Chapter 11 cases, she's

1    a member of our community and I haven't seen proof of anything

2    either way but I'm very skeptical that Ms. Midanek should be

3    classified anywhere near where we see Mr. Muho and what he's

4    done.

5        Ms. Midanek was appointed by Mr. Fletcher as was Mr.

6    Muho as we understand it but the court in the British Virgin

7    Islands has reaffirmed her right to run the British Virgin

8    Island funds, not before Your Honor.  She filed a liquidation

9    petition in the Cayman Islands, which, as we understand it,

10   divested her of authority -- any authority with respect to the

11   debtors before Your Honor.  So if she were engaging in any

12   nefarious conduct, the last place she'd run is to a court that

13   would supplant her authority and investigate her.

14       So there are no guarantees of anything in life but we

15   are very, very cynical of an allegation that she's stolen or

16   siphoned away any money from the estate and there are none that

17   have risen to the level that Mr. Muho has engaged in.

18       THE COURT:  Is a corollary of what you just said that

19   you see no urgency in proceeding against Ms. Midanek?

20       MR. GLENN:  That's correct.  And she's party to the

21   proceedings before Your Honor.  So Your Honor can -- and she's

22   being deposed, I believe, after court today.  So if anyone

23   comes to us and identifies any improper transfer, we'll be

24   right back here before Your Honor to support that petition

25   because we're not going to bite our nose to spite our face and

1    that's a good segue into Mr. Muho.

2         As we understood it, when the Patterson Belknap

3    application had been filed, before that time, we understood

4    that there was litigation between Fletcher and Muho.  That was

5    out in the open in Delaware.  We were not aware of this two

6    million dollar transfer from Monaco to Mr. Muho until the

7    Patterson Belknap application was filed.  We saw that there was

8    an order of attachment and we saw that there were funds

9    attached and we understood that the work was essentially done

10   and that that would be frozen and we could wait until December

11   17th.

12        If there's a deposition to be done between now and

13   December 17th, if their serviced to be issued to Mr. Muho, if

14   there's other activities that need to be done to freeze those

15   assets, we would withdraw our objection to allow those things

16   to happen between now and December 17th.

17        If they can identify more assets, great.  It should be

18   on an agreed upon basis so that we keep the ship righted.  And,

19   again, we're not going to stop them from doing that and we

20   would withdraw our objection to allow whatever minimum amount

21   of work needs to be done between now and the 17th so that the

22   estate's rights are not prejudiced in that interim period.

23        Concluding with the CohnReznick firm, there's

24   absolutely nothing in that application and there's nothing in

25   the reply to our objection indicating any urgency in moving

1  forward with that firm between now and December 17th and

2  there's nothing that counsel has articulated today.  If there

3  is anything, we'd like an opportunity to be heard with respect

4  to that but we think that that firm's retention can wait

5  without prejudice to anyone between now and December 17th.  And

6  I'm sure if we make a contrary point on December 17th, Your

7  Honor will remind us of the position we took today.  We're not

8  going to do that.

9          THE COURT:  Okay.

10         MR. GLENN:  Thank you.

11         THE COURT:  Now, let me hear from JOLs.  Mr. Engel?

12         MR. ENGEL:  Yes, Your Honor.

13         I generally agree with Mr. Glenn and as to the Muho

14  situation, I agree as well that can go forward.

15         Speaking to the Midanek situation, if you look at that

16  closely as we do, you will see that this is another Mr.

17  Fletcher controlled governance fight.  This time it involves

18  BVI and indirectly the Caymans as well.  There's absolutely no

19  reason for this Court to allow the debtors to start another

20  governance by -- it is totally counterproductive and ill-

21  advised for lots of reasons and certainly doesn't need to

22  happen between now and December 17th.  There's no reason for

23  that at all.

24         The JOLs have their own investigations.  We look at a

25  variety of things and we think that the Deborah Midanek

 1   situation is the lowest point of investigation of our concerns.

 2   And, basically, she's a whistleblower and this is a retribution

 3   is the way it appears to us.

 4       As to the CohnReznick situation, I totally agree with

 5   Mr. Glenn.  There is no basis for that and whatever work they

 6   did would have to be redone.  After the 17th, it would be not a

 7   productive expenditure.  Having been through depositions in the

 8   last week with three of the directors, I see no basis for

 9   CohnReznick to be needed for the 17th at all.  I'm sure they

10   have some ideas but they're not apparent to me and I was

11   looking for them as we went through that discovery process.

12       So we strongly oppose the Belknap Midanek situation,

13   we oppose CohnReznick.  And as to Porzio, let me clarify our

14   objection.

15       It was not to keep them from their work on the 17th.

16   We heard Your Honor.  We understand the debtors' rebel

17   government in exile needs to be represented by counsel.  Fine.

18   They can do that on the 17th.  But what's happening, in fact,

19   is far beyond that and it -- it is objectionable beyond that.

20       And so, for example, I'd invited Warren to update his

21   conflict disclosures because there's new information that the

22   Court should have that we think bears on all this which is the

23   fact that Porzio is representing at least two of the three

24   directors, officers, managers, the Fletcher team, personally.

