MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
John A. Pintarelli
James J. Beha II
William M. Hildbold

*Counsel for Peter Anderson and Matthew Wright,*
*As Joint Official Liquidators of Soundview Elite Limited,*
*Soundview Premium Limited and Soundview Star Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------

| | | |
|---|---|---|
| In re: | ) | Case No. 13-13098 (REG) |
| | ) | (Jointly Administered) |
| | ) | |
| Soundview Elite, Ltd., *et al.* | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

------------------------------------------------------------------

**THE JOINT OFFICIAL LIQUIDATORS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION TO DISMISS WITH PREJUDICE AND FOR
<u>RELATED RELIEF</u>**

## **Table of Contents**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 4

    A.    The Parties ........................................................................................... 4

        1.    The Limited Debtors ................................................................ 4

        2.    The SPV Debtors ..................................................................... 8

        3.    The JOLs .................................................................................. 8

    B.    CIMA's Regulatory Authority Over the Limited Debtors ................... 10

    C.    Events Leading up to the Filing of the Cayman Winding Up Petitions .............. 10

    D.    The Cayman Winding Up Petitions .................................................... 12

    E.    The Chapter 11 Cases ......................................................................... 17

    F.    The FILB Bankruptcy Proceedings, Trustee Report, and Disclosure
        Statement ............................................................................................ 18

    G.    The Fletcher Team Has Frustrated the JOLs' Efforts to Liquidate the
        Assets of the Limited Debtors for the Benefit of Creditors and Investors .......... 19

ARGUMENT ................................................................................................................... 20

I.    THE FLETCHER TEAM SHOULD NOT REMAIN IN CONTROL OF THE
    DEBTORS ............................................................................................... 21

    A.    The JOLs Investigation Has Revealed Multiple Instances of
        Mismanagement, Self-Dealing, and Failure to Comply with Legal and
        Regulatory Requirements by the Fletcher Team ................................ 22

    B.    All Relevant Stakeholders and Third Parties Agree That the Fletcher Team
        Should Not Govern the Limited Debtors ........................................... 27

II.    THIS COURT SHOULD ACKNOWLEDGE THE JOLS AS THE DEBTORS'
    CONTROLLING AUTHORITY ............................................................. 30

    A.    The JOLs are the Stakeholders' Preferred Governance and are in the Best
        Position to Manage an Efficient Winding Up of the Debtors .............. 30

        1.    The JOLs are Experienced, Independent Fiduciaries Supported by
            the Debtors' Stakeholders ...................................................... 30

        2.    A Winding Up Under The JOLs' Control is Preferable to
            Appointment of a Bankruptcy Trustee .................................... 31

        3.    Winding Up Under the JOLs Will Avoid Competing and
            Duplicative Proceedings and Investigations ........................... 34

        4.    Winding Up Under the JOLs Will Reduce Unproductive Litigation ...... 35

5.      Only The JOLs Can Propose An Integrated Solution to Stakeholders ........................................................................ 36

6.      Winding Up Under the JOLs Would Comply with Governing Cayman Law And CIMA Regulation as Well as U.S. Law of Foreign Relations ................................................................... 37

7.      The Cayman Islands Present the More Suitable Forum for Winding Up the Debtors ............................................................... 37

B.     This Court Should Acknowledge the JOLs' Appointment Because No One Else May Validly Govern the Limited Debtors in the Cayman Islands .............. 39

C.     The Automatic Stay Does Not Apply to the Winding Up Order Because it Was a Valid Exercise of CIMA's Sovereign Police and Regulatory Powers ...... 41

1.      CIMA Was Exercising Police and Regulatory Powers Over the Limited Debtors in the Winding Up Proceeding ..................................... 42

2.      Private Parties' Participation Does Not Preclude Application of the "Governmental Unit" Exception ........................................... 45

3.      If the Regulatory Stay Exception Did Not Apply, This Court Should Modify the Stay to Allow the JOLs to Act Pursuant to the Winding Up Order .................................................................. 47

III.   THE CHAPTER 11 CASES SHOULD BE DISMISSED WITH PREJUDICE AS BAD FAITH FILINGS ................................................................................ 48

A.     The Chapter 11 Filings Should be Dismissed as Bad Faith Filings Under Section 1112(b)(1) .............................................................. 48

1.      The Fletcher Team Acted With Subjective Bad Faith When It Filed the Chapter 11 Petition............................................................ 50

2.      Objective Factors Overwhelmingly Point to Bad Faith .......................... 53

B.     The Chapter 11 Cases Were Filed in Bad Faith Because the Limited Debtors Did Not Follow the Appropriate Corporate Formalities to File the Petitions....................................................................................... 56

IV.   THE CHAPTER 11 CASES SHOULD BE DISMISSED IN THE INTERESTS OF INTERNATIONAL COMITY OR UNDER THE ACT OF STATE DOCTRINE .................................................................................... 57

A.     These Cases Should be Dismissed in the Interests of International Comity........ 57

1.      The Cayman Islands Has Stronger Connections to the Companies That Are to Be Wound Up ....................................................... 59

2.      The Activity To Be Regulated is the Governance of Cayman Funds...... 59

3.      Winding Up the Debtors in the U.S. Would Violate the Justified Expectations of Interested Parties ........................................... 60

4.      Acknowledging the Winding Up Order Will Benefit the International System .......................................................... 61

5.   A Failure to Extend Comity Will Create Immediate and Inevitable
Conflict With Regulation by Another Nation .......................................... 63

B.   The Chapter 11 Cases Should be Dismissed Under the Act of State
Doctrine ............................................................................................................... 64

V.   IN THE ALTERNATIVE, THE COURT SHOULD LIFT THE STAY *NUC PRO
TUNC* TO ALLOW THE CAYMAN LIQUIDATION PROCESS TO GO
FORWARD .................................................................................................................... 67

A.   Modification of the Stay Is Appropriate for the Same Reasons That Justify
Dismissal .............................................................................................................. 67

B.   Modification of the Stay Is Also Appropriate Under the *Sonnax* Factors ........... 67

VI.   THIS COURT SHOULD DENY THE FLETCHER TEAM'S REQUEST FOR
AN INJUNCTION ........................................................................................................ 70

CONCLUSION ............................................................................................................................ 71

## TABLE OF AUTHORITIES

Page(s)

Cases

*Banco Nacional de Cuba v. Sabbatino,*
    376 U.S. 398 (1964)..........................................................................................64

*Board of Governors of the Federal Reserve System of the United States v. MCorp
    Financial, Inc.,*
    502 U.S. 32 (1991)........................................................................................42, 45

*Callejo v. Bancomer, S.A.,*
    764 F.2d 1101 (5th Cir. 1985) ........................................................................65

*Carolin Corp. v. Miller,*
    886 F.2d 693 (4th Cir. 1989) ..........................................................................50

*Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp.,*
    333 U.S. 103 (1948)..........................................................................................65

*China Trade & Development Corp. v. M.V. Choong Yong,*
    837 F.2d 33 (2d Cir. 1987)..........................................................................70, 71

*Credit Suisse v. United States District Court,*
    130 F.3d 1342 ..................................................................................................65

*Cunard Steamship Co. Ltd. v. Salen Reefer Services AB,*
    773 F.2d 452 (2d Cir. 1985)....................................................................39, 40, 62

*Finanz AG Zurich v. Banco Economico S.A.,*
    192 F.3d 240 (2d Cir. 1999)..........................................................................58, 62

*Fotochrome, Inc. v. Copal Co.,*
    517 F.2d 512 (2d Cir. 1975)............................................................................47

*Hilton v. Guyot,*
    159 U.S. 113 (1895)..........................................................................................58

*Iida v. Kitahara,*
    377 B.R. 243 (B.A.P. 9th Cir. 2007)................................................................40

*In re The 1031 Tax Group, LLC,*
    374 B.R. 78 (Bankr. S.D.N.Y. 2007)...............................................................31

*In re Bayou Group, LLC,*
    564 F.3d 541 (2d Cir. 2009)..........................................................................31, 32

*In re Briarpatch Film Corp.*,
  281 B.R. 820 (Bankr. S.D.N.Y. 2002) ................................................................53

*In re Brookdale Gardens Association*,
  No. 09-41305, 2010 Bankr. LEXIS 1643 (Bankr. N.J. May 20, 2010) ...................49

*In re C–TC 9th Ave. Partnership*,
  113 F.3d 1304 (2d Cir. 1997) ...........................................................49, 50, 53

*In re Commodity Futures Trading Commission v. Nahas*,
  738 F.2d 487 (D.C. Cir. 1984) ...............................................................62

*In re Consoidated Distributors, Inc.*,
  No. 13-40350, 2013 WL 3929851 (Bankr. E.D.N.Y. July 24, 2013) .....................49

*In re First Financial Enterprises, Inc.*,
  99 B.R. 751 (Bankr. W.D. Tex. 1989) ......................................................50

*In re Gaslight Club*,
  782 F.2d 767 (7th Cir. 1986) ..................................................................31

*In re Gee*,
  53 B.R. 891 (Bankr. S.D.N.Y. 1985) ..........................................40, 62, 63

*In re GEL, LLC*,
  2012 WL 3073069 (Bankr. E.D.N.Y. July 30, 2012) .......................................48

*In re Globo Comunicacoes e Participacoes S.A.*,
  317 B.R. 235 (S.D.N.Y. 2004) ..............................................................59

*In re Halo Wireless, Inc.*,
  684 F.3d 581 (5th Cir. 2012) ...............................................................45, 46

*In re Kaplan Breslaw Ash LLC*,
  264 B.R. 309 (Bankr. S.D.N.Y. 2001) .......................................................67

*In re Kingston Square Associates*,
  214 B.R. 713 (Bankr. S.D.N.Y. 1997) .......................................................48

*In re Kissinger*,
  72 F.3d 107 (9th Cir. 1995) ................................................................47

*In re Lee*,
  428 B.R. 667 (D.S.C. 2009) ................................................................67

*In re Philippine National Bank*,
  397 F.3d 768 (9th Cir. 2005) ...............................................................65

*In re Project Orange Associates, LLC,*
    432 B.R. 89 (Bankr. S.D.N.Y. 2010)..................................................................48

*In re Rognstad,*
    121 B.R. 45 (Bankr. D. Hawaii 1990) .............................................................48

*In re Sonnax Industries, Inc.,*
    907 F.2d 1280 (2d Cir.1990)..........................................................................68

*In re Squires Motel, LLC,*
    426 B.R. 29 (N.D.N.Y.2010) ..........................................................................49

*In re St. Stephen's 350 E. 116th St.,*
    313 B.R. 161 (Bankr. S.D.N.Y. 2004) ...........................................................49

*In re Syndicom Corp.,*
    268 B.R. 26 (Bankr. S.D.N.Y. 2001) .............................................................48

*In re Taub,*
    427 B.R. 208 (Bankr. E.D.N.Y.2010).............................................................49

*In re V. Savino Oil & Heating Co., Inc.,*
    99 B.R. 518 (Bankr. E.D.N.Y. 1989)..............................................................21

*In re Wally Findlay Galleries (New York), Inc.,*
    36 B.R. 849 (Bankr. S.D.N.Y.1984)...........................................................48, 51

*In re Woodbrook Associates,*
    19 F.3d 312 (7th Cir. 1994) ......................................................................48, 52

*International Distribution Centers, Inc. v. Walsh Trucking Co.,*
    62 B.R. 723 (S.D.N.Y.1986)..........................................................................53

*JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.,*
    412 F.3d 418 (2d Cir. 2005)..........................................................................58

*Little Creek Development Co. v. Commonwealth Mortgage. Corp.,*
    779 F.2d 1068 (5th Cir. 1986) ......................................................................49

*Maxwell Communications,*
    93 F.3d 1036 (2d Cir. 1996).......................................................................58, 59

*New York v. Exxon Corp.,*
    932 F.2d 1020 (2d Cir. 1991)........................................................................41

*Ricaud v. Am. Metal Co.,*
    246 U.S. 304 (1918).....................................................................................65

*Republic of Austria v. Altmann*
    541 U.S. 677 (2004)...................................................................................64

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993)...................................................................................71

*SEC v. First Financial Group of Texas*,
    645 F.2d 429 (5th Cir. 1981) .....................................................................42

*SEC v. Wolfson*,
    309 B.R. 612 (D. Utah 2004)......................................................................42

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
    632 F.3d 938 (5th Cir. 2011) .....................................................................65

*Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V.*,
    310 F.3d 118 (3d Cir. 2002).......................................................................58

*United States International Trade Commission v. Jaffe*,
    433 B.R. 538 (E.D. Va. 2010).....................................................................46

*Victrix S.S. Co., S.A., v. Salen Dry Cargo A.B.*,
    825 F.2d 709 (2d Cir. 1987).......................................................................58

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
    296 F.3d 1154 (D.C. Cir. 2002) cert denied, 537 U.S. 1187 (2003)......................65

## STATUTES

11 U.S.C. § 101.............................................................................................41

11 U.S.C. § 305.............................................................................................49

11 U.S.C § 362...............................................................................3, 41, 47, 67

11 U.S.C. § 1112............................................................................................48

28 U.S.C. § 1604............................................................................................71

Cayman Islands Companies Law §§ 94(1)(d), 94(4), 105 (2012) ...................................3

Cayman Islands Monetary Funds Law §§ 30(3)(e), 30(7)-(8) (2012) .......................43, 46

## OTHER AUTHORITIES

Restatement (Third) of the Foreign Relations Law of the United States, § 403...........................59

Peter Anderson and Matthew Wright (the "**JOLs**"),[1] as Joint Official Liquidators of

Soundview Elite Limited ("**Elite Limited**"), Soundview Premium Limited ("**Premium**

**Limited**") and Soundview Star Limited ("**Star Limited**," and together with Elite Limited and

Premium Limited, the "**Limited Debtors**"), by and through their undersigned counsel, hereby

submit this memorandum of law in support of their motion to dismiss and for related relief, in

accordance with the Court's October 7, 2013 *Endorsed Order* [Docket No.23].[2]

## **INTRODUCTION**

1.      After years of mismanagement, self-dealing, disqualifying conflicts of interest,

and disregard for legal and regulatory requirements by Alphonse Fletcher and his associates (the

"**Fletcher Team**") to the detriment of the Debtors' creditors and stakeholders, the Debtors'

largest stakeholders determined to remove the Fletcher Team and install in their place

experienced, independent fiduciaries to oversee an orderly liquidation and maximize the

remaining value for all stakeholders.  After carefully examining their options, those stakeholders

decided to wind up the Debtors in their home jurisdiction, the Cayman Islands.  The Cayman

Island Monetary Authority ("**CIMA**"), the Limited Debtors' primary regulator, joined in the

effort, submitting argument, briefing, and affidavits in support of a Cayman Islands liquidation.

The Cayman Islands proceeding provided the Fletcher Team ample notice and opportunity to

participate and to oppose the winding up petitions and the JOLs' appointment.  But the Fletcher

---

[1] As previously noted, the JOLs are making limited appearances in this case and reserve all rights, defenses and objections with respect to jurisdiction, venue and other adverse effects or limits on applicable rights and protections.

[2] In the Endorsed Order, the Court stated that

> [T]he Court will hold a unified hearing on joint administration, the motion for sanctions, dismissal of the case, and as an alternative to one or more of the foregoing, appointment of one or more chapter 11 or chapter 7 trustees in these cases, which should be deemed to have been raised on the Court's own motion.

(Order at ¶ 2.)

Team declined to participate in a valid proceeding in the Debtors' home jurisdiction and under

the Debtors' governing law.  Instead, after over a month's notice that the JOLs would be

appointed on the morning of September 24, 2013, the Fletcher team rushed into this Court (less

than hour before the hearing began in the Cayman Islands) to file their bad faith chapter 11

petitions.  They apparently did so without following required corporate formalities.  Given the

circumstances, the Fletcher Team could not have reasonably expected or intended to restructure

the Debtors and they admittedly filed the chapter 11 cases principally to frustrate the valid

Cayman Islands proceeding, "limit" CIMA's regulatory authority, and maintain control of the

Debtors.  The Grand Court of the Cayman Islands (the "**Grand Court**") rejected this maneuver,

correctly concluding that the chapter 11 petitions were a mere delay tactic.  The Grand Court

accordingly entered an order to wind up the Limited Debtors, and appointed the JOLs at the

request of CIMA and others.

2.      In light of the Fletcher Team's bad faith filings, the Grand Court's order

appointing the JOLs, and for the reasons detailed below, the Court should dismiss with prejudice

the petitions to allow an orderly liquidation in the Debtors' home jurisdiction.

3.      First, the JOLs believe that the proper course would be to recognize them as the

Debtors' governance and dismiss the petitions. However. at a minimum, this Court should not

allow the Fletcher Team to maintain control over the Debtors and, should instead acknowledge

the JOLs as the Debtors in Posession.  The JOLs investigations thus far have revealed gross

mismanagement, self-dealing, and failure to comply with regulatory requirements by the Fletcher

Team.

4.      Second, the Debtors' stakeholders selected the JOLs to wind up the Debtors and

the JOLs urge this Court to respect the creditors and stakeholders' chosen forum and liquidators.

2

The JOLs are experienced, independent fiduciaries.  They enjoy the support of the Debtors'

largest stakeholders.  They are recognized in the Debtors' home jurisdiction and by their primary

regulator.  They are in the best position to affect an efficient winding up.  In the more-than-two

months since their formal appointment, the JOLs and their professionals have already conducted

an extensive investigation of the Limited Debtors, including reviewing thousands of documents

and interviewing creditors and key stakeholders.  As a result, the JOLs would be superior to any

other fiduciary that this Court might appoint.  In addition, the Debtors' liquidation process

belongs in the Cayman Islands rather than in the United States.  The Limited Debtors' major

unresolved noncash assets are in the Cayman Islands—particularly claims in liquidation

proceedings that are already underway in the Cayman Islands.  In addition, the Limited Debtors'

stakeholders include exclusively non-U.S. investors and overwhelmingly non-U.S. creditors,

many of whom may legitimately seek to avoid incurring unnecessary U.S. tax risk or otherwise

facing the burdens of U.S. jurisdiction.

