**HEARING DATE AND TIME: December 17, 2013 at 9:45 a.m. (Eastern Time)**
**OBJECTION DEADLINE: December 10, 2013**

PORZIO, BROMBERG & NEWMAN, P.C.
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
(973) 538-4006 Telephone
(973) 538-5146 Facsimile
-and-
156 West 56th St.
New York, NY 10019
Warren J. Martin Jr.
Mark J. Politan
Terri Jane Freedman

*Counsel to the Debtors and Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------- X
In re:

      Soundview Elite, Ltd., *et al.*             Case No. 13-13098 (REG)
                                        (Jointly Administered)
               Debtors

-------------------------------------------------------------------------- X

**DEBTORS' REPLY MEMORANDUM OF LAW TO THE MOTIONS
TO APPOINT A TRUSTEE; OR IN THE ALTERNATIVE, CONVERT
OR DISMISS THESE CHAPTER 11 CASES**

# TABLE OF CONTENTS

Preliminary Statement ...........................................................................................................1

Statement of Facts .................................................................................................................2

Argument ...............................................................................................................................3

I.    THE CHAPTER 11 CASES WERE FILED IN GOOD FAITH ......................................3
     A.    The Totality of Circumstances Demonstrate the Debtors Good Faith. ..................3
     B.    The Timing of the Filing is Not Indicative of Bad Faith........................................5

II.   THE APPOINTMENT OF A TRUSTEE IS NOT NEEDED TO ADDRESS ANY
     ALLEGED CONFLICTS OF INTEREST ....................................................................9
     A.    Appointment of a Trustee Under 11 U.S.C. § 1104(a)........................................10
     B.    The Alleged "Improper Transfers" Were Permitted Under The Governing Private
           Placement Memorandums. ..................................................................................12
     C.    The Debtors' Professionals Are Investigating The Transactions At Issue And, If
           Necessary, Additional Independent Professionals Can Be Appointed As Needed.
           ..........................................................................................................................13

III.  ANY ASSETS OF THESE DEBTORS WHICH MIGHT POSSIBLY BE LOCATED IN
     THE CAYMAN ISLANDS ARE *DE MINIMUS*...........................................................16

IV.  FILING A U.S. BANKRUPTCY HAS NO IMPACT ON WHETHER OR NOT A
     FUND "ENGAGED IN A TRADE OR BUSINESS' IN THE U.S. ...............................17

V.   THE ACT OF STATE DOCTRINE IS INAPPLICABLE TO THESE CHAPTER 11
     CASES........................................................................................................................19

VI.  THE WINDING UP ACTION IN THE CAYMAN ISLANDS IS SUBJECT TO THE
     AUTOMATIC STAY UNDER § 362(b) .....................................................................21

VII. THE COURT SHOULD NOT LIFT THE STAY TO ALLOW THE CAYMAN
     ISLANDS LIQUIDATION PROCESS TO GO FORWARD BECAUSE THE JOINT
     LIQUIDATORS HAVE FAILED TO ESTABLISH CAUSE TO MODIFY THE STAY
     .................................................................................................................................26

2612894

## TABLE OF AUTHORITIES

### CASES

Page(s)

*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976) ............................ 19, 20

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ....................................... 20

*Banque de Financement, S.A. v. First National Bank of Boston*, 568 F.2d 911 (2d Cir. 1977) ...................................................................................................................... 6

*Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2000) ................................................... 19

*Callejo v. Bancomer, S.A.*, 764 F.2d 1101 (5th Cir. 1985) .......................................... 21

*Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989) ................................................... 3

*Commodore International Ltd. v. Gould (In re Commodore International Ltd)*, 262 F.3d 96 (2d Cir. 2001) ......................................................................................................... 16

*East End Development*, 491 B.R. 633 (Bankr. E.D.N.Y. 2013) .................................... 3

*Films by Jove, Inc. v. Berov*, 341 F. Supp. 2d 199 (E.D.N.Y. 2004) ........................... 21

*First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759 (1972) ................ 20

*Glinka v. Murad (In re Housecraft Industries USA, Inc.)*, 310 F.3d 64 (2d Cir. 2002) ... 16

*In re 234-6 West 22nd Street Corp.*, 214 B.R. 751 (Bankr. S.D.N.Y. 1997) ................ 5

*In re Adelphia Communications Corp.*, 336 B.R. 610 (Bankr. S.D.N.Y. 2006) *aff'd by* 342 B.R. 122 (S.D.N.Y. 2006) ...................................................................................... 15

*In re C-TC 9th Ave. P'ship*, 113 F.3d 1304 (2d. Cir 1997) .................................. 3, 5, 6, 7, 8

*In re Cajun Elec. Power Coop.*, 191 B.R. 659 (Bankr. M.D. La. 1995 ....................... 11

*In re Century/ML Cable Venture*, 294 B.R. 9 (Bankr. S.D.N.Y. 2003) ......................... 3

*In re Chateaugay Corp.*, 115 B.R. 28 (Bankr. S.D.N.Y. 1988) ............................. 22, 23

*In re Clinton Centrifuge, Inc.*, 85 B.R. 980 (Bankr. E.D. Pa. 1988) ............................ 12

ii

*In re Cohoes Industrial Terminal, Inc.*, 931 F.2d 222 (2d Cir. 1991) ..............................................6

*In re Colorado-Ute Elec. Ass'n*, 120 B.R. 164 (Bankr. D. Colo. 1990)..............................11

*In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973 (Bankr. N.D.N.Y. 1988) ................................3

*In re Edison Mission Energy, et al.*, No. 12-492192013 ......................................24, 26

*In re Fairfield Sentry Ltd.*, 484 B.R. 615 (Bankr. S.D.N.Y. 2013) ...................................16, 17, 18

*In re Fidelity Mortgage Investors,* 550 F.2d 47 (2d Cir.1976)......................................22

*In re Food Workshop, Inc.*, 70 B.R. 962 (Bankr. S.D.N.Y. 1987) ....................................6

*In re G.S. Distribution, Inc.*, 331 B.R. 552 (Bankr. S.D.N.Y. 2005) .................................4

*In re General Growth Properties, Inc.*, 409 B.R. 43 (Bankr. S.D.N.Y. 2009)..............................3

*In re Halo Wireless Inc.*, 684 F.3d 581 (5th Cir.2012) .........................................25, 26

*In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309 (Bankr. S.D.N.Y. 2001)................................5, 27

*In re Kingston Square Assocs.*, 214 B.R. 713 (Bankr. S.D.N.Y. 1997) ................................3

*In re Lee*, 428 B.R. 667 (Bankr. D.S.C. 2009) .................................................27

*In re Marvel Entm't Group, Inc.*, 140 F.3d 463 (3d Cir. 1998) ............................................10, 11

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 522 F. Supp. 2d 569 (S.D.N.Y. 2007)....................................................22, 23

*In re Saint Vincent's Catholic Medical Centers of New York*, 429 B.R. 139 (Bankr. S.D.N.Y. 2010) ...............................................................22, 23

*In re Sletteland*, 260 B.R. 657 (Bankr. S.D.N.Y. 2001).......................................5

*In re Sonnax Industries, Inc.*, 907 F.2d 1280 (2d Cir. 1990).......................................27

*In re Syndicom Corp.*, 268 B.R. 26 (Bankr. S.D.N.Y. 2001) .......................................4

*In re Taub*, 427 B.R. 208 (Bankr. E.D.N.Y. 2010) ...............................................3

*SEC v. Wolfson*, 309 B.R. 612 (D. Utah 2004)..................................................24

*Severnoe Securities Corp. v. London and Lancashire Insurance Co.*, 255 N.Y. 120 N.E. 299 (1931)..........................................................................17

2612894

*U.S. ex. rel. Fullington v. Parkway Hosp.*, 351 B.R. 280 (E.D.N.Y 2006)................................22

*U.S. Int'l Trade Commission v. Jaffe*, 433 B.R. 538 (E.D. Va. 2010) ........................................25

*Underhill v. Hernandez*, 168 U.S. 250 (1897)......................................................................19, 21

*Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN
Enterprises)*, 779 F.2d 901 (2d Cir. 1985)...............................................................................16

