UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SOUNDVIEW ELITE, LTD., *et al.*, | ) | Case No. 13-13098 (REG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

BENCH DECISION[1] ON MOTIONS TO DISMISS,
FOR RELIEF FROM STAY, FOR APPOINTMENT
OF TRUSTEE, AND ON SANCTIONS FOR
CONTEMPT

APPEARANCES:

PORZIO, BROMBERG & NEWMAN P.C.
*Counsel for the Debtors*
100 Southgate Parkway
Morristown, New Jersey 07962
By:     Warren J. Martin, Jr., Esq. (argued)
          Mark J. Politan, Esq. (argued)
          Terri Jane Freedman, Esq.
          Rachel A. Segall, Esq.


MORRISON & FOERSTER LLP
*Counsel for the Joint Official Liquidators*
1290 Avenue of the Americas
New York, New York 10104
By:     John A. Pintarelli, Esq. (argued)
          James J. Beha, II, Esq. (argued)
          William H. Hildbold, Esq.


425 Market Street
San Francisco, California 94105
By:     Larry Engel, Esq. (argued)

---

[1]     I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have a more conversational tone.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Counsel for Pasig Ltd.*
1633 Broadway
New York, New York 10019
By:    Andrew K. Glenn, Esq. (argued)
       Jeffrey R. Gleit, Esq. (argued)

OSTAD PLLC
*Counsel for Richcourt Allweather Fund Inc.; Optima Absolute Return Fund Ltd.;*
*  America Alternative Investments Inc.; Solon Group, Inc.; and Deborah Hicks Midanek*
185 Great Neck Road, Suite 330
Great Neck, New York 11021
By:    Karen Ostad, Esq. (argued)

WILLIAM K. HARRINGTON
*Office of the United States Trustee, Region 2*
201 Varick Street, Suite 1006
New York, New York 10014
By:    Richard C. Morrissey, Esq. (argued)


ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

       In this contested matter in the six jointly administered chapter 11 cases of Debtors

Soundview Elite, Ltd., Soundview Premium, Ltd., Soundview Star, Ltd. (together, the

"**Limited Debtors**"), Elite Designated, Premium Designated and Star Designated

(together, the "**SPV Debtors**," and together with the Limited Debtors, the "**Debtors**"),[2]

which are within the Fletcher Family of Funds, managed by Fletcher Asset Management,

under the leadership of Alphonse Fletcher ("**Mr. Fletcher**"), I have what are effectively

six motions before me:

---

[2]     The Debtors are mutual funds. I find that all were organized under the law of the Cayman Islands
(as Cayman Islands "Exempted Companies"), principally for tax reasons. But I further find that
their principal place of business is in the United States, at 48 Wall Street, in New York, New
York, and that if a chapter 15 case with respect to them now were filed, their "center of main
interests," or "**COMI**," would now be in New York as well.

(1) By Peter Anderson and Matthew Wright, the Joint Official

Liquidators of the Limited Debtors (the "**JOLs**") and America Alternative

Investments Inc., Optima Absolute Return Fund Ltd., and Richcourt

Allweather Fund Inc. (the "**BVI Petitioners**"), pursuant to section 1112(b)

of the U.S. Bankruptcy Code, to dismiss these cases (or, under section 305

of the Code, to abstain), in favor of a liquidation proceeding in the

Cayman Islands—or alternatively, pursuant to section 362(d) of the Code,

to grant relief from the stay to allow the Cayman insolvency proceeding to

proceed;

(2) By the United States Trustee Program ("**U.S. Trustee**"),

pursuant to sections 1104(a)(1) and (2) of the Code, to appoint a chapter

11 trustee;[3]

(3) by the Debtors, pursuant to sections 362 and 105(a) of the

Code, for entry of an order:

(a) declaring that section 362 of the Code applies to

proscribe proceedings in the Cayman Islands;

(b) finding the JOLs and  petitioning creditors Citco Global

Custody (N.A.) N.V. ("**Citco**"), the BVI Petitioners, the Solon

Group, and the latter's principal Deborah Hicks Midanek to have

acted in contempt of the U.S. automatic stay, and

---

[3]    The U.S. Trustee's motion for appointment of a chapter 11 trustee was initially accompanied by a
similar motion by Pasig, Ltd. ("**Pasig**"), a creditor and party-in-interest.  But Pasig thereafter
changed its position, and now supports dismissal or relief from the stay to allow the liquidation to
be accomplished in the Cayman Islands by the JOLs.  The U.S. Trustee's motion was filed after I
advised the parties that I wanted them to brief the desirability of the appointment of a chapter 11
or chapter 7 trustee as an additional option.

(c) imposing sanctions upon them for having done so.

The various motions raise a host of issues, some of which raise mixed questions of fact and law, and others of which raise matters of the Court's discretion. For the reasons set forth below, I conclude that:

(1) The cases were filed with sufficient corporate authority, as required under the articles of organization of the six Debtors here.

(2) I should not dismiss the cases under section 1112(b), either for "bad faith" filing or for unenumerated cause, nor wholly abstain under section 305.

(3) The Debtors' existing management should not continue in possession; one or more independent fiduciaries must be appointed for the Debtors in these cases. I find, as a mixed question of fact and law, that the U.S. Trustee and Pasig were plainly right when they argued that cause has been shown for the appointment of a trustee under each of sections 1104(a)(1) and (a)(2).[4]

(4) The U.S. automatic stay became effective immediately upon the filing of the chapter 11 petition in the U.S. I grant the requested declaration to that effect. I must reject the JOLs' principal argument to the contrary; the fact that the Cayman Islands Monetary Authority ("**CIMA**") supported an insolvency petition commenced by parties acting in their

---

[4]    Related to that is the separate question of whether I should appoint a trustee here in the United States, under circumstances where the JOLs were already appointed under Cayman law (albeit under an order that, from the perspective of U.S. law, was void, for reasons discussed below), and where the JOLs could perform some, but not all, of the tasks that I see as necessary here. The latter issue is so important that I discuss it separately.

private interests is insufficient to trigger the exception to the automatic

stay under the "police power" exception of section 362(b)(4). Actions in

the Cayman court thereafter—including the appointment of the JOLs—

were, from the perspective of U.S. law, void. But I can grant relief from

the U.S. automatic stay, and ratify otherwise void acts, and I do so to the

extent discussed below.

(5) The Debtors' motion that I hold the JOLs and petitioning

creditors in contempt, and award sanctions, is denied with respect to

actions they took on the day the JOLs were appointed. The motion is

continued, with respect to the JOLs only, with respect to actions the JOLs

took thereafter. The latter will enable me to gauge the extent to which the

JOLs and their counsel now understand that they cannot engage in

business as usual after the filing of a U.S. bankruptcy case.

(6) The last issue is how I should deal with the overlapping, and in

some respects conflicting, jurisdiction of the U.S. and Cayman courts,

with due regard for the comity that each court should provide the other—

being mindful that both courts share the view that fiduciaries to take the

place of the Debtors' management should be appointed, and that the needs

and concerns of stakeholders (and, to the extent it has any further

responsibilities), CIMA are paramount. Ultimately, I am authorizing and

directing the U.S. Trustee to appoint a chapter 11 trustee in these cases—

not only for the three debtors (the SPV Debtors) that are not the subject of

Cayman insolvency proceedings, but the three (the Limited Debtors) that

are the subject of Cayman proceedings as well.  But I am granting relief

from the stay to allow the JOLs to stay in place and to allow the existing

Cayman proceeding to continue—and, if necessary or desirable, to

entertain one or more similar proceedings for the three Debtors not already

the subject of the proceedings in that court—subject to the entry of a

satisfactory protocol governing the proceedings in the two nations.

The bases for this decision follow.

Findings of Fact

To avoid repetition, findings of fact are addressed above and in the individual

sections to which my factual findings relate.[5]

I.

Authority to File

With what effectively raises a threshold issue, the JOLs contend that the Debtors'

chapter 11 petitions were not authorized as a matter of corporate governance, and that the

chapter 11 cases here should not be deemed to have been duly filed in the first place.

That issue devolves into the sub-issues of (1) what was required to authorize the filing of

the petitions, and (2) whether that authorization was given.

I find that the filings here required the approval of the Debtors' stockholders—as

contrasted to the more common scenario, at least in the U.S., where approval by the

directors would be necessary and sufficient.  I further find that the requisite stockholder

approval here was given.

---

[5]    Many were agreed to in Paragraphs 1 through 61 of the Joint Pretrial Order.  Joint Pretrial Order,
Dec. 18, 2013, ECF No. 134 ("**Pretrial Order**").  The later portions of the Pretrial Order were
contentions only, and when they are cited, they are cited only in connection with parties'
arguments.

