Hearing Date and Time: December 16, 2015 at 9:45 a.m. (EST)
Objection Deadline: December 9, 2015 at 4:00 p.m. (EST)

DICONZA TRAURIG KADISH LLP
630 Third Avenue
New York, New York 10017
Telephone: (212) 682-4940
Facsimile: (212) 682-4942
Gerard DiConza
Richard Milin
Email: gdiconza@dtklawgroup.com
            rmilin@dtklawgroup.com

*Special Litigation Counsel for the Chapter 11 Trustee of the Soundview Debtors and the
Joint Liquidators of the Richcourt British Virgin Island Funds*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- x

In re                                                          :
                                                               :      Chapter 11
SOUNDVIEW ELITE LTD., *et al.*,                                :
                                                               :      Case No. 13-13098 (REG)
                             Debtors.                          :
                                                               :      (Jointly Administered)
--------------------------------------------------------------------- x

In re                                                          :
                                                               :      Chapter 15
RICHCOURT EURO STRATEGIES INC., *et al.*,                      :
                                                               :      Case No. 15-12273 (REG)
                 Debtors in Foreign Proceedings.               :
                                                               :      (Jointly Administered)
                                                               x

**DECLARATION OF RICHARD K. MILIN IN
SUPPORT OF DEBTORS' MOTION TO ENFORCE THE
AUTOMATIC STAY AND TO ENJOIN PROSECUTION
BY PASIG, LTD. AND ROGER AND JULIE CORMAN
OF CLAIMS BELONGING TO THE DEBTORS' ESTATES**

Pursuant to 28 U.S.C. § 1746, Richard K. Milin declares as follows:

1.       I am a member of the Bar of the State of New York and of counsel to the

law firm of DiConza Traurig Kadish LLP, special litigation counsel to Corinne Ball in her

capacity as the Chapter 11 Trustee (the "**Trustee**") of the debtors in case No. 13-13098 (REG)

(the "**Soundview Debtors**") and John Ayres and Matthew Wright in their capacities as Joint

Liquidators (the "**Joint Liquidators,**" and with the Trustee, the "**Trustees**") of the debtors in

foreign proceedings in case No. 15-12273 (REG) (the "**BVI Debtors**," and, together with the

Soundview Debtors, the "**Debtors**").

      2.      I respectfully submit this declaration based upon personal knowledge and

my review of relevant documents in support of the Debtors' motion pursuant to 11 U.S.C.

§§ 105(a) and 362 (the "**Motion**") to enforce the automatic stay and to enjoin prosecution by

Pasig, Ltd., Roger Corman and Julie Corman (together, "**Pasig**") of a complaint (the "**Pasig**

**Complaint**") filed in the Superior Court of the State of California (L.A. County) asserting claims

against Citco Group Limited and certain of its affiliates and related parties (collectively,

"**Citco**").

      3.      I attach as Exhibit 1 a copy of the Debtors' Complaint in Consolidated Adversary

Proceedings 15-01346 (REG).

      4.      I attach as Exhibit 2 a copy of the Pasig Complaint.

      5.      I attach as Exhibit 3 copies of declarations of Julie and Roger Corman dated

September 17, 2015 which were filed in the California litigation concerning the Pasig Complaint.

      6.      I attach as Exhibit 4 a copy of a letter from the Trustee's counsel to Pasig's

counsel dated March 30, 2015.

      7.      I attach as Exhibit 5 copies of letters exchanged by the Trustee's and Pasig's

counsel in and after April 2015.

      8.      I attach as Exhibit 6 a copy of the court's Case Management Order and Ruling on

Submitted Matters dated November 4, 2015 in the California litigation concerning the Pasig

Complaint.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge, information and belief.

Executed on:   December 2, 2015
              New York, New York                          /Richard K. Milin
                                                          RICHARD K. MILIN

<u>Exhibit 1</u>

<u>Debtors' Insider Complaint -- Consolidated Adv. Proc. Nos. 15-01346 (REG)</u>

DICONZA TRAURIG KADISH LLP
630 Third Avenue
New York, New York 10017
Telephone: (212) 682-4940
Facsimile: (212) 682-4942
Gerard DiConza
Richard Milin
Email:  gdiconza@dtklawgroup.com
        rmilin@dtklawgroup.com

*Special Litigation Counsel for the Chapter 11 Trustee of the Soundview Debtors and the
Joint Liquidators of the Richcourt British Virgin Island Funds*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

| | |
|---|---|
| In re | : |
| | :   Chapter 11 |
| SOUNDVIEW ELITE LTD., *et al.*, | : |
| | :   Case No. 13-13098 (REG) |
|         Debtors. | : |
| | :   (Jointly Administered) |

-------------------------------------------------------------------- x

| | |
|---|---|
| In re | : |
| | :   Chapter 15 |
| RICHCOURT EURO STRATEGIES INC., *et al.*, | : |
| | :   Case No. 15-12273 (REG) |
|         Debtors in Foreign Proceedings. | : |
| | :   (Jointly Administered) |

-------------------------------------------------------------- x

| | |
|---|---|
| CORINNE BALL, as Chapter 11 Trustee of SOUNDVIEW ELITE LTD., SOUNDVIEW PREMIUM, LTD., SOUNDVIEW STAR LTD., ELITE DESIGNATED, PREMIUM DESIGNATED and STAR DESIGNATED, and JOHN AYRES and MATTHEW WRIGHT, as Joint Liquidators of AMERICA ALTERNATIVE INVESTMENTS INC., OPTIMA ABSOLUTE RETURN FUND LTD., RICHCOURT ALLWEATHER B INC., RICHCOURT ALLWEATHER FUND INC., RICHCOURT COMPOSITE INC. and RICHCOURT EURO STRATEGIES INC., | :   Adv. Pro. No.: _____ |
| | : |
|         Plaintiffs. | :   **COMPLAINT** |
| | : |
|         v. | : |
| | : |

```
                                                      :
                                                      :
CITCO GROUP LIMITED, ERMANNO                          :
UNTERNAEHRER, SOUNDVIEW CAPITAL                       :
MANAGEMENT LTD., RICHCOURT CAPITAL                    :
MANAGEMENT LTD., CITCO FUND SERVICES                  :
(CAYMAN ISLANDS) LIMITED, CITCO FUND                  :
SERVICES (EUROPE) B.V., CITCO GLOBAL                  :
CUSTODY (NA) N.V., CITCO BANKING                      :
CORPORATION N.V., CITCO TRADING INC.,                 :
RICHCOURT HOLDING INC., CFS COMPANY LTD.,             :
CFS CORPORATION LTD., CHRISTOPHER G.                  :
SMEETS, ROBERT A. VOGES, ALPHONSE                     :
FLETCHER, JR., FLETCHER ASSET MANAGEMENT,             :
INC., FLETCHER INTERNATIONAL, INC., GEORGE            :
LADNER, ENRICO LADDAGA, GABRIELE MAGRIS,              :
YVES BLOCH, DENIS KIELY, STEWART TURNER,              :
GERTI MUHO and FLOYD SAUNDERS,                        :
                                                      :
                          Defendants.                 :
------------------------------------------------------------------ x
```

## **COMPLAINT**

Plaintiffs Corinne Ball, not individually, but solely in her capacity as the Chapter 11 Trustee (the "**Trustee**") of Soundview Elite Ltd. ("**Soundview Elite**"), Soundview Premium, Ltd. ("**Soundview Premium**"), Soundview Star Ltd. ("**Soundview Star**" and together with Soundview Elite and Soundview Premium, the "**Soundview Funds**"), Elite Designated, Premium Designated and Star Designated (the "**Designated Funds**," and together with the Soundview Funds, the "**Soundview Debtors**"), and John Ayres and Matthew Wright, not individually, but solely in their capacities as Joint Liquidators (the "**Joint Liquidators**") of America Alternative Investments Inc. ("**AAI**"), Optima Absolute Return Fund Ltd. ("**Optima**"), Richcourt Allweather B Inc. ("**RAB**"), Richcourt Allweather Fund Inc. ("**RAF**"), Richcourt Composite Inc. ("**RCI**"), and Richcourt Euro Strategies Inc. ("**RES**," and together with AAI, Optima, RAB and RAF, the "**BVI Funds**," and, together with the Soundview Funds and, with

respect to periods after their creation, the Designated Funds, the "**Richcourt Funds**"), by and through their counsel DiConza Traurig Kadish LLP, bring this complaint (the "**Complaint**") against Citco Group Limited ("**Citco Group**"), Ermanno Unternaehrer ("**Unternaehrer**"), Enrico Laddaga ("**Laddaga**"), Gabriele Magris ("**Magris**"), Yves Bloch ("**Bloch**"), Christopher G. Smeets ("**Smeets**"), Robert A. Voges ("**Voges**"), Soundview Capital Management Ltd. ("**SCM**"), Richcourt Capital Management Ltd. ("**RCM**"), Citco Fund Services (Cayman Islands) Limited ("**CFS Cayman**"), Citco Fund Services (Europe) B.V. ("**CFS Europe**," and together with CFS Cayman, the "**Citco Administrators**"), Citco Global Custody (N.A.) N.V. ("**Citco Global**"), Citco Banking Corporation N.V. ("**Citco Bank**"), Citco Trading Inc. ("**CTI**"), CFS Company Ltd. ("**CFS Company**"), CFS Corporation Ltd. ("**CFS Corporation,**" and together with CFS Company, the "**Citco Directors**"), Richcourt Holding Inc. ("**RHI,**" and together with Citco Group; SCM; the Citco Administrators; Citco Global; Citco Bank; CTI; Unternaehrer, Laddaga, Bloch, Smeets, Voges and Magris (each solely as to the time before he or it ceased working with Fletcher and FAM as specified below); and the Citco Directors (solely as to the time before June 21, 2008), the "**Citco Defendants**"), Alphonse Fletcher Jr. ("**Fletcher**"), Fletcher Asset Management, Inc. ("**FAM**"), Fletcher International, Inc. ("**FII**"), Denis Kiely ("**Kiely**"), Stewart Turner ("**Turner**"), George Ladner ("**Ladner**"), Gerti Muho ("**Muho**") and Floyd Saunders ("**Saunders**," and together with Fletcher, FAM, FII, Kiely, Turner, Ladner and Muho, the "**Fletcher Defendants**") and, based on, *inter alia*, the investigation conducted by and through their attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.    Citco may claim to be "the world's pre-eminent hedge fund administrator," but its treatment of the Richcourt Funds was an outrage and a shame. Citco Group created the now-

bankrupt Richcourt Funds, and it induced investors to place huge sums in them in reliance on Citco's good name.  Then Citco Group sold the Funds to a manager who, it knew, had repeatedly looted the investments under his control.  The result, for everyone except Citco Group, was disastrous.

2.  Citco Group's wrongs did not end there.  Citco Group remained on board, helping the deceitful manager, giving him an air of legitimacy and facilitating his defalcations.  And when the manager's wrongdoing became obvious, Citco Group did not 'blow the whistle'; it simply jumped ship, and made sure it got its money out with the smallest possible loss.  Citco even quit providing services to the Richcourt Funds before the looting was finished, leaving their books and records a shambles.  Worse, Citco may have been covering its tracks:  despite the Plaintiffs' requests, Citco Group and its subsidiaries have not provided documents essential to justifying their receipt of more than $340 million in payments from the Richcourt Funds.

3.  The Citco Defendants' partner in wrongdoing, the notorious Alphonse "Buddy" Fletcher, Jr., also cost the Richcourt Funds huge losses. Though he sometimes presented his activities as complex, multi-stage transactions, Fletcher's methods were actually time-honored and direct:  he simply took investors' assets for his own.  The Citco Defendants had ample evidence of Fletcher's wrongdoing when it sold him the Richcourt Funds, because Citco had been dealing with Fletcher for years.  Besides, the Citco Defendants knew that Fletcher did not have enough cash to pay the Funds' purchase price because it had long been pressuring him to pay overdue sums.  In the end, Fletcher had to purloin pension fund money that had been invested in one of his existing, fraudulently managed funds to pay Citco what he owed.  And Citco knew it.

-4-

4.      Once he had acquired the Richcourt Funds, Fletcher's actions were true to form: he took the Richcourt Funds' assets when he wanted them – sometimes using them to help his other money-losing funds appear successful – until the Funds had nothing left.  As the Trustee of one of Fletcher's defunct funds concluded, Fletcher's funds "had many of the characteristics of a Ponzi scheme."  (*See* Trustee Report and Disclosure Statement, filed January 24, 2014 in *In re Fletcher Int'l, Ltd.*, Case No. 12-12796 (REG) [Docket No. 393], the "**FILB Trustee Report**" at 9.)  Yet the Citco Defendants continued to assist Fletcher and to participate in his looting long after his purchase of the Richcourt Funds closed.

5.      This adversary proceeding seeks redress for the Defendants' multi-year, multi-faceted scheme to profit from the Richcourt Funds' unquestioning reliance on Citco by looting the Funds' assets in utter disregard of the Defendants' fiduciary duties.  This fraudulent scheme began while the Citco Defendants owned and managed the Richcourt Funds, continued after they sold most of their ownership interest to Fletcher and his company FAM, and culminated in the Funds' bankruptcy and liquidation.  As set forth below, each of the Defendants played an essential role in carrying out the fraud, breaches of duty and plundering of the Richcourt Funds' assets that made up this deplorable scheme.  But throughout, the Defendants' mindset and practice was the same:  they each pursued their own financial interests, heedless of their promises, contracts and duties as fiduciaries, even though the result was the Funds' destruction and huge financial losses.

6.      The Richcourt Funds' story begins in 1992, when Citco Group set up the "**Richcourt Group**," a family of hedge funds and investment management companies that Citco owned and controlled.  The various constituents of the Richcourt Group varied as new funds were launched and old ones were dissolved, but during the period relevant to this Complaint,

RHI was the Richcourt Group's primary holding company and the relevant funds in the Group were the following:

(a) the three Soundview Funds and, after March 2009, the three Designated Funds, which are now the six Soundview Debtors in this proceeding;

(b) the six "**BVI Funds,**" which were incorporated in the British Virgin Islands ("**BVI**") and are now the subject of "winding up" proceedings in the BVI courts as well as a Chapter 15 proceeding in the United States Bankruptcy Court for the Southern District of New York;

(c) Soundview Composite Ltd. ("**Soundview Composite**"), which is one of the few funds affiliated with Fletcher and FAM that has not yet filed a bankruptcy petition; and

(d) New Wave Fund SPC ("**New Wave**"), which, like Soundview Composite, is affiliated with Fletcher and FAM but has not yet filed a bankruptcy petition.

7.     The Richcourt Funds were entirely dependent on Citco Group, operating through its various subsidiaries.  The Citco Defendants – Citco Group and its relevant personnel and subsidiaries – provided all of the decision-making and all of the administrative and other services needed to run the Richcourt Funds.  The Citco Defendants occupied all managerial positions, served as officers and directors, chose all of the Funds' investments, and handled all of their communications with investors.  Ultimately, however, the Richcourt Funds' dependence on Citco proved to be the cause of their demise, because when the interests of the Citco Defendants and of the Funds diverged, the Citco Defendants made no effort to bring in independent management.  Instead, they ensured that no interests would be considered but their own.

8.     In late 2007, Citco Group decided to exit the fund management business because of complaints it received from the clients of its other businesses – most importantly, its core fund administration business.  These clients saw Citco Group's ownership of a competing fund management company as creating conflicts of interest, and Citco determined to accommodate them.  Citco Group did not face up to its conflicts in attempting to sell the Richcourt Group's funds, however, even though they had evidence that the highest bidder would be financing his bid with fraud.

9.     Citco Group began a concerted effort to sell RHI, and with it the Richcourt Funds and the rest of the Richcourt Group, in early 2008.  In the end, Citco Group determined that Fletcher and FAM had made the best offer for RHI, and Fletcher formed Richcourt Acquisition, Inc. ("**RAI**") to serve as the buyer.

10.     On June 20, 2008, Citco Group sold 85% of RHI to RAI, keeping 15% in Citco Group's subsidiary, Defendant CTI.  Citco Group retained the right, however, to "put" CTI's 15% interest to RAI whenever it wanted to divest itself entirely – and to do so at a price no less than it would have received if it had sold 100% of RHI initially.  As a result, Citco Group ensured that it could exit its dealings with Fletcher whenever it chose.  This transaction, which gave RAI, Fletcher and FAM control over RHI, is referred to as the "**Richcourt Acquisition**."

11.     The Citco Defendants were not merely heedless of the fact that selling RHI to Fletcher and FAM was inconsistent with their fiduciary duties to the Richcourt Funds.  The Citco Defendants were, at best, willfully blind, because each of them knew or had to know that Fletcher and FAM could not be trusted.  At the time of the Richcourt Acquisition, Citco and its affiliates had been doing business with Fletcher and FAM for years, and they had provided

-7-

myriad services to the funds Fletcher and FAM managed. As a result, the Citco Defendants knew Fletcher and FAM. They knew that, after paying Citco, Fletcher and FAM would not have the resources – even with access to the fees that the Richcourt Funds generated – to run those Funds effectively. And they had abundant evidence of what Fletcher and FAM did in that situation: they misappropriated investors' assets. As discussed below, the Citco Defendants had even participated in Fletcher and FAM's self-dealing.

12.     Despite what they knew, the Citco Defendants took no steps to warn either the Richcourt Funds of which they were fiduciaries, or the Funds' investors, about Fletcher and FAM. Instead, the Citco Defendants promised Fletcher and FAM that they would not disclose the Richcourt Acquisition unless they were required to do so by law. Thus, the Citco Group blithely became a participant in fraud: they threw the Richcourt Funds to the Fletcher and FAM wolves, without any warning of their impending fate. The Citco Defendants made sure that they themselves would not need to worry, however – their deal with Fletcher required him to pay the Citco Defendants up front and in cash.

13.     Astonishingly, the Citco Defendants did not keep the Richcourt Acquisition confidential merely until it closed on June 20, 2008. Ignoring their lawyers' urging and advice, the Citco Defendants delayed notifying investors about the Acquisition for months, and even then, they only approached selected investors informally. As a result, investors in the Soundview Funds and at least two of the BVI Funds did not receive official notice of the Richcourt Acquisition until late December 2008, fully six months after it occurred – and by then the Funds had suspended redemptions so that investors could not withdraw their money. Further, when the Defendants did disclose the Richcourt Acquisition to investors in letters from the Richcourt Funds' new, Fletcher-affiliated directors, the letters were misleading and inaccurate.

-8-

14.     The Citco Defendants' motivation in proceeding with the Richcourt Acquisition, and thereby assisting Fletcher and FAM's misappropriation of investor funds, was simple: it earned them enormous financial benefits. The Richcourt Acquisition not only extricated Citco from the fund management business, but also earned CTI more than $25 million dollars in proceeds from selling the Richcourt Group. Fletcher and FAM's misappropriation of investor funds secured repayment of long-overdue loans that Citco Group subsidiaries had made to a fund managed by Fletcher and FAM, and facilitated a sweetheart payment of over $6 million in cash to Unternaehrer - a member of Citco Group's Executive Committee (the "**Citco Executive Committee**"), and a Richcourt Funds fiduciary, who was leading the Richcourt Acquisition - so that he could purchase a house in France. These were benefits the Citco Defendants were unwilling to give up. Accordingly, even though they knew the Richcourt Acquisition put the Richcourt Funds at risk of looting by the self-dealing Fletcher and FAM, they sacrificed those Funds to their greed anyway, and ignored their fiduciary duties to the Funds and the investors that they knew were relying on them.

15.     From the moment the Richcourt Acquisition closed in June 2008, the Richcourt Funds' fate was sealed: Fletcher and his colleagues were now free to treat their newly acquired Funds as piggy banks they could loot at will. The Citco Defendants continued as fiduciaries of the Richcourt Funds; many remained in their former capacities until March 2010 or later. Unternaehrer did not resign from RHI until December 2011. Yet even after Fletcher and FAM began their misappropriation of the Richcourt Funds' assets, the Citco Defendants took no steps to warn or protect the Richcourt Funds or their investors; they were concerned solely to preserve the benefits of the Richcourt Acquisition. In other words, the Citco Defendants' breaches of their fiduciary duties not only continued; they got worse.

16.     Although not all of the relevant facts have yet come to light, the Defendants' post-Acquisition breaches of their duties to the Richcourt Funds began no later than November 2008. At that time, Fletcher and FAM started making new "investments" of the BVI Funds' assets into the Fletcher Income Arbitrage Fund, Ltd. ("**Arbitrage**"), a member of the failing family of funds that Fletcher and FAM had managed since before the Richcourt Acquisition.  The FILB Trustee found that these investments totaled approximately $40 million by June 2009.   Yet the FILB Trustee also found that Arbitrage was greatly overvalued, so that these investments were plainly not in the BVI Funds' interests, but only in Fletcher and FAM's own.   Further, during much of the time that Fletcher and FAM were making these investments, the Richcourt Funds had suspended their calculations of the Funds' net asset values, and investors' redemption rights were gated or suspended.

17.     The Soundview Funds, too, became Fletcher and FAM's victim.  In April 2009, Fletcher and FAM, with the assistance of certain Citco Defendants, misappropriated $11 million of the Soundview Funds' assets to make even more bad, self-interested investments in Arbitrage. These investments were contrary to the stated strategic goals and investment objectives that were supposed to guide the operation of the Soundview Funds and on which investors had relied when they invested in the first place.  Moreover, the Soundview Funds' new directors had specifically reassured investors in a January 2009 letter that the Soundview Funds' investment strategy had not changed and that they had not "invested in any [f]unds managed by FAM."  Less than three months later, neither of these statements was true.   And in October 2009, the Defendants converted the Funds' investments into even worse, *subordinated* investments in a different failing fund managed by Fletcher and FAM.

-10-

18.    In March 2010, Fletcher and FAM again misused the Richcourt Funds' assets –
this time approximately $13 million – for an ill-advised, self-interested investment.  Still, they
weren't finished:  the Defendants' pattern of misappropriation continued through at least 2013.
When Richard J. Davis, the chapter 11 trustee (the "**FILB Trustee**") of Fletcher International
Ltd. ("**FILB**"), sought to unwind a Fletcher Defendant's efforts to secrete assets away from
creditors and the bankruptcy courts of two countries in December 2012, the Fletcher Defendants
simply reached into their piggy bank and misappropriated another $4 million from Soundview
Elite to resolve their problem.

19.    The Defendants' mismanagement and misconduct here was so pervasive that,
within the span of just a few years, the Richcourt Group's assets under management declined
from over $1.5 billion prior to the Richcourt Acquisition to approximately $175 million by
December 2010.  This decline ultimately culminated in the bankruptcy or liquidation of most of
the funds in the Richcourt Group, and it certainly cannot be blamed on "market factors" alone –
most investment funds, after all, did not decline so dramatically that they were forced into
liquidation.  Further, the Fletcher Defendants did not act on their own: the Citco Defendants
consented to, and participated in, misconduct that led to the Richcourt Funds' demise.

20.    On behalf of the Richcourt Funds that the Citco Defendants created, enticed
investors into and then destroyed, the Trustee and the Joint Liquidators hereby seek redress from
those who orchestrated, participated in, consummated and wrongfully benefitted from the
Defendants' outrageous scheme to loot, defraud and – by leaving no assets for anyone else –
ultimately bankrupt the Richcourt Funds.

## PARTIES

**A.    The Soundview and Designated Funds**

21.     Soundview Elite was initially incorporated in October 2003 as an international business company in the Commonwealth of the Bahamas.  In June 2005, Soundview Elite's place of incorporation was transferred by way of continuation to the Cayman Islands, and it now exists as an exempted company incorporated under the laws of the Cayman Islands.

22.     Soundview Premium was incorporated on November 21, 2005 and continues to exist as an exempted company incorporated under the laws of the Cayman Islands.

23.     Soundview Star was initially incorporated in May 2002 as an international business company in the Commonwealth of the Bahamas.  In June 2005, Soundview Star's place of incorporation was transferred by way of continuation to the Cayman Islands, and it now exists as an exempted company incorporated under the laws of the Cayman Islands.

24.     Prior to their filing for bankruptcy, the Soundview Funds carried on business as open-ended investment companies and each fund was registered as a mutual fund with the Cayman Islands Monetary Authority.  The Soundview Funds operated as typically-structured Cayman Islands investment funds.  Investors invested in the Soundview Funds by subscribing for participating shares.  The participating shares represented investors' economic interest in the funds, and they were redeemable, subject to some limitations, upon request.  The Soundview Funds, in turn, undertook to invest the subscription monies in accordance with the stated investments strategies described in confidential private placement memoranda ("**PPMs**") issued by each Soundview Fund.

25.     Elite Designated, Premium Designated and Star Designated are each exempted companies incorporated on March 19, 2009 under the laws of the Cayman Islands.  They were created by a transfer of assets and liabilities from the Soundview Funds.  Because the liabilities they assumed were, on information and belief, greater than their assets, they were insolvent from the moment of their creation.

26.     On September 24, 2013 (the "**Petition Date**"), each of the Soundview Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court (the "**Chapter 11 Cases**").  By an order dated October 16, 2013, this Court directed that the Chapter 11 Cases be procedurally consolidated and jointly administered.  On January 23, 2014, this Court authorized and directed the United States Trustee to appoint a chapter 11 trustee.  On February 3, 2014, this Court approved the appointment of Corinne Ball as Trustee of the Soundview Debtors.

27.     Also, on September 24, 2013, the Grand Court of the Cayman Islands ordered that each of the Soundview Funds be placed into official liquidation and that Peter Anderson and Matthew Wright be appointed Joint Official Liquidators of the Soundview Funds.

### B.     The BVI Funds

28.     RES was incorporated in February 2000.  It exists as a BVI Business Company and is recognized as a professional fund.

29.     Optima was incorporated as EFG Optima Fund Ltd in May 2005 and changed its name in December 2005.   It exists as a BVI Business Company and is recognized as a professional fund.

30.     RAF was incorporated as Richcourt Variable Opportunities Inc. in October 1996 and changed its name immediately thereafter.  It exists as a BVI Business Company and is recognized as a professional fund.

31.     RAB was incorporated in October 1996 and changed its name in December 1996. It exists as a BVI Business Company.

32.     RCI was incorporated as Richcourt Variable Futures Inc. in May 2004 and changed its name in November 2006.  It exists as a BVI Business Company and is recognized as a professional fund.

33.     AAI was incorporated as Citco US Dollar Equities Ltd in October 1990 and changed its name to Richcourt America Inc. in October 1990.  It changed its name again to Citco US Dollar Equities in July 1991, and then to America Alternative Investments Inc. in February 2008.  It exists as a BVI Business Company and is recognized as a professional fund.

34.     Prior to their liquidation proceedings, the above-mentioned BVI Funds carried on business as open-ended investment companies and each fund was registered as a professional fund with the British Virgin Islands Financial Services Commission.  The BVI Funds operated as typically-structured BVI investment funds.   Investors, including independent third parties, invested in the funds by subscribing for participating shares offered by each of the BVI Funds. The participating shares represented investors' economic interest in the funds, and they were redeemable, subject to some limitations, upon request.  The BVI Funds, in turn, invested the subscription monies in accordance with their stated investment strategies as described in confidential PPMs issued by each BVI Fund.

35.     On June 6, 2014, the BVI Funds filed applications before the Eastern Caribbean Supreme Court in the British Virgin Islands seeking the appointment of John Ayres and David Walker as joint provisional liquidators of the BVI Funds.  On July 2, 2014, the BVI Court approved the applications.

36.     On July 21, 2014, the BVI Funds filed applications before the Eastern Caribbean Supreme Court in the British Virgin Islands (the "**BVI Court**") seeking the appointment of John Ayres and Matthew Wright as joint liquidators of the BVI Funds.  On July 23, 2014, the BVI Court approved the applications.

37.     On August 12, 2015 (the "**Chapter 15 Petition Date**"), the Joint Liquidators filed cases under chapter 15 of the Bankruptcy Code on behalf of each of the BVI Funds in this Court (the "**Chapter 15 Cases**").  On August 18, 2015, this Court entered an order directing that the Chapter 15 Cases be procedurally consolidated and jointly administered.  On September 15, 2015, this Court entered an order in the Chapter 15 Cases granting recognition of the British Virgin Islands liquidation proceedings (the "**BVI Proceedings**") as "foreign main proceedings." By order made on September 18, 2015, the BVI Court granted sanction to the Joint Liquidators to pursue the claims asserted in this Complaint.

**C.      The Citco Defendants and Other Relevant Personnel**

1.      The Citco Group

38.     Defendant Citco Group Limited ("**Citco Group**") is a holding company for a global financial services organization described on its website and in marketing materials as the "Citco Group of Companies" ("**Citco**").  According to its web site as of September 2015, the Citco Group of Companies operates in more than 40 countries across the world with over 5,000

-15-

staff and offers a full range of financial and fiduciary services to hedge funds and other clients, including fund administration, custody and banking, financial products, and corporate and fiduciary services.

39.     Citco Group, though it is a Cayman Islands company, has direct, substantial and continuous contacts with the United States and New York.  Citco Group operates in the United States through twelve offices of subsidiaries or affiliates, including Citco Fund Services (USA) Inc., Citco Corporate Services Inc. and Citco Insurance Services LLC, all of which have offices at 350 Park Avenue, 29th Floor, New York, N.Y. 10022.

40.     Upon information and belief, Citco Group conducts extensive business in New York, on its own or through its subsidiaries and affiliates, which generates substantial revenues for Citco Group.  Throughout Citco Group's relationship with the Richcourt Funds and Fletcher and FAM, Citco Group personnel including its Executive Director Unternaehrer participated in meetings and communicated by telephone and email with individuals in New York regarding the Richcourt Funds and the Richcourt Acquisition.  After the Richcourt Acquisition, Citco Group through Unternaehrer played a continuing role in managing the Richcourt Funds, in which Citco Group held a continuing 15% stake, and which were managed from New York by Fletcher and FAM.

41.     Further, in July 2015, Citco Group greatly expanded its operations in New York by opening a "Gateway Center" at 350 Park Avenue.  Citco Group's web site explains that "Citco Gateway is a unique market-entry solution, providing premium office locations and administrative services to businesses looking to establish operations in a new market, or further develop in an existing one."  Citco Group's web site further explains how the Gateway Center is

intended to attract clients to their "global footprint" and "comprehensive suite of fund administration and corporate services":

> Located at 350 Park Avenue, Citco Gateway New York is situated in the heart of Manhattan's commercial business and alternative funds district...Clients will be supported by Citco's extensive business network and robust infrastructure, including a skilled reception staff and reliable, secure IT support. Importantly, Gateway clients will also have convenient access to Citco's industry-leading, comprehensive suite of fund administration and corporate services.

> Jay Peller, Global Head of Sales and Product Development at Citco, said, "We are pleased to extend our Gateway offering and help clients establish and develop their businesses in New York. With our deep experience, global footprint, and wide range of business relationships, Citco is uniquely positioned to help clients tackle the complications and challenges that can arise from venturing into a new market. We look forward to giving businesses of all sizes and growth stages – from start-ups to established investment firms to multi-national corporations – the support and solutions needed to compete and succeed."

42.     Citco, as its web site makes clear, operates as a single, integrated company with a single staff assigned to several "divisions."  Each division is ultimately controlled by Citco Group through the Citco Executive Committee.  Upon information and belief, the Citco Executive Committee appoints global directors to oversee the daily operations of each of the divisions and these directors act on behalf of, and report directly to, the Citco Executive Committee.  In the Fund Services Division, for example, of which William Keunen ("**Keunen**") has been the global director since June 2001, "[e]ach office has a Managing Director reporting directly to Keunen who in turn reports directly to the four-man executive committee at Citco." (Hedgeweek, *The Hedgeweek Interview:  William Keunen, Director Fund Services*, November 28, 2003).

43.     A 2010 article, for which various high-ranking individuals in Citco were interviewed, emphasized the non-hierarchical "flat" nature of the group's management structure: "The firm prides itself as a flat organization….The fund services management team is just one

layer beneath the executive committee and there is day-to-day interplay between them." (Bill McIntosh, *Citco Fund Services: Adapting Hedge Fund Administration to Changing Needs*, Hedge Fund Journal, November 9, 2010).

44.    Citco Group's structure for controlling its various subsidiaries and affiliates was discussed by the United States District Court for the Southern District of New York in January 2009, a mere six months after the Richcourt Acquisition.  Citco Group's CEO testified in that case that the day-to-day operations of Citco's Fund Services Division – which includes some of the Citco Defendants in this proceeding – were supervised by a division director reporting directly to the Citco Executive Committee.  In denying Citco Group's motion for a summary judgment dismissing claims brought against it for "control person" liability under section 20(a) of the Exchange Act of 1934 – claims asserted by investors in two failed hedge funds administered by subsidiaries or affiliates of Citco – the Court stated:

> As explained by [Christopher] Smeets [the CEO and President of Citco Group] at his deposition, the Executive Committee of the Citco Group hired division directors to oversee the day-to-day operations of its business segments.  Keunen was the division director for the fund services segment of Citco Group's business.  The undisputed evidence shows not only that Keunen was hired by the Executive Committee of Citco Group, but that the committee reviewed his performance and set his compensation.  In addition, Keunen reported regularly to the Citco Group's Executive Committee.  Furthermore, there were times when the managing directors of individual fund services entities would substitute Keunen's approval for that of the Citco Group Executive Committee.  This evidence demonstrates that Keunen was acting on behalf of the Citco Group while in his capacity as division director of the fund services segment.

(*Pension Comm. of the University of Montreal Pension Plan v. Banc of America Sec. LLC*, 592 F. Supp. 2d 608, 635 (S.D.N.Y. 2009) (footnotes omitted)).

45.    The offering materials that the Citco Defendants made available to investors in the Richcourt Funds emphasized the integrated nature of Citco:

> The Citco Group offers a wide range of financial and fiduciary services
> consisting principally of fund administration, custody and banking and
> corporate/fiduciary services.  The Citco Group is one of the leading
> international fund administrators and the largest global service provider to
> hedge funds …. The Citco Group also serves as custodian for over $160
> billion in assets of hedge funds of funds and financial institutions.

(PPM for Soundview Premium, dated June 14, 2007, at 14; PPM for RES, dated December 22, 2006, at 20.)

46.    Later, a February 2008 presentation for Soundview Elite and a June 2008 presentation for the BVI Funds described how "Citco" provided a full range of services to hedge funds.  After stating that the investment manager of the Soundview Funds was ultimately "owned by the Citco Group Limited" the presentation added that Citco "provides corporate/fiduciary, fund administration, fund advisory, brokerage, banking, data processing and international pension services."  (Presentation for Soundview Elite, dated February 2008, at 22; Presentation for the BVI Funds, dated June 2008, at 9).

47.    Through its integrated and centralized control structure, the practice of the Citco Group was, at all times relevant to this Complaint, to direct and control the conduct of each of the Citco Defendants through the Citco Executive Committee, and for each of the Citco Defendants to act as an agent of Citco Group and Citco subject to their control.  Upon information and belief, Citco Group does not earn any revenue independent of the revenue generated by its operating subsidiaries.

        2.     The Citco Group Individual Defendants:
                  Unternaehrer, Smeets, Voges, Laddaga, Bloch and Magris

48.     Defendant Unternaehrer has been an employee of and officer in the Citco Group for over 20 years. He joined Citco in 1991 and moved to the United States shortly after 1992 to establish its first broker-dealer. He is currently a resident of Monaco and a director of The Citco Group (Monaco) SAM. At all times relevant to this Complaint, Unternaehrer was an Executive Director of Citco Group, a Director of the Financial Services Division of Citco and a member of the Citco Executive Committee.

49.     Prior to the Richcourt Acquisition, and for more than three years thereafter, Unternaehrer was a fiduciary of the Richcourt Funds and was actively involved in managing them. Prior to the Richcourt Acquisition, Unternaehrer was a director of SCM and RCM, the Richcourt Funds' investment managers which owned all voting shares in the Funds, as well as a director of their immediate parent company, RHI.

50.     In 1996, Unternaehrer established Richcourt Fund Advisors Inc. ("**RFA**"), headquartered in New York, which also acted as an investment advisor to the Richcourt Funds. Prior to the Richcourt Acquisition, Unternaehrer served as President of RFA's Investment Committee and Chairman of SCM's and RCM's Allocation Committees.

51.     Thus, during the period prior to the Richcourt Acquisition, as well as afterwards as discussed below, Unternaehrer was intimately and directly involved in managing the Richcourt Funds as well in directing and controlling the Citco Defendants through his position as a member of the Citco Executive Committee, to which each of the divisions in Citco reported. During the period after the Richcourt Acquisition, Unternaehrer remained involved in managing

the Richcourt Funds both as one of RHI's directors and as the representative and agent of Citco Group, RHI's 15% owner.

52.     During the period relevant to the Complaint, Unternaehrer was Citco Group's primary relationship contact with Fletcher and FAM, visiting their New York City offices and regularly communicating with the personnel in that office by email and telephone.   In all respects, including his managing the Richcourt Funds, his negotiating or conducting business with Fletcher and FAM, and his negotiating the Richcourt Acquisition, Unternaehrer acted as an agent of Citco Group and of the Citco Executive Committee of which he was a member.

53.     Enrico Laddaga is an individual who, upon information and belief, currently resides in London, England.  Laddaga joined Citco in October 1999 and thereafter served in various capacities, including as director and client relationship manager, for numerous subsidiaries of Citco Group.  At the time of the closing of the Richcourt Acquisition, Laddaga was a director of CTI and SCM.   In his capacity as director of CTI, he signed the relevant transaction documents to complete the Richcourt Acquisition.   Upon information and belief, Laddaga did not resign his position as director of SCM upon completion of the Richcourt Acquisition and continued to work extensively with the Richcourt Funds, devoting a substantial part of his time to investor relations as the client relationship manager of the investors of the Richcourt Funds.  Laddaga's involvement with the Richcourt Funds ended in February 2009 when his employment was terminated.

54.     Yves Bloch is an accountant who joined Citco in April 1991 and thereafter served in various capacities, including as Financial Officer of the Citco Financial Division and Financial Services Division.  At the time of the closing of the Richcourt Acquisition, Bloch was a director

of RHI, Richcourt (Monaco) S.A.M., SCM and CTI.  In his capacity as director of CTI, he signed the relevant transaction documents to complete the Richcourt Acquisition.  Bloch resigned as a director of SCM and RHI upon completion of the Richcourt Acquisition, but he remained a director of Richcourt (Monaco) S.A.M.  In that capacity, Bloch was primarily responsible for the finances of the Richcourt Group, and in particular for assisting the auditors of the various Richcourt Group companies and funds.  Bloch resigned from Richcourt (Monaco) S.A.M in or around May 2009.

55.    Gabriele Magris joined Citco in 2001 and thereafter served as a director of various subsidiaries of Citco Group.  At the time of the closing of the Richcourt Acquisition, Magris was a director of RHI, CTI and New Wave Asset Management Ltd. ("**NWAM**"), the investment manager for New Wave.  Magris resigned from the board of RHI upon completion of the Richcourt Acquisition, although he remained a director of NWAM.  Magris was also the representative of certain Richcourt Funds that were invested in an investment vehicle called the Corsair (Jersey) Limited Programme-Zero Coupon Fund linked Guarantee Principal Protection Notes ("**Corsair**"), which had an investment in FIA Leveraged Fund Ltd. ("**Leveraged**") prior to the Richcourt Acquisition.  Magris' involvement with the Richcourt Group ended in February 2009 when he resigned and, upon information and belief, returned to employment by Citco.

56.    Christopher G. Smeets is the President, the CEO and a Director of Citco Group. He is also a member of the Citco Executive Committee.  Smeets joined Citco Group in 1975 and, from 1984 to 1993, served as the President and Chief Executive Officer of The Citco Group, Ltd. B.V.I. as well as the Chairman of other subsidiaries of Citco Group.  According to a Citco brochure, Smeets "acquired control" of Citco in 1987, and he has been the President and CEO of

Citco Group since 1993.  Investors including the Smeets Family Trust acquired a controlling stake in Citco in July 2005.

57.    Smeets was a director of RCM from, upon information and belief, October 19, 1990 until at least June 20, 2008.  In addition, upon information and belief, Smeets continued to receive information about, and to participate in decisions concerning, Fletcher, FAM, the Richcourt Group, and Unternaehrer's activities as Citco Group's agent with respect to these entities until at least the time Unternaehrer stepped down from RHI.  Accordingly, Smeets remained a "Citco Defendant" until that time.  Upon information and belief, Smeets is a resident of The Netherlands.

58.    Robert A. Voges has been an Executive Director and Vice President of Citco Group, and a member of the Citco Executive Committee, since November 1994.  Voges joined Citco Group in 1980 and, from 1986 to 1994, served as Managing Director of certain Citco Group subsidiaries.  Voges was a director of RCM from August 27, 2004 until June 20, 2008.  Upon information and belief, Voges continued to receive information about, and to participate in decisions concerning, Fletcher, FAM, the Richcourt Group, and Unternaehrer's activities as Citco Group's agent with respect to these entities until at least the time Unternaehrer stepped down from RHI.  Accordingly, Voges remained a "Citco Defendant" until that time. Upon information and belief, Voges is a resident of The Netherlands.

> 3.    The Citco Group Subsidiary Defendants:
> SCM, RCM, RHI, CTI, CFS Cayman, CFS Europe,
> Citco Global, Citco Bank, CFS Company and CFS Corporation

59.    Defendant SCM is a limited liability company incorporated in 1999 under the laws of the Commonwealth of the Bahamas.  At the time of the Richcourt Acquisition, SCM had

three directors: Unternaehrer, Laddaga and Bloch, all of whom were employed by or affiliated with Citco.

60.     At all times relevant to this Complaint, SCM owned the voting shares of the Soundview Funds and acted as the Soundview Funds' investment manager pursuant to investment management agreements entered into between SCM and each of the Soundview Funds.  Upon information and belief, prior to the Richcourt Acquisition, SCM delegated some of its investment management responsibilities to RFA, which served as an investment advisor to the Soundview Funds from its headquarters in New York.  Upon information and belief, SCM's office has been in New York, New York since after the Richcourt Acquisition.

61.     Upon consummation of the Richcourt Acquisition in June 2008, ultimate majority ownership of SCM was transferred to RAI.  Citco Group continued to retain an ultimate minority ownership interest in SCM via CTI.  Initially, upon information and belief, the Citco Group and Unternaehrer continued to participate in the management and servicing of the Soundview Funds either directly or through certain of the Citco Defendants that they controlled.  Gradually, however, Fletcher and FAM asserted increasing control over SCM.

62.     Defendant RCM is a limited liability company incorporated in October 1990 in the British Virgin Islands as Citco Capital Management BVI Ltd.  It changed its name in May 1992 to RCM.  At the time of the Richcourt Acquisition, RCM had three directors: Unternaehrer, Smeets and Voges, all of whom were employees of or affiliated with the Citco Group of Companies.  At all times relevant to this Complaint, RCM owned the voting shares of the BVI Funds and acted as the BVI Funds' investment manager pursuant to investment management agreements entered into between RCM and each of the BVI Funds.  Upon information and

belief, prior to the Richcourt Acquisition, RCM delegated some of its investment management responsibilities to RFA, which served as an investment advisor. RFA was headquartered in New York and provided services to the BVI Funds in New York. Upon information and belief, RCM's office has been in New York, New York since after the Richcourt Acquisition.

63.     As described above, upon consummation of the Richcourt Acquisition in June 2008, ultimate majority ownership of RCM was transferred to Fletcher and FAM, who thereafter became involved with the management of the BVI Funds, although Citco Group continued to retain a minority ownership interest via CTI. Citco Group and Unternaehrer continued to assist with the management and servicing of the BVI Funds following the Richcourt Acquisition through certain of the Citco Defendants that they directed and controlled. However, over the following few years Fletcher and FAM asserted increasing control over RCM.

64.     Defendant RHI is a company incorporated on May 27, 2004 under the laws of the British Virgin Islands. At all times relevant to this Complaint, RHI has been the parent company of SCM and RCM, and the holding company for the Richcourt Group. In June 2008, pursuant to the Richcourt Acquisition, CTI sold majority ownership of RHI to RAI, a company affiliated with Fletcher and FAM. Prior to the Richcourt Acquisition, RHI had three directors: Unternaehrer, Bloch and Magris, all of whom were employed by or affiliated with Citco Group. After the Richcourt Acquisition and for the period relevant to this Complaint, RHI's directors were Fletcher, Unternaehrer, Kiely, Turner and Fletcher's brother, Todd Fletcher.

65.     Defendant CTI is a company incorporated under the laws of the British Virgin Islands. At the times relevant to this Complaint, CTI was wholly owned by Citco Group and, prior to the Richcourt Acquisition, CTI was RHI's parent company. In the Richcourt

Acquisition, CTI sold a majority interest in RHI to RAI. At the time of the Richcourt Acquisition, CTI had three directors: Laddaga, Bloch and Magris, all of whom were employed by or affiliated with Citco.

66. At all times relevant to this Complaint prior to the Richcourt Acquisition (the "**Pre-Acquisition Period**"), SCM, RCM, RHI and CTI were all part of the single integrated Citco Group of Companies directed and controlled by Citco Group. In addition, during the Pre-Acquisition Period, SCM, RCM, RHI and CTI were all managed by the same six individuals, all of whom were employed by or affiliated with Citco: (a) Unternaehrer, who was a director of SCM, RCM and RHI and a member of the Citco Executive Committee; (b) Laddaga, who was a director of SCM and CTI; (c) Bloch, who was a director of SCM, RHI and CTI; (d) Magris, who was a director of RHI and CTI; and (e) Smeets and Voges, who were directors of RCM and members of the Citco Executive Committe. Throughout the Pre-Acquisition Period, SCM, RCM, RHI and CTI all acted as agents of and at the direction of Citco Group, and when their actions were dictated by those entities' officers or directors, the officers or directors were themselves employed by, agents of or acting in the interests of Citco Group. After the Richcourt Acquisition, SCM, RCM and RHI became majority owned by Fletcher and FAM, but the role of Citco Group and CTI in the Citco Group of Companies did not change.

67. In light of the close business relationship between Unternaehrer, Smeets, Voges, Laddaga, Bloch and Magris, and the fact that at least two of them sat together on each of the SCM, RCM, RHI and CTI Boards, each of them knew, upon information and belief, all of the relevant facts that the others acquired in connection with their management and servicing of the Richcourt Funds or in their dealings with Fletcher and FAM. In addition, because they were each agents of each company they worked for and acted with the knowledge imputed to those

companies, each of these six individuals' relevant knowledge is properly imputed to each of the others, the Citco Group and the other Citco Defendants.

68.      Defendant CFS Cayman is incorporated under the laws of the Cayman Islands and maintains an office at 89 Nexus Way, 2nd Floor, Camana Bay, PO Box 31106, Grand Cayman KY1 – 1205.  CFS Cayman entered into agreements with each of the Soundview Debtors and the BVI Funds pursuant to which it agreed to provide financial and accounting services, administrative, registrar and transfer agency services, corporate and registered office services and middle office services.  These services were to be provided from at least September 2005 for Soundview Elite (the "**Elite Administration Agreement**"), the BVI Funds (the "**BVI Administration Agreement**"), and Soundview Star (the "**Star Administration Agreement**"), and from January 2006 for Soundview Premium (the "**Premium Administration Agreement**," and together with the three foregoing Administration Agreements, the "**Citco Administration Agreements**").  In January 2009, following the Richcourt Acquisition, the Citco Administration Agreements were replaced with a master administration and middle office services agreement (the "**Citco Master Administration Agreement**") to which each of the Richcourt Funds agreed pursuant to separate adherence agreements.   The material terms of the Citco Master Administration Agreement were substantially the same as the terms of the Citco Administration Agreements.

69.      Defendant CFS Europe is incorporated under the laws of the Netherlands and maintains an office at Telestone 8, Teleport, Naritaweg 165, 1043 BW Amsterdam, The Netherlands.  Since at least September 2005, for Soundview Elite, Soundview Star and the BVI Funds, June 2007 for Soundview Premium, and April 2009 for the Designated Funds, CFS

Cayman delegated responsibility for some of its duties under the Citco Administration Agreements (and later the Citco Master Administration Agreement) to CFS Europe.

70.    The Citco Administrators – CFS Cayman and CFS Europe – are part of the Fund Services Division of Citco, which is directed and controlled by Citco Group through the Citco Executive Committee.  The companies in this division, including the Citco Administrators, act principally as administrators to hedge funds and this function has been described by Citco Group as one of its "core businesses."  At all times relevant to this Complaint, the Fund Services Division operated through four "strategic centers" located in New York, Toronto, Amsterdam and Dublin.

71.    Defendant Citco Global is a company incorporated in Curaçao.  Upon information and belief, Citco Global maintains an office at De Reuterkade 62, P.O. Box 707, Willemstad, Curaçao.  Citco Global acted as custodian of:  AAI since November 1, 1990; RAF and RAB since November 1, 1996; RES since August 1, 2000; RCI since May 24, 2004; Soundview Star since January 17, 2005; Optima since July 1, 2005; Soundview Premium since December 28, 2005; Soundview Elite since at least June 2005; and the Designated Funds since, upon information and belief, in or around April 2009.  Upon information and belief, in providing custodial services to the Richcourt Funds, Citco Global regularly communicated with, received information from, and relayed information to individuals responsible for managing and advising the Funds in New York.

72.    Defendant Citco Bank is a company incorporated in Curaçao, with offices at De Reuterkade 62, P.O. Box 707, Willemstad, Curaçao.  Citco Bank has acted as the principal bank of:  AAI since November 1, 1990; RAF and RAB since November 1, 1996; RES since August 1,

2000; RCI since May 24, 2004; Soundview Star since January 17, 2005; Optima since July 1, 2005; Soundview Premium since December 28, 2005; Soundview Elite since at least June 2005; and the Designated Funds since, upon information and belief, in or around April 2009.  These bank accounts were located with Chase Manhattan Bank in New York, as well as in Amsterdam, Frankfurt and Zurich.  Upon information and belief, in providing its banking services to the Richcourt Funds, Citco Global regularly communicated with, received information from, and relayed information to individuals responsible for managing and advising the Funds who were based in New York.

73.     Defendants CFS Company and CFS Corporation are each exempted companies incorporated under the laws of the Cayman Islands.  Prior to the Richcourt Acquisition, the Citco Directors CFS Company and CFS Corporation served as the sole directors of the Soundview Funds and the BVI Funds.

74.     At all times relevant to this Complaint, Citco Global and Citco Bank were indirect subsidiaries of Citco Group, and the Citco Directors were affiliates of the Citco Group and of the Citco Administrators, Citco Global and Citco Bank.

4.     Other Relevant Citco Group Personnel

75.     Keunen is employed by Citco Fund Services (USA) Inc., which is incorporated in the State of New York and maintains an office at 350 Park Avenue, 29th Floor, New York, N.Y. 10022.  Since June 2001, Keunen has served as the global director of the Fund Services Division of Citco.  Upon information and belief, each fund services office in Citco, including the Citco Administrators, is run by a managing director who reports directly to Keunen.

5.    Citco Group's Integrated Operations

76.    At all times relevant to this Complaint, Citco operated as an integrated global organization under the direction and control of Citco Group.  Citco Global and Citco Bank were each subsidiaries of Citco Group and were ultimately directed and controlled by Citco Group. Also, the Citco Directors were subject to the direction and control of SCM and RCM and, during the Pre-Acquisition Period, were ultimately directed and controlled by Citco Group as well as, upon information and belief, members of the integrated Citco Group of Companies.  Thus, Citco Global, Citco Bank, the Citco Directors, Citco Group and the other Citco Defendants should be treated as a single company for all purposes.

77.    The Citco web site makes numerous statements which indicate or emphasize the fact that Citco, under the direction and control of Citco Group, operates and has long operated as a single integrated company with a centralized control structure.  As of early August 2015, the web site stated:

- The Citco Group of Companies has "more than 5,000 staff in over 40 countries," which includes, upon information and belief, the staff of Citco Group's many subsidiaries.

-  "Citco Fund Services companies offer a full range of fund administration services from 19 strategic centers globally.  Our global presence reflects our philosophy to provide support wherever our clients are located."

- The Citco Fund Services Division has "a global team of 3,000 experienced, knowledgeable and highly trained staff to ensure that each fund is supported appropriately and service quality standards are not only met, but consistently exceeded."  The web site also refers to these three thousand individuals as "our staff."

- Under "Locations," the web site identifies three New York offices of Citco companies as well as Defendants CFS Cayman, CFS Europe and Citco Bank.  In July 2015, Citco Group announced that it will also open a new "Gateway Center" in New York to attract customers for the services the Citco offers throughout the world.

- The web site's "Contact" tab includes contact information for Defendants CFS Cayman, CFS Europe and Citco Bank as "our contact information."

- The Fund Services tab of the web site has a link to downloadable brochures.  The Hedge Fund Administration Services brochure is headed with Citco' distinctive logo and states that "Citco Group companies are a global business with 5,500 staff and 50 offices."  The brochure also includes a disclaimer on behalf of Defendant CFS Cayman and its affiliates, which it refers to by the abbreviated forms "Citco" or "CFS," and which concludes with a copyright notice in the name of "Citco Group Limited."  The Fund of Funds Services brochure includes the same disclaimer.

78.     On information and belief, at all times relevant to this Complaint, many of the Citco Defendants shared a single email system with the address, "@citco.com."  Citco's web site provides @citco.com contact addresses for a large number of its subsidiaries and affiliates, including Defendants CFS Cayman, CFS Europe and Citco Bank.  Also, Citco's web site includes an "email disclosure" on behalf of "Citco, its subsidiaries and affiliates."  On information and belief, at all relevant times, some or all financial services employees of Citco Group, its subsidiaries and affiliates were directed to include links to the disclaimer on Citco' web site in their emails.

79.     Each office in Citco's Fund Services Division reports through a chain of command from the managing director to Keunen to the Citco Executive Committee (of which

Unternaehrer is a member). Accordingly, based on Citco Group's statements, each entity in the Fund Services Division, including the Citco Administrators, acted at all times relevant to this Complaint as an agent of the Citco Executive Committee and Citco Group.

80.    The Citco Administration Agreements and the Citco Master Administration Agreement both state that the administrative services provided by the Citco Administrators can be delegated to any member of "the Citco Group" without prior notification to the Soundview Funds. Consistent with Citco Group's practice of having all of its divisions operate together as a unified company, "the Citco Group" was defined in the Citco Administration Agreements and the Citco Master Administration Agreement as "the Citco Group Limited . . . and its subsidiaries and affiliates for the time being." (Elite Administration Agreement, at 1.)

81.    The Citco Administrators have direct, substantial and continuous contacts with New York. The Citco Administrators provided extensive fund administration services to funds operated from New York City, including funds managed by FAM (such as the Richcourt Funds, prior to their bankruptcy and liquidation proceedings). The Citco Administrators also directed that payment of their services for the Richcourt Funds should be made to a bank account maintained in CFS Cayman's name with HSBC's offices located at 452 Fifth Avenue, New York, NY. In providing their administrative services to the Richcourt Funds, the Citco Administrators also regularly communicated with, received information from and relayed information to individuals responsible for advising the Richcourt Funds, who were based in New York.

D.      **The Fletcher Defendants and Other Relevant Personnel**

1.      Fletcher

82.     Defendant Fletcher is an individual who maintains a residence at 1 West 72nd Street, New York, New York 10023 and a place of business at 48 Wall Street, New York, New York 10005.  Fletcher founded FAM in 1991 and since then has served as its Chairman and Chief Executive Officer.  At all times relevant to this Complaint, Fletcher has been the sole ultimate owner of FAM and has controlled it.  At various times relevant to this Complaint after the Richcourt Acquisition, Fletcher served as a director of the Richcourt Funds, RCM, SCM and RHI.

2.      The Fletcher Entity Defendants: FAM, FII

83.     Defendant FAM is an investment advisor incorporated in Delaware with its principal place of business at 48 Wall Street, New York, New York 10005.  At all times relevant to this Complaint, FAM has been owned, controlled and operated by Fletcher, assisted by certain of his associates, including Defendants Kiely, Turner, Ladner, Muho and Saunders.  Fletcher has served as FAM's Chairman and Chief Executive Officer since its founding.  After the Richcourt Acquisition and until the Richcourt Funds' bankruptcy and liquidation filings, FAM assumed responsibility as the Funds' chief investment advisor and, with assistance and advice from various Citco and Fletcher Defendants, managed the Funds.

84.     Defendant FII is a corporation incorporated under the laws of the State of Delaware, with its principal place of business located at 48 Wall Street, New York, New York 10005.  At times relevant to this Complaint, FII was ultimately owned, controlled and operated

-33-

by Fletcher, assisted by certain of his associates, including Defendants Ladner, Muho and Saunders.

        3.      The Fletcher Individual Defendants:
                  Ladner, Muho, Kiely, Turner and Saunders

85.    Defendant Ladner is an individual who, upon information and belief, maintains a residence in North Carolina and a place of business at 48 Wall Street, New York, New York 10005.  At times relevant to this Complaint, Ladner served as a director of FII, RCM, SCM and certain of the Richcourt Funds, and he was a consultant or adviser for FAM.  In connection with his service as director and officer of these entities, Ladner has travelled to and participated in meetings in New York.  He also participated in telephone and email communications into and out of the State of New York.

86.    Defendant Muho is an individual who, upon information and belief, maintains a residence in Miami, Florida.  From September 4, 2012 through April 3, 2013, Muho served as a director of, *inter alia*, SCM, RCM and certain of the Richcourt Funds.  In connection with his service as director, Muho travelled to, communicated with people in and participated in meetings in New York.

87.    Defendant Saunders is an individual who, upon information and belief, maintains a residence on 25th Street in Manhattan and a place of business at 48 Wall Street, New York, New York 10005.  At times relevant to this Complaint, Saunders served as corporate secretary of FAM and FII, President and director of FILB, as well as director of, among other entities, SCM, RCM and the Richcourt Funds.  In connection with his service in these capacities, Saunders

participated in meetings in New York and in telephone and email communications into and out of the State of New York.

88.     Defendant Kiely is an individual who, upon information and belief, currently resides in Cold Spring Harbor, New York.  Kiely worked closely with Fletcher for over 15 years and described himself in testimony before the U.S. Securities and Exchange Commission as Fletcher's right-hand man.  From on or about October 1, 1996 through on or about November 21, 2011, Kiely was employed by or otherwise affiliated with FAM and various of its subsidiaries and affiliates.  During at least part of that time, Kiely served as a director of each of FAM, FILB, Leveraged and Arbitrage as well as in other capacities.

89.     At the time of the Richcourt Acquisition, Kiely was a director of RAI and, in that capacity, signed transaction documents to complete the Richcourt Acquisition.  Upon completion of the Richcourt Acquisition, Kiely was appointed as a director of each of the Soundview Funds, RCM, SCM and each of the BVI Funds as well as of numerous other management companies and funds in the Richcourt Group.   Kiely remained a director of those Richcourt Group companies until November 2011.

90.     Defendant Turner is an individual who currently resides in New York, New York. He was a long-time business associate of Fletcher.  FAM first employed him in October 1998 as a managing director and he later became a consultant for FAM, serving in that capacity until February 2003.  After leaving FAM in February 2003, Turner returned in October 2005 as a director of FAM and remained employed by, a consultant to, or otherwise affiliated with FAM and various of its subsidiaries and affiliates until approximately June 2012.  During at least part of that time, Turner served as a director of each of FILB, Leveraged and Arbitrage, as well as in

other capacities.  At the time of the Richcourt Acquisition, Turner was a director of RAI and, in

that capacity, signed certain transaction documents to complete the Richcourt Acquisition.

Following completion of the Richcourt Acquisition, Turner was appointed as a director of each

of the Soundview Funds, RCM, SCM and each of the BVI Funds as well as of numerous other

management companies and funds in the Richcourt Group.  Due to a consensual resolution, the

Trustee does not assert claims against Turner in this action.

## JURISDICTION AND VENUE

91.    This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b) and this

Court has jurisdiction and power under that statute to hear and determine it.  Under Rule 7008-1

of the Rules of the United States Bankruptcy Court for the Southern District of New York (the

"**Bankruptcy Court**"), the Trustee and the Joint Liquidators consent to the entry of final orders

or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent the

consent of the parties, cannot enter final orders or judgment consistent with Article III of the

United States Constitution.

92.    This adversary proceeding is commenced pursuant to, *inter alia*, sections 101,

105(a), 502, 510, 541, 542, 544, 547, 548, 550 and 551 of the Bankruptcy Code; sections 273-

279 of the New York Debtor and Creditor Law; the general equity powers of the Bankruptcy

Court; and Rules 6009 and 7001 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**").

93.    The Bankruptcy Court has jurisdiction over this adversary proceeding under 28

U.S.C. § 1334.  By virtue of 28 U.S.C. § 157(b) and Amended Standing Order of Reference

M10-468 of the United Stated District Court for the Southern District of New York, dated January 31, 2012, this adversary proceeding is automatically referred to this Court.

94.    On September 15, 2015, this Court entered an order granting recognition of the BVI Funds' BVI Proceedings pending before the BVI Court as foreign main proceedings pursuant to section 1517(b)(1) of the Bankruptcy Code.  In addition, the BVI Court granted sanction to the Joint Liquidators to pursue the claims asserted in this Complaint by order made on September 18, 2015.

95.    This Court has personal jurisdiction over all of the Defendants.

96.    Venue for this adversary proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL ALLEGATIONS

## I.    THE CITCO DEFENDANTS' MANAGEMENT OF THE RICHCOURT FUNDS

### The Citco Defendants Directed and Managed the Richcourt Funds on a Day-to-Day Basis

97.    Citco may be best known today as a service provider, but its business was not always so limited.  In its earlier days, Citco Group also created and managed investment funds.

98.    In 1992, Citco Group created the Richcourt Group, a family of investment funds and companies for which it provided investment management and advisory services. Unternaehrer himself established the first Richcourt fund in 1992, only one year after he joined Citco.  Thereafter, Unternaehrer remained an integral part of managing the Richcourt Group, continuing even after the Richcourt Acquisition in June 2008.

99.    The Richcourt Funds began as funds within the Richcourt Group.  Prior to the Funds' bankruptcies and liquidation proceedings, the overwhelming majority of the redeemable,

non-voting shares in the Funds were owned by investors who had purchased them pursuant to subscription agreements. For example, prior to the Richcourt Acquisition, Soundview Elite's authorized share capital consisted of 5 million shares divided as follows: (a) 100 voting non-participating shares having a par value of $0.01 per share; (b) 2,499,900 participating non-voting shares having a par value of $0.01 per share; and (c) 2,500,000 participating non-voting shares having a par value of €0.01 per share.

100.    All of the Richcourt Funds' voting shares were indirectly owned by Citco Group. SCM or RCM owned the shares, and those entities were in turn wholly owned by RHI, whose direct parent company was CTI. Citco Group owned all of the shares in CTI.

101.    Citco Group ensured that potential investors in the Richcourt Funds were aware of Citco Group's relationship with SCM and RCM. A February 2008 presentation for Soundview Elite, for example, stated that "[SCM] is an indirect wholly-owned subsidiary of Richcourt Inc., a British Virgin islands company that is owned by the Citco Group Limited." (Presentation for Soundview Elite, dated February 2008, at 22). From their inception until the Richcourt Acquisition, SCM, RCM, RHI and CTI were all directed and controlled by, and functioned as agents or alter egos of, Citco Group via the Citco Executive Committee. Upon information and belief, SCM, RCM, RHI and CTI all formed part of the single, integrated Citco. And CTI, which remained an affiliate of Citco Group even after the Richcourt Acquisition, remained part of the single, integrated Citco.

102.    Citco Group ensured that, until the Richcourt Acquisition, SCM, RCM, RHI and CTI were all managed by the same six individuals: Unternaehrer, Smeets, Voges, Bloch, Laddaga and Magris. Unternaehrer, a member of the Citco Executive Committee, was a director

of SCM, RCM and RHI; Smeets and Voges were members of the Citco Executive Committee and directors of RCM; Bloch was a director of SCM, RHI and CTI; Laddaga was a director of SCM and CTI; and Magris was a director of RHI and CTI.

103.    At the times relevant to this Complaint, Unternaehrer, Smeets, Voges, Bloch, Laddaga and Magris were all employed by and held high positions in Citco.  Each had worked for Citco for several years:  Smeets joined in 1975, Voges joined in 1980, Unternaehrer and Bloch joined in 1991, Laddaga joined in 1999, and Magris joined in 2001.

104.    At the time of the Richcourt Acquisition, Unternaehrer, Smeets, Voges, Bloch, Laddaga and Magris all held positions of great responsibility within Citco.  Smeets was the President, the CEO and a director of Citco Group, and Voges was the Vice President and an Executive Director of Citco Group.  Both were members of the Citco Executive Committee. Unternaehrer was a member of the Citco Executive Committee and a director of the Citco Financial Services Division.  Bloch had previously served as Financial Officer of the Financial Services Division of Citco and served, at times relevant to this Complaint, as Financial Officer of the Richcourt Group.  Laddaga and Magris also held significant positions with Citco.  And all six of these individuals were appointed as directors of entities in the Richcourt Group.

105.    In fact, Unternaehrer, Smeets, Voges, Bloch, Laddaga and Magris together were directors of nine of the ten non-fund management companies that Citco Group transferred to Fletcher and FAM in the Richcourt Acquisition, and Unternaehrer himself was a director of eight of them.  These nine companies were as follows:  (i) RHI, of which Unternaehrer, Magris and Bloch were directors; (ii) Richcourt (Monaco) S.A.M., of which Bloch and RHI (represented by Magris) were directors; (iii) RCM, of which Unternaehrer, Smeets and Voges were directors;

(iv) Richcourt Group S.A., of which the directors included Unternaehrer; (v) SCM, of which Unternaehrer, Laddaga and Bloch were directors; (vi) Richcourt (Suisse) S.A., of which the directors included Unternaehrer; (vii) New Wave Asset Management Ltd., of which Magris and Unternaehrer were directors; (viii) Citco Richcourt (Luxembourg) S.A., of which the directors included Unternaehrer; and (ix) Richcourt Fund Advisors S.A.S., of which Unternaehrer was the director.

106.    Unternaehrer, Smeets, Voges, Bloch, Laddaga and Magris were pervasively involved in the management of the companies in the Richcourt Funds' corporate structure as well as Citco and the Richcourt Group more generally.  Smeets and Voges were members of the Citco Executive Committee as well as directors of RCM.  Also, Unternaehrer was simultaneously a member of the Citco Executive Committee, a director of SCM and RCM, and a director of their parent company RHI.  As a result, upon information and belief, SCM, RCM, RHI, CTI, Citco Group and the other Citco Defendants each shared all of the relevant information that any of the six individuals had concerning the Richcourt Funds, the Richcourt Group, Fletcher, FAM and the Richcourt Acquisition.  Further, given that Unternaehrer, Smeets, Voges, Bloch, Laddaga and Magris were each agents of numerous entities in Citco, any knowledge any of them had is properly imputed to the other five, as well as to SCM, RCM. RHI, CTI, Citco Group and the other Citco Defendants.

107.    The Richcourt Funds were each launched as part of the Richcourt Group between 1996 and 2006:  RAB and RAF were launched on November 1, 1996, RES on August 1, 2000, Soundview Elite on November 1, 2003; Soundview Star on January 1, 2005; Optima on July 1, 2005, Soundview Premium on January 1, 2006, RCI on January 1, 2007, and AAI on February 1, 2008.  Each Fund was structured as a "fund of funds," meaning that its portfolio consisted of

investments in other investment funds.  The Soundview Funds' stated investment strategy was to provide investors *i.e.*, the participating shareholders – with direct exposure to a select group of the most sought after hedge fund managers who had demonstrated the ability to make money under a variety of market conditions.  Unlike traditional funds of funds, the Soundview Funds only invested in investment funds that were "closed," meaning that they no longer accepted additional investments from the general investing public.

108.    At all times relevant to this Complaint, SCM was the investment manager of the Soundview Funds and RCM was the investment manager of the BVI Funds.  Citco Group founded RCM in 1990 and SCM in 1999 to allow its clients to gain access to a group of hedge fund managers who had a key role in the hedge fund industry.  Investment managers perform a critical role for the funds they manage because they are responsible for implementing the funds' investment strategies.  The success or failure of a fund, therefore, depends in large part upon the performance of its investment manager.  SCM and RCM performed this critical role for the Richcourt Funds by determining with which investment managers the Funds would invest.

109.    SCM's and RCM's responsibilities were enumerated in separate, although substantially identical, investment management agreements with each of the Richcourt Funds (the "**IMAs**").  Pursuant to these IMAs, Citco Group caused the Soundview Funds to appoint SCM, and the BVI Funds to appoint RCM, as their "true and lawful agent and attorney-in-fact" and SCM and RCM undertook, *inter alia*: (a) to cause the Funds they managed to make investments in other investment funds or trading vehicles and to execute all appropriate documentation in connection with such investments; and (b) to monitor the performance of the investment funds or trading vehicles in which the Funds were invested.

110.     Further, each Richcourt Fund expressly appointed SCM or RCM in its IMA as "the investment manager of the Fund" and as its "true and lawful agent and attorney-in-fact," "to cause the Fund to subscribe for shares, partnership interests, membership interests and other ownership interests …in Trading Vehicles…" and "to execute, deliver and enter into such Trading Vehicle subscription agreements…on such terms and conditions as the Investment Manager, in its sole and absolute discretion, deems necessary, appropriate or advisable in connection with investing the Fund's assets (the "Assets")…."   The Richcourt Funds also appointed SCM or RCM as agent "to select, add, substitute, replace and remove money managers and sub-advisors to manage all or a portion of the Assets…" and to "monitor the performance of" the Funds' investments, money manager and sub-advisor.  The Richcourt Funds specifically authorized SCM or RCM to choose RFA, in which Unternaehrer played a leading role, as a sub-advisor.

111.     The IMAs imposed additional specific duties on SCM and RCM.  Each assumed an express duty to "direct the management, investment and allocation of the Assets using the Investment Manager's proprietary investment strategies and methodologies in a manner consistent with the disclosures contained in the [Private Placement] Memorandum."  SCM and RCM agreed to perform their obligations with due care by agreeing to be liable for "acts or omissions which constitute negligence, willful misconduct or reckless disregard of the Investment Manager's duties."  SCM and RCM also acknowledged that "the Fund may at any time remove all its assets" from their management on ninety days' notice.

112.     In addition, SCM and RCM agreed to provide the Richcourt Funds with the information each would need in order to decide whether to remove its assets or terminate SCM's or RCM's management.  In clause 1(e) of each of the IMAs, SCM and RCM undertook to "make

all material disclosures to the Fund regarding itself and its officers, directors, shareholders, employees, affiliates and any person who controls the foregoing (collectively, "Principals and Affiliates"), their investment performance and general investment methods … and otherwise  . . . as are required in the reasonable judgment of the Fund … or by any applicable law, regulation, rule or order or as are deemed necessary by the Fund to enable it to monitor the performance of the Investment Manager."   The inclusion of this express duty in the IMAs underscores the importance to the Richcourt Funds (and their investors) of ensuring they received all material information regarding any person controlling SCM, RCM or their affiliates/shareholders, and any potential conflicts of interest they might have.

113.    Essentially, the Richcourt Funds handed over the task of choosing their investments to SCM and RCM, placing their complete trust and confidence in them as their agent for that purpose.  The Richcourt Funds also relied on and trusted SCM and RCM to manage their investments in accordance with the Funds' best interests and stated investment strategies, as SCM and RCM agreed to do in the IMAs.   SCM, RCM and the Citco Group officers who controlled them were well aware of and accepted this trust and confidence, and, as the Funds' agents, owed both contractual and fiduciary duties to the Richcourt Funds to manage and invest the Funds' assets with due care, loyalty and candor.

114.    To the extent that SCM or RCM was liable for "negligence, willful misconduct or reckless disregard of the Investment Manager's duties" under the IMA, they each agreed to "indemnify and hold harmless the Fund from and against any and all Losses," defined to include "losses, claims, damages, liabilities, costs and expenses (including, without limitation, attorneys' and accountants' fees and disbursements)…."

115.    The broad definition of "Principals and Affiliates" in the IMAs, which included "any person who controls the foregoing," provides an additional indication of the fact that Citco Group presented itself as operating as a single unified organization with respect to the management of the Richcourt Funds.  It also shows that Citco Group encouraged investors to place a high degree of trust and confidence in each Citco Group individual, subsidiary or affiliate who controlled RCM and SCM – including Citco Group, Unternaehrer, Smeets, Voges, Laddaga, Magris, Bloch, CTI and RHI – and that it expected them to do so.

116.    Unternaehrer, through his control of SCM and RCM and their New York sub-advisor RFA, was the individual primarily responsible for managing the Richcourt Funds' investments.  In addition to being a director of RCM and SCM, he was President of both of their Allocation Committees and RFA's Allocation Committee, as well as a member of the Citco Executive Committee, through which Citco Group had ultimate direction and control over Unternaehrer and all the Citco Defendants.

117.    Upon information and belief, the Allocation Committees were responsible for making decisions with respect to the allocation of the Richcourt Funds' investments among funds and fund managers.  For example, the February 2008 presentation for Soundview Elite stated that the Soundview Funds were "managed based on the qualitative judgment of the members of [their] Allocation Committee and their general knowledge of the hedge fund industry .... The Allocation Committee will rely on its general knowledge of the hedge fund industry and of the particular hedge fund manager's reputation within the industry when making allocation decisions."  (Presentation for Soundview Elite, dated February 2008, at 23).

118.    The Richcourt Funds therefore were induced to place a high degree of trust and confidence in Unternaehrer, through his control of RCM and SCM, to manage their investments in their best interests and with the care and loyalty properly to be expected of a fiduciary.   Upon information and belief, presentations in the same format as the February 2008 presentation were prepared on a monthly basis by an employee of the Richcourt Group for SCM and RCM and provided to the Funds' investors through, *inter alia*, Laddaga, who was one of SCM's directors and himself a member of the Allocation Committees.

119.    Citco Group further participated in the management of the Richcourt Funds by appointing its own agents and affiliates, the Citco Directors, as the Funds' directors.   The Richcourt Funds' continued retention of the Citco Directors in this position was within Citco Group's sole discretion because SCM and RCM, as the Funds' sole voting shareholders and entities controlled by Citco Group, controlled the election and removal of the Funds' directors. For example, Soundview Elite's PPM dated June 2005 stated the following with respect to the responsibilities of the Citco Directors:

> They are responsible for managing the business and affairs of the Fund, including supervision of the activities of the Administrator, Subadministrator and Middle-Office Service provider and the maintenance of corporate records.  The Directors establish and maintain the Fund's bank, custodial and other accounts and may exercise the power of the Fund under its Articles of Association to borrow and lend money.

(Soundview Elite PPM, dated June 2005, at 13.)

120.    The Citco Directors were agents and fiduciaries of the Richcourt Funds.   The Richcourt Funds placed a high degree of trust and confidence in the Citco Directors to monitor and supervise the Funds' operations, including the Funds' borrowing and lending of money.

Accordingly, the Citco Directors owed fiduciary duties of care, loyalty and candor to each of the Richcourt Funds.

**The Richcourt Funds Paid the Citco Defendants Fees As Their Sole Service Provider**

121.    Citco Group's involvement with the Richcourt Funds was not limited to direction and investment management of the Funds. Citco Group also provided all of the services required to operate the Richcourt Funds. In particular, subsidiaries or affiliates of Citco Group acted as administrator, middle-office service provider, registrar and transfer agent, custodian and bank for the Funds. The Richcourt Funds paid Citco Group and its subsidiaries or affiliates substantial fees for these services. As described above, these subsidiaries and affiliates were ultimately directed and controlled by Citco Group through the Citco Executive Committee.

122.    The Citco Administrators – *i.e.*, CFS Cayman and CFS Europe – had three primary tasks as administrators of the Richcourt Funds. First, they maintained the Richcourt Funds' financial and accounting books and records. This task included processing transactions and corporate actions, reconciling the Richcourt Funds' bank accounts and portfolio holdings, and calculating each Fund's net asset value ("**NAV**") and fees.

123.    Second, the Citco Administrators prepared monthly financial statements for the Richcourt Funds which included statements of the Funds' assets and liabilities, operations, changes in NAV and portfolio holdings. Third, the PPMs for the Richcourt Funds stated that the Citco Administrators were tasked with "communicating with the Funds' shareholders" and "preparing financial statements and periodic reports to shareholders." (PPM for Soundview Elite dated June 1, 2005, at 13).

124.    Pursuant to the Citco Administration Agreements, the Citco Administrators also agreed to serve as each of the Richcourt Funds' middle office service provider and registrar and transfer agent. The primary role of a registrar and transfer agent is to receive and process subscription, transfer and redemption requests and payments to and from investors. This required the Citco Administrators to issue or cancel securities in the Richcourt Funds. As registrar, the Citco Administrators assisted with the establishment and maintenance of the Richcourt Funds' bank accounts and acted as authorized signatory on those accounts. This role also included disbursing payments for third party fees and maintaining registers of the holders of the Richcourt Funds' securities.

125.    The services provided by the Citco Administrators as middle-office service provider essentially involved processing and administering the Richcourt Funds' investments as directed by SCM or RCM. Upon receiving instructions from RCM or SCM, the Citco Administrators would typically submit to the custodian, which in this case was Citco Global, subscription and redemptions requests in respect of the Richcourt Funds' investments. Upon receipt from Citco Global of trade confirmations, the Citco Administrators would reconcile those confirmations and notify SCM or RCM of any discrepancies or missing confirmations. The Citco Administrators also monitored compliance with the Richcourt Funds' investment restrictions (as set out in the PPMs) and, where possible, independently verified prices of the underlying funds in which the Funds were invested. Finally, the Citco Administrators would report on the cash management of each Richcourt Fund, including notifying SCM and RCM of any necessary liquidity requirements.

126.    The Citco Administration Agreements include at least two clauses which emphasize the Citco Administrators' role as part of the single, integrated Citco. One clause bars

delegation to anyone other than a Citco Group member without special authorization.  The other indemnifies a very broad range of Citco Group officers.

127.    Other Citco Group affiliates were paid to provide additional services to the Richcourt Funds.  Citco Global was the Richcourt Funds' custodian.  In that capacity, Citco Global held the shares comprising the Richcourt Funds' investment portfolios and transacted in those securities on behalf of and in the name of the Funds.  Citco Global also acted as custodian for certain external investors of the Richcourt Funds.

128.    Citco Bank provided the Richcourt Funds with brokerage services, meaning that Citco Bank effectuated purchase and sale transactions in the names of the Funds, Citco Bank or Citco Global (as custodian).  For each executed transaction, Citco Bank provided the Richcourt Funds with a contract note evidencing the transaction.  Citco Bank also held the bank accounts of the Richcourt Funds, into which investors were directed to pay their subscription monies.  These bank accounts were held with Citco Bank in New York, Amsterdam, Frankfurt and Zurich.

129.    In managing all aspects of the Richcourt Funds, the Citco Group made an effort to ensure that there were open lines of communication between the investment management and administrative service providers that it controlled.  For example, the Citco Administration Agreements obligated the Citco Administrators, in their provision of middle-office services, to "[a]ct[] as the liaison between the Investment Manager, Investment Advisor and the Funds' Custodian, enhancing the relationship between the various counterparties to the Fund, communicating relevant information to them and seeking new opportunities and efficiencies." (Elite Administration Agreement, Schedule 2, at (h)).  Citco Group therefore recognized that

ensuring that all parties involved with the management and servicing of the Funds were aware of what the others were doing was crucially important to the Richcourt Funds.

130.    Citco Group, through the Citco Defendants, was involved in all aspects of the management and servicing of the Richcourt Funds.  Not only did it process subscriptions and redemptions into and from the Funds, and process investments and redemptions by the Funds' themselves, but by means of its affiliates, Citco Group also reconciled the Funds' asset, cash and portfolio positions, monitored the Funds' adherence to their investment restrictions, executed the Funds' various investments, and held the Funds' bank accounts.  In addition, Citco Group ensured that its affiliates and subsidiaries were paid fees by the Richcourt Funds for the services the Citco Defendants provided.

131.    Citco Group, through the Citco Defendants, therefore was regularly informed concerning who was investing in and redeeming from the Richcourt Funds, when and in what amounts; what the Funds' positions were in terms of cash, assets and liabilities and underlying investments; the movements of the Funds' monies and their liquidity needs; and whether the Funds' investments were in accordance with relevant investment restrictions.

**The Citco Defendants Each Owed Fiduciary Duties to the Richcourt Funds**

132.    During the Pre-Acquisition Period, the Citco Defendants simultaneously acted as the Richcourt Funds' voting shareholders, directors, investment managers, administrators, middle-office service providers, registrars and transfer agents, custodians and bank.  All aspects of the Richcourt Funds' daily activities were handled by the Citco Defendants.  The Richcourt Funds had no employees of their own and of necessity placed their entire trust and confidence in

the Citco Defendants to function on a daily basis. The Citco Defendants fully accepted the

Funds' trust and confidence.

133.   The Citco Defendants were also responsible for monitoring, processing and

recording all aspects of the Richcourt Funds' activities.  Above all, the Richcourt Funds placed

their utmost trust and confidence in the Citco Defendants, as the Citco Defendants knew and

accepted, by entrusting them with the Funds' money and authorizing the Citco Defendants to

manage that money in the Funds' name.

134.   All of the Citco Defendants, whether as part of one single integrated entity, as

agents, as alter egos, in their own capacities, or in some combination of these, were fiduciaries of

the Richcourt Funds. As such, they were obligated at all times to act consistently with their

duties of care, candor and loyalty and in the Richcourt Funds' best interests.  These duties

required them, for example, to disclose any conflicts of interests and not to engage in any form

of self-dealing.  Nevertheless, as described below, the Citco Defendants breached each and every

one of these fiduciary duties by taking actions that served their own interests but were

devastating to the interests of the Richcourt Funds.

## II.    THE RICHCOURT ACQUISITION – CITCO SELLS THE RICHCOURT FUNDS TO FLETCHER DESPITE HIS LACK OF SUFFICIENT ASSETS AND HIS HISTORY OF MISUSING INVESTORS' FUNDS

**The Citco Defendants Knew That Fletcher Lacked
Sufficient Assets to Manage the Richcourt Funds and
That He Had Misused Investors' Funds**

135.   Since the late 1990's, Fletcher, through his wholly-owned New York based

investment management company, FAM, managed the investments of a master-feeder fund

structure.  Whereas FAM portrayed itself as a successful and experienced fund manager, in fact

FAM, and its management and employees, had been perpetrating a long-running fraud against the funds it managed. Their misconduct included misusing investors' money for their own benefit and inappropriately taking inflated management fees.

136.    Master-feeder fund structures are commonly used in the fund industry to pool capital raised from investors in one central vehicle called a "master fund." Instead of investing directly with the master fund, investors purchase interests in separate vehicles or "feeder funds," which in turn invest their assets in the master fund. Typically, the master fund (by its investment manager) makes and holds all of the portfolio investments and conducts trading activity, although the management and performance fees are generally payable to the investment manager at the feeder fund level.

137.    The master fund in the master-feeder fund structure managed by FAM was FILB. The three primary feeder funds were each exempted companies incorporated in the Cayman Islands: (a) Arbitrage; (b) Leveraged; and (c) Fletcher Fixed Income Alpha Fund, Ltd. ("**Alpha**"). An additional entity, FII, appears to have acted as both a master and a feeder fund.

138.    Fletcher's fund structure was designed to work as follows. Alpha and Leveraged invested the subscriptions they received in Arbitrage. Arbitrage, into which investors also made direct investments, pooled its direct investor subscriptions with the money it received from Leveraged and Alpha and transferred the total to FII. FII then transferred the funds to FILB, which used them to make the outside investments of the structure. (Alpha, Leveraged, Arbitrage, FII and FILB are collectively referred to herein as the "**Fletcher Structure**"). Upon information and belief, FAM acted as the investment manager of each entity in the Fletcher Structure.

139.    In mid-2012, FILB, Arbitrage, Alpha and Leveraged all collapsed.  Arbitrage, Alpha and Leveraged were each placed into liquidation in the Cayman Islands.  FILB filed for chapter 11 bankruptcy protection in this Court and, on September 28, 2012, this Court approved the appointment of the FILB Trustee.

140.    On January 24, 2014, the FILB Trustee issued the FILB Trustee Report, which reported his findings from a detailed investigation into the financial affairs of FILB that he had conducted.  The FILB Trustee Report disclosed that Fletcher and FAM had subjected the Fletcher Structure to gross mismanagement and fraud for years.  Ultimately, in March 2014, the Massachusetts Bay Transportation Authority Retirement Fund (the "**MBTA**"), the sole investor in Alpha, filed a complaint together with Alpha, Leveraged, Arbitrage and FILB against, *inter alia*, Fletcher and FAM in New York Supreme Court.  The complaint asserted claims based on the wrongdoing described by the FILB Trustee.  (Complaint, filed March 31, 2014, in *Fletcher International, Ltd. v. Fletcher, Jr., Alphonse*, Case No. 651015/2014 [Docket No. 2].)

141.    The Citco Defendants could not have been ignorant of Fletcher and FAM's misconduct in handling investors' money at the time Citco Group sold them the Richcourt Group.  Indeed, in the June 2008 Richcourt Acquisition, one of the Citco Defendants itself received money that Fletcher and FAM improperly diverted from a key investor's investments in the Fletcher Structure.  In addition, certain Citco Defendants had earlier arranged for Fletcher to make payments to Citco Group subsidiaries even though he did so by diverting investors' funds.

The MBTA and Louisiana Pension Fund Investments in the Fletcher Structure

142.    On June 8, 2007, the MBTA invested $25 million in Alpha, becoming the sole investor in that fund.  Most of MBTA's funds were not used to make legitimate investments,

however, as Alpha's PPM required. Instead, according to the FILB Trustee Report, FAM used the MBTA's money to repay loans from Citco Group subsidiaries Citco Bank and STF Bank N.V. (together the "**Citco Lenders**"), as well as to satisfy redemption requests from other investors and pay margin calls and fees.

143.    Approximately one year later, Citco Group subsidiaries received further sums that Fletcher and FAM misappropriated from investments by three Louisiana pension funds: the Firefighters' Retirement System, the Municipal Employees' Retirement System and the New Orleans Firefighters' Pension and Relief Fund (together, the "**Louisiana Pension Funds**"). These pension funds invested a total of $100 million in Leveraged in March and April, 2008.

144.    The FILB Trustee found that Fletcher and FAM, instead of investing this money in accordance with Leveraged's stated investment strategy, used it for their own benefit and for the benefit of Citco Group and its various subsidiaries and affiliates. Fletcher and FAM used the Louisiana Pension Funds' money in this way both before – and as part of – the Richcourt Acquisition.

145.    First, the FILB Trustee found, Fletcher and FAM gave the Citco Lenders $13.5 million of the Louisiana Pension Funds' money as repayment of loans that the Citco Lenders had previously made to Leveraged. Citco Group had been pressuring Fletcher and FAM to repay the loans since 2005, and Citco Group had been forced to grant Fletcher and FAM multiple extensions. Upon information and belief, as the FILB Trustee found, Unternaehrer was "the key Citco executive in charge of the … entire relationship with [Fletcher], FAM, and other Fletcher-Related Entities," and therefore acted as agent for the Citco Group in connection with these loans and extensions. Once the new money came in from the Louisiana Pension Funds, Fletcher and

FAM used it to repay the loans. In fact, the FILB Trustee found, Citco extended Fletcher's repayment deadline until the day after the Louisiana Pension Fund's money was due to be transferred to Fletcher, then promptly took the money from Fletcher's account once it came in.

146.   Second, the Louisiana Pension Funds' investment was used to fund the June 2008 Richcourt Acquisition. According to the FILB Trustee Report, Fletcher and FAM siphoned off $27 million from the Louisiana Pension Funds' investment to pay to CTI, via a series of Fletcher affiliates, for 85% of RHI. Once again, Unternaehrer acted as Citco Group's agent and principal negotiator for this transaction.

147.   Third, the FILB Trustee Report described how $4.1 million of the Louisiana Pension Funds' money was paid to Unternaehrer personally as part of a sweetheart deal he negotiated with Fletcher and FAM; he netted a total of $6.5 million, which he intended to use to buy a house in France. The transaction was personally approved by Citco Group's President and CEO Smeets, a fellow member of the Citco Executive Committee. Unternaehrer negotiated this transaction at the same time that he was negotiating the Richcourt Acquisition.

148.   Fourth, Fletcher and FAM used tens of millions of dollars of the $100 million invested by the Louisiana Pension Funds to pay margin calls, redemption requests by investors other than the Louisiana Pension Funds, and fees, including management fees to FAM and fees to Fletcher and other professionals working for Fletcher.

149.   Fletcher and FAM's use of investors' funds for purposes other than making permitted investments and paying properly calculated fees and expenses was a gross violation of Alpha and Leveraged's investment restrictions as set out in their PPMs. None of the four payments described above delivered any investment return for the Fletcher funds' investors.

Instead, almost half of the money misappropriated from the Louisiana Pension Funds was used to pay off Citco Group and its executives and subsidiaries or affiliates.

150.     The Citco Defendants cannot claim that they were blind to where the money Citco received from Fletcher and FAM was coming from.  Citco Group and Unternaehrer – who was the person in charge of the entire Fletcher-Citco relationship and had access to the other Citco Defendants' considerable information about Fletcher and FAM –  knew at a minimum that:

- For a considerable period of time, the Fletcher Structure had been unable to pay its debts to Citco Group subsidiaries.  Citco had spent years demanding that the Fletcher Structure repay $60 million which the Citco Lenders had lent to Leveraged.  At the time the Fletcher Structure received its investment from the Louisiana Pension Funds, the Fletcher Structure still owed the Citco Lenders $13.5 million.

- The Fletcher Structure did not have enough cash to satisfy the monetary demands on those funds without the MBTA and Louisiana Pension Funds' investments. Indeed, according to the FILB Trustee Report, the combined cash balance of Fletcher's FILB, FII, Alpha, Arbitrage and Leveraged funds was only about $1.6 million as of March 31, 2008, less than three months prior to the Richcourt Acquisition.

- The Fletcher Structure had no liquid assets, other than the cash from MBTA and the Louisiana Pension Funds, that were sufficient to pay its obligations to Citco Group at the time those obligations were paid.  Because Citco entities were the Fletcher Structure's administrators, banks and custodians, they and Unternaehrer knew the cash balances of the Fletcher structure, who was investing in it and in what amounts.  Also, though Fletcher indicated on occasion that he would have co-investors in RAI, Unternaehrer knew or must have known that, as of the time of the Richcourt Acquisition, no significant investments by co-investors had materialized.

- Citco extended the deadline for payment of the $13.5 million that the Fletcher Structure owed to Citco until April 1, 2008, the day after the Louisiana Pension Funds' investments in the Fletcher Structure were due.  Citco then promptly took the money from the Fletcher Structure's accounts after the Louisiana Pension Funds made their investment.

- The MBTA's and Louisiana Pension Funds' money could not properly be used to pay the Fletcher Structure's enormous, pre-existing obligations to Citco Group, let alone to others.

151.     Unternaehrer knew all of these facts, and they were no mere red flags:  they unequivocally demonstrated that Fletcher and FAM had to be using purloined money to pay for the Richcourt Acquisition.  Fletcher and FAM simply did not have any other available funds.  Given his multi-million dollar personal incentive, Unternaehrer may have been tempted to "look the other way" when faced with Fletcher and FAM's wrongdoing, but these facts were too compelling to ignore.

152.     What Unternaehrer knew, the other Citco Defendants also knew, both as a matter of fact and as a matter of law.  Unternaehrer was negotiating with Fletcher as Citco Group's agent, and Citco Group was calling the shots as his principal.  Unternaehrer's knowledge is therefore properly imputed to Citco Group.  In addition, on information and belief, because of Citco Group's management style, and because he knew that Citco Group was the key beneficiary of the Richcourt Acquisition, Unternaehrer likely shared his knowledge about Fletcher and FAM with Smeets, Voges and others who were aware of the Richcourt Acquisition.

153.     Even apart from Unternaehrer's personal knowledge, the other Citco Defendants could not have been unaware of Fletcher and FAM's misappropriations and other wrongdoing.  Citco operates as a single integrated organization under the direction and control of Citco Group, and Citco provided a multitude of services to the Fletcher Structure.  Both when the MBTA and the Louisiana Pension Funds invested, and when their investments were misappropriated, Citco Group affiliates or subsidiaries were providing all of the services Alpha, Leverage and Arbitrage required to function, just as they did for the Soundview Funds.  Among other things, Citco Group served as administrator, custodian and bank.  The Citco Lenders were also direct lenders to Leveraged and CTI was Arbitrage's marketing agent.

154.    Because of the multiple services the Citco Group and its subsidiaries provided to Fletcher and FAM, the Citco Defendants were aware of the essential restrictions on the Fletcher Structure's investments, how much money it had, what investments the Fletcher Structure held, how much the Fletcher Structure owed, who was investing in it, the amounts of any investments in it, and in general, where the Fletcher Structure's money was coming from.  In fact, the Citco Defendants were in a position to know as much about the Fletcher Structure's financial position as Fletcher did himself.

155.    Because of the way Citco Group functioned as a single integrated entity, all of this knowledge is properly imputed from Citco Group's subsidiaries to the Citco Group and the individuals such as Smeets, Voges and Unternaehrer at the top of the Citco Group chain. Further, even without imputation, the Citco Defendants emphasize in their marketing materials that they are constantly in communication with each other.  Many of the Citco Defendants, therefore, as a matter of fact and not just as a matter of law, must have had all of the information they needed to know that Fletcher and FAM could not be trusted.  In addition, all of the Citco Defendants, because of the wide variety of services they were providing to the Fletcher Structure, received sufficiently disturbing information and enough evidence of "red flags" in the ordinary course of their business that they could not ignore Fletcher and FAM's lack of assets or their attempts to remedy that lack by wrongdoing.

156.    For these reasons, the Citco Defendants knew all that they needed to know to conclude that Fletcher and FAM must have misappropriated MBTA and Louisiana Pension Fund money and, after the Richcourt Acquisition, even with access to the fees generated by the Richcourt Funds, would not have sufficient assets to be able to manage those Funds effectively. But that didn't stop the Citco Defendants from accepting tens of millions of dollars of that

money for themselves.  It is therefore clear that the Citco Defendants assisted and participated in Fletcher and FAM's misappropriations, and they benefited from those misappropriations improperly, both directly and indirectly.

**The Corsair Transaction**

157.    Citco also had evidence of another of Fletcher and FAM's defalcations before the Richcourt Acquisition:  the March 2008 Corsair transaction.  In or about early 2008, Fletcher and FAM attempted to induce the Louisiana Pension Funds to invest in Leveraged.  The Louisiana Pension Funds would agree to do so, however, only if the non-voting participating shares they were to acquire – the "**Series N Shares**" – were given priority over the other non-voting participating shares in the fund.

158.    Fletcher and FAM, desperate for cash, agreed.  They guaranteed the Series N Shares a preferred 12% annual return to be funded either by an increase in the value of the fund's underlying investments or from the capital accounts of other investors, *i.e.*, the non-Series N shareholders.  Also, if the capital accounts of the other external investors fell below 20% of the value of the Series N Shares, then the Louisiana Pension Funds' investment would automatically be redeemed.  And if any of the other investors sought to redeem their shares, the Louisiana Pension Funds' shares would be redeemed one day earlier.

159.    The Louisiana Pension Funds' demands in effect required subordination of the shares of other non-voting participating shareholders in Leveraged to the shares owned by the Louisiana Pension Funds.  As a result, Fletcher and FAM were required to obtain the consent of the shareholders who would be subordinated.

160.     According to the FILB Trustee Report, FAM only required consent to subordination from one investor in Leveraged that was not related to FAM or its affiliates:  the Corsair investment vehicle (*See* FILB Trustee Report, at 63-64).  The representative of that vehicle for voting purposes was Magris, who at the time was a director of CTI, RHI and multiple companies in the Richcourt Group.  In March 2008, Magris, with the knowledge of Unternaehrer who had been included in relevant email correspondence, provided consent on behalf of the Corsair investors.

161.     When Magris provided consent on behalf of Corsair, he, Unternaehrer and Citco Group knew, given Citco's pervasive involvement with the Fletcher Structure, that the returns posted by Arbitrage – into which Leverage invested as part of the master-feeder fund structure – had historically been well below 12%.  Indeed, according to the FILB Trustee Report, from June 1997 to December 2007, Arbitrage's annualized net returns were only a reported 8.13%.  (*See* FILB Trustee Report, at 64).

162.     Thus, Citco Group knew to a virtual certainty that the Corsair and other investors in Leveraged would end up funding the Louisiana Pension Funds' guaranteed 12% annual return.  When they nevertheless provided consent on behalf of the Corsair investors, Magris, Unternaehrer and Citco Group knowingly assisted Fletcher and FAM's misappropriation of investor funds; they sacrificed Corsair – in which the BVI Funds had a substantial interest – to entice the Louisiana Pension Funds into the Fletcher Structure.

**In the Richcourt Acquisition, the Citco Defendants' Interests Conflicted with Those of the Richcourt Funds, but The Citco Defendants Failed to Disclose the Conflict**

163.     In the lead up to the Richcourt Acquisition, the Citco Defendants placed themselves in a position where their own interests conflicted directly and dramatically with those

of the Richcourt Funds. According to the FILB Trustee Report, Citco Group was facing intense pressure from clients of its hedge fund administration business to exit the fund management business altogether. These clients viewed Citco Group's ownership of a fund that competed with them as creating a conflict of interest for Citco Group. (*See* FILB Trustee Report, at 77.) Citco Group eventually agreed and sought to sell the management of the Richcourt Funds as soon as possible, as well as to maximize returns from that sale.

164.     According to the FILB Trustee Report, Fletcher and FAM's offer for the Richcourt Group was the best offer Citco Group received because, among other things, Fletcher and FAM alone offered to pay virtually the entire purchase price up front. (*See* FILB Trustee Report, at 74). In addition, upon information and belief, Unternaehrer was working behind the scenes of the formal bidding process to feed Fletcher and FAM information that would enable them to improve their bid and ensure its success.

165.     The interests of the Richcourt Funds, on the other hand, were quite simple: to ensure that they were managed by an honest and competent manager who had the resources to manage them effectively and would not misappropriate their investors' funds.

166.     Because Fletcher and FAM were eager to put in the best bids but were neither honest nor competent, Citco Group's interests in the Richcourt Acquisition conflicted with those of the Richcourt Funds, to which the Citco Defendants owed fiduciary duties. Yet the Citco Group and the other Citco Defendants did nothing to protect the Richcourt Funds. They did not inform the Richcourt Funds or their investors in advance about the Richcourt Acquisition – in fact, they did not provide formal notice to investors in the Funds until six months afterwards. The Citco Defendants did not designate any independent manager to evaluate the Richcourt

Acquisition from the Funds' point of view. The Citco Defendants did not even disclose that they might have a potential conflicting interest either to a representative of the Richcourt Funds or to the Funds' stakeholders.

167.    Rather, the Citco Defendants acted entirely in their own self-interest and, by retaining the power to make all of the Richcourt Funds' decisions themselves, they ensured that the Funds would consider no interests but the Citco Defendants' own. They did so, moreover, knowing that the Richcourt Funds and their stakeholders were relying on Citco to provide the same effective management they had in the past. But that did not stop the Citco Defendants from going ahead with what amounted to a colossal, fraudulent bait and switch: Richcourt Fund investors thought they were being protected by one of the world's leading fund administrators, but their assets had secretly been turned over to the dangerous and self-dealing Buddy Fletcher instead.

**In June 2008, the Citco Defendants Profited at the
Richcourt Funds' Expense by Selling RHI to Fletcher and FAM**

168.    On June 20, 2008, the Richcourt Acquisition, which Unternaehrer – acting as an agent of Citco Group – had negotiated with Fletcher and FAM, was consummated. The transaction was structured so that RAI, an entity that Fletcher ultimately owned and controlled, acquired 85% of RHI from CTI. RHI was the Richcourt Group's holding company, and RCM's and SCM's parent company. The Richcourt Acquisition therefore provided Fletcher and FAM with a majority, controlling interest in SCM, RCM, which managed the Spoundview and BVI Funds, as well as other entities that managed funds in the Richcourt Group.

169.    Citco Group subsidiary CTI retained a 15% interest in RHI, which CTI continues to hold. However, CTI's 15% interest was hedged, in that both its "up side" and its "down side"

were strictly limited.  Citco Group retained the right to "put" their 15% interest to RAI whenever they wanted to divest themselves entirely – and to do so at a price no less than they would have received if they had sold 100% of RHI initially.  Also, RAI retained a right to "call" CTI's 15%, enabling it to force Citco Group to sell its interest at the same price the Citco Defendants would receive if they exercised their "put":  the higher of the amount CTI would have received if it had sold its 15% of RHI initially and a specified multiple of EBITDA.  The hedges on the value of CTI's 15% interest indicate that CTI did not retain it primarily for purposes of investment.  It did serve, however, to create the misleading impression that Citco Group was retaining its interest in the Richcourt Group and its historic role in managing the Richcourt Funds.

170.    As set forth above, the Citco Defendants all owed fiduciary duties of care, loyalty and candor to the Richcourt Funds.  Among other things, these duties required the Citco Defendants:  (i) to make inquiries concerning whether the Richcourt Acquisition was in the Richcourt Funds' best interests; (ii) to bring to the Funds' and their investors' attention any information that would suggest that the acquisition was not in their best interests; and (iii) to take all necessary steps to protect the Funds' interests.  The Citco Defendants also had a duty to make full disclosure to the Richcourt Funds and their investors of any conflict of interest on the part of any of the Citco Defendants in relation to the proposed Richcourt Acquisition.

171.    As stated above, the Richcourt Acquisition clearly was not in the Richcourt Funds' best interests:  Fletcher and FAM needed money, had a history of misappropriating investors' assets, and might well misappropriate assets again.  Yet without considering the Richcourt Funds' interests, the Citco Defendants were negotiating to sell the Funds and their managers to Fletcher anyway, despite his questionable past and his correspondingly risky future.

172.    In the end, the Citco Defendants went ahead and closed the Richcourt Acquisition, despite what they knew about Fletcher and FAM's improper conduct, and without sharing that knowledge with the Richcourt Funds or their investors.  The Citco Defendants received their cash, got their affiliates' loans repaid and secured the Richcourt Acquisition's other benefits.  But they also completely abandoned their fiduciary duties to the Richcourt Funds by doing so, and despite the Richcourt Funds' and their stakeholders' reliance on Citco Group's good faith, in effect perpetrated a fraud.  In the interests of their own greed, the Citco Defendants placed the Richcourt Funds at risk of being plundered, as they ultimately were plundered, by an unscrupulous manager.

173.    More specifically, when they went ahead with the Richcourt Acquisition, the Citco Defendants breached their fiduciary duties to the Richcourt Funds by:  (i) failing to provide complete disclosure to the Funds and their investors of the fact that the Richcourt Acquisition might not be in the Funds' best interests; (ii) failing to provide complete disclosure to the Funds and their investors of the information they possessed suggesting that the Richcourt Acquisition represented a conflict of interest for the Citco Defendants; and (iii) failing to take any other reasonable action to protect the Funds' interests.

174.    Further, the Citco Defendants could have taken, but did not take, a wide variety of steps prior to the Richcourt Acquisition to protect the Richcourt Funds.  For example, they could have appointed independent managers or advisors to evaluate the Richcourt Acquisition from the Funds' point of view, terminated the Funds' investment management agreements with RCM and SCM, or ensured that protections, such as an independent watchdog or auditor, were included in the Richcourt Acquisition transaction documents.  At the very least, the Citco Defendants could

and should have provided complete disclosure to the Richcourt Funds and their stakeholders of all of the relevant facts concerning Fletcher, FAM and the Richcourt Acquisition.

175.    In addition, SCM and RCM had express contractual duties under the IMAs to act as each of the Richcourt Funds' agent and to "make all material disclosures to the Fund regarding itself and its officers, directors, shareholders, employees, affiliates and any person who controls the foregoing (collectively, "Principals and Affiliates"), their investment performance and general investment methods … and otherwise  ..."  SCM and RCM breached that contractual promise, and they were induced to do so by the Citco Defendants, Fletcher and FAM, all of whom were aware of the IMAs' requirements but, yielding to interests which conflicted with the Funds', failed to provide the promised information.

176.    As a result of the Citco Defendants' self-interested and inappropriate actions in connection with the Richcourt Acquisition, the Richcourt Funds suffered huge losses, including, *inter alia*, losses due to mismanagement and self-dealing following the Richcourt Acquisition and all of the fees and expenses that the Funds paid to the Citco Defendants or their subsidiaries and other affiliates of third parties following the Richcourt Acquisition.  The total of the Richcourt Funds' damages, though at least in the tens of millions of dollars, will be established at trial.

**The Citco Defendants, Fletcher and FAM Fail to Notify Investors About the Richcourt Acquisition Until More Than Six Months After the Acquisition Closed – and Then They Misrepresented the Facts**

177.    The Citco Defendants, Fletcher and FAM did not merely fail to notify investors about the Richcourt Acquisition before it closed.  They failed to notify investors until more than *six months* afterwards.    Neither Citco Group nor Fletcher and FAM sent a general

-64-

communication to investors about the Richcourt Acquisition until the Richcourt Funds' new, Fletcher-affiliated directors sent letters to investors in December 2008, and those letters were misleading. Worse, the Richcourt Funds' directors sent follow-up letters in January 2009, and the information in those letters was false. This failure to notify did not merely show a disdain for investors' interests – it deprived them of the opportunity to protect themselves from Fletcher and FAM.

178.    About one day after the Richcourt Acquisition closed, Unternaehrer emailed an "Internal Announcement" to employees of Citco Group and its various subsidiaries about the Acquisition. No similar communication was sent to investors, however, until the Richcourt Funds' directors wrote to investors more than six months later. In letters to investors in the Soundview Funds and at least two BVI Funds dated December 30, 2008, which were edited and distributed by one of the Citco Defendants and copied in draft to Unternaehrer, the directors presented the Richcourt Acquisition as merely an equity investment by FAM instead of a change in control:

> Dear Shareholder:
>
> As you are aware, in June 2008, an affiliate of Fletcher Asset Management, Inc. ("FAM") acquired a controlling stake in the Richcourt Group ("Richcourt") including Soundview Capital Management Ltd., the investment manager (the "Manager") of the Fund. The Citco Group continues to hold a minority ownership stake in Richcourt and all executives and staff have been retained. In addition, FAM has augmented the research team in place and continues to identify and recruit additional personnel to the Group …

179.    The December letters are not only belated; they give investors a very misleading picture of the Richcourt Acquisition. After all, Smeets and Voges, who had long been directors of RCM, resigned, and they do not appear to have retained any formal, continuing role with

respect to the Richcourt Funds.  Investors had very limited options for protecting their interests in response to the letter, however, because they were simultaneously informed that redemptions had been suspended retroactively.  In other words, investors would be barred from cashing out their investments because Fletcher and FAM, with the Citco Defendants' assent, had decided that they would not honor requests to redeem that were dated less than one month earlier.  Even so, a significant number of investors wrote to Citco Defendants to express their outrage about the delay in providing them with notice of the Richcourt Acquisition – it is clear that investors were *not* all "aware" of the Richcourt Acquisition.

180.    In January 2009, the Fletcher-appointed directors of the Soundview Funds and at least two BVI Funds wrote to investors again to inform them that redemptions might soon resume.  This time the directors included a "Q and A" that appeared to be intended to reassure investors concerning the Richcourt Acquisition.  It did so, however, by providing materially false information.  For example, the Q and A asked:

"Q: Did Citco sell Richcourt Group to Fletcher Asset Management ("FAM")?"

And it answered:

"A: No, Fletcher became Citco's new partner…"

181.    In fact, of course, Citco Group *did* sell the Richcourt Group:  CTI not only sold 85% of RHI to a Fletcher affiliate, it also sold a "call" right for the remaining 15%.  Indeed, Unternaehrer himself described the transaction as a sale of the Richcourt Group in his June 2008 "Internal Announcement" to Citco Group employees:  He wrote that the Citco Executive

Committee had "completed the sale of the Richcourt Fund of Funds business to a group of
investors [led] by Fletcher Asset Management in New York."

182.    The January 2009 "Q and A" also offered false information about another key
issue:

> "Q: Has management of the Richcourt Group changed?
>
> "A: No, all executives of the Richcourt Group have been retained…and
> Citco executive Ermanno Unternaehrer continues on Richcourt's board"

183.    The facts were otherwise – the management of the Richcourt Group had certainly
changed.  Whereas the Citco Defendants continued to play important roles in managing, advising
and servicing the Richcourt Funds, and Citco Group retained a seat on the RHI board through
Unternaehrer, the ultimate decision-making authority had been transferred to Fletcher and FAM.
The decisions to suspend and then to resume redemptions, for example, were made by Fletcher's
personnel.  Moreover, it would not be long before Fletcher and FAM made their impact on
investment decisions felt.

184.    When the Richcourt Funds' Directors sent their January 2009 letters to the Funds'
investors, they sent the letters by means of a Citco Group subsidiary – indeed, because Citco
Group did not disclose the identity of the Richcourt Funds' investors to Fletcher and FAM, the
Richcourt Funds' management could only communicate with investors through Citco Group or
with Citco Group approval.  Also, at the time, Unternaehrer and other Citco Defendants were
still fiduciaries of the Funds in whom the Funds and their investors continued to place a high
degree of trust and confidence.  That trust and confidence had been recognized and reinforced in
the December letter, which had attempted to reassure investors that Citco Group and its
personnel – presumably including Smeets and Voges – were still in place.  Moreover, the effect

of both the December and January letters was to encourage the Funds' investors to continue to place their trust and confidence in the Citco Defendants. The letter was sent to Laddaga who had left Citco but remained a director of SCM, and to other important Citco executives as well as to investors. None of them, however, appear to have corrected the record.

185.    The failure by the Citco Defendants, Fletcher and FAM to provide the Richcourt Funds and their investors with all relevant information about the highly material Richcourt Acquisition until long after it occurred was a clear breach of the duties of loyalty and candor owed by the Citco Defendants, Fletcher and FAM. These Defendants' willingness to lie outright to investors in the January letter was worse. And the fact that Fletcher's and FAM's hand-picked directors Kiely and Turner lied to promote Fletcher and FAM's financial interest, while purporting to act in their capacity as Richcourt Fund directors, makes their actions all the more egregious. In sending the December and January letters, the Funds' new directors were not acting in the Funds' interests, which they had totally abandoned; instead, they acted entirely to further others' adverse interests.

186.    In fact, the Fund directors' December and January letters also misrepresented, and on information and belief were in part motivated by, a financial crisis at the Richcourt Funds. The Funds had received large redemption requests, but the Soundview Funds' lines of credit had expired in or about November 2008, and even after Unternaehrer intervened, neither Citco nor anyone else would agree to provide new credit. As a result, given the Soundview Funds' and Fletcher and FAM's inadequate financial resources, the Richcourt Funds could not pay redeeming investors without selling the Funds' assets – which Fletcher and FAM knew would likely exacerbate the volume of redemption requests. By December 2008, Unternaehrer had

even communicated to FAM that Citco Bank feared that the Soundview Funds could not meet their obligations.

187.    Yet the Fund directors' letters did not disclose these facts.  The December 2008 letters referred only to "expiration of *a* credit facility," for example, and the January 2009 letters refer to "***uncertainty*** regarding the fund credit line," though there was no genuine uncertainty by January 2009.  The January letters are even unclear whether the "fund credit line" at issue was the Richcourt Funds' own.  Thus, it appears that the right course of action for the Richcourt Funds in December 2008 and January 2009 – just as in June 2008 – was to wind down, and at a minimum, for the Citco Defendants, Fletcher and FAM to disclose the material facts.  Instead, these Defendants sought to mislead.  Fletcher and FAM were unwilling to shut down the funds they had just spent tens of millions to purchase, and irrespective of their fiduciary duties, the Citco Defendants were unwilling to risk having to give up the Richcourt Acquisition's ill-gotten spoils.

188.    If the Richcourt Funds and their investors had been informed about the Richcourt Acquisition, or the Richcourt Funds' financial situation, on a timely basis, they could have taken a variety of steps to protect themselves.  The Funds could have terminated their IMAs with SCM and RCM, because they would have discovered that SCM and RCM had breached their duties of candor and loyalty by failing to provide full disclosure.  The Funds could have put watchdogs in place, or could have barred SCM and RCM from investing in any of Fletcher's funds.  The Richcourt Funds could have done so through their directors, though both the directors chosen by Citco, and the directors chosen by Fletcher, totally abandoned the interests of the Richcourt Funds and acted instead entirely to favor the conflicting interests of the Citco Defendants, Fletcher and FAM.  Also, RCM, SCM and RHI as their parent had the power to instruct the

Richcourt Funds' directors to inform investors about the Richcourt Acquisition or take other measures to protect the Funds.  And even if none of the foregoing could be counted on to protect the Richcourt Funds' interests, the Funds' investors had the power, right and authority to act on their own, if only they had been informed of the facts:  They could have insisted that the Funds exercise any of their rights to protect themselves, and they could of course have redeemed, or threatened to redeem, their investments, unless they were adequately protected.  In addition, the investors had the right to file suits in the Richcourt Funds' name, to file suits seeking to appoint fiduciaries to take charge of the Funds, and the power to insist that SCM, RCM, or the directors of the Funds, SCM and RCM be replaced with managers who had no affiliation with Fletcher or FAM.

189.    The Richcourt Funds' inability to protect themselves cost them a great deal of money.  The Funds' assets declined, both due to Fletcher and FAM's defalcations and due to their bad investments in Fletcher-affiliated funds, not to mention as a result of their payment of undeserved fees.  The Funds also became potentially liable for investors' claims.  If the Funds and their investors had been told the truth about the Richcourt Acquisition, Fletcher and FAM on a timely basis, however, they could have taken steps to cause the Funds to terminate their IMAs and wind down, which would have allowed them to escape market declines as well.  As a result, if Fletcher, FAM and the Citco Defendants had acted in accord with their fiduciary duties, the Funds would not have sustained the huge losses they suffered under the management of the Citco Defendants, Fletcher and FAM.

## III.   LOOTING AND MISMANAGEMENT OF THE
## RICHCOURT FUNDS AFTER THE RICHCOURT ACQUISITION

**The Post-Acquisition Management of the Richcourt Funds**

190.    As a result of the Richcourt Acquisition, Fletcher and FAM acquired a controlling interest in the Richcourt Group, including SCM and RCM, which managed the investments of the Richcourt Funds.  True to form, by November 2008, and again in April 2009, Fletcher and FAM had already begun to misuse their control of the Richcourt Group, and to treat the Richcourt Funds' assets as their own.

191.    Fletcher and FAM did not, however, act alone.  They were provided with cover and assistance by the Citco Defendants, whom the Richcourt Funds and investors continued to trust as their fiduciaries, but who did nothing whatsoever to protect them.  Indeed, the Citco Defendants did more harm than good.

192.    The Richcourt Funds continued to have no employees of their own after the Richcourt Acquisition.  The Citco Administrators, Citco Global and Citco Bank continued to provide fund services to the Richcourt Funds as administrator, registrar, transfer agent, middle-office service provider, custodian and bank.

193.    SCM and RCM continued to manage the Richcourt Funds' investments following the Richcourt Acquisition, and the IMAs remained in place.  Many of the Citco employees who had been working on the Richcourt Group prior to the Richcourt Acquisition either continued in their previous roles or were hired by FAM.  The daily investment operations of the Richcourt Funds were therefore managed by a team made up of employees of FAM and employees of various companies in the Richcourt Group.  These employees were based in New York, San Francisco, Paris and Monaco, where they conducted research and provided investment and risk

management advice.  This team made up of Richcourt and FAM employees is hereinafter referred to as the "**Richcourt Team**."

194.    After the Richcourt Acquisition, Fletcher installed two of his long-term trusted associates, Kiely and Turner, as the sole directors of the Richcourt Funds and on the Board of SCM and RCM.  By this time, Kiely and Turner had both been with FAM for over a decade and they were both directors of FAM.

195.    The Richcourt Group employees who had been responsible for the daily management and administration of the Richcourt Funds prior to the Richcourt Acquisition and continued in place following the Richcourt Acquisition included, *inter alia*, Unternaehrer, Laddaga, Magris and Bloch.

196.    Unternaehrer, Laddaga, Magris and Bloch met with Kiely, Turner and other FAM representatives at least once to discuss the management of the Richcourt Group in New York in September 2008.  A presentation for the Richcourt Funds dated November 2008 identified these four individuals as the key "Richcourt Professionals" involved with managing the investments of the Richcourt Funds.  Over time, however, upon information and belief, the Europe-based Richcourt Team employees left Richcourt and New York-based employees of FAM were hired to fill their positions.  Also, upon information and belief, in the first half of 2009, Magris returned to the employment of Citco, Bloch resigned, and Laddaga was fired.

197.    The Richcourt Team reported directly to Kiely and Turner, as the Richcourt Funds' directors and SCM's and RCM's directors and investment committees.  SCM's and RCM's investment committees in turn were overseen by an "Executive Board" which was also the Board of their parent RHI.

198.    Following the Richcourt Acquisition, Fletcher installed himself and Kiely on the RHI Board, joining Unternaehrer who remained on RHI's board as Citco Group's representative for more than three years following consummation of the Richcourt Acquisition.  Turner joined RHI's board in December 2008 along with Fletcher's brother, Todd.  Thus, from June 2008 until at least December 2011, RHI was controlled by a board of five members, who in that capacity oversaw RHI's subsidiaries SCM and RCM:  Kiely, Turner and the two Fletchers from the Fletcher side, and Unternaehrer from Citco Group.

199.    The Citco Defendants who continued to work with the Richcourt Funds did not manage the Richcourt Funds' investments as appropriate and responsible fiduciaries.  Among other things, they caused the Richcourt Funds to make investments that were wholly contrary to the Funds' best interests.  For example, as recounted below, they transferred hundreds of millions of dollars to Citco Group affiliates or subsidiaries without apparent justification.  And Fletcher and FAM, having abused the investors in the Fletcher Structure for years, turned their attention to the Richcourt Funds as a new source of money to be misappropriated.

**The Richcourt Funds Deteriorated Rapidly and
Received Numerous Investor Redemption Requests**

200.    Within months of being acquired by Fletcher and FAM, the Richcourt Group's assets under management ("**AuM**") declined substantially.  At year end 2007, the Richcourt Group's AuM was approximately $1.594 billion.  By year end 2008, it had dropped to approximately $1.052 billion, a loss of over $500 million which had occurred primarily after June 2008.  Only two years later, the Richcourt Group's AuM had all but disappeared, totaling a mere $175 million as of December 31, 2010.  Further, by September 2010, the Group's AuM that were not subject to redemption requests was close to zero.  These declines were not solely a

result of market turbulence at the time; the S&P 500 Index, by way of comparison, increased more than 20% in 2009 and more than 10% in 2010. But Fletcher and FAM's mismanagement and defalcations, as well as their inability to secure a credit line, would have caused enormous losses in any market.

201.    The Soundview Funds received massive redemption requests following June 2008. The impact of the redemption requests was exacerbated, moreover, by the fact that the Richcourt Funds could not secure renewal of their lines of credit, which were in place to provide liquidity for redemptions, in November 2008. This forced the Richcourt Funds to redeem their own investments and expend their own assets to cover the incoming redemption requests. (*See* FILB Trustee Report, at 76-77). By November and December 2008, the Richcourt Group determined to suspend or "gate" redemptions in a group of funds which represented approximately 88% of its AuM, though redemptions were eventually resumed several months later.

202.    As a result of, *inter alia*, the Soundview Funds' negative returns, substantial redemptions and inability to obtain a credit facility, Kiely and Turner, as directors of the Soundview Funds, resolved on December 18, 2008 to suspend the calculation of those Funds' NAVs as well as all subscriptions and redemptions from November 28, 2008. The same decision was made for at least two of the BVI Funds, though the suspension was effective from December 31, 2008.

**The Creation of the Designated Funds**

203.    In the first quarter of 2009, as the Richcourt Funds continued to face redemption requests they could not honor without liquidating assets, Fletcher, FAM, SCM, RHI, and, upon

information and belief, Unternaehrer, determined to segregate the Soundview Funds' investments that, in their view, could not or should not be liquidated.  Accordingly, on March 19, 2009, SCM and RHI established the Designated Funds as repositories for these illiquid assets, removing them from the Soundview Funds' portfolios and providing a mechanism for the Soundview Funds to avoid having to pay out cash to redeeming investors.

204.    The Designated Funds were special purpose vehicles which acted as closed-ended investment funds – meaning that, once launched, they would not market themselves to the public for further subscriptions or make any new investments.  Shareholders who sought to redeem their shares after the November 28, 2008 redemption period and prior to the March 31, 2009 redemption period were paid partly in cash and partly with shares in the Designated Funds. More specifically:  redeeming investors of Soundview Elite received part of their redemption proceeds in shares of Elite Designated; redeeming investors of Soundview Premium received part of their redemption proceeds in shares of Premium Designated; and redeeming investors of Soundview Star received part of their redemption proceeds in shares of Star Designated.

205.    According to the Soundview Funds' PPMs, which were changed in May 2009 following the creation of the Designated Funds, the purpose of the Designated Funds was to:

> [P]ursue an orderly liquidation of … assets over time in an effort to distribute proceeds to the [Designated Funds'] shareholders.  The distribution of proceeds will be accomplished through a repurchase of the [Designated Funds'] Shares by the [Designated Funds] at intervals to be determined by the Directors, at such times that sufficient liquidity exists in the [Designated Funds] to fund repurchase.

(Soundview Elite PPM, dated May 2009, at 10.)

206.    Following the creation of the Designated Funds, and with liquidity supposedly returned to the Soundview Funds, the suspension of subscriptions and redemptions was lifted. But by then, a substantial number of investors had been stuck with illiquid, seemingly unredeemable shares in the Designated Funds.

207.    The Defendants also engaged in further financial rejiggering in or around March 2009:  they "restructured" the Soundview Funds by moving all remaining assets from Soundview Premium and Soundview Star to Soundview Elite, and giving the transferring Funds a share in Soundview Elite instead.  In other words, contrary to the Soundview Premium and Star Funds' PPMs, the Defendants in effect converted Soundview Elite into a master fund and Soundview Premium and Soundview Star into feeder funds, and also gave investors in Premium and Star potentially inferior rights.  Though the real motivation for the restructuring is not yet fully clear, it is at least clear that the restructuring gave Fletcher and FAM an opportunity to earn increased fees:  SCM and RCM could charge Soundview Premium and Soundview Star investors based on their investments in Soundview Elite, and could also charge Soundview Elite directly.

208.    The creation of the Designated Funds and the Soundview Funds' restructuring may or may not have helped to resolve some of the Richcourt Funds' financial issues in 2008. But one way or the other, given the turbulent markets at the time, careful, responsible management in the Richcourt Funds' best interests was more important than ever. Unfortunately, Fletcher, FAM and the Citco Defendants – despite their continuing contractual and fiduciary duties to the Richcourt Funds, chose to ignore their duties.  Completely abandoning the Richcourt Funds' interests, they pursued adverse, competing interests instead.   Most egregiously and inexcusably, as discussed below, they simply took the Richcourt Funds' assets

and used them as their own, leading eventually, as the assets diminished, to the Funds'
bankruptcy and liquidation proceedings.

 1. First Defalcation:  Approximately $50 Million of the Richcourt Funds'
 Assets Are Invested in Arbitrage Between November 2008 and June 2009

209. Predictably, beginning no later than November 2008, Fletcher and FAM began to
misappropriate the Richcourt Funds' assets by investing them in the Fletcher Structure.  They did
so notwithstanding any protections that Citco Group's involvement in the post-Acquisition
Richcourt Group supposedly offered to the Funds and their investors.  They did so, moreover,
even though – or arguably because – the Richcourt Funds had suspended redemptions as of
November 2008.

210. Fletcher and FAM invested the Richcourt Funds' assets into Fletcher's Arbitrage
fund, the FILB Trustee found, in three distinct time periods.  First, upon information and belief,
they invested approximately $10 million of the BVI Funds' assets in Arbitrage between
November 2008 and January 2009.  The FILB Trustee Report states that this money was used for
the second tranche of FILB's "Raser" investment in December 2008.

211. Second, the FILB Trustee Report states, Fletcher and FAM took approximately
$40 million more of the Richcourt Funds' assets between April and June 2009.  The Richcourt
Funds' records, though incomplete, confirm that Fletcher and FAM took at least $30 million
from them during this period.  As a first part of this sum, the BVI Funds have determined that
Fletcher, FAM, Kiely, Turner and the Citco Defendants caused them to invest at least $19
million in Arbitrage between November 2008 and June 2009.  Also, the Soundview Funds'
records show that Fletcher, FAM, Kiely, Turner and the Citco Defendants caused (a) Soundview

Elite to invest $5 million in Arbitrage on April 15, 2009, (b) Soundview Premium to invest €2 million in Arbitrage on May 5, 2009 and (c) Soundview Star to invest a total of €2.7 million in Arbitrage on May 5 and 29, 2009.  Thus, Fletcher, Kiely, Turner, FAM and the Citco Defendants caused the Soundview Funds to invest over $11 million in Arbitrage even though, less than three months earlier, the Soundview Funds' directors had written to reassure their investors that the Soundview Funds had not "invested in any Funds managed by FAM."  Due to the state in which the Citco Administrators, Citco Bank and Citco Global left the Richcourt Funds' records, they have not yet identified records of the additional $10 million that, the FILB Trustee found, the relevant Defendants caused the Richcourt Funds to invest in the Fletcher Structure between November 2008 and June 2009.

212.    Upon information and belief, Fletcher, FAM, Kiely, Turner and the Citco Defendants caused the Richcourt Funds' assets to be invested in Arbitrage in connection with Fletcher and FAM's apparent fraud against investors in FILB – a fraud later pursued by the FILB Trustee.  The FILB Trustee Report states that the Fletcher Structure had been grossly mismanaged by Fletcher and FAM for a considerable time before these investments – or more accurately, "investments" – by the Richcourt Funds.  Investors' money had been misappropriated and used for a variety of purposes outside the scope of the investment restrictions applicable to the funds from which the money came, including purposes that directly benefited Citco Group, such as the sweetheart transaction with Unternaehrer and repayment of the Citco Lenders' loans. After investigating Fletcher and FAM for many months, the FILB Trustee concluded that:  (i) the Fletcher Structure had "many of the characteristics of a Ponzi scheme" and (ii) among the facts obscured by fraud was the fact that the Fletcher Structure was likely insolvent by the end of 2008.  (*See* FILB Trustee Report, at 2 and 9).  In these circumstances, which were known to all

of Fletcher, FAM, Kiely, Turner and the Citco Defendants who continued to work with the Richcourt Funds when the Funds' investments in Arbitrage were made, the Richcourt Funds' investments in Arbitrage were contrary to the Funds' best interests.

213.     The Richcourt Funds' investments in Arbitrage were contrary to the Funds' interests, upon information and belief, for an additional reason:  the value of those investments was grossly inflated.  The FILB Trustee alleges that Fletcher and FAM carried FILB's largest assets on their books at a much higher value than those assets had been selling for in actual transactions, and that Fletcher and FAM had baselessly increased the value of one of FILB's assets by almost $50 million based on uncertain future litigation.  Further, the Citco Defendants who continued to work with the Richcourt Funds knew that Arbitrage valuations could not be relied upon because, contrary to Citco's policy with respect to its other clients, CFS Cayman provided values for Arbitrage without verifying the value of the portfolio of FILB as its master fund.  Thus, the actions of Fletcher, FAM, Kiely, Turner and the Citco Defendants in making these investments were irreconcilable with the fiduciary duties these entities and individuals owed to the Richcourt Funds.

2.      Second Defalcation:  The Richcourt Funds' "Investments" in
        Arbitrage Are Converted into Worthless Investments in Leveraged

214.    In October 2009, about six months after the Soundview Funds' $11 million and the BVI Funds' total of at least $19 million had been invested in Arbitrage, Fletcher, FAM, Kiely, Turner and the Citco Defendants caused the Soundview Funds' holdings in Arbitrage to be converted, through a purported "in kind" transfer, into shares of Leveraged.  In June 2011, Fletcher, FAM, Unternaehrer and the other Citco Defendants (other than Citco Bank, Citco Global and the Citco Administrator) also converted the BVI Funds' investments in Arbitrage into investments in Leveraged.  All of the Richcourt Funds' Leveraged shares, however, were so subordinated that they were substantially certain to lose their value.  Consequently, these transactions, like the Richcourt Funds' investments in Arbitrage, served Fletcher's and FAM's interests at the expense of the interests of the Richcourt Funds.

215.    The Richcourt Funds were likely to lose their investments because Leveraged was the Fletcher Structure fund from which Fletcher and FAM misappropriated the Louisiana Pension Funds' investments in 2008.  Also, in March 2008, as set forth above, Citco Group, acting through Magris with the knowledge of Unternaehrer, consented to the creation of the Series N Shares in Leveraged, to which all other shares were structurally subordinated, both as to capital and as to income.

216.    The shares that Fletcher, FAM, Kiely, Turner and the relevant Citco Defendants caused the Richcourt Funds to acquire in October 2009 and June 2011 were not Series N Shares.  They were shares that had been subordinated to the Series N Shares.  This meant, as a practical matter, that unless Leveraged's performance remained above 12% per year, the Richcourt Funds' investments would be diminished to provide the Louisiana Pension Funds with its guaranteed

12% annual return.  Further, according to FAM's presentation to SCM dated September 2009, Leveraged's annual net return, by August 31, 2009, was only -9.23%, and its annual net return for 2008 was a dire -35.89%.  In fact, Leveraged's performance had not exceeded 12% since 2001.  It was therefore a virtual certainty that the Richcourt Funds would never see a return on the investments they were forced to make in Arbitrage and Leveraged – and that they would lose their capital as well – unless Fletcher and FAM chose to pay them off for his own purposes.

217.    Fletcher, FAM, Kiely, Turner and the relevant Citco Defendants all knew that the Richcourt Funds' transfers of assets into the Fletcher Structure were contrary to the Funds' best interests.  Fletcher, FAM and Kiely in particular knew this because they were directly involved in the transactions.

218.    Citco Group knew that the Richcourt Funds' investments in the Fletcher Structure were contrary to the Funds' interests because Unternaehrer knew.  Unternaehrer knew because he knew that Fletcher and FAM had a history of misappropriating clients' assets; knew that shares in Arbitrage, and especially subordinated shares in Leveraged, were a disastrous investment; and oversaw the Richcourt Funds' investments as a member of RHI's board, which oversaw the RCM and SCM investment committees.

219.    Further, given CTI's interest in RHI and the various Citco Defendants' continuing obligations to the Richcourt Funds, Unternaehrer had a duty to Citco Group to share his knowledge of the Funds' inappropriate investments with the other members of the Citco Executive Committee, with whom he had close relationships.  Upon information and belief, Unternaehrer also shared his knowledge with other Citco Group personnel because of the structure of Citco, which operates as a single, integrated organization under the direction and

control of Citco Group.  At a minimum, Unternaehrer's knowledge is properly imputed to Citco

Group and the other Citco Defendants because of his role as their agent with respect to Fletcher

and the Richcourt Funds.

220.    Fletcher knew that the Richcourt Funds' investments in the Fletcher Structure

were contrary to the Funds' interests because he was one of the main beneficiaries of those

investments.  Also, at the time of the Richcourt Funds' initial subscriptions in Arbitrage, Fletcher

was a member of RHI's board, and he directed and controlled FAM, the investment manager in

the Fletcher Structure.  Fletcher also directed and controlled FAM when the subsequent "in kind"

transfer of those interests into Leveraged occurred.

221.    In addition, Fletcher knew that the Richcourt Funds' investments in Arbitrage and

Leveraged were contrary to the Funds' interests because his close associate Kiely knew.  At the

time of each of the subscriptions and transfers, Kiely was a member of the boards of the

Richcourt Funds, SCM, RCM, RHI, Arbitrage, FILB and FAM.  Kiely likely shared his

knowledge with Fletcher, and in any event it is properly imputed to Fletcher because of Kiely's

role as Fletcher's and FAM's agent.

222.    Fletcher, FAM and Kiely all owed fiduciary and other duties to protect the

Richcourt Funds' interests at the time of the Arbitrage and Leveraged transactions.  Fletcher,

FAM and Kiely were all agents of the Funds who were directly involved in managing the Funds'

investments, and Fletcher, FAM and Kiely all knew that the Funds and their investors were

relying on their loyalty and candor.

223.    The Citco Defendants too, through Unternaehrer and others, owed duties to

protect the Soundview Funds.  Unternaehrer had a duty, through his role at RHI, to oversee

SCM's investment choices, and he and the other Citco Defendants knew that the Funds and their investors were relying on him and the Citco Defendants to protect their interests in the Funds. In addition, because Unternaehrer was an agent of the Citco Group with respect to Fletcher, FAM and the Richcourt Funds, Citco Group is responsible for any breaches of duty in the course of his duties.

224. For the foregoing reasons, Fletcher, FAM, Kiely, Turner and the Citco Defendants who continued to work with the Richcourt Funds – as well as the Citco Defendants in whom the Funds and their stakeholders continued, due to lack of information to the contrary, to place their trust and confidence – all breached fiduciary duties that they owed to the Richcourt Funds. The did so by directing, approving or acquiescing in the Funds' investments into Arbitrage and Leveraged in 2009, by taking actions to effectuate those investments, by failing to notify the Funds and their investors that the investments were contrary to the Funds' best interests, and by failing to take steps to unwind those investments. Further, given their knowledge of the Funds' inappropriate Arbitrage and Leveraged investments, the Citco Defendants all owed the Richcourt Funds a duty to attempt to sever the Funds' relationship with Fletcher and FAM or, at a minimum, to provide the Funds with further protections against them. Fletcher and FAM, of course, had a fiduciary duty to sever their relationship with the Richcourt Funds voluntarily.

225. The Citco Administrators, Citco Global, Citco Bank and other Citco Defendants also owed fiduciary duties to the Richcourt Funds because the Funds and their investors placed a high degree of trust and confidence in them to protect the Funds' interests. These entities breached their fiduciary duties by substantially assisting and effectuating the breaches of fiduciary duty by Fletcher, FAM, Kiely, Turner and other Citco Defendants in connection with

the Funds' investments in the Fletcher Structure. For example, the Citco Administrators not only

processed the Funds' subscriptions in Arbitrage; they also processed and actively approved the

in-kind transfer of the Funds' investments in Arbitrage to Leveraged. Citco Bank also assisted

the Funds' Arbitrage subscriptions by issuing the necessary trade confirmations and processing

the relevant payments. Citco Global held the underlying investments on behalf of the Funds.

226.    In addition, SCM and RCM had clear duties under the IMAs both to refuse to

allow the Funds' potentially disastrous investments in the Fletcher Structure and to inform the

Funds and their stakeholders that Fletcher, FAM and affiliated personnel were pressuring SCM,

RCM and the Funds to make these investments. SCM and RCM breached their duties of care,

loyalty and candor by failing to stop these investments.

      3.    Third Defalcation: Fletcher and FAM Take Approximately $2 million
            from the BVI Funds for "FIP" and $13 million for the "UCBI" Transaction

227.    On or about November 1, 2009, Fletcher and FAM caused AAI to invest $2

million into their Fletcher International Partners, Ltd. ("**FIP**") fund. This investment was a clear,

self-interested breach of fiduciary duties by Fletcher, FAM, Kiely, Turner, RHI, RCM, and

Unternaehrer, as well as CTI and the Citco Group for whom Unternaehrer acted as an agent: FIP

did not invest the money, but used it instead to pay what were characterized as overdue

dividends to FILB and Unternaehrer. The investment in FIP was not in AAI's best interest, as all

of these Defendants knew. Further, despite AAI's redemption request approximately two years

later, AAI's $2 million has never been repaid.

228.    In March 2010, SCM, RHI, CTI, FAM, Fletcher, Unternaehrer and Citco Group

caused the BVI Funds to make a further investment of approximately $10.27 million, and

Soundview Elite to make a further investment of approximately $2.7 million, in Arbitrage.

These investments represented another blatant attempt by Fletcher and FAM to raid the bank accounts of the Richcourt Funds and use their investors' money for their own benefit. In sum, Fletcher and FAM caused approximately $13 million of the Richcourt Funds' money to be funneled through the Fletcher Structure to FII, which used the money as part of a down payment for Fletcher's purchase (the "**UCBI Transaction**") of a portfolio of non-performing loans, bank owned properties, and warrants for shares and preferred stock in a company called United Community Banks, Inc. ("**UCBI**").

229. The UCBI Transaction had two elements. First, UCBI and FII executed an asset purchase and sale agreement (the "**APSA**") pursuant to which FII bought certain non-performing loans and bank-owned properties from UCBI. Second, UCBI and FILB executed a securities purchase agreement ("**SPA**") pursuant to which FILB obtained warrants in certain securities issued by UCBI (the "**UCBI Warrants**").

230. Under the APSA, FII was required to pay a $10 million deposit by April 1, 2010 (and in any event no later than April 5, 2010). The SPA required that, upon receipt of the deposit, UCBI would issue the UCBI Warrants to FILB. FII's payment of the deposit was therefore necessary to trigger issuance of the UCBI Warrants to FILB.

231. On March 23, 2010, eight days before FII was required to pay the deposit to UCBI, neither FII nor Arbitrage had sufficient cash to fund the payment. Fletcher and FAM were therefore forced to look beyond the Fletcher Structure for the necessary funds. They turned to the bank accounts of the Richcourt Group, including Soundview Elite and the BVI Funds RES, RAF and AAI. In essence, Fletcher and FAM treated these accounts as their own personal piggy bank, and they used these investor funds for their own personal gain in violation of the

fiduciary duties they owed to, *inter alia*, Soundview Elite, RES, RAF and AAI. And the Citco Defendants did nothing to stop them.

232.    Thus, from March 23, 2010 to March 29, 2010, Fletcher and FAM, with the participation and assistance of the Citco Defendants who continued to work with the Richcourt Funds, caused Soundview Elite, RES, RAF and AAI, and other funds in the Richcourt Group to invest approximately $13.8 million in Arbitrage. On April 2, 2010, Arbitrage transferred $10 million of these funds to FII. FII received the $10 million on April 5, 2010 and the same day transferred that money to UCBI as the deposit for the UCBI Transaction. The $10 million deposit for the UCBI Transaction, therefore, consisted of money coming directly from and owned by, *inter alia*, Soundview Elite, RES, RAF and AAI.

233.    On April 30, 2012, FILB attempted to exercise $1 million of the UCBI Warrants, but UCBI refused to honor them. On August 16, 2013, the FILB Trustee tried to exercise all of the remaining UCBI Warrants, and again UCBI refused to honor them. Following negotiations in late 2013 and early 2014, on or about March 5, 2014, the FILB Trustee and UCBI reached a settlement whereby UCBI agreed to pay $12 million (the "**UCBI Settlement Proceeds**") to the FILB Trustee. Payment of the UCBI Settlement Proceeds was stated to constitute a release and be in full satisfaction of the UCBI Warrants and all claims by and between UCBI and FILB related to or arising out of the UCBI Transaction. On March 20, 2014, this Court approved the UCBI settlement agreement between UCBI and FILB. The Richcourt Funds, however, have not received any part of the UCBI Settlement Proceeds.

234.    The Richcourt Funds' approximately $13 million investment in Arbitrage in March 2010 in connection with the UCBI Transaction constituted an abandonment of, and was

entirely contrary to, the Funds' best interests – and SCM, RHI, CTI, FAM, Fletcher, Kiely, Turner, Unternaehrer and Citco Group knew it. This investment was made in direct breach of the fiduciary duties of SCM, RHI, CTI, FAM, Fletcher, Unternaehrer and Citco Group.

    4.       Fourth Defalcation: The Citco Administrators Resign, Leaving the Richcourt Funds' Records a Shambles, and Leaving Citco in <u>Unjustified Possession of More than $340 Million of the Funds' Money</u>

235.    On December 31, 2009, the Citco Administrators, Citco Bank and Citco Global resigned as administrator, middle office service provider, registrar and transfer agent, bank and custodian of the Richcourt Funds, effective March 31, 2010. Upon information and belief, they remained in place until approximately one month after that date.

236.    As stated above, among their various duties, the Citco Administrators were obligated to maintain the Richcourt Funds' financial and accounting books and records. However, in violation of their contractual obligations to the Funds under the Citco Administration Agreements and the Citco Master Administration Agreement, the Citco Administrators left these books and records substantially incomplete following their resignation. The Citco Administrators thereby caused the Richcourt Funds to incur substantial expense and damages, including the expense of completing their work, in an amount to be determined at trial.

237.    In addition, the records available to the Plaintiffs show that the Soundview Funds made almost $240 million in unreconciled payments to subsidiaries and affiliates of Citco Group, including the Citco Administrators and Citco Global, during the six years prior to the Petition Date. Schedules of these payments are attached as <u>Exhibit 1</u> to this Complaint. The Trustee, despite requests to Citco and review of the Richcourt Funds' financial records, such as they are, has been unable to reconcile these payments or verify that paying them was justified. The Citco

-87-

Defendants are directly responsible for any improper payments they made, permitted and/or received as part of this $240 million as well as for aiding or assisting other Citco entities in breaching their duties to the Richcourt Funds.

238.     Further, the records available to the Joint Liquidators indicate that the BVI Funds made more than an estimated $100 million in payments to subsidiaries and affiliates of Citco Group, including the Citco Administrators and Citco Global, during the period between June 1, 2008 (six years before the parties' tolling agrement) and the Chapter 15 Petition Date.   A schedule of more than $73 million of these payments is attached as <u>Exhibit 3</u> to this Complaint. The Joint Liquidators, despite requests to Citco and review of the Richcourt Funds' financial records, such as they are, have been unable to reconcile these payments or verify that paying them was justified.   The Citco Defendants are directly responsible for any improper payments they made, permitted and/or received as part of this $100 million as well as for aiding or assisting other Citco entities in breaching their duties to the Richcourt Funds.

239.     Because Citco Group, the Citco Administrators and Citco Bank have failed to reconcile and justify these payments and assist in providing missing records despite the Trustee's and the Joint Liquidators' requests, the Plaintiffs are entitled to assume that the Citco Defendants have taken and converted more than $340 million of the Richcourt Funds' money for their own purposes unless and until the Citco Group provides an acceptable reconciliation.

240.     Absent proof that the Citco Group has earned and is entitled to keep more than $340 million of the Richcourt Funds' money, those funds must be returned.   Also, the Citco Defendants, Fletcher and FAM, to the extent they permitted improper or unjustified payments to be made, kept or received, have breached their duties to the Funds by failing to secure the

money's return.  In addition, Citco Group's, Citco Bank's and the Citco Administrators' refusal to provide the Joint Liquidators and the Trustee with the information they have requested has forced the Richcourt Funds to incur legal and other expenses unnecessarily for which Citco Group is properly liable.

241.    Citco Group and the Citco Defendants had one more trick up their sleeves.  The Citco Defendants and their affiliates not only took more than $340 million of the Funds' money without apparent justification, they also ensured, in sharp contrast to the indifference they showed to the plight of other investors, that Citco Group's own investments in the Richcourt Funds were redeemed with the smallest possible loss.

242.    Prior to the Richcourt Acquisition, when the Citco Defendants alone serviced and managed the investments of the Richcourt Funds, the Citco International Pension Plan (of which Unternaehrer was a member), purchased 5,780.30 shares in the Soundview Funds.  By the time the Soundview Funds filed their bankruptcy petition, the Citco Group had reduced this investment to a mere 230.20 shares.  Thus, even though Citco Group and its subsidiaries and affiliates played a crucial role in the collapse of the Soundview Funds, they made sure that their own interests were protected.

5.    Fifth Defalcation:  The Fletcher Defendants Take $4 Million from Soundview
Elite to Pay Fletcher Entities' Debt to the FILB Estate and Third Parties

243.    In mid-2012, the funds in the Fletcher Structure collapsed as Fletcher and FAM's long-standing fraudulent scheme started to unwind.  After Leveraged was placed into liquidation in the Cayman Islands on April 18, 2012, Fletcher and FAM could see the writing on the wall:  it would not be long before FILB joined Leveraged in bankruptcy or liquidation.

-89-

244. In an effort to squirrel away as much money as possible before they lost control of FILB to a U.S. bankruptcy court or offshore liquidator, the Fletcher Defendants concocted a fraudulent scheme to transfer some of FILB's assets to FII, a non-debtor entity they controlled. They even planned to transfer away ownership of FILB itself. This series of transactions (the "**April 22 Transactions**") took place on April 22, 2012, just four days after Leveraged was placed into official liquidation in the Cayman Islands.

245. The April 22 Transactions consisted of the following elements:

- FILB would be owned 85% by Arbitrage and 15% by FII.

- Arbitrage transferred ownership of FII to other Fletcher-related entities that were not at risk of impending bankruptcy or liquidation.

- FILB transferred $2.2 million from its bank account to FII's bank account.

- FILB transferred all of its ownership interest in a company called BRG Investments, LLC (the "**BRG Interest**") to FII.

- FILB transferred to FII warrants entitling it to purchase common stock of the Document Security Systems company (the "**DSS Warrants**").

- FILB transferred to FII one-half of the UCBI Warrants.

- FILB assigned to FII the right to any payment in excess of $606,667 that UCBI made to FILB due to a "Registration Failure" under the SPA (the "**Excess Registration Funds**").

246. Although Fletcher and FAM tried to justify the April 22 Transactions as a "payment-in-kind" redemption by FII of its shares of FILB, the FILB Trustee concluded that the April 22 Transactions "were intended to remove FILB assets from the reach of Arbitrage and Arbitrage's investors, and in particular, Leveraged, Alpha, the JOLs administering Leveraged and Alpha, and Leveraged's and Alpha's public pension fund investors." (FILB Trustee Report, at 16.) Indeed, a few months after his appointment, the FILB Trustee approached Fletcher,

FAM, FII and others and insisted that the April 22 Transactions be unwound to return the transferred assets to the FILB estate.

247.    In mid-December 2012, the FILB Trustee entered into negotiations with Fletcher, FAM, FII and others to come up with a term sheet for this proposed unwind transaction. In December 2012, the FILB Trustee forwarded to Fletcher a draft term sheet which, among other things, called for FII to return these transferred assets to FILB and, specifically, to pay to FILB by wire transfer the sum of $2.2 million in immediately available funds.

248.    Fletcher, however, realized that FII no longer had the $2.2 million it had taken from FILB – the funds had apparently been dissipated elsewhere. Thus, to complete the contemplated unwind transaction, Fletcher needed to come up with a way to get $2.2 million into FII's account so FII could repay FILB under the terms of the settlement. Fletcher, FAM, FII and others turned to the not-yet-bankrupt Soundview Elite as a source for these funds. Fletcher, FAM and FII also opportunistically viewed Soundview Elite as a potential source to pay others of their own creditors, including FAM itself.

249.    To that end, while negotiations were continuing between Fletcher, FAM and FII on the one hand, and the FILB Trustee on the other, Fletcher secretly, with the assistance of his cronies Muho and Ladner, executed documents on December 31, 2012 which looted $4 million from Soundview Elite and transferred the money to FII (the "**New Year's Eve Transaction**"). Soundview Elite was insolvent at the time of the $4 million transfer, and the transfer was made with actual intent to hinder, delay or defraud Soundview Elite's creditors.

250.    Pursuant to a one-page sale agreement dated December 31, 2012, FII agreed to sell to Soundview Elite all of its shares in FILB. These were the very same shares that had

purportedly been redeemed in the April 22 Transactions and which the FILB Trustee planned to reissue to FII as part of the proposed unwind. Thus, Fletcher was causing Soundview Elite to pay $4 million for shares in an entity that was already bankrupt. Fletcher signed this sales agreement in his capacity as a director of FII and Fletcher and Muho signed the agreement as directors of Soundview Elite.

251.    In another one-page sale agreement entered into on December 31, 2012, FII agreed to sell the BRG Interest to Soundview Elite for the price of $1.38 million. This was the same asset that had been transferred from FILB to FII as part of the April 22 Transactions, and one of the very same interests the FILB Trustee now wanted returned to FILB. This one-page sales agreement was signed by Fletcher and Ladner as directors of FII and by Fletcher and Muho as directors of Soundview Elite.

252.    The final element of the secretive New Year's Eve Transaction was that Fletcher caused FII and Soundview Elite to enter into an assignment and assumption agreement dated December 31, 2012. Pursuant to that agreement, in purported consideration of Soundview Elite's agreement to pay FII $4 million for its shares of FILB, FII assigned and Soundview Elite assumed all of FII's shares of FILB and the BRG Interest. The assignment and assumption agreement was signed by Fletcher as director of FII and by Fletcher and Muho as directors of Soundview Elite.

253.    Thus, Fletcher acted on both sides of all aspects of the New Year's Eve Transaction, with the assistance of Ladner and Muho, and Soundview Elite was the victim. Nevertheless, it was not long before Fletcher, Ladner, FAM and FII ignored this purported transfer of ownership in effecting the unwind of the April 22 Transactions. In fact, FII never

transferred to Soundview Elite either the $4 million for the FILB shares or the $1.38 million for the BRG Interest. And the purported asset transfer to Soundview Elite and the payments to be made by Soundview Elite to FII memorialized in the New Year's Eve Transaction were not even disclosed to the Court that was asked to approve the settlement unwinding of the April 22 Transactions.

254.     The negotiations between the FILB Trustee and Fletcher concerning the unwind transactions continued into early 2013 and, on February 8, 2013, the parties executed a term sheet memorializing that transaction (the "**Term Sheet**"). After describing the assets transferred from FILB to FII in the April 22 Transactions, the Term Sheet set forth the material terms of the proposed unwind transactions ("**Unwind Transactions**") as follows:

> On the Closing Date FII and FILB shall enter into the following transactions . . .
>
> > 1.     FII shall pay to FILB by wire transfer in immediately available funds $2,200,000 to the account set forth on Schedule 1 hereto. The payment of this $2.2 million shall be without prejudice to the [FILB] Trustee's claims to any other monies transferred by or between FII and BRG or their direct or indirect subsidiaries or affiliates;
> >
> > 2.     FII shall execute an assignment of the UCBI Warrants in favor of FILB or to the extent any or all of such warrants have been exercised an assignment of the Common Stock Junior Preferred purchased pursuant to such UCBI Warrants and any claims against UCBI for its failure to honor the UCBI Warrants;
> >
> > 3.     FII shall execute an assignment of the BRG Membership Interests in favor of FILB;
> >
> > 4.     FII shall execute an assignment of the DSS Warrants in favor of FILB or to the extent any or all of such warrants have been executed an assignment of the common stock purchased pursuant to such DSS Warrants;
> >
> > 5.     FII and FILB shall execute an agreement assigning the right to receive the Excess Registration Funds from FII to FILB; and

6.     The FILB shares redeemed by FII shall be reinstated and reissued to FII.

(FILB Docket No. 188 (Term Sheet; Exhibit B to FILB Trustee's Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019(A) Approving the Term Sheet Agreement Between the FILB Trustee and Fletcher International, Inc.))

255.     The Term Sheet made no reference to the fact that the $2.2 million FII was to pay back to FILB was, in fact, coming out of the coffers of Soundview Elite.  The Term Sheet made no reference to the secret New Year's Eve Transaction.   Nor did the Term Sheet make any mention of where the funds FII was to be paying to FILB were coming from.   But the Fletcher Defendants knew that FII had no money in its account with which to make this $2.2 million payment.   In fact, the balance of FII's account immediately prior to the Unwind Transactions was zero.   The Fletcher Defendants knew that this money must, and planned that it would, be taken from Soundview Elite.

256.     On or about February 11, 2013, the FILB Trustee filed a Rule 9019 motion with the Bankruptcy Court seeking approval of the transaction embodied in the Term Sheet. (FILB Docket No. 188).   The Fletcher Defendants did not disclose to the Court, however, that the $2.2 million payment to FILB set forth in the Term Sheet was to come from Soundview Elite, an entity that had no reason to pay it.   Rather, the motion and proposed Term Sheet left the misleading impression that FII had $2.2 million in its account and still retained the BRG Interest, such that FII could complete the Unwind Transactions on its own.   That was not the case.

257.     On February 20, 2013, this Court issued an order approving the Unwind Transactions set forth in the Term Sheet.   The transactions were consummated on March 8, 2013, pursuant to an Omnibus Assignment and Stock Reinstatement Agreement entered into between

the FILB Trustee, on behalf of FILB, and Fletcher, on behalf of FII (the "**FILB/FII Assignment Agreement**"). That agreement purported to give effect to the various transactions embodied in the Term Sheet and consummated the Unwind Transactions, including FII's payment of Soundview Elite's $2.2 million to FILB.

258.    Remarkably, the FILB/FII Assignment Agreement contains a provision in which FII represents and warrants that:

> Assignor [*i.e.*, FII] or Assignee [*i.e.*, FILB] is the legal and beneficial owner of the BRG Membership Interests, which represent all of the equity interest in BRG. The BRG Membership Interests are owned by Assignor or Assignee free and clear of all liens, encumbrances, restrictions, liabilities and claims of every kind except for liens and encumbrances, if any, arising under the LLC Agreement.

(FILB/FII Assignment Ag. ¶ 4(d).)

259.    Rather than transferring just $2.2 million to FII, as called for under the FILB/FII Assignment Agreement at the closing of the Unwind Transactions, on March 8, 2013, Fletcher and FAM caused Soundview Elite to transfer an additional $1.8 million from its bank account to FII for a total of $4 million. Immediately thereafter, FII wired $2.2 million to FILB's account, which was controlled by the FILB Trustee, and the remaining terms of the Unwind Transactions were also consummated – the purported assignment of the BRG Interest to FILB, and the reissuance of FILB shares to FII.

260.    Over the course of the following month, FII disbursed the remaining $1.8 million to a number of creditors of Fletcher, FAM or other FAM affiliates. These payments were made, in large part, for services these creditors purportedly had rendered to entities other than FII and

Soundview Elite and in connection with obligations having nothing to do with the April 22 Transactions or the Unwind Transactions.

261.    For example, upon information and belief, FII disbursed approximately $522,000 to the law firm of Cohen & Gresser for services in connection with Fletcher's ongoing personal litigation against the Dakota apartment building in New York City.  Upon information and belief, FII also paid approximately $300,000 to RF Services for back office services it provided to FILB, Arbitrage, Leveraged and Alpha, all of which were either in insolvency proceedings in the Cayman Islands or in U.S. bankruptcy proceedings.  Further, upon information and belief, FII paid approximately $10,000 to James Crosson as a retainer for portfolio management services he purportedly rendered to New Wave Fund SPC, another fund Fletcher and FAM controlled.  FII even paid FAM approximately $65,000 out of the funds FII received from Soundview Elite.

262.    Fletcher and FAM's conversion of Soundview Elite's money to pay Fletcher entities was a breach of fiduciary and other duties, as they well knew.  They are liable for its return.

**The Fletcher Defendants Try to Cover Up Their Misuse of Soundview Elite Money**

263.    In the months following the closing of the Unwind Transactions, troubles continued to mount for the Fletcher entities that were not yet in bankruptcy or liquidation.  On March 26, 2013, the Solon Group, Inc. ("**Solon**") was appointed as a non-management co-director (along with Fletcher and Muho) for the Soundview Debtors (who were not yet in bankruptcy) and other Fletcher-controlled funds.   On April 2, 2013, Muho tendered his resignation as a director of many Fletcher-controlled entities, and this engendered disputes as to the ownership and control of various assets held by these entities.  On May 28, 2013, Deborah

Midanek, the president of Solon, contacted the Cayman Islands Monetary Authority to inform them about her concerns with respect to Fletcher's conduct and management of various Fletcher-controlled funds. In short, the Fletcher house of cards was continuing to fall and his tenure as director of many of these non-debtor funds appeared to be nearing an end.

264.    Upon information and belief, in July 2013, Fletcher, FAM and others sought to create a paper trail to mask the improper March 2013 transfer of $4 million from Soundview Elite to FII to fund the Unwind Transactions. Accordingly, on July 19, 2013 – more than four months after the Unwind Transactions closed – Fletcher, FAM, FII and others entered into agreements designed to conceal the improprieties and their breaches of fiduciary duty associated with their use of Soundview Elite as a personal piggy bank to fund the Unwind Transactions and to pay off their creditors.

265.    On July 19, 2013, Fletcher, FAM and others caused FII, Soundview Elite and RPGP (yet another entity owned and controlled by Fletcher and FAM) to execute an Omnibus Agreement (the "**Omnibus Agreement**"), which purported to tie up issues resulting from the Unwind Transactions and the New Year's Eve Transaction, including the FILB/FII Assignment Agreement. Indeed, the whereas clauses of the Omnibus Agreement relate: (a) the history of the April 22 Transactions, with FILB's transfer of the BRG Interest and $2.2 million to FII; (b) the New Year's Eve Transaction, with FII's assignment of its shares of FILB to Soundview Elite and Soundview Elite's associated payment of $4 million out of the $5.138 million cash consideration called for in that transaction; and (c) the fact that the transfer of FILB shares and the BRG Interest was not completed.

266.     The Omnibus Agreement stated as one of its purposes that RPGP was to "provide credit enhancements to [Soundview] Elite with respect to [FII's] liability to [Soundview] Elite and amounts of the Claims owed by [Soundview] Elite" and FII was to issue to RPGP newly issued common shares of FII.  (Omnibus Ag. at 4.)  To that end, the parties stated that they "wish to amend the [New Year's Eve] Sales Agreement relating to the ownership of BRG, the [New Year's Eve] Sales Agreement relating to the ownership of [FILB], and the related [New Year's Eve] Assignment and Assumption Agreement"  (*Id.*)

267.     The Omnibus Agreement was signed by SCM and FAM in their respective capacities as investment managers for Soundview Elite and FII.  Ladner signed for SCM and Saunders signed for FAM as its corporate secretary.  Fletcher signed the agreement on behalf of RPGP.   In short, Fletcher and entities he controlled were on all three sides of this sham transaction.

268.     Pursuant to the Omnibus Agreement, the transfer of the BRG Interest from FII to Soundview Elite was purportedly cancelled, rescinded and terminated, as was Soundview Elite's obligation to pay $1.38 million for that interest.  The transfer of shares of FILB from FII to Soundview Elite was also purportedly cancelled, rescinded and terminated, but notably, Soundview Elite's transfer of $4 million to FII was not.  Instead, FII was to issue a promissory note to Soundview Elite for the full amount of consideration paid by Soundview Elite to FII, plus 8% annual interest.   Attached to the Omnibus Agreement is a fully executed, one-year, promissory note issued by FII to Soundview Elite in the amount of $5.38 million.

269.     Upon information and belief, FII has no assets or ability to make payment on that note, and the note therefore is, and always has been, worthless.   Although the Omnibus

Agreement purports to memorialize some sort of benefit that Soundview Elite purportedly gained by paying $4 million to FII to finance the Unwind Transactions, the consideration Soundview Elite received through the Omnibus Agreement is and always was worth nothing.

270.     Compounding this bogus transaction, the Omnibus Agreement also contains a provision (paragraph 4) stating that RPGP "shall" deliver to FII a cash payment in the full amount of the promissory note (with some possible reductions) in exchange for FII issuing a specified number of shares of its common stock to RPGP.  (Omnibus Agreement ¶ 4)  Once this payment and issuance takes place, the Omnibus Agreement states that FII "will" within two business days prepay the promissory note and transfer to Soundview Elite the amount FII owes on the note.  (Omnibus Agreement ¶ 5)

271.     The fact that the parties did not expect this obligation to be fulfilled is confirmed by the First Amendment to the Omnibus Agreement, dated September 12, 2013, by and among Soundview Elite, FII and RPGP, just two weeks before Fletcher put Soundview Elite into bankruptcy.  Pursuant to that amendment, among other things, the word "shall" in paragraph 4 was changed to "may," rendering the obligation of RPGP to make the payment entirely optional. This confirms that the benefit the Omnibus Agreement purported to confer upon Soundview Elite was illusory from the start.  In any event, RPGP made no payment to FII, FII issued no shares to RPGP and Soundview Elite still has not been paid on the promissory note.

272.     The Omnibus Agreement promises to provide Soundview Elite with an indemnification by RPGP of 50% of any losses Soundview Elite incurs in connection with FII's repayment of cash to Soundview Elite after RPGP's payment of $5.38 million, or an appropriately reduced amount, to FII.  Since, upon information and belief, RPGP has no ability

and therefore no intention to pay this amount, the purported indemnification is also worthless. If anything, by amending the Omnibus Agreement in September 2013 (on the eve of Soundview Elite's bankruptcy), Fletcher, FAM, FII, RPGP and others intended to remove from the reach of the Soundview Elite estate (and the Trustee) the supposed "guarantee" provided by RPGP to Soundview Elite under the Omnibus Agreement. This further demonstrates Fletcher, FII and FAM's efforts to avoid paying anything to Soundview Elite in return for the $4 million they looted from its coffers in connection with the Unwind Transactions.

273.    In sum, the Omnibus Agreement provided no benefit to Soundview Elite in exchange for its payment of $4 million to FII in March 2013. Rather, it is merely another subterfuge in Fletcher's shell game whereby he and his cohorts moved money to entities they continued to control, while simultaneously attempting to create documents that justify and/or obscure their actions. The Omnibus Agreement was just another artifice in the Fletcher Defendants' scheme to effectuate fraudulent conveyances and breaches of fiduciary duty that caused the Richcourt Funds millions of dollars in losses. At a minimum, to the extent that the Omnibus Agreement could genuinely have provided benefits to Soundview Elite, those benefits have not been obtained.

## IV.    THE FINAL COLLAPSE OF THE FLETCHER STRUCTURE AND THE RICHCOURT FUNDS

274.    As described above, the Fletcher Structure collapsed in mid-2012. Each of Leveraged, Arbitrage and Alpha was placed into liquidation in the Cayman Islands and Mr. Davis was appointed as FILB's chapter 11 trustee on September 28, 2012. As of the date of this Complaint, Leveraged, Alpha and Arbitrage remain in liquidation in the Cayman Islands and Mr.

Davis, formerly the FILB Trustee, continues to administer the FILB estate as its Estate Administrator.

275.    On September 24, 2013, Fletcher caused each of the Soundview Debtors to file for bankruptcy protection.  On February 3, 2014, this Court approved the appointment of the Trustee as chapter 11 trustee of the Soundview Debtors.  Also, on September 24, 2013, the Grand Court of the Cayman Islands ordered that each of the Soundview Funds be placed into liquidation and the Joint Liquidators were appointed for that purpose.

276.    On June 6, 2014, the BVI Funds filed petitions before the Eastern Caribbean Supreme Court in the British Virgin Islands, seeking the appointment of John Ayres and David Walker as joint provisional liquidators of the BVI Funds.  On July 2, 2014, the BVI Court approved the petitions.  On July 21, 2014, the BVI Funds filed applications before the Eastern Caribbean Supreme Court in the British Virgin Islands, seeking the appointment of John Ayres and Matthew Wright as joint liquidators of the BVI Funds.  On July 23, 2014, the BVI Court approved the applications

277.    Upon information and belief, Fletcher and FAM continue to operate and control other entities in the Richcourt Group, including Soundview Composite, New Wave, SCM and Richcourt USA, Inc.  Soundview Composite is a defendant in an adversary proceeding brought by the Trustee in this bankruptcy case seeking a turnover and accounting in connection with Soundview Composite's refusal to redeem shares owned by Soundview Elite.  (*Corinne Ball as Chapter 11 Trustee of Soundview Elite Ltd. v. Soundview Composite Ltd.*, Adv. Proc. No. 14-01923 (REG)).

278.    From the time the negotiations began for the Richcourt Acquisition until the Richcourt Funds' ultimate bankruptcies and liquidations, the conduct of the Defendants, each of whom owed contractual or fiduciary duties to the Funds, was a scandal.  Citco's "premier" fund management services served only to assist the Fletcher Defendants in looting the Funds, and Citco itself in seizing more than $340 million for which it is has failed to provide a valid justification.

279.    The Citco Defendants owed fiduciary duties to the Richcourt Funds through at least March or April 2010, almost two years after the Richcourt Acquisition, because they continued to provide services to the Funds until that time.   However, certain of the Citco Defendants continued to owe fiduciary duties to the Funds even through late 2011, because Citco Group's agent Unternaehrer remained at RHI.   Unternaehrer was placed there, as he and the Citco Group knew, because the Funds and their investors placed a high degree of trust and confidence in the Citco Defendants to protect them.   The letters from the Funds' post-Acquisition directors in December 2008 and January 2009, which the Citco Defendants disseminated to investors, make that very plain:  Fletcher, FAM and their chosen directors sought to reassure the Funds' investors by telling them – falsely – that no, Citco Group hadn't sold its interest in the Richcourt Funds, and no, the Funds' management had not changed.  The Citco Defendants may choose to deny their fiduciary duties now, but they knew from the Richcourt Acquisition forward that the continued success of the Richcourt Funds, and the safety of their investors' assets, depended entirely on the Citco Defendants' protection.

280.    As the Fletcher and FAM's looting grew worse, the Citco Defendants scrambled to pay themselves off and then simply quit the scene, covering up the defalcations discussed above, and undoubtedly more, by leaving the Richcourt Funds' records in disarray.  The moral of

the story is plain:  the Citco and Fletcher Defendants behaved egregiously, benefiting themselves at what they knew would be others' expense.   They blithely violated their fiduciary and contractual duties to the Richcourt Funds, even though they knew that the investors in those Funds, which they had created and managed, would suffer enormous losses.  The Defendants must be held to account:   they owe the Richcourt Funds compensation for their outrageous wrongs.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
**(Against the Citco Defendants Based on the Richcourt Acquisition)**

281.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 280 of this Complaint as if fully set forth herein.

282.    Prior to the Richcourt Acquisition, the Richcourt Funds had no employees of their own.  Instead, they were directed, managed and serviced solely by the Citco Defendants.

283.    Prior to the Richcourt Acquisition, the Citco Defendants owned the Richcourt Funds' voting shares, directed and managed their business and investment activities and acted as their exclusive service provider.  The Citco Defendants also held positions as the Funds' sole voting shareholder, director, investment manager, investment advisor, direct and indirect parent company, administrator, sub-administrator, registrar and transfer agent, middle office service provider, custodian and bank.

284.    Prior to the Richcourt Acquisition, the Richcourt Funds and their stakeholders were wholly dependent on the Citco Defendants to protect their interests with respect to the

Funds.  The Citco Defendants controlled all aspects of the Funds, and the Funds and their stakeholders accordingly placed a high degree of trust and confidence in the Citco Defendants to direct, manage and service the Funds loyally and with care, as well as to protect and attempt to maximize their assets.  The Citco Defendants encouraged, knew of and accepted the Funds' and their stakeholders' trust and confidence.

285.    Prior to the Richcourt Acquisition, the Citco Defendants had a fiduciary relationship with the Richcourt Funds, and owed them fiduciary duties, because of the Citco Defendants' controlling position and acceptance of the Funds' trust and confidence. The Citco Defendants also owed the Funds fiduciary duties when they acted as the Funds' agents, officers or directors or provided fund services.

286.    Prior to the Richcourt Acquisition, the Citco Defendants acted as agents or alter egos of each other and, given the structure and operation of the Citco Group of Companies as a single, integrated organization under the direction and control of Citco Group through the Citco Executive Committee, the knowledge, conduct, liability and fiduciary and other obligations of any of the Citco Defendants is properly imputed to each of the others.

287.    The fiduciary duties that each of the Citco Defendants owed to the Richcourt Funds prior to the Richcourt Acquisition included duties of care, loyalty and candor.  Among other things, the duty of care requires fiduciaries to act with the care that an ordinarily prudent person in a like position would exercise under the circumstances.  The duty of loyalty requires, *inter alia*, that fiduciaries act in good faith and in the best interests of their principals without any desire to obtain personal benefit or to benefit some person other than their principals.  The duty of candor requires fiduciaries to reveal all material information to those to whom a duty of

candor is owed, including material information concerning the agent's conflicts of interest.  Prior

to the Richcourt Acquisition, the Citco Defendants owed all of these duties to the Funds.

288.    At the time of the Richcourt Acquisition, the Citco Defendants owed the

foregoing fiduciary duties to the Funds for, *inter alia*, the following additional reasons:

> A.    The Citco Directors owed fiduciary duties to the Richcourt
> Funds because they served as the Funds' directors.  The Fund PPMs
> encouraged the Funds and their stakeholders to place a high degree of trust
> and confidence in the Citco Directors because they were the Funds' agents
> and, according to the Soundview Elite PPM for 2005, for example, were
> "responsible for managing the business and affairs of the Fund, including
> supervision of the activities of the Administrator, Subadministrator and
> Middle-Office Service Provider and the maintenance of corporate
> records."  According to the PPMs, the Citco Directors also had the right to
> exercise the Funds' power under their Articles of Association to borrow
> and lend money.

> Because of the Citco Directors' power over and position of
> responsibility with respect to the Funds, the Funds and their stakeholders
> placed a high degree of trust and confidence in them, and the Citco
> Directors encouraged, knew of and accepted their trust and confidence.

> B.    SCM and RCM were the Richcourt Funds' agents
> responsible for selecting the Funds' investments and protecting their
> assets.  SCM and RCM also owned all of the Funds' voting shares and
> controlled both the election and removal of directors of the Fund, so that
> they supervised the directors' management of the business of the Funds.
> SCM and RCM also voted on amendments to the Articles of Association.

> Because of SCM's and RCM's power over and position of
> responsibility with respect to the Richcourt Funds, and because SCM and
> RCM expressly agreed to act as the Richcourt Funds' agents, the Funds
> and their stakeholders placed a high degree of trust and confidence in
> SCM and RCM, which SCM and RCM in turn encouraged, knew of and
> accepted.

> One way in which SCM and RCM encouraged the Funds and their
> investors to place a high degree of trust and confidence in their loyalty and
> competence was to provide assurances about their goals and activities in
> the PPMs on which the Funds and their stakeholders relied.  For example,
> the 2005 Soundview Elite PPM stated that SCM:

-105-

continuously screens the money management industry in an attempt to select promising up and coming money managers….Generally, in allocating the Funds' assets among Money Managers from time to time, the Investment Manager will attempt to provide the highest expected return for the amount of risk deemed appropriate by the Investment Manager at the time of allocation….the Investment Manager will attempt to maintain the Fund's investments … with a view toward maximizing the risk/reward potential of the Fund's portfolio.

SCM and RCM also encouraged the Funds and their stakeholders to place a high degree of trust and confidence in them because of their relationship to their ultimate parent Citco Group. In the Funds' PPMs and elsewhere, SCM, RCM and Citco Group encouraged reliance on Citco Group and all of its subsidiaries to protect and further the Funds' interests. In word or substance, the PPMs describe Citco Group as "one of the leading international fund administrators" with numerous international offices and 1,400 funds under management. The PPMs add, in word or substance, that "Citco Group Ltd. and its subsidiaries employ approximately 1,500 people worldwide," thereby implying that employees of Citco Group subsidiaries are also in effect employees of Citco Group and to be trusted for that reason.

C. Unternaehrer, Smeets, Voges, Laddaga and Bloch were SCM's or RCM's directors and managers and the Richcourt Funds' agents in ensuring that SCM and RCM fulfilled their responsibilities to the Funds. In the Funds' PPMs and elsewhere, Unternaehrer, Smeets, Voges, Laddaga and Bloch held themselves out as loyal to the Funds and competent to perform this task. They also exercised important power over the Funds. As a result, as they encouraged, knew and accepted, the Richcourt Funds and their stakeholders placed a high degree of trust and confidence in them.

One way in which Unternaehrer, Smeets, Voges, Laddaga and Bloch encouraged the Funds and their stakeholders to place confidence in them was to identify themselves as SCM's or RCM's directors in the PPMs on which the Funds and their stakeholders relied. The PPMs included specific assurances about SCM's and RCM's goals and activities on behalf of the Funds.

In addition, Unternaehrer was Chairman of SCM's and RCM's Allocation Committees which, upon information and belief, played a key role in choosing the Richcourt Funds' investments. Unternaehrer was intimately and directly involved in all aspects of managing the Funds as well as in directing and controlling the Citco Defendants through his position as a member of the Citco Executive Committee, to which each of

the divisions in the Citco Group of Companies reported. Unternaehrer was also a director of RHI, a position he retained until late 2011.

Laddaga was a director of CTI and SCM. Upon information and belief, Laddaga continued as a director until February 2009, and he worked extensively with the Funds until that time, devoting a substantial part of his time to investor relations. As a result, he was an agent of the Funds with respect to their communications with stakeholders as well as with respect to the Funds' investment and management.

Bloch was a director of RHI, Richcourt (Monaco) S.A.M., SCM and CTI. Although he resigned as a director of SCM and RHI, upon completion of the Richcourt Acquisition, he remained a director of Richcourt (Monaco) S.A.M. until about May 2009. Until May 2009, Bloch was primarily responsible for monitoring the finances of the Richcourt Funds and the Richcourt Group as a whole, and for the audits of the Funds and other Richcourt Group companies.

D. <u>Magris</u> was a director of RHI until the Richcourt Acquisition. Upon information and belief, Magris played a significant role in the management of SCM and RCM and the selection of their investments. Because he exercised important power over the Funds through his work with RHI, RCM and SCM, as Magris encouraged, knew and accepted, the Funds and their stakeholders placed a high degree of trust and confidence in him.

E. <u>RHI</u> was SCM's and RCM's parent company and, in that capacity, had the power to control SCM and RCM and, to a significant extent, the Richcourt Funds. Because it exercised important power over the Funds, the Funds and their stakeholders placed a high degree of trust and confidence in RHI, which RHI and its directors – Unternaehrer, Bloch and Magris – encouraged, knew and accepted.

RHI encouraged the Richcourt Funds and their stakeholders to place a high degree of trust and confidence in it because of its relationship to its ultimate parent Citco Group. In the Funds' PPMs and elsewhere, RHI and Citco Group encouraged reliance on Citco Group and all of its subsidiaries to protect and further the Funds' interests. In word or substance, the PPMs describe Citco Group as "one of the leading international fund administrators" with numerous international offices and 1,400 funds under management. The PPMs add, in word or substance, that "Citco Group Ltd. and its subsidiaries employ approximately 1,500 people worldwide," thereby implying that employees of Citco Group subsidiaries are also in effect employees of Citco Group and to be trusted for that reason.

F. <u>CTI</u> was Citco Group's subsidiary and RHI's parent company. In that capacity, it had the power to control SCM and RCM and, to a significant extent, the Richcourt Funds. Because it exercised important power over the Funds, the Funds and their stakeholders placed a high degree of trust and confidence in CTI, which CTI and its directors encouraged, knew and accepted.

In addition, CTI encouraged the Richcourt Funds and their stakeholders to place a high degree of trust and confidence in it because of its relationship to its ultimate parent Citco Group. In the Funds' PPMs and elsewhere, CTI and Citco Group encouraged reliance on Citco Group and all of its subsidiaries to protect and further the Funds' interests. In word or substance, the PPMs describe Citco Group as "one of the leading international fund administrators" with numerous international offices and 1,400 funds under management. The PPMs add, in word or substance, that "Citco Group Ltd. and its subsidiaries employ approximately 1,500 people worldwide," thereby implying that employees of Citco Group subsidiaries are also in effect employees of Citco Group and to be trusted for that reason.

G. <u>Citco Group</u> was CTI's parent company and an indirect shareholder in SCM, RCM and RHI. The Richcourt Group and its Funds were creations of Citco Group, and Citco Group had a dominant role in managing every aspect of the Funds, either directly or through agents, subsidiaries or affiliates that Citco Group presented as subject to its control. Indeed, Smeets and Voges were directors of both Citco Group and RCM. Also, when Unternaehrer circulated his "Internal Announce-ment" of the Richcourt Acquisition to Citco personnel, he stated that Citco's "Executive Committee," not CTI, had "completed the sale of the Richcourt Fund of Funds business to a group of investors [led] by Fletcher Asset Management in New York." Further, Unternaehrer signed the Internal Announcement as "Director, Executive Committee, The Citco Group Ltd."

Unternaehrer exercised his extensive control over SCM, RCM, RHI and the Richcourt Funds in his capacity as Citco Group's agent. Citco Group also exercised control over the Funds, RHI, RCM and SCM through its ownership interests in and control over all of the other Citco Defendants. Because it exercised important power over the Richcourt Funds, the Funds and their stakeholders placed a high degree of trust and confidence in Citco Group, which Citco Group and its directors encouraged, knew and accepted.

Citco Group made extensive efforts to encourage the Richcourt Funds and their investors to place a high degree of trust and confidence it its abilities as a fund manager. Upon information and belief, all or substantially all of the Richcourt Funds' investors and service providers

invested in the Funds or did business with them in reliance on their belief, specifically encouraged by Citco Group, that Citco Group would use its extensive expertise to ensure that the Funds would be managed honestly and competently.

H.  Citco Global and Citco Bank were each part of Citco and were ultimately directed and controlled by Citco Group.  The Richcourt Funds and their stakeholders placed a high degree of trust and confidence in Citco Bank and Citco Global because of their roles as part of the Citco Group of Companies, because of their role as providers of key services to the Funds, and because their contracts with the Funds gave them significant discretion in performing those services and to act as the Funds' agents.  Citco Bank and Citco Global encouraged, knew of, and accepted the Funds' and their stakeholders' trust and confidence.

Citco Bank acted as the principal bank of the Richcourt Funds from 2005 on and, upon information and belief, regularly communicated with, received information from, and relayed information to individuals responsible for managing and advising the Funds.  Citco Bank provided the Richcourt Funds with brokerage services, meaning that Citco Bank effectuated purchase and sale transactions in the names of the Funds, Citco Bank or Citco Global as custodian.  For each executed transaction, Citco Bank also held the bank accounts of the Richcourt Funds into which investors were directed to pay their subscription monies.

Citco Global acted as custodian of the Richcourt Funds for years stretching back, in at least one case, to 1990.  Upon information and belief, in providing custodial services to the Funds, Citco Global regularly communicated with, received information from, and relayed information to individuals responsible for managing and advising the Funds.  Citco Global held the shares comprising the Richcourt Funds' investment portfolios and transacted in those securities on behalf of and in the name of the Funds.  Citco Global also acted as custodian for certain external investors of the Funds.

I.  The Citco Administrators were part of the Citco Group of Companies and were ultimately directed and controlled by Citco Group. The Richcourt Funds and their stakeholders placed a high degree of trust and confidence in the Citco Administrators because of their roles as part of the Citco Group of Companies, because of their role as providers of key services to the Funds, and because their contracts with the Funds gave them significant discretion in performing those services and to act as the Funds' agents.  Citco Bank and Citco Global encouraged, knew of, and accepted the Funds' and their stakeholders' trust and confidence.

The Citco Administrators regularly communicated with, received information from and relayed information to individuals responsible for

advising the Richcourt Funds. Their primary tasks as administrators of the Funds included maintaining the Funds' financial and accounting books and records, which required them, among other things, to process transactions and corporate actions, reconcile the Funds' bank accounts and portfolio holdings, and calculate each Fund's NAV and fees. The Citco Administrators also prepared monthly financial statements for the Funds which included statements of the Funds' assets and liabilities, operations, changes in NAV and portfolio holdings. In addition, the PPMs for the Funds stated that the Citco Administrators were tasked with communicating with the Funds' shareholders and preparing financial statements and periodic reports to shareholders.

Pursuant to the Citco Administration Agreements and the Citco Master Administration Agreement, the Citco Administrators further agreed to serve as each of the Richcourt Funds' middle office service provider and registrar and transfer agent. As registrar, the Citco Administrators assisted with the establishment and maintenance of the Funds' bank accounts and acted as authorized signatory on such accounts. This role also included disbursing payments for third party fees and maintaining registers of the holders of the Funds securities.

Among the Citco Administrators' most significant and relevant tasks was monitoring compliance with the Richcourt Funds' investment restrictions as set out in the PPMs and, where possible, independently verifying the prices of the underlying funds in which the Funds were invested. Finally, the Citco Administrators reported on the cash management of each Fund, including notifying SCM and RCM of any necessary liquidity requirements.

289.    Despite the Citco Defendants' fiduciary duties, they went forward with the Richcourt Acquisition. For the Richcourt Funds and their stakeholders, the Acquisition operated as a colossal, fraudulent bait-and-switch. The Funds and their stakeholders had invested with Citco, the world-leading, world-beating fund administrators who knew better than anyone else which fund managers were successful and where stakeholders' investments were likely to grow. In mid-2008, the Richcourt Funds and their investors continued to rely on Citco Group's honesty and expertise, as they had already done for more than a decade. But then Citco Group secretly sold the Funds' investment decision-making to Fletcher – a manager who Citco Group knew had misused his investors' assets, made no profitable investments after August 1997, lacked the

resources to run the Richcourt Funds effectively, and paid Citco Group and Unternaehrer a premium for the right to treat the Richcourt Funds' assets as his own. Thus Citco's extensive expertise was the bait, and the Richcourt Acquisition was the switch. Yet the Richcourt Funds and their investors, who initially were kept in the dark and then were merely told that Citco Group had acquired a "partner" whose wrongdoing Citco Group concealed, continued to rely on Citco's protection. Unfortunately, Citco's protection was no longer there.

290. Citco Group compounded its wrongdoing by structuring the Richcourt Acquisition to create the misleading appearance that nothing had changed. Citco Group retained a minority stake in the Richcourt Funds' management, and Citco Group and Fletcher pointed to that role to lull the Funds and their stakeholders into acquiescence. But Citco Group also structured the Richcourt Acquisition to preserve a secret escape hatch, allowing them to "put" their remaining interest in the Richcourt Funds at will. If only Citco Group had publicized its sale of the Richcourt Funds to Fletcher instead of concealing it as part of their fraudulent scheme, the Funds and their stakeholders could and would have exercised their right, power and authority to stop it. But that is precisely what the Citco Defendants did not want to happen: if the Funds or their stakeholders had pulled the plug on the Richcourt Acquisition, Citco Group would not have received its $27 million payoff, and Unternaehrer would not have been able to purchase his multi-million dollar second home in France. So Citco duped the Richcourt Funds and their stakeholders, substituted in Fletcher and FAM as the Richcourt Funds' investment managers, and, in breach of their fiduciary duties, perpetrated a fraud.

291. At the time of the Richcourt Acquisition, each of the Citco Defendants knew, or had sufficient information such that they would have had to be willfully blind not to know, that Fletcher and FAM had misappropriated investors' assets for their own purposes. They also knew

that Fletcher and FAM did not have enough assets to manage the Richcourt Funds effectively even with access to the fees the Funds generated and that there was a substantial risk that Fletcher and FAM, after having purchased control of the Funds, would mismanage them and misappropriate their assets in the future.  Each of the Citco Defendants possessed this information either in their own right or by imputation through their agents and others for the reasons stated above.

292.    At the time of the Richcourt Acquisition, Unternaehrer, who had acted as Citco Group's agent with respect to transactions with Fletcher and FAM, had sufficient information concerning Fletcher and FAM's assets, liabilities and sources of funds that he knew or would have had to be willfully blind not to know, before the Richcourt Acquisition, that Fletcher and FAM had misappropriated investors' assets for their own purposes.  In particular, Unternaehrer knew before or at the time of the Richcourt Acquisition that Fletcher and FAM had misappropriated funds invested by the MBTA and Louisiana Pension Funds.  He was also a recipient of misappropriated funds himself.

293.    At the time of the Richcourt Acquisition, Unternaehrer was an Executive Director of Citco Group, a member of the Citco Executive Committee, a director of SCM, RCM and RHI and the chief negotiator of the Richcourt Acquisition on behalf of Citco Group and CTI. Consequently, all of those entities, as well as Smeets and Voges as fellow Citco Executive Committee members and directors of RCM, shared Unternaehrer's knowledge concerning Fletcher and FAM as a matter of law as well as, upon information and belief, as a matter of fact.

294.    Laddaga, Bloch and Magris similarly knew that Fletcher and FAM had misappropriated investors' assets for their own purposes and that there was a substantial risk that

he would do so again.  Upon information and belief, Laddaga, Bloch and Magris had this
knowledge as a matter of fact, and they are properly presumed to have known about these
dangers as a matter of law by virtue of their positions on the boards of Citco entities that had
access to the relevant facts.

295.    Several Citco Defendants had independent sources of information about Fletcher
and FAM's lack of sufficient assets and misappropriations because of their work for Fletcher and
FAM, and they also knew the relevant facts because of their status in the integrated Citco Group
of Companies, because of their status as agents or alter egos of other Citco Defendants, and
because of their close relationship and regular communication with other Citco entities in
possession of the relevant facts.

296.    As set forth above, the Citco Defendants not only knew at the time of the
Richcourt Acquisition about Fletcher and FAM's mismanagement and fraud in the Fletcher
Structure; they had actively participated in it.  For example, they provided essential assistance to
Fletcher and FAM in arranging the Louisiana Pension Funds' investment in Leveraged because
they signed the consent to the creation of the Series N Shares and turned a blind eye to other
incidents of Fletcher and FAM's misconduct towards their investors.

297.    At the time of the Richcourt Acquisition, each of the Citco Defendants knew, at a
minimum, that they had conflicts of interest with respect to the Acquisition.  Their fiduciary
duties to the Funds required them to protect the Funds' interests and to warn the Funds and their
stakeholders about Fletcher, FAM and the Richcourt Acquisition, but their interests as owners,
agents, subsidiaries, affiliates and employees of the Citco Group of Companies did not.  The
Citco Defendants even structured the Richcourt Acquisition so as to maximize their conflict of

interest by minimizing any impact that a failure of the Funds would have on the Citco Defendants: CTI received 85% of its payment up front and in cash, and it protected the rest of its payment from loss through its "put" right.  As a result, Unternaehrer and the Citco Defendants paid no significant attention to the Funds' likely post-Acquisition success.

298.    The Citco Defendants had conflicts of interest with the Funds in connection with the Richcourt Acquisition because the Citco Defendants were financially interested in, and would benefit from, ensuring that Fletcher and FAM would continue to be able to misappropriate investors' money.  Fletcher and FAM's unrestricted ability to misappropriate investors' money helped to ensure that Fletcher and FAM would be incentivized to close, and to pay CTI a higher price for, the Richcourt Acquisition.  Fletcher and FAM's unrestricted ability to misappropriate investors' money also helped to ensure, *inter alia*, that the Citco Defendants would receive repayment of their outstanding loans and that Unternaehrer would receive his cash payment of approximately $6.6 million from his "sweetheart" deal.

299.    In addition, the Citco Defendants were concerned to ensure that the Richcourt Acquisition would be completed promptly so that they could quickly extricate themselves from ownership and management of the Richcourt Group and satisfy the concerns of their other clients.  Further, they sought to close quickly irrespective of whether this would harm the Funds, which gave them an incentive to proceed with RAI as buyer.  Thus, many of the interests of the Citco Defendants in the Richcourt Acquisition were in direct opposition to the interests of the Funds.

300.    At the time of the Richcourt Acquisition, the Richcourt Funds were entitled to rely on the Citco Defendants to do their best to ensure that the management of the Funds would

not be acquired by managers who flouted the duties they owed to the funds under their control or who misappropriated investors' money. Among other things, the PPMs promised that SCM and RCM would "attempt to provide the highest expected return for the amount of risk …. with a view toward maximizing the risk/reward potential of the Fund's portfolio."

301.    At the time of the Richcourt Acquisition, the Citco Defendants owed the Richcourt Funds and their stakeholders a duty to disclose to them what the Citco Defendants knew about Fletcher and FAM's or any other potential buyer's misconduct so that the Funds and their stakeholders could take steps to safeguard their interests, or the Funds could take steps to protect themselves on their own.

302.    At the time of the Richcourt Acquisition, the Citco Defendants owed the Richcourt Funds and their stakeholders a duty to disclose their conflicts of interest with respect to the Richcourt Acquisition. After all, Smeets was a director of RCM, yet he did not disclose that, through Citco Group in which he had a financial interest, and CTI which Citco Group wholly owned, he had a multi-million dollar interest in the consideration CTI would receive in the Richcourt Acquisition. Nor did Unternaehrer, as a director of SCM and RCM, disclose that the closing of the Richcourt Acquisition would help him obtain millions in his "sweetheart' deal.

303.    None of the Citco Defendants disclosed either their conflicts of interest with respect to the Richcourt Acquisition or the risks the Acquisition posed for the Richcourt Funds. Also, none of them took any steps to protect the Funds. Instead, they totally abandoned the interests of the Richcourt Funds and acted entirely adversely to the Funds in pursuit of their own competing financial interests, heedless of the interests of, and their fiduciary duties to, the Funds

and their stakeholders.  By doing so, they breached their fiduciary duties of loyalty, care and

candor to the Funds.  Among other things:

A.  Each of the Citco Defendants breached their duties of candor and loyalty by failing to disclose to the Richcourt Funds and their stakeholders that they had a conflict of interest with respect to the Richcourt Acquisition.  The Citco Defendants had a duty to disclose this information because of the Funds' and their stakeholders' extraordinary dependence on the Citco Defendants, which the Citco Defendants had encouraged; because of the highly material nature of the information the Citco Defendants withheld; and because all parties knew that the Funds and their stakeholders would expect to be notified before the Citco Defendants turned over control of the Funds to someone else.  In addition, SCM and RCM undertook a specific duty of candor as the Funds' fiduciary and agent under the IMAs.

B.  Each of the Citco Defendants breached their duties of candor and loyalty by failing to disclose to the Richcourt Funds and their stakeholders that the Richcourt Acquisition was not in the best interests of the Funds.  The Citco Defendants had a duty to disclose this information because of the Funds' and their stakeholders' extreme dependence on the Citco Defendants, which the Citco Defendants had encouraged; because of the highly material nature of the information the Citco Defendants withheld; because the concealed information concerned fraud; and because all parties knew that the Funds and their stakeholders would expect to be notified before the Citco Defendants turned over control of the Funds to someone who could not be trusted.

C.  Each of the Citco Defendants failed to take any steps to protect the interests of the Richcourt Funds, because if they had notified the Funds and their stakeholders that they might need protection because Citco Group was selling most of RHI to Fletcher, Citco Group's whole fraudulent scheme would have unraveled.  Consequently, no independent officer was put in place to monitor the Richcourt Acquisition from the Funds' point of view before it took place, and no restrictions were placed on Fletcher or FAM to ensure proper management after the Acquisition closed.  The Citco Defendants similarly failed to take any other steps to protect the Funds.

D.  Each of the Citco Defendants breached their duties of care and loyalty by failing to investigate or inquire – and indeed, by turning a blind eye to – the misconduct and misappropriation of investors' funds by Fletcher and FAM.  The Citco Defendants all had evidence of, at a minimum, "red flags" sufficient to require them to investigate Fletcher and FAM's mismanagement before proceeding with the Richcourt

-116-

Acquisition. But because the Citco Defendants had no intention of warning the Richcourt Funds and their investors about the Richcourt Acquisition, they had no interest in investigating further. In addition, upon information and belief, the Citco Defendants actually knew or should have known about Fletcher and FAM's misconduct – even without investigating further – as a result of the Citco Defendants' involvement in various inappropriate transactions undertaken by the Fletcher Structure, including but not limited to the misuse of the MBTA and Louisiana Pension Funds' investments in Leveraged and Alpha for, among other things, the Richcourt Acquisition, and the Unternaehrer "sweetheart" deal.

304.    Each of the Citco Defendants breached its fiduciary duties to the Richcourt Funds by taking affirmative steps to facilitate the Richcourt Acquisition. Among other things: Unternaehrer negotiated the Acquisition, CTI consummated it, and Citco Group approved the Acquisition and directed both of their actions. Laddaga and Bloch signed Acquisition documents, and Unternaehrer, Smeets and Voges approved the Richcourt Acquisition at a June 2008 meeting of the Citco Group directors. As Unternaehrer informed Citco employees immediately after the Richcourt Acquisition, the Citco Executive Committee was responsible for "completing" the Richcourt Acquisition.

305.    Further, all of the individual Citco Defendants agreed to resign from directorships and change their jobs to facilitate the Richcourt Acquisition without disclosing the Acquisition to the Funds or their stakeholders. And in addition, each of the Citco Defendant entities provided services in connection with implementing the Richcourt Acquisition and each agreed to continue providing services to the Richcourt Funds subject to the control of SCM, RCM and RHI.

306.    In sum, in pursuit of their own selfish interests, the Citco Defendants transferred their majority interest in the management of the Richcourt Funds to the Fletcher Structure despite Fletcher's and FAM's misappropriations of investors' money and even though they knew that the transfer could not possibly benefit the Richcourt Funds. Because the Citco Defendants knew

that the transfer could not benefit the Richcourt Funds, they did what they could to conceal it for as long as possible. There can be no clearer breach of the fiduciary duties of care, loyalty and candor than the Citco Defendants' knowing and deliberate sacrifice of the Richcourt Funds' interests despite their agreement to serve as the Funds' fiduciaries. And the Citco Defendants' breaches of these duties continued even after the consummation of the Richcourt Acquisition as set forth below.

307. As a direct and proximate result of the Citco Defendants' breaches of fiduciary duty, the Richcourt Funds came to be subject to the management and control of Fletcher and FAM, and Fletcher and FAM foreseeably proceeded to run the Funds into the ground. Fletcher and FAM not only made foreseeably poor and inappropriate investment decisions; they also raided the assets and bank accounts of the Funds for their own self-interested purposes just as they had looted other investors' and Funds' assets in the past.

308. The Citco Defendants' breaches of fiduciary duty proximately caused the Richcourt Funds to lose substantially all of their assets and to be required to commence liquidation and bankruptcy proceedings.

309. If the Citco Defendants had not breached their fiduciary duties, and had instead disclosed the facts concerning the Richcourt Acquisition or the Citco Defendants' conflicts of interest, or had taken steps to protect the Richcourt Funds, the Funds' assets would not have declined due to mismanagement, looting, poor investments and excessive payments to the Defendants, and the Funds could have wound down in June 2008, preserving the value of their assets at that time.

310.    In equity and good conscience, the Citco Defendants have forfeited their rights to all fees and salaries they collected after they first breached their fiduciary duties to the Richcourt Funds, which they equitably should be required to disgorge.  In equity and good conscience, the Citco Defendants should also be required to disgorge the benefits they improperly received in the Richcourt Acquisition.

311.    The Citco Defendants are liable to the Plaintiffs on Plaintiffs' First Cause of Action for their breaches of duty in connection with the Richcourt Acquisition in an amount to be determined at trial, plus equitable disgorgement of benefits and fees, and interest, costs, attorneys' fees and exemplary damages.

## SECOND CAUSE OF ACTION

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against the Citco Defendants Based on the Richcourt Acquisition)

312.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 311 of this Complaint as if fully set forth herein.

313.    For the reasons set forth above, the Citco Defendants each owed fiduciary duties of care, loyalty and candor to the Richcourt Funds.

314.    The Citco Defendants each knew that all of the other Citco Defendants owed fiduciary duties to the Richcourt Funds because they each knew that the Funds had no employees of their own and were directed, managed and serviced in their entirety by the Citco Defendants. Each of the Citco Defendants also knew that, as a result, the Funds and their stakeholders placed a high degree of trust and confidence in each of the Citco Defendants, which each of the Citco Defendants encouraged, knew of and accepted.

-119-

315.    For the reasons set forth above, each of the Citco Defendants breached its fiduciary duties to the Funds in connection with the Richcourt Acquisition.

316.    Each of the Citco Defendants knew that each of the others breached its fiduciary duties to the Funds in connection with the Richcourt Acquisition because they knew, *inter alia,* that: none of the Citco Defendants disclosed that selling RHI to Fletcher and FAM put the Funds in the hands of a manager who had misappropriated investors' assets; none of the Citco Defendants took steps to protect the Funds from Fletcher and FAM; none of the Citco Defendants investigated any "red flags" indicating that selling RHI to Fletcher and FAM put the Funds at risk; and none of the Citco Defendants disclosed that their own interests conflicted with the Funds' in connection with the Richcourt Acquisition.

317.    Each of the Citco Defendants knew that each of the others breached its fiduciary duties to the Richcourt Funds in connection with the Richcourt Acquisition because they knew that, for the Acquisition to close, each of the Citco Defendants would have to, and did, take affirmative steps to facilitate the Acquisition.  Among other things:  Unternaehrer negotiated the Acquisition, CTI consummated it, and Citco Group with the pariticpation of Unternaehrer, Smeets and Voges approved the Acquisition and directed Unternaehrer's and CTI's actions.  Laddaga and Bloch signed Acquisition documents.  All of the individual Citco Defendants agreed to resign from directorships and change their jobs to facilitate the Richcourt Acquisition without disclosing the Acquisition to the Funds or their stakeholders.  Also, each of the Citco Defendant entities provided services in connection with implementing the transaction and each agreed to continue providing services to the Funds after they were subject to the majority control of Fletcher and FAM.

318.    The Citco Defendants each knew of each of the others' breaches of fiduciary duty because the Citco Defendants acted as each of the others' alter ego or agent and the Citco Group of Companies operated as a single, integrated organization under the direction and control of Citco Group through the Citco Executive Committee.  The Citco Defendants also knew of each of the others' breaches of fiduciary duty, and the fact that they were each acting adversely to the interests of the Richcourt Funds, because the knowledge of each of the Citco Defendants is properly imputed to each of the other Citco Defendants for the reasons stated above.

319.    Each of the Citco Defendants substantially assisted each of the others' breaches of fiduciary duty in connection with the Richcourt Acquisition because they all took the steps identified above to facilitate the Acquisition.  Also, they all knowingly concealed Fletcher and FAM's misappropriations of investors' assets, the risks the Acquisition posed for the Richcourt Funds or the Citco Defendants' conflicts of interest with respect to the Acquisition even though, given their fiduciary relationship with the Richcourt Funds, the materiality of the information, the fact that the information concerned fraud and the Citco Defendants' acceptance of the Funds' high degree of dependence, trust and confidence in them, they all had a duty to speak.

320.    Each of the Citco Defendants substantially also assisted each of the others' breaches of fiduciary duty in connection with the Richcourt Acquisition because their concealment prevented the Funds and their stakeholders from taking steps to protect the Funds from the Richcourt Acquisition, or encouraging others to take such steps, even though each of the Citco Defendants had a fiduciary duty to do so.

321.    In assisting the consummation of the Richcourt Acquisition despite their knowledge that the Acquisition breached the Citco Defendants' fiduciary duties to the Richcourt

Funds, the Citco Defendants even went so far as to facilitate Fletcher's and FAM's misuse of investors' money to pay for the Acquisition.

322.    Each of the Citco Defendants' actions and omissions which aided, abetted and facilitated other Citco Defendants' breaches of fiduciary duty in connection with the Richcourt Acquisition were proximate causes of the losses the Richcourt Funds incurred due to the Acquisition.  If any of the Citco Defendants had refused to play its part in concealing and helping to consummate the Richcourt Acquisition, the Acquisition would not have occurred, and the Richcourt Funds would not have incurred the losses they suffered as a result.

323.    If the Citco Defendants had not aided and abetted breaches of fiduciary duty, and had instead disclosed the facts concerning the Richcourt Acquisition or the Citco Defendants' conflicts of interest, or had taken steps to protect the Funds, the Funds' assets would not have declined due to mismanagement, looting, poor investments or excessive payments to the Defendants, and the Funds could have wound down in June 2008, preserving the value of their assets at that time.

324.    In equity and good conscience, the Citco Defendants who have aided and abetted breaches of fiduciary duty have forfeited their rights to all fees and salaries they collected after they first breached their fiduciary duties to the Richcourt Funds, which they equitably should be required to disgorge.  In equity and good conscience, these Citco Defendants should also be required to disgorge the benefits they improperly received in the Richcourt Acquisition.

325.    The Citco Defendants are liable to the Plaintiffs on Plaintiffs' Second Cause of Action for aiding and abetting breaches of fiduciary duty in connection with the Richcourt

Acquisition in an amount to be determined at trial, plus equitable disgorgement of benefits and fees, and interest, costs, attorneys' fees and exemplary damages.

### THIRD CAUSE OF ACTION

**BREACH OF FIDUCIARY DUTY**
**(Against Fletcher, FAM, Turner, Kiely and the**
**Citco Defendants Based on Failure**
**To Disclose the Richcourt Acquisition Properly After Its Consummation)**

326.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 325 of this Complaint as if fully set forth herein.

327.    Prior to the Richcourt Acquisition, the Richcourt Funds had no employees of their own.  Instead, they were directed, managed and serviced solely by the Citco Defendants.

328.    Prior to the Richcourt Acquisition, the Citco Defendants owned the Richcourt Funds' voting shares, directed and managed their business and investment activities, and acted as their exclusive service provider.  The Citco Defendants also held positions as the Richcourt Funds' sole voting shareholder, director, investment manager, investment advisor, direct and indirect parent company, administrator, sub-administrator, registrar and transfer agent, middle office service provider, custodian and bank.

329.    Prior to the Richcourt Acquisition, the Richcourt Funds and their stakeholders were wholly dependent on the Citco Defendants to protect their interests with respect to the Funds.  The Citco Defendants controlled all aspects of the Richcourt Funds, and the Funds and their stakeholders accordingly placed a high degree of trust and confidence in the Citco Defendants to direct, manage and service the Funds loyally and with care, as well as to protect

and attempt to maximize their assets.  The Citco Defendants encouraged, knew of and accepted the Funds' and their stakeholders' trust and confidence.

330.   Prior to the Richcourt Acquisition, the Citco Defendants had a fiduciary relationship with the Richcourt Funds, and owed them fiduciary duties, because of the Citco Defendants' controlling position and acceptance of the Funds' trust and confidence. The Citco Defendants also owed the Richcourt Funds fiduciary duties when they acted as the Funds' agents, officers or directors or provided fund services.

331.   Prior to the Richcourt Acquisition, the Citco Defendants acted as agents or alter egos of each other and, given the structure and operation of the Citco Group of Companies as a single, integrated organization under the direction and control of Citco Group through the Citco Executive Committee, the knowledge, conduct, liability and fiduciary and other obligations of any of the Citco Defendants is properly imputed to each of the others.

332.   After the Richcourt Acquisition, the Citco Defendants continued to act as agents or alter egos of each other, except to the extent that Fletcher acquired ultimate control of SCM, RCM and RHI, which even then continued for some time to be operated in large part by legacy Citco personnel under the direction of Unternaehrer and others at Citco, and the Citco Directors, Laddaga, Bloch and Magris, all of whom are excluded from the definition of "Citco Defendants" as of some or all of the times relevant to this cause of action.

333.   After the Richcourt Acquisition, Fletcher, Turner, Kiely and FAM had a fiduciary relationship to the Richcourt Funds and owed them fiduciary duties.  The Funds still had no employees of their own.  Instead, they were directed and managed by Fletcher and FAM with the participation and assistance of certain Citco Defendants.

-124-

334.    After the Richcourt Acquisition, Kiely and Turner became directors of, among other entities, SCM, RCM and all of the Richcourt Funds.

335.    After the Richcourt Acquisition, Fletcher and FAM owned an 85% controlling interest in RHI, which owned the Richcourt Funds' voting shares, with a right to "call" the remaining interest on certain dates at will, and Fletcher and FAM had the right to direct and manage the Funds' business and investment activities.  Fletcher and FAM also owned an indirect controlling interest in SCM and RCM, which served as the sole voting shareholder, investment manager and investment advisor in their respective Richcourt Funds, and which had the right to appoint the Funds' directors.  In addition, Fletcher and FAM owned a controlling interest in SCM's and RCM's direct and indirect parent companies.

336.    After the Richcourt Acquisition, the Citco Defendants continued to owe fiduciary duties to the Richcourt Funds.  Citco Group, via CTI, continued to own a 15% interest in the owner of the Richcourt Funds' voting shares and of SCM and RCM, the sole voting shareholder, investment manager, and investment advisor for their respective Funds, as well as in their direct and indirect parent companies.  Further, for as long as the Defendants did not notify the Richcourt Funds or their stakeholders of the details of the Richcourt Acquisition, the high degree of trust and confidence that the Richcourt Funds and their stakeholders placed in the Citco Defendants did not diminish – Unternaehrer, Smeets, Voges, Bloch, Laddaga and Magris had to know that the Richcourt Funds and their stakeholders rightfully expected them to disseminate all material information about a development that affected their interests as fundamentally as the Richcourt Acquisition.  Yet, because the Citco Defendants did not disclose the identity of the Richcourt Funds' investors to Fletcher, let alone insist that Fletcher and FAM promptly notify

the Funds and their stakeholders about the Richcourt Acquisition, the Citco Defendants actually hindered the Richcourt Funds' management in providing notice of the Richcourt Acquisition.

337. The Citco Defendants continued to provide services to the Richcourt Funds until about March or April 2010, subject to Fletcher's and FAM's control. The services the Citco Defendants provided included services as administrator, sub-administrator, registrar and transfer agent, middle office service provider, custodian and bank. Also, Citco Group never gave up its 15% interest in RHI, and Unternaehrer remained on the RHI board until about November 2011. Upon information and belief, Unternaehrer as Citco Group's agent kept Smeets and Voges informed about developments with respect to the Richcourt Funds and, on occasion, involved Smeets in personnel and other issues with respect to the Funds.

338. As a result of Fletcher's, FAM's, Kiely's, Turner's, and the Citco Defendants' control over the Richcourt Funds, the Funds and their stakeholders were wholly dependent on these Defendants to protect their interests with respect to the Funds. The Richcourt Funds and their stakeholders placed a high degree of trust and confidence in Fletcher, Kiely, Turner, FAM and the Citco Defendants to direct, manage and service the Funds both loyally and with care, and to protect and attempt to maximize their assets. Fletcher, Kiely, Turner, FAM and the Citco Defendants encouraged, knew of and accepted the Funds' and their stakeholders' trust and confidence. Further, Fletcher, Kiely, Turner, FAM and the Citco Defendants owed the Funds fiduciary duties because they acted as the Funds' agents in managing them and providing them with services.

339. The fiduciary duties that each of the Citco Defendants owed to the Richcourt Funds prior to the Richcourt Acquisition, and that they, Fletcher, Kiely, Turner, and FAM owed

-126-

after the Richcourt Acquisition, included duties of care, loyalty and candor. Among other things, the duty of care requires fiduciaries to act with the care that an ordinarily prudent person in a like position would exercise under the circumstances. The duty of loyalty requires, *inter alia*, that fiduciaries act in good faith and in the best interests of their principals without any desire to obtain personal benefit or to benefit some person other than their principals. The duty of candor requires fiduciaries to reveal all material information to those to whom a duty of candor is owed, including material information concerning the agent's conflicts of interest. Prior to the Richcourt Acquisition, and afterwards as specified above, the Citco Defendants owed all of these duties to the Richcourt Funds. After the Richcourt Acquisition, Fletcher, Kiely, Turner, FAM and the Citco Defendants owed all of these duties to the Richcourt Funds.

340. All of the Citco Defendants had fiduciary duties to disclose the facts about the Richcourt Acquisition before the Acquisition was consummated for the reasons stated in Plaintiffs' First Cause of Action. The Citco Defendants retained that duty after the Acquisition, because any change in their status – which Richcourt Fund stakeholders who were unaware of the Richcourt Acquisition had no reason to know – did not alter the Funds' or stakeholders' trust and confidence or relieve the Defendants of the duty. Citco Defendants who became affiliated with or began to work with Fletcher and FAM also owed fiduciary duties to the Funds for the same reasons that FAM owed those duties.

341. By June 30, 2008, upon information and belief, each of the Defendants knew that the Richcourt Acquisition had taken place and that the majority owner and manager of the Richcourt Funds was now Fletcher and FAM, not the Citco Group and its subsidiaries.

342.    The Richcourt Acquisition was highly material both to the Richcourt Funds and to their stakeholders.  At a minimum, after the Richcourt Acquisition, the Funds' investments were subject to different risks.  Fletcher and FAM had not only misappropriated investors' assets – they also had been extremely unsuccessful in managing investments, and they did not have sufficient assets of their own – even with access to the fees the Richcourt Funds generated – to manage the Funds effectively.

343.    Despite the materiality of the Richcourt Acquisition, Fletcher, Kiely, Turner, FAM and the Citco Defendants did not initially inform the Funds or most of their stakeholders that the Acquisition had taken place.  The failed to inform the Funds even though they knew that the Funds and their stakeholders had nothing to gain and everything to lose for so long as the information was withheld.

344.    There appear to have been some individual conversations in or around October 2008 in which Laddaga discussed the Richcourt Acquisition with select investors.  No official announcement was made, however, until the Funds' Fletcher-affiliated directors Kiely and Turner sent letters to investors at the end of 2008.

345.    Kiely's and Turner's letters to investors, which were dated as of December 30, 2008, gave a very partial and misleading picture of the Richcourt Acquisition as discussed above.  The letters also stated that the Richcourt Funds were suspending redemptions, so investors could not redeem their investment after they received the December letter even if they wanted to.

346.    In January 2009, Kiely and Turner, as directors of the Soundview Funds and at least two BVI Funds, again wrote to investors.  Their letters stated that redemptions would be

resumed.   But this time, the letters included materially false information about the Richcourt Acquisition.  The letters stated:

Q: Did Citco sell Richcourt Group to Fletcher Asset Management ("FAM")?

A: No, Fletcher became Citco's new partner…

Q: Has management of the Richcourt Group changed?

A: No, all executives of the Richcourt Group have been retained…

347.   In fact, of course, Citco Group not only sold 85% of its interest in the Richcourt Group to Fletcher affiliates, but also sold them a right to "call" Citco Group's retained 15%. Also, at a minimum, Citco veterans Smeets and Voges were no longer executives of the Richcourt Group after the Richcourt Acquisition.

348.   Upon information and belief, the January 2009 letters contained the foregoing misinformation because the Defendants were attempting to offer false reassurances to investors by indicating that, at least operationally, the Citco Defendants were still playing substantially the same role in managing the Richcourt Funds that they had played in the past.

349.   All of Fletcher, Kiely, Turner, FAM and the Citco Defendants breached their duties of loyalty and candor to the Richcourt Funds by failing to disclose the Richcourt Acquisition to the Funds and their stakeholders for months after it occurred.  Because the Funds and their stakeholders were not informed, they could do nothing to protect themselves from misappropriation, or bad decision-making, by Fletcher and FAM.

350.   Fletcher, Kiely, Turner, FAM and the Citco Defendants further breached their duties of loyalty and candor when Kiely and Turner, as the Funds' directors, sent their misleading letters to investors in January 2009.

-129-

351.    Although Kiely and Turner purported to send the January 2009 letters in their capacity as the new directors of Richcourt Funds, sending the misleading letters was entirely contrary to interests of the Funds and their stakeholders.  In sending the letters, Kiely and Turner acted solely as agents of their employers Fletcher and FAM, as well as of RHI, its board member Unternaehrer, and his principals CTI and Citco Group, not as agents of the Funds.  By their action, they totally abandoned the interests of the Richcourt Funds and their stakeholders, and acted entirely adversely to those interests for the sake of the conflicting interests of others.  They knew that the Funds and their stakeholders could not possibly benefit from the Defendants' failure to inform the Funds and their stakeholders; the result was likely to be (and was) investor anger and redemption requests due to the investors' losses of faith in the Funds' dishonest managers.

352.    Laddaga received an example of the January letters before they were sent to the Funds' investors and forwarded the letter to Bloch.  Both of them had a duty to read the letter because of their fiduciary duties to the Richcourt Funds and to SCM, and on information and belief, they did so.  Upon information and belief, Laddaga was a director of SCM at the time, and Bloch was responsible for working on the audits of the Richcourt Funds.  Unternaehrer too had a duty to read the letter because of his position as a director of RHI and an agent of Citco Group, and upon information and belief, he did so.  Yet none of Bloch, Laddaga and Unternaehrer took steps to stop the letter from being distributed or to correct its misleading information.  Nor did Smeets, Voges, Magris, SCM, RCM, RHI or Citco Group,

353.    Upon information and belief, other Citco Defendants also received the text of the January letters before they were sent to investors, and CFS Europe disseminated the letters.  Yet

none of the Defendants took steps to stop the letter from being distributed or to correct its inaccurate information.

354. By failing to inform the Richcourt Funds and their stakeholders about the Richcourt Acquisition for approximately six months, and then misrepresenting the facts to stakeholders approximately one month later, the Defendants breached their duties of loyalty and candor to the Funds.

355. Because the Defendants failed to provide the Funds and their stakeholders with the essential facts about the Richcourt Acquisition even seven months after it took place, the Defendants prevented the Funds and their stakeholders from taking steps to protect their interests from Fletcher and FAM. As a result, they proximately caused the Funds' losses due to their in ability to protect themselves.

356. If the Defendants had provided complete and accurate information about the Richcourt Acquisition when it took place in June 2008, investors could have sought to require the Richcourt Funds to terminate their IMAs with SCM and RCM, or to cause the Funds to adopt other precautions. Also, the Richcourt Funds could have been wound down immediately, preserving the value of their assets as of that time.

357. In equity and good conscience, Fletcher, Fletcher, Kiely, Turner, FAM and the Citco Defendants have forfeited their rights to all fees and salaries they collected after they first breached their fiduciary duties to the Richcourt Funds, which they equitably should be required to disgorge. In equity and good conscience, the Citco Defendants should also be required to disgorge the benefits they improperly received in the Richcourt Acquisition.

358.   Fletcher, Kiely, FAM and the Citco Defendants are liable to the Plaintiffs, and Turner is liable to the Joint Liquidators, on Plaintiffs' Third Cause of Action for breaches of fiduciary duty based on failing to disclose the Richcourt Acquisition in an amount to be determined at trial, plus equitable disgorgement of benefits and fees, and interest, costs, attorneys' fees and exemplary damages.

## FOURTH CAUSE OF ACTION

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Against Fletcher, Kiely, Turner, FAM and the Citco Defendants Based on Failure to Disclose the Richcourt Acquisition Properly After Its Consummation)**

359.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 358 of this Complaint as if fully set forth herein.

360.   For the reasons set forth above, Fletcher, Kiely, Turner, FAM and the Citco Defendants each owed fiduciary duties of care, loyalty and candor to the Richcourt Funds.

361.   Fletcher, Kiely, Turner, FAM and the Citco Defendants each knew that Fletcher, FAM and all of the other Citco Defendants owed fiduciary duties to the Richcourt Funds because they each knew that the Funds had no employees of their own and were directed, managed and serviced in their entirety by Fletcher, Kiely, Turner, FAM and the Citco Defendants.  Each of Fletcher, Kiely, Turner, FAM and the Citco Defendants also knew that, as a result, the Funds and their stakeholders placed a high degree of trust and confidence in Fletcher, Kiely, Turner, FAM and the Citco Defendants, which Fletcher, Kiely, Turner, FAM and the Citco Defendants encouraged, knew of and accepted.

362.   Each of Fletcher, Kiely, Turner, FAM and the Citco Defendants knew that each of the others breached its fiduciary duties to the Richcourt Funds in connection with the Richcourt

Acquisition because they knew, *inter alia*, that none of them had disseminated an accurate disclosure of the material facts of the Richcourt Acquisition to the Richcourt Funds, stakeholders in the Funds, or the public as of the end of January 2009. Nevertheless, none of Fletcher, Kiely, Turner, FAM or the Citco Defendants took steps to ensure that such a notice was disseminated.

363. Each of Fletcher, Kiely, Turner, FAM and the Citco Defendants knew that Fletcher and FAM, by causing Kiely and Turner to disseminate inaccurate descriptions of the Richcourt Acquisition to the Funds and their stakeholders, had breached their fiduciary duties to the Richcourt Funds. Citco Defendant CFS Europe also breached its fiduciary duties by disseminating the January 2009 letter and, on information and belief, other Citco Defendants including Unternaehrer reviewed and approved that letter as well.

364. In addition, the Citco Defendants knew of each of the other Citco Defendants' breaches of fiduciary duty because the Citco Defendants acted as each of the others' agent or alter ego and the Citco Group of Companies operated as a single integrated organization under the direction and control of Citco Group through the Citco Executive Committee. The Citco Defendants also knew of each of the others' breaches of fiduciary duty, and the fact that they were each acting adversely to the interests of the Richcourt Funds, because the knowledge of each of the Citco Defendants is imputed to each of the other Citco Defendants for the reasons stated above. After the Richcourt Acquisition, this remained true except as to the Citco Directors; as to Laddaga, Bloch and Magris, to the extent that they were no longer functioning as agents of Citco Group and its affiliates; and to the extent that Fletcher acquired ultimate control of SCM, RCM and RHI, which even then continued for some time to be operated in large part by legacy Citco personnel under the direction of Unternaehrer and others at Citco.

365.    Each of Fletcher, Kiely, Turner, FAM and the Citco Defendants substantially assisted each of the others' breaches of fiduciary duty by approving or disseminating Kiely's and Turner's misleading information about the Richcourt Acquisition, concealing the facts about the Acquistion, failing to issue a prompt notice of the material facts of the Richcourt Acquisition to the Richcourt Funds and their stakeholders, or otherwise failing to correct the misinformation in the Fund directors' December 2008 and January 2009 letters.

366.    Each of Fletcher, Kiely, Turner, FAM and the Citco Defendants' actions and omissions which aided, abetted and facilitated other Defendants' breaches of fiduciary duty in helping to conceal the material facts of the Richcourt Acquisition were proximate causes of the losses the Funds incurred due to the Acquisition.  If any of the Citco Defendants had refused to play its part in concealing the Richcourt Acquisition, the Acquisition could not have occurred, and the Funds would not have incurred their losses as a result.

367.    If Fletcher, Kiely, Turner, FAM and the Citco Defendants had not aided and abetted the other Defendants' breaches of fiduciary duty, and had instead disclosed the material facts concerning Fletcher, FAM, the Citco Defendants' conflicts of interest and the Richcourt Acquisition, the Richcourt Funds' assets would not have declined due to mismanagement, looting, poor investments and excessive payments to the Defendants, and the Funds could have wound down in June 2008, preserving the value of their assets as of that time.

368.    Fletcher, Kiely, FAM and the Citco Defendants are liable to the Plaintiffs, and Turner is liable to the Joint Liquidators, on Plaintiffs' Fourth Cause of Action for aiding and abetting breaches of fiduciary duty in connection with the Defendants' failure to make timely

disclosure of the material facts of the Richcourt Acquisition in an amount to be determined at trial, plus interest, costs, attorneys' fees and exemplary damages.

369.    Because Fletcher, Kiely, Turner, FAM and the Citco Defendants not only failed to ensure that the Funds and their stakeholders were informed about the facts of the Richcourt Acquisition for approximately six months, but also misrepresented the facts to stakeholders approximately one month later, Fletcher, Kiely, Turner, FAM and the Citco Defendants breached their duties of loyalty and candor to the Funds.

370.    Because the Defendants aided and abetted the Fletcher, Fletcher, Kiely, Turner, FAM and the Citco Defendants in failing to provide the Richcourt Funds and their stakeholders with the essential facts about the Richcourt Acquisition even seven months after it took place, and even though each of these Defendants had a fiduciary duty to provide the information, these Defendants prevented the Funds and their stakeholders from taking steps to protect their interests from Fletcher and FAM.  As a result, they proximately caused all of the Funds' losses that could have been prevented if the Funds had been able to protect themselves.

371.    If the Defendants had provided complete and accurate information on a timely basis concerning Fletcher, FAM, the Citco Defendants' conflicts of interest and the Richcourt Acquisition, the Richcourt Funds' assets would not have declined due to mismanagement, looting, poor investments and excessive payments to the Defendants, and the Funds could have wound down in June 2008, preserving the value of their assets as of that time.

372.    In equity and good conscience, Fletcher, Kiely, Turner, FAM and the Citco Defendants who have aided and abetted breaches of fiduciary duty have forfeited their rights to all fees and salaries they collected after they first breached their fiduciary duties to the Richcourt

Funds, which they equitably should be required to disgorge.  In equity and good conscience, the Citco Defendants should also be required to disgorge the benefits they improperly received in the Richcourt Acquisition.

373.    Fletcher, Kiely, FAM and the Citco Defendants are liable to the Plaintiffs, and Turner is liable to the Joint Liquidators, on Plaintiffs' Fourth Cause of Action for aiding and abetting breaches of fiduciary duty based on failure to disclose the Richcourt acquisition after its consummation in an amount to be determined at trial, plus equitable disgorgement of benefits and fees, and interest, costs, attorneys' fees and exemplary damages.

## FIFTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
**(Against SCM, RCM, RHI, CTI, FAM, Fletcher, Unternaehrer,
Smeets, Voges, Laddaga, Bloch, Magris, Kiely, Turner, Citco
Group, Citco Bank, Citco Global and the Citco Administrators
Based on the First Three Post-Acquisition Defalcations by Fletcher and FAM)**

374.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 373 of this Complaint as if fully set forth herein.

375.    Prior to the Richcourt Acquisition, the Richcourt Funds had no employees of their own.  Instead, they were directed, managed and serviced solely by the Citco Defendants.

376.    Prior to the Richcourt Acquisition, the Citco Defendants owned the Richcourt Funds' voting shares, directed and managed their business and investment activities and acted as their exclusive service provider.  The Citco Defendants also held positions as the Richcourt Funds' sole voting shareholder, director, investment manager, investment advisor, direct and indirect parent company, administrator, sub-administrator, registrar and transfer agent, middle office service provider, custodian and bank.

-136-

377.   Prior to the Richcourt Acquisition, the Richcourt Funds and their stakeholders were wholly dependent on the Citco Defendants to protect their interests with respect to the Funds.  The Citco Defendants controlled all aspects of the Richcourt Funds, and the Funds and their stakeholders accordingly placed a high degree of trust and confidence in the Citco Defendants to direct, manage and service the Funds loyally and with care, as well as to protect and attempt to maximize their assets.  The Citco Defendants encouraged, knew of and accepted the Funds' and their stakeholders' trust and confidence.

378.   Prior to the Richcourt Acquisition, the Citco Defendants had a fiduciary relationship with the Richcourt Funds, and owed them fiduciary duties, because of the Citco Defendants' controlling position and acceptance of the Funds' trust and confidence. The Citco Defendants also owed the Richcourt Funds fiduciary duties when they acted as the Funds' agents, officers or directors or provided fund services.

379.   Prior to the Richcourt Acquisition, the Citco Defendants acted as agents or alter egos of each other and, given the structure and operation of the Citco Group of Companies as a single, integrated organization under the direction and control of Citco Group through the Citco Executive Committee, the knowledge, conduct, liability and fiduciary and other obligations of any of the Citco Defendants is properly imputed to each of the others.

380.   After the Richcourt Acquisition, the Citco Defendants continued to act as agents or alter egos of each other, except to the extent that Fletcher acquired ultimate control of SCM, RCM and RHI, which even then continued for some time to be operated in large part by legacy Citco personnel under the direction of Unternaehrer and others at Citco, and the Citco Directors,

Laddaga, Bloch and Magris, all of whom are excluded from the definition of "Citco Defendants" as of some or all of the times relevant to this cause of action.

381.    After the Richcourt Acquisition, Fletcher and FAM had a fiduciary relationship to the Richcourt Funds and owed them fiduciary duties.  The Funds still had no employees of their own.  Instead, they were directed and managed by Fletcher and FAM with the participation and assistance of the Citco Defendants.

382.    After the Richcourt Acquisition, Kiely and Turner became directors of, among other entities, SCM, RCM and all of the Richcourt Funds.

383.    After the Richcourt Acquisition, Fletcher and FAM owned an 85% controlling interest in RHI, which owned the Richcourt Funds' voting shares, with a right to "call" the remaining interest on certain dates at will, and Fletcher and FAM, with the advice and assistance of Unternaehrer and Citco Group, directed and managed the Funds' business and investment activities.  Fletcher and FAM also owned an indirect controlling interest in SCM and RCM, the Funds' sole voting shareholder, investment manager and investment advisor which had the right to appoint the Funds' directors.  In addition, Fletcher and FAM owned a controlling interest in SCM's and RCM's direct and indirect parent companies.

384.    After the Richcourt Acquisition, the Citco Defendants continued to owe fiduciary duties to the Richcourt Funds.  Citco Group, through its subsidiary CTI, continued to own a 15% interest in the owner of the Richcourt Funds' voting shares and of SCM and RCM, their sole voting shareholder, investment manager, and investment advisor, as well as in SCM's and RCM's direct and indirect parent companies.  Further, for as long as the Defendants did not notify the Richcourt Funds or their stakeholders of the details of the Richcourt Acquisition, the

high degree of trust and confidence that the Richcourt Funds and their stakeholders placed in the Citco Defendants did not diminish – Unternaehrer, Smeets, Voges, Bloch, Laddaga and Magris had to know that the Richcourt Funds and their stakeholders rightfully expected them to disseminate all material information about a development that affected their interests as fundamentally as Fletcher and FAM's defalcations. The Citco Defendants continued to provide services to the Richcourt Funds until about March or April 2010. The services the Citco Defendants provided included services as administrator, sub-administrator, registrar and transfer agent, middle office service provider, custodian and bank. Also, Unternaehrer remained on the RHI board as Citco Group's agent until about November 2011 and, upon information and belief, kept Smeets and Voges informed as to developments affecting Citco Group's interests in the Richcourt Funds. Bloch, Laddaga and Magris all worked for Fletcher and FAM or their affiliates after the Richcourt Acquisition and continued to provide services to the Richcourt Funds until the dates in 2009 when they each ceased working with Fletcher and FAM.

385. As a result of Fletcher's, Kiely's, Turner's, FAM's and the Citco Defendants' control over the Richcourt Funds, the Funds and their stakeholders were wholly dependent on these Defendants to protect their interests with respect to the Funds. The Richcourt Funds and their stakeholders placed a high degree of trust and confidence in Fletcher, Kiely, Turner, FAM and the Citco Defendants to direct, manage and service the Funds both loyally and with care, and to protect and attempt to maximize their assets. Fletcher, Kiely, Turner, FAM and the Citco Defendants encouraged, knew of and accepted the Richcourt Funds' and their stakeholders' trust and confidence. Further, Fletcher, Kiely, Turner, FAM and the Citco Defendants owed the Richcourt Funds fiduciary duties because they acted as the Funds' agents in managing them and providing them with services.

386.    The fiduciary duties that each of the Citco Defendants owed to the Richcourt Funds prior to the Richcourt Acquisition, and that they, Fletcher, Kiely, Turner, and FAM owed after the Richcourt Acquisition, included duties of care, loyalty and candor.  Among other things, the duty of care requires fiduciaries to act with the care that an ordinarily prudent person in a like position would exercise under the circumstances.  The duty of loyalty requires, *inter alia*, that fiduciaries act in good faith and in the best interests of their principals without any desire to obtain personal benefit or to benefit some person other than their principals.  The duty of candor requires fiduciaries to reveal all material information to those to whom a duty of candor is owed, including material information concerning the agent's conflicts of interest.  Prior to the Richcourt Acquisition, and afterwards as specified above, the Citco Defendants owed all of these duties to the Richcourt Funds.  After the Richcourt Acquisition, Fletcher, Kiely, Turner, FAM and the Citco Defendants (with the date-based exclusions stated in the definition of this term) owed all of these duties to the Richcourt Funds.

387.    After the Richcourt Acquisition, Fletcher, Kiely, Turner, FAM and the Citco Defendants breached these duties repeatedly, and they did so most conspicuously – at least initially – by using the Funds' assets to make inappropriate, self-interested investments in the Fletcher Structure.  For example, between November 2008 and January 2009, less than six months after the Richcourt Acquisition took place and before it had even been formally announced, Fletcher, Kiely, Turner and FAM, with the assistance and participation of the Citco Defendants, invested approximately $10 million of the BVI Funds' assets in Arbitrage.

388.    Investing the BVI Funds' money in Arbitrage was, as Fletcher and FAM knew, contrary to those Funds' best interests and likely to lose them money.  As the FILB Trustee found, the Fletcher Structure was grossly mismanaged at the time.  Among other things, Fletcher

-140-

and FAM were misappropriating investors' subscriptions and, the FILB Trustee stated, the Fletcher Structure had many of the hallmarks of a Ponzi scheme. In addition, the FILB Trustee found that assets in FILB, in which Arbitrage in turn invested, were significantly overvalued. The FILB Trustee even concluded that the Fletcher Structure was likely insolvent as of December 31, 2008, about the time Fletcher, Kiely, Turner and FAM, with the assistance and participation of the Citco Defendants, invested the BVI Funds' $10 million into that Structure.

389.    The BVI Funds' investment in Arbitrage did, however, serve the interests of Fletcher and FAM. They made the investment, upon information and belief, not merely to collect fees, but as part of a broader effort to bolster the Fletcher Structure and create the appearance that, though failing, it could survive. This first investment alone did not solve Fletcher and FAM's problems, however:  upon information and belief, Fletcher and FAM invested approximately an additional $30 or $40 million of the BVI Funds' assets into Arbitrage by June 2009, and yet a further $10 million thereafter.

390.    Fletcher, Kiely, Turner, and FAM also breached their fiduciary duties, with the assistance and participation of the Citco Defendants, by using the Soundview Funds' assets to make inappropriate, self-interested investments in the Fletcher Structure. They did so on at least three occasions between April 2009 and March 2010. Like the BVI Funds' investments in Arbitrage, each of these investments was contrary to the Soundview Funds' interests and likely to lose money but served the conflicting interests of Fletcher and FAM. These defalcations were, in essence, as follows:

391.    First, in April and May 2009, Fletcher, Kiely, Turner and FAM, with the assistance and participation of the Citco Defendants, directed or approved subscriptions by each

-141-

of the Funds which caused them to invest over $11 million in Arbitrage. These investments were not in the Funds' best interests and, like the BVI Funds' investments, were made due to the Defendants' conflicting interest of propping up the already faltering Fletcher Structure. In addition, because these investments were later than the BVI Funds' investments, it appears that the Fletcher Structure's financial condition was even worse. According to the FILB Trustee, the Fletcher Structure was likely insolvent as of four months *before* Fletcher, Kiely, Turner and FAM caused the Soundview Funds to invest in it.

392. Second, in October 2009, Fletcher, Kiely, Turner, and FAM, again with the assistance and participation of the Citco Defendants, directed or approved an in-kind conversion of the Funds' investments in Arbitrage into investments in Leveraged. These conversions were not in the best interests of the Funds because the Leveraged shares they received were structurally subordinated from both a capital and income perspective to the Series N Shares held by the Louisiana Pension Funds. Given the performance of Leveraged at that time it was a virtual certainty that Funds would not see any return on their investment. Further, these investments, like the Funds' earlier investments into Arbitrage, resulted from Fletcher and FAM's conflicts of interest at the time, including their desire to prop up and delay the decline of the faltering Fletcher Structure.

393. Third, Fletcher, Kiely, Turner and FAM, with the assistance and participation of the Citco Defendants, directed or approved the Richcourt Funds' approximately $13 million investment into Arbitrage in March 2010. This investment again was not in Soundview Elite's best interests and was prompted by Fletcher's and FAM's conflicting interest of providing funds to Arbitrage that it could use to pay the deposit for the UCBI Transaction.

394.    In addition, Fletcher, Kiely, Turner and FAM caused AAI to invest $2 million into their Fletcher International Partners, Ltd. fund on or about November 1, 2009.  This investment was a clear, self-interested breach of fiduciary duties by Fletcher, Kiely, Turner, FAM, RHI, SCM and Unternaehrer, as well as CTI and the Citco Group for whom Unternaehrer acted as an agent:   FIP did not invest the money, but used it instead to pay what were characterized as overdue dividends to FILB and Unternaehrer.

395.    Each of the foregoing investments of the Richcourt Funds' assets in the Fletcher Structure was an obvious breach of Fletcher's, Kiely's, Turner's and FAM's fiduciary duties: the Funds' money was used to favor Fletcher and FAM's interests at the expense of the interests of the Funds.  In undertaking these defalcations, Fletcher acted in the interests, and as an agent or alter ego, of FAM.  Also, Fletcher and FAM's defalcations resulted from their total abandonment of the Richcourt Funds' interests in order to act solely to pursue their own.  They knew on each occasion that the Richcourt Funds would not benefit from Fletcher and FAM's improper investments; only Fletcher and FAM would.

396.    In addition, each of Fletcher and FAM's defalcations was fraudulent.  In each case, Fletcher and FAM  secretly took the Funds' money and spent it for purposes of their own, contrary to the Funds interests, the investment strategies and goals stated in the Funds' PPMs, and RCM's and SCM's assurances to the Funds that they would invest the Funds' assets in an effort to increase their value.

397.    Fletcher, Kiely, Turner and FAM did not act alone in breaching their fiduciary duties to the Funds:  the Citco Defendants were directly involved as well.  SCM, RCM, RHI, Laddaga, Bloch, Magris and Unternaehrer were all charged with fiduciary duties to supervise the

Richcourt Funds' investments, as were Smeets and Voges to the extent that their departure from RCM had not been publicized, and they breached their fiduciary duties by authorizing or facilitating the investments or, at a minimum, allowing them to be made. Fletcher and Unternaehrer, in whom the Funds and their stakeholders placed a high degree of trust and confidence, sat together on the RHI board and their knowledge of the defalcations' impropriety can therefore be imputed to RHI. SCM and RCM had fiduciary duties stemming from the IMAs as well as from the Funds' trust and confidence, and RHI owed the Funds fiduciary duties as SCM's and RCM's overseer and parent, and as the recipient of the Funds' and their stakeholders' trust and confidence. Smeets and Voges, upon information and belief, were aware of Fletcher's defalcations because Unternaehrer had a duty to inform them in his role as Citco Group's agent with respect to its investment in the Richcourt Group, and until all Richcourt Fund stakeholders were aware that Smeets and Voges had resigned as Richcourt Fund fiduciaries, their fiduciary duties did not diminish. Also, upon information and belief, at the times of Fletcher and FAM's first three defalcations, Kiely and Turner were simultaneously directors of SCM, RCM, RHI, Leveraged and Arbitrage.

398.    Citco Group, Smeets, Voges and CTI breached their fiduciary duties to the Funds in connection with Fletcher and FAM's defalcations by, upon information and belief, instructing Unternaehrer as their agent to protect the benefits of the Richcourt Acquisition – even at the cost of violating or abandoning his duties to the Funds – by allowing Fletcher and FAM's defalcations to take place. If Unternaehrer had objected to the Funds' investments into the Fletcher Structure, it is likely that they would have been undone instead of being made worse.

399.    Citco Bank, Citco Global and the Citco Administrators breached their duties to the Funds by, upon information and belief, each reviewing and processing the improper

investments. The Citco Administrators, Citco Bank and Citco Global all were required to review the subscriptions and in-kind transfers of shares by the Funds in the Fletcher Structure. As noted above, the Citco Administrators processed the Funds' subscriptions into Arbitrage and processed and approved the in-kind transfer of the Funds' investments in Arbitrage to Leveraged. Citco Bank assisted with the various subscriptions by issuing the necessary trade confirmations and processing relevant payments and Citco Global held the underlying investments on behalf of the Funds.

400.    Finally, given that, upon information and belief, Citco operates as a single, integrated organization under the direction and control of Citco Group through the Citco Executive Committee, such that all entities within the group act as agents or alter egos of the others, the knowledge of Citco Group, Unternaehrer, Smeets, Voges, CTI, the Citco Administrators, Citco Bank and Citco Global can properly be imputed to each of the others.

401.    Each of these Defendants knew that investing in the Fletcher Structure was contrary to the Funds' best interests. It was obvious that these investments were likely to be self-interested, and on information and belief, the Citco Defendants, Fletcher, FAM, Kiely and Turner were all aware by the time of Fletcher and FAM's defalcations that the Fletcher Structure's funds were in trouble. Citco Group's agent Unternaehrer in particular had communicated to Fletcher about Citco Bank's concerns that Fletcher and FAM could not meet their financial obligations, and he knew they could not obtain lines of credit for the Richcourt Funds. Also, the Soundview Funds' directors had already gone out of their way in their January 2009 letter to state that the Funds' assets had not been invested in the Fletcher Structure; a mere three months later, and that was no longer true. Accordingly, the investments were inherently suspicious and a reason why, at a minimum, the Funds' fiduciaries should have investigated

further.  They didn't.  Instead, the Citco Defendants sought to keep the benefits of the Richcourt Acquisition, and Fletcher, Kiely, Turner and FAM sought to prop up their house of cards by fraud.  The Funds and their stakeholders were the victims.

402.    The conduct of SCM, RCM, RHI, CTI, Unternaehrer, Smeets, Voges, Laddaga, Bloch, Magris, Citco Group, the Citco Administrators, Citco Bank and Citco Global in participating in or assisting Fletcher and FAM's defalcations was made even more egregious because they knew about Fletcher and FAM's past misappropriations and that, once Fletcher and FAM started misappropriating from the Funds, none of the Funds' assets were safe.  Each knew, furthermore, that they were operating with conflicts of interest they had failed to disclose to the Richcourt Funds or their stakeholders.  And they knew that the Funds' "investments" into Arbitrage and Leveraged, and use of invested funds to invest in UCBI, was intended to prop up the crumbling Fletcher Structure, to try to disguise and preserve the Ponzi-scheme like family of funds being run by Fletcher with assistance from Citco Group and its affiliates, and to maintain the facade of legitimacy and profitability that was a prerequisite to the Fletcher Structure surviving going forward.  As a result, Fletcher and FAM's improper investments meant, in essence, that Fletcher and FAM's options were running out:  both the Fletcher Structure and the Funds could not survive.  Yet the Citco Defendants assisted or participated anyway, in breach of their fiduciary duties.

403.    The foregoing breaches of fiduciary duty by SCM, RCM, RHI, CTI, FAM, Fletcher, Turner, Kiely, Unternaehrer, Smeets, Voges, Laddaga, Bloch, Magris, Citco Group, the Citco Administrators, Citco Bank and Citco Global proximately caused the Funds to suffer damages in the amounts they lost through Fletcher and FAM's three defalcations.  If any of them had disclosed the defalcations to the Funds or their stakeholders, the defalcations could have

been reversed or, at a minimum, investors could have brought derivative suits in the name of the Richcourt Funds. In addition, if any of the Defendants had disclosed Fletcher and FAM's defalcations when they occurred, the Funds could and would have cancelled their IMAs and liquidated, preserving the value of their assets as of that date. Accordingly, the Defendants' breaches of fiduciary duty in failing to expose Fletcher and FAM's defalcations were the proximate cause of the decline in the value of the Funds' assets between the date of the first defalcation and the Funds' petition date.

404.   In equity and good conscience, SCM, RCM, RHI, CTI, FAM, Kiely, Turner, Fletcher, Unternaehrer, Smeets, Voges, Laddaga, Bloch, Magris, Citco Group, the Citco Administrators, Citco Bank and Citco Global have forfeited their rights to all fees and salaries they collected after they first breached their fiduciary duties to the Richcourt Funds, which they equitably should be required to disgorge. In equity and good conscience, the Citco Defendants should also be required to disgorge the benefits they improperly received in the Richcourt Acquisition.

405.   SCM, RCM, RHI, CTI, FAM, Fletcher, Kiely, Unternaehrer, Smeets, Voges, Laddaga, Bloch, Magris, Citco Group, the Citco Administrators, Citco Bank and Citco Global are liable to the Plaintiffs, and Turner is liable to the Joint Liquidators, on Plaintiffs' Fifth Cause of Action for their breaches of fiduciary duty in connection with Fletcher's and FAM's first three defalcations in an amount to be determined at trial, plus equitable disgorgement of benefits and fees, and interest, costs, attorneys' fees and exemplary damages.

## SIXTH CAUSE OF ACTION

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against SCM, RCM, RHI, CTI, FAM, Fletcher, Kiely, Turner,**
**Unternaehrer, Smeets, Voges, Laddaga, Bloch, Magris, Citco**
**Group, the Citco Administrators, Citco Bank and Citco Global Based**
**on the First Three Post-Acquisition Defalcations by Fletcher and FAM)**

406.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 405 of this Complaint as if fully set forth herein.

407.    For the reasons set forth above, SCM, RCM, RHI, CTI, FAM, Fletcher, Unternaehrer, Smeets, Voges, Kiely, Turner, Laddaga, Bloch, Magris, Citco Group, the Citco Administrators, Citco Bank and Citco Global each owed fiduciary duties of care, loyalty and candor to the Richcourt Funds.

408.    SCM, RCM, RHI, CTI, FAM, Fletcher, Kiely, Turner, Unternaehrer, Smeets, Voges, Laddaga, Bloch, Magris, Citco Group, the Citco Administrators, Citco Bank and Citco Global each knew that they each owed fiduciary duties to the Richcourt Funds because they each knew that the Funds had no employees of their own and were directed, managed and serviced in their entirety by the Fletcher, FAM and the Citco Defendants.  Each of SCM, RCM, RHI, CTI, FAM, Fletcher, Kiely, Turner, Unternaehrer, Smeets, Voges, Laddaga, Bloch, Magris, the Citco Group, Citco Administrators, Citco Bank and Citco Global also knew that, as a result, the Richcourt Funds and their stakeholders placed a high degree of trust and confidence in SCM, RCM, RHI, CTI, FAM, Fletcher, Kiely, Turner, Unternaehrer, Smeets, Voges, Laddaga, Bloch, Magris, the Citco Group, the Citco Administrators, Citco Bank and Citco Global, which they each encouraged, knew of and accepted.

-148-

409.    Each of SCM, RCM, RHI, CTI, FAM, Fletcher, Kiely, Turner, Unternaehrer, Smeets, Voges, Laddaga, Bloch, Magris, Citco Group, the Citco Administrators, Citco Bank and Citco Global knew that each of the others breached his or its fiduciary duties to the Richcourt Funds in connection with Fletcher and FAM's first three defalcations as they are identified in this Complaint. They each knew that the others had breached their fiduciary duties with respect to the defalcations because they each knew that investing the Richcourt Funds' assets in the Fletcher Structure was not in the Funds' best interests or in accord with their PPMs and IMAs, and would be likely to lose money. They also knew that such investments could only be made if each of the relevant Defendants reviewed or facilitated it in the course of providing services to the Richcourt Funds in the ways identified above as breaches of fiduciary duty and if the investment was not generally disclosed.

410.    In addition, the Citco Defendants knew of each of the other Citco Defendants' breaches of fiduciary duty because the Citco Defendants acted as each of the others' agent or alter ego and Citco operated as a single integrated organization under the direction and control of Citco Group through the Citco Executive Committee. The Citco Defendants also knew of each of the others' breaches of fiduciary duty, and the fact that they were each acting adversely to the interests of the Richcourt Funds, because the knowledge of each of the Citco Defendants is imputed to each of the other Citco Defendants for the reasons stated above. After the Richcourt Acquisition, this remained true except as to the Citco Directors; as to Laddaga, Bloch and Magris, to the extent that they were no longer functioning as agents of Citco Group and its affiliates; and to the extent that Fletcher acquired ultimate control of SCM, RCM and RHI, which even then continued for some time to be operated in large part by legacy Citco personnel under the direction of Unternaehrer and others at Citco.

411.     Each of SCM, RCM, RHI, CTI, FAM, Fletcher, Kiely, Turner, Unternaehrer, Smeets, Voges, Laddaga, Bloch, Magris, Citco Group, the Citco Administrators, Citco Bank and Citco Global substantially assisted each of the others' breaches of fiduciary duty by providing services necessary to accomplish the defalcations, by concealing that they had taken place, or both.

412.     Each action and omission of SCM, RCM, RHI, CTI, FAM, Fletcher, Kiely, Turner, Unternaehrer, Smeets, Voges, Laddaga, Bloch, Magris, the Citco Group, Citco Administrators, Citco Bank and Citco Global which aided, abetted and facilitated other Defendants' breaches of fiduciary duty in facilitating or failing to disclose Fletcher and FAM's three defalcations were proximate causes of the losses the Funds incurred because of the defalcations.  If any of the Defendants had refused to play its part in facilitating or concealing the defalcations, the defalcations could not have occurred and would not have caused the Funds' losses.

413.     In addition, if any of the Defendants had disclosed Fletcher and FAM's defalcations when they occurred, the Funds could have cancelled their IMAs and liquidated, preserving the value of their assets as of that date.  Accordingly, the Defendants' breaches of fiduciary duty in failing to expose Fletcher and FAM's defalcations were the proximate cause of the decline in the value of the Funds' assets between the date of the first defalcation and the Funds' petition date.

414.     In equity and good conscience, SCM, RCM, RHI, CTI, FAM, Fletcher, Kiely, Turner, Unternaehrer, Smeets, Voges, Laddaga, Bloch, Magris, Citco Group, the Citco Administrators, Citco Bank and Citco, each of whom have aided and abetted breaches of

-150-

fiduciary duty to the Richcourt Funds, have forfeited their rights to all fees and salaries they collected after they first breached their fiduciary duties to the Richcourt Funds, which they equitably should be required to disgorge.  In equity and good conscience, the Citco Defendants should also be required to disgorge the benefits they improperly received in the Richcourt Acquisition.

415.    SCM, RCM, RHI, CTI, FAM, Fletcher, Kiely, Unternaehrer, Smeets, Voges, Laddaga, Bloch, Magris, the Citco Group, the Citco Administrators, Citco Bank and Citco Global are liable to the Plaintiffs, and Turner is liable to the Joint Liquidators, on Plaintiffs' Sixth Cause of Action for aiding and abetting breaches of fiduciary duty in connection with Fletcher's and FAM's first three defalcations in an amount to be determined at trial, plus equitable disgorgement of benefits and fees, and interest, costs, attorneys' fees and exemplary damages.

## SEVENTH CAUSE OF ACTION

### TURNOVER AND ACCOUNTING OF THE CITCO PAYMENTS
### (Against the Citco Defendants Pursuant to 11 U.S.C. §§ 541 and 542)

416.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 415 of this Complaint as if fully set forth herein.

417.    Under section 542(a) of the Bankruptcy Code, "a custodian, in possession, custody, or control …of property that the trustee may use, sell or lease…shall deliver to the trustee, and account for, such property or the value of such property…"

418.    As set forth in Exhibits 1 and 3 to this Complaint, Plaintiffs have identified more than $310 million – and estimate that the BVI Funds made a further $30 million – in

unreconciled and therefore apparently unjustified payments to the Citco Defendants and other Citco companies during the six years prior to the Soundview Funds' bankruptcy proceedings and the date as of which the BVI Funds' claims against the Citco Defendants were tolled. To date, Plaintiffs have identified more than $238 million in payments to Citco from the Soundview Funds (the "**Soundview Citco Payments**") and, based on records from 2009 and 2010, more than $73 million in Citco payments from the BVI Funds. Plaintiffs estimate that the BVI Funds paid an additional $30 million to Citco in 2008 (from June 1, 2008 on, the "**BVI Citco Payments**," which together with the Soundview Citco Payments, the "**Citco Payments**"). Plaintiffs have been unable to determine the purpose of the Citco Payments – and cannot identify specific BVI Citco Payments before 2009 – because the Richcourt Funds' books and records, which were prepared by the Citco Administrators, were left incomplete and in disarray. In addition, although Plaintiffs have asked Citco to provide a reconciliation of the Citco Payments, Citco has failed to do so.

419.    The Citco Payments, to the extent that they have not been reconciled and justified, are property of the Richcourt Funds' estates under section 541 of the Bankruptcy Code. Those Citco Payments are also property that the Trustee may use. Accordingly, under section 542(a) of the Bankruptcy Code, an accounting of the Citco Payments, and all payments that the accounting does not fully reconcile and justify, should promptly be delivered to the Plaintiffs.

420.    The Citco Defendants are liable to the Plaintiffs on Plaintiffs' Seventh Cause of Action for an accounting of the Citco Payments identified in Exhibits 1 and 3 to this Complaint, and for the amount of any of those payments that the accounting does not fully reconcile and justify, plus interest, costs, attorneys' fees and exemplary damages in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION

**BREACH OF FIDUCIARY DUTY**
**(Soundview Elite Against FAM, Fletcher, Ladner, Saunders and**
**Muho Based on the New Year's Eve Transaction and Related Agreements)**

421.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 420 of this Complaint as if fully set forth herein.

422.    At the time of the New Year's Eve Transaction and at all times thereafter, FAM, Fletcher, Ladner, Muho and Saunders each owed fiduciary duties of care, loyalty and candor to the Soundview Elite.  They owed these duties both because they served as Soundview Elite's agents and because Soundview Elite and its stakeholders placed a high degree of trust and confidence in them, which they encouraged, knew and accepted.  In addition, upon information and belief, Fletcher and FAM were alter egos or, at a minimum, acted as agents of each other in connection with Soundview Elite.  For this reason, they each owed fiduciary duties to Soundview Elite because of the other's status and actions.

423.    At the time of the New Year's Eve Transaction and thereafter, FAM managed Soundview Elite's business and investment activities.  FAM served as Soundview Elite's investment advisor as agent for SCM, allocated Soundview Elite's investment opportunities among Soundview Elite and other FAM-managed funds, and ultimately prepared and approved Soundview Elite's chapter 11 filing.  In these and other ways, FAM served as Soundview Elite's agent, and owed it fiduciary duties.  Also, because of FAM's control over Soundview Elite, Soundview Elite and its stakeholders placed a high degree of trust and confidence in FAM, which FAM encouraged, knew and accepted.

-153-

424.    At the time of the New Year's Eve Transaction and thereafter, Fletcher served as Chairman and sole shareholder of FAM and a director of Soundview Elite. Fletcher was therefore Soundview Elite's agent, and owed it fiduciary duties. Also, because of Fletcher's control over Soundview Elite, Soundview Elite and its stakeholders placed a high degree of trust and confidence in Fletcher, which he encouraged, knew and accepted.

425.    At the time of the New Year's Eve Transaction and thereafter, Ladner served as an agent of Soundview Elite. Because of his control over Soundview Elite, Soundview Elite and its stakeholders placed a high degree of trust and confidence in Ladner, which he encouraged, knew and accepted.

426.    At the time of the New Year's Eve Transaction and thereafter, Saunders was, upon information and belief, the corporate secretary of Soundview Elite, FAM and FII. He also served as an agent of Soundview Elite. Because of his control over Soundview Elite, Soundview Elite and its stakeholders placed a high degree of trust and confidence in Saunders, which he encouraged, knew and accepted.

427.    At the time of the New Year's Eve Transaction and thereafter, Muho served as a director of Soundview Elite and as its agent. Because of his control over Soundview Elite, Soundview Elite and its stakeholders placed a high degree of trust and confidence in Muho, which he encouraged, knew and accepted.

428.    For the foregoing reasons, each of FAM, Fletcher, Saunders and Muho owed fiduciary duties to Soundview Elite at the time of the New Year's Eve Transaction and thereafter. The fiduciary duties that they each owed to the Soundview Funds included duties of care, loyalty and candor. Among other things, the duty of care requires fiduciaries to act with the

care that an ordinarily prudent person in a like position would exercise under the circumstances. The duty of loyalty requires, *inter alia*, that fiduciaries act in good faith and in the best interests of their principals without any desire to obtain personal benefit or to benefit some person other than their principals. The duty of candor requires fiduciaries to reveal all material information to those to whom a duty of candor is owed, including material information concerning the agent's conflicts of interest.

429.    FAM, Fletcher, Ladner, Saunders and Muho each breached their fiduciary duties to Soundview Elite in connection with the New Year's Eve Transaction.

430.    FAM breached its fiduciary duties to Soundview Elite, and placed its own and FII's interests ahead of those of Soundview Elite, by causing Soundview Elite to consummate the New Year's Eve Transaction, which looted $4 million of its assets. As a direct result of FAM's authorization of the Omnibus Agreement on Soundview Elite's behalf, FAM directed Soundview Elite to transfer $4 million of its assets for which it was substantially certain to receive – and did receive – little or nothing in return. As a direct and proximate result of this and related breaches of duty by FAM, Soundview Elite lost millions of dollars, suffering financial harm and consequential damages, the amount of which will be established at trial.

431.    Fletcher, Ladner, Saunders and Muho each breached their duties to Soundview Elite by facilitating the New Year's Eve Transaction. As insiders of FAM and other entities in the Fletcher Structure, they knew or had to know that the New Year's Transaction would cause large losses to Soundview Elite given the parlous state of the Fletcher Structure. Fletcher, Ladner, Saunders and Muho all had access to information about the losses the New Year's Eve Transaction would cause Soundview Elite to incur and the authority and an opportunity to

-155-

ameliorate them.  Yet Fletcher, Ladner, Saunders and Muho did nothing to protect Soundview

Elite.  Instead, they implemented the transaction at the wrongful and self-interested direction of

FAM.  Among other wrongful acts:

432.    Fletcher was intimately involved in causing all of the breaches of duty described

in this Complaint during his tenure with Soundview Elite.  For example, as part of the secretive

New Year's Eve Transaction, Fletcher signed each of the agreements dated December 31, 2012

as director of Soundview Elite and FII.  As a result of these agreements, (a) FII agreed to sell

Soundview Elite all of the BRG Interest for the price of $1.38 million; (b) FII agreed to sell to

Soundview Elite all of its shares in FILB, a bankrupt entity, for $4 million; and (c) FII assigned

and Soundview Elite assumed all of FII's shares of FILB and the BRG Interest, in purported

consideration for Soundview Elite's agreement to pay FII $4 million for its shares of FILB.

Fletcher knew of and approved Soundview Elite's looting of the $4 million, and was responsible

for applying Soundview Elite's money to pay off creditors of Fletcher, FAM and other entities

they control, including the $2.2 million in cash that FII had taken and dissipated from FILB.

433.    Ladner was personally involved in and responsible for looting Soundview Elite in

the New Year's Eve Transaction.  Despite his position as Soundview Elite's investment

manager, Ladner signed the Omnibus Agreement to approve its participation in the New Year's

Eve Transaction, thereby robbing Soundview Elite of $4 million in exchange for worthless

consideration.  Like Fletcher, Ladner knew that the New Year's Eve Transaction would harm

Soundview Elite and did nothing to try to stop it or to bring it to the attention of regulatory

authorities.

434.    Saunders facilitated Soundview Elite's participation in the New Year's Eve Transaction in his capacity as corporate secretary of Soundview Elite, FAM and FII.  Among other things, Saunders signed the Omnibus Agreement on behalf of FII while acting as corporate secretary for FAM, FII's investment advisor.  In addition, on July 19, 2013, Saunders executed the illusory $5.38 million promissory note made out to Soundview Elite on FII's behalf, knowing that the promissory note was unlikely to be honored.  Like Fletcher and Ladner, Saunders knew that the New Year's Eve Transaction would harm Soundview Elite and did nothing to try to stop it or to bring it to the attention of regulatory authorities.

435.    Muho served as a director of Soundview Elite from on or around September 4, 2012 through early April 2013.  Like Fletcher, Muho approved the New Year's Eve Transaction on behalf of and as director of Soundview Elite.  Like Fletcher, Ladner and Saunders, Muho knew that the New Year's Eve Transaction would harm Soundview Elite and did nothing to try to stop it or to bring it to the attention of regulatory authorities.

436.    By the foregoing actions, FAM, Fletcher, Ladner, Saunders and Muho all violated their fiduciary duties of care, loyalty and candor to Soundview Elite by approving the New Year's Eve Transaction and related agreements, or facilitating them or allowing them to proceed, even though they knew that the Transaction would harm Soundview Elite.  At a minimum, they failed to take appropriate steps to investigate and fully understand the risks of, among other things, Soundview Elite's investment in the equity of the bankrupt FILB.  They also failed to inform the regulatory authorities, an independent representative of Soundview Elite or anyone else that they planned to engage in a multi-million dollar transaction for Soundview Elite as to which they had a conflict of interest and which risked causing the fund substantial damage.

437.    Each action and omission of FAM, Fletcher, Ladner, Saunders and Muho with respect to the New Year's Eve Transaction and related agreements was a proximate cause of the losses that Soundview Elite incurred because of the Transaction.  Without those actions, or if any of them had disclosed the Transaction to an independent party, Soundview Elite would not have suffered the resulting losses.  In addition, if the Transaction had been disclosed, action could and would have been taken to stop any future misappropriations or losses.

438.    In equity and good conscience, FAM, Fletcher, Ladner, Saunders and Muho have forfeited their rights to all fees and salaries they collected after they first breached their fiduciary duties to the Soundview Funds, which they equitably should be required to disgorge.  For the foregoing reasons FAM, Fletcher, Ladner, Saunders and Muho are liable to Plaintiffs on Plaintiffs' Eighth Cause of Action for breach of fiduciary duty in an amount to be determined at trial, plus disgorgement of fees, interest, costs, attorneys' fees and exemplary damages.

## NINTH CAUSE OF ACTION

### FRAUD
### (Against All Defendants)

439.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 438 of this Complaint as if fully set forth herein.

440.    Every Defendant named in this Complaint owed the Richcourt Funds fiduciary duties.  Yet, as set forth with particularity above, each of these Defendants either engaged in fraudulent schemes, or made or disseminated fraudulent statements to the Funds, their agents such as service providers, or their stakeholders that misrepresented transactions which, the Defendants knew, sacrificed the Funds' interests to the conflicting interests of others, or both.  If the Defendants had not engaged in fraudulent schemes, or if the Defendants' misstatements and

-158-

misleading omissions had not been made, the transactions the misstatements referred to could have been stopped or remedied, and all of the subsequent wrongful transactions would have been prevented.

441.   Every Defendant named in this Complaint had a duty to disclose any transaction that risked causing substantial harm to the Richcourt Funds because the Defendants were all fiduciaries, because the transactions were material to the Funds' ability to survive, because the Funds' stakeholders were relying on the Defendants to disclose potentially harm to the Richcourt Funds, because the transactions the Defendants failed to disclose were fraudulent, and because the Funds were regularly receiving and disseminating information which, absent disclosure of the material information that the Defendants failed to disclose, was highly misleading.

442.   The actions and transactions discussed in this Complaint that were fraudulent or misrepresented to the Richcourt Funds, their agents such as service providers or their stakeholders – or about which the Defendants knowingly withheld material information as pled in detail above – include:

1.   The Richcourt Acquisition, because, in pursuit of conflicting interests, the Citco Defendants knowingly sold control of the Richcourt Funds to a manager who had a history of misappropriating investors' money;

2.   Unternaehrer's sweetheart deal, because it gave him an incentive to favor Fletcher and FAM as buyers of the Funds irrespective of their competence and honesty;

3.   Each of the first three defalcations identified in this Complaint, beginning in November 2008;

4.   Payments to Citco Group subsidiaries or affiliates which the Richcourt Funds' records, in the state in which the Citco Administrators left them, fail to justify; and

      5.     Fletcher and FAM's later defalcations, including the New Year's Eve Transaction.

443.    None of the Defendants' misrepresentations concerning these five actions and transactions should have been made, and the material information the Defendants withheld concerning them should have been disclosed to the Funds and their stakeholders. At a minimum, the Defendants' misrepresentations and material omissions should have been corrected promptly after these actions and transactions took place. Instead, disclosure, except for partial disclosures concerning the Richcourt Acquisition, had to wait for the Richcourt Funds' bankruptcy.

444.    The factual allegations in this Complaint and causes of action for breach of fiduciary duty identify, with particularity, Defendants who made misleading statements about, or deliberately withheld material information about, the five actions and transactions listed above.

445.    Examples of the Defendants' material misrepresentations include:

      1.     The Fletcher and FAM-affiliated Fund Directors Kiely and Turner's December 2008 letters, which so misrepresented the Richcourt Acquisition as to be highly misleading.

      2.     The Fletcher and FAM-affiliated Fund Directors Kiely and Turner's January 2009 letters, which contained false information about the Richcourt Acquisition.

      3.     Each of the communications that the Defendants caused to be sent to the Funds, or to agents or stakeholders in the Funds, concerning the Funds' status or assets after Fletcher and FAM's initial defalcation. Each of those communications were based on inaccurate valuations of the Funds' holdings in the Fletcher Structure and contained no indication that, because Fletcher and FAM had begun using the Funds' assets for personal purposes, the Funds' stated assets no longer reliably belonged to the Funds. Further, the Defendants' financial reporting did not communicate, upon information and belief, that Citco had made a special exception to its policies for the Fletcher Structure by valuing feeder funds' assets without validating the value of the assets in the Fletcher Structure's "master" funds.

4.    Each of the revised PPMs that Fletcher, Kiely, Turner, SCM, RCM, RHI and FAM caused to be disseminated after Fletcher and FAM's April 2009 defalcation, because they each misrepresented the actual investment strategy that Fletcher and FAM had implemented.

5.    Each of the communications that the Defendants caused to be sent to the Funds, or to agents or stakeholders in the Funds, concerning the Funds' status or assets after the New Year's Eve Transaction. Each of those communications were based on inaccurate valuations of the Funds' holdings in the Fletcher Structure and contained no indication that, because Fletcher and FAM had begun using the Funds' assets for personal purposes, the Funds' stated assets no longer reliably belonged to the Funds.

446.    Defendants responsible for making or disseminating misrepresentations concerning the five actions and transactions identified above are specified in this Complaint's factual allegations and in Plaintiffs' causes of action for breach of fiduciary duty. The December 2008 and 2009 letters, for example, were drafted with input from certain Citco Defendants and distributed by the Citco Administrators who knew, because they had received Unternaehrer's June 2008 "Internal Announcement," that the letters were misleading or false. Upon information and belief, Unternaehrer reviewed both letters as agent for the Citco Group, and the Citco Administrators and the Citco Group caused the letters to be reviewed by Citco legal counsel as well. Upon information and belief, Fletcher and FAM also reviewed the letters and caused them to be sent.

447.    False and misleading communications concerning the five actions and transactions identified above were distributed by the Citco Administrators until in or about March or April 2010, and upon information and belief, were reviewed by Unternaehrer as a director of RHI and Citco Group's agent responsible for the post-Acquisition Richcourt Group, who had a duty to share information about the false communications with Smeets and Voges. After the resignation of the Citco Administrators, Citco Global and Citco Bank became effective

in or about March or April 2010, FAM distributed, or caused to be distributed, communications concerning the Funds. Unternaehrer continued to review them as an agent of RHI and Citco Group, upon information and belief, until he severed his relations with Fletcher and FAM in December 2011. At a minimum, Unternaehrer had a duty as a director of RHI to review the statements.

448.    The factual allegations in this Complaint and its causes of action for breach of fiduciary duty identify, with particularity, Defendants who knew about the five actions and transactions listed above and who helped to conceal them by failing to disclose them to anyone who might have stopped or remedied them. Each of these failures to disclose was fraudulent: the Defendants were all fiduciaries who had duties to speak, and they all knew that failure to disclose the actions and transactions would make the other information the Funds were providing to investors – including but not limited to their reports on performance – materially misleading.

449.    The basic facts concerning all five of the actions and transactions that the Defendants failed to disclose were highly material to the Funds. The first two transactions demonstrated that the Funds' new managers could not be trusted and that, because of Fletcher and FAM's history of defalcations, the Funds' assets were now at risk. The later three actions and transactions were all evidence that these risks had been realized.

450.    The statements and communications that the Defendants caused to be distributed in each of the five categories specified above were highly material, because they concerned the value of assets in the Funds, how they were being managed, and how reliably they would be available for stakeholders in the future. The two letters were material because they misrepresented the changes in the Funds' management that had resulted from the Richcourt

Acquisition.  Communications in the other categories were material because they misrepresented the Funds' assets and performance.

451.    The statements and communications that the Defendants caused to be distributed in each of the five categories specified above were made with scienter, in the knowledge that they were false.  Particular reasons why each of the Defendants knew that the two letters, and communications concerning the Funds' assets and management, were misleading are set forth in Plaintiffs' causes of action for breach of fiduciary duty and elsewhere in this Complaint.  The Citco Administrators, for example, knew the Funds' actual assets and liabilities because of their work for the Funds and because Citco Group operated as a single, integrated entity.  The Citco Administrators therefore knew that any financial information about the Funds prepared after Fletcher's April 2009 defalcation that did not mention the defalcation were misleading.  Upon information and belief, Bloch, who assisted the Funds' auditors, also knew and certainly must have known that the Funds' financial reporting after Fletcher and FAM's first defalcation was misleading.  Citco Group too, which received Funds' reports through Unternaehrer, and knew actually or by imputation through Unternaehrer that Fletcher and FAM were misappropriating Fund assets, knew that the Funds' post-defalcation financial reporting was inaccurate.  Citco Group caused the Citco Administrators to distribute the reports nonetheless.

452.    With respect to each of the five actions and transactions identified above, as set forth in the factual allegations in this Complaint and Plaintiffs' causes of action for breach of fiduciary duty, the Defendants withheld material facts from disclosure deliberately, with scienter, knowing that non-disclosure would mislead the Richcourt Funds and their stakeholders.  The particular reasons why each of the Defendants knew that each particular transaction would harm the Richcourt Funds are set forth above.

-163-

453.    The Defendants made the foregoing misrepresentations and withheld material facts with scienter because they knew that the truth would have endangered the Citco Defendants' benefits from the Richcourt Acquisition, as well as Unternaehrer's "sweetheart" deal.  Making more accurate representations also would have endangered the benefits that Fletcher and FAM were reaping from the Richcourt Acquisition, including the benefit of having more assets to misappropriate.  The Defendants' withholding of material information as set forth above was knowing, deliberate and made with scienter for these same reasons.

454.    The Richcourt Funds reasonably relied upon all of the foregoing misrepresentations and upon the Defendants' representations that, without the material information the Defendants withheld, were misleading.  The Defendants ensured that the Funds had no independent representative or management despite the conflicts of interest of Citco, Fletcher and FAM.    As a result, the Funds were forced to rely on the Defendants' misrepresentations and to continue their dependence on Fletcher and FAM.  Further, the Funds relied upon the misrepresentations through the stakeholders and agents who, by bringing derivative actions or otherwise, had the power and independence to act in the Funds' name and to cause the Funds to sever their relations with Fletcher and FAM.    By making misrepresentations about the Funds, as well as their management, status and assets, to the Funds' stakeholders, the Defendants wrongfully deprived the Funds of their crucial ability to prevent further depredations.

455.    The Richcourt Funds reasonably relied on the non-disclosure of each of the five actions and transactions in that they allowed the Richcourt Acquisition to proceed, allowed Citco to keep the unreconciled and apparently unjustified Citco Payments, and took no action to remedy Fletcher and FAM's defalcations.  The Funds also took no action to terminate their IMAs

with SCM and RCM or to sever their business relations with Fletcher and FAM, though they would have done so had they known about Fletcher and FAM's history of misappropriation. At a minimum, the Richcourt Funds' stakeholders could have brought suit derivatively or otherwise acted in the Funds' name to preserve the Funds' assets if only the Defendants had not deprived the Funds, their stakeholders and their independent agents of the truth.

456. The Defendants' misrepresentations and material omissions proximately caused the Richcourt Funds to incur many millions of dollars in damage and to suffer egregious harm. If the Funds and their stakeholders had been aware of the misappropriations by Fletcher and FAM that took place either before or after the Richcourt Acquisition, stakeholders could have brought suit against Fletcher and FAM in the Funds' name and thereby preserved the Funds' assets from future losses and depredations. Also, the Funds could have terminated their connection with Fletcher, FAM and their affiliates immediately or could have wound down. Doing so would have prevented the Richcourt Funds from incurring all of the staggering losses they subsequently incurred. At a minimum, the Funds' stakeholders could have brought derivative actions or otherwise acted in the name of the Funds to remedy past depredations and prevent new ones.

457. The Defendants' failure to disclose the Richcourt Acquisition before, or at least within a reasonable period after it occurred was particularly egregious because the Richcourt Funds' stakeholders were so blatantly abused and because the Richcourt Acquisition caused the greatest damage. If the Acquisition had been disclosed and then, inevitably, terminated, the Soundview Funds would not have suffered any of the damage alleged in this Complaint. Yet the facts alleged with particularity about each Defendant's knowledge of, participation in and wrongful failure to disclose the Richcourt Acquisition constituted an outrageous fraud not only

by Fletcher and FAM, but also by the Citco Defendants ranging from low-level nominee corporate directors and the Citco Administrators all the way to Unternaehrer, Smeets, Voges and the Citco Executive Committee.  As discussed elsewhere in this Complaint, the Citco Defendants knew that Fletcher and FAM had misappropriated investors' assets before the Richcourt Acquisition and, with Citco Group's knowing participation, they did so again in the Richcourt Acquisition itself.  Yet for months and even years, the Citco Defendants' conflicts of interest, knowledge about Fletcher and FAM's misappropriations and the inevitable cost to the Funds remained secret.  The Citco Defendants' failures to disclose these facts in order to secure for themselves the benefits of the Richcourt Acquisition constituted a truly vast international multi-million dollar fraudulent conspiracy, and the Citco Defendants should and must be held to account.

458.    Fletcher, FAM and the Fletcher Defendants similarly engaged in outrageous, fraudulent failures to disclose in circumstances in which they had a fiduciary duty to speak.  As described above, in connection with the unwind of the April 22 Transaction and the subsequent effort to cover up the financial aspects of that transaction, Fletcher, FAM, Ladner, Muho, Saunders, and SCM failed to disclose to Soundview Elite or the other Soundview Funds the key, material information relating to that transaction.  Their fraudulent omissions included failing to inform Soundview Elite or its stakeholders, despite the Fletcher Defendants' fiduciary duties to that fund, that $4 million of Soundview Elite's assets were to be used to unwind a transaction and pay obligations having nothing to do with Soundview Elite, contrary to the fund's best interests, but as to which the Fletcher Defendants had a directly conflicting interest.

459.    The Fletcher Defendants also failed to inform Soundview Elite or its stakeholders that $4 million of Soundview Elite's funds were to be invested in worthless or nearly worthless

assets, or that Soundview Elite would have little to no chance of receiving its money back. Similarly, the Fletcher Defendants failed to inform Soundview Elite or its stakeholders that the April 22 Unwind Transaction was being undertaken contrary to Soundview Elite's investment objectives. The Fletcher Defendants also made related intentional material misrepresentations to Soundview Elite **and to the Court** to help perpetrate this fraud. And the result, of course, was that Soundview Elite suffered an inevitable loss.

460. For the foregoing reasons, each of the Defendants is liable on Plaintiffs' Ninth Cause of Action for damages proximately caused by Defendants' fraud and failures to disclose in an amount to be determined at trial plus interest, costs, attorneys' fees and exemplary damages.

## TENTH CAUSE OF ACTION

### AIDING AND ABETTING FRAUD
### (Against All Defendants)

461. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 460 of this Complaint as if fully set forth herein.

462. Every Defendant named in this Complaint owed the Richcourt Funds fiduciary duties. Yet, as set forth with particularity above, the Defendants made misrepresentations to the Funds and their stakeholders and failed to disclose five actions and transactions that they knew sacrificed the Funds' interests to the conflicting interests of others. If the misrepresentations had not been made and the five actions and transactions had been disclosed to an independent representative of the Richcourt Funds, to the Funds' stakeholders, or to the Funds' agents, those actions and transactions could have been stopped or remedied, and all of the subsequent wrongful transactions would have been prevented.

463.    Each Defendant named in this Complaint had a duty to disclose any transaction that risked causing substantial harm to the Richcourt Funds because the Defendants were all fiduciaries, because the transactions were material to the Funds' ability to survive, because the Funds' stakeholders were relying on the Defendants to disclose potentially harmful actions, because the transactions the Defendants failed to disclose were often fraudulent, and because the Funds were regularly receiving and disseminating information that, absent disclosure of the harmful transactions, was highly misleading.

464.    The five actions and transactions discussed in this Complaint that should have been disclosed to an independent, unconflicted representative of the Richcourt Funds, or to the Funds' stakeholders, or regulators, or all of them, include:

1.      The Richcourt Acquisition, because, in pursuit of conflicting interests, the Citco Defendants knowingly sold control of the Richcourt Funds to a manager who lacked the resources to manage the Funds had a history of misappropriating investors' money;

2.      Unternaehrer's sweetheart deal, because it gave him an incentive to favor Fletcher and FAM as buyers of the Funds irrespective of their competence and honesty;

3.      Each of the first three defalcations identified in this Complaint, beginning in November 2008;

4.      Payments to the Citco Defendants which the Richcourt Funds' records, in the state in which Citco left them, fail to justify;

5.      Fletcher and FAM's later defalcations, including the New Year's Eve Transaction.

465.    Each of these actions and transactions should have been disclosed before it took place or, at a minimum, promptly thereafter.  Instead, disclosure, except for partial disclosures concerning the Richcourt Acquisition, had to wait for the Funds' bankruptcies and liquidations.

466.    The causes of action for breach of fiduciary duty stated in this Complaint each identify, with particularity, defendants who knew about the five actions and transactions listed above and who helped to conceal them by failing to disclose them to anyone who might have stopped or remedied them.  Each of these failures to disclose was fraudulent:  the Defendants all fiduciary had duties to speak, and they all knew that failure to disclose the actions and transactions would make the other information the Funds were providing to investors – including but not limited to their reports on performance – materially misleading.

467.    As set forth above, each of the Defendants wrongfully omitted to disclose material existing facts concerning the foregoing five actions and transactions that, absent disclosure, made the other information the Funds and their stakeholders received concerning the Funds' status, holdings, assets and performance misleading.  Also, the Defendants all had a duty to disclose the information they concealed because they were Fund fiduciaries who owed the Funds duties of candor.

468.    Each of the Defendants, by wrongfully concealing and omitting to disclose material existing facts concerning the foregoing five actions and transactions, substantially assisted and aided and abetted fraud.  As set forth above, each of the Defendants committed fraud by making misrepresentations, or failing to disclose, one or more of the foregoing five actions and transactions.  Further, as stated in the Trustee's causes of action for breach of fiduciary duty and fraud as well as elsewhere in this complaint, each of the Defendants knew that one or more of the other Defendants had committed fraud by making material misrepresentations or failing to disclose material facts, yet none of the Defendants disclosed the facts.  By keeping silent concerning material facts that they knew had fraudulently been misrepresented or

concealed, each defendant aided and abetted fraud.  The Defendants also aided and abetted fraud, as set forth above, to the extent that they facilitated or participated in fraudulent schemes.

469.    The Defendants' aiding and abetting fraud by concealing or failing to disclose the five actions and transactions identified above proximately caused the Funds to incur many millions of dollars in damage.  If Citco's unexplained payments had been disclosed, any overpayment could have been remedied, and the Funds and their stakeholders or independent agents could have taken steps to investigate the Richcourt Acquisition and other key aspects of the Citco Defendants' actions with respect to the Funds.  If the other four actions and transactions had been disclosed, the Funds could have terminated their connection with Fletcher, FAM and their affiliates immediately or could have wound down.  Doing so would have prevented the Funds from incurring all of the staggering losses they incurred after each of the actions and transactions.  At a minimum, the Funds' stakeholders could have brought derivative actions or otherwise acted in the name of the Funds to remedy past depredations and prevent new ones.

470.    For the foregoing reasons, each of the Defendants is liable on Plaintiffs' Tenth Cause of Action for aiding and abetting fraud in an amount to be determined at trial for the damage proximately caused by the Defendants' failure to disclose each of the actions and transactions that, as alleged in Plaintiffs' causes of action for breach of fiduciary duty and elsewhere in this Complaint, the Defendants knew about but did not disclose to the Funds, their stakeholders, regulators, or others who could have acted to protect the Soundview Funds, plus interest, costs, attorneys' fees and exemplary damages.

## ELEVENTH CAUSE OF ACTION

### TURNOVER AND ACCOUNTING OF BOOKS AND RECORDS
### (Against All Defendants Pursuant to 11 U.S.C. §§ 541 and 542)

471.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 470 of this Complaint as if fully set forth herein.

472.    Under section 542(a) of the Bankruptcy Code, "a custodian, in possession, custody, or control …of property that the trustee may use, sell or lease…shall deliver to the trustee, and account for, such property or the value of such property…"

473.    The Defendants are in possession of extremely valuable property of the Richcourt Funds' estates:  The Funds' books and records.

474.    The Citco Defendants created, managed and controlled the Richcourt Funds and their books and records.  Even after the Richcourt Acquisition, the Citco and Fletcher Defendants continued to manage and control the Funds and their books and records.  Moreover, the Funds have never had employees or records of their own – there were no electronic or paper "files".  Nor were there separate email addresses for Citco or Fletcher Defendant personnel working on Fund matters.

475.    Further, the Plaintiffs have not been able to have unfettered access to the Richcourt Funds' financial records or other electronic documents, such as emails or their attachments, shared drives, network or similar files.  For example, the Trustee has received virtually no Soundview Funds' records from the Citco Defendants, who have been largely unwilling to provide documents or information to the Trustee in connection with these cases.  And the Trustee has been forced to negotiate with the Fletcher Defendants to obtain certain of

the Soundview Funds' records, many of which appear to be missing from the production provided to date by the Fletcher Defendants.  As a result, the vast majority of the Richcourt Funds' books and records remain in the exclusive possession, custody and control of the Citco and Fletcher Defendants.

476.    The Defendants possess copies of the Richcourt Funds' books and records that the Trustee and Joint Liquidators can certainly use.  Those books and records, furthermore, are property of the Richcourt Funds' estates that the Trustee and Joint Liquidators are entitled to administer under section 541 of the Bankruptcy Code.  Consequently, the Trustee and Joint Liquidators are entitled to an order and judgment on Plaintiffs' Eleventh Cause of Action requiring each of the Defendants to turn over forthwith their copies of all of the Richcourt Funds' books and records.

## TWELFTH CAUSE OF ACTION

### TURNOVER AND ACCOUNTING OF INSIDER PAYMENTS
### (Against the All Defendants Pursuant to 11 U.S.C. §§ 541 and 542)

477.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 476 of this Complaint as if fully set forth herein.

478.    Under section 542(a) of the Bankruptcy Code, "a custodian, in possession, custody, or control …of property that the trustee may use, sell or lease…shall deliver to the trustee, and account for, such property or the value of such property…"

479.    Among the transfers of the Plaintiffs' assets that are the subject of this adversary proceeding are the payments and conveyances made to insiders of the Soundview Debtors identified in Exhibit 2 attached hereto (the "**Insider Transfers**").  The insiders of the Soundview

Debtors for the purposes of this Complaint include, but are not limited to, the Citco Defendants who played a role in controlling the Soundview Funds before or after the Richcourt Acquisition and the Fletcher Defendants for the period after the closing of the Richcourt Acquisition.

480.    The Richcourt Funds then in existence were each insolvent, upon information and belief, by November 2008, and the Designated Funds were each insolvent as of the moment of their creation in March 2009.  Given the Defendants' refusal to produce key books and records of the Richcourt Funds, the Plaintiffs have been forced to identify insider transfers based on public filings and documents provided by the Fletcher Defendants.  Accordingly, to the extent that the Defendants have failed to provide documents or the Richcourt Funds' records concerning transfers to insiders – as "insiders" is defined either in section 101 of the Bankruptcy Code or in the orders of the Bankruptcy Court in which the Richcourt Funds' cases are pending – that were made between September 30, 2010 and the Petition Date but are not listed in <u>Exhibit 2</u> (the "**Additional Insider Transfers**"), the Plaintiffs reserve the right, in equity and good conscience, to include those Additional Insider Transfers within the scope of the Insider Transfers.

481.    The Insider Transfers constitute property of the estate that the Richcourt Funds are entitled to recover and administer pursuant to section 541 of the Bankruptcy Code.

482.    Further, pursuant to section 542 of the Bankruptcy Code, the Plaintiffs are entitled to an order and judgment on Plaintiffs' Twelfth Cause of Action directing the Defendants to provide an immediate accounting of, and turn over, any and all Insider Transfers or Additional Insider Transfers that the Soundview Debtors made, directly or indirectly, to the Defendants or their affiliates.

## THIRTEENTH CAUSE OF ACTION

### CONVERSION
### (Against All Defendants)

483.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 482 of this Complaint as if fully set forth herein.

484.    As stated above, the Defendants on multiple occasions wrongfully took possession of the Richcourt Funds' property.  That property, which has not been returned, includes:

> 1.    The money Fletcher, FAM and others took from the Funds in the defalcations discussed above;
>
> 2.    The Citco Payments to Citco Group and its subsidiaries that they have not explained and to which they therefore are not entitled;
>
> 3.    The Insider Transfers; and
>
> 4.    Fees and salaries that Defendants received despite prior breaches of fiduciary duty.

485.    These conversions of the Funds' property were not authorized, proper, or for the Funds' benefit.  Rather, all of these sums were transferred either directly to Defendants, or to others for the Defendants' benefit, and were therefore converted for the Defendants' sole and improper benefit.

486.    The Funds are entitled to the return of their converted property in an amount to be determined at trial.

487.    Defendants are liable on Plaintiffs' Thirteenth Cause of Action for the return of the Funds' converted property in an amount to be determined at trial, plus interest, costs, attorneys' fees and exemplary damages.

## FOURTEENTH CAUSE OF ACTION

### UNJUST ENRICHMENT
### (Against All Defendants)

488.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 487 of this Complaint as if fully set forth herein.

489.    As described above, all of the Defendants have been unjustly enriched at the expense of the Richcourt Funds and it would be unjust, unfair and unreasonable, in equity and good conscience, for Defendants to be allowed to retain the amounts by which they have been unjustly enriched.

490.    The sums by which the Defendants have been unjustly enriched include:

1.    The money the Defendants took from the Richcourt Funds in the defalcations discussed above;

2.    The Citco Payments to Citco Group and its subsidiaries that they have not explained and to which they therefore are not entitled;

3.    All profits and other benefits that the Citco Defendants gained as a result of the Richcourt Acquisition;

4.    The Insider Transfers; and

5.    Fees and salaries that Defendants received despite prior breaches of fiduciary duty.

491.    All of these sums must, in equity and good conscience, be returned.  It is obvious that these benefits and enrichments all came at the Richcourt Funds' expense.  While the Defendants became rich and received benefits from the Richcourt Funds, the Funds themselves sought bankruptcy protection and liquidation after having incurred massive losses.

492.    The payments to Fletcher and FAM, and unexplained payments to Citco Group, were all looted from the Richcourt Funds, and no one but those Funds has a right to keep them.

-175-

Fees and salaries paid to individuals and business entities that breached their fiduciary duties and served themselves or other masters rather than the Funds who paid them similarly have no right to keep the sums they took.

493.    The Citco Defendants have been unjustly enriched because they have obtained and kept custody of an astonishing $340 million for which they have failed to account.  The Citco Defendants have also been unjustly enriched because they received fees and salaries for conduct that, once the facts were disclosed, proved to be in breach of their fiduciary duties to the Richcourt Funds.

494.    The Fletcher Defendants too were unjustly enriched, both directly and indirectly.  First, FAM paid itself some of the $1.8 million portion of the $4 million that was illicitly transferred from Soundview Elite to FII.  Second, FAM used some of the $1.8 million portion of the Soundview Elite money to pay many of its service providers and creditors, with no benefit to Soundview Elite.  Third, FAM and the other Fletcher Defendants were able to avoid a lawsuit filed by the FILB Trustee that asserted intentional and constructive fraudulent transfers by FII in connection with the April 22 Transactions.  In addition, the Fletcher Defendants were unjustly enriched by receiving fees and salaries for conduct that, once the facts were disclosed, proved to be in breach of their fiduciary duties to the Richcourt Funds.

495.    At the same time that the Funds were conferring substantial benefits on the Fletcher Defendants, Fletcher and Ladner were shepherding the Funds towards bankruptcy.  This was not, of course, the result that the Funds or their investors hoped for or expected from the oversight and management services rendered by (a) FAM, Soundview Elite's de facto investment advisor, (b) Fletcher, Ladner, Muho, and Soundview Elite's directors and (c) Saunders,

Soundview Elite's officer, at the times relevant to the allegations set forth in this Complaint. FAM, Fletcher, Ladner, Muho and Saunders engaged in multiple breaches of legal and fiduciary duties, all in an effort to loot the coffers of Soundview Elite before it failed.

496.    In the circumstances set forth in this Complaint, it would be unjust, unfair and inequitable to allow the Defendants to keep the substantial benefits they received from Soundview Elite, which enriched the Defendants at the expense of Soundview Elite and its other stakeholders.  Among other things, the actions of Fletcher, Ladner, Saunders and Muho favoring the interests of FAM and FII or other parties over the interests of Soundview Elite demonstrate the unfairness of allowing those Defendants, among others, to profit from their misconduct.  The Defendants should therefore be required to disgorge and return the benefits they unjustly secured from the Funds.

497.    Defendants are liable to Plaintiffs on Plaintiffs' Fourteenth Cause of Action for unjust enrichment for the return and disgorgement of the Funds' property which unjustly enriched them in an amount to be determined at trial, plus interest, costs, and attorneys' fees.

## FIFTEENTH CAUSE OF ACTION

### AVOIDANCE AND RECOVERY OF INSIDER TRANSFERS
### AS CONSTRUCTIVE FRAUDULENT CONVEYANCES
**(Against All Defendants Identified on Exhibit 2 Pursuant to 11 U.S.C. §§ 544
and 550 and New York Debtor and Creditor Law §§ 273, 274, 275, 278, and 279)**

498.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 497 of this Complaint as if fully set forth herein.

499.     Between November 2008 and the Petition Date, the Soundview Debtors transferred each of the Insider Transfers to the Defendants on the dates and in the amounts specified on Exhibit 2.

500.     Each of the Insider Transfers constituted a conveyance by the Soundview Debtors of their property under section 270 of the New York Debtor and Creditor Law.

501.     The Soundview Debtors did not receive fair consideration for the Insider Transfers.

502.     Upon information and belief, the Soundview Debtors were insolvent at the time they made each of the Insider Transfers.  As set forth above, the Soundview Funds' insolvency arose from financial deterioration after, and as a result of, the Richcourt Acquisition.  Soon after the Richcourt Acquisition, the Soundview Funds were unable to renew their credit lines, which had been in place to provide liquidity for redemptions and terminated in September 2008.  The Soundview Funds' insolvency during 2008 and thereafter is further shown by the fact that they were unable to meet their obligations, including redemption requests, as they came due beginning in or around November 2008.  This insolvency was not remedied by the creation in March 2009 of the Designated Funds, which were intended to be receptacles for illiquid and likely over-valued assets, but which were insolvent and unable to satisfy their own obligations, including redemption requests, from the moment of their creation.

503.     In addition or in the alternative, at the time the Soundview Debtors made each of the Insider Transfers, the Soundview Debtor which was the transferor of each Insider Transfer was engaged or was about to engage in business or a transaction for which the property remaining in its hands after the Insider Transfer was an unreasonably small amount of capital.

-178-

504.    In addition or in the alternative, at the time the Soundview Debtors made each of the Insider Transfers, the Soundview Debtor which was the transferor had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay as the debts matured.

505.    At all relevant times there has been at least one creditor who holds or held matured or unmatured unsecured claims against each of the Soundview Debtors allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e) of the Bankruptcy Code.

506.    The Trustee is entitled to avoid the Insider Transfers pursuant to section 544 of the Bankruptcy Code and sections 273, 274, 275, 278, and/or 279 of the New York Debtor and Creditor Law.  The Trustee is entitled to recover the avoided transfers under section 550(a) of the Bankruptcy Code.

507.    For the foregoing reasons, the Trustee is entitled to judgment on Plaintiffs' Fifteenth Cause of Action for avoidance and recovery of the Insider Transfers as constructively fraudulent transfers pursuant to sections 544(b), 550(a), and 551 of the Bankruptcy Code, and sections 273, 274, 275, 278, and/or 279 of the New York Debtor and Creditor Law:  (a) avoiding and preserving the Insider Transfers; (b) directing that the Insider Transfers be set aside; and (c) recovering the Insider Transfers, or the value thereof, from the Defendants for the benefit of the Debtors' estates, plus interest and costs.

## SIXTEENTH CAUSE OF ACTION

### AVOIDANCE AND RECOVERY OF INSIDER TRANSFERS
### AS INTENTIONAL FRAUDULENT CONVEYANCES

**(Against All Defendants Identified on <u>Exhibits 1 & 2</u>**
**Pursuant to 11 U.S.C. §§ 544 and 550 and**
**<u>New York Debtor and Creditor Law §§ 276, 276-a, 278, and/or 279</u>)**

508.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 507 of this Complaint as if fully set forth herein.

509.    Between November 2008 and the Petition Date, the Soundview Debtors transferred each of the Insider Transfers to the Defendants on the dates and in the amounts specified on <u>Exhibit 2</u>.    During the six years prior to the Soundview Funds' bankruptcy proceedings through November 27, 2008, the Soundview Debtors made the Soundview Citco Payments as identified on <u>Exhibit 1</u> to the Citco Defendants (the "Ad**ditional Citco Intentional Transfers**").

510.    Each of the Insider Transfers and Additional Citco Intentional Transfers constituted a conveyance by the Soundview Debtors of their property under section 270 of the New York Debtor and Creditor Law.

511.    The Soundview Debtors made each of the Insider Transfers and Additional Citco Intentional Transfers at the direction of the Citco Defendants and/or the Fletcher Defendants with actual intent to hinder, delay, or defraud the Debtors' existing or future creditors.    As set forth above, both the Citco and the Fletcher Defendants were determined to make themselves whole even when it was clear that other stakeholders of the Soundview Debtors would not be paid.    Further, the Citco and Fletcher Defendants, as the parties controlling the Soundview Debtors, had sufficient inside financial information to know that payment of the Insider

-180-

Transfers and Additional Citco Intentional Transfers removed assets from the Soundview Debtors that otherwise would have been available to the Soundview Debtors' creditors. In fact, the Citco and Fletcher Defendants knew that the Soundview Debtors were already insolvent by no later than November 2008, and accordingly they took steps to protect their interests by transferring the Soundview Debtors' property to themselves regularly thereafter. These payments were made to hinder, delay, and defraud the Soundview Debtors' other creditors.

512.    At all relevant times there has been at least one creditor who holds or held matured or unmatured unsecured claims against each of the Soundview Debtors allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e) of the Bankruptcy Code.

513.    The Trustee is entitled to avoid the Insider Transfers and Additional Citco Intentional Transfers pursuant to section 544 of the Bankruptcy Code and sections 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law. The Trustee is entitled to recover the avoided transfers under section 550(a) of the Bankruptcy Code.

514.    For the foregoing reasons, the Trustee is entitled to judgment on Plaintiffs' Sixteenth Cause of Action for intentional fraudulent transfers pursuant to sections 544(b), 550(a), and 551 of the Bankruptcy Code and sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law:  (a) avoiding and preserving the Insider Transfers and Additional Citco Intentional Transfers;  (b) directing that the Insider Transfers and Additional Citco Intentional Transfers be set aside; and (c) recovering the Insider Transfers and Additional Citco Intentional Transfers, or the value thereof, from the Defendants for the benefit of the Soundview Debtors' estates, plus interest, costs and attorney's fees.

## SEVENTEENTH CAUSE OF ACTION

### AVOIDANCE AND RECOVERY OF TWO-YEAR
### INSIDER TRANSFERS AS INTENTIONAL FRAUDULENT TRANSFERS
(Against All Defendants Identified on <u>Exhibit 2</u>
Pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550 and 551)

515.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 514 of this Complaint as if fully set forth herein.

516.    The Soundview Debtors transferred each of the Insider Transfers to the Defendants on the dates and in the amounts specified on <u>Exhibit 2</u>.  Each of the Insider Transfers made after September 24, 2011 is referred to herein as a "**Two-Year Insider Transfer.**"  Each of the Two-Year Insider Transfers was made on or within two years prior to the Petition Date.

517.    Each of the Two-Year Insider Transfers was a transfer of an interest of the Soundview Debtors in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code.

518.    The Soundview Debtors made each of the Insider Transfers at the direction of the Citco Defendants and/or the Fletcher Defendants with actual intent to hinder, delay, or defraud the Soundview Debtors' existing or future creditors.  As set forth above, both the Citco and the Fletcher Defendants were determined to make themselves whole even when it was clear that other stakeholders of the Soundview Debtor would not be paid.  Further, the Citco and Fletcher Defendants, as the parties controlling the Soundview Debtors, had sufficient inside financial information to know that payment of the Insider Transfers removed assets from the Soundview Debtors that otherwise would have been available to the Soundview Debtors' creditors.  In fact, the Citco and Fletcher Defendants knew that the Soundview Debtors were already insolvent in 2008, and accordingly they took steps to protect their interests by transferring the Soundview

-182-

Debtors' property to themselves regularly thereafter. These payments were made to hinder, delay, and defraud the Soundview Debtors' other creditors.

519.    At all relevant times there has been at least one creditor who holds or held matured or unmatured unsecured claims against each of the Soundview Debtors allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e) of the Bankruptcy Code.

520.    The Trustee is entitled to avoid the Two-Year Insider Transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code. The Trustee is entitled to recover the avoided transfers under section 550(a) of the Bankruptcy Code.

521.    For the foregoing reasons, the Trustee is entitled to judgment on Plaintiffs' Seventeenth Cause of Action for avoidance and recovery of Two-Year Insider Transfers as intentional fraudulent transfers: (a) avoiding and preserving the Two-Year Insider Transfers; (b) directing that the Two-Year Insider Transfers be set aside; and (c) recovering the Insider Transfers, or the value thereof, from the Defendants for the benefit of the Soundview Debtors' estates, plus interest and costs.

## EIGHTEENTH CAUSE OF ACTION

### AVOIDANCE AND RECOVERY OF TWO-YEAR
### INSIDER TRANSFERS AS CONSTRUCTIVE FRAUDULENT TRANSFERS
### (Against Certain Defendants Identified on Exhibit 2
### Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550 and 551)

522.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 521 of this Complaint as if fully set forth herein.

523.    The Soundview Debtors transferred each of the Two-Year Insider Transfers to the Defendants on the dates and in the amounts specified on Exhibit 2.  Each of the Two-Year Insider Transfers was made after September 24, 2011.  Each of the Two-Year Insider Transfers was made on or within two years prior to the Petition Date.

524.    Each of the Two-Year Insider Transfers constituted a transfer of an interest of the Soundview Debtors in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code.

525.    Upon information and belief, the Soundview Debtors were insolvent at the time they made each of the Insider Transfers.  As set forth above, the Soundview Funds' insolvency arose from financial deterioration after, and as a result of, the Richcourt Acquisition.  Soon after the Richcourt Acquisition, the Soundview Funds were unable to renew their credit lines, which had been in place to provide liquidity for redemptions and terminated in September 2008.  The Soundview Funds' insolvency during 2008 and thereafter is further shown by the fact that they were unable to meet their obligations, including redemption requests, as they came due beginning in or around November 2008.  This insolvency was not remedied by the creation in March 2009 of the Designated Funds, which were intended to be receptacles for illiquid and likely over-valued assets, but which were insolvent and unable to satisfy their own obligations, including redemption requests, from the moment of their creation.

526.    In addition or in the alternative, at the time the Soundview Debtors made each of the Insider Transfers, the Soundview Debtor which was the transferor of each Insider Transfer was engaged or was about to engage in business or a transaction for which the property remaining in its hands after the Insider Transfer was an unreasonably small amount of capital.

-184-

527.    In addition or in the alternative, at the time the Soundview Debtors made each of the Insider Transfers, the Soundview Debtor which was the transferor had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay as the debts matured.

528.    At all relevant times there has been at least one creditor who holds or held matured or unmatured unsecured claims against each of the Soundview Debtors allowable under section 502 of the Bankruptcy Code or not allowable only under section 502(e) of the Bankruptcy Code.

529.    The Trustee is entitled to avoid the Two-Year Insider Transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.  The Trustee is entitled to recover the avoided transfers under section 550(a) of the Bankruptcy Code.

530.    For the foregoing reasons, The Trustee is entitled to judgment on Plaintiffs' Eighteenth Cause of Action for avoidance and recovery of Two-Year Insider Transfers as constructive fraudulent transfers:  (a) avoiding and preserving the Two-Year Insider Transfers; (b) directing that the Two-Year Insider Transfers be set aside; and (c) recovering the Insider Transfers, or the value thereof, from the Defendants for the benefit of the Soundview Debtors' estates, plus interest and costs.

## NINETEENTH CAUSE OF ACTION

### AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS
**(Against the Fletcher Defendants and SCM
Pursuant to 11 U.S.C. §§ 547, 550 and 551)**

531.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 530 of this Complaint as if fully set forth herein.

-185-

532.     The Insider Transfers set forth on <u>Exhibit 2</u> made after September 24, 2012 (the "**Preferential Transfers**"), were made during the 1-year period prior to the Petition Date and are considered preferential transfers to "insiders" under section 547(b)(4) of the Bankruptcy Code.

533.     At the time of each of the Preferential Transfers, the Fletcher Defendants and SCM were creditors of the Soundview Fund to which each Preferential Transfer was made within the meaning of section 101(10) of the Bankruptcy Code.

534.     At the time of each of the Preferential Transfers, the Fletcher Defendants and SCM were "insiders" within the meaning of section 101(31) of the Bankruptcy Code.

535.     Each of the Preferential Transfers constitutes a transfer of an interest of the Soundview Debtors in property within the meaning of section 101(54) of the Bankruptcy Code.

536.     Each of the Preferential Transfers was to or for the benefit of the Defendant identified as the transferee on <u>Exhibit 2</u>.

537.     Each of the Preferential Transfers was made for or on account of an antecedent debt owed by the Soundview Debtors before the transfer was made.

538.     Each of the Preferential Transfers was made during the 1-year preference period for insider preferences specified in section 547(b)(4) of the Bankruptcy Code.

539.     Each of the Preferential Transfers enabled the Fletcher Defendants and SCM to receive more than they would receive (i) under chapter 7 of the Bankruptcy Code; (ii) if the transfers had not been made; and (iii) if the Fletcher Defendants and SCM received payment of

the debt for which each Preferential Transfer was made to the extent provided by the provisions of the Bankruptcy Code.

540.    Each of the Preferential Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the Fletcher Defendants and SCM as initial transferees or the persons or entities for whose benefit the transfers were made pursuant to section 550(a) of the Bankruptcy Code.

541.    For the foregoing reasons, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment on Plaintiffs' Nineteenth Cause of Action for avoidance and recovery of Preferential Transfers: (a) avoiding and preserving the Preferential Transfers; (b) directing that the Preferential Transfers be set aside; and (c) recovering the Preferential Transfers, or the value thereof, from the Fletcher Defendants and SCM for the benefit of the Soundview Debtors' estates, plus pre-judgment interest.

## TWENTIETH CAUSE OF ACTION

### DISALLOWANCE OF CLAIMS
**(Against All Defendants Asserting Claims
Pursuant to 11 U.S.C. § 502(d))**

542.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 541 of this Complaint as if fully set forth herein.

543.    Pursuant to section 502(d) of the Bankruptcy Code, the Court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, unless such entity or transferee has paid

the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550 or 553 of this title.

544.    Several Defendants have filed proofs of claim or have otherwise asserted claims against the Soundview Debtors, including Defendants Fletcher, Ladner, Sanders and SCM. Also, as set forth above, each of those Defendants has property recoverable under section 542, 543, 550 or 553 of the Bankruptcy Code or is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code.

545.    Any claim of Fletcher, Ladner, Sanders and SCM, and any claim of any other Defendant who asserts claims against the Soundview Debtors, should be disallowed until the Defendant has paid the Soundview Debtors the amount, or turned over any property, for which he is liable, or it is liable, under section 522(i), 542, 543, 550 or 553 of the Bankruptcy Code.

546.    For the foregoing reasons, the Trustee is entitled to an order and judgment on Plaintiffs' Twentieth Cause of Action disallowing the claims of Fletcher, Ladner, Sanders, SCM and any other Defendants who assert claims against the Soundview Debtors but who have not turned over to the Trustee the property transferred, or paid the Trustee the value of such property, for which it is liable under Bankruptcy Code section 550.

## TWENTY-FIRST CAUSE OF ACTION

### SUBORDINATION OF CLAIMS
### (Against All Defendants Asserting Claims
### Pursuant to 11 U.S.C. § 510(c))

547.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 546 of this Complaint as if fully set forth herein.

548.    Pursuant to section 510(c) of the Bankruptcy Code, the Court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

549.    Several Defendants have filed proofs of claim or have otherwise asserted claims against the Soundview Debtors, including Defendants Fletcher, Ladner, Sanders and SCM. Also, as set forth above, each of those Defendants has inequitably and outrageously injured the Soundview Debtors by taking the Soundview Debtors' property for their own purposes, or by aiding and abetting others' conduct in taking the Soundview Debtors' property for their own purposes, thereby injuring the Soundview Debtors and causing them millions of dollars in losses.

550.    Any claim of Fletcher, Ladner, Sanders and SCM, and any claim of any other Defendant who asserts claims against the Soundview Debtors, should be equitably subordinated, in equity and good conscience, to the claims of every other unsecured creditor of the Soundview Debtors.

551.    Equitable subordination as requested herein is fully consistent with the provisions and purposes of the Bankruptcy Code.

552.    For the foregoing reasons, the Trustee is entitled to an order and judgment on Plaintiffs' Twenty-First Cause of Action equitably subordinating the claims of Fletcher, Ladner, Sanders, SCM and any other Defendants who assert claims against the Soundview Debtors but who have engaged in inequitable conduct with respect to the Soundview Debtors as set forth above.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment and grant

the following relief against the Defendants:

1.      Judgment against Defendants on the First through Twenty-First Causes of Action in an amount to be determined at trial;

2.      Damages, including exemplary damages, in an amount to be determined at trial;

3.      Equitable disgorgement of fees, salaries and other benefits, in an amount to be determined at trial;

4.      Turnover of the Citco Payments, Insider Payments and Richcourt Funds' books and records as specified herein;

5.      An accounting of the Citco Payments, Insider Payments and Richcourt Funds' books and records as specified herein**;**

6.      Avoidance and recovery of the Insider Transfers, the Additional Citco Intentional Transfers, the Two-Year Insider Transfers and Preferential Transfers;

7.      Reasonable costs and expenses incurred in this action, including fees for attorneys, accountants and experts;

8.      An award of prejudgment interest and/or opportunity cost damages in favor of Plaintiffs; and

9.      Any other and further relief that the Court deems just and proper.

Dated:   September 23, 2015
        New York, New York

Respectfully submitted,

DICONZA TRAURIG KADISH LLP


/Richard K. Milin/       
Richard K. Milin
Gerard DiConza
630 Third Avenue
New York, New York 10017
Telephone:  (212) 682-4940
Facsimile:  (212) 682-4942
Email*:* gdiconza@dtklawgroup.com
        rmilin@dtklawgroup.com

*Special Litigation Counsel for Plaintiffs the Chapter
11 Trustee of the Soundview Debtors and the Joint
Liquidators of the Richcourt British Virgin Islands
Funds*

EXHIBIT 1

THE EXHIBITS TO THE DEBTORS' INSIDER COMPLAINT ARE NOT INCLUDED – ANY PARTY IN INTEREST INTERESTED IN A COPY OF SAID EXHIBITS MAY CONTACT LANCE SCHILDKRAUT, ESQ. AT LAS@DTKLAWGROUP.COM

<u>Exhibit 2</u>

<u>Pasig Complaint</u>

COPY

1 | HOWARTH & SMITH
2 | DON HOWARTH (SBN 53783)
dhowarth@howarth-smith.com
3 | SUZELLE M. SMITH (SBN 113992)
ssmith@howarth-smith.com
4 | PADRAIC GLASPY (SBN 259563)
pglaspy@howarth-smith.com
5 | JESSICA L. RANKIN (SBN 279237)
jrankin@howarth-smith.com
6 | 523 West Sixth Street, Suite 728
Los Angeles, California 90014
7 | Telephone: (213) 955-9400
Facsimile: (213) 622-0791

8 | Attorneys for Plaintiffs ROGER W. CORMAN,
9 | JULIE A. CORMAN, and PASIG, LTD.

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAR 23 2015

Sherri R. Carter, Executive Officer/Clerk
By Cristina Grijalva, Deputy

10 |         SUPERIOR COURT OF THE STATE OF CALIFORNIA
11 |                 FOR THE COUNTY OF LOS ANGELES

12 | ROGER W. CORMAN, an individual; JULIE A. CORMAN, an individual; and PASIG, LTD., a British Virgin Islands company,

CASE NO. BC 576379

13 |

14 |                 Plaintiffs.

COMPLAINT FOR:

vs.

15 | CITCO GROUP LIMITED, a Netherlands company; CITCO GROUP (MONACO) SAM, a Monaco company; CITCO GLOBAL CUSTODY (N.A.) N.V., a Curacao company; TORTRUST CORPORATION COMPANY LIMITED, a British Virgin Islands company; CITCO TRUSTEES S.A., a Switzerland company; CITCO B.V.I. LIMITED, a British Virgin Islands company; CITCO BANK BVI LIMITED, a British Virgin Islands company; CITCO BANK & TRUST COMPANY LIMITED, a Cayman Islands company; CITCO BANKING CORPORATION N.V., a Curacao company; SECURITAS MANAGEMENT SERVICES CORP, a British Virgin Islands company; CITCO FUND SERVICES (CAYMAN ISLANDS) LTD., a Cayman Islands company; CITCO SUISSE S.A., a Switzerland company; ERMANNO UNTERNAEHRER, an individual; CHRISTOPHER SMEETS, an individual; and DOES, 1 through 100,

1) **Breach of Fiduciary Duty**
2) **Constructive Fraud**
3) **Concealment**
4) **Negligent Misrepresentation**
5) **Fraud – Intentional Misrepresentation**
6) **Unjust Enrichment**
7) **Breach of Contract**
8) **Breach of Implied Covenant of Good Faith and Fair Dealing**
9) **Corporations Code § 25401**
10) **Corporations Code § 25403**
11) **Negligence**
12) **Punitive Damages**

**JURY TRIAL DEMANDED**

                Defendants.

COMPLAINT

1      Plaintiffs Roger W. Corman ("Roger Corman" or "Mr. Corman"), Julie A. Corman

2  ("Julie Corman" or "Mrs. Corman") (collectively, the "Cormans"), and Pasig Ltd. ("Pasig")

3  (collectively, "Plaintiffs"), complain of the Defendants Citco Group Limited, Citco Group

4  (Monaco) SAM, Citco Global Custody (N.A.) N.V., Tortrust Corporation Company

5  Limited, Citco Trustees S.A., Citco B.V.I. Limited, Citco Bank BVI Limited, Citco Bank &

6  Trust Company Limited, Citco Banking Corporation N.V., Securitas Management Services

7  Corp, Citco Fund Services (Cayman Islands) Ltd., Citco Suisse, S.A., Ermanno

8  Unternaehrer, Christopher Smeets, and Does, 1 through 100, (collectively "Defendants" or

9  "Citco"), and each of them, and allege as follows:

10                               **PARTIES**

11      1.      Plaintiff Roger Corman is an individual residing in Los Angeles County in the

12  city of Santa Monica.

13      2.      Plaintiff Julie Corman is an individual residing in Los Angeles County in the

14  city of Santa Monica.

15      3.      Plaintiff Pasig is a company incorporated in the British Virgin Islands

16  ("BVI"), and owned 100% by the Cormans.

17      4.      Defendants include the following corporate entities, collectively described

18  herein as Citco:

19              a.      Citco Group Limited, a Netherlands company;

20              b.      Citco Group (Monaco) SAM, a Monaco company;

21              c.      Citco Global Custody (N.A.) N.V., a Curacao company;

22              d.      Tortrust Corporation Company Limited, a British Virgin Islands

23                      company;

24              e.      Citco Trustees S.A., a Switzerland company;

25              f.      Citco B.V.I. Limited, a British Virgin Islands company;

26              g.      Citco Bank BVI Limited, a British Virgin Islands company;

27              h.      Citco Bank & Trust Company Limited, a Cayman Islands Company;

28              i.      Citco Banking Corporation N.V., a Curacao company;

1          j.      Securitas Management Services Corp, a British Virgin Islands

2                  company;

3          k.      Citco Fund Services (Cayman Islands) Ltd., a Cayman Islands

4                  company; and

5          l.      Citco Suisse S.A., a Switzerland company.

6     5.      Defendants also include the following individuals who were officers,

7     directors, owners, control persons, employees and/or agents of Citco:

8          a.      Ermanno Unternaehrer, an individual residing in Monaco; and

9          b.      Christopher Smeets, an individual residing in the Netherlands.

10    6.      Plaintiffs are informed and believe, and on that basis allege, that the individual

11    defendants were aware of, approved, participated in, and/or ratified all acts of Citco as

12    described herein.

13    7.      The true names and capacities, whether individuals, legal corporations, or

14    otherwise, of Defendant DOES 1 through 100, inclusive, and each of them, are unknown to

15    Plaintiffs at this time and therefore Plaintiffs sue said Defendants by such fictitious names.

16    Plaintiffs will amend this Complaint to show the true names and capacities of the fictitiously

17    named Defendants when they have been ascertained.  Plaintiffs are informed and believe,

18    and on that basis allege, that each fictitiously named Defendant is liable in some manner to

19    Plaintiff respecting in response to the events and damages referred to in this Complaint.

20    8.      Plaintiffs are informed and believe, and thereon allege, that at all times

21    mentioned herein, each of the Defendants, including all DOE Defendants, was the agent,

22    employee, partner, officer, director, shareholder, joint venturer, part of a single enterprise,

23    officer, director, owner, successor, assign, affiliate, subsidiary, alter ego, or other

24    representative of every other Defendant and acting within the course and scope of such

25    agency, employment, and/or other relationship in conducting the actions and activities or

26    omissions of each other Defendant and/or generally or specifically approving the failure to

27    take necessary and appropriate actions and activities, and/or subsequently ratified each other

28    / / /

1  Defendants' conduct.  References made herein to "Defendants" mean the acts of Defendants

2  acting individually, jointly, and/or severally.

3      9.      At all times mentioned herein, all Defendants were the alter egos of one

4  another and formed a single enterprise.  There is a sufficient unity of interest and ownership

5  among Defendants, and each of them, such that the acts of one are for the benefit of each

6  other and can be imputed to the acts of the others.  The separate corporate personalities of

7  Defendants are and were merged, so that one Defendant is and was a mere adjunct of

8  another, or the Defendants formed a single enterprise.  The separate personalities of each

9  individual Defendant do not and never did in reality exist, and there would be an inequitable

10  result if the acts of the entity in question were treated as the acts of one entity alone and not

11  of each of them.

12                    **JURISDICTION AND VENUE**

13      10.      This Court has personal jurisdiction over Defendants because Defendants have

14  the necessary contacts with California, provided services and/or contracted for services with

15  the Plaintiffs in the County of Los Angeles, California, either directly and/or through its

16  agents, purposefully availed themselves of the jurisdiction of the state of California, and

17  submitted to personal jurisdiction in California for actions relating to those contacts.

18  Further, Defendant Ermanno Unternaehrer lived in California in the time period when he

19  met with the Cormans, as set out herein below.

20      11.      Venue is proper in the County of Los Angeles because the Cormans reside in

21  Los Angeles, the Cormans and Pasig suffered harm in Los Angeles, pursuant to California

22  Code of Civil Procedure § 395.5, and because no Defendant resides in California, pursuant

23  to California Code of Civil Procedure § 395(a).

24                    **FACTUAL ALLEGATIONS**

25      12.      The Cormans are iconic Hollywood figures who have been in the film

26  business for decades.

27      13.      Roger Corman is an Academy Award-winning film producer and director.  He

28  is recognized for producing over 300 films and directing over 60, including a series based

1    on the works of Edgar Allan Poe. One of his most famous films, *The Little Shop of*
2    *Horrors*, made in 1960, is the basis for a successful Broadway musical. His filmography is
3    documented in his autobiography, *How I Made a Hundred Movies in Hollywood*, first
4    published in 1990. He was the youngest director ever to have a retrospective at the
5    Cinemateque Francaise in Paris, the British Film Institute in London and the Museum of
6    Modern Art in New York. In 1998, he won the first Producer's Award ever given by the
7    Cannes Film Festival. In 2006, he received the David O. Selznick Award, the highest honor
8    given by the Producers Guild of America. Also in 2006, his film *Fall of the House of Usher*
9    was among the twenty-five films selected for the National Film Registry, a compilation of
10   significant films preserved by the Library of Congress. He is the subject of the 1978
11   documentary *Roger Corman: Hollywood's Wild Angel*, as well as *Corman's World: Exploits*
12   *of a Hollywood Rebel*, which premiered at Sundance and Cannes Film Festivals in 2011. In
13   addition to his Academy Award and many other honors, he has a star on the Hollywood
14   Walk of Fame. He has also acted in films directed by his protégés, including *The Silence of*
15   *the Lambs*, *The Godfather Part II*, *Apollo 13*, *The Manchurian Candidate*, and *Philadelphia*.

16         14.    Julie Corman began producing movies in the early 1970s. During her
17   distinguished career, she has produced more than 35 films, including Jonathan Demme's
18   *Crazy Mama*, family classics such as *A Cry in the Wind*, and the Tony Award-winning play,
19   *DA*. In 2000, Julie was appointed Chair of the Graduate Film Department at NYU. She
20   lectures widely at leading universities around the world, including USC, UCLA, Yale,
21   Duke, University of Pennsylvania, and at several universities in Japan. She has received
22   many film awards, including several lifetime achievement honors, most notably from the
23   USC School of Cinematic Arts and Yale University and most recently from the Honolulu
24   International Film Festival. She has been a member of the Academy of Arts and Sciences
25   for thirty years, and is listed in "Who's Who in the World."

26         15.    In addition to their own film work, Roger and Julie have given countless
27   opportunities to young talent, forming what has become known as the "Corman School" of
28   film. Roger was a mentor to Francis Coppola, Martin Scorsese, Jonathan Demme, James

1   Cameron, Peter Bogdanovich, Ron Howard, and Curtis Hanson, all Academy Award-

2   winning filmmakers.  Academy Award-winning actors Jack Nicholson, Tommy Lee Jones,

3   and Sandra Bullock started with him, as well as Sylvester Stallone, Charles Bronson, Will

4   Farrell, and many more.  The Cormans' company, New World Pictures, also served as the

5   domestic distributor for international films by film legends Federico Fellini, Ingmar

6   Bergman, Francois Truffaut, Akira Kurosawa, and many others.  Together, Roger and Julie

7   Corman represent one of Hollywood's most original and enduring couples.

8       16.    Through their efforts in the film industry, the Cormans were able to acquire

9   substantial funds, much of which they put to use in various investments.

10      17.    In the 1990s, the Cormans were invested in a fund managed by George Soros,

11  who as manager made all investment decisions for the fund.  Under the direction and

12  management of George Soros, the Cormans' investments were very successful, and over the

13  years, these investments accumulated substantial appreciation for the Cormans.

14      18.    The administrator of the Soros fund was Citco.  As such, Citco provided all

15  accounting services for the fund, prepared reports to shareholders, paid fund expenses,

16  provided valuations of the fund, distributed dividends, and monitored compliance with SEC,

17  IRS, and other U.S. legal requirements.  The Cormans' investments with George Soros were

18  held at a Citco bank.  Citco is the largest independent hedge fund administrator in the world,

19  administering over 2,000 funds with more assets than any other hedge fund administrator,

20  and is a global industry leader in the financial services market.

21      19.    The Cormans' primary contact at Citco for the Soros-managed fund was

22  Defendant Ermanno Unternaehrer ("Mr. Unternaehrer").  Mr. Unternaehrer was an agent,

23  employee, and control person of Citco, as well as a member of Citco's Board of Directors.

24  Mr. Unternaehrer also provided legal and tax advice to the Cormans relating to their

25  investments.  In 1996, Citco through Mr. Unternaehrer recommended that the Cormans

26  invest a substantial part of their moneys in a fund managed by Citco, instead of the Soros-

27  managed fund.  Mr. Unternaehrer was the individual at Citco who was primarily responsible

28  for management of the Citco fund which he recommended to the Cormans.

20.    In late 1996, Mr. Unternaehrer, on behalf of Citco, came to Los Angeles and met with the Cormans. He represented to them that the Citco fund was a safe, secure place to invest their moneys, and that Citco would administer and manage the fund to ensure continued high performance. He further represented that Citco was the largest off-shore money manager in the world, that it would use its affiliated entities where appropriate in handling the funds, that it had its own moneys invested in the fund into which the Cormans' moneys would be put and would continue to keep Citco's own moneys side-by-side with the Cormans' moneys, that Citco would be an investment partner with the Cormans, that Citco would handle the funds in the best financial interests of the Cormans, and that the Cormans could trust and rely on Citco regarding the investing, managing, and administering of their funds. Mr. Unternaehrer made these representations and agreements with the intent that the Cormans would rely on them.

21.    The Cormans accepted and relied upon Citco's advice and representations and agreed on that basis to move substantial funds from the Soros funds to be under the management of Citco. The Cormans entrusted their funds to Citco in reliance on Citco's representations. As part of their agreement and in reliance on Citco's representations, Citco became the Cormans' agent, investment partner, investment and tax advisor, and promoter, manager, and administrator of their investment funds. This agreement was partly oral and partly in writings and was also implied in fact, among other things from the ensuing management of the Cormans' funds by Citco and the actions taken by Citco concerning the Cormans' investments. In reliance on Citco's representations and as part of their agreement to go forward, the Cormans committed their funds to Citco's management.

22.    Mr. Unternaehrer also gave the Cormans tax advice regarding the investment, including that the Citco fund would have tax advantages for the Cormans, and that the fund was 100% compliant with United States tax law.

23.    Relying on the representations of Mr. Unternaehrer, among other things, as Director and agent for Citco, the Cormans fulfilled their agreement with Citco and invested substantial moneys in the Citco fund, which had previously been invested in the fund

6

1   managed by George Soros, and left such funds there for about fourteen years, which they

2   would not have done but for the solicitation by the Citco and its agents and the

3   representations made by them.  The Cormans' reliance on Citco's representations was

4   reasonable, given the prior success of their investments in the Soros-managed funds that

5   were administered by Citco.

6       24.     From the time the Cormans made their first investments in the Citco managed

7   fund, Citco received fees for the on-going management of the fund.

8       25.     Between 1996 and 2008, Mr. Unternaehrer met with the Cormans

9   approximately once per year, usually in Los Angeles.  At these meetings, Mr. Unternaehrer

10  urged them to continue to keep their moneys under Citco management, and provided them

11  with tax advice relating to their investments.

12      26.     In 2002, in order to have even more complete control of the Cormans funds,

13  Citco, through Mr. Unternaehrer, recommended that Pasig Ltd. ("Pasig") be set up and that

14  for tax reasons, that it should be a British Virgin Islands entity.  Citco then set up Pasig and

15  used a Citco address in the British Virgin Islands as Pasig's address.  Once Pasig was set up,

16  Citco became the sole conduit for these investments of the Cormans, with Citco fully

17  managing and handling all administrative functions for Pasig.

18      27.     Roger Corman was included initially as a Director when Citco incorporated

19  Pasig.  However, within a few months of Pasig's incorporation, Mr. Unternaehrer told

20  Roger Corman that, for tax reasons, he should resign as Director, after which the Cormans'

21  only role in Pasig was as signatories to the account.

22      28.     Thereafter, having obtained complete control of Pasig, in or about June, 2008,

23  Citco transferred the management of the Cormans' funds then totaling $73 million in Pasig

24  to one Alphonse "Buddy" Fletcher ("Mr. Fletcher" and, together with the entities controlled

25  by him, "Fletcher").  Citco did so without informing the Cormans that it was transferring

26  management of the Pasig moneys to Fletcher.

27      29.     Citco did not make this transfer of management to Fletcher in good faith based

28  on the business or financial interests of the Cormans, but rather to further its own interests.

Citco was facing criticism from other clients for its conflicting role as both a bank and the manager of investment funds, and the transfer to Fletcher allowed Citco to mitigate this criticism. In addition, Citco obtained a payout to itself of at least $28 million for the transfer of management, along with other benefits for Citco and its representatives. Further, in connection with this transfer of management to Fletcher, Citco and its CEO, Defendant Christopher Smeets, and Defendant Unternaehrer arranged a side deal whereby Mr. Unternaehrer obtained $6.6 million in cash from Fletcher and received stock in a Fletcher entity, which he was able to redeem for cash. Mr. Smeets is also a control person of Citco and, as CEO was involved in and ratified all decisions by Citco herein.

30.     At the time of the transfer, Citco was familiar with Fletcher's operations because it was already serving as an administrator for Fletcher's funds, and in that capacity provided accounting services, prepared reports to shareholders, paid fund expenses, provided valuations of the fund, distributed dividends, and monitored compliance with SEC, IRS, and other U.S. legal requirements for Fletcher; and in particular Mr. Unternaehrer held a management position with Fletcher. Thus, Citco had access to Fletcher's financial information and knowledge about Fletcher's operations prior to the transfer of the management of the Pasig funds to Fletcher.

31.     At the time of the transfer, Citco was in possession of information that was material to the transfer of management of the funds to Fletcher. Citco knew or should have known at the time of the transfer that Fletcher would be a poor manager of the fund, and that he was already engaged in fraud and mismanagement of other funds under his control, including but not limited to knowledge of the following:

a.     Fletcher had not made a single profitable investment in the ten months prior to the transfer of management of Pasig funds;

b.     Citco was a lender to Fletcher, and Fletcher was having great difficulty paying back the Citco loan;

c.     Fletcher repaid Citco loans with money that was invested with Fletcher by the Firefighter's Retirement System, Municipal Employees

COMPLAINT

1    Retirement System, and New Orleans Firefights Pension Relief fund
2    (collectively, "Louisiana Firefighters Pension fund"). This investment
3    is the subject of the ongoing litigation in *Firefighters' Retirement*
4    *System et al. v. Citco Group Limited et al.*, Case No. 13cv00373-SDD-
5    SCR (M.D. La.). Fletcher's use of this pension fund money, which
6    Fletcher was purporting to invest, to pay old investors is a classic
7    hallmark of a Ponzi scheme and was not a permitted use of new
8    investor funds per Fletcher's organizing documents;

9    d.    Just two months prior to the transfer of management of the fund, the
10    combined cash balance of all Fletcher entities was only $1.6 million,
11    plainly insufficient to pay all of Fletcher's existing obligations; and

12    e.    The $28 million or more paid by Fletcher to Citco in return for the
13    transfer in management of the Pasig funds came directly from the
14    money invested by the Louisiana Firefighters Pension fund, which was
15    also not a permitted use of new investor funds per Fletcher's organizing
16    documents.

17    32.    Citco did not inform the Cormans that Fletcher would be a poor manager or
18    that he was already engaged in fraud and mismanagement of other funds under his control,
19    and did not give the Cormans an opportunity to decline to put the Pasig money with
20    Fletcher. Had Citco revealed this material information to the Cormans, the Cormans would
21    not have agreed to allow Fletcher to manage their funds. Rather, Citco failed to disclose this
22    material information and actively concealed this information from the Cormans, intending to
23    deceive them.

24    33.    No reasonable agent, investment partner, investment and tax advisor,
25    promoter, manager, and/or administrator of investment funds would have agreed to the
26    transfer of management of the funds to Fletcher in similar circumstances. In addition, Citco
27    also undertook direct actions that harmed the Cormans' interests just prior to the transfer in
28    management to Fletcher. At the time of the investment by the Louisiana Firefighters

1   Pension fund, Citco had already directed the Cormans' fund to invest in the same Fletcher

2   entity as the Louisiana Firefighters Pension fund.  Fletcher promised the Louisiana

3   Firefighters Pension fund that it would always obtain at least a 12% return on its investment.

4   Citco agreed to subordinate the rights of the Cormans' fund in the Fletcher entity to those of

5   the Louisiana Firefighters Pension fund, even allowing Fletcher to reduce the value of the

6   Cormans' funds in the entity in order to ensure that 12% return to the Firefighters.  This

7   transaction provided Fletcher with needed cash to pay back the Citco loan and to pay Citco

8   for the transfer of management of the Cormans' Pasig funds.  These actions were not in the

9   best financial or business interests of the Cormans, were not actions that a reasonable agent,

10  investment partner, investment and tax advisor, promoter, manager, and/or administrator of

11  investment funds would have undertaken in similar circumstances, and were not disclosed to

12  the Cormans, but were rather intentionally concealed so that Citco could benefit from them.

13  Had Citco revealed this material information to the Cormans, the Cormans would not have

14  agreed to the transfer of management of the Pasig funds.

15      34.     After the transfer of the management of the Pasig funds, Citco continued to

16  serve as the administrator of the funds.  In that capacity, Citco continued to have access to

17  the financial information regarding the investments and had the ability to monitor the

18  activities of the Fletcher and the status of the Cormans' investments.

19      35.     In October 2008, just four months after the transfer to Fletcher, Citco removed

20  the Cormans as signatories to the Pasig account.  This step took away the last remaining

21  control the Cormans had over their money, removed any transparency from Citco's control

22  of the Cormans' funds, and kept them ignorant of the risks to which their moneys were

23  subjected by the transfer to Fletcher, and of the benefits Citco received for the transfer of the

24  Cormans' moneys.  By 2009, the Cormans no longer received account statements for Pasig.

25  Instead, account statements were sent from one Citco entity to another Citco entity.

26      36.     At or about this time, additional red flags appeared that made Citco fully

27  aware that the funds were in jeopardy as a result of Fletcher's mismanagement and fraud.

28  These included, without limitation, the expiration of Fletcher's credit lines three months

after the transfer, with the foreseeable result that, without such credit lines, Fletcher would use assets which would have otherwise have gone to investors to pay Fletcher's own expenses.  Also, Fletcher directed the fund in which the Pasig moneys were held to invest approximately $60 million into other of his own entities, while double counting for this $60 million as an asset of each entity, and collecting a fee for each such transaction.

37.    These red flags put or should have put Citco on further notice that investments under Fletcher management, including those of the Cormans, were at extreme risk and likely to lose substantial value by virtue of Fletcher's mismanagement.  Citco did not reveal these red flags to the Cormans, but rather intentionally concealed this material information in order to deceive the Cormans and to further Citco's own financial interests.

38.    Indeed, by November 2008, just five months after the transfer, the Fletcher managed funds were insolvent and restrictions were imposed on investors, including the Cormans, from withdrawing funds invested or from receiving full value of their investments if they did withdraw funds.

39.    However, without informing the Cormans, prior to the time that Fletcher began restricting investors from exiting the funds he managed, Citco pulled out its own money from the Fletcher investments, and did not keep its funds alongside the Cormans' money as it had represented and agreed it would do.  Citco did not pull out the Cormans' Pasig funds or advise them to do so when it withdrew its own funds, and did not inform the Cormans of its withdrawal of its own funds or of any of the danger signals it became aware of as to investments with Fletcher, or the fact that it received a payout for putting the investments with Fletcher.  These actions were self-serving and not in the best financial or business interests of the Cormans, were not actions that a reasonable agent, investment partner, investment and tax advisor, promoter, manager, and/or administrator of investment funds would have undertaken in similar circumstances, and were not disclosed to the Cormans, but were rather intentionally concealed so that Citco could benefit from them.  Had Citco told the Cormans that it was pulling its money out of the Fletcher funds, the Cormans would not have left their own funds invested with Fletcher at that time.

40.     When Citco did finally attempt to withdraw the Cormans' funds from Fletcher

in or about May 2010, it was unable to do so given the state of the Fletcher investments.

41.     By the summer of 2013, the Cormans were able to recover about $13 million

from the total of $73 million Pasig funds which Citco had transferred to Fletcher's

management.  Faced with this stunning loss, the Cormans investigated the activities of Citco

and Fletcher and became aware of some of the facts alleged herein as to Fletcher's fraud and

mismanagement and Citco's fraud, self-dealing, mismanagement and failures to act or

inform the Cormans.

42.     In August, 2013, the Cormans demanded that Citco make them whole for their

losses.  Citco refused to do so but did enter into a tolling agreement for the claims of the

Cormans as to all Citco entities.  The Cormans made a further demand to be made whole in

December, 2014, which Citco also refused; and the tolling agreement was extended until

March 31, 2015.

43.     In or about 2013 and 2014, bankruptcy proceedings involving funds managed

by Fletcher were filed in New York, the Cayman Islands, and the British Virgin Islands.

The Cormans and/or Pasig have appeared and made claims in such bankruptcy actions, and

may receive small amounts as a creditor.  Plaintiffs are informed and believe that such

bankruptcy recoveries will not be more than something on the order of $5 million, and will

credit any such monies received as an offset against damages herein.  In order to make these

claims in mitigation of damages herein, the Cormans have been required to retain counsel to

represent them in the bankruptcy actions, and have incurred attorneys' fees and costs in

connection with the bankruptcies which they would not have incurred but for the conduct of

Citco as set forth herein.

44.     As a result of Citco's conduct, as alleged herein, the Cormans lost an amount

to be determined at trial but on the order of $55-$60 million, after offset for possible

recoveries from the bankruptcies, which they had invested with Citco at the time Citco

transferred management of such funds to Fletcher, lost the reasonable and expected

continued earnings on their $73 million investment funds from 2008 to present, in an

1  amount to be determined at trial, and have incurred attorney's fees and costs in connection

2  with the bankruptcy actions which were all made necessary by the conduct of Defendants as

3  set forth herein.

4  ## FIRST CAUSE OF ACTION

5  ### (Breach of Fiduciary Duty Against All Defendants)

6  44.    Plaintiffs, the Cormans, hereby repeat and re-allege the factual allegations

7  contained in paragraphs 1 through 43 above as though set forth in full herein.

8  45.    A fiduciary relationship existed between Plaintiffs and each of the Defendants.

9  Citco, including all of its affiliates, subsidiaries, parents, related entities, employees and

10  agents, including those named herein as Defendants, was an agent of Plaintiffs, investment

11  and tax advisor to Plaintiffs, promoter of stocks and other financial transactions, and

12  manager and administrator of their funds.  Plaintiffs entrusted their funds to Citco; the

13  Cormans gave broad authority to Citco to invest their funds; the Cormans relied on Citco's

14  advice and representations; the Cormans were vulnerable to Citco and depended on Citco;

15  Citco held itself out as and was an investment partner with the Cormans; Defendants

16  voluntarily and knowingly undertook to act on behalf of and for the benefit of the Cormans.

17  46.    Defendants owed fiduciary duties to Plaintiffs, including the duty to act with

18  the utmost good faith in the best interests of Plaintiffs.

19  47.    As alleged herein, Defendants, among other things, acted as Plaintiffs' agent

20  for purposes of investing their funds.

21  48.    As alleged herein above, Defendants, including all entities and individuals

22  named as Defendants, failed to act as reasonably careful agents, investment and tax

23  advisors, partners, managers, and/or administrators would have acted under the same or

24  similar circumstances.

25  49.    As alleged herein above, Defendants, including all entities and individuals

26  named as Defendants, also failed to act in the best interests of Plaintiffs, knowingly acted

27  against Plaintiffs' interests, and instead acted in their own self-interest, subordinated

28  ///

1    Plaintiffs interests to their own interests and engaged in numerous activities to the detriment

2    of Plaintiffs and did so without Plaintiffs' knowledge or consent.

3        50.    As alleged herein above, Defendants undertook direct actions and omissions

4    which caused harm to the Plaintiffs' investments and caused Plaintiffs to lose substantial

5    amounts of money.

6        51.    Plaintiffs were harmed by Defendants' actions and were damaged in an

7    amount to be proven at trial.

8        52.    Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

9                            **SECOND CAUSE OF ACTION**

10                    **(Constructive Fraud Against All Defendants)**

11        53.    Plaintiffs hereby repeat and re-allege the factual allegations contained in

12    paragraphs 1 through 52 above as though set forth in full herein.

13        54.    A fiduciary relationship existed between Plaintiffs and each of the Defendants.

14    Citco, including all of its affiliates, subsidiaries, parents, related entities, employees and

15    agents, including those named herein as Defendants, was an agent of Plaintiffs, investment

16    and tax advisor to Plaintiffs, promoter of stocks and other financial transactions, and

17    manager and administrator of their funds.  Plaintiffs entrusted their funds to Citco; the

18    Cormans gave broad authority to Citco to invest their funds; the Cormans relied on Citco's

19    advice and representations; the Cormans were vulnerable to Citco and depended on Citco;

20    Citco held itself out as and was an investment partner with the Cormans; Defendants

21    voluntarily and knowingly undertook to act on behalf of and for the benefit of the Cormans.

22        55.    Defendants owed fiduciary duties to Plaintiffs, including the duty to act with

23    the utmost good faith in the best interests of Plaintiffs.

24        56.    As alleged herein above, Defendants possessed information material to

25    Plaintiff's interests relating to the transfer, administration, and management of the Cormans'

26    investments.

27        57.    As alleged herein above, Defendants knew or should have known that this

28    information was material to Plaintiffs' interest.

14

1         58.    As alleged herein above, Defendants failed to disclose this material

2 information to Plaintiffs.

3         59.    Plaintiffs would have acted differently and would not have been damaged if

4 defendants have not breached their duties, had not made false representations and had not

5 omitted to inform Plaintiffs of material facts known or should have been known to them.

6         60.    Plaintiffs were damaged by Defendants' wrongdoing in an amount to be

7 proven at trial.

8         61.    Defendants' conduct and omissions were a substantial factors in causing

9 Plaintiffs' harm.

10                     **THIRD CAUSE OF ACTION**

11               **(Concealment Against All Defendants)**

12         62.    Plaintiffs hereby repeat and re-allege the factual allegations contained in

13 paragraphs 1 through 61 above as though set forth in full herein.

14         63.    A fiduciary relationship existed between Plaintiffs and each of the Defendants.

15 Citco, including all of its affiliates, subsidiaries, parents, related entities, employees and

16 agents, including those named herein as Defendants, was an agent of Plaintiffs, investment

17 and tax advisor to Plaintiffs, promoter of stocks and other financial transactions, and

18 manager and administrator of their funds. Plaintiffs entrusted their funds to Citco; the

19 Cormans gave broad authority to Citco to invest their funds; the Cormans relied on Citco's

20 advice and representations; the Cormans were vulnerable to Citco and depended on Citco;

21 Citco held itself out as and was an investment partner with the Cormans; Defendants

22 voluntarily and knowingly undertook to act on behalf of and for the benefit of the Cormans.

23         64.    Defendants owed fiduciary duties to Plaintiffs, including the duty to act with

24 the utmost good faith in the best interests of Plaintiffs.

25         65.    As alleged herein above, Defendants had exclusive knowledge of material

26 facts and intentionally concealed, suppressed, and failed to disclose facts to Plaintiffs

27 relating to the Cormans' investments and Defendants' own actions which harmed Plaintiffs'

28 interests and subordinated Plaintiffs' interests to their own.

66.     As a result, Plaintiffs did not know of material facts relating to the transfer and management of the Cormans' investments and Defendants' own actions which harmed Plaintiffs' interests and subordinated Plaintiffs' interests to their own.

67.     Defendants intended to deceive Plaintiffs by concealing these facts, in order to ensure their continued investment of their funds which benefitted Defendants and harmed Plaintiffs as alleged herein above.

68.     As alleged herein above, had Defendants disclosed the concealed facts, Plaintiffs would have acted differently and would not have been harmed.

69.     Plaintiffs were damaged by Defendants' actions in an amount to be proven at trial.

70.     Defendants' conduct and omissions were a substantial factor in causing Plaintiffs' harm.

## FOURTH CAUSE OF ACTION

### (Negligent Misrepresentation Against All Defendants)

71.     Plaintiffs hereby repeat and re-allege the factual allegations contained in paragraphs 1 through 70 above as though set forth in full herein.

72.     As alleged herein above, Defendants made representations to Plaintiffs regarding their investments with Citco.

73.     As alleged herein above, these representations were false.

74.     Defendants had no reasonable grounds for believing the representations to be true when they were made.

75.     Defendants intended Plaintiffs to rely on their representations, which they then did.

76.     Plaintiffs reasonably relied on the Defendants' misrepresentations.

77.     As alleged herein above Plaintiffs would have acted differently and would not have been harmed but for Defendants' misrepresentations.

78.     Plaintiffs were harmed by Defendants' misrepresentations in an amount to be proven at trial.

COMPLAINT

79. Plaintiffs' reliance on Defendants' misrepresentations was a substantial factor in causing Plaintiffs' harm.

## FIFTH CAUSE OF ACTION

### (Fraud - Intentional Misrepresentation Against All Defendants)

80. Plaintiffs hereby repeat and re-allege the factual allegations contained in paragraphs 1 through 79 above as though set forth in full herein.

81. As alleged herein above, Defendants made representations to Plaintiffs regarding their investments with Citco.

82. As alleged herein above, Defendants' representations regarding Plaintiffs' investments with Citco were false.

83. Defendants knew the representations were false when made, and/or they were made recklessly and without regard for their truth.

84. Defendants intended Plaintiffs to rely on their representations and invest in the fund, which they then did.

85. Plaintiffs reasonably relied on Defendants' representations.

86. As alleged herein above Plaintiffs would have acted differently and would not have been harmed but for Defendants' misrepresentations.

87. Plaintiffs were harmed by Defendants' misrepresentations in an amount to be proven at trial.

88. Plaintiffs' reliance on Defendants' misrepresentations was a substantial factor in causing Plaintiffs' harm.

89. Defendants' conduct as alleged herein, was unconscionable, fraudulent, oppressive, malicious and done intentionally or in conscious disregard of Plaintiffs' rights and in order to further their own financial self-interest at Plaintiffs expense so as to justify an award of punitive damages.

///

///

///

## SIXTH CAUSE OF ACTION

### (Unjust Enrichment Against All Defendants)

90.    Plaintiffs hereby repeat and re-allege the factual allegations contained in paragraphs 1 through 89 above as though set forth in full herein.

91.    As alleged herein above, a result of their actions and omissions, Defendants received financial and economic benefit at the expense of Plaintiffs.

92.    As alleged herein above, Plaintiffs suffered harm as a result of Defendants' actions in obtaining an economic benefit.

93.    Defendants' retention of these benefits at the expense of Plaintiffs is unjust.

94.    As a direct and proximate result of the allegations above, Defendants have been unjustly enriched at the expense of Plaintiffs in an amount to be proved at trial.

## SEVENTH CAUSE OF ACTION

### (Breach of Written, Oral, and/or Implied Contracts Against All Defendants)

95.    Plaintiffs hereby repeat and re-allege the factual allegations contained in paragraphs 1 through 94 above as though set forth in full herein.

96.    As alleged herein above, Defendants entered into partly written, partly oral and/or implied contracts with Plaintiffs.

97.    As alleged herein above, pursuant to their contract, Defendants promised and agreed to undertake certain actions, to refrain from undertaking certain actions, and made representations to Plaintiffs concerning the contracts.

98.    In return for the promises made by Defendants, Plaintiffs gave Defendants substantial amounts of money.

99.    Plaintiffs did all or substantially all of significant things that their contract with Defendants required.

100.    As alleged herein above, Defendants breached their contract with Plaintiffs by failing to undertake actions that the contract required them to and by undertaking actions that the contract prohibited them from doing.

///

18
COMPLAINT

101.  As a direct and proximate result of the breaches of contract, Plaintiffs were harmed in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith and Fair Dealing Against All Defendants)**

102.  Plaintiffs hereby repeat and re-allege the factual allegations contained in paragraphs 1 through 101 above as though set forth in full herein.

103.  As alleged herein above, Defendants entered into partly written, partly oral, and/or implied contracts with Plaintiffs.

104.  As alleged herein above, pursuant to their contract, Defendants promised and agreed to undertake certain actions, to refrain from undertaking certain actions, and made representations to Plaintiffs concerning the contracts.

105.  In return for the promises made by Defendants, Plaintiffs gave Defendants substantial amounts of money.

106.  Plaintiffs did all or substantially all of significant things that their contract with Defendants required.

107.  As alleged herein above, Defendants unfairly interfered with Plaintiffs' rights to receive the benefit of its promises and thereby breached their implied covenant of good faith and fair dealing inherent in every contract.

108.  As a direct and proximate result of the breaches of the implied covenant of good faith and fair dealing, Plaintiffs were in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

**(Violation of Corporations Code § 25401 Against All Defendants)**

109.  Plaintiffs hereby repeat and re-allege the factual allegations contained in paragraphs 1 through 108 above as though set forth in full herein.

110.  As alleged herein above, Defendants made untrue statements of material fact and omitted to state material facts in inducing Plaintiffs to invest their funds with Citco.

111.  Plaintiffs' investment in the funds owned and/or managed by Defendants included purchases of securities.

1     112.   The Cormans authorized payments for securities in Los Angeles, California.

2     113.   Defendants intended Plaintiffs to rely on their representations and intended to

3  induce Plaintiffs to purchase the securities.

4     114.   Plaintiffs reasonably relied on the representations in deciding to purchase the

5  securities and not to sell the securities.

6     115.   Plaintiffs were damaged by Defendants' actions in an amount to be proven at

7  trial.

8     116.   Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

9     117.   Defendants' conduct as alleged above, was unconscionable, fraudulent,

10  oppressive, malicious and done intentionally or in conscious disregard of Plaintiffs' rights

11  and in order to further their own financial self-interest at Plaintiffs expense so as to justify

12  an award of punitive damages.

13                      **TENTH CAUSE OF ACTION**

14     **(Violation of Corporations Code § 25403 Against Individual Defendants)**

15     118.   Plaintiffs hereby repeat and re-allege the factual allegations contained in

16  paragraphs 1 through 117 above as though set forth in full herein.

17     119.   As alleged herein above, Defendants made untrue statements of material fact

18  and omitted to state material facts in inducing Plaintiffs to invest their funds with Citco in

19  violation of California Corporations Code § 25401.

20     120.   Individual Defendants Mr. Unternaehrer and Mr. Smeets are control persons

21  of Citco.  Mr. Unternaehrer is an executive of Citco and directly or indirectly controls the

22  actions of Citco.  Mr. Smeets is the Chief Executive Officer, President, and Executive

23  Director, and directly controls the actions of Citco.

24     121.   California Corporations Code § 25403 imposes liability on persons who, with

25  knowledge, directly or indirectly control an entity liable under Corporations Code § 25401.

26     122.   Mr. Unternaehrer and Mr. Smeets are liable for the harm to the Cormans.

27     123.   Defendants' conduct as alleged above, was unconscionable, fraudulent,

28  oppressive, malicious and done intentionally or in conscious disregard of Plaintiffs' rights

1   and in order to further their own financial self-interest at Plaintiffs expense so as to justify

2   an award of punitive damages.

3                           **ELEVENTH CAUSE OF ACTION**

4                        **(Negligence Against All Defendants)**

5          124.    Plaintiffs hereby repeat and re-allege the factual allegations contained in

6   paragraphs 1 through 123 above as though set forth in full herein.

7          125.    Defendants had a duty to Plaintiffs to act reasonably carefully in the

8   administration, management and handling of their money and to give them investment and

9   tax advice within the standard of care.  Defendants fell below the standard of care and were

10  negligent.  As alleged herein, Defendants failed to use the skill and care that reasonably

11  careful agents, investment and tax advisors, partners, and/or managers would have used in

12  similar circumstances.

13         126.    As alleged herein, as a direct and proximate result of Defendants' negligence,

14  Plaintiffs were harmed.

15         127.    As alleged herein, Defendants' negligence was a substantial factor in causing

16  Plaintiffs' harm and Plaintiff would not have suffered the harm but for Defendants'

17  negligence.

18                           **TWELFTH CAUSE OF ACTION**

19                     **(Punitive Damages Against All Defendants)**

20         128.    Plaintiffs hereby repeat and re-allege the factual allegations contained in

21  paragraphs 1 through 127 above as though set forth in full herein.

22         129.    As alleged herein, Defendants' conduct causing Plaintiffs' harm justifies an

23  award of punitive damages against Defendants.

24         130.    As alleged herein, Defendants engaged in that conduct with malice,

25  oppression, or fraud.

26  / / /

27  / / /

28  / / /

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants as follows:

**As to the First, Second, Third, Fourth, Fifth, Seventh, Eighth, Nine, Tenth, and Eleventh Causes of Action:**

1.    For compensatory damages according to proof;

**As to the Fifth, Ninth, and Tenth Causes of Action:**

2.    For punitive damages pursuant to California Civil Code § 3294(a);

**As to the Sixth Cause of Action:**

3.    For restitution in such amounts as shall be shown at the time of trial and by which the Defendants have been unjustly enriched;

**As to All Causes of Action:**

4.    For attorneys' fees, costs, and interest as provided by law, including but not limited to prejudgment interest as provided for by Cal. Civil Code §§ 3288 and 3291; and

5.    For such other and further relief as the Court may deem just, equitable, and proper.

Dated: March 23, 2015                    Respectfully Submitted,

                                         HOWARTH & SMITH
                                         DON HOWARTH
                                         SUZELLE M. SMITH
                                         PADRAIC GLASPY
                                         JESSICA L. RANKIN

                          By:    _Don Howarth_____
                                         Don Howarth

                                         Attorneys for Plaintiffs
                                         ROGER W. CORMAN, JULIE A. CORMAN,
                                         and PASIG, LTD.

COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury.

Dated: March 23, 2015

Respectfully Submitted,

HOWARTH & SMITH
DON HOWARTH
SUZELLE M. SMITH
PADRAIC GLASPY
JESSICA L. RANKIN

By: _____
Don Howarth

Attorneys for Plaintiffs
ROGER W. CORMAN, JULIE A. CORMAN,
and PASIG, LTD.

23

Exhibit 3

Declarations of Julie and Roger Corman dated September 17, 2015

ORIGINAL

| | |
|---|---|
| 1 | HOWARTH & SMITH |
| 2 | DON HOWARTH (SBN 53783) |
| | dhowarth@howarth-smith.com |
| 3 | SUZELLE M. SMITH (SBN 113992) |
| | ssmith@howarth-smith.com |
| 4 | PADRAIC GLASPY (SBN 259563) |
| | pglaspy@howarth-smith.com |
| 5 | JESSICA L. RANKIN (SBN 279237) |
| | jrankin@howarth-smith.com |
| 6 | 523 West Sixth Street, Suite 728 |
| | Los Angeles, California 90014 |
| 7 | Telephone: (213) 955-9400 |
| | Facsimile: (213) 622-0791 |

**FILED**
Superior Court Of California
County Of Los Angeles

SEP 2 1 2015

Sherri R. Carter, Executive Officer/Clerk
By_____, Deputy
Paul So

8  Attorneys for Plaintiffs ROGER W. CORMAN,
9  JULIE A. CORMAN, and PASIG, LTD.

10                SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                     FOR THE COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| 12 | ROGER W. CORMAN, an individual; JULIE A. CORMAN, an individual; and PASIG, LTD., a British Virgin Islands company, | CASE NO. BC576379 |
| 13 | | [Complaint Filed on March 23, 2015] |
| 14 | Plaintiffs, | Assigned for all purposes to: Hon. Fredrick C. Shaller |
| | vs. | |
| 15 | CITCO GROUP LIMITED, a Netherlands company; CITCO GROUP (MONACO) SAM, a Monaco company; CITCO GLOBAL CUSTODY (N.A.) N.V., a Curacao company; TORTRUST CORPORATION COMPANY LIMITED, a British Virgin Islands company; CITCO TRUSTEES S.A., a Switzerland company; CITCO B.V.I. LIMITED, a British Virgin Islands company; CITCO BANK BVI LIMITED, a British Virgin Islands company; CITCO BANK & TRUST COMPANY LIMITED, a Cayman Islands company; CITCO BANKING CORPORATION N.V., a Curacao company; SECURITAS MANAGEMENT SERVICES CORP, a British Virgin Islands company; CITCO FUND SERVICES (CAYMAN ISLANDS) LTD., a Cayman Islands company; CITCO SUISSE S.A., a Switzerland company; ERMANNO UNTERNAEHRER, an individual; CHRISTOPHER SMEETS, an individual; and DOES, 1 through 100, | **DECLARATION OF ROGER W. CORMAN IN SUPPORT OF PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' MOTIONS TO QUASH** |
| 16 | | |
| 17 | | Date:  October 27, 2015 |
| 18 | | Time: 8:30 a.m. |
| 19 | | Dept.: 46 |
| 20 | | [Plaintiffs' Combined Opposition to Defendants' Motions to Quash; Declarations of Roger W. Corman, Julie A. Corman, Paul M. Butler, Jr., Manfred Kimmle, and Don Howarth in Support of Plaintiffs' Combined Opposition to Defendants' Motions to Quash; Plaintiffs' Request for Judicial Notice in Support of Combined Opposition to Defendants' Motions to Quash; [Proposed] Order Granting Plaintiffs' Request for Judicial Notice in Support of Combined Opposition to Defendants' Motions to Quash; Appendix of Non-California Authorities in Support of Plaintiffs' Combined Opposition to Defendants' Motions to Quash filed concurrently herewith] |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | Defendants. | |
| 27 | | |
| 28 | /// | |

09/22/2015

DECLARATION OF ROGER W. CORMAN ISO PLAINTIFFS' COMBINED OPP. TO DEFENDANTS' MOTIONS TO QUASH

I, Roger W. Corman, hereby declare as follows:

1.     I am a Plaintiff in the above entitled matter.  The following facts are within my personal knowledge and, if called as a witness herein, I can and will competently testify thereto.

2.     I reside in Santa Monica, California with my wife, Plaintiff Julie A. Corman.  I have lived in the Los Angeles area for 74 years.  I am currently 89 years old.

3.     My wife and I are the owners of New Horizons Picture Corp., which has an office at 11600 San Vicente Blvd. in Los Angeles, California.

4.     I have worked in the film business for decades.  I am an Academy Award-winning producer and director.  I have produced over 300 films and directed more than 60, including a series based on the works of Edgar Allan Poe.  I was the youngest director ever to have retrospectives at the Cinemateque Francaise in Paris, the British Film Institute in London and the Museum of Modern Art in New York.  In 1998, I won the first Producer's Award ever given by the Cannes Film Festival.  In 2006, I received the David O. Selznick Award, the highest honor given by the Producers Guild of America.  Also in 2006, my film *Fall of the House of Usher* was among the twenty-five films selected for the National Film Registry, a compilation of significant films preserved by the Library of Congress.  I am the subject of the 1978 documentary *Roger Corman: Hollywood's Wild Angel*, as well as *Corman's World: Exploits of a Hollywood Rebel*, which premiered at Sundance and Cannes Film Festivals in 2011.  I also have a star on the Hollywood Walk of Fame and have acted in films directed by my protégés, including academy award winners *The Godfather Part II*, Francis Ford Coppola, and *The Silence of the Lambs*, Jonathan Demme, as well as Apollo 13, Ron Howard, and others.

5.     By the early 1990s, my wife and I had earned substantial wealth from our work in the film industry, and invested money with investment manager George Soros ("Soros").  Soros was a very successful investment manager and, over the years, our investments with him accumulated substantial appreciation.  The administrator of the Soros investments was a Citco entity called Citco Fund Services (Curacao) N.V.  Our investments with George Soros were held at Defendant Citco Banking Corporation N.V.

6.     Since the mid-1990s, I have dealt with a number of representatives of Defendant

1

1    Citco Group Limited.

2        7.    Citco Group Limited representatives Rupert Walle ("Walle") and Defendant

3    Ermanno Unternaehrer ("Unternaehrer") told me personally from the beginning of our relationship

4    that the Citco Group of companies was a unified organization and that the various parts and offices

5    of Citco Group Limited, which might have different names, were used by Citco Group Limited as

6    necessary to service their clients.  Walle and Unternaehrer told me that Citco would use whatever

7    subsidiary or unit of Citco that was necessary or appropriate for a specific task, but that Citco Group

8    Limited controlled and directed all of them and I would deal directly with the parent and the

9    individuals, Smeets and Unternaehrer, who controlled them all.  Therefore, at all times I dealt with

10   Citco as one entity and did not make any distinctions between different Citco entities.

11       8.    I have known Walle since about 1994, because Walle worked for Citco Banking

12   Corporation N.V., which was the bank that held our investments with George Soros and provided a

13   number of financial services for us related to our investments.  If I had questions about the Soros

14   investments, I would call Walle.  We knew and trusted Walle.

15       9.    In 1996 Unternaehrer initiated and set up a meeting, through Walle, with myself, my

16   wife, Unternaehrer and Walle in Los Angeles, California.

17       10.   Unternaehrer told us, and I understood, that he was a representative of Citco and an

18   executive at Citco and was meeting with us on behalf of the entire Citco group.  He said that he was

19   living and working in La Jolla, California at the time and that he was Executive Director and

20   Director of Financial Services of the Citco Group Limited, which controlled all other Citco entities.

21   He told us that he worked with Christopher Smeets, the CEO of Citco Group Limited.  Walle told

22   us that he knew Unternaehrer and vouched for him and his role at Citco.  At no point did Walle or

23   Unternaehrer tell us that they were acting only in some limited capacity for specific Citco entities.

24       11.   At this meeting, Unternaehrer told us that he knew we were happy with our Soros

25   investments, but that it would be better for us if we invested some of our Soros money with Citco

26   instead to diversify our investments.  Unternaehrer told us that Citco would manage and control our

27   investments, making safe, wise, and profitable decision.  They told us that Citco owned banks, had

28   tax people, and subsidiary Citco entities all over the world, and that he and Citco would use them as

2

1   necessary to handle our monies.

2       12.    At this meeting and at several subsequent meetings in California, sometimes with

3   Unternaehrer and Walle and sometimes with Unternaehrer alone, they told us that we could rely on

4   Citco's management of our money because the Citco group of companies was a unified

5   organization controlled by Citco Group Limited.

6       13.    Unternaehrer told us that he spoke on behalf of Citco Group Limited, the Citco

7   parent company, as well as its subsidiaries and other entities, and for Smeets.  At one of the initial

8   meetings in California, Unternaehrer gave us a business card reflecting his position as Executive

9   Director and Director of Financial Services of the Citco Group Limited.  A true and correct copy of

10  this business card is attached hereto as Exhibit 1.

11      14.    In 1996, at our meeting in California, Unternaehrer and Walle told us that Citco was

12  the largest off-shore money manager in the world and that it had affiliated entities all over the world

13  that it would use to handle our investments, which would act together as necessary in our best

14  interests in handling our money.  They said that Citco would use whatever subsidiary or unit of

15  Citco that was necessary or appropriate for a specific task, but that the parent company, Citco

16  Group Limited, controlled and directed all of them and that Unternaehrer in particular would deal

17  directly with us.  They told us that we could trust Citco to use its appropriate entities to handle our

18  investments and not to worry about which particular Citco entity was handling any part of the

19  management of the investments because they were all part of Citco.  They said that the entities

20  might have different names, but that they were all used as necessary to serve Citco's clients.

21      15.    Unternaehrer told us that Citco would be an investment partner with us, and that we

22  could personally count on him and other Citco executives at the highest level, including Smeets, the

23  CEO of the parent Citco company, to make decisions and handle our money in our best financial

24  interest.  He said that we could trust and rely on Citco regarding the investing, managing, and

25  administering of our investments alongside their own and that Citco would look after our

26  investments for us and handle them in our best interests so that we could focus on our film work.

27      16.    Unternaehrer told us he and Smeets were partners, that Smeets was the "Soros" of

28  Citco, and that Smeets controlled all the Citco entities which would be working for us.  He told us

3

1    he spoke on behalf of Smeets and that Smeets would personally be involved with the management

2    of our investments and that Citco would be in a fiduciary relationship with us, one of utter trust.

3        17.    Unternaehrer told us that Citco would keep its own moneys invested side by side

4    with our moneys so that we would be fully protected by Citco.

5        18.    Unternaehrer and Walle told us that the way Citco would be compensated was from

6    returns on the investments and fees that would be deducted by Citco from the accounts they would

7    set up with Citco banks. They told us that the fact that Citco had so many offices and people

8    working on their investments all over the world would not increase the cost to us, because Citco

9    was all one entity which would share the fees earned from our investments. Several Citco entities

10    earned fees for their work for us, including Citco Global Custody (N.A) N.V., Citco B.V.I. Limited,

11    Tortrust Corporation Company Limited, Securitas Management Services Corp, Citco Bank &amp; Trust

12    Company Limited, Citco Bank BVI Limited, Citco Fund Services (Cayman Islands) Ltd., Citco

13    Trustees S.A., and Citco Suisse S.A.

14        19.    Both Unternaehrer and Walle made several visits to California, at which they made

15    the statements discussed above. They had dinner at our home several times and discussed our

16    investments. Every one of these meetings was business related.

17        20.    We met with Unternaehrer in Los Angeles, California on at least the following

18    occasions, which were all business-related.

19    
20    
21    
22    
23    

- In 1996 we met with Unternaehrer with Walle.
- On November 5, 1997, we met with Unternaehrer and had dinner with him.
- Sometime in May 1998 we met with Unternaehrer.
- On September 29, 1999, we met with Unternaehrer.
- In December 2001 we met with Unternaehrer and he attended a Christmas party at our home, at which he met our family. We invited him to the Christmas party because of our business relationship, and we discussed business matters at the party.
- On November 22, 2004, we met with Unternaehrer and had lunch together.
- Sometime in November 2007, we met with Unternaehrer.

24    Walle was also present for some of these meetings.

25        21.    These meetings took place in English, in which both Unternaehrer and Walle are

26    fluent. In addition to these meetings, Unternaehrer and Walle called and emailed us dozens of times

27    regarding our investments. The calls were made to our home or work phones in Los Angeles,

28    California. Substantially all of the reporting, decisions, and input from us in relation to our

4

1  investments with Citco was done in California in person or by telephone.

2      22.    We accepted and relied upon Citco's advice and representations and agreed on that

3  basis to move substantial money from Soros to the management and control of Citco. In 1996-97,

4  Mr. Unternaehrer and Mr. Walle directly arranged for the transfer most of our Soros-managed

5  investments to Citco. Attached as Exhibit 2 hereto is a true and correct copy of a letter to me from

6  Mr. Rupert Walle dated January 24, 1997, confirming one such transfer. All such monies invested

7  with Citco would otherwise have remained under the management of George Soros. Citco

8  continued to move our money from Soros to Citco.

9      23.    Our investments with Citco were initially held in two offshore entities which we

10  owned and controlled, Nebula Ltd. and Emerald City Ltd.

11      24.    In 2002, Citco recommended that we set up Pasig Ltd. ("Pasig") through Citco in

12  order to streamline all of our investments under Citco's control. Citco prepared the corporate

13  documents for this entity and set it up for Citco to continue to handle our investments. Citco took

14  care of all the arrangements and set up Pasig using a Citco address in the British Virgin Islands as

15  Pasig's address. Once Pasig was set up, Citco fully managed and handled all administrative

16  functions for Pasig.

17      25.    By 2008, we had approximately $73 million invested with Citco.

18      26.    I learned in 2012 that in or about June, 2008, Citco transferred the management of

19  our investments then totaling $73 million, to Mr. Alphonse "Buddy" Fletcher. Citco did so without

20  informing us that it was transferring management of the moneys to Fletcher.

21      27.    Neither Unternaehrer, Walle, Smeets, nor anyone else at Citco informed us that

22  Fletcher was already engaged in mismanagement and fraud at the time of the transfer. No one at

23  Citco, asked us or gave us an opportunity to decline to put our monies with Fletcher. Had Citco so

24  informed us, we would not have agreed to allow Fletcher to manage our investments.

25      28.    Nor did anyone at Citco ever inform us that Citco obtained a payout to itself of at

26  least $28 million for transferring management to Fletcher, or that Unternaehrer arranged a side deal

27  whereby he obtained $6.6 million in cash from Fletcher and stock in a Fletcher entity. Had Citco

28  informed us of these payouts, we would not have agreed to leave our money invested with Fletcher.

DECLARATION OF ROGER W. CORMAN ISO PLAINTIFFS' COMBINED OPP. TO DEFENDANTS' MOTIONS TO QUASH

29.    Nor did anyone at Citco ever inform us that Citco pulled out its own money from the Fletcher investments, and did not keep its money and investments alongside ours as it had represented and agreed it would do. Had Citco told us that it was pulling its money out of the Fletcher funds, we would not have agreed to leave our own money invested with Fletcher.

30.    When Citco did finally attempt to withdraw our money from Fletcher in or about May 2010, we were told that it could not be returned. By mid-2013, we were able to recover only about $13 million from the total of $73 million that Citco had transferred to Fletcher's management.

31.    Attached as Exhibit 3 hereto is a true and correct copy of an email dated September 26, 2012, from Paul Butler, a representative of Citco, to my lawyer, Robert Foote, a copy of which was provided to me in connection with the *Pasig Ltd. et al v. Roger William Corman et al.* litigation. Attached as Exhibit 4 hereto is a true and correct copy of the first attachment to this email, entitled "Rupert Walle.pdf." Attached as Exhibit 5 hereto is a true and correct copy of the second attachment to this email, entitled "Ermanno Unternaehrer.pdf."

32.    Attached as Exhibit 6 hereto is a true and correct copy of a letter from Rupert Walle to myself dated February 13, 1997, with its enclosures.

33.    Attached as Exhibit 7 hereto is a true and correct copy of the Affidavit of Siobhan Nicola Gillespie filed in the *Pasig Ltd. et al v. Roger William Corman et al.* litigation, to which I was a party.

34.    Attached as Exhibit 8 hereto is a true and correct copy of the Affidavit of Michael John Francombe filed in the *Pasig Ltd. et al v. Roger William Corman et al.* litigation, to which I was a party.

35.    Attached as Exhibit 9 hereto is a true and correct copy of the Second Affidavit of Michael John Francombe filed in the *Pasig Ltd. et al v. Roger William Corman et al.* litigation, to which I was a party.

36.    Attached as Exhibit 10 hereto is a true and correct copy of relevant excerpts of Exhibit MFJ-3 to the Second Affidavit of Michael John Francombe filed in the *Pasig Ltd. et al v. Roger William Corman et al.* litigation, to which I was a party.

37.    Attached hereto as Exhibit 11 is a true and correct copy of the Affidavit of Nicholas

DECLARATION OF ROGER W. CORMAN ISO PLAINTIFFS' COMBINED OPP. TO DEFENDANTS' MOTIONS TO QUASH

1  James Braham in Support of the Winding Up Petition of Soundview Elite Limited filed in the

2  liquidation proceedings in the Cayman Islands, *In the Matter of Soundview Elite Limited*, to which

3  Pasig (of which I am the beneficial owner) is a party.

4      38.    Attached hereto as Exhibit 12 is a true and correct copy of Exhibit NJB-3 to the

5  Affidavit of Nicholas James Braham in Support of the Winding Up Petition of Soundview Elite

6  Limited filed in the liquidation proceedings in the Cayman Islands, *In the Matter of Soundview Elite*

7  *Limited*, to which Pasig (of which I am the beneficial owner) is a party.

8      39.    Attached hereto as Exhibit 13 is a true and correct copy of the Affidavit of Nicholas

9  James Braham in Support of the Winding Up Petition of Soundview Premium Limited filed in the

10  liquidation proceedings in the Cayman Islands, *In the Matter of Soundview Premium Limited*, to

11  which Pasig (of which I am the beneficial owner) is a party.

12      40.    Attached hereto as Exhibit 14 is a true and correct copy of Exhibit NJB-3 to the

13  Affidavit of Nicholas James Braham in Support of the Winding Up Petition of Soundview Premium

14  Limited filed in the liquidation proceedings in the Cayman Islands, *In the Matter of Soundview*

15  *Premium Limited*, to which Pasig (of which I am the beneficial owner) is a party.

16      41.    Attached hereto as Exhibit 15 is a true and correct copy of the Affidavit of Nicholas

17  James Braham in Support of the Winding Up Petition of Soundview Star Limited filed in the

18  liquidation proceedings in the Cayman Islands, *In the Matter of Soundview Star Limited*, to which

19  Pasig (of which I am the beneficial owner) is a party.

20      42.    Attached hereto as Exhibit 16 is a true and correct copy of Exhibit NJB-3 to the

21  Affidavit of Nicholas James Braham in Support of the Winding Up Petition of Soundview Star

22  Limited filed in the liquidation proceedings in the Cayman Islands, *In the Matter of Soundview Star*

23  *Limited*, to which Pasig (of which I am the beneficial owner) is a party.

24  ///

25  ///

26  ///

27  ///

28  ///

DECLARATION OF ROGER W. CORMAN ISO PLAINTIFFS' COMBINED OPP. TO DEFENDANTS' MOTIONS TO QUASH



1    I declare under penalty of perjury under the laws of the State of California that the foregoing

2    is true and correct.

3    Executed on September _17_, 2015 in Los Angeles, California.

4

5

6    _Roger W. Corman_

7    Roger W. Corman

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ROGER W. CORMAN ISO PLAINTIFFS' COMBINED OPP. TO DEFENDANTS' MOTIONS TO QUASH

09/22/2015



1  HOWARTH & SMITH
   DON HOWARTH (SBN 53783)
2  dhowarth@howarth-smith.com
   SUZELLE M. SMITH (SBN 113992)
3  ssmith@howarth-smith.com
   PADRAIC GLASPY (SBN 259563)
4  pglaspy@howarth-smith.com
   JESSICA L. RANKIN (SBN 279237)
5  jrankin@howarth-smith.com
   523 West Sixth Street, Suite 728
6  Los Angeles, California 90014
   Telephone: (213) 955-9400
7  Facsimile: (213) 622-0791

8  Attorneys for Plaintiffs ROGER W. CORMAN,
   JULIE A. CORMAN, and PASIG, LTD.
9

**FILED**
Superior Court Of California
County Of Los Angeles

SEP 21 2015

Sherri R. Carter, Executive Officer/Clerk

By _____, Deputy
      Paul So

10        SUPERIOR COURT OF THE STATE OF CALIFORNIA

11            FOR THE COUNTY OF LOS ANGELES

12  ROGER W. CORMAN, an individual; JULIE A.    )  CASE NO. BC576379
    CORMAN, an individual; and PASIG, LTD., a    )
13  British Virgin Islands company,              )  [Complaint Filed on March 23, 2015]
                                                 )
                 Plaintiffs,                     )  Assigned for all purposes to:
14                                               )  Hon. Fredrick C. Shaller
         vs.                                     )
15                                               )  **DECLARATION OF JULIE A. CORMAN**
    CITCO GROUP LIMITED, a Netherlands           )  **IN SUPPORT OF PLAINTIFFS'**
16  company; CITCO GROUP (MONACO) SAM, a         )  **COMBINED OPPOSITION TO**
    Monaco company; CITCO GLOBAL                 )  **DEFENDANTS' MOTIONS TO QUASH**
17  CUSTODY (N.A.) N.V., a Curacao company;      )
    TORTRUST CORPORATION COMPANY                 )  Date:  October 27, 2015
18  LIMITED, a British Virgin Islands company;   )  Time:  8:30 a.m.
    CITCO TRUSTEES S.A., a Switzerland           )  Dept.: 46
19  company; CITCO B.V.I. LIMITED, a British     )
    Virgin Islands company; CITCO BANK BVI       )
20  LIMITED, a British Virgin Islands company;   )  [Plaintiffs' Combined Opposition to Defendants'
    CITCO BANK & TRUST COMPANY                   )  Motions to Quash; Declarations of Roger W.
21  LIMITED, a Cayman Islands company; CITCO     )  Corman, Julie A. Corman, Paul M. Butler, Jr.,
    BANKING CORPORATION N.V., a Curacao          )  Manfred Kimmle, and Don Howarth in Support of
22  company; SECURITAS MANAGEMENT                )  Plaintiffs' Combined Opposition to Defendants'
    SERVICES CORP, a British Virgin Islands      )  Motions to Quash; Plaintiffs' Request for Judicial
23  company; CITCO FUND SERVICES                 )  Notice in Support of Combined Opposition to
    (CAYMAN ISLANDS) LTD., a Cayman Islands      )  Defendants' Motions to Quash; [Proposed] Order
24  company; CITCO SUISSE S.A., a Switzerland    )  Granting Plaintiffs' Request for Judicial Notice in
    company; ERMANNO UNTERNAEHRER, an            )  Support of Combined Opposition to Defendants'
25  individual; CHRISTOPHER SMEETS, an           )  Motions to Quash; Appendix of Non-California
    individual; and DOES, 1 through 100,         )  Authorities in Support of Plaintiffs' Combined
26                                               )  Opposition to Defendants' Motions to Quash filed
                 Defendants.                     )  concurrently herewith]
27  _____)
                                                 )
28  / / /

DECLARATION OF JULIE A. CORMAN ISO PLAINTIFFS' COMBINED OPP. TO DEFENDANTS' MOTIONS TO QUASH

I, Julie A. Corman, hereby declare as follows:

1.    I am a Plaintiff in the above entitled matter.  The following facts are within my personal knowledge and, if called as a witness herein, I can and will competently testify thereto.

2.    I reside in Santa Monica, California with my husband, Plaintiff Roger W. Corman.

3.    My husband and I are the owners of New Horizons Picture Corp., which has an office at 11600 San Vicente Blvd. in Los Angeles, California.

4.    I have worked in the film business for decades.  During my career I have produced more than 35 films, including Jonathan Demme's *Crazy Mama*, family classics such as *A Cry in the Wind,* and the Tony Award-winning play, *DA*.  In 2000, I was appointed Chair of the Graduate Film Department at NYU.  I lecture widely at universities around the world, including USC, UCLA, Yale, Duke, University of Pennsylvania, and at several universities in Japan.  I have received many film awards, including several lifetime achievement honors, most notably from the USC School of Cinematic Arts and Yale University and most recently from the Honolulu International Film Festival.  I have been a member of the Academy of Arts and Sciences for thirty years.

5.    By the early 1990s, my husband and I had earned substantial wealth from our work in the film industry, and invested money with investment manager George Soros ("Soros").  Soros was a very successful investment manager and, over the years, our investments with him accumulated substantial appreciation.  The administrator of the Soros investments was a Citco entity called Citco Fund Services (Curacao) N.V.  Our investments with George Soros were held at Defendant Citco Banking Corporation N.V.

6.    Since the mid-1990s, I have dealt with a number of representatives of Defendant Citco Group Limited.

7.    Citco Group Limited representatives Rupert Walle ("Walle") and Defendant Ermanno Unternaehrer ("Unternaehrer") told us from the beginning of our relationship that the Citco Group of companies was a unified organization and that the various parts and offices of Citco Group Limited, which might have different names, were used by Citco Group Limited as necessary to service their clients.  Walle and Unternaehrer told us that Citco would use whatever subsidiary or unit of Citco that was necessary or appropriate for a specific task, but that Citco Group Limited

1

1   controlled and directed all of them and we would deal directly with the parent and the individuals,

2   Smeets and Unternaehrer, who controlled them all.  Therefore, at all times we dealt with Citco as

3   one entity and did not make any distinctions between different Citco entities.

4       8.    I have known Walle since about 1994, because Walle worked for Citco Banking

5   Corporation N.V., which was the bank that held our investments with George Soros and provided a

6   number of financial services for us related to our investments.  If we had questions about the Soros

7   investments, we would call Walle.  We knew and trusted Walle.

8       9.    In 1996 Unternaehrer initiated and set up a meeting, through Walle, with myself, my

9   husband, Unternaehrer and Walle in Los Angeles, California.

10      10.    Unternaehrer told us, and I understood, that he was a representative of Citco and an

11  executive at Citco and was meeting with us on behalf of the entire Citco group.  He said that he was

12  living and working in La Jolla, California at the time and that he was Executive Director and

13  Director of Financial Services of the Citco Group Limited, which controlled all other Citco entities.

14  He told us that he worked with Christopher Smeets, the CEO of Citco Group Limited.  Walle told

15  us that he knew Unternaehrer and vouched for him and his role at Citco.  At no point did Walle or

16  Unternaehrer tell us that they were acting only in some limited capacity for specific minor entities

17  of Citco.  They referred to Citco as a multi-billion dollar operation.

18      11.    At this meeting, Unternaehrer told us that he knew we were happy with our Soros

19  investments, but that it would be better for us if we invested some of our Soros money with Citco

20  instead to diversify our investments by investing our money with a Citco fund.  Unternaehrer told us

21  that Citco would manage and control our investments, making safe, wise, and profitable decisions.

22  They told us that Citco owned banks, had tax people, and subsidiary Citco entities all over the

23  world, and that he and Citco would use them as necessary to handle our monies.

24      12.    At this meeting and at several subsequent meetings in California, sometimes with

25  Unternaehrer and Walle and sometimes with Unternaehrer alone, they told us that we could rely on

26  Citco's management of our money because the Citco group of companies was a unified

27  organization controlled by Citco Group Limited.

28      13.    Unternaehrer told us that he spoke on behalf of Citco Group Limited, the Citco

DECLARATION OF JULIE A. CORMAN ISO PLAINTIFFS' COMBINED OPP. TO DEFENDANTS' MOTIONS TO QUASH

1  parent company, as well as its subsidiaries and other entities, and for Smeets. At one of the initial

2  meetings in California, Unternaehrer gave us a business card reflecting his position as Executive

3  Director and Director of Financial Services of the Citco Group Limited.

4      14.    In 1996, at our meeting in California, Unternaehrer and Walle told us that Citco was

5  the largest off-shore money manager in the world and that it had affiliated entities all over the world

6  that it would use to handle our investments, which would act together as necessary in our best

7  interests in handling our money. They said that Citco would use whatever subsidiary or unit of

8  Citco that was necessary or appropriate for a specific task, but that the parent company, Citco

9  Group Limited, controlled and directed all of them and that Unternaehrer in particular would deal

10  directly with us. They told us that we could trust Citco to use its appropriate entities to handle our

11  investments and not to worry about which particular Citco entity was handling any part of the

12  management of the investments because they were all part of Citco. They said that the entities

13  might have different names, but that they were all used as necessary to serve Citco's clients.

14      15.    Unternaehrer told us that Citco would be an investment partner with us, and that we

15  could personally count on him and other Citco executives at the highest level, including Smeets, the

16  CEO of the parent Citco company, to make decisions and handle our money in our best financial

17  interest. He said that we could trust and rely on Citco regarding the investing, managing, and

18  administering of our investments alongside their own and that Citco would look after our

19  investments for us and handle them in our best interests so that we could focus on our film work.

20      16.    Unternaehrer told us he and Smeets were partners, that Smeets was the "Soros" of

21  Citco, and that Smeets controlled all the Citco entities which would be working for us and this was

22  a major reason we would be safe moving our money from Soros to Citco. He told us he spoke on

23  behalf of Smeets and that Smeets would personally be involved with the management of our

24  investments and that Citco would be in a fiduciary relationship with us, one of utter trust.

25      17.    Unternaehrer told us that Citco would keep its own moneys invested side by side

26  with our moneys so that we would be fully protected by Citco.

27      18.    Unternaehrer and Walle told us that the way Citco would be compensated was from

28  returns on the investments and fees that would be deducted by Citco from the accounts they would

3

DECLARATION OF JULIE A. CORMAN ISO PLAINTIFFS' COMBINED OPP. TO DEFENDANTS' MOTIONS TO QUASH

set up with Citco banks. They told us that the fact that Citco had so many offices and people

working on their investments all over the world would not increase the cost to us, because Citco

was all one entity which would share the fees earned from our investments. Several Citco entities

earned fees for their work for us, including Citco Global Custody (N.A) N.V., Citco B.V.I. Limited,

Tortrust Corporation Company Limited, Securitas Management Services Corp, Citco Bank & Trust

Company Limited, Citco Bank BVI Limited, Citco Fund Services (Cayman Islands) Ltd., Citco

Trustees S.A., and Citco Suisse S.A.

19.    Both Unternaehrer and Walle made several visits to California, at which they made

the statements discussed above. They had dinner at our home several times and discussed our

investments. Every one of these meetings was business related.

20.    We met with Unternaehrer in Los Angeles, California on at least the following

occasions, which were all business-related.

- In 1996 we met with Unternaehrer with Walle.
- On November 5, 1997, we met with Unternaehrer and had dinner with him.
- Sometime in May 1998 we met with Unternaehrer.
- On September 29, 1999, we met with Unternaehrer.
- In December 2001 we met with Unternaehrer and he attended a Christmas party at our home, at which he met our family. We invited him to the Christmas party because of our business relationship, and we discussed business matters at the party.
- On November 22, 2004, we met with Unternaehrer and had lunch together.
- Sometime in November 2007, we met with Unternaehrer.

Walle was also present for some of these meetings.

21.    These meetings took place in English, in which both Unternaehrer and Walle are

fluent. In addition to these meetings, Unternaehrer and Walle called and emailed us dozens of times

regarding our investments. The calls were made to our home or work phones in Los Angeles,

California. Substantially all of the reporting, decisions, and input from us in relation to our

investments with Citco was done in California in person or by telephone.

22.    We accepted and relied upon Citco's advice and representations and agreed on that

basis to move substantial money from Soros to the management and control of Citco. In 1996-97,

Mr. Unternaehrer and Mr. Walle directly arranged for the transfer most of our Soros-managed

investments to Citco. Attached as Exhibit 2 hereto is a true and correct copy of a letter to me from

Mr. Rupert Walle dated January 24, 1997, confirming one such transfer. All such monies invested

DECLARATION OF JULIE A. CORMAN ISO PLAINTIFFS' COMBINED OPP. TO DEFENDANTS' MOTIONS TO QUASH

1    with Citco would otherwise have remained under the management of George Soros.  Citco

2    continued to move our money from Soros to Citco.

3        23.    Our investments with Citco were initially held in two offshore entities which we

4    owned and controlled, Nebula Ltd. and Emerald City Ltd.

5        24.    In 2002, Citco recommended that we set up Pasig Ltd. ("Pasig") through Citco in

6    order to streamline all of our investments under Citco's control.  Citco took care of all the

7    arrangements and set up Pasig using a Citco address in the British Virgin Islands as Pasig's address.

8    Once Pasig was set up, Citco fully managed and handled all administrative functions for Pasig.

9        25.    By 2008, we had approximately $73 million invested with Citco.

10        26.    We learned in 2012 that in or about June, 2008, Citco transferred the management of

11    our investments then totaling $73 million, to Mr. Alphonse "Buddy" Fletcher.  Citco did so without

12    informing us that it was transferring management of the moneys to Fletcher.

13        27.    Neither Unternaehrer, Walle, Smeets, nor anyone else at Citco informed us that

14    Fletcher was already engaged in mismanagement and fraud at the time of the transfer.  No one at

15    Citco, asked us or gave us an opportunity to decline to put our monies with Fletcher.  Had Citco so

16    informed us, we would not have agreed to allow Fletcher to manage our investments.

17        28.    Nor did anyone at Citco ever inform us that Citco obtained a payout to itself of at

18    least $28 million for transferring management to Fletcher, or that Unternaehrer arranged a side deal

19    whereby he obtained $6.6 million in cash from Fletcher and stock in a Fletcher entity.  Had Citco

20    informed us of these payouts, we would not have agreed to leave our money invested with Fletcher.

21        29.    Nor did anyone at Citco ever inform us that Citco pulled out its own money from the

22    Fletcher investments, and did not keep its money and investments alongside ours as it had

23    represented and agreed it would do.  Had Citco told us that it was pulling its money out of the

24    Fletcher funds, we would not have agreed to leave our own money invested with Fletcher.

25        30.    When Citco did finally attempt to withdraw our money from Fletcher, we were told

26    that it could not be returned.  By mid-2013, we were able to recover only about $13 million from

27    the total of $73 million that Citco had transferred to Fletcher's management.

28        31.    I am my husband's primary caregiver.  He is of advanced age and is in poor health.

2015-09-17 00:52:38 (GMT)                    12136220791  From: Howarth & Smith

1    I declare under penalty of perjury under the laws of the State of California that the

2  foregoing is true and correct.

3    Executed on September __17__, 2015 in Los Angeles, California.

4

5

6    _Julie A. Corman_

7  Julie A. Corman

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

09/22/2015

<u>Exhibit 4</u>

<u>March 30 2015 Letter from the Trustee's Counsel to Pasig's Counsel</u>

# JONES DAY

222 EAST 41ST STREET • NEW YORK, NEW YORK 10017.6702

TELEPHONE: +1.212.326.3939 • FACSIMILE: +1.212.755.7306

Direct Number:  (212) 326-3876
sjpearson@JonesDay.com

March 30, 2015

VIA OVERNIGHT MAIL AND E-MAIL

Howarth & Smith
523 West Sixth Street, Suite 728
Los Angeles, California 90014
Attention:  Don Howarth, Esq.

Re:    In re Soundview Elite, LTD., et al.

Dear Mr. Howarth:

      We write on behalf of Corinne Ball, solely in her capacity as chapter 11 trustee of Soundview Elite, Ltd., Soundview Premium, Ltd., Soundview Star, Ltd., Elite Designated, Star Designated, and Premium Designated (collectively, the "Debtors").  On September 24, 2013, each of the Debtors commenced cases under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York.  The chapter 11 cases are currently pending and are being jointly administered under Case No. 13-13098 (REG).

      We have been advised that, on or about March 23, 2015, Roger Corman, Julie A. Corman and Pasig Ltd. (collectively, the "Cormans") commenced an action in the Superior Court of the State of California for the County of Los Angeles against Citco Group Limited and certain of its affiliates and related parties (collectively, "Citco") for conduct relating to the Debtors and their collapse.

      Pursuant to section 362(a) of the Bankruptcy Code,  which is entitled the "automatic stay," all entities are enjoined from, among other things, "any act to obtain possession of property of the estate … or to exercise control over property of the estate."  Property of the estate includes any legal or equitable claim of the debtors. 11 U.S.C. § 541.  Thus, the automatic stay prohibits creditors from exercising possession or control over such claims. *See, e.g., In re Chateaugay Corp.*, 78 B.R. 713, 725 (S.D.N.Y. 1987); *see also Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 740 F.3d 81, 93 (2d Cir. 2014) (affirming an injunction of creditors from pursuing claims that where duplicative or derivative of estate claims).  The California action asserts claims belonging to the Debtors, including claims for transfers made by the Debtors to Citco and claims for Citco's role in the Debtors' mismanagement, and was commenced in violation of the automatic stay.

NYI-524649347

JONES DAY

March 30, 2015
Page 2

For example, the complaint alleges the Debtors were insolvent, *id.* at ¶ 38, wrongfully made transfers to Citco for millions of dollars, *id.* at ¶ 29, and the Cormans and other creditors will only receive a fraction of their loss from the Debtors' bankruptcy cases, *id.* at ¶ 43. These claims belong to the Debtors—not the Cormans—and thus any pursuit of them by the Cormans is a violation of the automatic stay.

A violation of the automatic stay is willful if it is taken with knowledge of the bankruptcy case. *See Chateaugay Corp.*, 78 B.R. at 726. "[C]ontempt proceedings are the proper means of compensation and punishment for willful violations of the automatic stay." *Maritime Asbestosis Legal Clinic v. LTV Steel Co., (In re Chateaugay Corp.)*, 920 F.2d 183, 186-187 (2d Cir. 1990); *see also Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976). Here, the Cormans are actively participating in the Debtors' bankruptcies, and the California complaint expressly references the bankruptcy proceedings. The Cormans' actions are therefore willful.

In accordance with the foregoing, any attempt by the Cormans to continue the action in the Superior Court of California is in violation of the automatic stay and willful. Consequently, the Cormans should take any and all steps necessary to promptly either withdraw and re-file the above-described action or otherwise amend the complaint such that the action complies with the automatic stay. Failure to do so will be in violation and derogation of the provisions of the Bankruptcy Code and would necessitate appropriate proceedings in the Bankruptcy Court with the attendant possibility of sanctions, costs and other expenses.

Please do not hesitate to call me if you have any questions or need additional information.

Very truly yours,

Stephen J. Pearson

cc:    Suzelle Smith, Esq.
       Padraic Glaspy, Esq.
       Jessica L. Rankin, Esq.
       Andrew K. Glenn, Esq.

NYI-524649347

<u>Exhibit 5</u>

<u>Copies of letters exchanged by the Trustee's and Pasig's counsel in and after April 2015</u>

**HOWARTH & SMITH**
ATTORNEYS AT LAW
523 WEST SIXTH STREET
SUITE 728
LOS ANGELES, CALIFORNIA 90014
TELEPHONE: (213) 955-9400
FAX: (213) 622-0791
www.howarth-smith.com

DON HOWARTH                    April 3, 2015                    DHowarth@howarth-smith.com
                                                               Direct Line: (213) 955-9400 Ext. 117

**VIA EMAIL AND U.S. MAIL**

Stephen J. Pearson, Esq.
Jones Day
222 East 41st Street
New York, NY 10017
sjpearson@jonesday.com

      Re:    *In re Soundview Elite, Ltd., et al.*

Dear Mr. Pearson:

      This will acknowledge and respond to your letter of March 30, 2015, in which you allege that the Complaint filed by Roger Corman, Julie Corman, and Pasig Ltd. (collectively, the "Cormans") on March 23, 2015 in Los Angeles Superior Court was "commenced in violation of the automatic stay" in the bankruptcy proceedings involving various Soundview entities. You assert that the claims made by the Cormans belong to the Soundview Debtors, not to the Cormans, and that the Cormans have willfully violated the stay and may be subject to sanctions.

      The automatic bankruptcy stay only bars claims that belong to the bankruptcy estate, including, for example, claims for recovery of fraudulent transfers made by the bankruptcy debtors, here Soundview, to third parties, or derivative claims made on behalf of the Soundview entities. The Cormans assert no such claims in their Complaint. The Cormans plainly assert individual claims, not claims on behalf of the Soundview entities, against Citco and its agents for breach of its fiduciary duties *to the Cormans* in their role as investment and tax advisors, stock promotors, and managers and administrators of the Cormans' assets. *See, e.g.,* Complaint, ¶¶ 45, 54, 63. The Cormans also bring claims arising from Citco's misrepresentations made at the time Citco induced the Cormans to invest in Citco's fund, and Citco's breach of promises made to the Cormans to induce them to invest. *See* Complaint, ¶¶ 71-127. These are all claims based on Citco's duties

Stephen J. Pearson, Esq.
April 3, 2015
Page 2

to the Cormans and Citco's activities directed at the Cormans, and have nothing to do
with Soundview.

Such claims plainly do not constitute an "act to obtain possession of property of
the estate…or to exercise control over property of the estate" as alleged in your letter and
do not fall within the ambit of the automatic bankruptcy stay.

It is established that a creditor is well within his rights to sue non-bankrupt entities
for his individual harm, regardless of the pendency of a bankruptcy, just as the Cormans
have done here. *See In re Phar-Mor, Inc. Sec. Litig.*, 164 B.R. 903 (W.D. Pa. 1994) (stay
denied where creditor asserted negligence and breach of contract claims against debtor's
auditor); *see also Edwards v. Armstrong World Industries, Inc.,* 6 F.3d 312, 318 (5th
Cir.1993) ("property of the debtor cannot be extended to include the separate obligations
of the non-bankrupt [third party]"). Claims of misrepresentation, fraud, negligence, and
other individual claims have been specifically held to belong to the creditor. *See Begier
v. Price Waterhouse*, 81 B.R. 303 (E.D. Pa. 1987) (summary judgment granted in favor
of auditor where debtor attempted to bring claims on behalf of creditors who relied on
auditor's statements in investing); *see also Cumberland Oil Corp v. Thropp*, 791 F.2d
1037 (2d Cir) (creditor's claim that it suffered damages as a result of intentional fraud is
the property of the creditor, not the debtor's estate); *Bankers Trust Co. v. Rhoades*, 859
F.2d 1096, 1101 (2d Cir.1988) (finding that a creditor had "standing to bring a RICO
claim, regardless of the fact that a bankrupt [debtor] might also have suffered an identical
injury" because "[creditor] does not seek recovery for injuries suffered by [debtor] but for
injuries it suffered directly"); *see also Primavera Familienstiftung v. Askin*, No. 95 CIV.
8905 (RWS), 1996 WL 494904, at *18 (S.D.N.Y. Aug. 30, 1996) ("fraud and negligent
misrepresentation claims are personal, not derivative").

The legal authority you cite in your letter is perfectly consistent with this and does
not support the application of the bankruptcy stay to the Cormans' Complaint in Los
Angeles Superior Court. You cite *In re Chateaugay Corp.*, 78 B.R. 713 (S.D.N.Y. 1987),
which involved a bankruptcy creditor initiating an action to recover on a debt owed by
the bankruptcy debtor directly from one of the bankruptcy debtor's accounts receivable.
There, the court held that such an action was stayed by the bankruptcy because the
account receivable that was claimed against was property of the bankruptcy debtor:

> The consignees entered into contracts to purchase the Debtors' steel
> products. Upon receiving the products they ordered, those consignees
> incurred an obligation to pay the Debtors which is uncontested. This
> uncontested obligation is an account receivable in favor of the Debtors. The
> definition of "property of the estate" includes the Debtors' *right to collect*
> accounts receivable…. Section 362(a)(3) of the Code enjoins "any act to
> obtain possession of property of the estate or of property from the estate or
> to exercise control over property of the estate." Based on the foregoing this

Stephen J. Pearson, Esq.
April 3, 2015
Page 3

> Court finds that Graham's collection of freight charges from the Debtors'
> consignees amounts to a violation of § 362 and of this Court's restraining
> order. Accordingly Graham is enjoined from pursuing the collection of its
> pre-petition freight charges directly from the Debtors' consignees. Instead
> Graham, like all other pre-petition creditors, has the right to file a claim
> against the Debtors' estate to the extent that it is owed money by the
> Debtors for debts incurred pre-petition.

*In re Chateaugay Corp.*, 78 B.R. 713, 725-26 (S.D.N.Y. 1987).

The claims in the Cormans' Complaint are nothing like the claims at issue in
*Chateaugay*. The Cormans are not claiming against accounts receivable of the
Soundview Debtors or property otherwise belonging to the Soundview Debtors. The
Cormans are suing Citco for damages to them from breaches of Citco's fiduciary and
other duties based on its wrongful conduct and fraud, not to recover property of
Soundview.

Similarly, your reliance on *Marshall v. Picard (In re Bernard L. Madoff Inv. Sec.
LLC)*, 740 F.3d 81 (2d Cir. 2014) is misplaced, as that case also supports the Cormans'
position. The court in *Marshall* held that a bankruptcy stay precluded a party from
bringing derivative actions belonging to the bankruptcy debtor, but expressly did not
affect a creditor's own direct claims against a third party:

> A claim based on rights "derivative" of, or "derived" from, the debtor's
> typically involves property of the estate. *See In re Quigley*, 676 F.3d at 57
> ("[W]e have treated whether a suit seeks to impose derivative liability as a
> helpful way to assess whether it has the potential to affect the bankruptcy
> *res....*"). By contrast, a bankruptcy court generally has limited authority to
> approve releases of a non-debtor's independent claims. *See Deutsche Bank
> AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network,
> Inc.)*, 416 F.3d 136, 141–43 (2d Cir.2005)… Put another way, "when
> creditors ... have a claim for injury that is particularized as to them, they are
> exclusively entitled to pursue that claim, and the bankruptcy trustee is
> precluded from doing so." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085,
> 1093 (2d Cir.1995).

*In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 88 (2d Cir. 2014).

Furthermore, the court in *Madoff*, which held that the stay applied to claims of
fraudulent transfer against co-conspirators in the Ponzi scheme, also expressly stated that
the stay would not have applied if the plaintiffs brought claims that the conspiring
defendants took particularized actions against plaintiffs, such as making direct
misrepresentations:

Stephen J. Pearson, Esq.
April 3, 2015
Page 4

> As just noted, however, appellants have not alleged that the Picower
> defendants took any such "particularized" actions aimed at BLMIS
> customers. They have not alleged, for instance, that the Picower defendants
> made any misrepresentations to appellants. Appellants respond that their
> respective complaints allege "that the Picower Defendants' wrongful
> conduct ensured the fraud's success *by inducing [them] and other
> customers to invest* (and remain invested) in BLMIS." Fox Br. 25
> (emphasis supplied); *see also* Marshall Br. 31. We do not think that the
> complaints can reasonably be read in this way. Allegations that the Picower
> defendants knowingly reaped the benefits of Madoff's scheme through
> fraudulent withdrawals, and effected such withdrawals through backdating
> trades and recording fictional profits, does not amount to a particularized
> claim that they directly participated in defrauding BLMIS customers by
> inducing them to invest.
>
> ....
>
> We conclude, therefore, that appellants purported conspiracy-based claims
> against the Picower defendants are "derivative" of those asserted by the
> Trustee in his fraudulent conveyance action, and, therefore, the Bankruptcy
> Court was authorized to enjoin those actions.
>
> We note that we affirm without prejudice to appellants seeking leave to
> amend their complaints. There is conceivably some particularized
> conspiracy claim appellants could assert that would not be derivative of
> those asserted by the Trustee. That question, however, is not properly
> before us, and is a question in the first instance for the United States
> District Court for the Southern District of Florida.

*In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 90-94 (2d Cir. 2014).

As discussed, the Cormans' Complaint here does not involve claims for fraudulent transfer, like the claims that were stayed in the *Madoff* case. Rather, the Cormans claim particularized harm that they suffered by Citco's actions, including claims for misrepresentation, as specifically held by the *Madoff* case to fall beyond the automatic bankruptcy stay. There is no basis under either of the cases that you cite in your letter to support your claim that the bankruptcy stay applies to the Cormans' Complaint.

In summary, the assertions in your letter are so utterly frivolous as to be in complete bad faith. Given the clear case law on point, we trust that you will withdraw your totally unsupportable allegation that the Cormans have violated the automatic stay, and absent hearing further from you, we will understand that you have done so. Certainly, consistent with the discussion above, any attempt to interfere with the Corman's action by motion or petition to the bankruptcy court would be frivolous in the extreme and a violation of Fed. R. Bankr. P. 9011, and the Cormans will seek all

Stephen J. Pearson, Esq.
April 3, 2015
Page 5

appropriate relief if any such steps are taken in derogation of the clear controlling law on
this subject.

Sincerely,

Don Howarth

cc: Andrew Glenn, Esq.

## JONES DAY

222 EAST 41ST STREET • NEW YORK, NEW YORK 10017.6702
TELEPHONE: +1.212.326.3939 • FACSIMILE: +1.212.755.7306

Direct Number:  (212) 326-3876
sjpearson@JonesDay.com

April 23, 2015

VIA OVERNIGHT MAIL AND E-MAIL

Howarth & Smith
523 West Sixth Street, Suite 728
Los Angeles, California 90014
Attention: Don Howarth, Esq.

Re:   In re Soundview Elite, LTD., et al.

Dear Mr. Howarth:

We are in receipt of your letter dated April 13, 2015.

There is nothing "bizarre" about our prior letter, which cites to specific language in the Cormans' own pleading that makes clear that the Cormans are asserting mismanagement and wrongful transfer claims that belong to the Debtors' estates. We do not believe that there is any dispute that, as a matter of law, mismanagement and wrongful transfer claims are paradigmatic debtor causes of action. Citing to specific language found in the complaint, our letters have warned the Cormans that they are asserting such debtor causes of action. You have never denied that these types of claim are included in the complaint; instead taking the (erroneous) position that the Cormans are entitled to pursue them directly.

Your April 13 letter makes no attempt whatsoever to respond to the specific points we raised about the wording of the complaint, and instead limits itself to criticizing our prior letter for citing *Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 740 F.3d 81 (2d Cir. 2014); a case which provides, among other things, that the allegations found in a complaint control over formal labels. Despite this binding authority, your letters rely exclusively on the formal labels in the complaint and *ipse dixit* proclamations that the Cormans are only asserting direct causes of action. This silence, coupled with the promise of continued silence in the April 13 letter, is telling.

If we end up in front of Judge Gerber on this issue then we will also stress to him that we have repeatedly provided the Cormans with a clear way forward without having to withdraw their complaint in its entirety, namely to amend the complaint to make it clear that their claims are limited to ones that belong solely to them rather than to the Debtors' estates. The Cormans

ALKHOBAR • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DUBAI
FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID • MEXICO CITY
MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS • PITTSBURGH • RIYADH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

**JONES DAY**

April 23, 2015
Page 2

could have therefore cured their stay violation at any time by simply removing the Debtors' causes of action from the complaint. If the Cormans have no intention to pursue derivative claims belonging to the estates and the complaint does not intend to assert such claims then making that clear in this correspondence and through appropriate amendments should be a simple and uncontentious fix. Against that backdrop, their continued refusal to make that fix (i.e., to eradicate the vagueness and uncertainty in the current language) suggests that your clients do in fact wish to assert such claims.

Put simply, if the Cormans do not intend to pursue derivative claims then why are they so opposed to making that clear both in this correspondence and in the complaint itself? Absent your clients having a change of heart and taking us up on this eminently reasonable and cost effective proposal, the Trustee will have no option but to protect the estates' assets (in the form of the relevant causes of action). That would involve both our clients in unnecessary expense. Specifically, if voluntary amendments are not made by close of business on Wednesday, April 29, then we intend to file a motion to enforce the automatic stay. A draft of such motion is attached so you can consider your client's position carefully. We will reserve our position on seeking a contempt sanction pending your response.

We would also note in closing that the language in your letters is often intemperate and inappropriate, particularly when addressing a Court-appointed fiduciary. Your reliance on insults, rather than reasoning, betrays the weakness in the Cormans' underlying position on these matters. While the Cormans are free to disagree with the Trustee's position, we expect them to do so in a respectful manner. We anticipate that the Judge with conduct of this bankruptcy would take a similar view when he reviews the relevant correspondence.

Very truly yours,

Stephen J. Pearson

cc:     Suzelle Smith, Esq.
        Padraic Glaspy, Esq.
        Jessica L. Rankin, Esq.
        Andrew K. Glenn, Esq.

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Veerle Roovers
Stephen Pearson
Amy Ferber

*Attorneys for the Chapter 11 Trustee*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : | Case No. 13-13098 (REG) |
|  | : |  |
| SOUNDVIEW ELITE LTD., *et al.*, | : | (Jointly Administered) |
|  | : |  |
| Debtors. | : |  |
|  | : |  |

---------------------------------------------------------------X

## MOTION TO ENFORCE THE AUTOMATIC STAY WITH RESPECT TO THE CORMANS AND PASIG LTD.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

FACT SUPPORTING RELIEF REQUESTED .......................................................... 2

ARGUMENT ............................................................................................................. 3

I.     Asserting Claims Belonging To The Debtors Violates The Automatic Stay ................... 3

II.    The California Action Asserts Claims Belonging To The Debtors .................................. 6

       A.     Mismanagement ....................................................................................... 6

       B.     Transfers ................................................................................................... 7

       C.     Holding Claims ......................................................................................... 9

III.   Plaintiffs Willfully Fail To Amend The Complaint To Cure The Stay Violation ........... 11

# TABLE OF AUTHORITIES

**Page**

**Cases**

Broyles v. Cantor Fitzgerald & Co.,
2013 U.S. Dist. LEXIS 54767 (M.D. La. Apr. 17, 2013) ........................................................ 10

Fidelity Mortgage Investors v. Camelia Builders, Inc.,
550 F.2d 47 (2d Cir. 1976) ....................................................................................................... 11

Fox v. Picard (In re Madoff),
848 F. Supp. 2d 469 (S.D.N.Y. 2012), aff'd, 740 F.3d 81 (2d Cir. 2014) ................................. 5

Lehman Bros. Holdings Inc. v. Barclays Capital Inc.,
2014 U.S. Dist. LEXIS 175049 (S.D.N.Y. Dec. 18, 2014) ..................................................... 11

Maritime Asbestosis Legal Clinic v. LTV Steel Co., (In re Chateaugay Corp.),
920 F.2d 183 (2d Cir. 1990) ................................................................................................... 11

Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC),
740 F.3d 81  (2d Cir. 2014) ............................................................................................... 4, 7, 9

Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.,
474 U.S. 494 (U.S. 1986) ........................................................................................................... 4

In re AP Industries, Inc.,
117 B.R. 789 (Bankr. S.D.N.Y. 1990) ................................................................................... 4, 7

In re Chateaugay Corp.,
78 B.R. 713 (S.D.N.Y. 1987) .................................................................................................. 11

In re Commonwealth Oil Refining Co.,
805 F.2d 1175 (5th Cir. Tex. 1986) .......................................................................................... 6

In re Gen. Growth Props.,
426 B.R. 71 (Bankr. S.D.N.Y. 2010) ..................................................................................... 5, 6

In re Ionosphere Clubs, Inc.,
922 F.2d 984 (2d Cir. 1990) ..................................................................................................... 4

In re Margaux City Lights Partners, Ltd.,
2014 Bankr. LEXIS 4841 (Bankr. N.D. Tex. Nov. 24, 2014) ................................................... 5

In re United States Lines, Inc.,
197 F.3d 631 (2d Cir. 1999) ..................................................................................................... 4

Jackson v. Novak (In re Jackson),
593 F.3d 171 (2d Cir. 2010) ..................................................................................................... 4

NYI-524653532v3

## TABLE OF AUTHORITIES

**Page**

Kagan v. St. Vincents Catholic Med. Ctrs. (In re St. Vincents Catholic Med. Ctrs.),
    449 B.R. 209 (S.D.N.Y. 2011), aff'd, 581 Fed. Appx. 41 (2d Cir. N.Y. 2014) ........................ 5

Kagan v. Saint Vincents Catholic Med. Ctrs. (In re Saint Vincents Catholic Med. Ctrs.),
    581 Fed. Appx. 41 (2d Cir. N.Y. 2014) ..................................................................................... 7

Keene Corp. v. Coleman (In re Keene Corp.),
    164 B.R. 844 (Bankr. S.D.N.Y. 1994) ..................................................................................... 7

San Diego County Emples. Ret. Ass'n v. Maounis,
    749 F. Supp. 2d 104 (S.D.N.Y. 2010) ......................................................................... 5, 6, 9-10

SEC v. Brennan,
    230 F.3d 65 (2d Cir. 2000) ...................................................................................................... 4

Stephenson v. Citco Group Ltd.,
    700 F. Supp. 2d 599 (S.D.N.Y. 2010) ..................................................................................... 6

Stephenson v. PricewaterhouseCoopers, LLP,
    482 Fed. Appx. 618 (2d Cir. 2012) .......................................................................................... 9

United States v. Whiting Pools,
    462 U.S. 198 (U.S. 1983) ........................................................................................................ 4

Wynder v. McMahon,
    360 F.3d 73 (2d Cir. 2004) ...................................................................................................... 5

NYI-524653532v3

## TABLE OF AUTHORITIES

**Page**

**Statutes**

11 U.S.C. § 105(a) ............................................................................................................... 1

11 U.S.C. § 362 ........................................................................................................... 1, 2, 4

11 U.S.C. § 541 ............................................................................................................... 2, 4

28 U.S.C. § 157 ..................................................................................................................... 3

28 U.S.C. § 1334 ................................................................................................................... 3

28 U.S.C. § 1408 ................................................................................................................... 3

28 U.S.C. § 1409 ................................................................................................................... 3


**Legislative Materials**

H.R. Rep. No. 95-595 (1977);................................................................................................ 4

 S. Rep. No. 95-989 (1978) ................................................................................................... 4

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

   Jones Day, counsel to Corinne Ball, not individually but solely in her capacity as

chapter 11 trustee (the "**Trustee**") for the above-captioned debtors (the "**Debtors**") respectfully

moves the Court (the "**Motion**") for an order substantially in the form attached hereto as

**Exhibit A**, pursuant to 11 U.S.C. § 105(a) and 362, to enforce the automatic stay with respect to

Roger W. Corman, Julie A. Corman and Pasig, Ltd for knowingly and willfully violating the

automatic stay by filing and prosecuting a complaint asserting claims belonging to the Debtors

against Citco Group Limited and certain of its affiliates (collectively, "**Citco**") and related

parties.   In support of the Motion, the Trustee respectfully represents as follows:

<u>**PRELIMINARY STATEMENT**</u>

   1. The Trustee moves this Court to enforce the automatic stay in connection

with certain claims and causes of action asserted in a Complaint filed by the Cormans and Pasig

against Citco and related parties in the Superior Court of the State of California (L.A. County) on

March 23, 2015 (BC576379) (the "**California Action**").   The California Action asserts (among

others) claims against Citco and related parties for their role relating to the Debtors'

mismanagement and failure.   Specifically, the Complaint includes claims for fraud and

misrepresentation in connection not only with the Cormans' initial investment in the Debtors but

their continued investment in the Debtors, negligence and breach of fiduciary duty, unjust

enrichment, and breach of contract.   While certain of these claims may constitute direct claims

that belong to the Cormans and in respect of which no complaint lies, others are clearly

derivative in nature and may only be asserted by the Trustee for the benefit of all creditors of the

Debtors.

2.      Prior to filing this Motion,  the Trustee repeatedly informed the Cormans that the automatic stay prevents creditors from exercising control over causes of action belonging to the Debtors and that the California Action improperly asserted estate claims.  Accordingly, the Trustee demanded that the Cormans amend the Complaint to excise such claims.  The Cormans, who are represented by sophisticated counsel, flatly refused and proclaimed ownership over all of the actions asserted in their Complaint.   Contrary to the Cormans' position, however,  actions based on Citco's role in the Debtors' mismanagement, recovery from Citco for transfers that the Debtors made to Citco, and generalized harms felt by all investors through a reduction in the Debtors' value constitute derivative claims that, pursuant to section 362(a)(3) and 541(a)(1) of the Bankruptcy Code, may only be asserted by the Trustee.

3.      Accordingly, the Trustee brings this Motion to enforce the automatic stay and, to the extent the Court deems appropriate, for contempt sanctions against the Cormans and Pasig for their continued and willful violation of the stay.

## FACTS SUPPORTING THE RELIEF REQUESTED

4.      On September 24, 2013, the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. By Order dated October 16, 2013 (Docket No. 40), this Court directed that the Chapter 11 Cases be procedurally consolidated and jointly administered.

5.      On October 4, 2013, Pasig filed a notice of appearance in the bankruptcy cases.  (Docket No. 21).   Thereafter, Pasig actively participated in these proceedings through its counsel,  Andrew Glenn of Kasowitz Benson.  (*E.g.*, Docket Nos. 49, 53, 54, 70, 80, 94, 112, 153, 190, 218, 219, 396, 446, 452, 499).

6.      On January 23, 2014, this Court entered a bench decision (Docket No. 156) which, among other things, authorized and directed the U.S. Trustee to appoint a chapter 11

NYI-524653532v3

trustee.  By a notice dated January 31, 2014 (Docket No. 160), the U.S. Trustee appointed

Corinne Ball to serve as the Trustee in these Chapter 11 Cases.  On February 3, 2014, the Court

approved (Docket No. 164) the U.S. Trustee's appointment of Corinne Ball as Trustee.

7.    On March 23, 2015, the Cormans and Pasig filed the California Action

against Citco and related parties in the Superior Court of the State of California (L.A. County) on

March 23, 2015 (BC576379).   A copy of the Complaint in the California Action is attached

hereto as **Exhibit B**.

8.    Through a letter dated March 30, 2015 (**Exhibit C**), counsel for the

Trustee advised counsel in the California Action that the action was commenced in violation of

the automatic stay because it included claims belonging to the estates and, accordingly,

demanded that the Cormans "promptly either withdraw and re-file the above-described action or

otherwise amend the complaint such that the action complies with the automatic stay."  The

parties, thereafter, exchanged letters dated April 3, 2015 (**Exhibit D**), April 9, 2015 (**Exhibit E**),

April 13, 2015 (**Exhibit F**), and April 23, 2015 (**Exhibit G**).  As of the date hereof, the

Complaint in the California Action remains pending in the California Superior Court unaltered

from the originally filed version.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction to consider this motion pursuant

to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue in

this District is proper under 28 U.S.C. §§ 1408 and 1409.

## ARGUMENT

**I.    Asserting Claims Belonging To The Debtors Violates The Automatic Stay**

10.    The filing of the bankruptcy petition operates as an automatic stay of "any

act to obtain possession of property of the estate or of property from the estate or to exercise

control over property of the estate." 11 U.S.C. § 362(a)(3). The automatic stay is "one of the

fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. N.J.

Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (U.S. 1986) (quotations omitted). The scope of the

automatic stay is "broad in order to effectuate its protective purposes on behalf of both debtors

and creditors." *In re AP Industries, Inc.*, 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990) (quoting

H.R. Rep. No. 95-595 at 340 (1977); S. Rep. No. 95-989 at 49 (1978), *reprinted in* 1978

U.S.C.C.A.N. 5987, 6296-97)).

      11.     The automatic stay "centralize[s] all disputes concerning property of the

debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated

proceedings in other arenas." *SEC v. Brennan*, 230 F.3d 65, 70 (2d Cir. 2000); *In re United

States Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999); *In re Ionosphere Clubs, Inc.*, 922 F.2d 984,

989 (2d Cir. 1990).

      12.     Section 541(a) of the Bankruptcy Code provides that the property of the

bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the

commencement of the case." 11 U.S.C. § 541(a)(1). Section "541(a)(1)'s scope is broad."

*United States v. Whiting Pools*, 462 U.S. 198, 205 (U.S. 1983). It includes all kinds of property,

including tangible and intangible property. *Id.* at 205 n. 9. Causes of action of the debtors

constitute property of the bankruptcy estate under section 541(a). *Id.*; *see also Marshall v.

Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 740 F.3d 81, 88 (2d Cir. 2014) (property of the

estate includes causes of action possessed by the debtor); *Jackson v. Novak (In re Jackson)*, 593

F.3d 171, 176 (2d Cir. 2010) (same); *accord* H.R. REP. 595, 95th Cong., 1st Sess. 367 (1977)

("This includes all interests, such as interests in real or personal property, tangible and intangible

property, choses in action, causes of action, rights such as copyrights, trade-marks, patents, and processes, contingent interests and future interests, whether or not transferable by the debtor.").

13. Accordingly, the commencement by an investor of an action that belongs to the debtor, including a derivative cause of action, is an exercise of control over the debtor's property and violates the automatic stay. *See, e.g., Fox v. Picard (In re Madoff)*, 848 F. Supp. 2d 469, 481 (S.D.N.Y. 2012), *aff'd*, 740 F.3d 81 (2d Cir. 2014); *Kagan v. St. Vincents Catholic Med. Ctrs. (In re St. Vincents Catholic Med. Ctrs.)*, 449 B.R. 209, 218-219 (S.D.N.Y. 2011), *aff'd*, 581 Fed. Appx. 41, 43 (2d Cir. N.Y. 2014); *see also In re Gen. Growth Props.*, 426 B.R. 71, 76 (Bankr. S.D.N.Y. 2010) (claim asserted by non-debtor belonged to the estate and thus violated the automatic stay).

14. To determine whether a claim is a derivative claim belonging to the debtor, courts "look past the nominal title of the cause of action pleaded in assessing whether or not a claim is in substance duplicative or derivative of a claim that is the property of the [estate]." *Fox*, 848 F. Supp. 2d at 482, *aff'd*, 740 F.3d 81 (2d Cir. 2014) (cautioning against "too much significance on the labels appellants attach to their complaints"); *In re Margaux City Lights Partners, Ltd.*, 2014 Bankr. LEXIS 4841, 15 (Bankr. N.D. Tex. Nov. 24, 2014) (same); *see also San Diego County Emples. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 126 (S.D.N.Y. 2010) ("In conducting its analysis, the court must not rely on a plaintiff's characterization of his claims in the complaint, but rather, 'must look to all the facts of the complaint and determine for itself whether a direct claim exists.'"); *see generally Wynder v. McMahon*, 360 F.3d 73, 77 (2d Cir. 2004) (noting a plaintiff is not required to plead law or legal theory in a complaint).

15. A creditor cannot frustrate the Bankruptcy Code by pleading around the automatic stay provisions. *See, e.g., Fox*, 848 F. Supp. 2d at 481 ("If potential creditors could

bypass the automatic stay injunction by simply pleading around it, … the bankruptcy laws' core

purpose would be severely undermined, because some potential creditors could 'obtain[]

payment of the[ir] claims in preference to and to the detriment of other creditors' simply by

styling their pleadings as sounding in tort."); *see also In re Commonwealth Oil Refining Co.*, 805

F.2d 1175, 1187 (5th Cir. Tex. 1986) (the automatic stay should not be undermined "by artful

pleading that depends on form rather than substance." (quoting *Penn Terra Ltd. v. Dep't of Envtl.*

*Res., Comm'n of Pa.*, 733 F.2d 267, 275 (3d Cir. 1984)).

## II.    The California Action Asserts Claims Belonging To The Debtors

16.    The California Action asserts certain claims that belong to the Debtors, not

Pasig or the Cormans.  The Complaint includes allegations for claims arising from (i) Citco's

mismanagement of the Debtors, (ii) transfers made by the Debtors to Citco and others, and

(iii) damages associated with concealing claims that caused investors generally not to withdraw their

moneys from the Debtors (so-called "holdings claims").  Claims arising from such allegations

rightfully belong to the Debtors, not Pasig or the Cormans.

### A.    Mismanagement

17.    "A claim for deficient management or administration of a fund is a

paradigmatic derivative claim."  *Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599, 610

(S.D.N.Y. 2010); *see also Maounis*, 749 F. Supp. 2d at 127 (describing gross negligence claims

as "paradigmatic derivative claim[s]" because they were "[e]ssentially claim[s] for

mismanagement") (citing *Albert v. Alex. Brown Mgmt. Servs.*, 2005 Del. Ch. LEXIS 133, 46

(Del. Ch. Aug. 26, 2005) and *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988)); *In*

*re Gen. Growth Props.*, 426 B.R. 71, 76 (Bankr. S.D.N.Y. 2010) (collecting cases; it is settled

law that corporate waste and mismanagement claims are property of the estate).

18.    The Complaint alleges breach of fiduciary duty and negligence actions against Citco claiming that it failed to act in a reasonably careful manner as, inter alia, investment advisor, [investment] manager and administrator.  *See* Complaint, ¶¶ 48 and 125. Various Citco companies performed those roles for the Debtors pursuant to contracts with the Debtors.  Copies of the contracts between the relevant Citco companies and the Debtors are annexed hereto as **Exhibit H**.  The fiduciary duty and negligence counts incorporate all of the preceding allegations of the Complaint, *id.* ¶¶ 44 and 124, and thus include a host of conduct that could only give rise to a derivative claim that belongs to the Debtors' estates.  The Cormans may not exercise control over such claims.

### B.    Transfers

19.    When a debtor makes an improper transfer, it is the debtor that necessarily suffers.  Investors suffer too, but they suffer only the secondary effects of such transfers through the diminution in the value of recoverable assets and the consequent effect that has on the value of the fund they are invested in.  Those secondary effects may give rise to a claim, but that claim, by its very nature, is derivative and, therefore, subject to the automatic stay.  *See*, *e.g.*, *Kagan v. Saint Vincents Catholic Med. Ctrs. (In re Saint Vincents Catholic Med. Ctrs.)*, 581 Fed. Appx. 41, 43 (2d Cir. N.Y. 2014) (holding "claims of fraud, waste, and improper transfers clearly represent[ed] property of the bankruptcy estate"); *Marshall*, 740 F.3d at 94 (holding "appellants' purported tort claims are, in essence, disguised fraudulent transfer actions, which belong exclusively to the Trustee."); *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 849 (Bankr. S.D.N.Y. 1994) (package of "wrongful transfer" claims were property of the estate); *AP Indus.*, 117 B.R at 801 ("not only is the fraudulent conveyance cause of action property of the estate, but clearly any recovery, either in the form of a return of that particular asset to the estate or monetary damages, is also property of the estate").

-7-

20.    Pasig and the Cormans complain of various payments/benefits that Citco wrongfully received, but in every case those payments/benefits were derived from transfers made by the Debtors (or, at minimum, investments funds that included the Debtors). Indeed, the Complaint is completely devoid of any allegation that the Cormans (as opposed to the Debtors or funds including the Debtors) transferred these payments/benefits to Citco.

21.    The Cormans obscure the fact that they are complaining about transfers made by the Debtors rather than transfers made by the Cormans by relying upon imprecise terminology. For instance, when the Complaint refers to the transfer of the management of the funds to Fletcher, it is in reality complaining about the transfer of the management of Debtors (or, at a minimum, the management of a number of funds including the Debtors) to Fletcher. Complaint, ¶ 33. When the Complaint refers to the subordination of rights to the Louisiana Firefighters Pension fund, it is in reality complaining about the subordination of the Debtors' rights (among other similarly affected funds). *Id.*

22.    In each case, the Cormans treat the monies they have invested with the Debtors as the "fund" and elide the existence of the Debtors. Indeed, other allegations in the Complaint reinforce the notion that "Cormans' fund" or "Pasig funds" simply refers to moneys that the Cormans invested with the Debtors (and/or other funds). *See, e.g.,* Complaint, ¶ 41 ("the Cormans were able to recover about $13 million from the total of $73 million Pasig funds which Citco had transferred to Fletcher's management"). Viewed with this color, each of the transfers referenced in the Complaint is in reality seeking relief for transfers or transactions undertaken by the Debtors (or funds including the Debtors).

23.    The Complaint's blurring of the Cormans and the Debtors is neither harmless nor innocent. For instance, the Cormans assert a claim for unjust enrichment against

Citco despite the fact that the only benefit allegedly conferred on Citco was conferred by the Debtors (or funds including the Debtors).  *See* Complaint, ¶¶ 90-94.[1]  The Cormans are thus prosecuting a claim that belongs exclusively to the Debtors.   Further, and as set forth in more detail below, the Debtors provided the Cormans with numerous opportunities to amend or clarify their Complaint, but the Cormans have refused point blank.  If they genuinely had no intention to assert claims belonging to the Debtors, they would have confirmed as such in correspondence and made appropriate edits to their Complaint.   Their refusal to do so means that the Cormans' violation of the stay cannot be innocent.

### C.    Holding Claims

24.    The Debtors have acknowledged throughout that, in some instances, fraud in the inducement to invest in a fund may constitute a direct claim of an investor where there is a particularized injury.[2]  While fraud in the inducement as to an initial investment can be characterized as a direct claim, so-called holding claims—that is, claims based on a decision to remain invested that are generic to all investors in a fund—are derivative in nature, belong to the fund, and are not direct investor claims.  *See Stephenson v. PricewaterhouseCoopers, LLP*, 482 Fed. Appx. 618, 621 (2d Cir. 2012) ("The district court correctly found that Stephenson has standing to bring a claim that PWC's negligence induced him to invest in Greenwich Sentry (the 'inducement' claim), but that he lacks standing to assert a claim based on his decision to remain invested in Greenwich Sentry through December 2008 (the 'holding' claim).");  *Maounis*, 749 F.

---

[1]    Indeed, in the Complaint—apparently to support the claim of unjust enrichment— the Cormans allege all of the elements of a fraudulent transfer:  The complaint alleges the Debtors were insolvent, Complaint at ¶ 38, wrongfully made transfers to Citco for millions of dollars, *id.* at ¶ 29, and the Cormans and other creditors will only receive a fraction of their loss from the Debtors' bankruptcy cases,  *id.* at ¶ 43.  A fraudulent transfer claim, of course, unquestionably belongs to the estates, *see, e.g., Marshall*, 740 F.3d at 94, and the estate and all of its creditors would be prejudiced by a lone investor prosecuting such an action.

[2]    Prior to filing this motion, the Debtors did not demand that the Cormans withdraw their Complaint in its entirety, but rather demanded that the Cormans withdraw their Complaint and re-file it or otherwise amend it so as to comply with the automatic stay.  The Cormans refused.

Supp. 2d at 127 ("[w]hile Plaintiff claims it was individually wronged by Defendants' misrepresentations, '[t]o the extent that plaintiff was deprived of accurate information upon which to base its investment decisions . . . [plaintiff] experienced an injury suffered by all' Fund investors when the Fund collapsed, in proportion to their share of investment." (citing *Smith v. Waste Management Inc.*, 407 F.3d 381, 385 (5th Cir. 2005)); *Broyles v. Cantor Fitzgerald & Co.*, 2013 U.S. Dist. LEXIS 54767, 32-33 (M.D. La. Apr. 17, 2013) (determining that so-called holdings or "holder claims" were derivative in nature).

25.    Despite the fact that generic holding claims are derivative in nature, the Complaint's allegations are not limited to fraud or misrepresentation in connection with the Cormans' initial investment. Instead, Pasig and the Cormans also assert derivative "holding claims." For instance, Paragraphs 34 through 39 of the Complaint address the time period after the Cormans made their initial investment. In essence, these paragraphs allege:

- after the initial investment, Citco learned of red flags that it did not disclose; *see* Complaint, ¶ 36;

- "[t]hese red flags put or should have put Citco on further notice that investments under Fletcher management, <u>including</u> those of the Cormans, were at extreme risk and likely to lose substantial value by virtue of Fletcher's mismanagement," *id.*, ¶37; (emphasis added)

- "the Fletcher managed funds were insolvent and restrictions were imposed on investors, <u>including</u> the Cormans, from withdrawing funds invested or from receiving full value of their investments if they did withdraw funds," *id.*, ¶ 38; (emphasis added) and

- by the time the Cormans' ultimately withdrew their investment, they (like many others) realized a fractional recovery on their investment, (emphasis added) *id.*, ¶ 41.

As can be seen from the Complaint itself, these red flags may have "include[ed] those of the Cormans", but they were in no way unique or confined to the investment of the Cormans; rather these holding claims are derivative claims common to many and which vest in the fund.

### III.    Plaintiffs Willfully Fail To Amend The Complaint To Cure The Stay Violation

26.    A violation of the automatic stay is willful if it is taken with knowledge of the bankruptcy case. *See In re Chateaugay Corp.*, 78 B.R. 713, 726 (S.D.N.Y. 1987). "[C]ontempt proceedings are the proper means of compensation and punishment for willful violations of the automatic stay." *Maritime Asbestosis Legal Clinic v. LTV Steel Co., (In re Chateaugay Corp.)*, 920 F.2d 183, 186-187 (2d Cir. 1990); *see also Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976).  Here, the Cormans are actively participating in the Debtors' bankruptcies, *see* Docket No. 21, the California complaint expressly references the bankruptcy proceedings, Complaint, ¶¶ 43-44, and the Cormans were expressly warned on a number of occasions that they were violating the automatic stay, *see* Exs. C, E and G.  The Cormans' actions are therefore willful.[3]

27.    As set forth above, prior to filing the Motion, counsel for the Trustee and counsel for the Cormans and Pasig exchanged a series of letters discussing the matters contained herein.  Counsel for the Trustee repeatedly asked that the Cormans/Pasig promptly either  to withdraw and re-file the above-described action or otherwise amend the complaint so that the

---

[3]    Whether or not the Cormans and Pasig were subjectively operating in good faith, they may be subject to sanctions in the discretion of this Court. *See Lehman Bros. Holdings Inc. v. Barclays Capital Inc.*, 2014 U.S. Dist. LEXIS 175049, 40 (S.D.N.Y. Dec. 18, 2014).

action would comply with the automatic stay.  *See* Exs. C, E and G.  The Cormans and Pasig, who are represented by sophisticated counsel, refused.  *See* Exs. D and F.

## NOTICE

28.     Notice of this Motion has been provided to: (a) counsel in the California Action; (b) counsel to Pasig in the bankruptcy case; (c) the U.S. Trustee; and (d) all parties requesting notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002. The Trustee submits that no further notice of this Motion should be required.

## PRIOR REQUEST

29.     No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Trustee respectfully requests that this Court: (i) enter an

order substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein;

and (ii) grant such other and further relief to the Trustee as the Court may deem proper.

Respectfully submitted,

Dated: New York, New York
      April [_____], 2015

_____

Veerle Roovers
Stephen Pearson
Amy Ferber
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

*Attorneys for the Chapter 11 Trustee*

-13-

# JONES DAY

222 EAST 41ST STREET • NEW YORK, NEW YORK 10017.6702

TELEPHONE: +1.212.326.3939 • FACSIMILE: +1.212.755.7306

DIRECT NUMBER: 020 7039 5165
SJPEARSON@JONESDAY.COM

May 5, 2015

Howarth & Smith
523 West Sixth Street, Suite 728
Los Angeles, California 90014
Attention: Don Howarth, Esq.

Re:    In re Soundview Elite, LTD., et al.

Dear Mr. Howarth:

I write with reference to your letter dated April 27, 2015.

It is obviously pleasing that you are prepared to confirm in correspondence that you are not seeking to pursue claims which belong to the Debtors. We do not however want any confusion to arise going forward as to whether particular claims are properly characterized as claims belonging to your clients or to the Debtors. Nor equally, do we want any confusion to arise as to which losses are losses suffered by the Debtors (and therefore claimable only by the Debtors) or losses suffered and claimable by the Cormans. There seems to have been some prior confusion on both those topics and so we would like to eradicate that confusion going forward.

The footnote you have suggested does not go far enough, not least because it still begs these two key questions, specifically (a) whether claims which lie within the complaint do actually belong to the Debtors as a matter of law (whatever the footnote might say) and (b) whether any assets or losses of the Debtors are being claimed under one or more of the various heads of claim.

To take one example of issue (a), you plead unjust enrichment but, as we have said in earlier correspondence, we are not aware of any money having passed from the Cormans to Citco which thereby unjustly enriched Citco. As such, if what is being claimed under that head of claim are sums that have passed to Citco from the Debtors or which reflect Citco's dealings with the Debtors then the entire head of claim is objectionable on the basis that it is a derivative claim which cannot be pursued. If, however, we are wrong and sums did pass from the Cormans directly to Citco and the unjust enrichment claim is limited to the recovery of such sums then the head of claim may not be objectionable per se.

EUI-1200074870v1

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • RIYADH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Howarth & Smith

May 5, 2015
Page 2

Another problem which arises here—issue (b) above—is that a head of claim may not be objectionable per se but it would become so in practical terms if it is used as a vehicle to claim the Debtors' losses together with the Cormans' own losses. At that point, Debtor losses would be the subject of a claim not by the Debtors but by an individual investor in the Debtors. As such, the issue we face is not simply crossing out particular claims; we also need clarity as to what amounts are being claimed within the existing heads of claim.

Further to the above, could you please confirm the following:

(1)  No loss or damage is being or will be claimed relating to the mismanagement of the Debtors by Citco or for breaches of any duties owed by Citco to the Debtors (rather than to the Cormans directly).

(2)  No claims are being asserted or will be asserted in respect of the misappropriation, loss, transfer or conveyance of monies or other assets from the Debtors (rather than from the Cormans).  To the extent that cash or other assets were misappropriated by Citco from the Debtors then claims in that respect lie with the Debtors and not with the Cormans.

(3)  As far as  the quantum of the claims are concerned, the Cormans are only seeking (and will only ever seek) to recover losses they have personally suffered and no losses will be claimed which represent, include or reflect losses suffered by the Debtors or other investors in the Debtors.

You have indicated that Debtor claims are not being asserted. It should therefore follow that you are not seeking to recover Debtor losses. As such, we are hopeful that these additional confirmations will prove uncontentious.

I look forward to hearing from you.  If, as I hope, the additional confirmations listed above can be provided then please let us have your proposal as to how they should be recorded in the complaint or otherwise.

Very truly yours,

Stephen J. Pearson

cc:    Suzelle Smith, Esq.
       Padraic Glaspy, Esq.
       Jessica L. Rankin, Esq.
       Andrew K. Glenn, Esq.

EUI-1200074870v1

HOWARTH & SMITH
ATTORNEYS AT LAW
523 WEST SIXTH STREET
SUITE 728
LOS ANGELES, CALIFORNIA 90014
TELEPHONE: (213) 955-9400
FAX: (213) 622-0791
www.howarth-smith.com

June 8, 2015

DON HOWARTH

DHowarth@howarth-smith.com
Direct Line: (213) 955-9400 Ext. 117

**VIA EMAIL AND U.S. MAIL**

Stephen J. Pearson, Esq.
Jones Day
222 East 41st Street
New York, NY 10017
sjpearson@jonesday.com

    Re:   *In re Soundview Elite, Ltd., et al.*

Dear Mr. Pearson:

    Pursuant to our recent discussions, this letter will outline our proposal for avoiding a dispute by Soundview over the complaint filed by Roger Corman, Julie Corman, and Pasig, Ltd. (collectively, the "Cormans") in Los Angeles Superior Court against Citco.

    Since we agree that the Cormans are not prevented by the bankruptcy stay from pursuing their own independent claims against Citco, we propose that by this letter we provide you with security that we are not pursuing anything but claims belonging to the Cormans in the recently filed action. Therefore, we are prepared to confirm that the Cormans are only pursuing their own claims against Citco in the California litigation (those that arise from Citco's violation of its duties and responsibilities to the Cormans and to Pasig) and are not pursuing any claims belonging to the Soundview debtors.

    We believe that these representations should satisfy your concern that the Cormans are advancing claims that exclusively belong to the Soundview Debtors. Therefore, if this is acceptable to you, we are prepared to make the above representations and you will then need to agree that the Trustee will not move the Bankruptcy Court for an order staying the Cormans' action. As a part of this understanding, the Cormans will also agree to add you to our service list for our filings in Los Angeles.

Stephen J. Pearson, Esq.
June 8, 2015
Page 2

Please advise at your earliest convenience whether the above proposal is acceptable to you or if you have a different proposal that you would like us to consider.

Sincerely,

Don Howarth

DH:am

cc:    Andrew Glenn, Esq.
       Suzelle M. Smith, Esq.

# JONES DAY

222 EAST 41ST STREET • NEW YORK, NEW YORK 10017.6702
TELEPHONE: +1.212.326.3939 • FACSIMILE: +1.212.755.7306

Direct Number:  (212) 326-3876
sjpearson@JonesDay.com

June 9, 2015

VIA OVERNIGHT MAIL AND E-MAIL

Howarth & Smith
523 West Sixth Street, Suite 728
Los Angeles, California 90014
Attention:  Don Howarth, Esq.

        Re:    In re Soundview Elite, LTD., et al.

Dear Mr. Howarth:

       Thank you for your letter of yesterday's date (June 8).

       Unfortunately, it does not take us very far.  We had already established in prior correspondence, and indeed during our recent telephone conversation, that your clients were not intending to assert claims belonging to the Debtors.  The problem is/was that we appear to have a different understanding of what particular claims are properly characterized as claims belonging to your clients and to the Debtors.  I explained in my previous letter of May 5, 2015 why we believed that this was a serious issue which needed to be resolved now and why that led us to the position that various confirmations would have to be given above and beyond the bare assertion that the Cormans did not believe that they were pursuing claims belonging to the Debtors.

       If anything your latest letter takes us backwards.  In our letter of May 5, 2015 we had tried to resolve the problem in an amicable way and backed that up by engaging constructively on our subsequent call.  During that call you indicated that you did not believe that the assurances sought in our May 5 letter were unreasonable but would consider the position with Andrew Glenn and see whether any minor language edits were necessary before the assurances were given.  It now transpires that you are not prepared to give the assurances sought and have simply reverted back to a position whereby you are maintaining that the claims set out in the complaint do not assert claims belonging to the Debtors.  As I have indicated above (and on numerous prior occasions), we disagree based on the language of the complaint and general principles.  That is why we convened a call to try to see whether a solution could be found.

       If, as you maintain, the Cormans have no intention of asserting claims belonging to the Debtors then why are they not prepared to give the confirmation set out in our letter of May 5, 2015?  These are all short and reasonable confirmations which would remove the current uncertainty for the benefit of everyone and without the need to trouble the Court.  In your most

EUI-1200113902v1

**JONES DAY**

June 9, 2015
Page 2

recent letter you asked whether we had a different proposal we would wish you to consider. The answer is we do and it was set out in our letter of May 5, 2015. As such, we do not understand why you have not responded to that specific proposal and instead reverted back to where we were before our call. As we need to write to the Court this week with an update as to where matters stand with this particular issue could you please come back to us later today with the confirmations we seek or, alternatively, explain why your clients are not prepared to provide them.

I look forward to hearing from you.

Very truly yours,

Stephen J. Pearson

cc:    Suzelle Smith, Esq.
       Padraic Glaspy, Esq.
       Jessica L. Rankin, Esq.
       Andrew K. Glenn, Esq.

EUI-1200113902v1

Exhibit 6

California Court's Case Management Order and Ruling dated November 4, 2015



**Case Number:** BC576379
ROGER W CORMAN ET AL VS CITCO GROUP LIMITED ET AL

**Filing Date:** 03/23/2015
**Case Type:** Other Intentional Tort-notPI/WD/PD (General Jurisdiction)

11/4/2015
Conference-Case Management

# CASE MANAGEMENT ORDER

The priority in trial setting motion having been granted pursuant to CCP §36(a), the case is set as a jury trial as a jury fee deposit was made by Plaintiff. The following dates are set and case management orders are made in this matter:

| Note 1 | Select Mediator | 11/13/2015 |
|--------|-----------------|------------|
| Note 1 | Complete Mediation | 1/7/2016 |
| Note 1 | Post-Mediation Hearing | 1/8/2016    8:30 a.m. |
| Note 4 | In Person Meet and Confer Deadline Re Trial Documents | 01/8/2016 |
| Note 5 | File and Serve Motions In Limine (Opposition and Reply Per Code for Noticed Motions) | 01/11/2016 |
| Note 3 | Discovery Deadline including hearing on motions related to discovery | 01/25/2016 |
| Note 4 | Exchange Final Lists and Documents As Ordered Below and File with Dept. 46 and Exhibit Exclusion Deadline | 02/05/2016 |
| Note 6 | Final Status Conference and Presentation of "trial readiness binder(s)" | 02/09/2016 8:30 a.m. |
| Notes 2 & 7 | Jury Trial and Delivery of Evidence Books, Deposition Transcripts | 02/24/2016 9:30 a.m. |

**Note 1:** The parties agree to mediation. The court orders the parties to select a mutually agreeable mediator by 11/13/2016, complete mediation by 1/07/2016 and then return to court for post-mediation conference on 1/08/2016 at 8:30 a.m. in Dept. 46.

**Note 2:** Jury fees were posted by Plaintiff on 04/01/2015. The parties have not informed the court in the CMC statements of any conflicting trial dates. Both parties estimate a 10-day jury trial. Jury Trial is set pursuant to CCP section 36(a) for 02/24/2016 at 9:30 a.m. in Dept. 46.

**Note 3:** Subject to CCP §2024.010 (motions) and CCP §2034.010 (expert depositions and motions relating thereto) or other statutory exceptions, deadline for completion of all written discovery, depositions, and motion practice shall be 01/25/2016.

Note 4: The parties are ordered to meet and confer *in person* not later than 01/08/2016 to discuss and come to agreement regarding final preparation of documents for the Final Status Conference. The parties should discuss, among other things, (1) identity of motions in limine to be brought by each party; (2) identity of witnesses to place on joint witness list, (3) identity of exhibits to be listed on joint exhibit list; (4) the method and timeline for actual exchange of trial exhibits; (5) for jury trials, the identity of any CACI, BAJI, or Special Jury Instructions to be filed with the court; (6) division of labor and timeline regarding preparation of actual text for the jury instructions (if applicable) and FSC book to be submitted to the court for documentation of compliance with this CMC order.

By 02/05/2016, the parties are to exchange final trial witness lists, exhibit lists, proposed jury instructions (if applicable) and special verdict forms (if applicable) in final form (not merely a reference to a CACI or BAJI instruction or verdict forms) and shall have met and conferred and prepared joint witness and exhibit lists and a trial book with actual exhibits – impeachment and rebuttal exhibits and witnesses excepted – that also includes motions in limine and jury instructions and special verdict forms. These documents shall be placed into a trial readiness binder to present to the court on the date of the FSC.

After 02/05/2016, any undisclosed exhibits (ones that have not been identified and a copy of the actual exhibit exchanged) or unidentified witnesses shall be excluded from the trial absent a finding by the trial court of surprise or justifiable excuse and absence of prejudice to the other party even if the case is continued.

Note 5: Motions in Limine are to be served by mail by 01/11/2016 and are to be heard at the FSC. Opposition and reply shall be in compliance with CCP §1005.

Note 6: Final Status Conference is set for 02/09/2016 at 8:30 a.m. in Dept. 46. At the final status conference the court will determine trial readiness and will receive the trial readiness binder(s) and inquire of the parties as to completion of (1) Joint Witness List; (2) Joint Exhibit List; (3) Exchange of Actual Trial Exhibits excluding rebuttal or impeachment exhibits; (4) For jury trials, Jury Instructions and Special Verdict Form; (5) Motions in Limine: (6) Completion of Trial Books.  If the parties have not complied, further FSC dates will be set.

The parties are to prepare a "trial readiness binder" with the required documents and bring a copy to the FSC for the court. Copies of the trial book shall be provided to each party or attorney.

The trial readiness binder must include: (1) Exhibit List; (2) LACIV – 216 relating to each exhibit which shall include a statement as to whether the parties stipulate to authenticity, foundation, and/or admission of the exhibit; (3) Actual Exhibits pre-marked with exhibit and page numbers; (3) Witness List which includes a brief description of the testimony expected from each witness and an estimate of time for direct and cross examination; (4) Motions in Limine and any opposition or reply; (5) for jury trials, Actual Jury instructions subdivided as stated above; (6) for jury trials, Special Verdict Forms, and

in jury trials, (7) for jury trials, A brief statement of the case for the jury to be read during jury selection.

Proposed jury instructions presented in the trial readiness binder (if applicable) shall be in the actual form that is to be read to the jury, not merely a reference to a CACI or BAJI instruction. The jury instructions (if applicable) shall be divided into three separate groups: (A) Agreed upon Instructions; (B) Those proposed by Plaintiff but as to which Defendant(s) object; and (C) Those proposed by Defendant(s) and objected to by Plaintiff. The parties shall submit a statement in support of any objection or against any objection to a proposed instruction supported by points and authorities.

The court will retain the trial readiness binder as evidence of mutual exchange and to base later exclusion orders.

<u>Note 7:</u> The original deposition transcripts and the original and four (4) copies of the "Evidence Binders" are to be delivered to the court on the date of trial.

The parties are to place originals of all trial exhibits into a 3-ring binder or binders as needed for the court with a copy of a joint exhibit list as a table of contents and with each trial exhibit corresponding to the joint exhibit list. Exhibits shall be separated by a tab corresponding to the exhibit number. A multipage exhibit should have each page numbered for reference during testimony. The 3-ring binders shall also contain a copy of the joint witness list with a brief description of the testimony expected from each witness and an estimate of time for direct and cross examination.

Failure to comply with this order may subject a party or attorney to sanctions, including striking pleadings, or precluding the introduction of evidence or contesting issues at trial.

IT IS SO ORDERED:

NOV 0 4 2015

Frederick C. Shaller, Judge

1    ५१

**Case Number:** BC576379
ROGER W CORMAN ET AL VS CITCO GROUP LIMITED ET AL

**FILED**
LOS ANGELES SUPERIOR COURT

NOV 0 4 2015

SHERRI R. CARTER, EXECUTIVE OFFICER/CLERK
BY ROSEMARIE B. AQUINO, DEPUTY

**Filing Date:** 03/23/2015
**Case Type:** Other Intentional Tort-notPI/WD/PD (General Jurisdiction)

11/04/2015

## RULING ON SUBMITTED MATTERS

In consideration of the specially appearing defendants' and plaintiffs' oral arguments of 11/3/2015, the court took the matter under submission to reconsider the tentative ruling. The court now issues its final ruling in this matter. Due to the time sensitivity of the matter in light of the issues raised in the CCP §36(a) motion, the court gives the parties courtesy notice by e-mail.

Specially Appearing Defendants, Citco Group Limited; Citco Group (Monaco) SAM; Citco Global Custody (N.A.) N.V.; Tortrust Corporation Company Limited; Citco Trustees S.A.; Citco B.V.I. Limited; Citco Bank & Trust Company Limited; Citco Banking Corporation N.V.; Securitas Management Services Corp.; Citco Fund Services (Cayman Islands) Ltd. and Citco Suisse S.A. Motions to Quash ("MTQ") for Lack of Personal Jurisdiction are DENIED. See discussion below.

Specially Appearing Defendant, Ermanno Unternaehrer's MTQ for Lack of Personal Jurisdiction is DENIED. See discussion below.

Specially Appearing Defendant, Christophel Smeets MTQ for Lack of Personal Jurisdiction is DENIED.

Plaintiffs, Roger Corman; Julie A. Corman and Pasig, Ltd. Motions for Preference in Trial Setting is GRANTED. See discussion.

The court has issued a separate Case Management Order, which is signed and filed this date. The matter is set for JURY TRIAL on 2/24/2016 at 9:30 am in Department 46, with other dates specified in the separate Case Management Order.

## DISCUSSION

### MOTION #1 — CITCO Entities Motion To Quash

Relative to the motions made by Citco Group Limited, a Netherlands company; Citco Group (Monaco) SAM, a Monaco company, Citco Global Custody (N.A.) N.V., a Curacao company, TORTRUST Corporation Company Limited, a British Virgin Islands company, Citco Trustees, S.A., a Switzerland company; Citco Bank & Trust Company Limited, a Cayman

#8

Islands company, Citco Banking Corporation N.V., a Curacao company, Securitas Management Services Corp, a British Virgin Island company, Citco Funds Services (Cayman Islands) Ltd, a Cayman Islands company; Citco Bank & Trust Company, Ltd.; Citco B.V.I Limited, and Citco Suisse, S.A. (referred to herein together as "Citco entities"), the motion to quash pursuant to CCP §418.10(a)(1) on the basis of lack of personal jurisdiction is DENIED.

There is ample evidence that these Citco entities are all interrelated corporations and unified business entities that are subject to ownership, direction, and control by Citco Group Limited. This was the representation to Mr. Corman by Mr. Unternaeher as reflected in paragraph 7 of his declaration filed on 09/21/2015 and is supported by substantial corroborating evidence. Defendant Unternaeher told Mr. Kimmle substantially the same information conveyed to Corman as reflected in paragraphs 24 – 26 of the Kimmle declaration filed on 9/21/2015. The corporate organization chart, Exhibit 16 to the Howarth declaration also filed on 9/21/2015. Further, the marketing information provided in the other Howarth attachments to his declaration document that the company is centrally operated and controlled by Citco Group Limited. The declaration of Paul M. Butler is to the same effect (see paragraphs 3 & 5) and further documents that the operations are operated by Christopher Smeets and his management team at Citco Group Limited.

Further evidence of the operations of Citco corroborating the unified operation and control of the various Citco entities is shown by the documents of which the court has taken judicial notice. In this regard, Plaintiffs' Request for Judicial Notice is:

- GRANTED as to Exhibit "1" (i.e., Trustee's ("TE's") Report and Disclosure Statement filed 11/25/13 in In re: Fletcher International, Ltd., U.S. Bankruptcy Court for the Southern District of New York, Case No. 12-12796-reg (Nov. 25, 2013) [Dkt. No. 327]);
- GRANTED as to Exhibit "2" (i.e., Bankruptcy Form B1—Voluntary Petition filed 6/29/12 in In re: Fletcher International, Ltd., U.S. Bankruptcy Court for the Southern District of New York, Case No. 12-12796-reg (Nov. 25, 2013) [Dkt. No. 1]),and;
- GRANTED as to Exhibit "3" (i.e., Declaration of Dyanne E. Feinberg in Support of D, the Citco Group Limited's MSJ ["Feinberg Decl."] and Exhibit "1" to Feinberg Decl., filed 8/11/08 in Pension Committee of the University of Montreal Pension Plan v. CITCO Fund Services N.V., U.S. District Court for the Southern District of New York, Case No. 1:05-cv-09016 [Dkt. No. 177, 177-2]).

Based upon this evidence the court concludes that the Citco entities should all be considered as being in reality one large entity and further, the court concludes, that when Mr. Unternaeher came to California to reach a management agreement relative to the Cormans' funds that he came on behalf of the Citco entities and Christophel Smeets. Although Defendants argue that Mr. Unternaeher was not a senior controlling member of the Executive Committee in charge of the Citco entities operations, the prior recorded testimony of Christophel Smeets at pages 22:17 to page 23:17, attached to the request for judicial notice, Exhibit 3, filed on 09/21/2015, clearly indicates that Unternaeher was a

member of the Executive Committed controlling all investments and management of portfolios back to the onset of the relationship between Plaintiffs and Citco in the mid to late 1990's.

Given this background then, and the testimony of the Cormans as corroborated by other witnesses, it is clear to the court that Unternaeher, on behalf of himself, Smeets, and the Citco entities purposefully availed himself of jurisdiction in California in order to obtain agreements to manage the Corman's significant property interests.

Plaintiff Roger attests that:

"9. In 1996 Unternaehrer initiated and set up a meeting, through Walle, with myself, my wife, Untemaehrer and Walle in Los Angeles, California.

10. Unternaehrer told us, and I understood, that he was a representative of Citco and an executive at Citco and was meeting with us on behalf of the entire Citco group. He said that he was living and working in La Jolla, California at the time and that he was Executive Director and Director of Financial Services of the Citco Group Limited, which controlled all other Citco entities. He told us that he worked with Christopher Smeets, the CEO of Citco Group Limited. Walle told us that he knew Unternaehrer and vouched for him and his role at Citco. At no point did Walle or Unternaehrer tell us that they were acting only in some limited capacity for specific Citco entities.

11. At this meeting, Unternaehrer told us that he knew we were happy with our Soros investments, but that it would be better for us if we invested some of our Soros money with Citco instead to diversify our investments. Unternaehrer told us that Citco would manage and control our investments, making safe, wise, and profitable decision. They told us that Citco owned banks, had tax people, and subsidiary Citco entities all over the world, and that he and Citco would use them as necessary to handle our monies.

12. At this meeting and at several subsequent meetings in California, sometimes with Unternaehrer and Walle and sometimes with Unternaehrer alone, they told us that we could rely on Citco's management of our money because the Citco group of companies was a unified organization controlled by Citco Group Limited.

13. Unternaehrer told us that he spoke on behalf of Citco Group Limited, the Citco parent company, as well as its subsidiaries and other entities, and for Smeets. At one of the initial meetings in California, Unternaehrer gave us a business card reflecting his position as Executive Director and Director of Financial Services of the Citco Group Limited. A true and correct copy of this business card is attached hereto as Exhibit 1.

14. In 1996, at our meeting in California, Unternaehrer and Walle told us that Citco was the largest off-shore money manager in the world and that it had affiliated entities all over the world that it would use to handle our investments, which would act together as necessary in our best interests in handling our money. They said that Citco would use whatever subsidiary or unit of Citco that was necessary or appropriate for a specific task, but that the

3

parent company, Citco Group Limited, controlled and directed all of them and that Untemaehrer in particular would deal directly with us. They told us that we could trust Citco to use its appropriate entities to handle our investments and not to worry about which particular Citco entity was handling any part of the management of the investments because they were all part of Citco. They said that the entities might have different names, but that they were all used as necessary to serve Citco's clients.

15. Unternaehrer told us that Citco would be an investment partner with us, and that we could personally count on him and other Citco executives at the highest level, including Smeets, the CEO of the parent Citco company, to make decisions and handle our money in our best financial interest. He said that we could trust and rely on Citco regarding the investing, managing, and administering of our investments alongside their own and that Citco would look after our investments for us and handle them in our best interests so that we could focus on our film work.

16. Unternaehrer told us he and Smeets were partners, that Smeets was the "Soros" of Citco, and that Smeets controlled all the Citco entities which would be working for us. He told us he spoke on behalf of Smeets and that Smeets would personally be involved with the management of our investments and that Citco would be in a fiduciary relationship with us, one of utter trust.

17. Unternaehrer told us that Citco would keep its own moneys invested side by side with our moneys so that we would be fully protected by Citco.

18. Unternaehrer and Walle told us that the way Citco would be compensated was from returns on the investments and fees that would be deducted by Citco from the accounts they would set up with Citco banks. They told us that the fact that Citco had so any offices and people working on their investments all over the world would not increase the cost to us, because Citco was all one entity which would share the fees earned from our investments. Several Citco entities earned fees for their work for us, including Citco Global Custody (N.A) N.V., Citco B.V.I. Limited, Tortrust Corporation Company Limited, Securitas Management Services Corp, Citco Bank & Trust Company Limited, Citco Bank BVI Limited, Citco Fund Services (Cayman Islands) Ltd., Citco Trustees S.A., and Citco Suisse S.A.

19. Both Unternaehrer and Walle made several visits to California, at which they made the statements discussed above. They had dinner at our home several times and discussed our investments. Every one of these meetings was business related.

20. We met with Unternaehrer in Los Angeles, California on at least the following occasions, which were all business-related.

• In 1996 we met with Unternaehrer with Walle.
• On November 5, 1997, we met with Unternaehrer and had dinner with him.
• Sometime in May 1998 we met with Unternaehrer.
• On September 29, 1999, we met with Unternaehrer.
• In December 2001 we met with Unternaehrer and he attended a Christmas party at our home, at which he met our family. We invited him to the

Christmas party because of our business relationship, and we discussed business matters at the party.

• On November 22, 2004, we met with Unternaehrer and had lunch together.

• Sometime in November 2007, we met with Unternaehrer. Walle was also present for some of these meetings.

21. ...In addition to these meetings, Unternaehrer and Walle called and emailed us dozens of times regarding our investments. The calls were made to our home or work phones in Los Angeles, California. Substantially all of the reporting, decisions, and input from us in relation to our investments with Citco was done in California in person or by telephone.

22. We accepted and relied upon Citco's advice and representations and agreed on that basis to move substantial money from Soros to the management and control of Citco. In 1996-97, Mr. Untemaehrer and Mr. Walle directly arranged for the transfer most of our Soros-managed investments to Citco...

23. Our investments with Citco were initially held in two offshore entities which we owned and controlled, Nebula Ltd. and Emerald City Ltd.

24. In 2002, Citco recommended that we set up Pasig Ltd. ("Pasig") through Citco in order to streamline all of our investments under Citco's control. Citco prepared the corporate documents for this entity and set it up for Citco to continue to handle our investments. Citco took care of all the arrangements and set up Pasig using a Citco address in the British Virgin Islands as Pasig's address. Once Pasig was set up, Citco fully managed and handled all administrative functions for Pasig.

25. By 2008, we had approximately $73 million invested with Citco..." (P Roger Declaration, ¶¶ 9-25).

*The court finds that California has personal jurisdiction over the Citco Entities, Unternaeher, and Smeets relative to the claims in this action based upon the doctrine of Specific Jurisdiction*

"Personal jurisdiction is not determined by the nature of the action, but by the legal existence of the party and either its presence in the state or other conduct permitting the court to exercise jurisdiction over the party." Greener v. Workers' Comp. Appeals Bd. (1993) 6 C.4th 1028, 1034-1035.

"Although defendant is the moving party, the burden of proof is on the *plaintiff*: '(W)hen jurisdiction is challenged by a nonresident defendant, the burden of proof is upon the plaintiff to demonstrate that "minimum contacts" exist between defendant and the forum state to justify imposition of personal jurisdiction.' [Mihlon v. Sup.Ct. (Murkey) (1985) 169 CA3d 703, 710; Floveyor Int'l, Ltd. v. Sup.Ct. (Shick Tube-Veyor Corp.) (1997) 59 CA4th 789, 793; Elkman v. National States Ins. Co. (2009) 173 CA4th 1305, 1313]." Weil & Brown, et al., CAL. PRAC.GUIDE: CIV. PRO. BEFORE TRIAL (The Rutter Group 2015) ¶ 3:384 (emphasis theirs). "The burden is on the plaintiff to demonstrate by a *preponderance* of the evidence that all jurisdictional criteria are met. [Ziller Electronics Lab GmbH v. Sup.Ct. (Grosh Scenic Studios) (1988) 206 CA3d 1222, 1232]." Id. at ¶ 3:385 (emphasis theirs).

"When there is conflicting evidence, the trial court's factual determinations are not disturbed on appeal if supported by substantial evidence. (Felix v. Bomoro Kommanditgesellschaft (1987) 196 C.A.3d 106, 111). When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record. (Great-West Life Assurance Co. v. Guarantee Co. of North America (1988) 205 C.A.3d 199, 204)." Vons Companies, Inc. v. Seabest Foods, Inc. (1996) 14 C.4th 434, 449.

"Personal jurisdiction may be either general or specific." Id. at 445.

➤ **Plaintiff has not shown general jurisdiction**

"General jurisdiction permits a court to exercise personal jurisdiction over a nonresident defendant when said defendant's activities are substantial or continuous and systematic, even if the cause of action is unrelated to the defendant's forum-related activities. (Helicopteros Nacionales de Colombia v. Hall [[1984]] 466 U.S. [408,] at p. 414; see also Vons, supra, 14 C.4th at pp. 445–446; Serafini [v. Superior Court (1998) 68 C.A.4th [70,] at pp. 78–80, quoting and relying upon Perkins v. Benguet Mining Co. (1952) 342 U.S. 437; Mansour v. Superior Court (1995) 38 C.A.4th 1750, 1758.). 'Such a defendant's contacts with the forum are so wide-ranging that they take the place of physical presence in the forum as a basis for jurisdiction.' (Vons, at p. 446.)." Paneno v. Centres For Academic Programmes Abroad Ltd. (2004) 118 C.A.4th 1447, 1455.

Plaintiff cannot establish personal jurisdiction on the basis of doctrines of agency or alter ego: Such claim that general jurisdiction "may be established under the doctrines of agency or alter ego" was rejected by the U.S. Supreme Court in Daimler AG v. Bauman (2014) 134 S. Ct. 746, 759-60 (i.e., "[t]he Ninth Circuit's agency theory thus appears to subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or affiliate, an outcome that would sweep beyond even the 'sprawling view of general jurisdiction' we rejected in Goodyear [Dunlop Tires Operations, S.A. v. Brown] 564 U.S., at ––––, 131 S.Ct., at 2856"); see also, Young v. Daimler (2014) 228 C.A.4th 855, 867 (i.e., "the specifics of the agency test applied are irrelevant to the Bauman II holding, as the result would be the same under *any* theory of agency").

Similarly Plaintiffs' reliance on the representative services doctrine is without merit as this doctrine is merely "a species of agency." Id. at 866.

Finally, Plaintiffs' argument that this court has general jurisdiction over each of Ds because of two in-state subsidiaries of Citco Group fails under Daimler.

➤ **Plaintiff, however, has shown a basis for personal jurisdiction on the basis of specific jurisdiction**

"'When determining whether specific jurisdiction exists, courts consider the "'relationship among the defendant, the forum, and the litigation.'" (Helicopteros Nacionales de

6

Colombia[, *supra*,] 466 U.S. [at] 414, quoting Shaffer v. Heitner (1977) 433 U.S. 186, 204.) A court may exercise specific jurisdiction over a nonresident defendant only if: (1) "the defendant has purposefully availed himself or herself of forum benefits' (Vons, *supra*, 14 C.4th at p. 446); (2) "the 'controversy is related to or "arises out of" [the] defendant's contacts with the forum'" (*ibid.*, quoting Helicopteros, *supra*, 466 U.S. at p. 414); and (3) "'the assertion of personal jurisdiction would comport with "fair play and substantial justice"'" (Vons, *supra*, 14 C.4th at p. 447, quoting Burger King Corp. v. Rudzewicz (1985) 471 U.S. 462, 472–473.)" (Pavlovich[ v. Superior Court (2002)] 29 C.4th [262,] at p. 269.)." Snowney v. Harrah's Entm't, Inc. (2005) 35 C. 4th 1054, 1062.

"'"The purposeful availment inquiry ... focuses on the defendant's intentionality. [Citation.] This prong is only satisfied when the defendant purposefully and voluntarily directs [its] activities toward the forum so that [it] should expect, by virtue of the benefit [it] receives, to be subject to the court's jurisdiction based on" [its] contacts with the forum.' (Pavlovich, *supra*, 29 C.4th at p. 269, quoting U.S. v. Swiss American Bank, Ltd. (1st Cir.2001) 274 F.3d 610, 623–624.) Thus, purposeful availment occurs where a nonresident defendant "'purposefully direct[s]" [its] activities at residents of the forum' (Burger King, *supra*, 471 U.S. at p. 472), "'purposefully derive[s] benefit" from' its activities in the forum (*id.* at p. 473), 'create[s] a "substantial connection" with the forum' (*id.* at p. 475), "'deliberately" has engaged in significant activities within' the forum (*id.* at pp. 475–476), or 'has created "continuing obligations" between [itself] and residents of the forum' (*id.* at p. 476). By limiting the scope of a forum's jurisdiction in this manner, the "'purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts....' (*id.* at p. 475.) Instead, the defendant will only be subject to personal jurisdiction if "'it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the state.'" (Pavlovich, at p. 269, quoting World–Wide Volkswagen [Corp. v. Woodson (1980)] 444 U.S. [286,] at p. 297)." Snowney v. Harrah's Entm't, Inc. (2005) 35 C. 4th 1054, 1062-63.

The court finds that Defendants' efforts to distinguish the Anglo Irish Bank case are unavailing. The case is very compelling to this court as a basis for determining that all defendants should be subject to California jurisdiction.

In Anglo Irish Bank Corp., PLC v. Superior Court (2008) 165 C.A.4th 969, Ps Imelda Brar, individually and as a TE of the Satnam Trust, and Kal Brar sued (1) an Irish bank; (2) two of its subsidiaries—a bank and a trust company based in the Isle of Man and (3) two officers of the Defendant corporations, (a) Connolly, the director of the trust company and director of the Isle of Man Bank (an Irish citizen and resident) and Davies, the managing director of the trust company and director of the Isle of Man bank (an English citizen and resident) for intentional misrepresentation, fraudulent concealment, securities fraud, breach of fiduciary duty, negligent misrepresentation, and an accounting.

In that case, Ps were CA residents and co-trustees of the SatnamTrust. They met with investment advisors in late 1999 who encouraged them to invest in "with profit

7

bonds" and to leverage their investments. Ps caused more than $4 million from the Satnam Trust to be transferred to the Kivrar Trust, which was a trust organized under the laws of the Isle of Man, for the purpose of investing abroad in "with profit bonds."

D entities sought investors who would borrow funds from the Isle of Man bank to purchase investments known as "with profit bonds" to be held in trust by the trust company. The Irish bank would review and approve the investors' applications for credit. D Davies visited CA to meet with potential investors. At the request of the Irish bank, D Connolly accompanied D Davies on the visit. The primary purpose of their meetings with potential investors was to determine whether the potential investors were suitable investors. Part of their responsibility in that connection was to satisfy Isle of Man's "know your customer" anti-money laundering requirements by determining that the funds were from legitimate sources.

Davies and Connolly jointly met with 10 or 11 potential clients in California in March 2000, 9 or 10 of whom decided to invest through the trust company. Their business cards handed out at the meetings bore a logo for "Anglo Irish Bank." Davies's card identified him as managing director of the trust company. Connolly's card identified him as "Head of Offshore Trust Operations" for the Irish bank.

In March 2000, Ps, Davis, Connolly, Ps' attorney and two investment advisors met at Ps' CA home to discuss the potential leveraging of Ps' investments. After the meeting, the leveraging was approved and put in motion. The trust company was appointed trustee of the Kivrar Trust in June 2000, a new trust called Kivrar Trust II was created, and Kivrar Trust II borrowed funds in order to purchase additional "with profit bonds." Davies subsequently visited CA two more times to attend conferences and solicit further business for the bank. Ps' investments eventually suffered substantial losses.

Ds petitioned for a writ of mandate after the trial court denied their motion to quash service of the summons; said writ was denied by the 2nd District, Division 3 Court of Appeal. The Court of Appeal determined, with respect to the issue of "purposeful availment," as follows:

"The Irish bank, the Isle of Man bank, and the trust company worked closely together in connection with the leveraged investments. The Irish bank reviewed and approved credit applications on behalf of the Isle of Man bank, which made the loans, and the trust company served as trustee of the trusts holding the "with profit bonds" that were purchased using the loan proceeds. Davies, Connolly, and McGee visited California for the purpose of meeting with suitable investors who would be willing to invest in leveraged 'with profit bonds' and whose investment funds were from legitimate sources. Davies was managing director of the trust company at the time of his first visit to California and was a director of the Isle of Man bank at the time of his later visits to this state. Connolly was employed by the trust company at the time of his visit to California and was also a director of the Isle of Man bank at that time. McGee was managing director of the Isle of

8

Man bank at the time of his visit to this state. Although Connolly was not an employee of the Irish bank at the time, he visited California at the request of the Irish bank and in furtherance of the common interests of the three entities.

The business cards handed out by Davies and Connolly exemplified the close relationship among the three entities for purposes of the leveraged investments. Davies's card bore an Anglo Irish Bank logo yet identified him as managing director of the trust company. Connolly's card bore the same logo and identified him as 'Head of Offshore Trust Operations' for the Irish bank, although he was not formally employed by the Irish bank at the time.

In our view, reliance on state substantive law of agency and alter ego to determine the constitutional limits of specific personal jurisdiction is unnecessary and is an imprecise substitute for the appropriate jurisdictional question. The proper jurisdictional question is not whether the defendant can be liable for the acts of another person or entity under state substantive law, but whether the defendant has purposefully directed its activities at the forum state by causing a separate person or entity to engage in forum contacts. That constitutional question does not turn on the specific state law requirements of alter ego or agency, although the inquiry may be similar in some circumstances. [Citations omitted].

Davies, Connolly, and McGee visited California for the purpose of engaging in economic activity with California residents. Contrary to Petitioners' argument that they only sought to satisfy Isle of Man's 'know your customer' requirements, the purpose of satisfying those requirements was to make the leveraged investments possible. They discussed leveraging 'with profit bonds' with the Brars and other potential investors during the visit by Davies and Connolly in March 2000, McGee's visit a few months later, and Davies's visit in May 2001. Through those visits, they succeeded in garnering millions of dollars in investments from California residents.

The evidence supports the conclusion that in doing so, the individuals acted not only on behalf of their employers, the Isle of Man bank and the trust company, but also on behalf of the Irish bank. Connolly testified in his deposition that he visited California to meet with potential investors at the specific request of the Irish bank, which relied on his experience and expertise both in evaluating the prospective clients and in answering any questions regarding the leveraged investments. Moreover, Connolly's business card identifying him as 'Head of Offshore Trust Operations' for the Irish bank and the need to obtain approval from the Irish bank to make the loans are further evidence that Connolly in particular was acting on behalf of the Irish bank as well as the other entities.

9

Accordingly, we conclude that the Irish bank, the Isle of Man bank, and the trust company purposefully directed their activities at California residents by and through the individuals who visited California on their behalf. We conclude further that Petitioners, and each of them, purposefully derived benefit from their activities in California and deliberately engaged in significant activities within this state, and that they therefore purposefully availed themselves of forum benefits." (Id. at 981-984).

*Relatedness Argument*

"[T]he relatedness requirement is satisfied if 'there is a substantial nexus or connection between the defendant's forum activities and the plaintiff's claim.' (Vons, *supra*, 14 C.4th at 456)." Id. at 1068. There is such a nexus. Here, Ps claims are based on alleged misrepresentations made by Defendants Unternaehrer and Walle on behalf of all the corporate Defendants, Unternaehrer himself and Defendant Smeets, during multiple meetings with Plaintiff Cormans in CA, in an effort to solicit business from Plaintiffs Cormans, who are CA residents. The solicitation was aimed at inducing the Cormans to move millions of dollars of their investments into Citco-controlled funds. As referenced above, the harm that resulted to the Plaintiffs in Anglo Irish Bank was in their alleged loss of approximately $2 million of their initial investment, which had come from funds that they had previously moved to an offshore trust. As a result of the California meetings, Unternaeher (on behalf of the Citco entities as well as Christoffel Smeets) reached agreement for Citco, Smeets, and Unternaeher to manage Plaintiff's money and investments. Plaintiffs state, "[s]imilarly, here, the harm alleged—the Cormans' loss of an estimated $55-60 million dollars (initially held in their offshore entities Nebula and Emerald City, and later in the British Virgin Islands company, Pasig, set up by Citco) relates directly to all of Defendants' activities in California and misrepresentations made to them in California." ((Ps' Combined Opposition, 52:1-5).

*Fair and Reasonable*

Finally, "[i]n determining whether the exercise of jurisdiction would be fair and reasonable,...a court must consider (1) the burden on the defendant of defending an action in the forum, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining relief, (4) '"the interstate [or international] judicial system's interest in obtaining the most efficient resolution of controversies,"' and (5) the states' or nations' shared interest '"in furthering fundamental substantive social policies."' (Asahi, *supra*, 480 U.S. at p. 113.). 'These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. [Citations.] On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." (Burger King, *supra*, 471 U.S. at p. 477.)." Anglo Irish, *supra*, 165 C.A.4th at 979-980.

Here, it is evident to the court that Unternaeher came to California at the behest of Smeets and Citco entities to secure from California residents the agreement to control and

10

manage the Corman's vast property interests in various funds. Citco entities, Unternaeher, and Smeets advice led to the restructuring of property holdings and to formation of *certain* entities such as Pasig, Inc. The property and entities holding funds and property are held in various locations, but the nexus of control is with the Cormans here in California and the effects of the mismanagement and other alleged wrongdoing have their effect in California. To require Mr. Corman, a man of advanced age and poor health to pursue this litigation in another jurisdiction would in effect defeat the ability of the Cormans to recover their lost property. For defendants, it would not appear to impose any greater burden on them to defend this case in this or any number of other possible locations. It would appear just and proper to require the defendants to defend the case in California since they gleaned substantial financial benefits from the contracts and agreements reached in California to manage the Corman interests.

MOTION #2— UNTERNAEHRER'S MTQ

Unternaehrer's motion is DENIED for the reasons set forth above.

MOTION #3—SMEETS' MTQ

Smeets' motion is DENIED for the reasons set forth above.

MOTION #4—PLAINTIFFS' MOTION FOR PREFERENCE IN TRIAL SETTING

Plaintiffs move this court, per CCP §36a, for an order granting preference and setting of trial in the above-entitled action within 120 days. Roger Corman (hereinafter, "Roger") is 89 years old and there is substantial medical doubt that he will survive beyond 6 months.

CCP § 36 states, in pertinent part, as follows:

> "(a) A party to a civil action who is over 70 years of age may petition the court for a preference, which the court shall grant if the court makes both of the following findings:
> (1) The party has a substantial interest in the action as a whole.
> (2) The health of the party is such that a preference is necessary to prevent prejudicing the party's interest in the litigation...
> (d) In its discretion, the court may also grant a motion for preference that is accompanied by clear and convincing medical documentation that concludes that one of the parties suffers from an illness or condition raising substantial medical doubt of survival of that party beyond six months, and that satisfies the court that the interests of justice will be served by granting the preference...
> (f) Upon the granting of such a motion for preference, the court shall set the matter for trial not more than 120 days from that date and there shall be no continuance beyond 120 days from the granting of the motion for preference except for physical disability of a party or a party's attorney, or upon a showing of good cause stated in the

11

record. Any continuance shall be for no more than 15 days and no more than one continuance for physical disability may be granted to any party..."

Plaintiffs seek preference pursuant to subsections (a) and/or (d):

<u>Subsection (a)</u>

"Parties who are 70 years of age or older...may be entitled to preference if they establish to the court's satisfaction that: • they have a 'substantial interest in the *action as a whole*'; and • their health is "such that a preference is *necessary to prevent prejudicing* the party's interest in the litigation." [CCP § 36(a), (c)(2) (emphasis added)]." Weil & Brown, supra, at ¶ 12:246. "Trial priority is not mandatory and absolute merely because one of the parties is age 70. The court has *discretion* to determine the *extent* of that party's interest and of any risk of that party's death if trial is delayed." <u>Id.</u> at ¶ 12:246.1 (emphasis theirs).

"A declaration supporting a motion for §36(a) preference "may be signed by the attorney for the party seeking preference *based upon information and belief* as to the *medical diagnosis and prognosis of any party*." [CCP § 36.5 (emphasis added)]." <u>Id.</u> at ¶ 12:247.

"The attorney's declaration can consist entirely of hearsay and conclusions! — For example: 'Based on discussions with my client's doctor, I am informed and believe that my client suffers from arteriosclerosis, that her mental and physical condition is constantly deteriorating, and that she will be unable to testify competently unless trial is set within the next 120 days.'" <u>Id.</u> at ¶ 12:247.1. "The attorney's declaration cannot be used for any other purpose (see CCP § 36.5). Even so, it is an exception to the normal rule that declarations must contain *admissible evidence*, not hearsay or conclusions." <u>Id.</u> at ¶ 12:247.2 (emphasis theirs). "Competent evidence is still required as to the *party's age* (e.g., declarations by party or admissible records showing he or she is over age 70). The attorney's affidavit is *not* sufficient for this purpose." <u>Id.</u> at ¶ 12:247.3 (emphasis theirs).

Defendants do not dispute that Roger is over the age of 70 (a fact which is contained within the Declaration of Dr. Gregg C. Fonarow; hereinafter, "Fonarow"), nor that preference is necessary to prevent prejudicing Roger's interest in the litigation; rather, they contend that Roger does not have a substantial interest in this case, because "Pasig is the only real party in interest in the case" and Roger "lacks standing to sue on behalf of Pasig." However, this argument rests on the faulty premise that Plaintiff Roger's only interest in this case is as a "shareholder" of Pasig and that he has no standing to bring an individual claim. This argument is both factually and legally incorrect. First, the Complaint in this case in part relates to wrongful conduct that pre-existed the formation of Pasig, Inc. This contention is incorrect:

In <u>Sutter v. General Petroleum Corp.</u> (1946) 28 C.2d 525, P, an individual, was induced by Ds to take over an oil and gas lease and to use certain oil drilling equipment by Ds' misrepresentations. P formed a corporation and the corporation entered into Ks for the

12

equipment. Ds were thereafter unable, contrary to their promise, to obtain the consent of the state to an assignment to P's corporation of the lease. The trial court determined that there was no injury suffered by P, and that all of the injury was suffered by the corporation. The CA Supreme Court, en banc, reversed and held:

"Generally, a stockholder may not maintain an action in his own behalf for a wrong done by a third person to the corporation on the theory that such wrong devalued his stock and the stock of the other shareholders, for such an action would authorize multitudinous litigation and ignore the corporate entity. Under proper circumstances a stockholder may bring a representative action or derivative action on behalf of the corporation. [Citations omitted]. But 'If the injury is one to the plaintiff as a stockholder and to him individually, and not to the corporation, as where the action is based on a contract to which he is a party, or on a right belonging severally to him, or on a fraud affecting him directly, it is an individual action. ... The action is derivative, i.e., in the corporate right, if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent the dissipation of it's assets.' (Fletcher Cyc. Corps. (perm. ed.) § 5911.) (See Shenberg v. De Garmo, 61 C.A.2d 326.) And a stockholder may sue as an individual where he is directly and individually injured although the corporation may also have a cause of action for the same wrong. (Coronado Development Corp. v. Millikin, 175 Misc. 1; Hammer v. Werner, 239 App.Div. 38; Witherbee v. Bowles, 201 N.Y. 427; Von Au v. Magenheimer, 110 N.Y.S. 629, Aff'd, 196 N.Y. 510; Stinnet v. Paramount-Famous Lasky Corp. (Tex.Com.App.), 37 S.W.2d 145; White v. First Nat. Bank, 252 Pa. 205 [97 A. 403]; Brachman v. Hyman, 298 Mich. 344 [299 N.W. 101]; 18 C.J.S. Corporations, § 559.)

In the instant case the essence of plaintiff Sutter's charge is that by reason of the fraudulent representations of defendants, he was induced to do several things, namely, abandon his own oil development projects, devote his time to the project whereby the steel island and other facilities would be used and *to form and invest in a corporation* (the Development Company) to carry on the new oil production project. The formation of the Corporation and investing therein was only one of the several things which he did in reliance upon defendants' representations. The fraud was committed by defendants, and plaintiff Sutter took steps in reliance upon the misrepresentations including the formation of the Development Company *before that company was formed.* The tort was completed except as to the injury suffered. It is true that the promises made by defendants with no intent to perform were to run also to the Development Company when formed and that company and its successor Rincon Company were to use the defective island. In that fashion the defect in the island and the failure to perform the promises injured the Development Company and Rincon Company but there was also a direct individual injury to plaintiff Sutter, and,

13

as we have seen, the dual nature of the injury does not necessarily preclude an action by the stockholder as an individual. Defendants, by their promises and representations induced plaintiff to form the corporation and invest his money therein, and then breached their duty of honest dealing with him. By way of damages plaintiff Sutter asserts that because of the false representations he invested $33,440 in the venture and the Rincon Company, and that as the result of the fraud of defendants the stock in the Rincon Company became valueless.

While ordinarily a stockholder may not sue individually for impairment of a corporation's assets rendering the stock worthless, yet here that result is merely one method of ascertaining the amount of damages suffered by Sutter. He lost his investment which was represented by the stock, and its reduction in value would be the extent of his loss. The damages all flowed from the tort of defendants." Id. at 530-531 (emphasis theirs).

Here, the claims asserted by Ps allege individual injury to Ps Cormans themselves, not exclusively to P Pasig, and based upon conduct before P Pasig existed and upon which P Cormans were induced to agree that Ds could form Pasig. P Pasig, in fact, did not exist until 2002, six years after D Unternaehrer and Rupert Walle visited CA to solicit Ps Cormans' investments with Citco and made representations to induce their investment. (Complaint, ¶¶ 19, 20 and 26). P Pasig, moreover, was created at D Unternaehrer's urging. (Id., ¶ 26). Ps allege that they "entrusted their funds to Citco; the Cormans gave broad authority to Citco to invest their funds; the Cormans relied on Citco's advice and representations; the Cormans were vulnerable to Citco and depended on Citco; Citco held itself out as and was an investment partner with the Cormans; Defendants voluntarily and knowingly undertook to act on behalf of and for the benefit of the Cormans." (Complaint, ¶ 45). They also bring claims arising from Ds' misrepresentations made at the time Ds induced Ps Cormans to invest in Citco's fund and Ds' breach of Ks entered into with Ds Corman to induce them to invest. (Id., ¶¶71-127). These are all claims based on Citco's duties to Ps Cormans and Citco's activities directed at Ps Cormans. Ps' claims arise from Ds' actions in inducing Ps Cormans to invest with Citco and the promises they made to Ps Cormans at that time.

Preference, then, is granted on the basis of CCP §36(a).

Subsection (d)

"In addition, the court in its *discretion*, may grant a trial setting preference where there is "clear and convincing" evidence that one of the parties suffers from an illness or condition 'raising *substantial medical doubt of survival ... beyond 6 months.*' [CCP § 36(d) (emphasis added)]." Id. at ¶ 12:251.

"The evidentiary burden is much less when preference is based on CCP § 36(a) (party over age 70). It is sufficient for the moving party's *attorney* to state a medical diagnosis based on information and belief (CCP § 36.5). Such declarations are clearly *not*

14

enough for a preference under §36(d); i.e., competent *medical* testimony is required." Id. at ¶ 12:251.1 (emphasis theirs).

Fonarow's declaration is conclusory; it does not provide this court with the "clear and convincing evidence" required to afford preference under subsection (d). This determination, of course, is ultimately of no significance, inasmuch as preference is warranted under subsection (a).

### Conclusion

Therefore, the specially appearing defendants' motions to quash on the basis of lack of personal jurisdiction are DENIED and the plaintiffs' motion for preference in trial setting is GRANTED. Specially appearing defendants to appear within 15 days.

IT IS SO ORDERED:

*Frederick C. Shaller*

Frederick C. Shaller, Judge

NOV 0 4 2015

15