25   And the third one is a money situation -- I can explain to you,

1   if you wish.  They may or may not be representing Mr. Saunders
2   but they are representing Mr. Ladner and they are representing
3   Mr. Fletcher individually and we think that that's
4   objectionable and creates all sorts of conflicts.

5        From our perspective, we're investigating Mr.
6   Fletcher, we're investigating Mr. Ladner and they're not just
7   potential defendants, they're also claiming to be creditors,
8   they're seeking indemnification, they're defense is to
9   indemnification.  How can debtors' counsel represent
10  individually those insiders under these circumstances?  I've
11  never seen that allowed as a matter of disinterestedness.  So
12  we have that concern with respect to Porzio.  So it's really
13  the scope of what it is that Porzio is doing that is the issue
14  here today not their defense on the 17th.

15       We're not trying to resist what Your Honor told us you
16  wanted to have happen.  We're accommodating that perspective;
17  we just don't want to get it out of control.  And what's really
18  blown this whole thing up, frankly, is the fact that they are
19  intermeddling in the -- someone for the debtor and in due
20  course we'll find out who, is intermingling and meddling in the
21  Cayman Islands in a very serious way.

22       The thing that distinguishes this case from all the
23  other cases that you're talking about is that we're here in
24  part because CIMA wants us here; the Cayman Islands Monetary
25  Authority.  The sovereign regulator of these Cayman companies

1    wanted the JOLs to be appointed.  They missed that whole point

2    in their opening affidavits the first day -- you still don't

3    understand from them in their papers why their role is seen as

4    so critical here but we have sovereign issues here with a

5    regulator who's never been stayed because of 362(b)(4) and

6    other reasons and yet they're telling -- they're instructing

7    people in Cayman not to answer our questions, not to cooperate

8    with involun --

9            THE COURT:  They, to whom you made reference, leads

10   that program?

11           MR. ENGEL:  The debtors, and they include the Porzio

12   firm, I believe, have told Stuarts, for example, not --

13           THE COURT:  Who is Stuarts?

14           MR. ENGEL:  That's a law firm in the Cayman Islands,

15   Your Honor.

16           THE COURT:  Acting for whom?

17           MR. ENGEL:  Acting for the debtor; Soundview in the

18   Caymans.  They were party to the action in the Caymans.  And

19   under Cayman law, they're accountable to the JOLs.  They're

20   supposed to cooperate with the JOLs, they're supposed to turn

21   over records.  And what's going to happen, I suppose, is that

22   CIMA is going to have to -- to go to their Cayman people.  If

23   we're not -- if we're supposedly stayed for asking for

24   information, which is what we're doing, and trying to do it

25   informally rather than trying to use discovery, we'll, I guess,

1    have to have CIMA do it.  I mean they're certainly not stayed.

2             From the Cayman perspective, this meddling in the

3    Caymans is a serious, serious sovereign issue.  And the worst

4    part of it, economically, and I'm sure this alarms the real

5    parties-in-interest here, the major investors, is HSBC came and

6    told CIMA that someone, a "a director" was trying to move

7    assets out of the Cayman Islands.  Now, they deny there even

8    are assets in the Cayman Islands but we believe there are, we

9    believe that's the registered place where HSBC came into hold

10   the securities.  We can't have people moving assets out of the

11   Cayman Islands between now and the 17th.  This was supposed to

12   be a status quo maintenance situation.  And we can't get HSBC

13   to talk to us because they're told by Porzio they're violating

14   the stay.  Everybody's afraid of the stay.  But it doesn't

15   apply to CIMA and it doesn't apply to CIMA's agents and we

16   don't think it should apply to the JOLs either.

17            So what I'm suggesting to Your Honor, is not that

18   Porzio doesn't represent them on the 17th, I'm not trying to

19   change history and I'm not trying to move back -- the last

20   thing I want to do is move back the date, what I am suggesting

21   is that the legitimate scope of what they're doing should be

22   narrowed to what they're supposed to be doing in the interim

23   period which is getting ready for the 17th.

24            We have never tried to restrict them for what they

25   tried to do on the 17th here.  We're just trying to keep the

1   scope of it to that.  And Mr. Martin is correct, maybe I should

2   have filed a request for a protective order and that seems a

3   lot of cumbersome more expensive, et cetera, than just trying

4   to address this question directly to Your Honor but

5   fundamentally, there's going to be unnecessary conflict if the

6   scope of that representation continues to expand into the

7   Caymans.

8           And what triggered all this is that there's an

9   upcoming motion to hire Stuarts.  Well, as soon as that happens

10  over objections, I expect, we then get into some really

11  interesting questions because, for instance, if they try and

12  use Stuarts as an expert up here, then the question becomes

13  experts don't have privileges anymore, now, we're cross-

14  examining our own debtor on our own privilege to waive the

15  privilege.  I mean it's counterproductive, right?  I mean,

16  the -- things are getting out of control.  Your Honor should

17  understand that.  The scope of what Porzio was doing should be

18  limited in a reasonable way and that's my major concern for

19  Your Honor today.  Do you have any questions?

20          THE COURT:  Not that I didn't already ask you.

21          MR. ENGEL:  I'm sorry.

22          THE COURT:  Not that I did not already ask you.

23          MR. ENGEL:  Thank you.

24          My colleague has a brief comment on Pinnacle and then

25  we're --

 1          THE COURT:  Mr. Hildbold?

 2          MR. HILDBOLD:  Good morning, Your Honor.  Billy

 3  Hildbold on behalf on the JOLs.

 4          We also had a productive conversation with Mr. Smith

 5  and we did not file an objection because it was our

 6  understanding that the books are in such disarray that they

 7  needed someone to be working on them and it was our

 8  understanding that it was going to take a while to get this

 9  done.  We were not led to believe that this would be done by

10  the 15th but that this was an ongoing project.