    5.    Third, the JOLs were appointed at CIMA's request pursuant to CIMA's

regulatory authority.  Although the Debtors argue that the JOLs' appointment violated the

automatic stay, under Section 362(b)(4), the automatic stay does not apply to such regulatory

action.  See 11 U.S.C § 362(b)(4).  Should this Court determine that the JOLs' appointment

violated the stay, however, the JOLs' respectfully request that the Court modify the automatic

stay nunc pro tunc to allow the JOLs to exclusively continue with the liquidation proceedings in

the Cayman Islands given the Fletcher Team's bad faith filings and the reality that the Limited

Debtors' home jurisdiction and their primary regulator recognize the JOLs.

    6.    Fourth, the Fletcher Team filed these petition in bad faith.  They did so only to

interfere with the valid Cayman Islands proceedings and with no hope of reorganizing the

3

Debtors.  The Court should not reward this abuse of the U.S. bankruptcy process by allowing

these cases to continue under the Fletcher Team's control.  Moreover, every major stakeholder

and independent third-party involved in this process, including the Debtors' largest creditors, the

United States Trustee, and the FILB Trustee (defined below) has concluded that the Fletcher

team is unfit to govern the Debtors.  The Fletcher Team has already been ousted from control by

the Grand Court—a determination that will not change regardless of what happens in this Court.

As a result, the Fletcher Team lacks both the credibility and the legal standing necessary to

control, reorganize, or wind up the Limited Debtors in their home jurisdiction.

7.    Fifth, in addition, both the principles of international comity and the act of state

doctrine provide independent grounds for dismissal, and preclude the Court from enjoining the

Cayman Islands proceedings as the Debtors request.

8.    For these reasons and as set forth more fully below, the JOLs respectfully request

that this Court dismiss with prejudice the petitions or, in the alternative, recognize the JOLs as

debtor-in-possession, and deny the Debtors' request to enjoin the Cayman Islands proceedings.

## BACKGROUND

**A.    The Parties**

**1.    The Limited Debtors**

9.    The Limited Debtors are open ended mutual funds created in the early 2000s by

the Citco Group of Companies ("**Citco**") as part of the Richcourt Group of funds.  (JOL Ex. 4

(Fletcher Aff.) at ¶ 4.)[3]

---

[3] The Limited Debtors investment manager is and at all material times has been
Soundview Capital Management Limited of One Montague Place, 1st Floor, East Bay Street,
Nassau, Bahamas (the "**Investment Manager**").

10.    The Limited Debtors are mutual funds registered with the Cayman Islands

Monetary Authority ("**CIMA**") pursuant to section 4(3) of the Mutual Funds Law.  (*See* JOL Ex.

1 (PPM) at ii.)[4]  The Limited Debtors registered office is at dms Corporate Services Ltd., P.O.

Box 1344, dms House, 20 Genesis Close, Grand Cayman, KY1-1108 Cayman Islands.[5]  (JOL

Ex. 27 (dms Resolutions))

11.    Elite Limited was initially incorporated as an international business company in

the Commonwealth of the Bahamas in October 2003 and was transferred by way of continuation

to the Cayman Islands in June 2005.  (JOL Ex.4 (Fletcher Decl.) ¶ 4.)[6]

12.    Premium Limited was incorporated in the Cayman Islands on November 21,

2005.  (*Id.*)

13.    Star Limited was initially incorporated as an international business company in

the Commonwealth of the Bahamas in May 2002 and was transferred by way of continuation to

the Cayman Islands in June 2005.  (*Id.*)

14.    The Limited Debtors have exclusively non-U.S. investors, and under the Limited

Debtors' governing PPMs, the shares of the Limited Debtors may not be sold or transferred for

the benefit of any U.S. persons.  (JOL Ex. 1 (PPM) at iv, 5; Midanek Tr. Aff. ¶ 16)

---

[4] Each of the Limited Debtors has a Confidential Private Placement Memorandum
("**PPM**").  The PPMs are substantially identical for the purposes of this trial, although pagination
may differ slightly.  For the sake of convenience, this brief will refer to page numbers for the
PPM of Elite Limited, which is JOL Exhibit 1.  The PPMs for Premium Limited and Star
Limited are designated as JOL Exhibits 2 and 3, respectively.

[5] The Fletcher Team asserts that the Limited Debtors' registered office was transferred to
Stuarts Corporate Services Ltd., however, the Debtors have not produced any directors'
resolutions approving such transfer.

[6] The designation "JOL Ex. xx" refers to the JOLs' hearing exhibits, to be submitted by
the JOLs prior to the hearing set for December 17, 2013.

15.    On or about June 12, 2008, a consortium led by Fletcher Asset Management Inc.

("**FAM**") acquired an 85% controlling interest of the Richcourt Group.  (JOL Ex. 4 (Fletcher

Decl.) ¶ 9; *id*. Ex. C.)

16.    In or about June 2010, HSBC Trustee (Cayman) Limited ("**HSBC Trustee**")

replaced Citco as fund administrator and custodian.  (JOL Ex. 29 (HSBC Resolutions).)  On or

about June 1, 2010, the Limited Debtors and HSBC Trustee entered into separate master

administration agreements.  (JOL Ex. 30 (Investor Notices).) HSBC Trustee terminated the

administration agreements effective July 25, 2011 and ceased to act as administrator for the

Limited Debtors.  (JOL Ex.19 (HSBC Resignation).) The Limited Debtors did not have an

administrator for the following 18 months, until January 2013, when the Limited Debtors entered

into separate fund administration agreements with Pinnacle Fund Administration.  *See Motion of*

*Debtors Pursuant to Section 365 of the Bankruptcy Code, Bankruptcy Rule 6006 and Local*

*Bankruptcy Rule 6006-1(a) for an Order Authorizing the Assumption of Administration*

*Agreements, as Modified, Between the Debtors and Pinnacle Fund Administration LLC* at 3

[Docket No. 43]

17.    On or about June 1, 2010, the Limited Debtors and HSBC Bank USA, N.A.

("**HSBC Bank**") entered into separate custody agreements.  HSBC Bank terminated the custody

agreements effective July 25, 2011, but continued to provide certain post-termination custodial

services to the Debtors. (JOL Ex. 30 (Investor Notices).)  In early 2013, the Debtors entered into

separate custody agreements with Wilmington Trust, National Association ("**Wilmington**

**Trust**").  Wilmington Trust holds the substantial majority of the Debtors cash assets.   (JOL Ex.

4 (Fletcher Decl.) at 18.)  No evidence has been presented that Wilmington Trust holds securities

on behalf of the Debtors.

18.    The current officers and directors of the Debtors and the Investment Manager are director Alfonse Fletcher, Jr. ("**Fletcher**"), director George Ladner ("**Ladner**"), and corporate secretary Floyd Saunders ("**Saunders**," and together with Fletcher and Ladner, the "**Officers**" ). (JOL Ex. 4 (Fletcher Decl.) at 19.)  The Officers purported to authorize the filing of the Limited Debtors' petitions in these cases.  (JOL Ex. 5 (Corp. Ownership Stat. at 3).)

19.    As Fletcher has admitted, the Limited Debtors' primary noncash assets are liquidation claims against two Fletcher-related entities, FIA Arbitrage Fund ("**Arbitrage**") and FIA Leveraged Fund ("**Leveraged**"), in their respective Cayman liquidation proceedings.  (*See* Fletcher Tr. at 142:23-143:8; *see also id.* at 179:12-15 ("The primary investment decisions at this point, involve recoveries from the insolvency proceedings.").) [7]  Although the Limited Debtors also have claims in the Fletcher International Limited (Bermuda) ("**FILB**")  a debtor in a chapter 11 proceeding before this Court under case number 12-12976 (REG), these claims will largely be resolved in accordance with the Disclosure Statement filed in that action.  (*See* ¶ 55, *infra*.)

20.    Elite Limited's balance sheet consists of $20.3 million in assets, including (a) $5.5 million of Richcourt-related investments in two affiliated funds, New Wave Fund SPC and Soundview Composite Ltd.; (b) $4.1 million of FAM-related investments, which consists of (i) a $4 million note issued by affiliate Fletcher International, Inc. ("**FII**") in connection with the unwinding of Elite Limited purchase of FII's ownership interests in FILB; and (ii) a claim totaling $244,000 against Leveraged; (c) a $2 million receivable arising from a former director's fraudulent transfer of money from Elite Limited's account at HSBC, Monaco; and (d) a $1.8 million receivable arising from claims against affiliates under the Master Recovery Cooperation

---

[7] Deposition transcripts cited in this brief are attached to the concurrently filed Proffers for each of the deponents.

and Financing Agreement (the "**Litigation Support Agreement**") dated as of February 26,

2012, and entered into by and among FAM and substantially all of its affiliates. (JOL Ex. 4

(Fletcher Decl.) at 13.)

21.    Premium Limited's balance sheet consists of $7.5 million in assets, including (a)

approximately $637,000 in cash; (b) $6.8 million in Richcourt-related investments, consisting of

a redemption payable by Elite Limited; and (c) $44,835 (after discount) of FAM-related

investments, consisting of a filed $89,670 proof of debt against Leveraged. (*Id.*)

22.    Star Limited's balance sheet consists of $6.97 million in assets, including (a)

approximately $3.3 million in cash; (b) $2.6 million in Richcourt-related investments, consisting

of a redemption payable by Elite Limited; and (c) $1.1 million (after discount) in FAM-related

investments, consisting of a filed $2.2 million proof of debt against Leveraged. (*Id.*)

### 2.    The SPV Debtors

23.    The SPV Debtors are Elite Designated, Premium Designated and Star Designated.

The SPV Debtors were incorporated in the Cayman Islands on or about March 19, 2009. (JOL

Ex. 4 (Fletcher Decl.) at 13; *id.* Exs. D, E and F, ¶¶ 12, 19, 27.) The purpose of the companies is

to act as a closed-end investment fund housing the illiquid investments of the Limited Debtors.

In return for the transfer of assets to the SPV Debtors, the SPV Debtors issued shares to Limited

Debtors. (*Id.*)

### 3.    The JOLs

24.    Peter Anderson and Matthew Wright are the JOLs. They are both highly-

experienced Cayman Islands restructuring and liquidation professionals.

25.    Peter Anderson graduated from Queens University, Belfast, Northern Ireland with

a degree in economics and upon graduation was employed by Coopers & Lybrand, Ireland. In

1981, he began working for Coopers & Lybrand as an auditor in Belfast, Northern Ireland and in

8

Edinburgh, Scotland.  Around 1982, Mr. Anderson began working for Coopers & Lybrand,

Cayman Islands. In 1998, he formed an independent practice Benbow Anderson & Co., with a

colleague, which was later absorbed by Deloitte in 2002.  Following a reorganization in 2004,

Mr. Anderson resigned as a partner from Deloitte and remained with Rawlinson & Hunter, where

he has been doing insolvency, trust, corporate and fund fiduciary work at Rawlinson & Hunter

since 2000, mainly with companies domiciled in the Cayman Islands.  He is a qualified

insolvency practitioner in the Cayman Islands and has been appointed as a joint official

liquidator to wind up Cayman Islands companies for more 30 years.  During that time, he has

acted as a joint official liquidator for numerous entities being wound up in the Cayman Islands.

        26.     Matthew Wright has approximately a decade of experience in restructuring and

insolvency, and eight years' experience in international restructuring and insolvency.  Mr.

Wright was first employed by Ernst & Young in its London office as a trainee accountant in its

Transaction and Advisory Services division, specializing in large corporate restructuring and

liquidation projects. During this time, Mr. Wright also trained as a certified chartered accountant

and completed his accountancy exams with the Association of Chartered Certified Accountants.

In 2009, he moved to the Cayman Islands to work for Zolfo Cooper, a leading independent

provider of restructuring, financial, and corporate advisory solutions.  In August 2011, Mr.

Wright left Zolfo Cooper to join Rawlinson & Hunter, where he has been involved in numerous

insolvency and restructuring projects, acting as official, provisional and voluntary liquidator.

His practice has concentrated on companies domiciled in the Cayman Islands and the British

Virgin Islands.  Mr. Wright is a qualified insolvency practitioner in the Cayman Islands.  During

his time in the Cayman Islands, he has been appointed as a joint official liquidator or otherwise

been involved in the liquidation of more than 20 Cayman Islands companies.

**B.      CIMA's Regulatory Authority Over the Limited Debtors**

27.      CIMA is the Cayman Islands' primary financial services regulator, tasked with

the mission to enhance the economic wealth and reputation of the Cayman Islands by fostering a

thriving and growing, competitive, and internationally recognized financial services industry,

through appropriate, responsive, cost-effective and efficient supervision and a stable currency.

(*See* CIMA Mission Statement, "Our Mission," available at http://www.cimoney.com.ky/)

28.      Each of the Limited Debtors' PPMs makes clear that "[a]s a regulated mutual

fund, the Fund is subject of the supervision of the Cayman Islands Monetary Authority and the

Cayman Islands Monetary Authority has wide powers under the Mutual Funds Law in that

regard."  (JOL Ex. 1 (PPM) at 34.)  The PPMs also acknowledge that "[t]he powers of the

Cayman Island Monetary Authority include the power . . . to appoint a person to assume control

of the affairs of the Fund including, but not limited to, having the ability to terminate the

business of the Fund" and that "[t]here are other remedies available to the Cayman Islands

Monetary Authority including the ability to apply to the courts of the Cayman Islands for

approval of other actions."  (*Id.*)

**C.      Events Leading up to the Filing of the Cayman Winding Up Petitions**

29.      As Fletcher admits, for at least two years, the Limited Debtors have failed to

make required payments to redeeming investors and failed to complete required independent

calculations of their net asset value ("**NAV**").  (*See* Fletcher Tr. 5-16; 120:9-17)  Additionally,

the Limited Debtors have not produced audited financial statements since 2008.  (*Id.* at 20:6-9.)

30.      On or about March 16, 2012, CIMA contacted the directors of the Limited

Debtors and their affiliated funds with a number of inquiries, including but not limited to:

> a)      the delay in submitting audited financials for 2009 and 2010 year
> ends;

b)      when the audited financial were expected to be submitted;

c)      if there was any expectation that the 2011 audited financial would also be delayed;

d)      the number of investors in the funds;

e)      the latest NAV of the funds;

f)      number and value of redemptions pending;

g)      the latest shareholder register of the funds;

h)      confirmation of the funds' mutual fund administrator;

i)      if any complaints have been received from investors; and

j)      confirmation that investors have been treated in a non-prejudicial manner.

(*See* JOL Ex. 6 (CIMA March 16 Letter) at 1.)

31.      Over the next year-and-a-half, CIMA sent the Limited Debtors at least six more letters requesting information (and numerous informal email inquiries. (*See* JOL Ex. 7 (McCoy Aff.) ¶ 12; *see also* JOL Exs. 8 through 11 (CIMA Letters).)  The Limited Debtors did not respond to these inquiries for over a year until July 2013, when they sent an admittedly incomplete response.  (Ladner Tr. at 87:25-88:7.)

32.      CIMA considered the Debtors' ongoing failure to respond to regulatory inquiries and breaches of their regulatory requirements when considering appropriate enforcement action and, ultimately, chose to support Citco's winding up petitions.  (*See* JOL Ex. 7 (McCoy Aff.) ¶¶ 14, 15.)

33.      On or about August 2012, Citco retained Smeets Law (Cayman) to represent it in respect of unpaid redemption requests made by Citco as a shareholder of the Limited Debtors. Janet Francis, head of the Corporate and Commercial Practice Group of Smeets Law (Cayman), advised on the options available to Citco and eventually commenced the process of winding up based on the instructions received and Cayman Islands law.

34.      It was determined on or about February 2013, that Citco had debts certain and

was in a position to file petitions for the winding up of the Limited Debtors.  At this time, Ms.

Francis contacted the JOLs regarding the potential winding up of the Limited Debtors and their

service as Joint Official Liquidators.

35.    In February 2013, the Officers approached Deborah Midanek, President of Solon

Group, Inc.  The Officers invited the Solon Group to act as director of the Richcourt funds,

including the Debtors, and Midanek accepted.  (Midanek Tr. Aff. ¶¶ 15-19.)  Ms. Midanek

thereafter functioned as a director for the Debtors.  (*Id.* ¶ 28.)

36.    Once she began acting in the role of director, Ms. Midanek quickly learned of the

issues discussed above, including the Debtors' failure to complete NAVs, the failure to complete

audit reports, the failure to honor redemption requests, and the failure to respond to outstanding

CIMA requests.  (*Id.* ¶ 32.)  After consulting with the Debtors' professionals, Ms. Midanek

concluded that the Debtors should be wound up and that Fletcher should resign from the board of

each Debtor.  (*Id.* ¶¶ 45-46)

37.    Ms. Midanek and the Debtors' professionals explored the option of filing chapter

11 petitions on behalf of the Debtors in Delaware.  (*Id.* ¶¶ 45, 47-49.)  Although recognizing that

a U.S. bankruptcy proceeding would have benefits, Ms. Midanek concluded that there were

significant potential tax consequences to the Debtors and their non-U.S. investors.  (*Id.* ¶ 49.)  In

particular, even after consulting with restructuring and insolvency experts such as Harvey Miller,

Esq. and Marcia Goldstein, Esq. of Weil Gotshal LLP, Ms. Midanek was concerned that she was

not able to obtain any guarantee that the chapter 11 process would not subject foreign investors

and creditors to U.S. taxes.  (*Id.* ¶¶ 49, 58)  For this and other reasons, Ms. Midanek concluded

that winding up in the Caymans would present the best course of action.  (*Id.* ¶ 56.)

**D.    The Cayman Winding Up Petitions**

38.    On August 14, 2013, Solon Group, as director of Optima Absolute Return Fund,

Ltd., Richcourt Allweather Fund, Inc., and America Alternative Investments, Ltd. filed petitions

with the Grand Court for an order winding up and appointing liquidators over the SPV Debtors

and Elite Limited.  (*See* Midanek Tr. Aff. ¶ 51; JOL Ex. 4 (Fletcher Decl.) ¶¶ 14-16; *see also id*.

Exs. D, E, F, G.)

39.    On August 20, 2013, Ms. Francis on behalf of Citco—the Limited Debtors'

largest creditor—filed petitions (the "**Winding Up Petition**") in the Grand Court for an order

winding up and appointing Matthew Wright and Peter Anderson, of the firm of RHSW

(Cayman) Limited, as Joint Official Liquidators over the Limited Debtors.  (JOL Ex. 12; JOL

Ex. 13 (Winding Up Petitions).)