*W.S. Kirkpatrick & Co., Inc. v. Envt'l. Tectonics Corp., Int'l*, 493 U.S. 400 (1990)...................20

## STATUTES

11 U.S.C. §101(41) and (13) ..........................................................................................18

11 U.S.C. § 1104(a) ......................................................................................................10

11 U.S.C. § 362 ............................................................................................................22

11 U.S.C. § 362(a) ........................................................................................................22

11 U.S.C. § 362(b)........................................................................................................21

11 U.S.C. § 362(b)(4) ..........................................................................................22, 23, 25,
26

11 U.S.C. §541(a)..........................................................................................................19

2612894

**<u>Preliminary Statement</u>**

Soundview Elite Ltd., and certain of its debtor affiliates, as Chapter 11 debtors and debtors in possession (each a "**Debtor**" and collectively, the "**Debtors**") in the above-captioned Chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this omnibus Reply Memorandum of Law in Opposition to the pending Motions to Appoint a Trustee by the United States Trustee (the "**Trustee**") and Pasig Ltd. ("**Pasig**"); or the Alternative, Convert or Dismiss These Chapter 11 Cases by America Alternative Investments Inc., Optima Absolute Return Fund Ltd., and Richcourt Allweather Fund Inc. (the "**Objecting Funds**")  and Matthew Wright and Peter Anderson, as purported Joint Official Liquidators (the "**Joint Liquidators**", and together with the Objecting Funds, Pasig and the Trustee, the "**Objectors**") (collectively, the "**Motions**").[1]

---

[1] Capitalized Terms not defined herein shall have the meanings ascribed to them in the Debtors' initial Brief, and related pleadings.

1

2612894

## Statement of Facts

For the Debtor's Counter-Statement of Facts to the Statement of Facts contained in the Motions, the Court is respectfully referred to the Supplemental Direct Testimony Affidavit of Alphonse Fletcher, Jr. filed herewith, as well as to the Rebuttal Testimony of Richard Annette, and the Direct Testimony of the Debtors' Cayman Islands Law expert, Gary Smith.

2

2612894

<u>**Argument**</u>

**I.    THE CHAPTER 11 CASES WERE FILED IN GOOD FAITH**

The court has wide discretion in determining whether a debtor's lack of good faith rises to the level of "cause" for dismissal or conversion under section 1112(b). *East End Development*, 491 B.R. 633, 641 (Bankr. E.D.N.Y. 2013). This discretion is not unguided, however, and is informed by the principle that dismissal for bad faith shall be used sparingly, for exceptional circumstances. *In re Century/ML Cable Venture*, 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003).

When considering whether a debtor has acted in good faith, the court must examine the totality of the circumstances. *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1312 (2d. Cir 1997). In this analysis, the moving party bears the burden of establishing the debtor did not act in good faith. *East End Development*, 491 B.R. at 641. To meet this burden, the moving party must establish the debtor's lack of good faith by a preponderance of the evidence. *In re Taub*, 427 B.R. 208, 231 (Bankr. E.D.N.Y. 2010). Moreover, the moving party is required to prove both: (1) the objective futility of the reorganization process; and (2) the debtor's subjective bad faith in filing the petition. *See In re General Growth Properties, Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009) (quoting *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997).

**A.    The Totality of Circumstances Demonstrate the Debtors Good Faith.**

The court's inquiry into the debtor's intent is designed to prevent petitioners from abusing the bankruptcy process or causing unnecessary hardship or delay to creditors where the debtor lacks the intent or ability to reorganize. *Carolin Corp. v. Miller*, 886 F.2d 693, 702 (4th Cir. 1989). In this context, however, "reorganize" is not strictly construed and includes liquidation. *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 985 (Bankr. N.D.N.Y. 1988); *see also East End Development*, 491 B.R. at 642 ("So long as the liquidating plan serves a valid

3

bankruptcy purpose . . . the intent to liquidate assets in an orderly process is not evidence of bad faith.").

Here, the Debtors primarily filed the Chapter 11 cases because of their first-hand experience with Cayman Island Joint Liquidators' lack of financial foresight and investment knowledge. (Fletcher Aff. ¶¶ 135-36, 141). Rather than liquidate the Debtors' assets in a "fire sale' manner as these Debtors fear the Joint Liquidators would, the Debtors believe that a thoughtful, carefully constructed liquidation scheme, combined with their familiarity with the investments, their collective vast investment expertise, and the protections of Chapter 11, would ensure greater value for all creditors.

In the Supplemental Direct Testimony Affidavit of Alphonse Fletcher, (the **"Supplemental Testimony"**), filed herewith, Fletcher points out the paramount motivation of these filings, *i.e.,* to preserve the value of the UCB Warrants to recover on the direct and indirect claims of the Debtors. *See* Section II. A., pp. 8 – 11, of the Supplemental Testimony.

In addition, the Debtors have procedural and factual concerns with proceedings in the Cayman Islands, including relaxed conflict of interest rules, the lack of significant avoidance powers, the secrecy of the proceedings, and the presence of the vast majority of the Debtors' assets outside the Cayman Islands. (*Id.* ¶ 142(i-ix)). Put simply, the Debtors fail to see how granting the Joint Liquidators *carte blanche* to dispose of the Debtors' assets *will* benefit anyone, especially the estate and its creditors.

Lastly, although the Joint Liquidators express concern with the timing of the Debtors' petitions, it is axiomatic that most bankruptcy petitions are not filed until the debtor reaches a severe friction point. The timing of the filing of a bankruptcy petition is not, in and of itself, indicia of a bad faith. *See, e.g., In re G.S. Distribution, Inc.,* 331 B.R. 552, 558 (Bankr. S.D.N.Y.

4

2005) (no bad faith where debtor filed petition a mere eleven days after creditor received court permission to file for summary judgment and sanctions); *In re Syndicom Corp.,* 268 B.R. 26, 47 (Bankr. S.D.N.Y. 2001) ("It is well settled, of course, that the filing of a bankruptcy petition on the eve of a foreclosure or . . . an eviction does not, by itself, establish a bad faith filing or 'cause' for relief from the stay."); *In re 234-6 West 22nd Street Corp.,* 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997) ("[In] and of itself, a filing on the eve of foreclosure is not per se indicative of bad faith.").   Nevertheless, although the court may consider the timing of the Debtors' petitions, such consideration is but one of many as the court's analysis must examine the totality of the circumstances.   *See C-TC 9th Ave. P'ship*, 113 F.3d at 1312.   In such an analysis, the Debtors' numerous valid concerns with the Cayman Island procedures, including Winding Up proceedings lack of adequate protection for creditor constituents, outweighs any negative inference that the Joint Liquidators hope this Court to draw from the timing of the Debtors' petitions.   See *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 333 (Bankr. S.D.N.Y. 2001) (the filing of a bankruptcy petition on the eve of a foreclosure or eviction is only one of several indicia that a court may appropriately look to in determining whether, under the totality of the circumstances, resort to the Bankruptcy Code has been in good faith).   Thus, that the Debtors' filed the Chapter 11 cases in subjective good faith is plain, and the Joint Liquidators fail to meet their burden to prove otherwise.

### B.    The Timing of the Filing is Not Indicative of Bad Faith.

Many decisions have considered whether to dismiss a bankruptcy petition, on the basis of the alleged "bad faith" of the debtor in seeking to avoid the effect of litigation in another court. *In re Sletteland*, 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001).   It is established in this Circuit that "Filing a bankruptcy petition with the intent to frustrate creditors does not by itself 'establish an absence of intent to seek rehabilitation,' " *In re Cohoes Industrial Terminal, Inc.,* 931 F.2d 222,

5

227 (2d Cir. 1991) *quoting Banque de Financement, S.A. v. First National Bank of Boston*, 568 F.2d 911, 917 (2d Cir. 1977). In reality, there is "a considerable gap between delaying creditors, even secured creditors, on the eve of foreclosure and the concept of abuse of judicial purpose." Cohoes, 931 F.2d at 228 *citing C*ollier § 1112.03, at 1112-33. "Indeed, because a major purpose behind our bankruptcy laws is to afford a debtor some breathing room from creditors, it is almost inevitable that creditors will, in some sense, be "frustrated" when their debtor files a bankruptcy petition. *Id.*; *See, e.g., In re Food Workshop, Inc.*, 70 B.R. 962, 967 n. 3 (Bankr. S.D.N.Y. 1987).