*(1) What was Required?*

All parties appear to agree that under Cayman law, the commencement of insolvency proceedings with a view to the liquidation of a corporate debtor—*i.e.*, for the winding up of the company—generally requires the approval of the debtor's stockholders. Cayman law provides for an exception to that general rule when the organizational documents of the corporation vest that power in the corporation's board of directors. But in such an instance, the organizational documents must expressly so provide.

As applicable here, any grant of that power would be found in the Debtors' Articles of Association,[6] and in such event would clearly delineate that the "powers of the directors extend[] beyond the powers of managing the business of the company and . . . include[] powers to bring that business to an end."[7] Absent such a grant of power to directors, stockholder approval is required.

But the Debtors' Articles of Association do not provide for an exception to the general rule. Thus I must look to the extent to which the chapter 11 filings were here authorized by the six Debtors' stockholders.

*(2) Was the Required Authorization Given?*

The real question here is whether the six Debtors' stockholders sufficiently approved the filing. I find, as a mixed question of fact and law, that they did.

---

[6]    Testimony of the JOLs' Cayman law expert Kenneth Farrow QC ("**Mr. Farrow**"), Trial Tr. 102:5–8, Dec. 17, 2013, ECF No. 138 ("**Dec. 17 Trial Tr.**") ("the powers . . . the articles confer on the directors . . . is the basis of their authority or lack of authority.").

[7]    *Id.* at 103:8–15; 104:9–13.

-7-

*(A) The Limited Debtors*

All parties agree that at the time of filing of the chapter 11 petitions, Soundview

Capital Management was the sole stockholder holding the voting interest in each Limited

Debtor.[8] All parties likewise agree (or at least do not dispute) that at the time of filing,

Mr. Fletcher and George Ladner ("**Mr. Ladner**") were the sole directors of Soundview

Capital Management. And all parties agree (or at least do not dispute) that Mr. Fletcher

and Mr. Ladner approved the filing of the Limited Debtors' chapter 11 petitions.

But Mr. Fletcher and Mr. Ladner did so, initially, thinking of themselves not as

directors of Soundview Capital Management (the Limited Debtors' stockholder), but

instead as directors of the Limited Debtors. Mr. Fletcher and Mr. Ladner—while indeed

directors of the three Limited Debtors—were more importantly directors of Soundview

Capital Management. And for reasons I explained above, Mr. Fletcher's and Mr.

Ladner's status as directors of the Limited Debtors would not matter for the purpose of

finding due authorization of the Limited Debtors' chapter 11 filings; only their ability to

act on behalf of Soundview Capital Management would. At a time not precisely reflected

in the record (but obviously after the chapter 11 filings), Mr. Fletcher and Mr. Ladner

realized that they had provided the necessary authorization in the wrong capacity, and

executed corrective documents—though whether I should respect those corrections is a

matter of dispute.

Obviously the approvals by Mr. Fletcher and Mr. Ladner (which they did without

the presence of counsel) were amateurish. I find that they gave insufficient thought to the

formalities of the authorization that was required, and the capacities in which they were

---

[8]        *See* Pretrial Order ¶¶ 13–14.

-8-

required to act.  But they did focus, importantly, on the wisdom of the Limited Debtors'

resort to chapter 11, which was the substantive matter to consider.  Each of the people

whose votes were necessary to authorize the filings did so, and all voted in favor of filing.

And no person who was entitled to vote on the Limited Debtors' authorization to file was

deprived of that right, or even failed to exercise it.

Courts in this District, at both the bankruptcy court and district court level, have

previously considered flawed processes in authorizing chapter 11 petitions.  They have

rejected a formalistic approach.  Rather, they have ruled that "the determination as to

whether to honor corporate formalities is an equitable one,"[9] after "a fact-sensitive

inquiry."[10]

Thus, for example, in *Source Enterprises*, two corporate directors had the right to

vote on a decision to file a chapter 11 case but did not.  And the filings by two

subsidiaries of the debtors were not preceded by meetings of those subsidiaries, as

required under their LLC agreements.  But after a factual analysis, the district court

affirmed a bankruptcy court determination that the filings nevertheless were sufficiently

authorized.  Even assuming that corporate governance requirements were not satisfied,

the corporate directors who failed to vote had not moved to dismiss those cases as having

been filed without board approval, and the equities of the debtors' chapter 11 cases

---

[9]    *In re Am. Globus Corp.*, 195 B.R. 263, 264–65 (Bankr. S.D.N.Y. 1996) (Brozman, C.J.)
("**American Globus**") (after an analysis of the underlying facts, denying motion to dismiss the
debtor's chapter 11 petition on the theory that it was not filed with the requisite corporate
authority, even though debtor failed to comply with a bylaws provision requiring a unanimous
vote of the shareholders to authorize the filing); *In re Source Enterprises*, 392 B.R. 541, 554–55
(S.D.N.Y. 2008) (Stein, J.) ("**Source Enterprises**") (quoting *American Globus*) (affirming a
decision by Gonzalez, C.J., denying a motion to dismiss chapter 11 cases, after having rejected
contentions that a corporate debtor had filed a chapter 11 case without adherence to required
formalities).

[10]    *Source Enterprises*, 392 B.R. at 555.

-9-

(which involved a closely held company and many related entities that did not adhere to corporate formalities) led to the conclusion that the boards' actions were proper.[11]

This is a considerably easier case than either *American Globus* or *Source Enterprises*, because nobody who had the right to be heard was excluded. Each of the human beings who needed to have input into the decision to file did so, and focused on the exact decision that needed to be made. The only offense of which the authorizing personnel were guilty was in improperly describing the capacity in which they had acted. The principles articulated in *American Globus* and *Source Enterprises* make it easy for me to find satisfactory authorization here.

### (B) The SPV Debtors

Unlike the three Limited Debtors, the sole voting shareholder of each SPV Debtor was its corresponding Limited Debtor.[12] Thus the chapter 11 filing of each SPV Debtor, which had to be approved by its stockholders with voting power, in this case had to be approved by persons authorized to act for the corresponding Limited Debtor. On a matter of this importance, the persons to make that decision were the Limited Debtors' directors.

As previously noted, the directors of the Limited Debtors were in each case Mr. Fletcher and Mr. Ladner. And though, as directors, they were not empowered to *commence liquidation proceedings* for their respective Limited Debtors, they were still empowered—and in fact were the exact persons empowered—to act for the Limited Debtors in other respects. As directors of each of the three Limited Debtors—the sole voting shareholders of each of the three SPV Debtors—Mr. Fletcher and Mr. Ladner

---

[11]    *Id.* at 554–55.

[12]    Pretrial Order, Stipulated Facts ¶ 28 ("Elite Limited holds the sole voting share in Elite Designated. . . .  Premium Limited holds the sole voting share in Premium Designated. . . .  Star Limited holds the sole voting share in Star Designated.").

-10-

were capable of authorizing—and did authorize—the SPV Debtors' chapter 11 petitions.[13]

The earlier analysis with respect to the Limited Debtors' compliance with corporate formalities applies equally here. Here too, each of the individuals who voted on the authorization focused on the exact decision that needed to be made, and was authorized to do so. And here too, no individual who was entitled to vote on the authorization was deprived of the opportunity to do so, or even failed to do so. I find that the SPV Debtors' chapter 11 petitions were satisfactorily authorized as well.

## II.

### Dismissal for Cause

The JOLs then argue that the Debtors' chapter 11 cases should be dismissed under section 1112(b) of the Code, which authorizes dismissal for "cause"—which has been judicially construed to include, among other things, "bad faith filing" and "unenumerated cause."[14]

---

[13]    Once again, Mr. Fletcher and Mr. Ladner acted in the wrong capacities. The Certificate of Resolution for each SPV Debtor listed Mr. Fletcher and Mr. Ladner as acting on behalf of the SPV Debtor in their roles as a directors *of the SPV Debtor*. The documents should have described Mr. Fletcher and Mr. Ladner as acting on behalf *of the voting stockholder* of each SPV Debtor—*i.e.*, its respective Limited Debtor. Then, in shareholder minutes drafted at a later time, the Debtors attempted to correct that mistake by stating that Mr. Fletcher and Mr. Ladner had acted on behalf of Soundview Capital Management. But this too was in error, as they thereafter learned that it was the Limited Debtors, not Soundview Capital Management, that were the voting stockholders of the SPV Debtors. But here too, because Mr. Fletcher and Mr. Ladner were the sole directors of Soundview Capital Management *and* the Limited Debtors, this is a distinction without a difference.

[14]    *See In re C-TC 9th Ave P'ship*, 113 F.3d 1304, 1311 (2d Cir. 1997) (identifying factors (the "*C-TC* **Factors**"), most commonly found in chapter 11 cases filed to stay creditor actions against property, that tend to support dismissal for cause). As explained in my decision in *In re Century/ML Cable Venture*, 294 B.R. 9, 35–36 & 35 n.41 (Bankr. S.D.N.Y. 2003), I have preferred to save the appellation "bad faith filing" for the most egregious cases, and have preferred to characterize the basis for dismissal as "unenumerated cause" in cases where dismissal is required after applying the *C-TC* Factors, but where there is greater justification for the filing.