11          We do have concerns, the same concerns that Pasig

12  raised about revisiting the costs and understanding that at the

13  end of the day it's largely Pasig's dime so we are concerned

14  about this and --

15          THE COURT:  I'm losing you in pronouns.  You're

16  concerned about what?  I thought you said half-a-second ago

17  that you weren't objecting to the Pinnacle retention.

18          MR. HILDBOLD:  Right.  We did not object because --

19  because of the disarray of the books but we do have concerns

20  about the cost.

21          THE COURT:  So your problem is not that Pinnacle

22  serves, it's the price at which Pinnacle would serve.

23          MR. HILDBOLD:  Right.  Mostly because we weren't made

24  aware of the negotiations that took place, how this price was

25  arrived at.  As Mr. Glenn said, from what we understand, it was

1  largely based on assumptions to get this work completed by the

2  15th.

3          THE COURT:  The 15th of what?  I lost you.

4          MR. HILDBOLD:  I believe November 15th to the

5  schedule.  Correct?

6          THE COURT:  Oh, the debtors' existing deadline for

7  filing schedules.  Is that right?

8          MR. HILDBOLD:  Right.

9          THE COURT:  Well, what about the point that I asked

10 Mr. Glenn?  If you have intercompany obligations, do you think

11 the best accounting firm in the world could do schedules and

12 statements before the 15th or any date before the 17th or any

13 date before the summer of 2014?

14         MR. HILDBOLD:  We don't know that it's that

15 complicated, as you described earlier in Adelphia, but we do

16 have concerns that this could not be completed by the 15th.

17         THE COURT:  All right.  I'm losing my bearings in this

18 to a certain extent.  I'm trying to get my arms around the

19 extent, if any, to which I still have objections to the

20 retention of Pinnacle as a conceptual matter and apart from

21 that, as a level two issue, whether there is agreement that

22 Pinnacle's fine, nobody's said anything bad about Pinnacle

23 itself, whether people simply want to have the opportunity to

24 have input as to its cost.

25         MR. HILDBOLD:  Let me make sure I under --

1          THE COURT:  And I want just not -- I want not just

2    your position but your understanding of the other guy's

3    position.

4          MR. HILDBOLD:  I think my understanding from Mr. Glenn

5    is that this is not -- they're not capable of completing this

6    before --

7          THE COURT:  "They" being Pinnacle?

8          MR. HILDBOLD:  Yes, sir.  That they are not capable of

9    completing this before the 17th and, therefore, their retention

10   should not go forward before then because it's not required.

11         THE COURT:  Um-hum.  And your view is to what extent

12   similar and to what extent different?

13         MR. HILDBOLD:  I believe that our position is similar,

14   although as the JOLs, we recognize that at some point this work

15   will likely need to be done.

16         THE COURT:  And that Pinnacle would be good as any an

17   entity to do it?

18         MR. HILDBOLD:  As far as we know at this time.

19         THE COURT:  Um-hum.  All right.  Anything else?

20         MR. HILDBOLD:  No, sir.

21         THE COURT:  All right.  Ms. Ostad and then I want to

22   hear from Mr. Zipes.

23         MS. OSTAD:  Good morning, Your Honor.

24         I omitted to mention when I introduced myself this

25   morning that I also represent the Solon Group, Inc. and Deborah

1    Midanek, its principal.

2            And to correct something that Mr. Martin said earlier,

3    it is actually the Solon Group and not Ms. Midanek in her

4    personal capacity that was appointed at the request of Mr.

5    Fletcher to be a director of a number of the Richcourt funds

6    including these debtors and who essentially resigned from these

7    debtors' boards in order to bring creditor petition on behalf

8    of the BVI entities that Solon is the director of in the Cayman

9    Islands.  And unfortunately, it was because Ms. Midanek had the

10   audacity to see that she had fiduciary duties to investors and

11   brought those petitions that she was sued in her individual and

12   personal capacity in late July in the District of New Jersey on

13   allegations of --

14           THE COURT:  Which vicinage?  Down in Camden did I hear

15   somebody say?

16           MS. OSTAD:  I believe so, Your Honor.  I'm not counsel

17   in that case.  It is pending in federal court in the District

18   of New Jersey --

19           THE COURT:  Um-hum.

20           MS. OSTAD:  -- on claims of disparagement, breach of a

21   confidentiality provision of her contract as a director and for

22   damages relating to those.

23           Your Honor may have noticed that I involuntarily

24   jumped out of my chair earlier and that is because it is for

25   the very first time during Mr. Harvey's addressing the Court

1   that I've heard that there's even a mention or a question of

2   Ms. Midanek taking monies from these debtors in an unauthorized

3   manner.