40.    CIMA joined in and actively voiced its support for the winding up proceeding, the

removal of the Fletcher-controlled director and management teams, and the appointment of the

JOLs.  Although CIMA often participates in such proceedings, it took the unusual step of

submitting filings to the Grand Court, including the *Skeleton Argument on behalf of Cayman*

*Islands Monetary Authority*, and an affidavit from the Head of CIMA's Investment and

Securities Division, Yolanda Banks McCoy.[8]  (JOL Ex. 7 (McCoy Aff.); JOL Ex. 14 (CIMA

Skel. Arg.).)  In her affidavit, Ms. McCoy explained why CIMA was stepping into the already-

in-progress winding up proceeding:  "[G]iven the seriousness of the regulatory concerns, CIMA

has sufficient grounds to take action.  However, given the timing of the hearing of the winding

up petitions, it is unlikely that CIMA would be in a position to appoint a Controller before the

hearing date."  (JOL Ex. 7 (McCoy Aff.) ¶ 15(a)-(b).)  Moreover, CIMA stated that it "supports

the persons nominated [by Citco] to act as liquidators from the firm of RHSW (Cayman)

---

[8] Under Cayman Islands procedure, a Skeleton Argument is a short outline or preview of
the arguments that a party intends to present in a hearing.

Limited," *i.e.*, the JOLs, Matthew Wright and Peter Anderson.  (*Id.* ¶ 18.)

41.    At the request of Citco, the Grand Court scheduled a hearing on the Winding Up

Petition for Tuesday, September 24, 2013.  (Francis Direct ¶ 4 )  The Limited Debtors had notice

of the hearing on the Winding Up Petition on or about August 20, 2013.  (*Id.*)

42.    In the month they had notice of the Winding Up Petition, the Limited Debtors did

not file any rebuttal evidence or substantive argument against the Winding Up Petitions.  The

Limited Debtors only response was to request an adjournment a few days before the hearing.

Their request did not mention their intent to file chapter 11 petitions, did not mention the

automatic stay, and did not make any reference to U.S. bankruptcy filings.  (Francis Direct ¶ 5 )

43.    The Grand Court initially scheduled the Winding Up Hearing for the early

morning on September 24, 2013.  (Francis Direct ¶ 6)  Andrew De La Rosa, the barrister for

Citco, and Janet Francis, counsel for Citco, went to the Grand Court shortly before the scheduled

hearing time and saw Richard Annette, counsel for the Limited Debtors.  Mr. Annette informed

Mr. De La Rosa and Ms. Francis that the Grand Court had postponed the hearing due to a delay

in another matter.  Counsel for the Limited Debtors did not mention that the Limited Debtors

would be filing these chapter 11 cases, nor was this mentioned in the Limited Debtors' skeleton

argument.  (Francis Direct ¶ 7.)

44.    Roughly fifteen minutes before the now-delayed hearing began, Ms. Francis

received an email from Mr. Annette.  In that email, Mr. Annette wrote that he had "in the last 30

minutes been notified that Soundview Premium, Soundview Elite, Soundview Star, Elite

Designated, Star Designated and Premium Designated have this morning been placed into

Chapter 11 Bankruptcy in the United States."  (JOL Ex. 15 (Annette Email).)  Mr. Annette went

on to say that "we were not aware that the Companies were going to be placed into Chapter 11

Bankruptcy this morning. The Affidavits were not previously reviewed by us." (*Id.*)  Finally,

Mr. Annette wrote that he had "just been instructed to request an adjournment of today's Hearing

so that the Court can be fully appraised of the Chapter 11 Bankruptcy and the effects that has on

all of the Proceedings." (*Id.*)

45.    Barristers for Citco, the Limited Debtors, and CIMA all appeared at the hearing.

The barrister for the Limited Debtors, Mr. Akiwumi, informed the Grand Court that the Limited

Debtors had filed the chapter 11 cases in the United States to avail themselves of the automatic

stay.  He said that he had just learned that the cases were being filed and had not known about

them previously.  Mr. Akiwumi presented no evidence of the stay or the chapter 11 filings,

except for an affidavit from Warren Martin, attaching only the filing receipt as proof of the

filings without the actual petitions or any other relevant information regarding the chapter 11

cases.  (Francis Direct ¶ 13; JOL Ex. 16 (Martin Affidavit).)

46.    Mr. Akiwumi argued that the winding up hearing could not continue because the

chapter 11 filings stayed the Chief Justice from proceeding.  In sum and substance, Mr. Akiwumi

told the Chief Justice that the chapter 11 filings were a "*fait accompli*" and the Chief Justice

could not continue the hearing.  Chief Justice Smellie admonished Mr. Akiwumi, indicating that

it was not prudent to come into a Cayman Island courtroom and tell the Chief Justice what he can

and cannot do.  Chief Justice Smellie asked Mr. Akiwumi a number of questions, such as

whether the existence of the Limited Debtors Petitions before the Cayman Islands Court had

been brought to the attention of the US Court?  The Chief Justice remarked that the chapter 11

proceedings appeared to have been instituted despite the Debtors having notice of the winding up

proceedings, apparently to afford the Debtors of the automatic stay.

47.    These facts made Chief Justice Smellie reluctant to stay the court's hand on the

grounds of judicial comity.  In particular, the Chief Justice said that it would not be conducive to

the proper and expeditious resolution of insolvency matters, if litigants could thwart the Grand

Court could by "pushing a button" and filing a chapter 11 proceeding.  Demonstrating his

familiarity with the chapter 11 process, Chief Justice Smellie recounted that the chapter 11 sets

out a debtor-instigated procedure that does not necessarily lead to the appointment of a trustee.

As such, the Chief Justice stated that there would be no act of futility in appointing liquidators by

the Grand Court.

      48.    The Court also solicited opinions from all of the parties, including CIMA, about

whether the hearing should proceed.  CIMA and the other petitioning parties argued that the

hearing should go forward, and the Chief Justice agreed.  Chief Justice Smellie indicated that the

chapter 11 filings had been "sprung" on the parties, and that the scant documentation provided

by the Limited Debtors did not provide any explanation as to how the chapter 11 petitions

affected the hearing, him or CIMA from moving forward.

      49.    At the conclusion of the hearing, Chief Justice Smellie, when approving the

winding up of the Limited Debtors and the appointment of the JOLs.  (Winding Up Order.)  He

indicated that he was satisfied that the debts are owed and the regulatory concerns raised by

CIMA (in their skeleton argument) about the management were well-founded.  (Francis Direct

¶ 19.)  Mindful of the international turn that the case had taken, the Chief Justice also ordered the

JOLs to "obtain the recognition of their appointment in any other relevant jurisdictions and to

make applications to the courts of such jurisdictions for that purpose . . . ."  (JOL Ex. 21

(Winding Up Order) at 2.)

      50.    For procedural reasons, the Court declined to act on Solon Group's winding up

petitions as to the SPV Debtors during the hearing.  Those petitions remain pending, and Solon

has not acted on them further out of respect for the chapter 11 proceedings before this Court and

the automatic stay. Although the Solon Group initially supported the appointment of different

liquidators, it has now determined that liquidation by the JOLs is preferable, and will support

their appointment when the winding up proceeding as to the SPV Debtors moves forward.

(Midanek Tr. Aff. ¶¶ 58.)

> ## E.    The Chapter 11 Cases

51.    On the morning of Tuesday, September 24, 2013, at the direction of the Fletcher

Team, and the agents and professionals who work at their direction, each of the Limited Debtors

filed voluntary petitions in this Court for relief under chapter 11 of title 11 of the United States

Code (the "**Bankruptcy Code**").

52.    The Fletcher Team asserts that it made the decision to file the chapter 11 petitions

that morning.  (Fletcher Tr. at 136:11-14.)  As noted above, the Debtors did not consult or inform

their Cayman counsel before filing the petitions.  (JOL Ex. 15 (Annette Email).)  And, as

Fletcher and his associates have repeatedly acknowledged, they directed the Debtors to file the

petitions in a conscious attempt to halt the Cayman proceedings, to "limit" CIMA's regulatory

authority, and ensure that "the current management would be . . . left in place."  (*See* Fletcher Tr.

at 105:22-24, 106:22-107:3; 114:2-9132:21-133:2; Ladner Tr.at 19:23-20:19; 21:10-15; JOL Ex.

4 (Fletcher Decl.) ¶ 24.)  Notably, rather than file a fully formed petition with a full set of

supporting documents, the Fletcher Team filed the chapter 11 petitions without any supporting

first-day motions.  (*Id*. ¶ 27.)

53.    Over the course of the chapter 11 proceedings, the Fletcher Team continues to

claim that it controls the Limited Debtors.  In particular, on September 30, the Fletcher Team

sought sanctions and contempt orders against the participants of the winding up proceeding and

have asked this Court to enjoin any act in furtherance of that proceeding.  (*See* Debtors' Motion

for an Imposing Sanctions against Citco Global Custody (N.A.) N.V., Deborah Hicks Midanek,

the Solon Group, Inc., Optima Absolute Return Fund, Ltd., Richcourt Allweather Fund, Inc.,

America Alternative Investments, Ltd. for Contempt of the Automatic Stay in Connection with

their Continued Prosecution of Foreign Liquidation Proceedings Following Entry and Clear

Notice of the Automatic Stay Herein, dated September 30, 2013 [Dkt. No. 12] ("**Debtors'**

**Sanctions Motion**").)  And despite all indications to the contrary, Fletcher continues to insist

that he is best able to maximize the Debtors' assets, including liquidations claims in the Cayman

Islands, where he has been removed from governance over the Limited Debtors.  (Fletcher

Proffer ¶ 20.)

> **F.    The FILB Bankruptcy Proceedings, Trustee Report, and Disclosure
> Statement**

54.    During this same period, FILB's chapter 11 case proceeded in this Court under a

Court-appointed chapter 11 trustee, Richard Davis (the "**FILB Trustee**").  The FILB Trustee

recently completed and submitted the *Trustee's Report and Disclosure Statement* on November

25, 2013. (JOL Ex. 17 (FILB Trustee Report).)[9]  The FILB Trustee reported that Fletcher and his

team, aided by administrators, valuation experts, and auditors, had committed widespread fraud

upon and through FILB, diverting assets for personal use and deceiving their investors.  (*Id*. at 2-

7.)  "FILB, its feeder funds, and their investors were victims of a fraud perpetrated by AF

[Alphonse Fletcher] and others at FAM, which enabled them to divert investor funds for AF's

---

[9] The JOLs do not rely upon, and do not seek to prove, the truth of the FILB Trustee
Report.  The JOLs and stakeholders in this case do not have that costly burden, nor do they have
access to that Trustee's evidence.  Nevertheless, irrespective of its truth, the FILB Trustee Report
is relevant to the Fletcher Team's credibility, or the lack thereof, with the Debtors' stakeholders.
In addition, the FILB Trustee Report represents allegations that should, at the very least, be
investigated by disinterested third parties.  The FILB Trustee Report, at a minimum, highlights a
fatal conflict of interest.

own benefit, aided or facilitated by those we normally think of as creating a line of protection
against such fraud – administrators, valuation experts, and auditors." Highlighting practices such
as manager-controlled pricing, inflated valuations, and the backdating of corporate and
transaction documents, the trustee believed that the investors were "victims of an environment
where self-interest all too often trumped fiduciary obligations." (*Id*. at 4, 9-10.)

55.    In the FILB Trustee Report, the FILB Trustee indicates that, because most of
FILB's assets are virtually valueless, a key part of the recovery would include claims for "fraud,
breach of fiduciary duty, negligence and similar tort claims against Insiders and affiliates and
certain service providers and professionals." (*Id*. at 10-13.) The disclosure statement included in
the FILB Trustee Report indicates that the FILB Trustee reached a settlement with, among
others, Arbitrage and Leveraged pursuant to which the parties will pool certain claims, prosecute
them under joint supervision and distribute the net proceeds according to an agreed-upon
formula. (*Id.* at 251.) Such an arrangement means that the substantial recoveries by the Limited
Debtors for the above-stated claims can only come through the Cayman-based liquidations of
Arbitrage and Leveraged.

**G.    The Fletcher Team Has Frustrated the JOLs' Efforts to Liquidate the Assets
of the Limited Debtors for the Benefit of Creditors and Investors**

56.    Since the JOLs' appointment, the Fletcher Team has repeatedly invoked the
chapter 11 petitions and the automatic stay in an effort to frustrate the JOLs' attempts to honor
the Winding Up Order and meet their statutory and court-ordered obligations.

57.    On October 1, 2013, the Fletcher Team's counsel, Porzio Bromberg & Newman
P.C. ("**Porzio**"), sent a letter to the JOLs stating in part that "any further actions taken in
violation of the automatic stay shall be additional grounds for relief and will be presented to
Judge Gerber through supplemental affidavits. We intend to vigorously prosecute before the

19

bankruptcy court any additional, willful violations of the automatic stay.  Please be guided

accordingly."  (JOL Ex. 18 (Oct. 1 Politan Letter ).)

58.    The JOLs, in furtherance of their statutory duties, contacted HSBC Bank

(Cayman) to obtain information regarding an attempted transfer of assets from the bank.  HSBC

Bank (Cayman) informed the JOLs that it could not provide the information to the JOLs because

it is not clear who is authorized to act on behalf of the Limited Debtors.  (JOL Ex. 19 (HSBC

Cayman E-mail); Wright Direct ¶¶ 53-54.)

59.    The JOLs also contacted Stuarts Corporate Services Ltd., the Limited Debtors'

registered office holder, to retrieve the Limited Debtors' corporate records.  In their return letter,

Stuarts Corporate Services stated that

> [f]or the record, please also note that we have been requested by
> U.S. bankruptcy counsel to advise you that your demand violates
> Title 11 of the United States Code (U.S.C.) Section 362 and that
> the Chapter 11 Debtors in the U.S. fully reserve their rights
> without limitation to seek additional sanctions against you for this
> continuing course of conduct.

(JOL Ex. 20 (Oct. 14 Stuarts Letter).)

60.    As a result, the Debtors' filing has prevented the JOLs from fully meeting their

statutory and court-ordered obligations.

## ARGUMENT

61.    For the reasons stated below, this Court should dismiss the Debtors' chapter 11

petitions with prejudice.  The Fletcher Team filed these cases in bad faith as their admitted

purpose was to avail themselves of the automatic stay and to avoid the Grand Court's winding up

proceeding, which would wrest control of the Debtors from them.  The Fletcher Team did not

(and could not) expect to reorganize the Limited Debtor when they knew they had not filed

evidence or provided substantive arguments against the Winding Up Petitions and the Grand

Court would enter the Winding Up Order as a matter of form.

62.    The JOLs realize that the Court has several options under Section 1112 of the Bankruptcy Code and the Court must choose the best path for parties involved, including those stakeholders not participating in the U.S. bankruptcy case.  The JOLs respectfully submit that the most efficient and cost effective method is for the Court to dismiss these cases because it reduces the number of court-appointed fiduciaries (and the associated costs and fees from the fiduciaries and their professionals) and it avoids the potential for conflicting rulings from competing jurisdictions.

63.    Nevertheless, at a minimum, this Court should not allow the Fletcher Team to maintain control over the Debtors.  If the Court does not dismiss the cases, the JOLs urge that the Court recognize the JOLs, as CIMA and the Grand Court do, as the management of the Limited Debtors and, therefore, as the debtors in possession

## I.    THE FLETCHER TEAM SHOULD NOT REMAIN IN CONTROL OF THE DEBTORS

64.    "The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee."  *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989).  The Fletcher Team cannot be depended upon to act as a fiduciary for the Debtors.  As discussed below, the best way to serve the Debtors' stakeholders' best interests, maximize returns to the creditors, and honor concerns of international law and comity would be to recognize the JOLs, defer to the ongoing Cayman proceedings, and dismiss the Debtors' petitions.  If the Court does not dismiss the chapter 11 cases, at a minimum, the Fletcher Team should be removed and the JOLs respectfully request that this Court recognize the Winding Up Order and its appointment of the JOLs as the management of the Limited Debtors.  The fruits of

the JOLs investigations since their appointment confirm what every other stakeholder and third

party has concluded:  The Fletcher Team is not fit to manage the Debtors.  Moreover, setting

aside their record of self-dealing, mismanagement, disqualifying conflicts of interest, and

disregard for legal and regulatory requirements, because the JOLs, and not the Fletcher Team,

are recognized as the Limited Debtors' governance in the Cayman Islands, *see infra* __, the

Fletcher Team cannot realize the Debtors' key assets: claims against Leveraged and Arbitrage

that are proceeding in the Cayman Islands before the Grand Court.

> **A.    The JOLs Investigation Has Revealed Multiple Instances of Mismanagement,
> Self-Dealing, and Failure to Comply with Legal and Regulatory
> Requirements by the Fletcher Team**

65.    As confirmed by the JOLs' investigations and as will be shown more fully during

the December 17 hearing, the Fletcher Team has caused the Limited Debtors to engage in self-

dealing with other Fletcher entities, which wasted resources and yielded no apparent benefit for

the Limited Debtors and their creditors.

66.    On December 31, 2012, Fletcher caused Elite Limited to spend $4 million to

acquire an equity interest in FILB, as discussed previously, a bankrupt entity, from another

affiliate, FII, which was another Fletcher-controlled entity.  (Fletcher Tr. at 75:4-76:2.)  The core

Fletcher Team—Fletcher, Ladner and Saunders—"negotiated" this transaction among

themselves, and did not bother obtaining a third party appraisal of the interest purchased by Elite

Limited.  (*Id*. at 83:20-24, 85:5-8.).  In other words, the Fletcher Team bought a worthless asset

for $4 million, and they did so with their shareholders money instead of paying redemptions.

67.    Among other things, the Fletcher Team, through FII, used this money to pay

"legal fees" and Fletcher stated that it was "certainly possible" that such fees were incurred as a

result of litigation in which Fletcher was personally involved.  (*Id*. at 82:16-22.)  Similarly,

Fletcher admits that "it is possible that directors' fees or other payments were made to directors

and officers, in which case, I likely would have received a fee also." (*Id*. 82:23-83:8.)  It should

be noted that Elite Limited faced at least $9.7 million in unpaid redemptions at the time of this

transaction.  (JOL Ex. 4 (Fletcher Decl.) at 13)  Fletcher testified that, in his judgment, the

acquisition of an interest in a bankrupt entity was an "attractive business opportunity,"

notwithstanding the outstanding redemptions.  (Fletcher Tr. at 96:13-97:13.)