The Second Circuit also examined the question of a good faith filing in I*n re C–TC 9th Avenue P'ship*, 113 F.3d 1304 (2d Cir.1997). On a motion to dismiss, the court found that a partnership in dissolution had filed under Chapter 11 solely to frustrate the "legitimate efforts" of a secured party to foreclose on the debtor's only asset, that the debtor had not paid its property or other taxes, and that the debtor had taken no other action in the case for more than a year after the filing. *Id.* at 1312. The Court of Appeals held that the Bankruptcy Court did not abuse its discretion in dismissing the case where "on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings." 113 F.3d at 1309, quoting *In re Cohoes*, 931 F.2d at 227.

In both *C–TC 9th Avenue P'ship* and *Cohoes,* the critical issue is whether there was, on the date of the filing, a good faith intent to reorganize and a lack of any intent to use the bankruptcy process solely as a means to delay and frustrate creditors. As will be seen below, based on the totality of the circumstances here, the movants have not demonstrated that these Debtors lacked a good faith intent to reorganize on the date the case was filed or that they intended to use to this Court simply as a mechanism for frustrating the movants in the Winding Up Proceeding.

2612894

The Joint Liquidators, in their pleadings, aver that the Debtors filed these bankruptcies: (i) simply to delay the legitimate rights of creditors, and (ii) to thwart CIMA's efforts in the Cayman Islands. Both statements are false.

There is no benefit to anyone of delay. These bankruptcies were filed for the primary purpose of putting these Debtors in a position to recapture lost value from the United Community Bank warrants, which effort these Debtors believe must include enforcing the validity of the payment-in-kind (PIK) redemption of the Louisiana Pension Funds. No assistance in this effort has been provided by Cayman Litigators or by the Trustee.

Further, as the Court is aware, these Debtors have absolutely no access to cash. In the hedge fund industry, funds generally maintain no employees. Instead, business and management services are performed by related and unrelated entities who contract with the mutual funds to perform services. None of the Fletcher Team has been compensated for any work done on behalf of these entities since January 2013, a period of nearly twelve (12) months, and before that for many years. Meanwhile, the amount of work required in connection with these bankruptcies and efforts made prior to these bankruptcies has been extensive.

Although the Court will consider all the facts and circumstances in determining whether a debtor's filing was made in good faith, the following factors enumerated by the Second Circuit in *C–TC 9th Avenue P'ship* may be helpful:

(1)     the debtor has only one asset;

(2)     the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3)     the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

7

(4)    the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5)    the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6)    the debtor has little or no cash flow;

(7)    the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8)    the debtor has no employees.

*C-TC 9th Ave. P'ship*, 113 F.3d at 1311.[2]

In analyzing these factors here, it is clear that the Debtors filed the Chapter 11 Cases in good faith.  First and third, the Debtors have more than one asset as they possess significant cash assets within the United States, smaller amounts of illiquid assets outside the United States, and numerous claims in other proceedings.

Second, the Debtors have only unsecured creditors, and no secured creditors to "thwart." Accordingly, creditors will be treated equally.

Fourth, this is not a two-party dispute.  This is an arrangement between a likely, although not necessarily insolvent estate, and its creditors and investors.  It is the Joint Liquidators who attempt to create a two-party dispute by asserting that they represent <u>all</u> adverse interests- an inaccurate fact given that the automatic stay was invoked prior to their purported appointment.

Fifth, it is evident that the Debtors did not file with the intent to frustrate their creditors' rights.  Rather, the Debtors believe that they are best positioned to maximize the value of assets

---

[2] Although the factors enumerated in *C-TC 9th Avenue Partnership* were developed in the context of a single asset real estate debtor, they still prove helpful in this case.

2612894

and the attendant distributions on account of creditor and investor claims.  Thus, regardless of the timing, this factor is not present here.

Sixth and Seventh, although the Debtors' currently have little or no cash flow, the Debtors have significant assets with which to fund their restructuring/orderly liquidation.

Lastly, as the Joint Liquidators succinctly point out, "[t]he Debtors have no employees and no need for employees." (Joint Liquidators' Brief ¶ 151).  Under the direction of their current directors, and assuming some payments can begin to the service providers, the Debtors are more than adequately staffed to manage the affairs through the Chapter 11 proceedings.

Although the factors are not intended to operate as a checklist, it becomes clear that in addition to subjectively acting in good faith, the Debtors have also objectively acted in good faith and the Joint Liquidators fail to meet their burden of demonstrating cause for dismissal or conversion.

## II.    THE APPOINTMENT OF A TRUSTEE IS NOT NEEDED TO ADDRESS ANY ALLEGED CONFLICTS OF INTEREST

Certain of the moving parties, i.e., Pasig and, to a lesser extent, the Joint Liquidators, argue that the removal of the Fletcher management team and the appointment of a trustee (or recognition of the Joint Liquidators) is appropriate due to certain alleged "inherent conflicts of interest."  *See e.g.,* Pasig Moving Br. at p. 16.  Although the precise alleged "inherent conflicts of interest" are not clearly articulated, the main gist of the argument seems to be that Mr. Fletcher and his management team are incapable of conducting investigations into the allegations of mismanagement and self-dealing because they will not thoroughly investigate themselves.  As explained below, this argument has no merit.  First, many of the alleged conflicts relate to transactions between the family of Fletcher funds, transactions that were expressly authorized by the relevant, and governing, private placement memorandums.    Second, the Debtors'

9

professionals are in fact investigating all of the alleged improper conduct raised by the moving

parties.  Lastly, the Bankruptcy Court is well equipped to bring in any necessary third-party

investigators as needed, without removing the Fletcher management team from possession and

either destroying, or greatly diminishing, the value of the Debtors' assets.

### A.    Appointment of a Trustee Under 11 U.S.C. § 1104(a).

Section 1104(a) of the Bankruptcy Code governs appointment of a chapter 11 trustee. It

provides:

> a) At any time after the commencement of the case but before confirmation of a plan, on
> request of a party in interest or the United States trustee, and after notice and a hearing,
> the court shall order the appointment of a trustee—
>
>> (1) for cause, including fraud, dishonesty, incompetence, or gross
>> mismanagement of the affairs of the debtor by current management, either
>> before or after the commencement of the case, or similar cause …

11 U.S.C § 1104(a).

Although not expressly identifying the alleged "inherent conflict of interest" at issue

here, Pasig cites to *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 473 (3d Cir. 1998) as support

for the proposition that a conflict of interest supports the appointment of a trustee.  However,

*Marvel* is easily distinguished from the case *sub judice*.  In *Marvel*, the court recognized that

normally there is a "strong presumption against appointing an outside trustee" due to "the debtor-

in-possession's usual familiarity with the business it had already been managing at the time of

the bankruptcy filing, making it the best party to conduct operations during the reorganization."

*Id.* at 471.  In *Marvel*, however, that usual presumption did not apply because a creditor had

taken control of the debtor's management six months after the filing of the bankruptcy case.  *Id.*

The court found that the bankruptcy court had not abused its discretion when it approved the

appointment of a trustee due to the "deep conflict" existing between the creditor controlled

debtor's interests and those of other creditors.  *Id.* at 473.

10

Unlike in *Marvel*, here, the presumption against the appointment of an outside trustee should be recognized because of the complex nature of the Debtors' businesses and because the historical knowledge that is critical to maximize value for creditors rests with the Soundview Capital Management, and RF Services, both Fletcher Asset Management affiliates. Soundview Capital Management and RF Services are not creditors that have taken control of the Debtors, post-petition, without the familiarity of the businesses at hand like in *Marvel*. Rather, RF Services and Soundview Capital Management have no "inherent conflict" with the creditors and, in fact, are in the best position to maximize value for creditors. As history has shown, neither the Joint Liquidators nor a newly appointed trustee have the sufficient financial background and historical knowledge necessary to maximize value for the Debtors' stakeholders.