-11-

The JOLs contend that both subjective and objective bad faith are present here and constitute the cause necessary to dismiss the Debtors' cases pursuant to section 1112(b). In their reply brief, the JOLs seem to abandon the "bad faith" argument from their initial brief and instead focus on dismissal of the Debtors' chapter 11 cases for "cause" generally.

This case differs from the bulk of the cases in which section 1112(b) dismissals are sought, which most commonly involve filings to avoid threatened actions against a debtor's property—such as mortgage foreclosures in single asset real estate cases or proceedings to terminate leases.[15] The JOLs place only modest reliance, accordingly, on the *C-TC* Factors, as do I; while the *C-TC* Factors are not applicable solely to cases involving actions against property, they tend to apply to a much lesser degree in other cases. The JOLs' principal contention, instead, is that the Debtors admittedly filed their chapter 11 petitions to take advantage of the automatic stay, and that the petitions were filed at the "eleventh hour"[16]—to block the imminent appointment of liquidators in the Cayman Islands, who now are the JOLs.

But while I agree with the JOLs that such was the Debtors' purpose, these facts, in the absence of more, are insufficient for me to find either bad faith or unenumerated cause. Indeed, if I or any other U.S. court were to consider a desire to invoke the stay to be sufficient, a very significant portion of perfectly unobjectionable chapter 11 cases could never be filed. The JOLs also question the Debtors' filings on the basis that the

---

[15]    *See, e.g.*, *C-TC*, involving such a situation.

[16]    *See* JOLs' Mem. in Support of Their Mtn. to Dismiss ¶¶ 44, 139, Dec. 3, 2013, ECF No. 97 ("**JOLs' Br.**").

Debtors cannot be "reorganized,"[17] but it is not bad faith to file a chapter 11 petition for

the purpose of a more orderly liquidation.[18]

Here I find that the Debtors' filings had a valid business purpose, and were not in

bad faith. The Debtors' management was dealing with frozen assets and impaired

liquidity—with an inability to reach the bulk of the Debtors' liquid assets before the

Wilmington Trust interpleader action was resolved, and very limited liquidity with

respect to the remainder. The Debtors' management also had the view—which may or

may not be correct, but which cannot be said to be unreasonable—that that it could

realize more on the Debtors' illiquid assets than any court-appointed fiduciaries could.[19]

Although I readily accept as true the JOLs' argument that "the explicit purpose" of the

filings was to "delay[] the Winding Up Proceeding and prevent[] the Grand Court from

appointing [the Debtors' management's replacement],"[20] that is insufficient, without

more, to establish bad faith or unenumerated cause in the presence of the valid business

purposes just described.[21]

---

[17]    *See id.* ¶ 136.

[18]    *See* 6 *Collier on Bankruptcy* (16th ed. 2013) ("*Collier*") ¶ 1112.07[6][b][i] ("Because the automatic stay is an important incident of the bankruptcy filing, the bare fact that the debtor desires to obtain the benefits of this element of bankruptcy relief cannot by itself support a finding of bad faith. Rather, the debtor must intend to obtain the benefit of the automatic stay for an improper purpose, such as merely to frustrate the rights of creditors rather than to reorganize *or have an orderly liquidation*.") (emphasis added).

[19]    *See* Debtors' Reply Mem. to the Mtns. to Appoint a Trustee, Convert or Dismiss 3–5, Dec. 11, 2013, ECF No. 121 ("**Debtors' Reply Br.**").

[20]    JOLs' Br. ¶ 138.

[21]    The related motions under section 305 asking me to abstain, or under section 362(d) for relief from the stay, conceptually relate more to the issue as to whether I should keep any proceedings here, allow proceedings in the Cayman Islands to proceed, or some combination of the two. For reasons addressed in Section VI below, I believe that a combination of the two is best. For the reasons set forth in Section VI, I decline to abstain, and grant partial relief from the stay.

III.

Appointment of Trustee

Having found the cases duly filed, and inappropriate for dismissal under section 1112, I turn next to the question of whether I should nevertheless appoint a chapter 11 trustee.

Pasig moved, and the United States Trustee still moves, for the appointment of a chapter 11 trustee pursuant to each of sections 1104(a)(1) and 1104(a)(2) of the Bankruptcy Code.  Section 1104(a) provides, in relevant part:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
> > (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . . ; or
> >
> > (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . .

I agree with the United States Trustee (and points Pasig made before it withdrew its own motion) that the requirements for appointment of a chapter 11 trustee have been satisfied here.

*(1) "Cause" Under Section 1104(a)(1) and 1104(a)(2)*

"Cause" exists under both subsection 1104(a)(1) and 1104(a)(2) to appoint a chapter 11 trustee.  I do not yet find, if I ever well, that the Debtors' management has acted fraudulently or incompetently.  But I do find that the U.S. Trustee and Pasig

-14-

identified numerous matters of concern that raise issues in that regard, and that

necessitate investigation in depth—including the apparent backdating of documents; the

$2 million Muho transfer; the payment of management fees to Fletcher Asset

Management based on seemingly inflated values for assets under management; the failure

to produce audited financials for five years; the failure to produce net asset value

statements for three years; continued payments of management fees to Fletcher Asset

Management at the same time redemption requests were not being honored; and the use

of funds of one or more of the Limited Debtors for a lawsuit brought by Mr. Fletcher

against the Dakota Apartments that at this juncture appears to have been principally, if

not entirely, advancing Mr. Fletcher's private concerns.

Likewise, matters identified by the trustee in the chapter 11 case of Fletcher

International Limited (Bahamas)—referred to colloquially by many of the parties as

"**FILB**")—put us on notice of the need to investigate whether practices identified by the

FILB Trustee in that case took place in these cases as well.  And the Debtors' purchase of

FILB shares, based on a decision by the Fletcher management team, at a time when FILB

was already in bankruptcy and FILB stock was an investment fraught with great risk, is a

matter of substantial concern to me; the propriety of that likewise requires investigation.

As the Debtors argue, the risk that the Debtors' management—including, most

significantly, Mr. Fletcher himself—would engage in self dealing was indeed disclosed to

investors in Fletcher investment vehicles.  And such self dealing might be entirely

unobjectionable in the absence of insolvency or an ongoing chapter 11 case.  But self

dealing is an anathema to U.S. bankruptcy courts in the chapter 11 cases on their watch,

and now that the Debtors are in bankruptcy, I cannot allow such self-dealing, even if

-15-

previously disclosed, to continue.  The Debtors' payments of management fees (and accruals of payables for such) to Fletcher Asset Management, based on Mr. Fletcher's own asset valuations and accounting techniques he approved, exemplify self-dealing and conflicts that are matters of concern in a bankruptcy case.

As importantly or more so, we cannot expect the Debtors' management, so long as the Debtors remain in possession, to investigate themselves.[22]  Now that I am on notice that there are matters that need to be investigated, I have to place that investigation in the hands of an independent fiduciary in whom the stakeholders and I can have confidence, and who is not subject to the conflicts of interest that otherwise would so plainly exist.

Thus cause exists to appoint a chapter 11 trustee.  I need a trustee to ensure that the Debtors are hereafter managed free of plainly existing conflicts of interest.  I also need a trustee to ensure that investigation and, if warranted, litigation that must take place in the United States may be fully pursued for the benefit of stakeholders and the estates— once again, free of any conflicts of interest.  It is wholly unrealistic to expect the Debtors' current management to appropriately investigate and prosecute potential breach of fiduciary duty actions and avoidance actions so long as current management, which will be the focus of much of the investigation, remains in place.

*(2) Best Interests Standard Under Section 1104(a)(2)*

Section 1104(a)(2) authorizes the appointment of a trustee "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." Although a finding of "cause" found pursuant to section 1104(a)(1) is usually sufficient

---

[22]    Indeed, the Debtors' accountant Mr. Katz, whom I found to be highly credible, testified that while he did not believe that a trustee should be appointed (since he believed that the estate should continue to use the talent and skill sets of the Debtors' management), he recognized that there are clearly conflicts of interest, and that the Debtors need some independent responsible party.  Trial Tr. 14:8–15:5, Dec. 19, 2013, ECF No. 140 ("**Dec. 19 Trial Tr.**").

to establish that the appointment of a trustee is in the best interest of creditors (and as I

noted earlier, I find that to be the case here), "cause" is not required pursuant to section

1104(a)(2).[23] As I stated in one of my opinions in the *Adelphia* cases:

> In exercising the considerable discretion this
> Court has in deciding the motion insofar as it rests
> on [subsection 1104(a)(2)], the Court engages in a
> fact-driven analysis, principally balancing the
> advantages and disadvantages of taking such a step,
> and mindful of the many cases . . . that have held
> that appointment of a trustee is an extraordinary
> remedy, and should be the exception, rather than the
> rule.
>
> Subsection (a)(2) envisions a flexible
> standard.  It has been repeatedly held that "'[i]n
> determining whether the appointment of a trustee is
> in the best interests of creditors, a bankruptcy court
> must necessarily resort to its broad equity powers.'"
> In considering requests under subsection (a)(2),
> courts "'eschew rigid absolutes and look [ ] to the
> practical realities and necessities.'"[24]

To guide the interests analysis, factors to consider include:  "(i) the

trustworthiness of the debtor; (ii) the debtor in possession's past and present performance

and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the

business community and of creditors in present management; and (iv) the benefits

derived by the appointment of a trustee, balanced against the cost of the appointment."[25]

Here, for reasons I noted above, I find that *all* of those factors weigh against the

Debtors remaining in possession.  Further, looking to the "practical realities and

---

[23]    *See* 6 *Collier* ¶ 1104.02[3][d][iii].