4            I should note to the Court that there are nine

5   accounts aside from the six accounts that are frozen to these

6   debtors at Wilmington Trust, there are nine other accounts

7   which include the accounts that my client is -- well, BVI

8   entities that are my clients and Solon is a director of that

9   are also frozen at Wilmington Trust that are not the subject of

10  these proceedings.

11           It is because of those frozen accounts that we've been

12  very, very judicious in my involvement in these cases, my

13  filing of pleadings in these cases and so forth because we're

14  dealing with funds that also Solon is the director of that are

15  themselves in need of an orderly wind down.

16           So it's my belief, Your Honor, and I've asked the

17  debtors' counsel on several occasions in the past few weeks

18  that we agreed to stay those New Jersey proceedings because

19  there's no prejudice in waiting until after the December 17th

20  hearing because I believe that another fiduciary, if there is

21  one appointed, will make different decisions about whether

22  those suits should -- that suit should proceed.

23           Ms. Midanek's separate counsel has moved to dismiss

24  that proceeding or in the alternative to stay it or have the

25  Court abstain pending the outcome of these proceedings.

1          After those --

2          THE COURT:  But those -- normally when I'm staying

3    another court, I do it in more gentlemanly way.  I pick up the

4    phone to the district judge or whoever it is and say, hey,

5    listen, I don't like to stay you but I would appreciate it if

6    you would put things on hold for a while and I assume that from

7    your perspective that would skin the cat.

8          MS. OSTAD:  I believe it would,  Your Honor, but it's

9    only be after we've had, through other counsel, to brief

10   matters before that court now and the debtors have also made

11   emergency requests for expedited discovery there, none of

12   which, I was told, seek to have discovery about monies being

13   taken but simply to explore jurisdictional and related issues.

14   And again, in the interest of economy of these debtors' assets

15   and others, we'd ask for those matters to be stayed.  And it

16   really -- the denial of that request has fueled our concerns

17   that this is a personal vendetta to make matters as expensive

18   as possible for Ms. Midanek.  Unfortunately, these are

19   indemnifiable actions but --

20         THE COURT:  Indemnifiable actions are, nevertheless,

21   pre-petition debts and there is not easy way to make any

22   payment on indemnifiable obligations.

23         MS. OSTAD:  Yes, Your Honor.  It would be acceptable

24   to us to freeze those proceedings or stay them pending the

25   outcome of the December 17th hearings, Your Honor.

1     THE COURT:  Let me rephrase the question, Ms. Ostad.

2          Can I, in fairness to both sides, if I tell Mr. Harvey

3  that he's got -- he doesn't yet have authority to act in the

4  Midanek action, can I do that in a way that doesn't prejudice

5  the company in the event that you're view of the world isn't

6  the only view of the world?

7     MS. OSTAD:  I believe that, perhaps, we can agree that

8  the matters that are before the New Jersey court in connection

9  with Ms. Midanek's motion to dismiss or stay has been fully

10 briefed by both sides.  That's my belief and that the matter is

11 subjudice without further oral argument unless it's requested

12 by the district court --

13     THE COURT:  To what extent have issues already been

14 fully briefed in that action?

15     MS. OSTAD:  With respect to the motion to dismiss,

16 they have been fully briefed.

17     THE COURT:  And that's a motion that you filed or your

18 co-counsel filed?

19     MS. OSTAD:  My co-counsel filed, yes.  And there is a

20 separate motion for expedited discovery that I believe is

21 returnable on the 18th of November there that has, I believe,

22 been opposed by my co-counsel and we has just informally

23 requested --

24     THE COURT:  Opposed?

25     MS. OSTAD:  Opposed.  And we have been formally

1    requested that parties agree to simply hold that discovery in

2    abeyance pending the outcome of the December 17th hearing.

3         I believe we can agree that if it is held in abeyance,

4    that there is no prejudice to either side in seeking it again.

5         THE COURT:  Who is the named plaintiff in the Midanek

6    action?

7         MS. OSTAD:  Deborah Midanek.

8         THE COURT:  She's plaintiff?

9         MS. OSTAD:  I believe it's Deborah Hicks Midanek that

10   is the named plaintiff.

11        THE COURT:  Oh, I thought she was the defendant.

12        MS. OSTAD:  Oh, I'm sorry; Your Honor, I misspoke.

13        The named plaintiffs are fifteen funds which -- six of

14   which are the debtors and nine of which are other Richcourt

15   funds, all of whom have Fletcher Asset Management or related

16   management companies as their managers and all of whom have Mr.

17   Fletcher as a director.

18        THE COURT:  What name for that lawsuit would be

19   meaningful to the New Jersey District Judge?