68.    As another example, the Fletcher Team has also persisted in employing

professionals that continue to represent them personally, in depositions and throughout

discovery, at the expense of the Limited Debtors.  These professionals have no apparent interest

in exploring the potential conflicts of interest that the Limited Debtors may have with present

management, nor have they exercised any of the defenses that might be available to spare the

Limited Debtors these litigation expenses, under 11 U.S.C. § 502(d) or otherwise.  (*Id*. at 109:9-

111:20.)

69.    In addition, the Fletcher Team's chosen professionals have supported this

widespread self-dealing by allowing the Debtors' to assume and perform the disputed obligation

to indemnify and defend the Fletcher Team and using the Debtors' asset  to fight meritorious

objections to the Fletcher Team's disputed control of the Debtors over the opposition of all non-

insider stakeholders, the CIMA regulators, the Grand Court, the JOLs, the U.S. Trustee, and

others.  In fact, the Debtors' estates have comprehensive defenses and excuses for denying any

indemnity or defense to the Fletcher Team, since (a) they are guilty of willful misconduct and

gross negligence that disqualify them for those benefits, (b) they are liable to the estates' for

many wrongs that can be offset against any alleged liability, (c) they are blocked from any claim

recovery by unpaid wrongful transfers on account of Section 502(d), and (d) their claims must be

equitably subordinated under Section 510(c) and otherwise disallowed on the merits.

70.     As another example, the Fletcher Team has subjected the Limited Debtors to U.S.

Bankruptcy jurisdiction in order to prolong their control even though they cannot guarantee their

non-U.S. investors that they will not be subject to substantial U.S. taxes.  According to Fletcher,

his value to the Limited Debtors is so great that his continued management would be worth

subjecting the investors of the Limited Debtors to a 35% withholding tax.  (*See* Fletcher Tr. at

145:14-146:3.)

71.     The JOLs and their professionals, in conjunction with preparing for the

Evidentiary Hearing, have begun their investigation into the Debtors' business affairs and

reviewed a significant number of documents produced in response to discovery requests.

(Wright Direct at ¶ 29).)  By reviewing these documents, the JOLs have uncovered a number of

questionable transactions, including the intentional back dating of transactions and the entry into

transactions on behalf of Soundview Elite, Ltd. ("**Elite Limited**") that appear to be outside the

scope of the approved investment strategy and which directly or indirectly benefitted the Fletcher

Team, that will likely result in litigation against the Fletcher Team and third parties located in

and outside of the Cayman Islands.  *Id*. at 30.

72.     The following items represent concerning transactions that we have learned about

during the course of personally reviewing documents that have been produced to us by the

Debtors.  These transactions involve the backdating of documents and the use of Elite Limited's

assets for improper purposes that were outside the scope of permissible investments under its

governing documents.

73.     Elite Limited made payments under the Litigation Support Agreement totaling

more than $1.8 million to various attorneys, including almost $1 million to fund an appeal of

entry of the Leveraged winding up order where Elite Limited has filed a proof of debt for less than $250,000.

74.     The Debtors purportedly entered in the Litigation Support Agreement on February 26, 2012 for the stated purpose of coordinating legal strategy with respect to direct and indirect claims in the chapter 11 case of FILB and the Cayman Islands insolvency proceedings of Leveraged and Arbitrage.  (JOL Ex. 31 (Litigation Support Agreement) at 2.)  However, it was impossible to enter into the Litigation Support Agreement on that date because (a) the FILB chapter 11 petition was not filed until June 29, 2012 – more than 4 months later (FILB docket, Case No. 12-12796 [Docket No. 1]); (b) the Leveraged winding up order was not entered was not ordered until April 18, 2012 (nearly two months later) (JOL Ex. 32); and (c) Arbitrage was not placed into voluntary liquidation until June 29, 2012 (more than four months later).  *Id.*

75.     Moreover, Leveraged and Arbitrage are signatories to the Litigation Support Agreement.  It stands to reason that if the purpose of the agreement were to pursue claims in the insolvency proceedings of Leveraged and Arbitrage, joint liquidators would have already been appointed for those entities and the Fletcher Team would not have any authority to enter into this agreement on their behalf.

76.     In addition, Elite Limited entered into a number of sales agreements with Fletcher International, Inc. ("**FII**") dated December 31, 2012 (the "**December 2012 Agreements**"), wherein Elite Limited agreed to pay $4 million for FII's shares in FILB, a company subject to a chapter 11 proceeding and placed under the control of a FILB Trustee, as well as other assets, including the FII's ownership interests in BRG Investments, LLC ("**BRG**").  (JOL Ex. 33).)  This agreement was drafted internally by Gerti Muho, a non-lawyer, without any input from outside counsel.

77.    At trial, the evidence will show that Mr. Fletcher instructed him team to draft the sales agreement on or about January 1, 2013, dictating the terms of the sale.  (JOL Tr. Ex.34).) The Debtors did not produce any documents that evidence an internal or external valuation for these assets was completed.  The December 2012 Agreements were later unwound as a result of an agreement between the FILB Trustee and FII that was approved by this court.  *See* FILB Docket, Case No. 12-12796 [Docket No. 190] and an agreement (the "**Omnibus Agreement**") among Elite Limited, FII and RPGP Limited ("**RPGP**"), which was later amended in September 2013, which appears to be under continuous review for further adjustment. (JOL Ex. 35 (Omnibus Agreement) and JOL Ex.36 (Omnibus Amendment).)

78.    The evidence will show that Fletcher Team in March 2013 did not know the actual value of the FILB shares is unknown—but a *pro forma* balance sheet drafted by a FAM affiliate reflects a value lower than $4 million. (JOL Ex. 37).).  The evidence shows that Elite Limited only paid the $4 million to FII for the FILB shares on March 8, 2013 - - the same date FII was required to make a $2.2 million payment to the FILB Trustee.  In addition, FII used the funds received from Elite Limited to pay more than $365,000 to FAM or another affiliate, RF Services, LLC and approximately $900,000 to law firms that represent Mr. Fletcher in his personal capacity.

79.    When the FILB share sale was unwound pursuant to the Omnibus Agreement, FII issued the FII Note to Elite Limited rather than repay the $4 million purchase price.  (JOL Ex. 38 (FII Note).)  In addition, RPGP partially guaranteed the FII Note.  However, RPGP's guarantee may be of little value because RPGP significant assets are claims against Leveraged and it has little more than $10,000 in cash.  (JOL Ex. 37)

80.    Although there are many other suspicious circumstances and wrongful actions involving the Fletcher Team and affiliates that could be addressed, the JOLs have generally attempted to avoid duplicating those issues that were likely to be raised in briefing by other stakeholders against Fletcher and his potential co-defendants.  The JOLs reserve the right to offer additional proof at trial and through supplemental briefing.

**B.    All Relevant Stakeholders and Third Parties Agree That the Fletcher Team Should Not Govern the Limited Debtors**

81.    None of the various third parties—who have evaluated the Debtors' leadership of—including both disinterested tribunals and interested investors—believe that the Fletcher Team should remain in control.  As a result of these third-party conclusions, the Fletcher Team has no credibility to act as the leadership of the Limited Debtors, and this precludes them from working with relevant regulators and creditors as the Limited Debtors wind up.  In addition, these third-party conclusions provide—at the very least—grounds to investigate possible wrongdoing by the Fletcher Team, to which the Fletcher Team has a fatal conflict of interest that precludes them from doing so on behalf of the Limited Debtors

82.    First, the Limited Debtors' primary regulator, CIMA has voiced "serious concerns . . . that there is a loss of confidence in the management of the Companies . . . ."  (JOL Ex. 14 (Skeleton Br. ¶ 5(ii).)  In particular, CIMA questioned the "management's present and historical attitude to resolving problems," including "the fact of the varying Cease and Desist Orders filed by the former and current directors against each other."  (*Id.* ¶ 5.)  As a result of these issues, CIMA believed that "the Companies cannot be effectively managed as resolutions cannot be made" and "day-to-day management has been suspended pending court matters . . . ."  (*Id.*)  CIMA's concern included "the extent of the exposure to Fletcher Asset Management, Fletcher International Limited (In Bankruptcy) and FIA Leverage Fund (in liquidation)."  (*Id.*)

83.     CIMA wrote at length on its concern regarding Fletcher's continued control:

[T]he fitness and propriety of Mr. Fletcher as a director of the Companies must be called into question as a result of the pending actions and the fact of his declaration of bankruptcy in respect of entities to which [he] acts in the capacity of principal and/or director. To this end, the Authority notes that under the [Monetary Fund Law] and the Monetary Authority Law, the criteria for assessing the fitness and propriety of an individual who holds a position of director, manager, officer of a regulated entity includes *his integrity, reputation and financial soundness*. . . . [T]hese are material matters for which [CIMA] should hold as *serious allegations into the loss of confidence of the management of the Companies*. . . . [I]t is clear that the Companies [are] operating in a manner that may be considered *prejudicial to its stakeholders*.

(*Id*. ¶ 6.)

84.     CIMA also criticized the Fletcher Team's litigation methods in the Cayman proceedings as consisting of "delay tactics" of "no merit." (*Id*.)

85.     Second, when it issued its Winding Up Order, the Grand Court agreed with CIMA and other stakeholders that the JOLs should be appointed rather than allow the Limited Debtors to continue to operate under the Fletcher Team's control. (JOL Ex. 21 (Winding Up Order).) And the Grand Court shared CIMA's view that the filing of the chapter 11 petitions was a delay tactic rather than a legitimate attempt to reorganize. (*See* Francis Direct ¶¶ 14, 17.)

86.     Third, counsel for the U.S. Trustee describes this case as a "stark example of a situation where the debtors' principals should not remain in charge." (*Mem. of Law in Supp. of U.S. Tr.'s Mot. Pursuant to 11 U.S.C. § 1104 for Order Directing the Appointment of a Chapter 11 Trustee* at 5 [Docket No. 82].) Like CIMA, the Trustee cited the "ongoing struggle for control among the Debtors' current and former directors" and the need for investigations that "cannot be conducted by the principals, one or more of whom may be the targets of the investigation." (*Id*.) The Trustee concluded that "these cases cry out for an independent

28

fiduciary . . . ."  (*Id.*)  The JOLs refer this Court to the U.S. Trustee's filings, which speak for

themselves.

87.     Fourth, Pasig, Ltd., a significant creditor of the Limited Debtors, has indicated

that it has "zero faith in the Debtors' management's ability to protect stakeholder interests,"

stemming in part from "Debtors' mismanagement of funds" under control of Fletcher and his

colleagues.  (*Obj. to the Stip. & Consent Order By and Between the Debtors and Wilmington*

*Trust, Nat'l Assoc. Authorizing the Release of Funds and for Related Relief* at 8 [Docket No.

70].)

88.     Finally, although it did not address these cases, the FILB Trustee concluded that

Fletcher and his colleagues have defrauded investors in other Fletcher-related funds and diverted

those funds for personal gain.  (*See* JOL Ex. 17 (FILB Trustee Report).)  In particular, the FILB

Trustee concluded that FILB and related funds were

> victims of a fraud defined by the extensive use of wildly inflated
> valuations, the existence of fictitious assets under management . . .
> numbers, the improper payment of excessive fees, the misuse of
> investor money, and efforts wrongly to deny [investors] . . .
> mandatory redemption of their investment under certain
> circumstances.  The Funds were also victims of an environment
> where self-interest all too often trumped fiduciary obligations."

> (*Id.* at 4.)

89.     For instance, the FILB Trustee concluded that "$27 million of investor money

diverted to [Alphonse Fletcher's] personal benefit so that he could buy the Richcourt fund of

funds business."  (*Id.* at 16.)  According to the FILB Trustee, those funds were used in ways that

were "patently at odds" with FILB's investment strategy, including "nearly $8 million . . .

diverted to fund a movie being made by [Fletcher's] brother."  (*Id.* at 16, 33.)  According to the

FILB Trustee, this conflict of interest was never reported.  (*Id.* at 163.)  The nearly-300-page

report is replete with similar allegations.

90.     The FILB Trustee concluded that FILB has significant claims against Fletcher and his colleagues, including "fraud, breach of fiduciary duty, negligence, and similar torts; breach of contract; and aiding and abetting these torts and breaches." (*Id*. at 251.)

91.     The JOLs refer this Court to the FILB Trustee Report, which speaks for itself. These allegations call Fletcher's credibility into question, pose practical problems for the Fletcher Team's ability to work with skeptical outside partners and affiliates, and raise serious concerns regarding his ability to impartially investigate claims that his companies may have against their officers and directors.

## II.     THIS COURT SHOULD ACKNOWLEDGE THE JOLS AS THE DEBTORS' CONTROLLING AUTHORITY

### A.     The JOLs are the Stakeholders' Preferred Governance and are in the Best Position to Manage an Efficient Winding Up of the Debtors

92.     This Court should recognize the JOLs and defer to the Cayman proceedings.   As discussed above, under no circumstances should the Fletcher Team be permitted to maintain control.  In addition, because the JOLs are experienced, independent fiduciaries who have already conducted a substantial investigation, are recognized in the Cayman Islands, and have the support of key stakeholders, a winding up under the JOLs is preferable to appointing a U.S. bankruptcy trustee.

#### 1.     The JOLs are Experienced, Independent Fiduciaries Supported by the Debtors' Stakeholders

93.     The JOLs are experienced independent fiduciaries.  They are both qualified Cayman Islands insolvency practitioners with more than forty years of insolvency experience between them.  They have acted as joint official liquidators in Cayman Island liquidation proceedings for dozens of Cayman Islands companies.  (Anderson Direct ¶ 2; Wright Direct ¶ 2. )

94.       In addition, the JOLs have the support of the Debtors' key stakeholders.  When

Citco, filed its Winding Up Petition in the Cayman Islands, it selected the JOLs to manage the

Limited Debtors' winding up.  Solon, which filed the pending winding up petitions with respect

to the SPV Debtors, has also determined that the JOLs should manage the SPV Debtors' winding

up.  (Midanek Direct at 24 n.8.)

> **2.       A Winding Up Under The JOLs' Control is Preferable to
> Appointment of a Bankruptcy Trustee**

95.       There is no need to appoint a trustee when there is already an independent

fiduciary in place.  *See Bayou Group, LLC*, 564 F.3d 541, 547 (2d Cir. 2009) (refusing to

appoint trustee where court-appointed receiver already controlled debtors); *In re Gaslight Club*,

782 F.2d 767, 773-74 (7th Cir. 1986) (refusing to appoint trustee where prior manager had

already been replaced by court-approved manager acting as debtor in possession); *see also In re

The 1031 Tax Group, LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007) ("[T]he fact that the

debtor's prior management might have been guilty of fraud, dishonesty, incompetence, or gross

mismanagement does not necessarily provide grounds for the appointment of a trustee under §

1104(a)(1), as long as a court is satisfied that the current management is free from the taint of

prior management.").

96.       Appointment of a chapter 11 trustee is not appropriate here given that

independent, court-appointed fiduciaries are already in place.  Cayman Islands law recognizes

the JOLs, and only the JOLs, as the Limited Debtors' lawful managers and any appointment by

this Court of a trustee will not change that, and the JOLs and the Cayman proceedings will not

go away.  (Farrow Direct.)[10]  The appointment of a chapter 11 trustee is appropriate in those

---

[10] At the hearing on December 18, the JOLs will present the testimony of K. Farrow QC
as an expert on Cayman Islands law.  Under the scheduling order, the parties will submit written
(Footnote continues on next page.)

cases where there is cause to replace the debtors in possession and there is no alternative

fiduciary.    *See Bayou Group*, 564 F.3d at 547.  This is not such a case.  Thus, the best interest

of the stakeholders favors dismissal of Debtors' chapter 11 cases, or, if the Court declines to

dismiss, in the alternative to allow the JOLs to be the sole responsible persons managing the

Debtors in the chapter 11 cases, because winding up under the JOLs will avoid conflicting

proceedings and investigations, reduce unproductive litigation, allow for a global resolution for

all stakeholders, and comply with the Debtors' governing law.

97.    In addition, the factors that warranted continued U.S. oversight in the *FILB*

matter, Case No. 12-12796, are absent in this case.  In particular, the *FILB* case involved U.S.

pension fund creditors who wanted U.S. jurisdiction.  In contrast, this case solely involves

investors that are located outside of the U.S., who invested in a fund that was not subject to U.S.

jurisdiction and taxation.  In addition, the fact that the Cayman's foremost financial services

regulator, CIMA, has been actively involved in the winding up of the Debtors reduces the need

for yet another fiduciary overseeing these funds  (and also exempts the JOLs' appointment form

the automatic stay, as discussed in Part II.C, *infra*.)

98.    Similarly, conversion of these chapter 11 cases to chapter 7 would be wasteful,

time-consuming and wholly duplicative of the Cayman winding up process.  The investigation of

the Limited Debtors and the Fletcher Team has already begun.  The JOLs and their professionals

have reviewed over 30,000 documents in connection with these proceedings.  Additionally, the

_____

(Footnote continued from previous page.)

expert testimony to the Court on December 9, 2013 after the completion of expert depositions
and the close of expert discovery.  In advance of his deposition, Mr. Farrow has completed
expert disclosures, which will be exchanged with the parties on December 3, 2013.  The JOLs
anticipate that Mr. Farrow's testimony will be consistent with the opinions expressed in his
disclosures and references to "Farrow Direct" refer to Mr. Farrow's anticipated direct testimony.

JOLs have already reached out, although in some cases unsuccessfully, *see* Background Part G above, and begun gathering the Limited Debtors books and records.   Any fiduciary appointed by this Court, and its professionals, would necessarily duplicate those efforts wasting time and resources of the estates.   An additional fiduciary over the Limited Debtors (and eventually all of the Debtors) would, at best, only duplicate the JOLs' efforts, without providing any additional value.   Conversion to chapter 7 would also slow creditors' recovery.