The other cases cited by Pasig to support the appointment of a trustee are distinguishable because an actual conflict existed, including *In re Cajun Elec. Power Coop.,* 191 B.R. 659, 662 (Bankr. M.D. La. 1995), and *In re Colorado-Ute Elec. Ass'n*, 120 B.R. 164, 175 (Bankr. D. Colo. 1990) and thus, are wholly inapposite. In both of those utility board cases, the respective courts found inherent, and actual, conflicts between the interests of the debtor electric cooperatives (whose interests were to deliver electric at low rates to members) versus the interests of the creditors (whose interests lie in having higher rates, and the resulting higher revenue to pay claims). *See Cajun Elec.*, 191 B.R. at 662 (finding cause to appoint a trustee because of the actual conflict between the debtor and its members, the estate, and creditors); *Colorado-Ute*, 120 B.R. at 176 ("The Court cannot envision a way for the current management and board to resolve the inherent conflict between what is best for Colorado-Ute, its creditors and the co-op members."). The final case cited by Pasig, *In re Clinton Centrifuge, Inc.*, is equally unavailing. 85 B.R. 980, 985-86 (Bankr. E.D. Pa. 1988) (where the court refused to

11

appoint a trustee despite allegations of improper transfers and between debtor and non-debtor

companies under the same management and alleged conflicting duties and interests).

> **B.      The Alleged "Improper Transfers" Were Permitted Under The Governing Private Placement Memorandums.**

In framing the analysis for the appointment of a trustee based upon alleged conflicts of

interest in investigating intercompany claims and transfers, it is important to recognize that the

Fletcher funds were intended for investment by a small pool of sophisticated investors.   As

explained in detail in the Direct Testimony/Affidavit of Alphonse Fletcher, Jr. on Motions to

Dismiss, Convert, or Appoint a Trustee [Corrected] (the "**Corrected Fletcher Affidavit**") and

accompanying exhibits, the Private Placement Memoranda at issue expressly disclosed that there

could be conflicts in connection with management and investment activities:

> The circulation and distribution of this memorandum in certain countries is restricted by law.  In particular, this memorandum may not be circulated or distributed in the United States.

> Certain actual and potential conflicts of interest exist in the structure and operations of the Fund.   The Shares are suitable for purchase only by sophisticated high net worth investors…which are able to bear the potential loss of their entire investment.

> A shareholder will not be able to liquidate its investment of the Fund immediately after deciding to do so… .   The Fund may limit, defer or suspend redemptions under certain circumstances… .   Further the ability of the shareholders to redeem Shares will be subject to the Fund's ability to make withdrawals from the Trading Vehicles, which may be restricted as described in their Memorandum.

> The Directors are affiliates of the administrator… .   They are also affiliates of the Citco Group which is a minority shareholder of the Investment Manager…. Therefore, the directors may have a conflict of interest with respect to their duties to manage the Fund in the best interest of its shareholders… .   There is an absence of arms-length negotiation with respect to the terms of the compensation payable to such parties pursuant to their respective agreements with the Fund.

*See* Corrected Fletcher Affidavit at pp. 4-5; 1007-2 Declaration at pp. 3-4 and the accompanying

Exhibit A.

12

2612894

Accordingly, while such conflicts may be unusual or improper in the context of

investment funds governed by U.S. law, the same is not true for investments made outside of the

United States in accordance with foreign laws.  Such transactions and relationships in no way

support the appointment of a trustee when such matters were expressly authorized by the relevant

PPM's, and were expressly acknowledged in a document executed by each of the Debtors'

investors.  *See* 1007-2 Declaration at p. 4 and accompanying Exhibit B.

C.    **The Debtors' Professionals Are Investigating The Transactions At Issue And, If Necessary, Additional Independent Professionals Can Be Appointed As Needed.**

Pasig argues that a trustee should be appointed because "the Debtors cannot investigate

and prosecute claims against themselves."  Pasig Moving Br. at p. 2.  This argument is not only

untrue as a factual matter, it is an issue that arises in almost every single complex multi-debtor

Chapter 11 proceeding.   As to the facts at hand, the Debtors' professionals are indeed

investigating, analyzing and questioning all potential claims as demonstrated in the recent

deposition of Mr. Fletcher:

> Q. Since they filed their Chapter 11 petitions, have the Debtors taken any steps to investigate potential claims against you personally?
>
> A. I would say that the team working with the Debtor are looking at absolutely everything and are not shy in asking for information, explanations or anything they need in order to do their job the best they can.
>
> Q. So people have asked you personally for information in connection with an investigation of claims against you personally, is that what you're saying?
>
> A. I don't know that I would characterize it as making an allegation against me. I would characterize it as collecting any and all facts in a manner that appears so sincere that they would see anything that merited attention or in depth investigation. I don't think they would be shy about it.

13

Q. So you don't think they would be shy about it, but you don't have any indication that anyone has taken any specific steps to investigate claims against you personally; is that right?

A. I don't think I could accept it the way you worded it because, for example, to request all the information related to an allegation that Ms. Midanek or someone else made and rigorously examine it and question us and seek confirmation is the kind of thing that I would consider an investigation.

Q. Well, has that, in fact, occurred, have you been rigorously questioned about accusations against you?

A. Yes.

Q. Who has rigorously questioned you about accusations against you?

A. The financial advisor has rigorously questioned me and everybody who would have any information related to these Debtors.

Q. And who is that?

A. Gosh, now that you asked me, Bernie.

Q. Mr. Katz?

A. Yes, from CohenReznick.

Q. Yes.

A. And his colleague Howard.

*See Deposition Transcript of Alphonse Fletcher* dated December 4, 2013 at pp. 166-169 attached hereto as **Exhibit 1.**     Accordingly, despite contentions to the contrary, the Debtors' professionals are, indeed, investigating all of the claims raised by parties to these proceedings.

Furthermore, as this Court has expressly found:

[i]n multi-debtor cases, individual debtors frequently, if not always, have actual or arguable obligations to each other---by reason of money lent, or funds or other assets having been transferred, from one debtor to another; by reason of one debtor having provided or obtained services for other debtors; by reason of

14

2612894

allocations of overhead or charges for shared facilities or other property; or by reason of other interdebtor dealings.

*In re Adelphia Communications Corp.*, 336 B.R. 610, 617 (Bankr. S.D.N.Y. 2006) *aff'd by* 342 B.R. 122 (S.D.N.Y. 2006).   "Multi-debtor chapter 11 cases with disputes or apparent conflicts between or amongst debtors are quite common."   *Id.* at 645.   This Court also found in *Adelphia* that while interdebtor issues cannot be swept under the rug, "the means established to resolve them should be the least destructive available."   *Id.* at 620.   Given the complexity and history involved with these Debtors, having the Fletcher management team remain in possession will help maximize value for the benefit of all creditors.   Even if the court determines at some point that an independent investigation/litigation is required, the appointment of a trustee is not the "least destructive available" alternative despite the unsubstantiated claims asserted by the moving parties.   Rather, the court has the ability to appoint examiners under section 1104 of the Bankruptcy Code, as well as granting creditors the right to investigate and, if appropriate, litigate matters on behalf of an estate.   *Id.* at 666 *citing Glinka v. Murad (In re Housecraft Industries USA, Inc.),* 310 F.3d 64 (2d Cir. 2002); *Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN Enterprises),* 779 F.2d 901 (2d Cir. 1985); *Commodore International Ltd. v. Gould (In re Commodore International Ltd)*, 262 F.3d 96 (2d Cir. 2001).

Finally, the unique facts of these cases do not justify the appointment of a trustee, and indeed, it would be wasteful to the estate to do so under the current status of these cases.   As this Court is well aware, Richard J. Davis, the Chapter 11 Trustee of Fletcher International Ltd. (Bermuda) (the "Trustee") is already in place and has already spent substantial time (and sums) investigating the very allegations that are being raised by the movants herein.   Given that no monies will be paid or transferred by these Debtors without express Court approval, that fact alone eliminates the most of the concerns raised by the movants and there is simply no benefit to

15

2612894

removing the Fletcher management team in favor of a trustee at this time. And if, in fact, issues arise that require additional independent investigation, the Court is well equipped to deal with such matters in due course. Therefore, the alleged conflicts of interest should not drive appointment of a trustee at this time.