[24]    *In re Adelphia Comm'ns Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006) (citations and footnotes omitted).

[25]    *Id.*

-17-

necessities" of this case, as discussed further below, a chapter 11 trustee is desirable, if not essential, to pursue investigations and litigation in the U.S.

Thus, while I find cause exists to appoint a trustee under section 1104(a)(1), I find that an interests analysis under subsection 1104(a)(2) leads to the same conclusion.

* * *

Displacing a debtor in possession—such as by appointing a chapter 11 trustee—is extraordinary relief,[26] and I don't take it lightly in any case, including, of course the one here.  Here, I have no faith that the Debtors' current managers are capable of acting independently and in the best interests of the estates, or in objectively investigating themselves.  Nor can I have confidence that stakeholders' best interests could be achieved without quick and nondebatable access to the U.S. legal system, in connection with investigation and, if appropriate, litigation that would be principally, if not totally, in the U.S.  In the interests of stakeholders and the integrity of the bankruptcy process, an independent fiduciary must be appointed.  While I can (and hereafter do) consider the alternative of allowing the JOLs alone to act, I find that cause has been shown to appoint a chapter 11 trustee.

IV.

Automatic Stay

The JOLs urge me to find that the U.S. automatic stay did not apply to any actions taken on September 24, 2013, because the "police power" exception of section 362(b)(4), based on CIMA's involvement, assertedly applies.  In contrast, the Debtors argue that the automatic stay plainly did apply, and that I need not concern myself with comity

---

[26]    *See* 6 *Collier* ¶ 1104.02[1].

arguments based on Cayman court actions that were void as violations of the automatic stay. I find that the "police power" exception did not apply, and that the U.S. automatic stay did, making subsequent proceedings in the Cayman Islands, at least from the perspective of U.S. law, void. But I still must concern myself with comity (and get the proceedings in the two countries back on track in providing comity to each other), as discussed in Section VI below.

The underlying facts with respect to this are not in dispute. On September 24, 2013, the Debtors' chapter 11 petitions were filed prior to a previously-scheduled hearing in the Grand Court of the Cayman Islands with respect to winding up petitions filed by creditors of each of the Debtors. Nevertheless, at the hearing in the Cayman Islands, held after the filing of the Debtors' chapter 11 petitions, the Grand Court entered winding up orders appointing the JOLs with respect to each of the Limited Debtors.[27]

Apparently, those in the Cayman Islands on that day had very little confirmation of the fact of the U.S. filings, and even less knowledge of the details, though it is undisputed that those present in the Cayman Islands were aware of at least an assertion of the U.S. filings. But their limited knowledge of the filings, while relevant to any award of sanctions for contempt, is irrelevant to the effect, under U.S. law, that the Debtors' chapter 11 filings had.

U.S. law is clear that immediately upon the filing of the Debtors' chapter 11 petition, the U.S. automatic stay became effective,[28] both in the U.S and

---

[27]   Pretrial Order ¶ 2. It adjourned the hearing on the winding up petitions with respect to the SPV Debtors. *Id.*

[28]   Bankruptcy Code sections 301 (a voluntary bankruptcy case in the U.S. is commenced by the filing of a petition); 362(a) ("Except as provided in subsection (b) of this section, a *petition* filed under section 301 . . . operates as a stay . . . .) (emphasis added).

extraterritorially.[29]  Thus the further proceedings in the Cayman Court were, from the

perspective of U.S. law, in violation of the stay and thus void.  This latter conclusion is

not at all debatable or close; the Second Circuit, among others, has so held with respect to

post-filing acts in non-international matters,[30] and other bankruptcy courts have held

similarly in international matters where foreign courts took action after U.S. filings.[31]

       In *Gold & Honey*, for example, the court found that the appointment of receivers

by an Israeli court after the filing of chapter 11 cases in the U.S. "was a clear violation of

the automatic stay," which "ar[ose] by operation of law and without the need for an order

---

[29]    *Picard v. Maxam Absolute Return Fund L.P. (In re Bernard L. Madoff Inv. Sec. LLC)*, 474 B.R.
76, 81 (S.D.N.Y. 2012) (Oetken, J.) ("*Madoff*") ("The Court concludes that the automatic stay and
the Bankruptcy Court's injunctive power have extraterritorial effect . . . ."); *In re Nakash*, 190
B.R. 763, 768 (Bankr. S.D.N.Y. 1996) (Lifland, C.J.) ("*Nakash*") ("The Court finds . . . that based
upon the applicable Code sections, other indicia of congressional intent and case law in this
district, the automatic stay applies extraterritorially."); *In re McLean Indus., Inc.*, 74 B.R. 589, 601
(Bankr. S.D.N.Y. 1987) (Buschman, J.) ("*McLean Industries*") ("The automatic stay applies
extraterritorially").  Of course here, much, if not also most, of the Debtors' property is in the U.S.,
a fact that underscores the importance of the U.S. automatic stay.

       Nevertheless, I emphasize here, as did the *Madoff* court, that "none of these cases stands for the
notion that a United States court can exercise control over a foreign court.  Rather, a bankruptcy
court can enforce the automatic stay extraterritorially only against entities over which it has *in
personam* jurisdiction."  474 B.R. at 82.  Here the U.S. courts plainly have *in personam*
jurisdiction over Fletcher Asset Management and Mr. Fletcher, and would with respect to
witnesses in the U.S. whose documents or testimony are required for investigative purposes.
Whether the U.S. courts have *in personam* jurisdiction with respect to the JOLs is debatable; on
the one hand, when appearing here the JOLs specially appeared and reserved jurisdictional
defenses they might have, but on the other, they tried to exercise control over property in the U.S.
Ultimately, getting immersed in issues of this character is unproductive; facts like these reinforce
the wisdom of each of the U.S. and Cayman courts working cooperatively with each other.

[30]    *See, e.g., In re 48th Street Steakhouse*, 835 F.2d 427, 431 (2d Cir. 1987) ("*48th Street
Steakhouse*") ("Judge Brozman correctly held that Landlord's termination notice violated the
automatic stay with respect to 48th Street and was therefore void."); *Morgan Guar. Trust Co. v.
American Sav. & Loan Ass'n*, 804 F.2d 1487, 1490 (9th Cir. 1986) ("Actions taken in violation of
the automatic stay are void."); *see also* 3 *Collier* ¶ 362.12 ("Most courts have held that actions
taken in violation of the stay are void and without effect.").

[31]    *See In re Cenargo Int'l, PLC*, 294 B.R. 571, 597 (Bankr. S.D.N.Y. 2003) (Drain, J.) ("*Cenargo*")
("[I]t is well established in this Circuit that actions in violation of the automatic stay, like [the
secured creditors'] *ex parte* initiation of the joint provisional liquidations, are void *ab initio*"); *In
re Gold & Honey, Ltd.*, 410 B.R. 357, 368 (Bankr. E.D.N.Y. 2009) (Trust, J.) ("*Gold & Honey*")
(appointment of receivers by an Israeli court after the filing of chapter 11 cases in the U.S. "was a
clear violation of the automatic stay").

to impose the stay."[32]  And citing *48th Street Steakhouse*, together with other authority,[33]

it denied chapter 15 recognition to the Israeli receivers because, among other reasons,

their appointment, after the filing of chapter 11 cases by U.S. debtors, was void.[34]  In

analysis remarkably applicable to this case as well, it observed that:

> Once the Chapter 11 Cases were filed, the
> Bankruptcy Code contains a number of provisions
> which FIBI [an Israeli creditor] could have invoked
> prior to proceeding in Israel.  FIBI could have
> requested this Court to determine that the filing of
> the Chapter 11 Cases was not legitimate, and sought
> stay relief under Section 362, abstention under
> Section 305, and/or dismissal or conversion under
> Section 1112.  FIBI failed to do so.  However, it is
> for this Court, with jurisdiction over the Chapter 11
> Cases, to decide whether and when to grant relief
> from the stay, but respectfully, not for the Israeli
> Court to decide to not recognize and apply the
> stay.[35]

The *Cenargo* court, in this District, ultimately granted relief from the U.S.

automatic stay and deferred to English proceedings, but in that connection it observed:

> [T]he Court ultimately deferred to English
> proceedings, but the automatic stay ensures that
> such decisions are considered in an orderly way, on
> notice, and with the presumption that parties who
> have violated the stay will not necessarily obtain the
> benefits of such violation and might, indeed, be
> punished for it.  The rationale for this process would
> not need to be stated in a routine chapter 11 case, so
> deeply ingrained is the principle that the automatic
> stay is the cornerstone of the Bankruptcy Code.[36]

---

[32]    *Gold & Honey*, 410 B.R. at 368, 369.