20        UNIDENTIFIED SPEAKER:  The plaintiff is attached to

21   Mr. Harvey.

22        MS. OSTAD:  I believe it's In re Richmond -- Richcourt

23   Funds, Limited, et al., but I'm not positive.

24        THE COURT:  Richcourt -- all right.  It's in the

25   Harvey affidavit?

 1          UNIDENTIFIED SPEAKER:  Yes.  Attached to the Harvey
 2  affidavit and --
 3          THE COURT:  All right.  That's good enough.  If I
 4  decide to go that route, I got what I need.  All right.
 5          Anything else, Ms. Ostad?
 6          MS. OSTAD:  I would be happy, Your Honor, to provide
 7  the court clerk with the case number as well.
 8          THE COURT:  Um-hum.  Anything else?
 9          MS. OSTAD:  Other than that, Your Honor, we support,
10  and have not filed separate papers, but support the objections
11  that have been filed to the various retention applications.
12          THE COURT:  All right.
13          MS. OSTAD:  Thank you.
14          THE COURT:  Mr. Zipes?
15          MR. ZIPES:  Greg Zipes with the U.S. Trustee's Office
16  on what is sort of a side issue in connection with all this
17  litigation.
18          My office did agree to a deadline.  It's part of a
19  back-and-forth that typically takes place with debtors and
20  until the debtors are displaced in some fashion we deal with
21  the hand we're dealt.  Obviously, it's not a court order it's
22  just a promise that we won't do something before that date
23  based on a failure by the debtor.
24          If the debtor is having specific issues with filing
25  schedules -- and we always work to get those filed as quickly

1   as possible and everybody is usually on board with that, more

2   transparency is better than less transparency.  But if there is

3   some issue or if there's a money issue or something like that,

4   we'll typically approach the debtor and ask, is there some

5   portion of the schedules that can be filed, or is there

6   something that can be filed to at least give some disclosure in

7   the meantime.

8        And we did -- if we knew that this was a specific

9   issue in this case, we might have recommended, and we do

10  recommend that perhaps some middle ground could be met with the

11  schedules so that something's on file if the work has been

12  done, subject to review and subject to revisiting if there's a

13  change in control of this debtor at some point in the near

14  future.  And obviously, having that information out in some

15  form may be helpful at the next hearing.

16        And I've heard the parties, that they're not going to

17  use this filing of schedules as evidence or lack of evidence of

18  bad faith, and so it would just be another piece that this

19  Court can use in deciding whether -- what to do when the

20  hearing occurs on the 17th.

21        THE COURT:  Um-hum.

22        MR. ZIPES:  So we would obviously defer to the Court

23  if the Court wants to extend times for the schedules.  And we

24  wouldn't require a separate application in that regard.

25        THE COURT:  Um-hum.  Do you have a position vis-a-vis

1    what Mr. Engel said about Porzio not being disinterested?

2            MR. ZIPES:  Your Honor, I didn't review that retention

3    application.  All I can say is that if there was some lack of

4    disclosure, my office would be very concerned about that.  And

5    I --

6            THE COURT:  I think the problem is exactly the

7    opposite of lack of disclosure.  His contention is that what

8    was duly disclosed is a disabling cup.

9            MR. ZIPES:  And, Your Honor, we are faced with that as

10   well.  And oftentimes we'll ask for disclosure without fully

11   understanding that we don't have the background of the

12   creditors.  If it turns out that there was a disabling -- this

13   is a disabling conflict, then obviously we'll review the

14   situation and bring it to the Court's attention, if other

15   parties don't do so in the meantime.

16           But for example, if funds come from a third party to

17   fund the debtor, we'll ask for a disclosure of that fact and

18   then someone might subsequently come forward and say, well,

19   that -- that actually is creating a conflict in the case, we

20   didn't necessarily recognize it as such when the disclosure was

21   made.  So --

22           THE COURT:  All right.  Folks, I've heard plenty.

23           But I want to hear, Mr. Martin, your views and your

24   position on the allegation of disinterestedness deficiencies.

25           MR. MARTIN:  Thank you, Your Honor.  And with all due

1    respect, I think Your Honor -- and I'll repeat it.  Mr. Engel
2    can correct me if I get it wrong.  But I think Your Honor
3    misunderstands Mr. Engel's new allegation.  And it is a new
4    allegation.  It is not a disclosure.  It is not a disqualifying
5    conflict that has been disclosed.  It is something that has not
6    been disclosed.  And let's talk about it precisely and clearly.
7            The debtor presented two officers and a corporate
8    secretary for depositions over the last week.  A third of those
9    depositions of Mr. Fletcher was concluded yesterday.  At each
10   deposition at some time during the deposition the party
11   examining the witness asked the witness, who's your lawyer, and
12   the witness responded Porzio, Mr. Martin.  And the questions
13   then proceeded to, well, are they representing you in your
14   individual capacity, or in some other way.  And in each case I
15   put a representation on the record that pursuant to typical
16   indemnity agreements between companies and directors, the
17   company -- for purpose of today's deposition, the company is
18   providing a defense.  That's it.
19           Five minutes before we came up to see Your Honor today
20   Mr. Engel said, would you put on the record -- would you
21   announce -- and frankly, we just didn't get to it -- that
22   you're representing the individuals.  And I intended to
23   disclose exactly what I just disclosed, which is at those
24   depositions, the company, the corporate officers and
25   directors -- and that was the capacity in which the company was

1    representing them -- did not have separate individual counsel.

2          I, frankly, don't know of a single question and/or

3    answer that somehow created some personal liability for some

4    individual.  If I've been ambushed in some way and there's some

5    law that I'm about to be made aware of that a company should

6    not, it's inappropriate.  The company speaks through their

7    officers and directors.  For me to state on the record that I

8    was -- the company was, in fact, representing them in their

9    capacity as officers and directors for purposes of the

10   deposition, then I'll stand corrected, if that's in some way

11   wrong.  But that's the extent of it.