99.     The appointment of an additional fiduciary, certainly an additional liquidator, will likely create serious confusion between the creditors and the liquidators, as each liquidator will seek to liquidate the entirety of the estates according to the statutory mandates of their home jurisdiction (a chapter 7 trustee according to the Bankruptcy Code and the JOLs according to the Companies Law).   Each fiduciary will need to retain professionals in both jurisdictions, doubling the cost of the liquidation, and creditors will need to retain counsel in both jurisdictions as well. The appointment of a chapter 7 trustee will multiply the costs and fees associated with the liquidation of these estates and for creditors to receive their distribution.   This is an untenable proposition when part of the reason that these investors, now creditors, invested in these funds was to avoid U.S. jurisdiction.

100.     As for the SPV Debtors, the Grand Court has adjourned the appointment of the JOLs as liquidators for the SPV Debtors and the creditors have not pressed the issue, out of respect for the automatic stay.   Upon dismissal with prejudice of the SPV Debtor's chapter 11 cases, or the lifting of the stay for such a purpose, the creditors and the JOLs will move the Grand Court for an expedited hearing to appoint the JOLs as liquidators of the SPV Debtors as well.   Under Cayman law, the JOLs are authorized to manage the Limited Debtors business. (Farrow Direct.)   As holders of the voting shares in the SPV Debtors, the Limited Debtors have

the authority to remove the Fletcher Team from the management of the SPV Debtors. (JOL Ex.

28 (SPV Debtors Register of Members).)  and will do so with the blessing of this Court, either

through dismissal or lifting the automatic stay.

            **3.**      **Winding Up Under the JOLs Will Avoid Competing and Duplicative
Proceedings and Investigations**

101.    The Cayman proceedings must continue in accordance with the Winding Up

Order and CIMA's continuing regulation, because these are *Cayman*-registered Companies.

Cayman Islands law does not recognize the authority of any foreign trustee appointed over any

Cayman Islands companies, including any of the Debtors.  (Farrow Direct.)  The JOLs have been

respectful of this Court's process and mindful of the automatic stay as it applies to the Debtors'

assets located outside of the Cayman Islands.  The Limited Debtors do, however, control the

voting shares of the SPV Debtors. (JOL Ex. 28 (SPV Debtors Register of Members).)

102.    The JOLs, as the Limited Debtors' managers, have the right to change the

governance of the SPV Debtors.  After the Evidentiary Hearing, the JOLs will remove the

Fletcher Team as officers and directors of the SPV Debtors so that the SPV Debtors can be

wound up concurrently with the Limited Debtors.  As a matter of Cayman Islands law, the Grand

Court and CIMA will not recognize the appointment of a U.S.-appointed trustee as the

governance of a Cayman-registered company without the JOLs' consent.  (*See* Farrow Direct.)

103.    The JOLs have invested considerable time and funds in the course of preparing

for trial and the extensive investigation of the wrongdoing and objectionable conduct of the

Fletcher Team and related parties, among others.  There is no need for a chapter 11 trustee to

replicate that effort or expense.  Indeed, because of the pace of the FILB Plan process and the

affiliated insolvency cases in the Caymans, there is no time for a new chapter 11 trustee to catch

up now.  The Debtors' estates need the JOLs to begin acting to protect their interests

immediately, whether in the Cayman winding-up proceeding, in the chapter 11 cases, or both.

Regardless of what happens at the Evidentiary Hearing, the JOLs will continue their

investigation and seek directions (orders) from the Grand Court and the courts of other

jurisdictions, as appropriate, to enforce the Winding Up Order so that they may fulfill their

statutory duties and recover assets for the benefit of stakeholders.  Moreover, the Debtors and

their stakeholders may be subject to unnecessary U.S. taxes and other jurisdictional burdens,

which could not have been contemplated when the Debtors were formed or stakeholders made

their initial investment.

104.    The Debtors' non-cash assets, consist of intercompany claims, investments in

foreign investment funds managed by third parties or are the subject of foreign liquidation

proceedings and litigation claims.  (*See supra* Background ¶¶ 19-22.)  The JOLs can easily

manage the Debtors' cash assets.  The JOLs are the best suited to deal with the Debtors'

investment assets because those investments were made in Cayman-registered funds.  In

addition, the JOLs are best positioned to protect the Debtors' claims against its Cayman affiliates

that are in Cayman insolvency proceedings because they do not have the Fletcher Team's

credibility issues.  Finally, the JOLs can bring claims against the Fletcher Team and other

affiliates wherever they are located, including the United States.  The JOLs can always seek

recognition of the Cayman proceedings under chapter 15 of the Bankruptcy Code at the

appropriate time if they deem it necessary.  Continuing these chapter 11 cases, whether under the

control of a chapter 11 trustee or the JOLs, will only add additional costs to estates with limited

resources and will yield no additional recoveries for stakeholders.

### 4.    Winding Up Under the JOLs Will Reduce Unproductive Litigation

105.    With the JOLs in control, the Fletcher Team and affiliates cannot waste more

estate assets by provoking unproductive litigation, particularly in the Cayman Islands.  Even in

the U.S., the Fletcher Team would likely be a reduced distraction because they could no longer

misuse the Debtors' assets to advance their personal interests contrary to the best interest of

stakeholders.  The JOLs, unlike the Fletcher Team, are confident of achieving successful

solutions and relations with every relevant party in interest.

106.    On the other hand, given past events, the Fletcher Team and their affiliates cannot

hope to regain the trust and confidence of stakeholders, CIMA or the JOLs necessary to manage

a successful liquidation.  Even before uncovering evidence in discovery of the Fletcher Team's

mismanagement, abuse of power, self-dealing, conflicts of interest, breaches of fiduciary duty,

and other wrongs, CIMA and the non-insider stakeholders all regarded the Fletcher Team as

unsuitable or worse.  The fruits of the JOLs' investigations and the FILB Trustee Report have

eliminated any remaining possibility of the Fletcher Team as a credible management team.

### 5.    Only the JOLs Can Propose an Integrated Solution to Stakeholders

107.    The JOLs are the only party that can fashion an integrated solution that works in

the United States, the Cayman Islands and elsewhere.  This is why most efficient and cost

effective solution is dismissal of the chapter 11 cases, and, if necessary, a later filed chapter 15

proceeding.  The JOLs are the only party that the Caymanian courts will recognize as the

governance of the Limited Debtors, and a substantial amount of the Limited Debtors' assets are

accessible through Cayman proceedings.  This means that, if this Court recognizes or appoints

another entity, that entity would have to work with and through the JOLs in order to be effective

in the Cayman Islands.  This would inevitably lead to a duplication of costs and labor.  In

contrast, the JOLs can operate in either jurisdiction (including by filing a chapter 15 petition, if

appropriate).  Indeed, this is what Chief Justice Smellie envisioned when he empowered the

JOLs and ordered them to seek foreign recognition as necessary.  (JOL Ex. 21 (Winding Up

Order) at 2.)

6.    **Winding Up Under the JOLs Would Comply With Governing Cayman Law and CIMA Regulation as Well as U.S. Law of Foreign Relations**

108.    Pursuant to 28 U.S.C. § 959, either the management of the Debtors or a Chapter 11 trustee, as applicable, must comply with applicable law—here, Cayman law and CIMA regulation.  The Fletcher Team could never achieve that compliance, as required by 28 U.S.C. § 959, or even function again in the Cayman Islands.  A chapter 11 trustee would have significant challenges in attempting to appear in the Cayman Islands or elsewhere outside the U.S., absent a satisfactory protocol with the JOLs.  Winding up in the Cayman Islands would also encourage compliance with the U.S. law of foreign relations.  Under these circumstances, the Cayman Islands have a continuing and superior interest in the Limited Debtors' regulation and governance.  And in any event, CIMA cannot abdicate its obligations as the Limited Debtors' sovereign regulator.  Thus the best and most cost-effective compliance is simply to dismiss the chapter 11 cases or, alternatively, allow the JOLs to be the responsible persons to manage the Debtors here.

7.    **The Cayman Islands Present the More Suitable Forum for Winding Up the Debtors**

109.    The interests of the stakeholders would not be served by winding up these companies in a forum with little connection to, or interest in, the proceedings.  The Debtors are Cayman regulated funds, bound by Cayman law and subject to the jurisdiction and oversight of CIMA.  (*See*, *e.g.*, JOL Ex. 1 (PPM) at 34.)  The Limited Debtors are the subject of ongoing investigations by Cayman authorities, and are at the center of a liquidation proceeding before the Grand Court.  (*See* Background Parts C & D.)  The JOLs appointed by the Grand Court are non-U.S. citizens and Cayman residents and stand ready to liquidate the Limited Debtors in accordance with Cayman law.  The Cayman Islands has much stronger ties to these entities than

37

the United States and the exercise of U.S. jurisdiction would frustrate the justified expectations

of non-U.S. investors and creditors.

110.    The Cayman Islands are also where the bulk of the Limited Debtors' key assets

are located, and where their distribution will be resolved.  According to Fletcher, the Limited

Debtors' principal assets are "the claims that the estate has in the insolvency proceedings in

Cayman"—*i.e.*, claims against Arbitrage and Leverage (as well as the FILB chapter 11 cases,

which will be resolved according to the FILB Disclosure Statement).  (Fletcher Tr. at 142:23-

143:8; 179:12-15.) The Limited Debtors also possess causes of action against directors and

officers—whether for breach of fiduciary duty, wrongful transfer of assets or other wrongs—and

Cayman law regards Cayman to be the situs of these claims.  (*See* Farrow Direct.)  These

litigation-related Cayman connections offer a particularly powerful basis for exercising comity

because Cayman law has already established that the JOLs are the only ones with the authority to

pursue these claims on behalf of the Limited Debtors.  Finally, Cayman law regards the Debtors'

custodians in Cayman, like HSBC Cayman, as the holders of the Limited Debtors' non-

certificated investment securities, and the Cayman Islands are therefore the location or situs of

those securities.  (*Id.*)

111.    The interests of the U.S. in this suit are limited when compared to the Cayman

Islands  The only connection that the Limited Debtors have with the U.S. is the presence of some

of the Limited Debtors' cash in U.S. bank accounts and the office of the removed and discredited

Fletcher Team.  (*See* Background Parts A & 9.)  The Limited Debtors are not registered with the

SEC.  (Tr. of Fletcher Dep. at 113:15-17.)  No U.S. shareholders exist because the Limited

Debtors' shares will not be sold within the U.S. or for the benefits of U.S. persons.  (JOL Ex. 1

(PPM) at iv, 5.)  The investors relied on the U.S. exclusions set forth in the PPM, and seek to

avoid incurring unnecessary U.S. tax liability and other burdens of U.S. Jurisdiction.

112.    For all of these reasons, winding up in the Cayman Islands will be most consistent

with the justified expectations of creditors and shareholders.  Indeed, one of the purposes of

establishing the Limited Debtors in the Cayman Islands was to manage its investors' resources so

as to minimize involvement in the U.S. and legitimately avoid incurring U.S. tax liability.  (PPM

at 25-26.)  As a result, the Limited Debtors' investors reasonably expect that any proceedings

related to their involvement with the Limited Debtors will take place outside the United States.

Similarly, creditors who conducted business with the Limited Debtors knew that they were

dealing with a Cayman company and had every reason to expect that any insolvency would be

resolved in the Cayman Islands.  *See Cunard Steamship Co. Ltd. v. Salen Reefer Servs. AB*, 773

F.2d 452, 458 (2d Cir. 1985) ("every person who deals with a foreign corporation impliedly

subjects himself to such laws of the foreign government, affecting the powers and obligations of

the corporation with which he voluntarily contracts, as the known and established policy of that

government authorizes").

113.    Because the JOLs can maximize net recoveries and a Cayman proceeding will

conform to non-U.S. stakeholders' reasonable tax-planning expectations, an orderly and

comprehensive winding up in the Cayman Islands under the JOLs' control is the best possible

outcome for the Limited Debtors' stakeholders.

**B.      This Court Should Acknowledge the JOLs' Appointment Because No One
          Else May Validly Govern the Limited Debtors in the Cayman Islands**

114.    From the time of their appointment, the JOLs have been the only persons

authorized, as a matter of Cayman law, to manage the corporate affairs of, and to act for and on

behalf of, the Limited Debtors.  Accordingly, any actions taken on behalf of the Limited Debtors

by the Fletcher Team without the JOLs' explicit agreement—including continued prosecution of

the chapter 11 petitions— is *ultra vires* as a matter of Cayman law.  (*See* Farrow Direct.)

115.    The Winding Up Order cannot be collaterally attacked or invalidated in the U.S. or elsewhere, as far as Cayman law is concerned, and Cayman courts would not be bound by any U.S. or other foreign court order that would attempt to defeat, invalidate or obstruct the Winding Up Order or CIMA's sovereign regulatory governance.  (*Id.*); *see also In re Gee*, 53 B.R. 891, 901-902 (Bankr. S.D.N.Y. 1985) (refusing to entertain arguments that were "tantamount to an attempt by the debtor to appeal the Grand Court's orders [appointing a liquidator], an avenue which, significantly, was never exhausted by the debtor").  As such, regardless of how this chapter 11 proceeding is resolved, the Winding Up Order will remain lawful and controlling, and the JOLs will remain governing fiduciaries over the Limited Debtors, in the Cayman Islands and in every other jurisdiction that recognizes Cayman law or affords it comity.

116.    For these reasons, this Court should recognize and give effect to the Winding Up Order, CIMA's regulatory choices, and the appointment of the JOLs, out of basic considerations of international law and comity.  *Cunard SS*, 773 F.2d at 458 ("It has long been established that foreign trustees in bankruptcy were granted standing as a matter of comity to assert the rights of the bankrupt in American courts."); *see also Iida v. Kitahara*, 377 B.R. 243 (B.A.P. 9th Cir. 2007) (Japanese trustee in bankruptcy of a Japanese debtor owning U.S. subsidiaries entitled to act as manager of those entities, without necessity of any U.S. court action or chapter 15 recognition).  The extension of comity is especially important in this case because the Limited Debtors' key assets include two ongoing affiliate insolvency proceedings that are pending in the Cayman Islands (as to Arbitrage and Leveraged).  The JOLs are the only entities authorized to act on the Limited Debtors' behalf in the Cayman Islands.  The Fletcher Team in particular has

no right, standing or credibility to act for the Limited Debtors to obtain those recoveries. As a result, the JOLs are the only party able to recover the Debtors' most significant assets.

### C.    The Automatic Stay Does Not Apply to the Winding Up Order Because it Was a Valid Exercise of CIMA's Sovereign Police and Regulatory Powers

117.    The Fletcher Team argues that the automatic stay barred the winding up proceeding, and that the Winding Up Order is therefore "null and void." (*See* Debtor's Motion for Sanctions at 9-12.) But the automatic stay did not apply because CIMA was a party to and fully supported the Winding Up Proceeding. (*See* Background Parts C & D.) This triggers an exception to the automatic stay because, under Section 362(b)(4), the automatic stay does not apply to "the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power . . . ." 11 U.S.C. § 362(b)(4). And CIMA is a governmental unit under Section 362(b)(4). *See* 11 U.S.C. § 101(27). ("governmental unit" includes a "foreign state," the "department, agency, or instrumentality" of "a foreign state" and any "other foreign . . . government").

118.    This exception is intended to prevent debtors from "frustrating necessary governmental functions by seeking refuge in bankruptcy court," just as the Fletcher Team admits it sought to do here. *New York v. Exxon Corp.*, 932 F.2d 1020, 1024 (2d Cir. 1991) (citation and internal quotation marks omitted).[11]

119.    The exception applies to actions "where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or

---

[11] As noted above, the involvement of CIMA is sufficient to distinguish this case from the one considered by the Court in *Fletcher International, Ltd.*, Case No. 12-12796. That case did not involve a regulatory action taken by a concerned foreign sovereign and confirmed by a valid Cayman court order. Consequently, the FILB case did not present facts for this Court to consider the regulatory stay exception of 11 U.S.C. § 362(b)(4).

similar police or regulatory laws . . . ." *Id.* (quoting legislative history).  For instance, courts

routinely apply the exception to actions brought by entities such as the SEC, because "[i]t is well

settled that the primary purpose of Commission enforcement actions is to promote public policy

and safety by ensuring fair and equitable securities markets."  *E.g.*, *SEC v. Wolfson*, 309 B.R.

612, 618-19 (D. Utah 2004); *see also Board of Governors of the Federal Reserve System of the

United States v. MCorp Financial, Inc.*, 502 U.S. 32 (1991) (applying exception to enforcement

action by Board of the Federal Reserve).

### 1.    CIMA Was Exercising Police and Regulatory Powers Over the Limited Debtors in the Winding Up Proceeding

120.    CIMA acts in a regulatory role that is closely analogous to the SEC, and wields

"police and regulatory power" as authorized by the Cayman Monetary Funds Law, the financial

regulatory law of the Cayman Islands.  Court have repeatedly applied Section 362(b)(4) to SEC

actions analogous to CIMA's actions here.  For example, in *Wolfson*, 309 B.R. 612, the SEC

sought court appointment of a receiver to take control of the defendant's company.  Like the

Fletcher Team in the Grand Court proceeding, the *Wolfson* defendant mounted little-to-no

substantive defense to the regulator's charges.  *Id.* at 615.  "Apparently recognizing his

predicament in this action, [the defendant] sought refuge in the bankruptcy court less than four

hours before the" hearing on the SEC's motion for appointment of a receiver, "thereby creating

significant confusion among the parties as to the ability of this court to proceed."  *Id.* at 616.

After noting clear public purpose of SEC enforcement provisions, the *Wolfson* court concluded

that "it is abundantly clear that continuation of the instant action, brought in the public interest

by the Commission, is excepted from the automatic stay provision of the Bankruptcy Code,"  and

that the "exception also permits this Court to appoint a receiver."  *Id.* at 619-20; *see also SEC v.

First Fin. Grp. of Tex.*, 645 F.2d 429 (5th Cir. 1981) (SEC's appointment of a receiver over a

securities dealer did not violate the automatic stay and noting that appointing a receiver "serves

to prevent dismemberment of the corporate estate by management personnel who have been

found to have acted fraudulently and who could otherwise easily dispose of the assets to the

detriment of the debtor's creditors")

121.    CIMA has broad regulatory powers, including the power to replace the

governance of Cayman entities like the Limited Debtors by (1) directly appointing a Controller

(Cayman Islands Monetary Funds Law §§ 30(3)(e), 30(7)-(8) (2012)); (2) presenting a winding

up petition to the Grand Court on its own initiative, which usually involves the appointment of

an official liquidator (Cayman Islands Companies Law §§ 94(1)(d), 94(4), 105 (2012)); or, as it

chose to do here, (3) joining a private creditor's previously-filed winding up petition (*id*. at

§ 94(1)).  Indeed, CIMA retains explicit authority to join a proceeding and seek appointment of a

provisional liquidator "regardless of whether or not the Authority presented the winding up

petition."  (*Id*. § 104(6).)