## III. ANY ASSETS OF THESE DEBTORS WHICH MIGHT POSSIBLY BE LOCATED IN THE CAYMAN ISLANDS ARE *DE MINIMUS*

Throughout their brief, the Joint Liquidators repeatedly overstate the importance of the Debtors' direct claims in the liquidation proceedings of Leveraged and Arbitrage. The Joint Liquidators characterize these claims as the "key," "major," "substantial" and the "most significant" assets. In truth, the value of the Debtors' direct claims against Leveraged and Arbitrage are a tiny portion of the Debtors' overall assets. The combined value of these claims, as noted in the Katz Affidavit and the Supplemental Direct Affidavit, is only $1.2 Million out of total combined assets of the Debtors equal to $56 Million. Out of the total assets of the Limited Debtors alone, the direct claims against Leveraged and Arbitrage comprise only 0.59% of Elite's total assets, 0.54% of Premium's total assets and 13.82% of Star's total assets.

On the other hand, the most substantial part of the Debtors' assets are located here in the United States in the Debtors' bank accounts at Wilmington Trust. The Debtors' remaining assets consist of intangible property, and according to the flexible test used by New York courts in determining the location of intangible property interests, those assets are located here in New York where the Debtors operate their business. *See In re Fairfield Sentry Ltd.*, 484 B.R. 615, 624 (Bankr. S.D.N.Y. 2013). This Court stated in *In re Fairfield Sentry* as follows:

> The situs of intangibles is in truth a legal fiction, but there are times when justice or convenience requires that a legal situs be ascribed to them. The locality selected is for some purposes, the domicile of the creditor; for others, the domicile or place of business of the debtor, the place, that is to say, where the obligation was created or was meant to be discharged; for others, the place where the debtor can be found. **At the root of the**

16

> **selection is generally a common sense appraisal of the requirements of justice and convenience in particular conditions**.

*In re Fairfield Sentry Ltd.*, 484 B.R. 615, 624 (Bankr. S.D.N.Y. 2013) (quoting *Severnoe Securities Corp. v. London and Lancashire Insurance Co.,* 255 N.Y. 120, 123–24, 174 N.E. 299 (1931) (emphasis added) (internal citations omitted).

Here, where the Debtors' principal place of business is located at 48 Wall Street, New York, New York, the substantial liquid assets of the Debtors are located in the United States, and the ultimate owner of the assets of the largest appearing creditor of the Debtors—Pasig—is a United States Citizen, the "requirements of justice and convenience" dictate that the Debtors' intangible assets be deemed located in the United States for purposes of analyzing where these estates should be administered. The only other appearing "creditors," who are insiders of the Debtor, are also controlled by a U.S. Citizen, Ms. Deborah Midanek.

## IV.    FILING A U.S. BANKRUPTCY HAS NO IMPACT ON WHETHER OR NOT A FUND "ENGAGED IN A TRADE OR BUSINESS' IN THE U.S.

At paragraphs 37 and 70 of the Joint Liquidator's Brief, the Joint Liquidator's make an argument that these Debtors will harm their investors by proceeding with a U.S. Bankruptcy. The governing documents for each of the Funds provide that, if the funds "engage in a trade or business" in the United States, foreign investors could become subject to U.S. income tax as well as a "branch profits tax."

Long before these Debtors filed their Chapter 11 bankruptcies, they held the vast majority of their cash assets, *i.e.*, the sum of $20 million, in the United States, their business was conducted by related parties out of offices located in the United States (at 48 Wall Street), and their Fund Administrator, Pinnacle Asset Management, was also located in the United States (North Carolina). So were the offices of virtually all related parties providing services to these Debtors.

17

2612894

The Debtors are advised and continue to believe that none of these activities, including the filing of a Chapter 11 Bankruptcy, constitutes "engaging in a trade or business in the United States" given the operations and the portfolios of the Debtors.

Second, these funds, along with former director Deborah Midanek, spent extensive amounts of time (and money) working with Weil Gotshal as restructuring counsel in the Spring and early Summer of 2013 to consider Chapter 11 filings for these Debtors.  Without disclosing attorney-client privilege, the fact is that Weil Gotshal prepared a lengthy comparison analysis of the pros and cons of U.S. Bankruptcy proceedings vs. Cayman Winding Up proceedings.

Again without revealing attorney-client privilege, the Debtors can affirmatively state that nowhere in that analysis and at no time despite more than $1,000,000 of legal fees spent on Weil Gotshal and other attorneys at Ms. Midanek's request, was there any mention or discussion of possible tax problems for investors as a result of filing in the U.S.  Indeed, the conclusion urged at that time by the Debtor's then director, Deborah Midanek, was that U.S. Chapter 11 proceedings should be filed both for these Debtors as well as for _all_ of the affiliated offshore Richcourt Funds (there are 15 of them in all).

Notwithstanding, the Joint Liquidators seem to assert Soundview's classification as a "debtor" under the Title 11 could cause it to be considered to be "engaged in a trade or business" in the U.S., thereby creating U.S. Tax exposure for investors.  *See* Corrected Fletcher Affidavit, Ex S at p. 26 [Elite Offering Memorandum].  This assertion is without merit.  Under the Bankruptcy Code Soundview is treated as an entity separate from its owners.  See 11 USC §101(41) and (13).  Pursuant to IRC §1399 no separate taxable entity results from a case filed by a corporation under Title 11.  Taken together, this means that a corporate debtor in Title 11 is the same entity for tax purposes before and after the Title 11 case is filed.  This is true even though

18

an "estate" is created under Title 11.  See 11 USC §541(a).  In short, while an "estate" is created

for Title 11 purposes, no separate taxable entity is created for Internal Revenue Code purposes.

Furthermore, since no separate taxable entity is created, the tax year does not close with a filing

of a case under Title 11 by a corporation.

## V.    THE ACT OF STATE DOCTRINE IS INAPPLICABLE TO THESE CHAPTER 11 CASES.

The American statement of the act of state doctrine was articulated by the U.S. Supreme

Court in *Hernandez*:

> Every sovereign state is bound to respect the independence of
> every other sovereign state, and the courts of one country will
> not sit in judgment on the acts of the government of another,
> done within its own territory. Redress of grievances by reason of
> such acts must be obtained through the means open to be availed
> of by sovereign powers as between themselves.

*Underhill v. Hernandez,* 168 U.S. 250, 252 (1897) (finding that a military commander carrying

on operations under the authority of a revolutionary government in Venezuela, which was later

recognized by the U.S. as the legitimate government of that country, was not liable in a U.S.

court for wrongs inflicted upon a U.S. citizen).  The act of state doctrine is a defense, and "[t]he

burden of proof rests on defendants to justify application of the act of state doctrine." *Bigio v.*

*Coca-Cola Co.,* 239 F.3d 440, 453 (2d Cir. 2000) (holding that the District Court's application of

the act of state doctrine was reversible error); *see also, Alfred Dunhill of London, Inc. v. Republic*

*of Cuba,* 425 U.S. 682, 694 (1976).

Contrary to the Joint Liquidators contentions, the act of state doctrine is inapplicable to

these Chapter 11 cases.  Notably, the U.S. Supreme Court has declined to apply the act of state

doctrine  as an "inflexible and all-encompassing" rule; instead it has applied the doctrine with

circumspection, noting that the act of state doctrine's "continuing vitality depends on its capacity

to reflect the proper distribution of functions between the judicial and political branches of the

19

Government on matters bearing upon foreign affairs." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427-28 (1964). Furthermore, the act of state doctrine cannot be invoked by a defendant merely because proceedings touch upon foreign relations concerns; rather, "[a]ct of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign." *W.S. Kirkpatrick & Co., Inc. v. Envt'l. Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990) (emphasis in original). Here, the filing and continuation of these Chapter 11 cases does not in itself require that this Court sit in judgment on the acts of a foreign state. To this point, significantly, none of the cases cited by the Joint Liquidators regarding the act of state doctrine involve insolvency proceedings. Indeed, Congress has already recognized the need for a coordinating mechanism between the insolvency laws of the United States and of other jurisdictions, and has provided an avenue of recognition in the form of a Chapter 15 filing.