[33]    *See Interstate Commerce Comm'n v. Holmes Transp., Inc.*, 931 F.2d 984, 988 (1st Cir.1991)
(automatic stay nullifies post-petition actions and proceedings against the debtor).

[34]    410 B.R. at 360, 373.

[35]    *Id.* at 369.

[36]    294 B.R. at 597.

The *Cenargo* court continued:

> The rationale underlying the automatic stay is
> equally, and perhaps more, important, however, if
> the debtor has assets and creditors in different
> countries, when orderly cooperation among
> different courts is necessary to protect a
> transnational business as a whole for all the
> creditors' benefit. The breathing spell provided by
> the automatic stay and similar stays under the laws
> of foreign jurisdictions must be preserved, even if it
> is, as here, relatively brief, if courts and the parties
> with the true economic stake in the matter are to
> make rational decisions about potentially competing
> insolvency proceedings and, if possible, proceed in
> a way that is respectful of each court's jurisdiction
> and maximizes distributable value.[37]

I must reject the JOLs' argument that CIMA's support of an insolvency petition

commenced by parties acting in their private interests was sufficient to trigger the

exception to the automatic stay under the "police power" exception of section 362(b)(4).

One need not get immersed into the "pecuniary purpose" or "public policy" tests of what

constitutes the exercise of the "police power" by a governmental entity,[38] because more

fundamentally, CIMA did not "commence[] or continu[e]" anything.[39] While it is at least

possible that if CIMA had done so, my conclusion would be different, CIMA's

participation in proceedings initiated by private parties did not amount to "the

commencement or continuation of an action or proceeding by a governmental unit" as

required by section 362(b)(4).[40]

---

[37]    *Id.*

[38]    *See In re Chateaugay Corp.*, 115 B.R. 28, 31–32 (Bankr. S.D.N.Y. 1988) (describing the tests).

[39]    *See* Bankruptcy Code section 362(b)(4).

[40]    If, by contrast, CIMA had itself commenced the winding up proceedings in the Cayman Islands, and was itself prosecuting them, the conclusion would not necessarily be the same.

## V.

## Contempt

Having found a violation of the automatic stay, I now address the Debtors' motion to hold the JOLs and the petitioners in contempt.  I deny that request with respect to actions the JOLs and petitioners took on the day the JOLs were appointed, September 24, 2013, and continue it, with respect to the JOLs only, with respect to actions the JOLs took thereafter.

I find that the JOLs acted as if they could continue with business as usual even after they knew to a certainty that the U.S. bankruptcy case had been filed.  And I heard no satisfactory explanation for their inability to find all of the cases I discussed in Section IV of this decision, or their decision to disregard those cases if they were aware of them. But ultimately I care more about developing respect for the law than I care about punishment in this case.  I think that before making a finding of contempt, it would be better to wait and see if the JOLs can hereafter demonstrate that they will comply with the requirements of U.S. law.

I've already found that the U.S. automatic stay had come into being as of the morning of September 24, 2013, prior to the entering of the winding up orders.[41]  I then find, as facts or mixed questions of fact and law, that after that day, the JOLs took numerous actions to continue the Cayman proceeding with respect to the Limited Debtors and their assets (thereby violating section 362(a)(1)), and to exercise control over property of the estates of the Limited Debtors (thereby violating section 362(a)(3))—all without the permission of—or even notification to—this Court.  Indeed, in one very

---

[41]        *See* pages 19–20 & nn.30 through 37 above.

troubling instance, they did so without notification even to the Debtors themselves.  After

the U.S. chapter 11 case was filed, the JOLs:

(1) Advertised notice of the Cayman Islands liquidation with the

International *Financial Times*;

(2) Sent letters to all directors requiring submission of a statement of

affairs;

(3) Sent letters to all known stakeholders notifying them of the liquidation,

the proof of debt process, and the first meeting of stakeholders;

(4) Set a stakeholder meeting for November 19, 2013, which was opened

and immediately adjourned, to November 26, 2013, to allow further stakeholders

to come forward;

(5) Conducted the adjourned stakeholder meeting, on November 26, 2013,

at which several investors and creditors joined; and

(6) Formed a liquidation committee with the Limited Debtors' three

largest stakeholders.[42]

Additionally, some time between December 4 and December 12, 2013, the JOLs

delivered an *ex parte*, "Strictly Private & Confidential," report to the Cayman Court.[43]

And after the filing of that report, the JOLs (probably on or about December 12, 2013)

took part in an *ex parte* meeting with the Cayman Court.[44]  The next day, December 13,

---

[42]       Debtors' Ex. 98; *see also* Pretrial Order ¶ 62(A)(1)(e)(ii)(A)–(C).

[43]       *See* Debtors' Ex. 98.  The report was "Dated" December 4, 2013, and "Issued" December 12,
2013.  Proceedings at the evidentiary hearing on these motions established that the Debtors'
counsel and management never were given a copy of this report until some time on December 17,
2013, after the evidentiary hearing in my Court commenced.

[44]       *See* Dec. 17 Trial Transcript 165:13–15 (Matthew Wright, one of the Joint Official Liquidators,
testified, "After the filing of the report, there was a meeting in chambers with Peter Anderson, the
other joint official liquidator, our counsel, and the judge."); *see also* Debtors' Ex. 93, ECF No.

-24-

13-13098-mkv    Doc 156    Filed 01/23/14    Entered 01/23/14 10:19:59    Main Document
Pg 25 of 39


the Cayman Court entered a more detailed ruling of its decision to enter Winding up

Orders with respect to the Limited Debtors. [45]  Each of these was, at the least, a

continuation of the Cayman insolvency proceeding, and violative of the U.S. automatic

stay.

And then only three days ago, when the JOLs sought to enjoin a transfer of cash

from Wilmington Trust to a non-debtor subsidiary of Soundview Elite Limited, they

expressed their intention to "move in the Grand Court of the Cayman Islands for similar

relief" in addition to their motion before this Court.[46]

In short, the JOLs went full speed ahead in advancing the Cayman case as if the

U.S. bankruptcy cases had never been filed, even though the JOLs were on full notice, at

least after September 24, of the U.S. filings, and were actively participating in parallel

proceedings in this Court. [47]

It would have been far better if, on September 24, 2013, all concerned had paused,

learned the true facts, and communicated with the U.S. court—or, as so many have done

---

132-1 (the Grand Court's more detailed ruling of its decision to enter Winding up Orders with
respect to the Limited Debtors) ("**Grand Court Ruling**").  Although the Grand Court Ruling is
signed and dated by the Chief Justice on December 13, 2013, the caption to the Grand Court
Ruling states "in Chambers" on December 12, 2013, which, coupled with Matthew Wright's
testimony described above, leads me to infer that the *ex parte* meeting probably occurred on or
about December 12, 2013, the day before the Grand Court Ruling.  *See* Grand Court Ruling at 1,
6.

[45]     *See* Grand Court Ruling in n.44 above.

[46]     JOLs' Emergency Mtn. for TRO 2, Jan. 20, 2014, ECF No. 150 ("**JOLs' Emergency TRO
Mtn.**").

[47]     The JOLs also argue that these were merely administrative acts, and that they were required under
Cayman law.  I do not regard them as merely administrative and note that the JOLs rely on some
of those activities when pointing to creditor involvement in the Cayman proceeding.  But even if
those acts were merely administrative, they nevertheless constituted actions to proceed with the
stayed proceedings in the Cayman Islands.  Likewise, I am not in a position to draw a conclusion
as to whether these actions were required under Cayman law.  But if the JOLs thought their
continuing actions in the Cayman Islands were required, or benign, they could have, and should
have, advised this Court of the need (or their desire) to do them, and sought the permission of the
U.S. court.

-25-

in other cases on my watch, to ask, "in an excess of caution," for an order declaring that

the automatic stay did not apply or granting relief from it.  On a going forward basis,

steps of that character will be required, at least in cases before me.  But contempt requires

knowing misconduct, and I cannot find knowing misconduct with respect to anyone's

actions in the Cayman court on September 24, 2013.  The facts were incomplete on that

day.  I don't consider it appropriate to sanction the petitioning creditors and the JOLs for

acts taken so quickly and with such little time to confirm the facts and give the matter the

necessary thought.