12         I am not representing individuals parallel to the case

13   in some other matters.  The company provided a defense at their

14   deposition, period.  I'm repeating myself.

15         Is that all Your -- that's the only thing I wanted to

16   say about Porzio.

17         THE COURT:  That's the only thing I need you to say.

18   I won't put a sock in your mouth if you want to say anything

19   else, but we've taken a lot of time on this --

20         MR. MARTIN:  With re --

21         THE COURT:  -- so I think at this point we don't need

22   to say a whole lot more.

23         MR. MARTIN:  All right.  Let me say a couple of

24   things.  I want to describe, because I want to try to get some

25   clarity in the record, in three sentences that hopefully no one

1  would object to, the role and position of Ms. Midanek versus

2  the debtors, because there's been a lot of banter about it.

3           Ms. Midanek is a turnaround professional who Mr.

4  Fletcher brought in in mid-2013 to help these debtors.  He

5  appointed her as a director.  As you've heard, there's sort of

6  two groups of debtors.  Sorry, two groups of Richcourt funds.

7  These debtors fall under the umbrella of the Richcourt funds.

8  There are the British Virgin Islands Richcourt funds and there

9  are the Cayman Richcourt funds.

10          Ms. Midanek succeeded in essentially a takeover of the

11  British Virgin Islands funds and a forcing out of Mr. Fletcher.

12  That was done while she was subject to fiduciary duties to the

13  debtors, a duty of care and loyalty under a signed agreement

14  and a confidentiality agreement.

15          Third sentence, final.  She then used that position as

16  now controlling the British Virgin Islands funds because of the

17  interentity claims; to use those claims to bring the winding of

18  petitions against the debtor in the Caymans to explain to the

19  Cayman's monetary authority all the things that were wrong with

20  Mr. Fletcher, and what, essentially, is what got the other

21  parties up in arms and is why we are here today.

22          So this lawsuit against Ms. Midanek, again, let's get

23  the timing straight, started before winding up petitions in the

24  Caymans, before these bankruptcies.  And Mr. Harvey is our

25  attorney representing us in those.

1    With respect to Pinnacle and Mr. Katz -- and I think

2    there's sort of a -- in my view -- and parties can differ, but

3    in my view ought to be considered together.  We've heard a lot

4    of attorneys saying whether schedules can or can't be completed

5    in time, whether there's enough information, not enough

6    information.  None of the people you've heard from, including

7    me, are really qualified to tell you about that.

8    Suffice it to say we will have schedules on the U.S.

9    Trustee's time frame based on our internal records, with or

10   without Pinnacle.  Would we like to continue to have Pinnacle's

11   help and Mr. Smith, who's been working eight hours a day, as I

12   said, and cleared his calendar, in verifying and getting the

13   best information possible?  Yes.

14   And finally, what are bankruptcy cases about if not

15   assets, and liabilities, and claims?  I need Mr. Katz.  Mr.

16   Katz is a forensic accountant, among other things, and Mr. Katz

17   will be -- we haven't gotten the pretrial order yet, but he

18   will be on my witness list for December 17th.

19   THE COURT:  Katz is a Pinnacle employee?

20   MR. MARTIN:  No, Katz is CohenReznick.

21   THE COURT:  Oh.

22   MR. MARTIN:  Katz is the financial advisor.  So he is

23   the debtors' financial advisor, the debtors' accountant; and to

24   me, it's two sides of the same coin.  So can we do schedules

25   without Pinnacle?  Yes, if we have CohenReznick.  And I suspect

SOUNDVIEW ELITE LTD., et al.                    53

1   Mr. Katz is a professional and will continue to work whether or

2   not you carry his retention, but I don't understand the need

3   for carrying when we are always protected by the fee

4   application process.  Thank you.

5           THE COURT:  Not quite, Mr. Martin.

6           MR. MARTIN:  Okay.

7           THE COURT:  I was dealing with it in conceptual terms.

8   I didn't focus on the terms of the CohenReznick retention.  Is

9   he getting paid on an hourly rate, or is there some kind of --

10          MR. MARTIN:  It's hourly, Your Honor.

11          THE COURT:  An hourly alone, no success fee or any of

12  that stuff?

13          MR. MARTIN:  No success fee.

14          THE COURT:  So all we're talking about is letting him

15  get paid for whatever hours that he works between now and the

16  17th?

17          MR. MARTIN:  That's correct.

18          THE COURT:  Okay.  Thank you.

19          MR. ENGEL:  Your Honor, just one minute?

20          THE COURT:  Yes, Mr. Engel.

21          MR. ENGEL:  Very quickly.

22          THE COURT:  I'll hear you too, Ms. Ostad.  Sit down,

23  please, ma'am.

24          MR. ENGEL:  Very quickly.  Mr. Fletcher was deposed in

25  every capacity, not just as an officer or director of these

1  debtors.  He was also asked questions as a director/manager, et

2  cetera, of other nondebtor affiliates who engaged in wrongful

3  transactions with these debtors.  He was asked questions in his

4  individual capacity as to a variety of other things that we're

5  investigating.  Again, none of this is just a matter of

6  representing a corporate officer as to what he did as a

7  corporate officer.  It was much more wide ranging than that.