122.    In this case, CIMA considered exercising its power to directly appoint a

Controller, but consciously decided to exercise its regulatory powers by supporting the Winding

Up Petitions instead.  Yolanda Banks McCoy, Head of CIMA's Investments and Securities

Division, summarized CIMA's rationale in her affidavit to the Grand Court:

> CIMA reviewed its powers i.e. permissible enforcement actions
> under section 30(3)[12] of the MFL and management arrived at the
> following viewpoint:
> (a)    Given the seriousness of the regulatory concerns, CIMA
>         has sufficient grounds to take action.
> (b)    However, given the timing of the hearing of the winding up
>         petitions, it is unlikely that CIMA would be in a position to

---

[12] Section 30(3) includes the power to "appoint a person to assume control of the affairs
of the mutual fund," which "include the power to terminate the business of the mutual fund."
(Cayman Islands Monetary Funds Law §§ 30(3)(e), 30(7)-(8).)

<div style="margin-left: 2em;">
appear a Controller before the hearing date.

(c)    In any event, appointing a Controller would be at the expense of the Funds who would undertake similar yet less pervasive functions as a Liquidator and the Controller may well have recommended a winding up as a similar recourse to solving the Companies issues.

(d)    In respect to the redemption payments, the Companies have failed to make further payments and as such there are grounds for a winding up application.
</div>

(JOL Ex. 7 (McCoy Aff. ¶ 15).)

123.    After joining the winding up proceeding against the Limited Debtors, CIMA submitted briefing before the Grand Court, and participated in the September 24 winding up hearing.  CIMA explicitly stated that it "supports the persons nominated to act as liquidators from the firm of RHSW (Cayman) Limited," namely Matthew Wright and Peter Anderson.  (JOL Ex. 7 (McCoy Aff. ¶ 18.)  The Grand Court issued the Winding Up Order after "hearing counsel for the Companies and the Cayman Islands Monetary Authority," and appointed Wright and Anderson as Joint Official Liquidators of the Limited Debtors, exactly as CIMA requested.  (JOL Ex. 21 (Winding Up Order) at 1.)

124.    The Winding Up Order is analogous to the orders appointing receivers considered by the courts in *Wolfson* and *First Financial*.  Just as in those cases, the Grand Court has, at the request of a financial regulator, appointed a responsible steward to control the assets of an entity that has filed for bankruptcy.  (*See* JOL Ex. 21 (Winding Up Order) at 1-2.)

125.    The Fletcher Team argues that the ultimate purpose of the winding up proceeding is an attempt "to recover claims against the Debtors or obtain possession of, or exercise control over property of the Debtors' estates" in violation of the automatic stay.  (Debtors' Mot. For Sanctions at 10-11.)  But as the Supreme Court held in *MCorp Fin., Inc.*, 502 U.S. 32, the exception to the automatic stay found in Section 362(b)(4) does not turn on the "ultimate

objective" of the proceeding or the potential for future action by the parties. *Id*. at 40. A civil

proceeding brought by a regulator must go forward even if future activity could "affect the

Bankruptcy Court's control over the property of the estate," because "that *possibility* cannot be

sufficient to justify the operation of the stay against an enforcement proceeding that is expressly

exempted by § 362(b)(4). To adopt such a characterization of enforcement proceedings would

be to render subsection (b)(4)'s exception almost meaningless." *Id*. at 40-41 (emphasis in

original). Because the Winding Up Order itself does not purport to affect the disposition of the

assets of the Limited Debtors, it remains "squarely within § 362(b)(4)." *Id*.

### 2.    Private Parties' Participation Does Not Preclude Application of the "Governmental Unit" Exception

126.    As described above, CIMA's decision to participate in a winding up proceeding

initiated by private parties represents a conscious choice among the different regulatory

enforcement mechanisms available to the agency. The fact that private parties were also

involved in the winding up proceeding and seeking the same relief as CIMA does not remove

that proceeding from Section 362(b)(4).

127.    The Fifth Circuit's recent ruling in *In re Halo Wireless, Inc.*, 684 F.3d 581 (5th

Cir. 2012) is instructive on this point. In *In re Halo*, private parties had filed actions in various

state public utility commissions to establish that Halo Wireless was misclassifying itself as a

wireless carrier, and thereby avoiding regulation and unlawfully passing charges off to those

private parties. In reaction to these suits, Halo filed a voluntary petition under chapter 11. The

Fifth Circuit concluded that the utility commissions could proceed with the actions against Halo

under Section 362(b)(4). It noted that the commissions "become parties to the proceedings once

a private party files a complaint," and found it meaningful that the proceedings involved the

active participation of commission staff, who appeared and provided testimony. *Id*. at 592. The

actions were therefore "similar to any action that a state regulatory commission might take itself .

. . ." *Id*.  But "more importantly," the proceedings fell under the "governmental unit" exception

because:

> the statutory language directs that 'the commencement *or
> continuation* of an action or proceeding by a governmental unit' is
> excepted from the automatic stay.  It neither ignores nor twists the
> words of the statute to interpret this phrase as excepting suits
> continued by a governmental unit, without regard to who initially
> filed the complaint."

*Id*. (emphasis in original); *see also United States Int'l Trade Comm'n v. Jaffe*, 433 B.R. 538

(E.D. Va. 2010) (holding that International Trade Commission could proceed with action

initiated by private party pursuant to exception under section 362(b)(4)).

128.    The same reasoning applies in this case.  CIMA joined in the winding up

proceeding, submitted arguments and affidavits in support, and argued at the winding up hearing.

(*See* Background Part D, *supra*).  The September 24 hearing was therefore the "continuation of

an action or proceeding by a governmental unit" under section 362(b)(4).  *Halo*, 684 F.3d at 592.

129.    Importantly, Cayman law gives CIMA the power to do all of this again, by

appointing the JOLs as Controllers, or by initiating another liquidation proceeding before the

Grand Court.  (Cayman Islands Monetary Funds Law §§ 30(3)(e), 30(7)-(8), 94(1)(d), 94(4),

105; *see also* Farrow Direct.)  And if CIMA were to do so, there would be no question its actions

would fall under the exception.  Given CIMA's stated lack of faith in the Fletcher Team and its

desire to remove the Fletcher Team from control of the Limited Debtors, there is no reason to

think that it would not do so if necessary.  CIMA's basis for doing so has only become stronger

after the filing of the FILB Trustee Report and Disclosure Statement.  The Fletcher Team's effort

to circumvent the Winding Up Order is therefore futile—as it would at most put CIMA through

the unnecessary expense and effort of redoing what the Winding Up Order already does.

46

130.    The bottom line is that the automatic stay never applied to the winding up

proceeding, and offers no basis for refusing to recognize the Winding Up Order.  The fact that

the Fletcher Team barely won the race to the courthouse, and filed the chapter 11 petitions

moments before the winding up hearing took place, is therefore of no consequence to the lawful

authority of the JOLs.[13]

### 3.    If the Regulatory Stay Exception Did Not Apply, This Court Should Modify the Stay to Acknowledge the Winding Up Order

131.    Even if this Court concludes that the automatic stay could apply to the winding up

proceedings notwithstanding CIMA's active role, this Court should extend U.S. recognition to

the Winding Up Order in the interest of comity by modifying the automatic stay.

132.    Such an accommodation is well within this Court's discretion under Section

362(d)(1), which allows this court to annul or modify a stay "for cause."  11 U.S.C. § 362(d)(2);

*In re Kissinger*, 72 F.3d 107, 108-09 (9th Cir. 1995) ("section 362 gives the bankruptcy court

wide latitude in crafting relief from the automatic stay, including the power to grant retroactive

relief from the stay" (citation omitted)); *see also Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512,

519 (2d Cir. 1975) (ordering bankruptcy court to lift restraining order in chapter 11 proceeding,

so that litigant could obtain recognition of a foreign arbitration award issued after the bankruptcy

---

[13] In addition, neither the Supreme Court nor the Second Circuit has ruled that the automatic stay of Section 362(a) can be given extraterritoriality effect under these circumstances.  In the event that this Court grants the Fletcher Team's requested relief, the JOLs reserve the right to challenge the extraterritorial reach of the automatic stay in circumstances such as these, which would be contrary to the comity required by the U.S. law of international relations, the U.S. Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, the act of state doctrine, and other additional laws and doctrines addressed herein.  Although the JOLs recognize that turning this dispute into a test case for the appellate courts is not in the best interest of the Limited Debtors' creditors and investors, it remains preferable to the alternative of allowing the Fletcher Team to retain control in violation of Cayman law, and thereby straining the relations of these friendly nations with competing insolvency proceedings that cannot otherwise be reconciled.

stay).  Ample cause for modifying the stay is set forth in Part III and IV below, including the bad

faith nature of the Fletcher team's filing, the interest of comity and need to observe the act of

state doctrine.

### III.   THE CHAPTER 11 CASES SHOULD BE DISMISSED WITH PREJUDICE AS BAD FAITH FILINGS

#### A.    The Chapter 11 Filings Should be Dismissed as Bad Faith Filings Under Section 1112(b)(1)

133.    "Congress has never intended that bankruptcy be a refuge for the irresponsible,

unscrupulous or cunning individual."  *In re Rognstad*, 121 B.R. 45, 50 (Bankr. D. Hawaii 1990).

To address abuses of the bankruptcy process, Congress included section 1112(b) of the

Bankruptcy Code, which provides:

> Except as provided in paragraph (2) and subsection (c), on request of a
> party in interest, and after notice and a hearing, the court shall convert a
> case under this chapter to a case under chapter 7 or dismiss a case under
> this chapter, whichever is in the best interests of creditors and the estate,
> for cause unless the court determines that the appointment under section
> 1104(a) of a trustee or an examiner is in the best interests of creditors and
> the estate.

11 U.S.C. § 1112(b)(1).  "Cause" is a broad and flexible concept which must be determined on a

case-by-case basis.  *Cf. In re Project Orange Associates, LLC*, 432 B.R. 89, 103 (Bankr.

S.D.N.Y. 2010).  Bankruptcy courts have broad discretion to dismiss a chapter 11 case for cause.

*See In re Woodbrook Associates*, 19 F.3d 312, 316 (7th Cir.1994); *In re Syndicom Corp.*, 268

B.R. 26, 43 (Bankr. S.D.N.Y. 2001); *In re GEL, LLC*, 2012 WL 3073069 (Bankr. E.D.N.Y. July

30, 2012).

134.    Evidence of a "bad faith" filing will support a dismissal for cause.  *See C–TC 9th

Ave.*, 113 F.3d at 1309-10.  "[A] bankruptcy petition will be dismissed if" a movant can show

"both objective futility of the reorganization process and subjective bad faith in filing the petition

. . . ."  *E.g., In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997).  These

factors are considered in the context of the totality of the circumstances. *In re Consol. Distribs., Inc.*, No. 13-40350, 2013 WL 3929851 at *7 (Bankr. E.D.N.Y. July 24, 2013); *see also C-TC 9th Ave.*, 113 F.3d at 1312 (finding of bad faith "requires a full examination of all the circumstances of the case" and is "a highly factual determination").

135.    To warrant dismissal, a movant need only establish "cause" by a preponderance of the evidence.  See, e.g., *In re Taub*, 427 B.R. 208, 231 (Bankr. E.D.N.Y.2010); *In re St. Stephen's 350 E. 116th St.*, 313 B.R. 161, 170 (Bankr. S.D.N.Y. 2004).  Once the movant establishes the elements of bad faith, "a rebuttable presumption of bad faith arises and the burden shifts to the debtor to establish good and sufficient reasons why the relief should not be granted." *Consol. Distribs.*, 2013 WL 3929851 at *7; *see also In re Squires Motel, LLC*, 426 B.R. 29, 34 (N.D.N.Y.2010).

136.    This case presents a particularly strong case for dismissal:  The Fletcher Team admittedly filed the chapter 11 petitions in an attempt to retain control of the Limited Debtors and avoid CIMA's regulatory enforcement of Cayman law, and the Limited Debtors cannot be reorganized.  The Court should therefore dismiss these cases as bad-faith filings.  *In re C–TC 9th Ave. P'ship*, 113 F.3d 1304, 1309-10 (2d Cir. 1997) (recognizing "bad faith" as grounds for dismissal); *Little Creek Dev. Co. v. Commonwealth Mort. Corp.*, 779 F.2d 1068, 1072 (5th Cir. 1986) (dismissal for bad faith "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes").[14]

---

[14] This Court also has the power to dismiss or suspend this case if "the interests of creditors and the debtor would be better served by such dismissal or suspension . . . ."  11 U.S.C. § 305(a).  The same facts that support dismissal under Section 1112(b) for bad faith also support abstention under Section 305(a).  *See In re Brookdale Gardens Ass'n*, No. 09-41305, 2010 Bankr. LEXIS 1643, at *14-16 (Bankr. N.J. May 20, 2010) (unpublished) (abstaining because "[a] petitioner's

(Footnote continues on next page.)

      **1.     The Fletcher Team Acted With Subjective Bad Faith When It Filed the Chapter 11 Petition**

137.    Subjective bad faith exists if "the petitioner's real motivation is 'to abuse the reorganization process' and 'to cause hardship or to delay creditors by resort to the chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities.'" *Carolin Corp. v. Miller*, 886 F.2d 693, 698-99 (4th Cir. 1989). The Second Circuit holds that "an entity may not file a petition for reorganization which is solely designed to attack a judgment collaterally—the debtor must have some intention of reorganizing." *C-TC 9th Ave.*, 113 F.3d at 1310.

138.    Here, the Fletcher Team filed the chapter 11 petitions for the explicit purpose of delaying the Winding Up Proceeding and preventing the Grand Court from appointing their replacement at the urging of both CIMA and the petitioning creditors. (*See* Fletcher Proffer; Ladner Proffer; Background Part E, *supra*.) Both Fletcher and Ladner indicated that it was imperative that the Limited Debtors submit the chapter 11 petitions before the Cayman winding up hearing in order to, among other things, prevent CIMA from using its regulatory enforcement powers to replace the Limited Debtors' management. (Fletcher Tr. at 132:21-133:2; Ladner Tr. at 96:6-19.) Fletcher testified that he believed that the petitions would halt the proceeding and impose "more limits" on CIMA's authority over the Limited Debtors. (Fletcher Tr. at 105:22-24, 106:22-107:3; 114:2-9.) According to Ladner, the Fletcher Team thought that one of the "primary pluses" of filing the petitions would be that the Fletcher Team "could be left in place."

---

(Footnote continued from previous page.)

good faith use of bankruptcy is equally of concern when considering abstention and dismissal under § 305(a)") Many courts have opted to abstain under Section 305 to avoid "the use of a chapter 11 case purely as a litigation strategy." *In re First Fin. Enters., Inc.*, 99 B.R. 751, 754 (Bankr. W.D. Tex. 1989) (abstaining where debtor sought "to halt the state court receivership and conservatorship" and maintain control of assets).

(Ladner Tr. at 21:10-15.)

139.     The Fletcher Team's eleventh-hour filing is analogous to the bad-faith petition

considered by the bankruptcy court in *In re Wally Findlay Galleries (New York), Inc.*, 36 B.R.

849, 850 (Bankr. S.D.N.Y. 1984), a case cited with approval by the Second Circuit in *C-TC 9th

Ave*.  In *Wally Findlay Galleries*, the bankruptcy court dismissed a chapter 11 case after finding

that the "petition was filed the same day that judgments on . . . promissory notes were entered in

the state court." *Id.* at 851.  Finding that the "debtor filed its petition herein to avoid the

consequences of adverse state court decisions while it continues litigating," and that the "debtor

is unable to propose a meaningful plan of reorganization until its litigation . . . is resolved," the

bankruptcy court then found it "evident that the debtor seeks to use this court not to reorganize,

but to relitigate.  This is an impermissible use of Chapter 11 . . . ." *Id.*

140.     As in *Wally Findlay Galleries*, the Fletcher Team sought the protection of chapter

11 less than an hour before the commencement of the winding up proceedings, in hopes that the

petitions would frustrate the Grand Court and CIMA.  The Limited Debtors had submitted no

opposing papers and no evidence in the Cayman proceeding to rebut the arguments presented by

CIMA and Citco for winding up the Limited Debtors.  (*See* Background Part D, *supra*.)  At the

time they made the decision to file the petitions, chapter 11 was the only way to keep the

Fletcher Team in control of the Limited Debtors.  Further evidence that the Fletcher Team's only

purpose was to frustrate the winding up proceeding is the failure to file any first day motions.

(JOL Ex.  4 (Fletcher Decl.) ¶ 27.)  An entity seeking to truly rehabilitate itself would normally

seek such relief at the time of filing.   Moreover, a debtor with an intent to reorganize would seek

to work with its creditors and stakeholders to convince them that they are truly in the best

position to manage the funds—which the Fletcher team has not done.  (*See* Saunders Tr. at

21:15-22, 23:14-23, 143:19-22; Ladner Tr. at 36:10-23.)

141.    Contrary to the Fletcher Team's self-serving representations, it is clear that they

have no reasonable (or actual) expectation of emerging from bankruptcy and reorganizing the

Limited debtors.  *Woodbrook Assoc.*, 19 F.3d at 317 (1112(b) allows dismissal "to cut short th[e]

plan and confirmation process where it is pointless").  The Limited Debtors face insurmountable

hurdles that would make reorganization a legal and practical impossibility.  By the time the

chapter 11 petitions were filed, CIMA had already stated its intention of removing the Fletcher

Team, and the Fletcher Team had already lost too much credibility to allow them to effectively

reorganize any Cayman entity.  (*See* Background Part D, *supra*.)  Moreover, because the Fletcher

Team never responded to or provided evidence against the Winding Up Petitions, all that

remained was the effectively ministerial hearing in which the Grand Court would issue the

Winding Up Order—entry of that Order was by then inevitable.