Moreover, even if the act of state doctrine did apply, in contrast to the position assumed by the Joint Liquidators, the act of state doctrine does not require dismissal of these proceedings. First, the act of state doctrine is not necessarily a bar to litigation. By way of example, in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428-437 (1964), the act of state doctrine did not require dismissal of the suit, but only that the expropriation of property in that case be given effect as the rule of decision. Judicial inquiry into the validity of the act of a foreign sovereign has been permitted where consistent with related legal principles or the underlying purposes of the act of state doctrine. *See First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759 (1972); *see also, Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682 (1976). Additionally, the act of state doctrine contains a territorial limitation in that it relates only to actions "performed within [the foreign sovereigns] *own* territory" and does not prevent inquiry into the validity of

20

acts affecting or purporting to affect property not located within the acting state's territory.

*Underhill v. Hernandez,* 168 U.S. 250, 252 (1897) (emphasis added); s*ee also*, *Films by Jove,*

*Inc. v. Berov*, 341 F. Supp. 2d 199 (E.D.N.Y. 2004) (act of state doctrine did not bar judicial

inquiry into validity of Russian ministerial directive retroactively changing ownership of

copyrights where the situs of copyright license was located outside the Soviet Union).

The theory underlying the territorial limitation to the act of state doctrine is that a foreign

state is less concerned about the effects of its acts on property outside of its  territory than within:

> . . .  [t]he obvious inability of a foreign state to complete an
> expropriation beyond its borders reduces the foreign state's
> expectations of dominion over that property.... Consequently, the
> potential for offense to the foreign state is reduced, there is less
> danger that judicial disposition of the property will 'vex the peace
> of nations,' and there is less need for judicial deference to the
> foreign affairs competence of the other branches of government.

*Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1121-22 (5th Cir. 1985) (internal citations omitted).

Here, where the Debtors' assets are located outside the acting state and the Joint Liquidators

purport to act outside the acting state, the act of the state doctrine is not applicable.  Accordingly,

the Joint Liquidators' argument that these Chapter 11 cases should be dismissed under the act of

state doctrine is without merit.

## VI.    THE WINDING UP ACTION IN THE CAYMAN ISLANDS IS SUBJECT TO THE AUTOMATIC STAY UNDER § 362(b)

The Joint Liquidators argue that the automatic stay does not apply to the Winding Up

Petition "because CIMA was a party to and fully supported the Winding Up Proceeding", and as

such, the Winding Up Proceeding is a continuation of a governmental action and falls outside of

the stay.  Joint Liquidators Memorandum of Law, ¶ 117. The premise of this faulty conclusion is

factually and legally inaccurate - CIMA is not a party to the Winding Up Proceeding, was never

a party to the Winding Up Proceeding and cannot become a party to the Winding Up Proceeding

21

2612894

in the future.  See Expert Testimony of Gary Smith.  Therefore, there can be no "continuation of action" by CIMA because none existed either prior to the Winding Up proceeding, or even during the Winding Up Proceeding.  In fact, the Joint Liquidators' argument on this point, when read carefully, is based solely on manipulated facts and a tortured reading of both statutory Cayman Island Law (the Mutual Funds Law) and U.S. case law.

The automatic stay under 11 U.S.C. § 362 "operates to stop the commencement or continuation of a judicial, administrative, or other action that seeks to exercise control over or take possession of property of the estate." *In re Saint Vincent's Catholic Medical Centers of New York*, 429 B.R. 139, 146. (Bankr. S.D.N.Y. 2010)*, In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 522 F.Supp.2d 569, 576 (S.D.N.Y. 2007). 11 U.S.C. § 362(a). The crucial role of the stay is to "prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts ... to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another." *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation,* 522 F. Supp 2d at 578 *(citing In re Fidelity Mortgage Investors,* 550 F.2d 47, 55 (2d Cir.1976)).*"*

However, the filing of a bankruptcy petition does not operate as a stay against:

commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

11 U.S.C. § 362(b)(4).[3]

---

[3] The courts have developed two tests for determining whether a particular state action is one that Congress intended to be excepted under § 362(b)(4): the pecuniary purpose (or pecuniary interest) test and the public policy test.  In order for the police powers exception to apply, an action by the state must satisfy one of these tests. *U.S. ex. rel. Fullington v. Parkway Hosp.,* 351 B.R. 280  (E.D.N.Y 2006); *See also In re Chateaugay Corp.,* 115 B.R. at 31 (Bankr. S.D.N.Y. 1988).  In their analysis, the Joint Liquidators shied away from this test and focused solely on the statutory language.

2612894

Courts narrowly construed Section 362(b)(4) to allow actions by governmental units to continue only if they are enforcing laws affecting health, welfare and public safety and not to merely protect its pecuniary interest. *In re Chateaugay Corp.,* 115 B.R. 28 (Bankr. S.D.N.Y. 1988). The plain and unambiguous language of 362(b)(4) only excepts actions <u>brought by governmental units, and not by individuals</u>. *In re St. Vincent's Catholic Medical Centers of New York,* 429 B.R. at 148 (emphasis added). In *St. Vincent's,* the Court ruled that:

> A broad reading of § 362(b)(4) would allow too many entities to have 'free rein over a debtor's assets simply because they state that they are enforcing police or regulatory power despite the fact that they generally lack any such authority.' [*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation,* 522 F. Supp 2d at 577]. The Court … cannot construe § 362(b)(4) so broadly as to allow individuals to exercise police and regulatory powers that are not theirs to exercise.

*In re St. Vincent's*, 429 B.R. at 148.

Under the law of this court, the investors who filed the Winding Up Action are individuals and not governmental units, and without demonstrating some special circumstance, the automatic stay applies to the Winding Up Proceeding. The Joint Liquidators argue that "the fact that private parties were also involved in the Winding Up Action and seek the same relief as CIMA does not remove that proceeding from Section 362(b)(4)."[4] Joint Liquidators' Memorandum of Law at ¶ 126. Accordingly, the Joint Liquidators conclude that the Winding Up Proceeding amounts to the "continuation of an action or proceeding by a governmental unit" under Section 362(b)(4). But private parties were not just "also involved." Citco and the Objecting Funds are the only prosecuting parties.

CIMA brought no independent action, and CIMA did not seek independent relief against the Debtors. Private parties brought the action, and CIMA was, at best, the "also involved"

---

[4] Indeed  the statement: "the fact that private parties were also involved" is offensive and borders on a sanctionable misstatement of undisputed factual record here.

party. At most, CIMA <u>supported</u> the appointment of the Joint Liquidators, but did nothing more to exercise autonomous power. A separately pending action is critical to there being a "continuation of an action" by a governmental entity.  *SEC v. Wolfson*, 309 B.R. 612 (D. Utah 2004).  A fatal defect in the Joint Liquidators reliance on cases like *Wolfson* is that unlike the SEC, CIMA did not independently seek relief in its own action, or even bring its own motion in the Winding Up Proceeding. Thus, *Wolfson* is not instructive.[5]

There is no dispute that at the very last minute (*see* Rebuttal Testimony Affidavit of Richard Annette) CIMA supported the actions of Citco in bringing the Winding Up Proceeding. But, interest or support alone is not enough to deem CIMA as continuing the action. To qualify as "continuation of an action", there must be some independent action, beyond mere support. *In re Edison Mission Energy, et al*., No. 12–492192013 WL 6092445 (Bankr. N.D. Ill. Nov. 19, 2013).

Critical to this analysis is consideration of Cayman Law: Under Section 30 of the Mutual Funds Law, once the Joint Liquidators were appointed, CIMA lost its ability to take action against these Debtors.  See Affidavit of Gary Smith at ¶¶ 38-82.  Thus, it is currently impossible for there to be any continuation of the action by CIMA as CIMA never started an action, and it has now lost the authority to take action in the future.