But thereafter, even the most basic effort and research would have confirmed the

Debtors' chapter 11 filings in the U.S.; that the U.S. automatic stay then went into effect

instantly; that the U.S. automatic stay is extraterritorial; and that proceedings against the

debtor in other courts after a U.S. bankruptcy filing are void, as addressed in the *48th

Street Steakhouse*, *McLean Industries*, *Nakash*, *Madoff*, *Cenargo*, and *Gold & Honey*

cases discussed above.  Yet thereafter, as noted above, the JOLs took numerous steps that

were in violation of the U.S. automatic stay, under circumstances when the JOLs were on

notice of the U.S. filing, and of proceedings ongoing in this Court.  Conduct of this

character greatly troubles me.

I'm continuing the motion for contempt, insofar as it focuses on actions taken

after September 24, pending consideration of the JOLs' future conduct now that they are

on notice of how troubled I was by their conduct.  If and when they give me comfort that

they will no longer continue with business as usual after the filing of a chapter 11 case in

the U.S., they may ask me to take the remaining contempt issues off calendar.

## VI.

### Division of Responsibility

*(1) Overview*

  I now need to address how I should deal with the overlapping, and in some respects conflicting, jurisdiction of the U.S. and Cayman courts.  I must be mindful of the fact that liquidators have been appointed in the Cayman Islands for only three of the six debtors in this case, and that the petitions for the remaining three are still pending.  But I must be most mindful of the need for investigation in the U.S. and any needs for litigation in this country—the latter of which, especially, would require a proceeding in the U.S., under either chapter 11 or chapter 15.

  For the reasons noted in Section III above, I've concluded that these cases require one or more independent fiduciaries, and that the requirements for appointment of a chapter 11 trustee under U.S. law have been satisfied.  Under certain circumstances (such as if any and all investigation and litigation would take place in the Cayman Islands, and if no litigation were required here), appointment of JOLs in the Cayman Islands might fully satisfy the independent fiduciary need.  But here I must conclude that the JOLs acting without a trustee in the U.S. could not satisfactorily meet the needs of this case, and that a chapter 11 trustee in the U.S. is necessary, either in addition to, or in place of, the JOLs.

  As I noted in the closing arguments on these motions and in earlier proceedings in these chapter 11 cases, I was deeply troubled by the JOLs' considerably less than total respect for U.S. law.  The JOLs made things even worse when they told me, as part of an emergency invocation of the jurisdiction of the U.S. courts to block a disbursement of

-27-

cash in the United States to which they objected (based on the contention that the cash was property of Debtor Soundview Elite's estate), that "the JOLs intend to move in the Grand Court of the Cayman Islands for similar relief in addition to this motion."[48] One would have thought that with all of the briefing on the requirements of section 362 of the U.S. Bankruptcy Code and my comments in open court, the JOLs would understand, and would violate section 362 no more. As of three days ago, they still didn't get it.

But ultimately, I'm willing to permit continued service by the JOLs with respect to aspects of the case that they could handle as well as a trustee in the U.S, and at no greater expense. Thus I'm granting relief from the stay to allow the JOLs to remain in place; to ratify otherwise void acts in the Cayman Islands; and to allow the existing Cayman proceedings to continue—and, if necessary, to entertain similar proceedings for the three Debtors in this Court that do not have JOLs—subject to the implementation of the protocol discussed below.

Yet for the reasons discussed below, I consider a trustee in the U.S. to be essential, even if the JOLs continue to serve. I'm authorizing and directing the U.S. Trustee to appoint a chapter 11 trustee in these cases—not only for the three debtors (the SPV Debtors) that aren't in insolvency proceedings in the Cayman Islands but the three (the Limited Debtors) that are as well. And when that chapter 11 trustee is appointed, he or she is to work out a protocol, subject to the approval of each of the Cayman Court and mine, providing for a division of responsibilities between them.[49]

---

[48]    JOLs' Emergency TRO Mtn. 2; *accord id.* at 8 ("[T]he JOLs must now turn to this Court and the Cayman court to prevent the dissipation of the estate assets.").

[49]    From the perspective of U.S. law, that is permissible as a delegation of the trustee's authority. If it involves matters out of the ordinary course (and an assignment of responsibilities under the protocol is such) that may be done if (but only if) the bankruptcy court approves. *See Mosser v. Darrow*, 341 U.S. 267, 274 (1951) ("The practice is well established by which trustees seek

*(2) Resolution of Dual Proceedings*

As the Second Circuit stated in *In re Maxwell Communications*, 93 F.3d 1036, 1041 (2d Cir. 1996), "[s]imultaneous proceedings in different countries, especially in multi-party cases like bankruptcies, can naturally lead to inconsistencies and conflicts." The situation here, where continued proceedings in the Cayman Islands were violative of the U.S. automatic stay, and where a chapter 11 petition here would have been violative of a Cayman automatic stay if a Cayman court winding up order had been entered and was not void, is emblematic of those concerns.

Here the U.S. chapter 11 case was filed after creditors had filed for appointment of liquidators in the Cayman Islands, but before the Cayman Court issued an order appointing them. Under U.S. law, as I've noted, the automatic stay came into effect immediately upon the chapter 11 case filing, making subsequent proceedings against the Debtors and affecting the Debtors' property—including the Cayman Court's entry of the winding up order—void.

But a U.S. court would also have to consider whether, under Cayman law, a Cayman automatic stay might have come into effect when the Cayman winding up petition *was filed*—which could cause the U.S. filing (and the U.S. automatic stay resulting from that) itself to have been void. This creates a potential dilemma. Though

---

instructions from the court, given upon notice to creditors and interested parties, as to matters which involve difficult questions of judgment. In this particular matter, it is claimed that the special knowledge of Miss Johnson and Kulp was indispensable to the trustee. . . . If their services were so indispensable that an arrangement so highly irregular was of advantage to the trust, this might have been fully disclosed to the court and the creditors cited to show cause why it should not have been openly authorized."); *In re Lowery Graphics, Inc.*, 86 B.R. 74, 76 (Bankr. S.D. Tex. 1988) (Clark, J.) ("The trustee has considerable scope within which to exercise his business judgment in running the business, without prior notice to creditors or leave of court. However, this scope does not include leave to delegate virtually all of his chief executive officer duties, or any of his specific duties as a representative of the court, without prior notice to creditors and without leave of court.") (citations omitted).

the matter ultimately turns out to be academic, because the two nations' courts will work

cooperatively together, I nevertheless provide some analysis of those issues here.

The Cayman Islands has several types of automatic stays, as implemented through

different statutory provisions of the Cayman Companies Law.  Section 97 provides:

> (1) *When a winding up order is made* or a
> *provisional liquidator is appointed*, no suit, action
> or other proceedings, including criminal
> proceedings, shall be proceeded with or commenced
> against the company except with the leave of the
> Court and subject to such terms as the Court may
> impose.
>
> (2) When *a winding up order has been made*, any
> attachment, distress or execution put in force
> against the estate or effects of the company *after the
> commencement of the winding up* is void.[50]

Each of those two subparagraphs has great similarity in concept to provisions of

the U.S. automatic stay, but they are not the same in coverage, with respect to either the

U.S. automatic stay or each other.  Section 97(1) imposes a bar against suits and other

proceedings against the company (at least seemingly sufficient to bar a U.S. chapter 11

filing) at the time *a winding up order is made or a provisional liquidator is appointed*.

Section 97(2) is structured differently.  Effectively it says that conditional upon a winding

up order having been entered, any attachment, distress or execution that was put into

force after the *commencement of the winding up* (which often, as here, would be earlier

than the entry of the winding up order) are void.  Only Section 97(2) makes reference to

the filing of a petition that might lead to the winding up.

---

[50]    Cayman Companies Law Section 97 (emphasis added).

Similar to Section 97(2)—but unlike Section 97(1)—Cayman Companies Law

Section 99 provides that (in the absence of a Cayman court order to the contrary) certain

other kinds of actions are void as well.  Section 99 provides:

> *When a winding up order has been made*, any
> disposition of the company's property and any
> transfer of shares or alteration in the status of the
> company's members made *after the commencement
> of the winding up* is, unless the Court orders
> otherwise, void.[51]

Section 99 is like Section 97(2) in several respects.  It too applies if (and

presumably only if) "a winding up order has been made."  But it speaks of transfers made

"after the commencement of the winding up," which the Cayman Court held in its Ruling

would be back at the time of the filing of the petition that would ultimately lead to the

winding up.[52]

But the filing of the U.S. chapter 11 cases did not result in an "attachment,

distress or execution" against the estates of any of the companies that were the subjects of

Cayman petitions, as addressed in Section 97(2).  Nor did the filing of the U.S. chapter 11

cases result in a "disposition of the company's property," nor "any transfer of shares or

alteration in the status of the company's members," as addressed under Section 99.