8          And frankly, Mr. Fletcher, and the same is true for

9  Mr. Ladner, they have lots of lawyers.  It doesn't have to be

10  Porzio.  And all we're suggesting is that we not create more

11  conflict, because I don't know how --

12          THE COURT:  You're suggesting that at this point in

13  the case I make the debtors' law firm -- the debtor hire a

14  different law firm?

15          MR. ENGEL:  Yeah, that's right.

16          THE COURT:  Uh-huh, all right.  Ms. Ostad.

17          MS. OSTAD:  Your Honor, I would just like to reserve

18  all of my clients' rights with respect to the comments made by

19  Mr. Martin about the takeover of the BVI funds, et cetera, et

20  cetera, and just reserve our rights.  Thank you.

21          THE COURT:  You've got a reservation of rights.

22          All right, everybody sit in place.

23      (Pause)

24          THE COURT:  All right, ladies and gentlemen, my

25  rulings in some respects will be similar, and in other respects

1  will be different than the tentatives I articulated at the

2  outset of the hearing.  And because I laid out so much of my

3  thinking in my questions to all of you, I'm not going to flesh

4  out the bases for the exercise of my discretion to the same

5  extent that I might otherwise have done so.

6        The Porzio retention will be approved, as I said in my

7  tentatives under 327(a), but I am also ordering that within a

8  week of this date, or as any reasonable extension beyond that

9  might be requested, that the Porzio firm, Mr. Martin, you or

10  your designee, file a supplemental affidavit or declaration

11  laying out what you told us on the record today, vis-a-vis

12  exactly who you're acting for and explaining more if you wish.

13  And if anybody had any residual concerns vis-a-vis Porzio's

14  continuing to act, that matter can be revisited as part of the

15  proceedings on the 17th of December.

16        Of course, anything that happens on the December 17th

17  or as a consequence of that hearing could also bear on the

18  counsel situation thereafter, but I am not going to be

19  prejudging that in any way at this point in time.

20        So for the avoidance of doubt the Porzio firm will

21  have full freedom to act as it sees fit, not just with respect

22  to preparation of this -- for the 17th, but also vis-a-vis the

23  things that any 327(a) counsel has to do for the wellbeing of

24  the estate under its watch.

25        I am modifying my tentative vis-a-vis CohenReznick,

1  because with Mr. Martin's explanation it appears to me that

2  CohenReznick may be required to be a testifying witness at the

3  hearing, and the same principles that inform the exercise of my

4  discretion, vis-a-vis allowing Porzio to act for the debtors

5  under their existing management, cause me to believe that it

6  should have the witness support that it requires as well.

7          The continued services of CohenReznick after December

8  17th will be fair game for discussion on that date or

9  thereafter.

10         For the avoidance of doubt I am approving only an

11  hourly rate and I'm not dealing with the more difficult issues

12  that might be associated with any kind of success fee, if one

13  had been requested.

14         Vis-a-vis Patterson Belknap, I am authorizing

15  Patterson Belknap's service under 327(e) with respect to the

16  Muho litigation and anything that might be required to protect

17  the interests of the estates -- estates, plural, correct -- in

18  any battles with Muho.  But the request is denied without

19  prejudice otherwise, including for the avoidance of doubt, the

20  continuation of the Midanek litigation, except that I am

21  authorizing communications to the New Jersey court to advise

22  the New Jersey court of my ruling to avoid prejudice to the

23  interests of the estate on the one hand, or -- and also to

24  avoid any unfair advantage in the other direction on the other.

25         I see no need for services now vis-a-vis Wilmington

1   Trust.  All of these matters that are denied without prejudice

2   are fair game for bringing back to me after we know where we're

3   headed on the 17th of December.

4            Finally, the Pinnacle retention -- or more precisely

5   the motion to assume and assign -- excuse me, not to assume and

6   assign -- to assume Pinnacle arrangements is denied without

7   prejudice, again, until after we get a better handle on things

8   after the 17th, subject to two additional protective provisions

9   that I will impose.

10            First, the time for the debtors to file their

11   schedules and statements will be extended until thirty days

12   after December 17th, subject to further order of the Court and

13   without prejudice to the rights of any party in interest or the

14   U.S. Trustee program, to weigh in on whether further extensions

15   should be granted.

16            Secondly, the parties are encouraged to talk to Mr.

17   Smith or his designee, or anybody else at Pinnacle, to see if,

18   as is very possible, there would be consensus as to the need

19   for useful Pinnacle services.  And I'm going to give you the

20   ability to see if there are areas in which people see an

21   immediate need for Pinnacle to serve, and I certainly have a

22   very open mind vis-a-vis that.

23            My discretion in the Pinnacle respect is informed by

24   the view that I do not see an immediate need for the services

25   that Pinnacle would provide between now and the 17th.  If and

1    to the extent people did see a need, which, frankly, has not

2    been shown to me after all the discussion we had today, but

3    which I would approach with an open mind if it were to occur,

4    that could affect the exercise of my discretion going forward,

5    also for the avoidance of doubt.