142.    Following the entry of the Winding Up Order, the only activities that the Limited

Debtors are permitted to undertake are those that are in furtherance of the liquidation.  There can

be no attempt to rehabilitate or reorganize the Limited Debtors.[15]  And certainly, there can be no

activities directed by the Fletcher Team. Under Cayman Islands Law, any acts done without the

authority of the JOLs, are ultra vires.

143.    The Fletcher Team's conduct following the chapter 11 filings confirm that they

sought to use the automatic stay as a sword, rather than for its intended purpose, as a shield.  *In*

*re Briarpatch Film Corp.*, 281 B.R. 820, 834 (Bankr. S.D.N.Y. 2002) ("It has often been stated

---

[15] Moreover, as described in Parts IV.B, CIMA still has regulatory tools that would allow
it to preclude Fletcher from acting in the reorganization.  CIMA has indicated that it wants the
Limited Debtors to be liquidated, and there is no way for the Fletcher Team to obtain judicial
relief from a U.S. court that would prevent CIMA from bringing this about.

that the automatic stay is a shield, not a sword.") (quoting *Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*, 62 B.R. 723, 730 (S.D.N.Y.1986)).  In particular, they have confounded the JOLs' attempts to proceed with the winding up of the Limited Debtors by reaching out to third parties, claiming the JOLs lack the authority to control the Limited Debtors, and threatening sanctions against various parties, including the JOLs.  (*See* Background Part G.)

### 2. Objective Factors Overwhelmingly Point to Bad Faith

144.    In *C-TC 9th Avenue*, the Second Circuit outlined the following factors as indicative of a bad faith filing, giving rise to cause for dismissal:

> (1) the debtor has only one asset;
> (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
> (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;
> (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
> (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
> (6) the debtor has little or no cash flow;
> (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and
> (8) the debtor has no employees.

*C-TC 9th Ave.*, 113 F.3d. at 1311.

145.    As set forth below, seven of the eight *C-TC 9th Avenue* factors clearly support a finding of bad faith here.  And the remaining factor—whether the debtor has only one asset—is a "near miss."  As described above in the Background Part A.1, and as Fletcher himself admits, the Limited Debtors have only three meaningful noncash assets:  two claims receivable in the Cayman insolvency proceedings of two Fletcher-affiliates, Leveraged and Arbitrage, and claims in the FILB chapter 11 cases.  (*See* Fletcher Tr. at 142:23-143:8; 179:12-15.)

53

a.     **The Limited Debtors Have a Modest Group of Trade or Vendor Creditors Whose Claims Are Small in Relation to Those of the Redeeming Investors**

146.   The creditor body of the Limited Debtors is almost entirely non-U.S. investors, most of whom are redeeming creditors, with few vendor and trade creditors.  Although there are no known secured creditors, this presents a situation that is analogous to the scenario identified by *C-TC 9th Avenue* (*i.e.*, few unsecured creditors relative to secured creditors), because the disputes are dominated by one creditor class which is most affected by this proceeding: the redeeming investors.  This is not a case with extensive or diverse creditors who need chapter 11 for their recovery.  Like the secured creditors in the *C-TC 9th Avenue* analysis, all stakeholders have a satisfactory (indeed, a superior) alternative in the Cayman winding up process under the JOLs appointed by the Grant Court with CIMA's regulatory approval.  (*See* Part V & VI.A, *infra*.)

b.     **The Limited Debtors' Assets are the Subject of the Winding Up Order**

147.   All of the Limited Debtors' assets, wherever they may be, are subject to the Winding Up Order.  The Winding Up Order provides for the liquidation of all the assets by the JOLs and the winding up of the companies. None of these assets escape the reach of the Winding Up Order.

c.     **The Dispute is Essentially a Two-Party Dispute Between the Fletcher Team and the JOLs (Acting for CIMA and Non-U.S. Stakeholders)**

148.   By filing these chapter 11 cases, the Fletcher Team has created what is essentially a two-party dispute for control over the Limited Debtors between the Fletcher Team on the one hand and the JOLs on the other (backed by CIMA, the Cayman Courts, and the non-U.S. stakeholders).  Recognizing that they had already lost in the Grand Court, the Fletcher Team did

the only thing they could do to create chaos and, at least for a limited time, to appear to retain

control of the Limited Debtors and maintain access to the assets of the Limited Debtors.

> d.      **The Limited Debtors' Filing Evidences an Intent to Delay or
> Frustrate the Legitimate Efforts of CIMA Regulators,
> Stakeholders, and the JOLs Acting for Key Debtors**

149.    As described above, the Fletcher Team has delayed the payment of outstanding

redemption requests for the past two-and-a-half years despite of holding sufficient cash to make

distributions, while using investor cash for self-serving purposes.  (*see Background* Part C)  Now

that the Fletcher Team's control over these sources of cash is threatened, the Fletcher Team has

been very explicit about their intent to delay and frustrate CIMA regulation, the entry of the

Winding Up Order, and the subsequent winding up of the Limited Debtors by the JOLs.  The

testimony set forth in ¶ 131 above provides an ample basis for concluding that this (essentially

subjective) element is satisfied.

> e.      **The Limited Debtors have Little or No Cash Flow, Cannot
> Meet Their Current Expenses**

150.    Trial evidence will show that the Debtors are substantially liquidated, resulting in

cash that the Fletcher Team has misused contrary to their fiduciary duties.  The Debtors are left

only with noncash assets, principally insolvency claims against other Fletcher-related entities and

claims for wrongdoing by the Fletcher Team and their affiliates.  (*see Background* Part A)

Accordingly, the Debtors have no active operations besides litigation recovery efforts and there

is no legitimate business purpose except to satisfy redemption requests and distributions to

creditors who have long awaited such payments.  The Fletcher Team cannot be trusted to recover

the claims receivables and is not qualified or capable to do so in any event.

> f.      **The Limited Debtors have No Employees**

151.    Before entering liquidation, the Debtors operated as investment funds under an

55

investment management agreement with an affiliate, which performed substantially all of the

Debtors' business.  Now they have substantially liquidated and are incapable of operating, except

to collect on insolvency and litigation claims and distribute the remaining funds to creditors.  The

Debtors have no employees and no need for employees.

**B.    The Chapter 11 Cases Were Filed in Bad Faith Because the Limited Debtors
Did Not Follow the Appropriate Corporate Formalities to File the Petitions**

152.    In addition, the JOLs will show that the Limited Debtors filed the chapter 11

petitions without holding a general meeting of shareholders, as required by the Limited Debtors'

PPM.  Under the PPM, the Limited Debtors may be liquidated or wound up only upon approval

by the "holders of a majority of the Voting Shares *at a general meeting of the shareholders*."

(JOL Ex. 1 (PPM) at 34-35 (emphasis added).)[16]  However, no record of a general shareholder

meeting was attached to the chapter 11 petitions.  Instead, the chapter 11 petitions only included

a certificate of resolutions from the Board of Directors.  (See Corporate Ownership Statement,

Sept. 24, 2013 [Docket No. 4].)

153.    The JOLs pointed out the apparent absence of shareholder approval on October 1,

2013.  (*See* JOLs' Obj. to Mot. for Joint Admin., Oct. 1, 2013 [Docket No. 14].)  Counsel for the

Limited Debtors then purported to produce copies of minutes from shareholder meetings.  (JOL

Ex. 26 (Shareholder Minutes).)  The minutes of the SPV Debtors' shareholder's meeting reflect

that Fletcher and Ladner, as authorized representatives of Soundview Capital Management Ltd.

("**Soundview Capital**"), were present at the meeting.  *Id*.  However, Soundview Capital is not

the holder of the SPV Debtors' membership interests – the Limited Debtors hold those interests.

---

[16] Under the articles of association, the directors are entitled to conduct the business of
the Debtors—however, under Cayman law such power does not include the authority to wind up
and liquidate a company.  (Farrow Direct.)

(JOL Ex. 28 (SPV Debtors Register of Members)).) Moreover, although the minutes are signed

and dated as of September 23, Fletcher admits that he did not review or approve the minutes until

"much later" after the filing of September 24.  (Fletcher Tr. at 153:8-12.)  Fletcher has testified

that counsel for the Limited Debtors drafted the minutes—a fact confirmed by the presence of a

document stamp indicating that the minutes were generated by the Porzio word processing

system—even though Saunders testified that counsel was not present at the meeting.  (*Id*. at

151:16-20; Saunders Tr. at 161:13-162:5.).

154.    The Fletcher Team failed to submit any contemporaneous evidence of required

shareholder approval.  The only evidence they present now are the self-serving testimony of

members of the Fletcher Team and minutes created after the fact by counsel who did not attend

the meeting.  On this record, the JOLs expect to prove at trial that no shareholder vote actually

occurred and that these filings should be dismissed as *ultra vires*.

## IV.    THE CHAPTER 11 CASES SHOULD BE DISMISSED IN THE INTERESTS OF INTERNATIONAL COMITY OR UNDER THE ACT OF STATE DOCTRINE

155.    Even if the Court declines to dismiss the petitions as bad faith and *ultra vires*

filings, the Court should dismiss the petitions in favor of the Cayman Islands proceedings in the

interest of international comity and under the Act of State Doctrine.

### A.    These Cases Should be Dismissed in the Interests of International Comity

156.    This case involves the actions of a Cayman court, acting upon the request of a

Cayman regulator, and enforcing Cayman law against a Cayman company for the benefit of non-

U.S. stakeholders.  As a sovereign nation, the Cayman Islands have clearly and decisively

concluded that the Fletcher Team cannot be permitted to retain control of the CIMA-regulated

Limited Debtors, and has charged the JOLs with the responsibility of governing the Limited

Debtors through the winding up process.  The interests of international comity therefore present

an ample basis for dismissal. Accordingly, this Court should dismiss the petitions in favor of the Cayman Island proceedings in the interest of international comity.[17]

157.    International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *JP Morgan Chase Bank*, 412 F.3d at 423 (quoting *Hilton v. Guyot*, 159 U.S. 113, 164, 40 L. Ed. 95, 16 S. Ct. 139 (1895)). "United States courts ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries, so long as the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999) (citation and internal quotation marks omitted).

158.    "Comity is especially important in the context of the Bankruptcy Code" and "Congress explicitly recognized the importance of the principles of international comity in transnational insolvency situations when it revised the bankruptcy laws." *Maxwell Comm'ns*, 93 F.3d 1036, 1048 (2d Cir. 1996) (collecting sources); *see also Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V.*, 310 F.3d 118, 126 (3d Cir. 2002) ("comity [is] particularly appropriately applied in the bankruptcy context"). This is because "the equitable and orderly distribution of a debtor's property requires assembling of all claims . . . in a single proceeding." *Victrix S.S. Co., S.A., v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713-14 (2d Cir. 1987). As a result, "American courts regularly defer to" actions first filed in other countries. *Id.*

---

[17] As a procedural matter, this Court has several avenues to dismiss this case on comity grounds, including its ability to dismiss petitions "for cause" under 11 U.S.C. § 1112(b), its power of abstention under 11 U.S.C. § 305, and its inherent power to abstain in deference to a foreign process. *See JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 422-23 (2d Cir. 2005). Whichever method the Court chooses, the result is the same.

159.    Comity concerns weigh even more heavily where, as here, substantially all of the

relevant parties in interest are non-U.S. citizens and non-U.S. residents, who will face substantial

burden from the exercise of U.S. jurisdiction.  *See In re Globo Comunicacoes e Participacoes

S.A.*, 317 B.R. 235, 253-55 (S.D.N.Y. 2004) (finding bankruptcy initiated against Brazilian

debtor to be "a strong candidate" for dismissal under 11 U.S.C. § 305(1) in part based on the fact

that the Court may not be able to exercise personal jurisdiction over Brazilian creditors).

160.    To determine whether to decline jurisdiction in the interests of comity, courts in

the Second Circuit examine factors such as (1) the connection between the regulating state and

the activity to be regulated, (2) the character of the activity to be regulated, (3) the existence of

justified expectations that might be hurt or prejudiced by regulation, (4) the extent to which

regulation is consistent with the international system, and (5) the likelihood of conflict between

regulating states.  *Maxwell Communications*, 93 F.3d at 1048 (numbers added); *see also*

Restatement §§ 403(2).  As described below, all of these factors weigh in favor of the Cayman

Islands.

### 1.    The Cayman Islands Has Stronger Connections to the Debtors That Are to Be Wound Up

161.    As explained in Part II.A.7, *supra*, the Cayman Islands are more closely

connected with the Debtors and their assets, while the U.S. has only a limited connection with

their business.  There are no U.S. investors and few U.S. creditors.

### 2.    The Activity To Be Regulated is the Governance of Cayman Islands Funds

162.    The activity to be regulated is the governance of Cayman Islands funds, whose

investors and substantially all of whose stakeholders are non-U.S. residents and non-U.S.

taxpayers.  The Cayman Islands have an extremely strong interest in overseeing and enforcing its

regulations as to such Cayman Islands entities, especially as to their governance

163.    Regulation of the Limited Debtors goes straight to the heart of CIMA's core regulatory mission, which involves protecting the reputation and security of the Cayman Islands financial services industry and the core of the Cayman Islands economy.  (*See* CIMA Mission Statement, *supra*.)  This is reinforced by the fact that the Cayman Islands government has already asserted its strong interest in regulating the Limited Debtors when CIMA joined the winding up proceeding and offered its full-throated support to the appointment of the JOLs. CIMA found that the Limited Debtors have repeatedly violated Cayman regulatory law, that "[t]he Directors have failed to respond to CIMA's directives in a timely manner or to rectify the breaches to the MEL over the past 5 years." (JOL Ex. 7 (McCoy Aff. ¶¶ 14-15).)  CIMA emphasized "the seriousness of the regulatory concerns . . . " (*id.*),  and "holds firm to the fact that the said company is in breach of its regulatory obligations and that the Authority holds serious concerns with respect to its ability to meet its obligations as they fall due . . . " (JOL Ex. 14 (Skeleton Br.) ¶ 9.)  At this point, Cayman regulatory credibility would be at stake if CIMA allowed the Fletcher Team to evade regulation after it determined that the Fletcher Team were not suitable fiduciaries for the Limited Debtors, and took appropriate steps to remove them from control.  And CIMA's concerns are no doubt heightened by the recent FILB Trustee report.

### 3.    Winding Up the Debtors in the U.S. Would Violate the Justified Expectations of Interested Parties

164.    As explained in Part II.A.7, *supra*, all of the shareholders and creditors—most of whom are non-U.S. persons and companies—knew that they were dealing with Cayman Islands companies when they dealt with the Debtors.  Indeed, many of them chose to do business with Cayman Islands companies because they legitimately desired to avoid the burdens of the U.S. jurisdiction, including unnecessary tax risks.  Winding the Debtors up in the U.S. would upset those expectations.

**4.    Acknowledging the Winding Up Order Will Benefit the International System**

165.    Recognizing the validity of the Winding Up Order will promote the international system by (1) ensuring clear international consensus regarding the Limited Debtors' management; (2) preventing harm to stakeholders through application of conflicting laws; and (3) preventing unnecessary intrusion on another nation's sovereignty.

166.    First, recognizing the Cayman Islands proceedings will facilitate the efficient resolution of the Limited Debtors' debts.  As this Court previously stated in the FILB chapter 11 proceeding, "two tribunals can't simultaneously marshal the debtor's assets and distribute them to creditors and other stakeholders.  So one tribunal or the other at least should, if the proper word isn't must, yield to the other."  (Fletcher Int'l v. FIA Arbitrage Fund, 12-01740-REG (Bankr. S.D.N.Y.) Jul. 27, 2013 Hr'g Tr. at 176:15-19.)  By recognizing the Cayman Islands proceedings, this Court will ensure a clear international consensus as to the management of the Limited Debtors—which is a prerequisite to the efficient and organized liquidation of the Limited Debtors' assets for the benefit of their creditors and investors.  Under Cayman Islands law, the Fletcher Team can no longer operate as the recognized governance of the Limited Debtors.  (*See* Part II.B).  Similarly, a trustee appointed by the Court would not have standing to act on behalf of these Cayman Islands Debtors in the Cayman Islands.  (*See* Farrow Direct.) With this Court's acknowledging the primacy of the winding up order, the JOLs can operate in either jurisdiction.

167.    Second, recognizing the Cayman proceedings will allow these disputes to be resolved without risking prejudice to any party by the application of conflicting laws.  Some of the Debtors' stakeholders may have actively chosen to remain outside U.S. jurisdiction and may be harmed by having to submit to U.S. jurisdiction.  (*See* Part II.A.7)  The Fletcher Team, on the

other hand, does not and cannot argue that the process in the Cayman Islands is inadequate or inconsistent with the legal norms expected within the international system.  *See In re Gee*, 53 B.R. at 901 (applying comity to Cayman Islands proceeding and noting that "[p]articularly where the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, exceptions to the doctrine of comity are narrowly construed."); *see also Cunard SS*, 773 F.2d at 459 (applying comity where "there is no indication that" the parties "will be prejudiced or treated unjustly if it were to participate in the [foreign] bankruptcy proceedings").

168.    Indeed, the Fletcher Team identifies only two trivial distinctions between Cayman law and U.S. law, namely:  (1) "proposed liquidators are 'not . . . .required to give security for their appointment'"; and (2) proposed liquidators are "not required to make express disclosures about possible conflicts of interest in their affidavits of fitness, but only to report that '[h]aving made due enquiry, [we] believe that [we] meet the independence requirement contained in Regulation of the Insolvency Practitioners Regulations.'"  (Debtors' Mot. for Sanctions at 10 n.4.)  The Fletcher Team does not claim that it was prejudiced (or even affected) by these differences.  *See Finanz AG Zurich.*, 192 F.3d at 249-50 (2d Cir. 1999) (difference in Brazilian notice requirements were irrelevant where party received actual notice.)  Nor could they claim prejudice.

169.    First, the requirement of security is a matter within the Grand Court's sound discretion.  The representatives for the Fletcher Team had an opportunity to argue that a security was necessary, and it was the ultimate judgment of the Grand Court here that no security was required.  (*See* Farrow Direct; *see also* JOL Ex. 21 (Winding Up Order) at 1.)