Moreover, the Joint Liquidators rely on the Affidavit of Yolanda Banks McCoy ("**McCoy Affidavit**"), but leave out critical information contained in that affidavit clarifying that CIMA will be taking no independent steps. CIMA told the Cayman Court what steps it "would have taken" (*i.e.* to appoint a controller) but rather than take action, decided to defer to the

---

[5] Importantly,  it is plain that CIMA does not have the power that the SEC has.  CIMA's powers are limited to those enumerated in Section 30 of the Mutual Funds Law.

creditor's Winding Up petition.  That is as far as CIMA's involvement went.  (Joint Liquidators Ex. 7 (McCoy Aff. ¶ 17)).  It is the practical reality of this situation is that CIMA did not take action on its own because any action CIMA could take would only undercut what the Grand Court ordered.  McCoy Affidavit, ¶ 15.  In other words, because the only exercise of authority CIMA could take is the appointment of a controller, and by Ms McCoy's own account, a controller would exercise less control than the Joint Liquidators, the sole "action" taken by CIMA was to endorse Citco's petition. McCoy Affidavit, ¶ 15.  CIMA's expression of an opinion at the September 24 Winding Up hearing cannot rise to the level of "continuation of the action" under § 362(b)(4) as argued in the Joint Liquidators briefs.

Further, the Joint Liquidator's reliance on *In re Halo Wireless Inc.,* 684 F.3d 581 (5th Cir.2012), is misguided.  In *Halo,* the Court of Appeals held that although the proceeding at issue was initiated by private entities, the public policy exception applied because the suit was being prosecuted or continued by governmental units, which is explicitly contemplated within the text of Section 362(b)(4). *Id.* at 592. Similarly, in *U.S. Int'l Trade Commission v. Jaffe,* 433 B.R. 538 (E.D. Va. 2010), the court held that the automatic stay was not applicable to an action where a private party files a complaint but the government agency independently chooses to commence an investigation. *Jaffe,* 433 B.R. at 544.  The case *sub judice* is clearly distinguishable from these two cases.

Here, in this case, CIMA did not independently exercise regulatory authority by instituting an action prior to appointment of the Joint Liquidators, nor did they take action within the Winding Up Action by filing anything more than a statement of support. Further, unlike the findings in *Halo,* there is no statute requiring CIMA's involvement in the Winding Up Action, nor is the Winding Up Action being prosecuted by CIMA.  The record here indisputably

25

2612894

evidences that Citco independently initiated the Winding Up Actions without guidance or prompting by CIMA, and to date, CIMA has not intervened. Indeed, CIMA has plainly stated that it will not intervene. McCoy Affidavit at 15 & 17.

*In re Edison Mission Energy, et al.*, No. 12–492192013 WL 6092445 (Bankr. N.D. Ill. Nov. 19, 2013) lends more appropriate guidance to the Court. In *Edison Mission Energy*, the debtor, a leading independent power producer, was the subject of a motion brought by the Sierra Club, a non-governmental entity, for the entry of an order either confirming that the automatic stay is not in effect due to Section 362(b)(4)'s police power exception, or, in the alternative, granting relief from the automatic stay to continue a regulatory action pending before the Illinois Pollution Control Board (the "**IPCB Proceeding**"). Similar to the facts in the instant case, the Sierra Club independently initiated the IPCB Proceeding and no Illinois governmental unit intervened or indicated that it planned to commence an investigation. Moreover, like the IPCB in *Edison Mission Energy*, a representative of CIMA appeared at the Winding Up hearing and although supported the Winding Up petition, made clear it had no intention to join in, or initiate its own action In light of those circumstances. Thus, the Court found that "the Sierra Club's decision to commence the IPCB Proceeding was an independent action, not done under the directive of any Illinois governmental unit" and ….'the police power exception of Section 362(b)(4) does not apply.'[6]

## VII. THE COURT SHOULD NOT LIFT THE STAY TO ALLOW THE CAYMAN ISLANDS LIQUIDATION PROCESS TO GO FORWARD BECAUSE THE JOINT LIQUIDATORS HAVE FAILED TO ESTABLISH CAUSE TO MODIFY THE STAY

Whether in the context of dismissal or relief from the stay, the standards for proving bad faith are not substantively different. *See In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 334

---

[6] The Court did find under the facts there, cause existed to lift the stay to allow the Sierra Club's suit to proceed.

(Bankr. S.D.N.Y. 2001).  As established in Point I above, the Debtors filed the Chapter 11 cases in both objective and subjective good faith.  Thus, the Joint Liquidators cannot meet their burden of proof and modification of the stay should not be granted on these grounds.

Similarly, although the interests of judicial economy and comity can constitute cause to modify the automatic stay, this is only true where the issue has already been litigated in and addressed by another tribunal.  *See In re Lee*, 428 B.R. 667, 671-72 (Bankr. D.S.C. 2009) (granting relief from the stay where the debtor's interest in property had already been litigated in South Carolina state court).  Here, the Chapter 11 cases were already filed, and the automatic stay was already in effect, when the matter was argued in the Cayman Islands.  Surely the Court cannot sanction the Cayman Islands' decision to disregard the import of the Chapter 11 filings.  Moreover, if the Joint Liquidators were concerned with comity and respect for the sovereignty of other nations, the Joint Liquidators would have joined the Debtors' request for an adjournment of the Cayman Islands proceedings until the Joint Liquidators and the court could determine the impact of the automatic stay.  Therefore, the Court should not grant the Joint Liquidators' request to modify the automatic stay.

In addition, the Second Circuit's test for establishing cause to modify the stay weighs heavily against doing so in this matter.[7]

---

[7] The Second Circuit expressed this test in *In re Sonnax Industries, Inc.*, 907 F.2d 1280 (2d Cir. 1990).  The factors are: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.  *See id.* at 1286.

2612894

First, although granting relief from the stay would result in resolution of the issues, so would denial of such relief. The issues in the Chapter 11 cases and the Cayman Islands proceedings are exactly the same: the insolvency of the Debtors. Thus, this factor weighs in favor of denial of the relief as the Chapter 11 cases were initiated prior to the Cayman Island proceedings or, at worst, is neutral as both proceedings would resolve the issues.

Second, it is undeniable that the Cayman Island proceedings are connected to, and would interfere with, the Chapter 11 cases. This factor clearly supports denial of the relief.

Third, although the Cayman Islands court may initially be more familiar with Cayman Islands law, it is certainly not beyond this Court's ability to understand and apply such law as necessary. Moreover, there is no tribunal more specialized with necessary expertise to hear this matter than this Court. Indeed, it is these matters for which this Court was established to hear.

Fourth, granting relief from the stay would clearly prejudice the creditors. The only party supporting Cayman jurisdiction, besides the Cayman appointed purported Joint Liquidators themselves, is a group of insiders controlled by a disgruntled former director of the Debtors, Deborah Midanek. If the Court denies the relief, the Debtors can utilize their expertise to maximize the value of all creditor claims working in the environment of transparency that Chapter 11 grants to creditors and all parties in interest.

Fifth, while Cayman Islands proceedings might or might not move more expeditiously than a Chapter 11 case (a debatable point), they will certainly not lead to a more economical resolution of the issues. Under either proceeding, the professional fees are likely to be similar, although in the Cayman Islands, such fees are not subject to Court review. In the Chapter 11 cases here, the Debtors are confident that they can deliver more value on all the creditors' claims.

Sixth, granting relief from the stay will clearly harm all parties in interest. Such relief

28

2612894

will enable the Joint Liquidators to proceed without the transparency and U.S. due process protections. Conversely, denial of relief will enable all parties in interest time to analyze the nature and extent of the Debtors' assets and determine the best methods and timeframe for the liquidation. In addition, denial of relief will enable the Debtors to utilize their investment expertise to increase the value of all creditor claims.

Accordingly, the Joint Liquidators have not established cause for relief from the stay and such relief should therefore be denied.

2612894

WHEREFORE, the Debtors respectfully request that this Court deny the Motions to Appoint a Chapter 11 Trustee, or in the alternative, convert or dismiss the cases and grant such other and further relief as the Court deems just and proper.