Under U.S. law, after the filing of the U.S. chapter 11 cases, the property remained in the

Debtors' estates, and the six U.S. Debtors' shareholders[53] remained unchanged.

---

[51]    *Id.* § 99 (emphasis added).

[52]    *See* Grand Court Ruling at 4 ("these winding up proceedings . . . are deemed to have commenced once the petitions were presented to this Court" (citing Cayman Companies Law Section 100(2))).  That section defines "commencement of the winding up" in an involuntary petition context as "the time of the presentation of the petition for the winding up."

[53]    Here the concept of "members" as used in Section 99 would seemingly be inapplicable.

The Cayman automatic stay provisions, though similar in concept (and probably

purpose) to their U.S. counterparts, are drafted in narrower terms. The U.S. chapter 11

filings would be offensive under Cayman Companies Law Section 97(1), but not under

Sections 97(2) and 99. And the Section 97(1) automatic stay would come into place *only*

*upon the entry of the winding up order*—which had not yet taken place when the U.S.

chapter 11 cases were filed.[54]

Of course the Cayman Court was right in its observation that the Debtors'

management was on notice of the winding up proceedings. But the prohibition embodied

in Section 97(1) would come into place only upon entry of the winding up order, which

came after the U.S. chapter 11 filings. Thus, upon analysis of the similar-in-purpose but

not congruent statutes, the U.S. automatic stay came into being first.

*(3) No Need to Decide Conflicting Stays*

But the fact that the U.S. automatic stay came into being first should not be the

end of the matter. Under circumstances like those here, I think it would be wrong to

address these issues based solely on construction of the two nation's statutes. It's my

desire, as a U.S. bankruptcy judge, to render comity to Cayman needs and concerns to the

---

[54]    Possibly for this reason, the Grand Court Ruling did not say that the U.S. chapter 11 filings were
violative of Section 97(1). Rather, the Ruling said that when the Debtors filed their chapter 11
cases, they did so "on notice" or "having notice" of the earlier filed Cayman Islands petitions.
*See, e.g.*, Grand Court Ruling at 3, 4, 5. In its second mention of matters of which the U.S.
Debtors were on notice, the Cayman Court continued that the U.S. Debtors were on notice of
"legal consequences that flow from the institution of winding up proceedings" in the Cayman
Islands—which would "include an immediate and automatic prohibition against steps being taken
to bring proceedings elsewhere against the Companies without the leave of this Court." *Id.* at 5.
But it did not declare the U.S. filings to be void when they were filed, nor did it cite Section 97(1),
any other statutory provision, or any Cayman caselaw that might provide that they would be.

Similarly, the JOLs' expert, Mr. Farrow, made reference in his direct testimony to Cayman
Companies Law Sections 97(1), 97(2), and 99, but nothing else on point. *See* Expert Test. of
Kenneth Farrow QC ¶¶ 14, 15, Dec. 10, 2013, ECF No. 114 ("**Farrow Decl.**"). He opined that the
Cayman Grand Court had jurisdiction to restrain the commencement or continuation of foreign
proceedings after the presentation of a winding up petition. *See id.* at ¶ 14. But such an order was
not sought or entered.

extent I can, and I'm confident that the Cayman Court, now that it knows my needs and

concerns, would do the same for me. That's especially so since we share common

goals—maximizing value for stakeholders in the cases on our watch; ensuring the faithful

performance of corporate responsibilities in those cases (and appointing independent

fiduciaries when necessary); and, to the extent applicable, recognizing regulatory needs

and concerns.

Because I'm willing to share my jurisdiction in the interests of comity, and I

suspect that the Cayman Court would do the same, I don't think it's necessary to decide

what I would do if the situation were otherwise.

Ultimately the best course is for a comity driven approach under which each court

cedes any applicable primacy to the other, by relief from the stay, which each nation's

law authorizes its judges to grant.[55]

*(4) Joint Protocol*

So what's best in accomplishing the job to be done? The Cayman Court and I

agree that independent fiduciaries are essential here. So the task then becomes deciding

whether that should be the JOLs, a chapter 11 trustee in the U.S., or a combination of the

two.

In that connection, it's important to recognize that there are different tasks for any

independent fiduciaries to perform. Some (like managing the Debtors' assets, and

reviewing and managing claims) presumably could be done equally satisfactorily in

either jurisdiction, perhaps in whichever jurisdiction the greatest recovery can be realized

on the Debtors' assets, or is most cost effective. And I'm agnostic with respect to

---

[55] *See* Bankruptcy Code section 362(d); Cayman Companies Law Section 97(1).

whether estate administration, claims management, asset management and other non-investigative and non-litigation functions should take place in the Cayman Islands, the U.S., or elsewhere.

But investigation would be done most effectively in the U.S., since that is where the great bulk of the Debtors' documents, third party document custodians, Debtor personnel, and third party witnesses to be interviewed would be found. And if testimony is to be taken, that's where most of the witnesses would be. It's also foreseeable that at least some of the witnesses would have to be subpoenaed. All or nearly all of those subpoenas would have to be issued, and enforced, in the U.S.

Conducting the necessary investigation would require a major presence in the United States, and, more likely than not, use of the U.S. courts. The necessary investigation could be quickly and easily accomplished upon the appointment of a chapter 11 trustee in the U.S. It might also be accomplished if the JOLs served alone, but it could be more difficult, and probably would take more time.[56]

---

[56]    The JOLs argue that they could obtain the necessary discovery under 28 U.S.C. § 1782 ("**§ 1782**"). It provides, in relevant part:

> (a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken,

Considerations of that type would apply even more plainly if the investigation were to lead to litigation, or if the JOLs once more wanted to seek injunctive relief with respect to property in the U.S., as they did in the TRO application they filed three days ago.[57] I express no view, of course, as to whether further litigation would be warranted,

---

and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

It is possible that § 1782 could meet the JOLs' needs in the absence of a pending chapter 11 or chapter 15 case here, but it is not clear, and use of § 1782 could give rise to otherwise needless litigation. As discussed below (in the context of any litigation foreign representatives might need to commence in the U.S.), section 1509 of the Code—enacted along with the remainder of chapter 15 as part of the 2005 BAPCPA amendments to the Code—requires chapter 15 recognition in order to commence litigation in the U.S. The parties here cited no case, and I am aware of none, that has addressed whether the U.S. proceeding required to be commenced under § 1782 to secure the desired order(s) could be brought only after compliance with section 1509 of the Code, discussed in nn.58 through 61 below, which in turn requires chapter 15 recognition in the U.S. Additionally, one of the very few decisions that has addressed the interplay between chapter 15 and § 1782 in the post-BAPCPA era, *In re Glitner banki hf.*, 2011 WL 3652764, 2011 Bankr. LEXIS 3296 (Bankr. S.D.N.Y. Aug 19, 2011) (Bernstein, C.J.) ("***Glitner banki***")—in which, significantly, chapter 15 recognition had *already* been granted—noted that § 1782 "authorizes the *district court* to order discovery in connection with foreign proceedings," *id.* at *4 n.10 (emphasis in original), and that it had "questioned its authority" to permit discovery under that provision. *Id.* The *Glitner banki* court did not need to, and did not, decide the issue, and instead granted the unobjectionable part of the discovery that had been requested under section 1521(a)(4) of the Code and Fed.R.Bankr.P. 2004.

Another, slightly earlier, decision, *In re Toft*, 453 B.R. 186 (Bankr. S.D.N.Y. 2011) (Gropper, J.) ("***Toft***"), likewise was decided in the context of a then-pending chapter 15 case. Thus the *Toft* court similarly did not have to decide whether chapter 15 recognition would have to be granted to invoke § 1782. But the *Toft* court stated, after noting that discovery could be authorized under section 1521(a)(4), *id.* at 190, that discovery was "also available" under § 1782, *id.* at 191 n.5, and that § 1782 had been used in connection with insolvency cases. *Id.* (citing *Lancaster Factoring Co. Ltd. v. Mangone*, 90 F.3d 38, 39–43 (2d Cir. 1996). However, the *Toft* court found the discovery request there (for emails from servers in the U.S., where the debtor had no other property in the U.S., and where the foreign representative sought the equivalent of a wiretap on future emails) to be "manifestly contrary" to U.S. public policy, and for that reason, among others, did not have to address the interplay between § 1782 and chapter 15 beyond the extent just noted.

The only other § 1782 post-BAPCPA case, *Hecny Transp. Ltd. v. Summit Global Logistics, Inc.* (*In re Summit Global Logistics, Inc.*), 2009 WL 1025104, 2009 Bankr. D.N.J. 2009) (Steckroth, J.), discussed § 1782 in general terms and assumed that § 1782 could eventually be invoked in a U.S. adversary proceeding where there was a simultaneous proceeding pending in Hong Kong. *Id.* at *3, 2009 Bankr. LEXIS, at *5–6. But it went on to say that "[s]ince no application has been made here pursuant to Section 1782, this Court will not make a determination at this juncture."). *Id.* Thus it too did not decide any of the issues that would have to be determined if the JOLs were to try to use § 1782 in the future.