6           Nothing has been said to me nor do I find any basis

7    for questioning the integrity, capability, or anything else

8    vis-a-vis Pinnacle.  And my exercise of my discretion here is

9    informed by the corporate governance disputes that permeate

10   this case, and this is nothing personal vis-a-vis Pinnacle.

11          All right.  Not by way of reargument, do we have any

12   open issues, Mr. Glenn?

13          MR. GLENN:  Your Honor, it's not for today, but I

14   don't want my silence to be deemed acceptance.  The Patterson

15   application which we had categorically opposed before the

16   recent update, indicated that the debtors were to pay fifty

17   percent of their fee, and the nondebtors would pay fifty

18   percent even though we represent only six of twelve -- fifteen

19   funds.  And there may be a justification for that, and we'll

20   talk to Mr. Martin to see if that's appropriate, but if it's

21   not, I just wanted to make sure that I wasn't waiving the right

22   to contest any appropriate portion of that.

23          THE COURT:  All right.  You're just looking for a

24   reservation of rights at this point?

25          MR. GLENN:  Right.  Correct.

1          THE COURT:  Okay, Mr. Martin?

2          MR. MARTIN:  I can go further and agree --

3          THE COURT:  Come to a mic if you would, please.

4          MR. MARTIN:  I'm sorry.

5          I think we can go farther and stipulate to what Mr.

6   Glenn proposed.  There are fifteen entities, if I'm not

7   mistaken, who are plaintiff in the Muho action, and Mr. Harvey

8   had a retainer which, frankly, was unallocated.

9          There are six debtors, and we have proposed that Mr.

10  Harvey's services be booked fifty/fifty.  And what Mr. Glenn is

11  suggesting, that it be a numerical ratio in terms of fees and

12  expenses, we agree.

13         THE COURT:  Okay.  Ms. Ostad, did you need to be

14  heard?

15         MS. OSTAD:  Your Honor, I have only today asked Mr.

16  Martin for his thoughts on this, and I think I've spoken to Mr.

17  Engel as well.  But one housekeeping issue as to the December

18  17th hearing that we've come across is that we'd like to submit

19  an affidavit of Cayman Island counsel on Cayman Island law

20  without necessarily the need to fly counsel in, but perhaps to

21  have an affidavit and to have counsel available on the phone at

22  the hearing.  And I wanted to see if Your Honor has any

23  thoughts about that.

24         THE COURT:  I always take direct testimony by

25  affidavit, but in any instance in which somebody wants to

1    cross-examine, I never take away the right to cross-examine.

2    So if you can convince your opponents not to cross your person,

3    then I won't insist on a personal appearance, but that's for

4    you to resolve.  I do not take cross-examination except live.

5          MS. OSTAD:  Thank you, Your Honor.

6          THE COURT:  Also, if this person is testifying as an

7    expert, then your opponents have the rights to compliance with

8    the expert rules.  So talk to your opponents about it.

9          I am very much of a mind to streamline hearings and to

10   avoid unnecessary costs, but not at the price of due process.

11         MS. OSTAD:  Thank you.

12         THE COURT:  Okay.  I see a whole bunch of more people

13   rising.  Are you rising to get out of here or to raise new

14   issues?

15         MR. HILDBOLD:  No, I just --

16         THE COURT:  Mr. Hildbold.

17         MR. HILDBOLD:  Yeah, just a housekeeping issue I

18   wanted to let the Court know that we did meet and confer with

19   the Porzio firm yesterday to discuss amending the agreed to

20   schedule.  There's been a few delays in getting documents and

21   depositions taken, so if it's okay with Your Honor, we would

22   submit an amended schedule to replace what is currently there.

23         THE COURT:  That makes me shrug my shoulders if it's

24   consensual, but I need to also ask you, do you envision just

25   rearranging things before the 17th or asking for an adjournment

SOUNDVIEW ELITE LTD., et al.                    61

1  beyond the 17th?

2       MR. HILDBOLD:  No, no, just rearranging things before

3  the 17th.

4       THE COURT:  Okay.  As long as you allow me enough time

5  to read stuff before the trial date.

6       MR. HILDBOLD:  Of course.

7       THE COURT:  Okay, anything else?

8       MR. HILDBOLD:  No.

9       THE COURT:  All right.  Those who are here then on

10  Soundview are excused.  We're going to take only a five-minute

11  recess and then I'm going to hear WineCare.

12       (Whereupon these proceedings were concluded at 11:39 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              I N D E X

3

4                              RULINGS

5                                              Page      Line

6    Porzio retention approved                 55        6

7

8    CohenReznick's retention approved         55        25

9

10   Patterson Belknap's retention approved    56        14

11   with respect to Muho litigation

12

13   Services of Wilmington Trust denied       56        25

14

15   Pinnacle retention denied without         57        4

16   prejudice

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T I O N

3

4      I, Sharona Shapiro, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7

8

9      _____

10     SHARONA SHAPIRO

11     AAERT Certified Electronic Transcriber CET**D 492

12

13     eScribers

14     700 West 192nd Street, Suite #607

15     New York, NY 10040

16

17     Date:  November 7, 2013

18

19

20

21

22

23

24

25