170.    Second, the difference in the conflict disclosure procedures are trivial given that (1) the JOLs have, after due enquiry, attested their belief that they have no conflict (JOL Dep. Tr.

at 6:12-14); and (2) the Fletcher Team had an opportunity to, and did in fact, cross examine the

JOLs on this subject. (JOL Dep. Tr. at 13:24-17:15.)[18]

171.    Third, recognizing the validity of the Cayman proceedings will promote U.S.

policy to "minimize intrusion on another nation's sovereignty." *In re Commodity Futures

Trading Comm'n v. Nahas*, 738 F.2d 487, 494-95 & nn. 15-16 (D.C. Cir. 1984)(construing U.S.

law to disallow service of a Brazilian national on Brazilian soil, except through channels that are

recognized by the Brazilian sovereign).

### 5.    A Failure to Extend Comity Will Create Immediate and Inevitable Conflict With Regulation by Another Nation

172.    This Court's exercise of jurisdiction to entertain governance other than the JOLs

will create a cross-border conflict over which set of insolvency laws control the liquidation of the

Limited Debtors, with different sovereigns recognizing different management.  This regulatory

conflict would have particularly harsh consequences for the JOLs.  As an implementer of the

regulatory powers of CIMA and the Grand Court, and as Cayman residents and non-U.S.

citizens, the JOLs are required to comply with Cayman laws and regulations.  Neither the JOLs

nor anyone else in Cayman can assert compliance with the U.S. bankruptcy law or court orders

as a legal excuse or defense to violation or non-compliance with Cayman laws. (*See* Farrow

Direct.)  Moreover, in performing their fiduciary duties, the JOLs must seek—or even compel—

the cooperation of third parties.  So far, at least two parties, HSBC Cayman and Citco Curacao,

have been paralyzed in the face of this conflict.  (*See* Background Part A ¶15-18, *supra*.)  The

---

[18] As another Bankruptcy Court in this district has held, the fact that a creditor like Citco has sought the appoint of a JOLs does not create a conflict of interest, any more than a creditor voting for the appointment of a trust in a bankruptcy proceeding.  *See Gee*, 53 B.R. at 903 ("No more should a trustee appointed by a foreign tribunal at the behest of creditors be presumed a biased scoundrel blind to his fiduciary obligations to contributories than should his American counterpart elected by the creditors.").

conflict between U.S. and Cayman law is therefore immediate, concrete, and already impacting

the interests of creditors and debtors.

<div align="center">*     *     *</div>

173.    The need to apply international comity in this case is readily apparent.  The

Cayman winding up process is cost-effective, fair, open and otherwise deserving of U.S. comity

and respect, including in the case of multiple affiliated debtors like the Debtors at issue here.

(*See* Farrow Direct; Anderson Direct ¶ 11.)  By dismissing this action, this Court would allow

the JOLs to proceed with the winding up of these Limited Debtors—including, to whatever

extent necessary, by "obtain[ing] the recognition of their appointment in any other relevant

jurisdictions and to make applications to the courts of such jurisdictions for that purpose . . . ."

(JOL Ex. 21 (Winding Up Order) at 2.)

### B.    The Chapter 11 Cases Should be Dismissed Under the Act of State Doctrine

174.    In its demand for sanctions, the Fletcher Team asks this Court to find the winding

up proceeding, and the resulting Winding Up Order, "null and void and of no effect."  (Debtors'

Mot. for Sanctions at 13-14.)  Going further, they demand a ruling that nullifies "any post-

petition actions by . . . *any other party* to . . . exercise control over property of the Debtors' estate

shall be null and void and of no force and effect pursuant to 11 U.S.C. § 362(a)(1) and (a)(3)."

(*Id.* (emphasis added); Proposed Order for Sanctions at 2.)  Such a ruling would clearly violate

the U.S. act of state doctrine.

175.    The act of state doctrine commands that "the courts of one state will not question

the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own

borders, even when such courts have jurisdiction over a controversy in which one of the litigants

has standing to challenge those acts."  *Republic of Austria v. Altmann* 541 U.S. 677 (2004); *see*

*also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964) (U.S. courts "will not

<div align="center">64</div>

examine the validity of a taking of property within its own territory by a foreign sovereign

government, extant and recognized by this country at the time of the suit").

176.     Of particular importance for this proceeding, the act of state doctrine protects the

decisions of foreign courts, particularly where the foreign court has issued "a judgment sought

by a foreign government" that "gave effect to the public interest of the [foreign] government."

*In re Philippine Nat'l Bank*, 397 F.3d 768, 773 (9th Cir. 2005).  The doctrine treats acts of

foreign sovereigns as "a rule of decision for the courts of this country," which become immune

from collateral attack in U.S. Courts.  *See*, *e.g.*,  *World Wide Minerals, Ltd. v. Republic of*

*Kazakhstan*, 296 F.3d 1154, 1165-66 (D.C. Cir. 2002) cert denied, 537 U.S. 1187 (2003)

(requiring U.S. court to refrain from challenging the validity of alleged expropriation by the

Kazakh government).  This forces affected parties to resolve their disputes within the tribunals

established by the foreign sovereign, rather than pull the U.S. court system into an international

dispute.  *See Credit Suisse v. United States Dist. Court,* 130 F.3d 1342, 1347-48 (under act of

state doctrine, "to contest the legality of the Swiss freeze orders . . . [plaintiffs] should do so via

the Swiss judicial system").

177.     The act of state doctrine applies whenever parties affected by the act of a foreign

government ask a U.S. Court to pass judgment on those acts.  *Spectrum Stores, Inc. v. Citgo*

*Petroleum Corp.*, 632 F.3d 938, 954 (5th Cir. 2011) ("For act of state (as opposed to sovereign

immunity) purposes, the relevant acts are not merely those of the named defendants, but *any*

governmental acts whose validity would be called into question by adjudication of the suit."

(citation omitted; emphasis in *Spectrum*)); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1122 (5th

Cir. 1985) (doctrine applies "even if the defendant is a private party, not an instrumentality of a

foreign state . . . .").

178.    The Fletcher Team's demand that this Court hold the Winding Up Order "null and void" would violate the act of state doctrine.  This Court should decline the Fletcher Team's invitation to second guess the authority of CIMA—who have every right to protect Cayman Islands interests by proceeding against Cayman Islands companies and their directors—as well as the propriety of the Grand Court's judicial acts.  *See*, *e.g. Ricaud v. Am. Metal Co.*, 246 U.S. 304, 310 (1918) (refusing to pass judgment on Mexico's appropriation of U.S. citizen's property).  Recognition of any authority other than the JOLs would create tension and confusion when Cayman Islands regulators and Cayman Islands courts continue to proceed in accordance with Cayman Islands law.  This will also create headaches and unnecessary expenses for individuals and creditors who seek to abide by the laws of both jurisdictions and cooperate across borders.  The act of state doctrine requires this Court to avoid such a scenario, and to defer to the Grand Court's Winding Up Order appointing the JOLs and initiating the winding up proceeding.[19]

---

[19] In the event the JOLs have to further debate or defend this act of state defense the JOLs reserve the right to support their position with a further constitutional challenge through a separation of powers doctrine forbidding U.S. courts to interfere on political questions.  *See Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948) (requiring courts to refrain from foreign affairs politics because such judgments belong to the Executive Branch and are "not subject to judicial intrusion or inquiry.").  The JOLs also reserve all other constitutional rights and objections, if and to the extent that a bankruptcy court were to deny the JOLs' relief, or to grant the Debtors' contrary relief, contrary to the U.S. law of foreign relations that is paramount here, even when and if it conflicts with the Bankruptcy Code.  *E.g.* International Comity, the U.S. Act of State Doctrine, and the U.S. Sovereign Immunities Act.  Specifically, we reserve the right to apply the *Stern v Marshall* reasoning to object to any final order of a U.S. bankruptcy court that violates those sovereign rights of the Debtors' CIMA regulator, the Cayman court, and the JOLs as their instrument.  Among other things, this includes the reservation of rights as to each non-U.S. sovereign's counterpart to the foreign equivalent of the <u>Rooker Feldman</u> doctrine, *e.g.* denying  a bankruptcy court the power urged by Debtors here to act like a Cayman appellate court and somehow invalidate a valid in Cayman court ruling, such as  on the theory that somehow the Cayman court erred in that Cayman winding up proceeding or that CIMA should have done something different procedurally in Cayman in order to achieve the section 362(b)(4) exception to the U.S. stay.

V.    **IN THE ALTERNATIVE, THE COURT SHOULD LIFT THE STAY** *NUC PRO TUNC* **TO ALLOW THE CAYMAN LIQUIDATION PROCESS TO GO FORWARD**

179.    If the Court does not dismiss these cases, and if this Court concludes that the winding up proceeding does not fall within the stay exception, the JOLs request that the Court lift the stay under Section 362(d)(1) for three purposes.[20]  First, so that the Grand Court's Winding Up Order for the Limited Debtors can be fully implemented without the interference of the U.S. chapter 11 cases; second, so the Grand Court can enter a winding up order as to the SPV Debtors; and third, so that the JOLs can wind up all of the Debtors in the Cayman Islands.

A.    **Modification of the Stay Is Appropriate for the Same Reasons That Justify Dismissal**

180.    The reasons set forth above in Part III, which serve as grounds for dismissal, also serve as a basis for modifying the stay.  As this Court explained in *In re Kaplan Breslaw Ash LLC*, 264 B.R. 309, 334 (Bankr. S.D.N.Y. 2001), "the standards for bad faith as evidence of cause, whether in the context of dismissal or relief from the stay, are not substantively different from each other."  CIMA's regulatory position, as well as comity for the Winding Up Order, also constitute "cause" for relief here so as to avoid the conflict and competition between the U.S. and Cayman Islands insolvency proceedings.[21]

B.    **Modification of the Stay Is Also Appropriate Under the** *Sonnax* **Factors**

181.    Modification is also appropriate under the Second Circuit's test for showing cause

---

[20] "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—(1) for *cause,* including the lack of adequate protection of an interest in property of such party in interest . . ."  11 U.S.C. § 362(d)(1).

[21] Many Courts have recognized that the principle of comity and respect for the sovereignty of other states can serve as "cause" for modifying a stay under 11 U.S.C. § 362(d)(1).  *See, e.g., In re Lee*, 428 B.R. 667, 672-73 (D.S.C. 2009) (where parties' interest in property was issue of state law already litigated in state court, stay was modified in the interest of comity).

to modify the stay.  *See In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1286 (2d Cir.1990).[22]  The

applicable *Sonnax* factors favor lifting the stay *nunc pro tunc* to September 24, 2013.

182.    First, lifting the stay will completely resolve the issues in these cases.  When it

proceeds, the Cayman Islands winding up process would resolve all of the Limited Debtors'

debts.  More importantly, lifting the stay would result in complete resolution of not only the

power struggle between the JOLs and the Fletcher Team, but would also eliminate much of the

duplicate cost associated with competing liquidation proceedings.  On the other hand, the

absence of such relief would prolong questions regarding the governance of the Limited Debtors.

183.    Second, the other proceeding involves the debtor as a fiduciary.  The winding up

proceeding in the Grand Court calls into question the fiduciary responsibilities of the Fletcher

Team.  A large basis of the filing of the Winding-Up Petitions was the Fletcher Team's failure to

meet their fiduciary duties to the stakeholders.  (*See* Background Part C.)

184.    Third, the Grand Court is better equipped to address the Cayman Islands law

issues regarding these cases.  The Limited Debtors are Cayman Companies, and the Grand Court

already has already started the winding up process, and has subjected the Limited Debtors to the

requirements set forth in the Winding Up Order.  The Grand Court is best suited to handle the

issues arising from that Order.  Additionally, the Grand Court is best placed to decide any

---

[22] The *Sonnax* factors are: "(1) whether relief would result in partial or complete issue resolution;
(2) lack of connection with or interference with bankruptcy case; (3) whether other proceeding
involves debtor as fiduciary; (4) whether specialized tribunal with necessary expertise has been
established to hear cause of action; (5) whether debtor's insurer has assumed full defense
responsibility; (6) whether the action primarily involves third parties; (7) whether litigation in
another forum would prejudice interests of other creditors; (8) whether judgment claim arising
from other action is subject to equitable subordination; (9) whether movant's success in other
proceeding would result in a judicial lien avoidable by debtor; (10) interests of judicial economy
and expeditious and economical resolution of litigation; (11) whether parties are ready for trial in
other proceeding; (12) impact of stay on parties and balance of harms.  *In re Sonnax*, 907 F.2d
1280 (2d. Cir. 1990).

contract disputes or other interpretations of law that are normally questions of local law.

Similarly, proceedings before the Grand Court will be argued by Cayman Islands practitioners

who will be better situated to represent all sides fairly.

185.    Fourth, proceeding in the Grand Court would not prejudice the creditors.  Nearly

all of the creditors—and certainly the majority stakeholders—are off-shore entities.  These

entities chose to invest in the Debtors in part to avoid U.S. jurisdiction and taxes.  There will be

no prejudice to the creditors by proceeding in the Grand Court.  However, if the proceeding in

the U.S. goes forward, there is no guarantee that these creditors and stakeholders will not face

unnecessary U.S. tax risk.  (*See* Part II.A.7, s*upra*)

186.    Fifth, lifting the stay will provide judicial economy and an expeditious and

economical resolution to the proceeding.  In this case, having the Limited Debtors' liquidation in

one tribunal significantly reduces the time and cost to creditors and avoids potential conflicting

results from different tribunals interpreting the same law.  The Grand Court, as the court in the

chosen jurisdiction, will provide the most expeditious and economical resolution as it is a court

of Cayman Islands law, and regularly handles the issues raised in the winding up of these

entities.  In contrast, a U.S. court would be required to interpret foreign law and potentially

address questions of first impression.

187.    Sixth, there is no reasonable harm to the parties by proceeding in the Grand Court.

These companies were formed in the Cayman Islands.  They are regulated by CIMA.  The

stakeholders reside outside of the U.S.  The only harm to the Officers and Directors is that they

lose control of the Debtors.  This result, however, is the result chosen by the stakeholders who

filed to have the Debtors wound up in the Cayman Islands, and enforced by CIMA.  It is in the

best interest of all parties—save the Fletcher Team—to have the Limited Debtors wound up in

the Grand Court.

188.    Accordingly, if this Court chooses to retain jurisdiction of the chapter 11 petitions

rather than dismiss them, it should modify the stay to allow the JOLs to proceed with the

winding up proceedings already underway in the Cayman Islands.

## VI.    THIS COURT SHOULD DENY THE FLETCHER TEAM'S REQUEST FOR AN INJUNCTION

189.    The Fletcher Team has requested that this Court enter an injunction under 11

U.S.C. § 105(a).  In particular, they ask that "the Cayman Island Action be enjoined and that all

parties be prevented from attempting to exercise any control over the Debtors."  (Debtors' Mot.

for Sanctions at 11-15.)  This request is inappropriate for at least three reasons.

190.    First, comity precludes the Fletcher Team from enjoining the Cayman

proceedings.  *See*, *e.g.*, *China Trade & Development Corp. v. M.V. Choong Yong*, 837 F.2d 33

(2d Cir. 1987) (denying U.S. court authority in an admiralty action to enjoin a parallel action in

South Korea, the defendant ship owners' home country).  Injunctions related to foreign suits

should "used sparingly" and granted "only with care and great restraint."  *Id*. at 36 (citation

omitted).  The Cayman Islands liquidation proceeding can and should be allowed to go forward

given the interests of comity and the deference typically afforded to foreign bankruptcy

proceedings.  (*See* Part IV, *supra*.)

191.    Second, such an injunction would be futile.  Foreign litigation may only be

enjoined when "resolution of the case before the enjoining court would be dispositive of the

enjoined action."  *China Trade*, 837 F.2d at 36.  That is not the case here, where CIMA has

indicated a clear intention to remove the Fletcher Team from control over the Limited Debtors,

and where this Court has no power to retrain CIMA from doing so.  As a regulatory arm of a

sovereign nation, CIMA is beyond this Court's jurisdiction and beyond the scope of the

automatic stay.  Moreover, CIMA stands ready to take action again as necessary.  (*See* Part

II.C.2, *supra*.)  Similarly, this Court is has no power to enjoin the Grand Court as an injunction

may "operate[] only against the parties, and not directly against the foreign court . . . ."  *China*

*Trade*, 837 F.2d at 35.  Of course this nuance "does not eliminate the need for due regard to

principles of international comity."  *Id*.

192.    Third, the relief sought by the Fletcher Team is prohibited by the Foreign

Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1601, *et seq.*, which provides that "a foreign

state shall be immune from the jurisdiction of the courts of the United States and of the States,"

subject to certain inapplicable exceptions.  28 U.S.C. § 1604.  The FSIA "'provides the sole

basis for obtaining jurisdiction over a foreign state in the courts of this country.'"  *Saudi Arabia*

*v. Nelson*, 507 U.S. 349, 355 (1993) (citation omitted).  The FSIA precludes the entry of any

judgment or order that would bar CIMA (or the Grand Court) from appointing the JOLs and

proceeding with the winding up of the Limited Debtors.

193.    For the above reasons, even if the Fletcher Team could "nullify" the Winding Up

Order and enjoin every party that is before this Court, there would be nothing standing in

CIMA's way if it decided to simply reappoint the JOLs or someone else to wind up the Limited

Debtors.  The inability of this Court to assert jurisdiction over all of the relevant actors, and

thereby reinstate the pre-liquidation status quo, presents another reason to defer to the Cayman

Islands proceeding.

## CONCLUSION

For the above reasons, the JOLs respectfully request that this Court dismiss the chapter

11 petitions with prejudice or, in the alternative, acknowledge the Winding Up Order and its

71

appointment of the JOLs as the management of the Limited Debtors or any other or further relief

the Court deems just and proper.


Dated: December 2, 2013                 /s/ Gary S. Lee
      New York, New York              Gary S. Lee
                                        John A. Pintarelli
                                        James J. Beha II
                                        William M. Hildbold
                                        **MORRISON & FOERSTER LLP**
                                        1290 Avenue of the Americas
                                        New York, New York 10104
                                        Telephone: (212) 468-8000
                                        Facsimile: (212) 468-7900

                                        *Counsel for Peter Anderson and Matthew Wright,*
                                        *As Joint Official Liquidators of Soundview Elite*
                                        *Limited, Soundview Premium Limited and*
                                        *Soundview Star Limited*