Dated:  December 10, 2013

PORZIO, BROMBERG & NEWMAN, P.C.
*Counsel to the Debtors and Debtors-in-Possession*

By: /s/ Mark J. Politan
    Warren J. Martin Jr.
    (admitted *pro hac vice*)
    Mark J. Politan
    Terri Jane Freedman
    100 Southgate Parkway
    P.O. Box 1997
    Morristown, New Jersey 07962
    (973) 538-4006 Telephone
    (973) 538-5146 Facsimile
    -and-
    156 West 56th St.
    New York, NY 10019

2612894

# EXHIBIT 1

Rough 12-4-13 Transcript - 1776203.txt

1

```
 1
 2    UNITED STATES BANKRUPTCY COURT
 3    SOUTHERN DISTRICT OF NEW YORK
 4    - - - - - - - - - - - - - - - - - - - - - - -x
 5
      In re:
 6
      SOUNDVIEW ELITE, LTD., et al.,
 7
                        Debtor.
 8
                  Case No. 13-13098(REG)
 9                Case No. 13-13099(REG)
                  Case No. 13-13101(REG)
10                Case No. 13-13102(REG)
                  Case No. 13-13103(REG)
11                Case No. 13-13104(REG)
                  (Jointly Administered)
12
13    - - - - - - - - - - - - - - - - - - - - - - -x
14                        1290 Avenue of the Americas
                          New York, New York
15
                          December 4, 2013
16                        10:16 a.m.
17        EXAMINATION BEFORE TRIAL of ALPHONSE
18    FLETCHER, on behalf of the Debtors, in the
19    above-entitled action, held at the above time
20    and place, taken before Alice Schulman, a Notary
21    Public of the State of New York, pursuant to
22    Notice.
23                    *       *       *
24
25
```

.                                                2

```
 1
```

Rough 12-4-13 Transcript - 1776203.txt

24    Soundview Elite, Ltd. had more cash before Mr.

25    Muho was permitted to remove $2 million from his

                                                        166

1                     Alphonse Fletcher

2     bank account than they did after that; is that

3     right?

4          A.     Yes.

5                 MR. MARTIN:   That's an obvious

6          objection.

7          Q.     And the next thing she says is the

8     potential for claims that could be directed at

9     your personal estate.

10                Did you consider the potential for

11    claims that could be directed at your personal

12    estate to be an important consideration or a

13    significant issue to be considered in deciding

14    the way forward?

15         A.     To the contrary.  Ms. Midanek and I

16    seemed to clash on that point because my focus

17    was not on potential claims against me.

18                My focus was on how to get the best

19    job done and her consistent return to trying to

20    push me in the direction she wanted with scares,

21    I found unproductive and less than sincere.

22         Q.     So you are not concerned about

23    potential for claims directed at you personally?

24                MR. MARTIN:  Objection.

25         A.     I would say --

                                                        167

Page 145

Rough 12-4-13 Transcript - 1776203.txt

1            Alphonse Fletcher

2      Q.      Is that right?

3      A.      -- the best way to deal with

4   personal claims is to do the best job that I can

5   on behalf of the entities that I'm representing.

6      Q.      Since they filed their Chapter 11

7   petitions, have the Debtors taken any steps to

8   investigate potential claims against you

9   personally?

10     A.      I would say that the team working

11  with the Debtor are looking at absolutely

12  everything and are not shy in asking for

13  information, explanations or anything they need

14  in order to do their job the best they can.

15     Q.      So people have asked you personally

16  for information in connection with an

17  investigation of claims against you personally,

18  is that what you're saying?

19     A.      I don't know that I would

20  characterize it as making an allegation against

21  me.  I would characterize it as collecting any

22  and all facts in a manner that appears so

23  sincere that they would see anything that

24  merited attention or in depth investigation.  I

25  don't think they would be shy about it.

                                        168


1            Alphonse Fletcher

2      Q.      So you don't think they would be

3   shy about it, but you don't have any indication

4   that anyone has taken any specific steps to

                    Page 146

Rough 12-4-13 Transcript - 1776203.txt

5    investigate claims against you personally; is

6    that right?

7         A.    I don't think I could accept it the

8    way you worded it because, for example, to

9    request all the information related to an

10   allegation that Ms. Midanek or someone else made

11   and rigorously examine it and question us and

12   seek confirmation is the kind of thing that I

13   would consider an investigation.

14        Q.    Well, has that, in fact, occurred,

15   have you been rigorously questioned about

16   accusations against you?

17        A.    Yes.

18        Q.    Who has rigorously questioned you

19   about accusations against you?

20        A.    The financial advisor has

21   rigorously questioned me and everybody who would

22   have any information related to these Debtors.

23        Q.    And who is that?

24        A.    Gosh, now that you asked me,

25   Bernie.

                                        169


1              Alphonse Fletcher

2         Q.    Mr. Katz?

3         A.    Yes, from CohenReznick.

4         Q.    Yes.

5         A.    And his colleague Howard.

6         Q.    Now, in the time between the --

7              MR. BEHA:  Well, strike that.

8         Q.    When the winding up petitions from
                     Page 147

Rough 12-4-13 Transcript - 1776203.txt

9  filed in August, the Debtors retained the

10  Stuarts law firm in the Cayman Islands in

11  connection with those petitions; is that right?

12      A.    That's not how I recall it.  I

13  believe the Debtors were retaining Stuarts

14  before those petitions came in, and then when

15  the petitions came in, Stuarts obviously

16  refocussed on the petitions and advising the

17  Debtors on what they, on the implications.

18      Q.    And without getting into any

19  specific communications, as a general matter,

20  when you initially retained Stuarts before the

21  petitions were filed, were they in connection

22  with potential liquidation or restructuring

23  efforts?

24              MR. MARTIN:  For these Debtors?

25              MR. BEHA:  For these Debtors, yes.

                                          170


1              Alphonse Fletcher

2      A.    I believe Stuarts was initially

3  approached regarding representing the Debtors'

4  interest in the insolvency proceedings taking

5  place in Cayman, and then --

6      Q.    You mean with respect to arbitrage

7  and leveraged?

8      A.    Yes.

9              MR. MARTIN:  You know what, just

10          read back the question and answer.

11              (The record was read.)

12              MR. MARTIN:  when he said the
                          Page 148

Rough 12-4-13 Transcript - 1776203.txt

```
13                        REQUESTS

14
              Page            Line
15
               ^               ^
16             ^               ^
               ^               ^
17             ^               ^
               ^               ^
18             ^               ^

19

20

21

22

23

24

25
```

♀

                                              179


```
 1

 2                     CERTIFICATION

 3

 4        I, Alice Schulman, a Notary Public for and

 5   within the State of New York, do hereby certify:

 6        That the witness whose testimony as herein

 7   set forth, was duly sworn by me; and that the

 8   within transcript is a true record of the

 9   testimony given by said witness.

10        I further certify that I am not related to

11   any of the parties to this action by blood or

12   marriage, and that I am in no way interested in

13   the outcome of this matter.

14        IN WITNESS WHEREOF, I have hereunto set my

15   hand this  ^ DAY ^  day of December 2013.

16
```

                        Page 156

Rough 12-4-13 Transcript - 1776203.txt

17
18                    _____
                          ALICE SCHULMAN
19

20                    *      *      *

21

22

23

24

25

                                              180

1

2                    ERRATA SHEET
           VERITEXT/NEW YORK REPORTING, LLC
3
   CASE NAME: In re: Soundview Elite, Ltd.
4  DATE OF DEPOSITION:  December 4, 2013
   WITNESS' NAME:  ALPHONSE FLETCHER
5
   PAGE/LINE(S)/      CHANGE             REASON
6  ____/____/_____/_____
7  ____/____/_____/_____
8  ____/____/_____/_____
9  ____/____/_____/_____
10 ____/____/_____/_____
11 ____/____/_____/_____
12 ____/____/_____/_____
13 ____/____/_____/_____
14 ____/____/_____/_____
15 ____/____/_____/_____
16 ____/____/_____/_____
17 ____/____/_____/_____
18 ____/____/_____/_____
19 ____/____/_____/_____

20                 _____
                      ALPHONSE FLETCHER
                         Page 157