[57]    *See* n. 48 above.

-35-

but if it turns out to be, the circumstances cry out even more for a trustee in the U.S. who

could prosecute any claims that might otherwise exist.

That's so for several reasons.  If litigation in the U.S. is necessary, either a chapter

11 case or chapter 15 recognition is essential, since in the absence of the former, chapter

15 recognition would be necessary for foreign representatives to gain the capacity to sue

here.[58]  In the absence of a chapter 11 case (with the limited exception of rights to collect

or recover on claims that are property of the estate, such as accounts receivable),[59]

chapter 15 recognition is in effect "the ticket to entry" to the U.S. courts.  As *Collier*

explains, "[b]efore foreign representatives can appear before any state or federal court,

other than to file a petition for recognition or collect an account receivable, an order

granting recognition must be entered."[60]  "If recognition is granted, the foreign

representative will have full access to the state and federal courts of the United States; if

recognition is denied, the foreign representative cannot seek relief from another court

except for the limited purpose of collecting a claim or account receivable of the debtor."[61]

---

[58]    Section 1509 of the Bankruptcy Code, captioned "Right of Direct Access," provides:

> (b) If the court grants recognition under section 1517, and subject to any limitations that the court may impose consistent with the policy of this chapter—
>
> > (1) the foreign representative has the capacity to sue and be sued in a court in the United States;
> >
> > (2) the foreign representative may apply directly to a court in the United States for appropriate relief in that court; and
> >
> > (3) a court in the United States shall grant comity or cooperation to the foreign representative.

[59]    *See* 8 *Collier* ¶ 1509.06.

[60]    8 *Collier* ¶ 1501.03[7].

[61]    *Id.* at ¶ 1509.02.  *See also id.* at ¶ 1509.03 ("Congress intended that chapter 15 be the 'exclusive door to ancillary assistance to foreign proceedings' with the goal of controlling such cases in one court.").

A chapter 15 case in the U.S. in support of the JOLs' efforts in the Cayman Islands would not now be an option, because no reasonable court could now find the Debtors' COMI to be other than in the United States, at their principal place of business at 48 Wall Street.  Under the Second Circuit's *Fairfield Sentry* decision,[62] if the JOLs were to undertake active day-to-day management of the Debtors that are the subject of the Cayman proceedings, and for a sufficient period of time, I might be able to eventually find that the COMI shifted to the Cayman Islands,[63] but that would take months—and prompt action in these cases is desirable, if not also essential.[64]

Moreover, even assuming that any necessary litigation could be delayed (which would make chapter 15 a more viable option), section 1521 of the Code, which describes the relief that may be granted upon chapter 15 recognition, does not authorize a foreign representative to invoke the Code's avoidance powers unless a chapter 7 or chapter 11 case is concurrently pending.[65]  The need for prompt action in these cases, coupled with

---

[62]     *In re Fairfield Sentry Ltd.*, 714 F.3d 127 (2d Cir. 2013) ("***Fairfield Sentry***").

[63]     *See id.* at 137–39.

[64]     Exemplifying this is the TRO application that the JOLs made three days ago**.**  They sought to invoke, on an emergency basis, the jurisdiction of the U.S. Bankruptcy Court to block the receipt of funds by a subsidiary of Debtor Soundview Elite from stakeholder Wilmington Trust, based on a contention that those funds were property of Debtor Soundview Elite's estate.  Before it became clear that an undertaking by the Debtors would make the TRO application moot, I noted, among other things, the JOLs' failure to commence an adversary proceeding to secure the requested injunction, which is required under Fed.R.Bankr.P. 7001(7).  But the JOLs could not easily bring the required adversary proceeding; they had not first secured the ticket to entry to the U.S. courts that section 1509 requires.  As the great bulk of the Debtors' assets, or at least their liquid assets, are in the U.S., quick and easy resort to the U.S. courts is essential.

[65]     Section 1521(a) provides, in relevant part

> (a) Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including--
>
> . . . .

-37-

the desirability of keeping avoidance actions available if needed, makes maintaining the

Debtors' chapter 11 cases the only practical option.

Thus, in my view, addressing stakeholder needs and concerns requires

maintenance of the chapter 11 cases alongside the Cayman insolvency proceeding.  And

that, in turn, requires the creation of a joint protocol, with fiduciaries in the United States

and the Cayman Islands working hand-in-hand, akin to the protocol that was developed in

*Lancelot*.[66]   While the Cayman Court was correct in its view that *Lancelot* is not on all

fours with this case, the needs and concerns balanced in *Lancelot* apply equally here.

The Cayman and U.S. courts can and should work cooperatively, with due comity to each

other, to address the needs and concerns of stakeholders.

As noted above, it appears at this juncture to be desirable and in some respects

essential to give the chapter 11 trustee responsibilities for U.S. investigation, issuance of

U.S. subpoenas and U.S. document demands; any U.S. litigation that turns out to be

warranted, and any acts that otherwise need to be accomplished within the U.S.[67]  But it's

---

(7) granting any additional relief that may be available to
a trustee, *except for relief available under sections 522,
544, 545, 547, 548, 550, and 724(a).*

(emphasis added).

[66]    *See In the matter of Lancelot Investors Fund Ltd.* [2009] CILR 7 (Cayman Islands Grand Ct.)
(embracing cooperation and coordination in cross-border insolvency proceedings where "the
majority of the investigations to be undertaken for the realization of [Debtor's] assets are required
to be undertaken in the United States," but the "claims that the petitioners and . . . other investors
may have against the company will have to be examined and assessed according to the law of the
Cayman Islands"); *see also Maxwell Comm'ns*, 93 F.3d 1036, 1042 (2d Cir. 1996) (concurrent
U.S. chapter 11 case and UK administration  involving "perhaps the first world-wide plan of
orderly liquidation ever achieved").

[67]    The JOLs' expert Mr. Farrow noted that Cayman Companies Law Section 108(1), enacted in
2009, provides that a foreign practitioner may be appointed to act jointly with a qualified
insolvency practioner as an additional joint official liquidator.  *See* Farrow Decl. ¶ 22.  But he
added that "[i]t is not clear what purpose such an appointment would serve."  *Id.*  It is, however,
quite clear to me; it would facilitate the necessary investigation, and permit necessary litigation, in
the U.S., where documents and witnesses would be found, along with much, if not most, of the
Debtor assets to be monetized.

less obvious that the chapter 11 trustee would need to do anything else, and I have no

particular preference with respect to anything else.  Ultimately, it's best for the

stakeholders to discuss with the fiduciaries what these estates' needs and concerns are,

and what division of responsibilities most effectively meets them and in the most cost-

effective manner.[68]

Conclusion

For the reasons set forth above, the matters before me are decided in accordance

with the summary of my rulings at pages 4 through 6 above.

SO ORDERED.

Dated: New York, New York          _s/Robert E. Gerber_____
       January **23**, 2014                United States Bankruptcy Judge

---

Mr. Farrow was mistaken in his understanding of U.S. law when he also opined that "[g]iven that they [the JOLs] are appointed by the court of the Limited Debtors' domicile, they might reasonably be expected to be recognized."  *Id.* ¶ 13.  Recognition under U.S. law, determined under Bankruptcy Code sections 1515 through 1524, is not governed by domicile.  Rather, recognition turns upon a showing that the foreign proceeding for which recognition is sought is a "foreign main proceeding," or a "foreign nonmain proceeding," *see* Bankruptcy Code section 1517(a)(1), each of which turns on the COMI of the foreign debtor.  *See, e.g.*, *In re Bear Stears High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127–28 (Bankr. S.D.N.Y. 2008) (Lifland, C.J.), *aff'd* 389 B.R. 325 (S.D.N.Y. 2008) (Sweet, J.).

A presumption that a foreign debtor's registered office is also its COMI "is not a preferred alternative where there is a separation between a corporation's jurisdiction of incorporation and its real seat." 374 B.R. at 128.  Such a separation frequently exists with respect to companies organized under the law of offshore jurisdictions such as the Cayman Islands, especially when they are "exempt companies."  A debtor's COMI generally equates not to domicile, but rather "where the debtor conducts its regular business, so that the place is ascertainable by third parties." *Fairfield Sentry*, 714 F.3d at 130.

[68]    I was not persuaded that any activities in the U.S. would result in adverse tax consequences to the Debtors' investor stakeholders.  But I assume those stakeholders will be consulted incident to the negotiation of the protocol.  If any activities ought to take place in the Cayman Islands to minimize tax concerns, I have no objection to the protocol providing for such.